JDB/JAG
F.#2004R01353

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against - 04 CR 911 (JS)

ALPHONSE PERSICO, et al.,

Defendants.

- - - - - - - - - - - - - - - - - X

GOVERNMENT'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANTS' POST-TRIAL RULE 29 MOTIONS

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

JOHN D. BURETTA
JEFFREY A. GOLDBERG
Assistant U.S. Attorneys

TABLE OF CONTENTS

PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . 1

STANDARD OF DECISION. . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS. . . . . . . . . . . . . . . . . . . . . . . . . 4

I. Persico’s Strong Motive to Kill Cutolo. . . . . . . . . . . . 4

II. The Defendants Orchestrated Cutolo’s Murder. . . . . . . . . 6

III. The Defendants’ Post-Murder Conduct and Admissions. . . . 14

A. The Defendants’ Scavenging. . . . . . . . . . . . . . . 14

B. The Defendants’ Lack of Investigation. . . . . . . . . 15

C. The Defendants’ Admissions. . . . . . . . . . . . . . . 17

IV. The Defendants’ Witness Tampering. . . . . . . . . . . . . . 22

A. Persico’s Knowledge of the Federal Government’s Grand Jury Investigation of His Participation in Cutolo’s Murder. . . . . . . . . . . . . . . . . . . . . 22

B. The March 28, 2000 Tampering by DeRoss at Persico’s Direction. . . . . . . . . . . . . . . . . . 23

C. The March 30, 2000 Meeting with Persico’s Investigator. . . . . . . . . . . . . . . . . . . . . . 28

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

I. The Evidence Was More than Sufficient to Sustain the Jury’s Verdict as to Count One (Cutolo Murder). . . . . . 31

A. Elements of the Offense. . . . . . . . . . . . . . . . 31

B. The Government Was Not Required to Prove the Method and Manner of Cutolo’s Death. . . . . . . . . . 33

C. The Defendants Fail to Defer to the Jury in Assessing Witness Credibility and Conflicts in Testimony. . . . . . . . . . . . . . . . . . . . . . . 34

D. The Cases Cited by Persico Are Distinguishable or Do Not Support His Motion. . . . . . . . . . . . . . . 37

II. The Evidence Was More than Sufficient to Sustain the Jury's Verdict as to Counts Five and Six (Witness Tampering). . . . . . . . . . . . . . . . . . . . . . . 45

A. Elements of the Offense. . . . . . . . . . . . . . . . 45

B. The Evidence Established a Specific Intent and Agreement to Intimidate. . . . . . . . . . . . . . . . 46

C. The Evidence Established a Connection Between the Obstruction and an Actual or Potential "Official Proceeding". . . . . . . . . . . . . . . . . . . . . . 49

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . 55

PRELIMINARY STATEMENT

The government respectfully submits this memorandum in response to the March 28, 2008 motions of acquittal filed by the defendants Alphonse Persico and John DeRoss. At the conclusion of a six-week trial, the jury found both defendants guilty of participating in the 1999 murder of William Cutolo, and of tampering in 2000 with witnesses who could testify against them, namely Cutolo's wife and two of his children.

Both defendants make essentially the same arguments. First, they contend that despite the jury's verdict, this Court should enter a judgment of acquittal as to the Cutolo murder because, in the defendants' view, there allegedly was insufficient evidence presented at trial that Cutolo was in fact killed, and insufficient evidence that the defendants were involved in his murder. Second, the defendants assert that there was insufficient evidence to support the jury's verdict as to the witness tampering counts. For the reasons set forth below, the defendants' motion are without merit and should be denied.

STANDARD OF DECISION

Pursuant to Rule 29(c) of the Federal Rules of Criminal Procedure, a district court may enter a judgment of acquittal following a jury's guilty verdict only if "no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003). A defendant challenging the sufficiency of the evidence

against him "bears a very heavy burden," United States v. Scarpa, 913 F.2d 993, 1003 (2d Cir. 1990); United States v. Rodriguez, 702 F.2d 38, 41 (2d Cir.1983), and must demonstrate that "no rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." United States v. Leslie, 103 F.3d 1093, 1100 (2d Cir. 1997). See also United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003).

A "court may grant a judgement of acquittal only if it is convinced that 'the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" United States v. MacPherson, 424 F.3d 183, 187 (2d Cir. 2005); United States v. Canady, 126 F.3d 352, 356 (2d Cir. 1997) (explaining that a court "must affirm the conviction so long as, from the inferences reasonably drawn, the fact finder might fairly have found guilt beyond a reasonable doubt").

In reviewing a challenge under Rule 29, the Court must view the trial evidence "in the light most favorable to the government." Canady, 126 F.3d at 356 (citations omitted); United States v. Weiss, 930 F.2d 185, 191 (2d Cir. 1991). Indeed, "[m]atters of the choice between competing inferences, the credibility of the witnesses, and the weight of the evidence are within the province of the jury, and [the Court is] not entitled to second-guess the jury's assessments." United States v. Rea,

958 F.2d 1206, 1221-22 (2d Cir. 1992); see also United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000) ("[A] court must be careful to avoid usurping the role of the jury."); United States. v. Guadagna, 183 F.3d 122, 129 (2d Cir. 1999) (reviewing court may not substitute its judgment for that of the jury). In addition, the Court must review the evidence offered at trial "as a whole, not in isolation." Canady, 126 F.3d at 356 (quoting United States v. Podlog, 35 F.3d 699, 705 (2d Cir. 1994)).

Lastly, it is well-settled that a court "must defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." United States v. Bala, 236 F.3d 87, 93-94 (2d Cir. 2000); see also United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). Even the uncorroborated testimony of a single cooperating witness is sufficient to sustain a defendant's conviction. Hamilton, 334 F.3d at 179 (citing United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993); Sanchez, 969 F.2d at 1415 (testimony of cooperating witness alone was sufficient foundation for conviction). "Any lack of corroboration goes only to weight of the evidence, not to its sufficiency." Hamilton, 334 F.3d at 179.

STATEMENT OF FACTS

The evidence presented at trial convincingly demonstrated the defendants' participation in murdering Cutolo, including: evidence of direct admissions of guilt by both defendants; motive evidence as to both defendants; opportunity evidence as to Persico; and specific acts by both defendants following Cutolo's murder establishing their guilt, including, among other things, their tampering with witnesses who had knowledge of their participation in the murder.

A summary of the evidence in this regard is set forth below in a chronological format.

I. Persico's Strong Motive to Kill Cutolo

The government proved at trial that in the early 1990s an internal battle erupted within the Colombo family. This "Colombo War" arose when the crime family splintered into two factions — one aligned with official boss Carmine Persico ("the Persico faction") and one loyal to acting boss Victor Orena ("the Orena faction"). (T 1275). Cutolo was central to the dispute — he was one of the most powerful members fighting against the Persicos — and was frequently accompanied by bodyguards. (T 287, 682-83, 1267, 1277, 3767). Trial testimony established that the war was extremely violent, resulting in numerous murders and attempted murders. Approximately 12 men were killed, with victims on both sides. (T 1277-78, 1791-92).

The evidence also showed that after the violence of the Colombo War subsided and Alphonse Persico was released from prison, he continued to be concerned that Cutolo might seek to take control of the Colombo family. Former Gambino captain Michael DiLeonardo described how he warned Persico, several months before Cutolo's murder, of Cutolo's mob ambitions:

> Q. Did you ever express concerns to Alphonse Persico about Billy Cutolo?
>
> A. Yes. There was one time we had a meeting in . . . Dyker Park, I believe, and like I said, I liked Allie [Persico] very much, and not that I disliked Billy [Cutolo], but Billy was very difficult. And from my perception from what I was seeing, <u>I took a shot with Allie, and told him that Bill has boss mentality.</u>

(T 1821-22; emphasis added). DiLeonardo further testified that Cutolo was a "threat" to Persico — "I think [Cutolo] would have killed [Persico]. I know he would have killed Allie [Persico] in time." — and that Cutolo was not someone who would ever accept being shelved; Cutolo would have to be killed. (T 1822-23).

The evidence at trial established that by May 1999, Persico had to act upon his concerns. Earlier that year, in February 1999, Persico was arrested in Florida on gun possession charges, and was about to be sent back to prison. (T 3668-69, 3921).

## II. <u>The Defendants Orchestrated Cutolo's Murder</u>

The evidence of the defendants' activities leading up to Cutolo's disappearance also established that they were responsible for his murder.

First, former Colombo soldier Joseph Campanella, who was known by the defendants to be close to Cutolo, testified that several weeks before Cutolo's disappearance he was approached by DeRoss on their way to a sit-down, and DeRoss asked him about murdering Cutolo:

> Q. When you met Jack DeRoss . . . what did you discuss?
>
> A. We just — I said hello to Jack. I was just getting ready to get into the meeting. And we was just basically having a little conversation about going through what we were going to do at the sit-down. And then as we were going through the meeting, <u>Jack DeRoss asked me how I feel about killing Wild Bill [Cutolo].</u>
>
> Q. When DeRoss asked you how you would feel about killing Wild Bill [Cutolo], what was Jackie DeRoss's demeanor?
>
> A. <u>He was serious.</u>

(T 1291-92; emphasis added). Campanella testified that he was "shocked" by DeRoss's comment, and that Campanella did not want to kill Cutolo. (T 1292).

DeRoss also revealed to former Colombo associate Giovanni Floridia that DeRoss was involved in the developing plot

to kill Cutolo. Floridia explained that Cutolo had "taxed" Floridia for lying about how much loanshark money Floridia had outstanding on the street, and that just before Cutolo disappeared Cutolo had directed Colombo associate Paul Rizzuto to slap Floridia for not paying the tax. (T 2283-87). Immediately after the confrontation with Rizzuto, Floridia reported the incident to Colombo soldier Vincent "Chickie" DeMartino. (T 2287-88). DeMartino then himself signaled to Floridia that Cutolo's murder was imminent:

> A. Chickie tells me, "Listen, don't worry about it. [Cutolo] is not going to be around much longer. I'm going to call Jackie [DeRoss], and I want you to tell him exactly what happened. And you're going to meet him and tell him exactly what happened."

(T 2289; emphasis added). At the ensuing meeting between DeRoss and Floridia, DeRoss revealed to Floridia that Cutolo was going to be killed:

> A. [DeRoss] grabbed me by the arm and he told me, "Don't worry about it. Things are going to change. Stick with Chickie [DeMartino]. Keep doing what you're doing."
>
> Q. When Jackie DeRoss grabbed you by the arm and said, "Don't worry about it. Things are going to change," what did you understand him to mean?
>
> A. Well, then, my understanding was that they were going to whack Billy Cutolo]; "things are going to

> change." Chickie just told me that, you know, "he ain't going to be around much longer," and now I have Jackie telling me that . . . "things are going to change." So, you know, I'm thinking that something is happening. You know, I'm thinking that something is going to happen to Billy.

Q. And what was Jackie DeRoss's demeanor when he told you that, that "things are going to change, to stick with Chickie"?

A. Well, [DeRoss] was serious. . . .

(T 2291-92; emphasis added).

The evidence at trial showed that Persico and DeRoss ultimately decided against including Campanella in the murder plot, and that Persico himself lured Cutolo to his May 26, 1999 death. On May 25, the day before the murder, Persico — who had traveled to New York from Florida — paged Cutolo twice at 11:18 a.m., and again at 11:25 a.m. (GX 69).[1] Seven minutes later, at 11:32 a.m., Cutolo returned the page by calling 888-943-1762, a pager used by Persico. (GX 70C).[2]

---

[1] The government will file the exhibits cited herein under separate cover.

[2] This 888-943-1762 number, along with the notation "Al," was on a piece of paper written by Cutolo and found in Persico's apartment during a search in October 1999, a few months after Cutolo's disappearance. (GX 57). Moreover, the number 888-943-1762 with the "Al" notation was also in Cutolo's electronic organizer. (GX 53). Further proof that Cutolo referred to Persico as "Al" was found in Cutolo's leather organizer. On a page titled "Don't Forget," Cutolo had listed certain individuals' birthdays. Included on the list was "Al, February

Contrary to Persico's claims, Persico's three pages to Cutolo on May 25, the day before his murder, were not "proven to be quite ordinary." (Persico Br. at 11, 31-32). Rather, they constituted powerful evidence that it was Persico who was behind Cutolo's disappearance and murder. First, although it is true that Persico had paged Cutolo in the past, he paged Cutolo only once from his Romantique Limousines cell phone in the six weeks preceding the May 25 pages. (GX 69). Second, Persico's May 25 pages were immediately followed by Cutolo's disappearance. Third, Persico never paged Cutolo after Cutolo's May 26 disappearance. (GX 69). The jury was entitled to draw the logical inference that Persico never attempted to page Cutolo after May 26 because — consistent with the other evidence presented during the trial — Persico had orchestrated Cutolo's murder, and so paging him thereafter would serve no purpose.[3]

The evidence also showed that not only did Persico and Cutolo page each other on May 25, but they also spoke that day. Phone records showed that Cutolo was paged at 2:16 p.m. from a payphone located at the Dyker Beach Golf Course, which was walking distance from Persico's bagel store. (GX 73, 191). At

8th." (GX 133). Persico's birth certificate showed that he was born on February 8, 1954. (GX 155).

[3] Persico did not even attempt to page Cutolo after Persico was approached on June 1 by Special Agent John Sheehan, who told Persico that Cutolo was missing. (T 2167, 2169; GX 69).

2:18 p.m. — just two minutes after being paged — Cutolo called the payphone, but he was apparently unable to get through. Over the next eight minutes he called the payphone several times. At 2:26 p.m., Cutolo was finally able to connect to the person at the payphone, and the records indicate the call last more than two minutes. (GX 70C). Cell site records showed that at the time Cutolo was receiving pages from and placing calls to the Dyker Beach Golf Course payphone, Persico's cell phone was in the vicinity of the Dyker Beach Golf Course. (T 3977-78; GX 176A-B, 205).[4]

The government also established what was discussed between Persico and Cutolo — that Persico and Cutolo had planned to meet that day, May 25, but that Persico postponed the meeting to the following day, May 26. Betty Anne Fox, Cutolo's girlfriend, testified that she and Cutolo cooked dinner together

[4] Persico correctly notes that the phone records appear to indicate that Persico's cell phone was in use at 2:26 p.m., when Cutolo began speaking with the person at the payphone. (GX 69, 70C; Persico Br. at 12-13). Indeed, Persico highlighted these overlapping phone records to the jury in summation, arguing that they proved that Persico could not have possibly been the person communicating with Cutolo from the payphone. (T 5743). In rebuttal, however, the government made the unremarkable observation that — far from being a "highly improbable event," (Persico Br. at 13) — it is quite common for a person to be on his or her cell phone at the same time that he or she receives a call on another nearby phone (or vice versa). (T 5937). The jury in this case was entitled to reject Persico's "overlapping phone call" defense.

at Fox's home on May 25. (T 4569). That evening, Fox and Cutolo discussed Cutolo's schedule for the next day, May 26:

> A. [H]e had an appointment the next day [May 26]. So we couldn't make any plans of our own because of an appointment he missed that day [May 25].
>
> . . .
>
> Q. So there was an appointment that had been missed that day [May 25], and it was pushed to the next day [May 26]?
>
> A. Yes.
>
> Q. What was Billy [Cutolo]'s mood about having this meeting missed on Tuesday [May 25], moved to Wednesday [May 26]?
>
> A. He wasn't happy about it. It interfered with our schedule and other things that he had to do.

(T 4571-72).[5] After setting up the lure, later that day Persico called Barry Levin to arrange for his May 26 alibi. (T 3658; GX 69).

The evidence showed that on May 26, the day of the murder, Cutolo reported to the location at which he would typically meet with Persico, and that he was never seen or heard

---

[5] Cutolo's leather organizer provided further evidence that during the call between Cutolo and Persico earlier that day, Persico had informed Cutolo that they would meet the next day, May 26. On the calendar page for May 26, Cutolo had written down an appointment in White Plains, but that meeting was crossed out, indicating that it was canceled. (GX 133).

from again. Kathleen Joseph, who worked with Cutolo at Local 400 in Manhattan, testified that Cutolo arrived at the union office on May 26 at around 11:00 a.m., but then left about 30 minutes later. (T 3709-10).[6] She further testified that Cutolo had said he was not coming back that afternoon, but that he would call her before she left for the day. (T 3711). Joseph also explained that Cutolo was upset:

> Q. What was [Cutolo's] mood that day?
>
> A. He seemed sort of upset. He wasn't his usual self. He did not seem happy. There's something wrong. He didn't appear to be the way he used to be, usually was.

(T 3711). Cutolo never did call Joseph before she left work that day, and she never saw or heard from him again. (T 3711).

Cutolo's wife, Marguerite Cutolo, testified that she spoke with her husband on May 26 at approximately 12:00 p.m. or 12:30 p.m., and that he told her that he had to go to Brooklyn to meet "The Kid," one of Persico's nicknames. (T 563, 567, 1051).[7]

---

[6] Parking records for Cutolo's vehicle showed that he arrived at the union around 11:10 a.m. and exited at approximately 12:40 p.m. (GX 47).

[7] Persico claims that the phone records "failed to corroborate this assertion," (Persico Br. at 9-10), noting that they show Cutolo calling the Cutolo home at 1:11 p.m. (GX 70A). Because Cutolo had already left the union offices by then, and because Marguerite Cutolo said she understood Cutolo to be calling her from the union, Persico suggests that Marguerite Cutolo's account of a phone call was a complete fabrication. (Persico Br. at 10). Under Rule 29 analysis, however, "[a]ny lack of corroboration goes only to weight of the evidence, not to

Marguerite Cutolo further testified that when Cutolo and Persico would usually meet at a secluded spot near the intersection of the 92nd Street and Shore Road, in Brooklyn. (T 567-68).

Joseph Gorga, a mechanic, testified that Cutolo arrived at his shop on May 26 at approximately 2:45 p.m., and that Cutolo asked Gorga to drive with Cutolo to a certain location. (T 215-16). At around 3:15 p.m., Cutolo and Gorga drove in Cutolo's vehicle to 92nd Street and Shore Road, where Cutolo exited the vehicle, and then Gorga drove it back to his shop. (T 216-19). Although Cutolo told Gorga he would see Gorga "later," Cutolo never returned to the shop that day, and Gorga never saw or heard from him again. (T 211, 219).

Phone records indicated that at 4:29 p.m. that day — a short time after Cutolo was dropped off at the Cutolo-Persico meeting location — Persico called 516-957-5900, in Lindenhurst, Long Island. (GX 69). Federal agents testified that 516-957-5900 belonged to a phone at the Surfside Marina, and Special Agent Gary Pontecorvo testified that there were no logs or records maintained by that marina concerning the movement of boats in and out of the facility. (T 4422, 5334, 5374). Giovanni Floridia testified that after Cutolo's murder, Vincent

---

its sufficiency." Hamilton, 334 F.3d at 179. Moreover, the jury, of course, was entitled to draw the reasonable inference that Marguerite Cutolo simply remembered the call to be slightly earlier than 1:11 p.m., and that she assumed Cutolo was calling from his office.

DeMartino would from sometimes comment on Cutolo's disappearance: "You know, that cocksucker got everything he deserved. They're never going to find him." (T 2297; emphasis added).

III. The Defendants' Post-Murder Conduct and Admissions

The defendants' conduct and statements after Cutolo's disappearance constituted further evidence that Cutolo was killed and that the defendants were involved in his murder.

A. The Defendants' Scavenging

Almost immediately after Cutolo went missing, Persico and DeRoss began an intense search for Cutolo's money — both money he had in his home and money owed to him by others. Both Marguerite Cutolo and Barbara Jean Cutolo testified that DeRoss came to the Cutolo home and brazenly demanded Cutolo's money and records. (T 299-300, 569-70). This testimony constituted powerful evidence that DeRoss participated in Cutolo's murder, because DeRoss, who at the time was lower in rank than Cutolo, would never have dared to engage in such acts of disrespect if he thought that Cutolo might still be alive. Persico and DeRoss also began to determine who owed Cutolo money, and how much. (GX 56, 58-60). Again, the jury was entitled to make the logical inference that unless Persico and DeRoss participated in Cutolo's murder, they would not have taken such actions.

Kathleen Joseph, from Local 400, also recounted how just a few days after Cutolo disappeared, Frank Persico (Alphonse Persico's cousin) appeared at the union offices. (T 3713).

Although he was not employed by or otherwise involved in the union, Frank Persico sought to gain access to the union's pension fund:

> Q. What did Frank Persico demand from you?
>
> A. He wanted the names of the actuaries, the attorney, the trustees, the accountant. Everyone involved with the pension fund, all the officers and everyone concerned.
>
> Q. Now, at that time, in 1999, what was the amount of the funds in the pension fund that Frank Persico was seeking information about?
>
> A. $50 million.

(T 3778-89).[8]

B. <u>The Defendants' Lack of Investigation</u>

The evidence at trial also showed that although Cutolo was the official underboss of the Colombo family at the time of his disappearance, Persico — Cutolo's only superior — made no effort whatsoever to locate him, or seek revenge for his murder. This lack of mob investigation was powerful evidence that Persico sanctioned Cutolo's murder.

Cooperating witness Michael DiLeonardo testified that between May 1999, when Cutolo went missing, and June 2002, when DiLeonardo was arrested, Persico never inquired with DiLeonardo

---

[8] After Cutolo's disappearance, Frank Persico also prevented Cutolo's wife, Marguerite Cutolo, from retrieving Cutolo's union office desk. (T 3794).

as to what might have happened to Cutolo, despite the fact that DiLeonardo was the liaison to the Colombo family during that time period. (T 1828). By contrast, DiLeonardo testified explained that in 1986, when then Gambino underboss Frank DeCicco was murdered, the Gambino family went to great lengths to determine who was responsible:

> Q. What, if anything, did the Gambino crime family do to try to find out who had killed the underboss Frank DeCicco?
>
> A. We started calling all the captains, investigating the captains to see if they had anything to do with it, because Paul [Castellano] was killed [before DeCicco] and they wanted to see if there was allegiance to Paul. Sit down and look in their eyes and sit down and find out who did this to Frank, and they did that with other families, put out some inquiries.
>
> Q. What do you mean by "putting out inquiries"?
>
> A. To find out what happened with Frankie, like I said, trying to do some kind of investigation, not with the police, within the Cosa Nostra.
>
> Q. Were there inquiries made to only some families or all families?
>
> A. All the families.

(T 1747-48). The jury was entitled to make the logical inference that the reason Persico did not launch an investigation was because he had Cutolo killed.

C. The Defendants' Admissions

Multiple witnesses testified that the defendants admitted that Cutolo was killed and that they were responsible for his murder.

First, former Colombo soldier Joseph Campanella testified that soon after Cutolo disappeared, Campanella went to DeRoss's home to discuss with him an issue that had arisen with Colombo associate Richard Cappa. (T 1298). When Campanella met with DeRoss, DeRoss revealed to Campanella that Cutolo was killed, and why Persico had him murdered:

> A. I asked [DeRoss] what else is going on. Jackie [DeRoss] just told me the situation with Wild Bill [Cutolo], that Bill had to go, he was getting too powerful. If, when Allie Boy [Persico] went away on a gun charge, Bill would have took over the family. And he would have never gave the family back to Allie Boy. And that Bill had to go. He was too powerful. . . .
>
> Q. When Jackie DeRoss told you that Wild Bill had to go, what did you understand that to mean?
>
> A. That Bill Cutolo was dead.
>
> Q. When Jackie DeRoss told you that The Kid was going away on a gun charge, what did you understand that to mean?
>
> A. Allie [Persico] was going away to prison.
>
> Q. When DeRoss said that Wild Bill would have took over the family,

what did you understand that to mean?

A. That Bill would have just became the acting boss of the family.

(T 1299-1300; emphasis added). In that same conversation, DeRoss disclosed to Campanella his own personal motive for having Cutolo killed: "Jackie was offended that Bill had too much going on. He was offended that Bill's girlfriend [Fox] had a bigger house than he did." (T 1299-1300).

Campanella also testified that, shortly after that meeting with DeRoss, Campanella and DeRoss met with Persico at a house in Brooklyn. (T 1300-01). During that meeting, DeRoss, with Persico sitting right next to him, confirmed that Cutolo was dead:

Q. What did Jack [DeRoss] say?

A. He says that we'll lie no more. <u>Bill [Cutolo] is gone.</u> And he says it would be family business as usual.

(T 1302; emphasis added). During that same meeting, DeRoss told Campanella that any debt he owed to Cutolo was being forgiven. (T 1302).

The defendants also told former Gambino captain Michael DiLeonardo that Cutolo was killed, and that they were responsible. DiLeonardo explained that he had scheduled a meeting with Cutolo at a house in Brooklyn, but when he arrived he only saw Persico and DeRoss:

Q. When you went into the house, what was the first thing you said?

A. Hellos.

Q. What else?

A. I said, "where is he?"

Q. When you said where is he, who [we]re you referring to?

A. Bill [Cutolo].

Q. When you said "where is he," what, if anything, did Jackie DeRoss say in response?

A. "Haven't you heard, he's been missing for a week."

Q. Did [DeRoss] say anything else?

A. And he says, "you will be dealing with us now and everything will be eas[ier]."

. . .

Q. When Jackie DeRoss said, "haven't you heard, he has been missing for a week," who did you understand him to be referring to?

A. Bill [Cutolo].

. . .

Q. Where was Alphonse Persico when Jackie DeRoss said, "haven't you heard, he has been missing for a week?"

A. He was standing maybe a little behind Jack.

. . .

Q. When Jackie DeRoss said [Cutolo] "had been missing for a week," what did you understand Jackie DeRoss to be telling you?

A. <u>That [Cutolo]'s dead.</u>

(T 1824-26; emphasis added).

Likewise, former Bonanno underboss Salvatore Vitale testified that he and Bonanno boss Joseph Massino met with Persico in the fall of 1999, after learning that Cutolo had disappeared. (T 2865). During the meeting, Persico revealed to Vitale why Cutolo was murdered:

Q. What did Allie Boy [Persico] say?

A. <u>He said that "a person can't take what's not his," leading me and Mr. Massino to believe that that's why they killed [Cutolo].</u>

. . .

Q. When Allie Boy said to you "he can't take what's not his," what was Allie Boy's demeanor?

A. Matter-of-factly.

. . .

Q. Did that have a meaning to you regarding the Colombo organized crime family?

A. Yes.

Q. Was there a history behind that that you were aware of?

. . .

A. [The Colombo family was] at war with each other for a period of

time. Other people tried to take the family or to rob the family and that started a war.

Q. When Allie Boy said to you "he can't take what's not his," what did you understand "take" to mean?

A. Take the [Colombo] family.

. . .

Q. When Allie Boy said to you 'he can't take what's not his," did you believe Wild Bill [Cutolo] was alive?

A. No, I believed Wild Bill was dead.

(T 2866-69; emphasis added). These statements by Persico were another direct admission that Persico had Cutolo killed because Persico feared Cutolo was seeking to supplant Persico at the helm of the Colombo family.

Later, DeRoss revealed — this time on tape — the reason why Persico ordered Cutolo's murder. In October 1999, DeRoss attended a meeting with, among others, former Genovese associate Michael D'Urso. Unbeknownst to DeRoss, D'Urso was wearing a recording device. (GX 28B). During the ensuing conversation, DeRoss was recorded saying that "gentlemen [can] work out anything" but that Cutolo "acted like . . . he had his own mob by himself." (GX 28C).

Finally, Colombo associate Giovanni Floridia testified that in 2004, he and DeRoss were housed together in the same unit at the Metropolitan Detention Center, a fact that was

independently established by prison records. (T 3264; GX 136, 148). Floridia explained that, during that period of time, DeRoss admitted he was involved in Cutolo's murder:

> Q. What did Jackie DeRoss tell you about Billy Cutolo's disappearance?
>
> A. That [DeRoss] took [Cutolo] into the family, <u>and he took him out of the family</u>.
>
> Q. And what did you understand him to mean?
>
> A. That [DeRoss] brought [Cutolo] into the family, and <u>he killed him.</u>

(T 2224; emphasis added).

IV. <u>The Defendants' Witness Tampering</u>

Other powerful evidence of the defendants' guilt in orchestrating Cutolo's murder included their tampering with Cutolo's wife and two children once the defendants learned the FBI was investigating Persico's participation in Cutolo's murder.

A. <u>Persico's Knowledge of the Federal Government's Grand Jury Investigation of His Participation in Cutolo's Murder</u>

In October 1999, Persico was arrested by federal authorities and remanded into custody. (T 3946, 3949). The arrest stemmed from Persico's violation of supervised release concerning his pending federal gun case in Florida, in that Persico was residing at a location unknown to his supervised release officer. (T 3949). During the October 1999 bail revocation, the federal government informed Persico that he was a

"target" of the grand jury investigation into Cutolo's murder. (T 3864). In early 2000, in direct response to the government's disclosure of the investigation, Persico, through his counsel, retained private investigator Margaret Clemons. Id.

B. The March 28, 2000 Tampering by DeRoss at Persico's Direction

On March 28, 2000, DeRoss met with Cutolo's wife and two of his children: Marguerite Cutolo, Barbara Jean Cardinale, and William Cutolo, Jr. Cutolo, Jr., who at the time was cooperating with the FBI, recorded the meeting. (GX 67A-B). DeRoss started out his obstructive statements by informing the Cutolo family, "I got a message that the other fella would like to send an investigator." (GX 67B at 4). The "other fella" was Persico. (T 322). DeRoss also explained that the purpose of Persico's investigator meeting with the Cutolos was because "they [the FBI] may be trying to build a case. He [Persico] wants to find out too, what's going on." (GX 67B at 7).

DeRoss then directed the Cutolo family to meet with Persico's investigator,[9] but instructed them not to tell the investigator what they actually believed had happened to Cutolo, or else they, Barbara Jean Cutolo's children (who were five and

[9] DeRoss was particularly emphatic that Marguerite Cutolo — the individual with the most knowledge of Persico's participation in Cutolo's murder — must meet with the investigator. (GX 67B at 5 (Cutolo, Jr.: "Does she [Marguerite Cutolo] have to." DeRoss: "Yes.")).

seven years old at the time), (T 323), and Barbara Jean Cutolo's spouse would suffer, both physically and economically:

> JD: Don't burn any bridges with anybody. Don't show your feelings. What you got in your heart, what you got in your stomach. Talk to the investigator.
>
> MC: You know what I got in my heart.
>
> JD: I know what you got in your heart. I know what you got and I know what I got in my heart too. But what are we going to do about it? We're only pawns. You got little, you got kids here. You got him here. You got her husband that could be called upon at any time and pulled out of that job.

(GX 67B at 6). DeRoss made repeated threats of retaliation in this regard. (See id. at 4 ("if you tell the woman no, people may get bad feelings. And I don't think you should burn any bridges."); id. at 5 ("In this life, listen to me, don't burn any bridges."); id. at 6 ("You understand what I'm telling you babe? You've been, you've been around this life. I don't wanna see you . . ."); id. at 7 ("I wanna do the right thing, but I'm also here worrying over yous like a father."); id. at 8 ("Look [UI] you've got your family. Worry about your family."); id. at 9 ("Her husband, her husband's on the street. Your sister, she may meet a guy. Why have any hard feelings? The family's a nice family.")).

DeRoss also warned that it would be dangerous for the Cutolos to leave Persico with the impression that they would not

do as asked. (See id. at 8 (DeRoss: "I don't wanna see [UI], you're a smart enough kid. I don't want him [Persico] to get any idea." Cutolo, Jr.: No, I don't want him [Persico] to either." DeRoss: "You understand." Cutolo, Jr.: I don't want him [Persico] to either.")).

DeRoss emphasized the importance of lying; when asked what would happen if Marguerite Cutolo made a mistake in talking to the investigator by stating the truth, DeRoss stated that this might not harm Persico, since "the investigator is Allie's investigator," but DeRoss nonetheless conveyed that Marguerite Cutolo would still be in danger, but that DeRoss could engage in damage control: "I'm in a position where I can say listen, I don't want this girl hurt." (Id.).

DeRoss and Cutolo, Jr. later practiced some of the falsities Cutolo, Jr. would tell the investigator:

> WCJ: If they ask me do you know Alphonse Persico . . .
>
> JD: Yeah.
>
> WCJ: . . . I seen him a couple of times, yes I do. Do you think he's a nice fellow? Yeah, I spoke with him a few times, he's very nice. What else can I say? He was my father's friend. Yeah he was. I've seen them together, they're friendly. What am I gonna tell ya's?

(Id. at 11). DeRoss reiterated at this point again the harm that would befall the Cutolo family if they mis-stepped in fabricating a story for the investigator:

JD: I tell yous what to do think of yourself and your family.

MC: I think about my poor husband that's what I think of.

JD: But right now, listen, you can't think about that.

MC: And he'd want you to be smart anyway.

JD: You can't think about that. You gotta think of the kids here. You gotta think about yourself. Try and think of him [Cutolo, Jr.].

WCJ: Think of me.

(Id. at 11-12).

Marguerite Cutolo finally capitulated, agreeing to do as DeRoss directed:

MC: I know, don't worry, whatever you need, you call them up, I get shit.

JD: [UI] you get shit.

WCJ: Of course.

JD: But you know this life.

MC: Yeah, well, it sucks.

(Id. at 12-13).

DeRoss then discussed arranging the meeting with the investigator for the next day. (See id. at 15). DeRoss noted that the investigator had reached out already for DeRoss, but that he did not yet "get back to her." (Id. at 15). DeRoss also stated that he would inform Persico of the Cutolo's decision to meet with the investigator: "I'll get back to him today. And,

uh, tell him you'll be too happy to help. That's my words to him." (Id. at 15).

The Cutolos understood DeRoss's various threats during this meeting to be a directive to them not to disclose truthful information. (T 322 (Barbara Jean Cutolo: "[I]f we didn't listen and tell them what they wanted to hear, then we would have problems later on."); T 324 (Barbara Jean Cutolo: "Don't tell them what we really thought, what happened to my father."); id. (Barbara Jean Cutolo: "We couldn't tell them how we really felt, because it would come back to us by it getting taken out on my husband or my brother."); T 325 (Barbara Jean Cutolo: "To not make any waves, because my husband will get it taken out on him."); T 326 (Barbara Jean Cutolo: "That it can't affect Allie if you talk to her. If you talk to the police about what we actually thought, that it could hurt him."); T 328 (Barbara Jean Cutolo: "To worry about what we say, and just worry about the safety of our family."); T 331 (Barbara Jean Cutolo: "And because if we did, there would be repercussions."); T 331 (Barbara Jean Cutolo: "That if we told them what we really felt, that it would be taken out on my husband or my brother, even my kids."); T 628 (Marguerite Cutolo: Q: Did you provide her [the investigator] with all of the information that you knew at that time? A: No. Q: Why not? A: Because I was told not to. Q: Who told you not to? A: Jackie."); T 631 (Marguerite Cutolo: "Watch what I say. And I couldn't speak the truth."); T 632 (Marguerite Cutolo:

"Keep your mouth shut."); T 633 (Marguerite Cutolo: "That somebody would get hurt. . . . My children. My grandchildren. Me. My son.")).

The defendants' motions emphasize that DeRoss stated at certain points that the Cutolos should "tell the truth." (Persico Br. at 48; DeRoss Br. at 20-21). The jury could reasonably infer, however, that "tell the truth" in this context meant to lie, especially since DeRoss, a senior member of the Colombo crime family, had repeatedly threatened the well-being of the Cutolo family just prior to telling them to "tell the truth." (T 634 (Marguerite Cutolo: "tell the truth" meant "I'm lying. . . . I got to lie, in other words, if I want my family to stay alive.")).

C. <u>The March 30, 2000 Meeting with Persico's Investigator</u>

On March 30, 2000, two days after DeRoss tampered with the Cutolo family, Persico's investigator, Margaret Clemons, met with the Cutolos. Cutolo, Jr. covertly tape recorded the meeting. (GX 68A-B).

Clemons informed the Cutolos at the outset of the meeting that the federal government was investigating Persico's involvement in Cutolo's murder: "The Government has made it very clear that they will do everything possible, they've said this in open court . . . to show that, ah, Alphonse, ah, was somehow responsible for the disappearance of Billy." (GX 68B at 1). Clemons also inquired repeatedly about what information the FBI

appeared to have when the FBI interviewed the Cutolo family shortly after Cutolo's murder. (See id. at 44 (Clemons: "what did they, what was the FBI looking for?"); id. (Clemons: "Did they [the FBI] have questions about people, was he with this one, was he with that one?"); id. (Clemons: "In particular, any questions about Alphonse Persico?"); id. at 46 (Clemons: "Did they [the FBI] ask about cell records, telephone records, anything like that?"); id. (Clemons: "Did they [the FBI] have the information that . . . he had taken the Expedition to, um, the mechanic.?"); id. at 47 (Clemons: "Did they [the FBI] have the information that he, uh gone, been dropped off at 92nd and Shore Roa? Did they [the FBI] seem to have that information."); id. (Clemons: "Did they [the FBI] have any, did they have any questions about . . . meetings with people or anything like that?")).

During the meeting, the Cutolo family — complying with DeRoss's prior intimidating directions — provided false information about Cutolo's murder. Marguerite Cutolo falsely told the investigator that she was not aware of what Cutolo was planning to do the afternoon of the day he disappeared. (See id. at 13 (Clemons: "And as far as you were concerned, he was gonna be there [at the office] all day." Marg. Cutolo: "Mm hmmm."); id. at 14 (Clemons: "And you were unaware of what he had to do for the rest of the day." Marg. Cutolo: "No. I did not hear from him after that."). In fact, she knew Cutolo was going to

meet with Persico. (T 635 (Marg. Cutolo: did not tell investigator truth about knowing Cutolo was leaving his office that afternoon "because I was told not to."); T 636 (Q: Who told you not to? A: Jackie DeRoss.")).

Marguerite Cutolo likewise falsely stated during the meeting with the investigator that 92nd Street and Shore Road — the place Cutolo was last seen alive — had no significance, (GX 68B at 27), when in fact she knew that it was where her husband would meet with Persico, (T 636). At various points during the meeting with the investigator, Marguerite Cutolo struggled not to reveal that she knew Cutolo met with Persico at 92nd Street and Shore Road. (GX 68B at 28 (Clemens: "Is it known who these meetings were with at that location?" Marg. Cutolo: "[UI] somebody does know")). Near the end of the meeting, Marguerite Cutolo volunteered the following: "I gotta say one thing. . . . He [Cutolo] knew who he was meeting that day. Okay? That's my last statement. And he knew who he was meeting. . . . But he knew who he was meeting." (See id. at 56). This was because Marguerite Cutolo was struggling not to disclose her knowledge that Cutolo had been going to meet with Persico. (T 637). Clemons did not follow up to determine what Marguerite Cutolo knew about who her husband was meeting. (T 638).

Barbara Jean Cardinale likewise testified that she did not provide the investigator with all of the information she knew "because I was afraid to," (T 318), and "because I was afraid

that it would come back and I would get in trouble for it,” (T 319).

## ARGUMENT

### I. The Evidence Was More than Sufficient to Sustain the Jury’s Verdict as to Count One (Cutolo Murder)

The defendants first contend that no rational trier of fact could have found the evidence sufficiently proved that they participated in the Cutolo murder, in violation of 18 U.S.C. §§ 1959(a) and 2, as charged in Count One. As noted above, they argue that the evidence was insufficient to establish that Cutolo was in fact killed, and that, if killed, there was insufficient evidence that the defendants were involved in his murder. As demonstrated below, the defendants’ arguments are legally and factually flawed, and therefore their motions should be denied.

#### A. Elements of the Offense

Section 1959(a) states, in pertinent part, that “[w]hoever, . . . for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity, murders . . . in violation of the laws of any State or the United States . . . shall be [guilty of a crime].” In order to prove that a defendant is guilty of § 1959(a), the government must show the following:

> (1) that the organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged [murder],

> and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise.

United States v. Rahman, 189 F.3d 88, 126 (2d Cir. 1999). The defendants in this case appear to concede that the evidence was legally sufficient as to the first, second, third, and fifth elements. They take issue, however, with the sufficiency of the evidence concerning the fourth element — that a murder occurred, and that the defendants participated in that murder. In making their arguments, however, the defendants ignore well-settled Rule 29 standards.[10] As demonstrated in the government's extensive fact section, there was overwhelming evidence of their guilt, including, among many other forms of evidence, specific admissions of guilt by each defendant. Rather than reiterate here that evidence, that government addresses below the basic and fundamental flaws in the defendants' various arguments as to why this overwhelming body of evidence does not survive a Rule 29 challenge.

---

[10] At various points during Persico's argument, he notes that certain evidence was received by the Court "over defendant's objection," (Persico Br. at 5, 13), or "[o]ver vehement objection," (id. at 13), or despite "vigorous[]" objection, (id. at 20; see also DeRoss Mem. at 6). Persico also alleges discovery violations. (See Persico Br. at 10 n.2). While these references may be designed to distract the Court, they are entirely irrelevant to the issue to be decided — whether the evidence presented was legally sufficient.

B. The Government Was Not Required to Prove the Method and Manner of Cutolo's Death

At the outset, the government notes that much of the defendants' insufficiency challenge focuses on the alleged lack of any direct evidence of Cutolo's death itself, such as the lack of evidence as to exact method and manner in which Cutolo was killed, or the lack of any dead body. For example, early in Persico's brief he notes that "no body, means of death or other forensic evidence was ever discovered or introduced at trial." (Persico Br. at 5). Similarly, DeRoss observes that "[t]here was no forensic evidence — no body was ever discovered; no blood or other signs of a struggle were found during the search of the area around 92nd Street and Shore Road." (DeRoss Mem. at 5). He further notes that "there was no witness to the alleged murder or the supposed disposal of Cutolo's body." (Id.).

The Second Circuit, however, has stated that "[i]t is . . . established that a prosecution for murder may succeed without a body having been found or without evidence of the means of death being provided." United States v. Sureff, 15 F.3d 225, 228 (2d Cir. 1994). In United States v. Kwong, 14 F.3d 189 (2d Cir. 1994), for example, the defendant in an attempted murder case asserted that the evidence was insufficient because no eyewitness identified him as the perpetrator. See id. at 193. The Second Circuit rejected this argument: "[T]here is no rule of law that requires identity to be established by an eyewitness.

Identity can be inferred through circumstantial evidence." Id. "Moreover, the absence of any direct evidence that [a defendant] killed [another person] is not dispositive; the prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt." United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002).

C. The Defendants Fail to Defer to the Jury in Assessing Witness Credibility and Conflicts in Testimony

In making their arguments, the defendants also violate a bedrock Rule 29 principle — that a reviewing court "must defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." Bala, 236 F.3d at 93-94. The defendants' submissions are replete with instances in which they ignore this well-settled rule of law.

For example, instead of assuming as true the testimony of Joseph Campanella, Persico seeks to have this Court disregard his account when deciding the Rule 29 motions: "Not only did Campanella have every motive to fabricate given the extensive amount of prison time he faced but for his agreement to cooperate with the government, he was in fact demonstrated to have lied on a critical matter." (Persico Br. at 15). Persico then proceeds to argue, unsuccessfully, that Campanella was "clearly concealing his whereabouts on the very afternoon of Cutolo's disappearance" because although he testified that he did not enter Bruno's barber shop that day, a surveillance agent saw someone (who

Persico believes was Campanella) actually entering the shop. (Id.). Putting aside Persico's mischaracterization of the trial record in an effort to generate this purported inconsistency, Persico's entire argument in this regard violates basic standards of Rule 29 jurisprudence, because it fails to "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." Bala, 236 F.3d at 93-94.

DeRoss also consistently breaks this basic rule. In one glaring example, he urges "total rejection" by this Court of the testimony of Giovanni Florida. (DeRoss Mem. at 14). In support of this sweeping statement, DeRoss makes two arguments. First, DeRoss illogically claims that because the jury acquitted the defendants on the Campanella attempted murder counts, and because Floridia incriminated DeRoss in that crime, then the jury must have concluded that Floridia was lying. (DeRoss Mem. at 14-15). Suffice it to say, however, Floridia did not provide the only evidence of DeRoss's involvement the Campanella shooting and, in any event, we do not know what it is that caused the jury to have reasonable doubt as to DeRoss's culpability. Second, DeRoss contends that Floridia committed perjury when he testified that he fled to New Hampshire because he was fearful of Vincent DeMartino, given that Floridia had also recently been arrested due to a domestic dispute. (DeRoss Mem. at 15). But Floridia clearly testified that DeMartino was not the sole reason he went to New Hampshire: "I was having problems with my wife, too."

(T 2310). But again, DeRoss's entire argument concerning Floridia is inappropriate, as it fails to "defer to the jury's assessment of witness credibility and the jury's resolution of conflicting testimony." Bala, 236 F.3d at 93-94.

Persico also questions the inherent reliability of Floridia, DiLeonardo, and Vitale by noting that "[e]ach of these witnesses . . . had extensive criminal histories and face[] long prison sentences." (Persico Br. at 16). He also contends that "[a]ll four of the government's cooperating witnesses contradicted each other in significant ways, even with respect to basic [organized crime] position testimony." (Id.) Again, however, in deciding a motion made pursuant to Rule 29, a reviewing court must assume the truthfulness of the government's witnesses, even if they testify pursuant to cooperation agreements, and even if their accounts are inconsistent with one another. See United States v. Glenn, 312 F.3d 58, 64 (2d Cir. 2002) ("[E]ven though each of the Government witnesses . . . had pled guilty to large-scale drug dealing and testified pursuant to cooperation agreements . . . and even though their testimony was pock-marked with inconsistencies, at this stage we credit what they said.") (citing Bala, 236 F.3d at 93-94).[11]

---

[11] By contrast, Persico takes no issue with the fact that much of the evidence discussed in the cases he cites in support of his position, such as in United States v. Glenn, 312 F.3d 58 (2d Cir. 2002), and United States v. Diaz, 176 F.3d 52 (2d Cir. 1999), was provided by cooperating witnesses. (See, e.g., Persico Br. at 33 ("substantial cooperator testimony" was

D. The Cases Cited by Persico Are Distinguishable or Do Not Support His Motion

Aside from cases setting forth general principles of law, DeRoss fails to cite any authority in support of his argument that the evidence, when taken as a whole and in the light most favorable to the government, was insufficient to support the jury's verdict. The decisions cited by Persico are easily distinguishable, or simply do not support his motion.

In United States v. Glenn, 312 F.3d 58 (2d Cir. 2002), the defendant Parker was convicted of murdering a man named Lewis. The evidence at trial established, in summary, that (1) both Parker and Lewis were drug dealers who operated along with other dealers in the same vicinity; (2) on the day of Lewis's murder, Parker notified a third person that Parker wanted to talk to Lewis; (3) two hours later, Lewis was found shot to death in an area where armed drug dealers and narcotics transactions "abounded;" (4) within an hour of Lewis's murder, a witness claimed to have seen a bulge in Parker's waistband, and, even though they were several houses apart, the witness believed the bulge was a gun; (5) Parker later calmly told another person that he didn't want to talk about Lewis being shot; (6) two months later, Parker, during a police interview, lied about

---

presented regarding defendant Parker's motive), 38 ("the shooter was specifically identified by cooperating witness testimony")).

knowing Lewis and about his whereabouts on the day of the murder. See id. at 62-63.

The Second Circuit ruled that the district court should have granted Parker's Rule 29 motion. First, although the court eventually found the government's motive evidence legally sufficient, it nonetheless observed that "the record [was] bereft of any evidence of disagreement between Parker and Lewis." Id. at 65. Second, the court found the evidence of opportunity "attenuated," given that Lewis's body was found in an active drug dealing area. Id. at 65-66. Third, the court noted that "drug dealers routinely carry guns" and therefore a "sizable inferential leap" was required to conclude that, even if Parker had a gun in his waistband, it was the same gun used to shoot Lewis. Id. at 67. Fourth, the court noted that the trial judge incorrectly concluded that there was evidence of flight. Id. at 67-68. Lastly, the court saw little probative value — at least with regard to Lewis's murder — in Parker's decision to lie to the police about his involvement in illegal drug dealing. Id. at 68-69. After considering the evidence as a whole, the Second Circuit concluded that even when viewed in the light most favorable the prosecution, "[t]he Government's evidence gave 'nearly equal circumstantial support' to competing explanations for Lewis's death," and therefore the evidence failed to establish Parker's guilt beyond a reasonable doubt. Id. at 70.

Persico relies heavily on Glenn, characterizing the decision as "compelling." (Persico Br. at 32). He is mistaken.

First, in this case, unlike in Glenn, the evidence established not mere "disagreement" between Persico and Cutolo, but both that Persico had a longstanding and deep motive to kill Cutolo, and a specific need to do so expeditiously right before Cutolo was actually killed. As to the longstanding motive, Persico and Cutolo were on opposite sides of the murderous Colombo War — Persico was the son of the leader of one faction, and Cutolo was one of the most powerful figures on the opposing faction. The evidence also showed that by May 1999, Persico had been warned by others — namely Michael DiLeonardo — that Cutolo had "boss mentality." Knowing that he was soon to be sent back to prison, Persico had an immediate need to kill Cutolo. Second, in this case, unlike in Glenn, Persico was the only person who had the opportunity to kill Cutolo. Although Cutolo might have been disliked by others, Cutolo was nevertheless the official underboss of a powerful crime family. As such, only one person had the authority to order his murder, and that person was Persico. (T 1147-48, 1756, 1827, 1843, 2873, 2895). Third, the Glenn court noted that "[n]o witnesses testified about any statements concerning the circumstances of the shooting." 312 F.3d at 61. In this case, by contrast, Persico admitted that he was responsible for killing Cutolo, including to Salvatore Vitale.

In light of these significant differences, and considering all of the other evidence in the light most favorable to the government, Glenn is inapposite.

United States v. Concepcion, 983 F.2d 369 (2d Cir. 1992), also does not support Persico's motion. In that case, Concepcion and three subordinates had approached a retail drug location to use violence to settle a territorial dispute with a rival gang. When a man named Gines got in his way, Concepcion shot him, and a "general shootout" ensued resulting in Gines's murder and the shooting of two bystanders, Ortiz and Reyes. See id. at 375. Concepcion was convicted of, among other things, assaulting Ortiz and Reyes, even though there was no evidence establishing who exactly shot them. On appeal, Concepcion argued that there was insufficient evidence, even under an aiding and abetting theory, to support his conviction because the government did not identify the actual shooter(s). See id. at 383. The Second Circuit rejected this argument, noting that although the identity of the primary actor may be relevant under 18 U.S.C. § 2(a), it is not an issue under § 2(b). See id. at 383-84. It then found the evidence sufficient:

> [T]here can be no question that there was sufficient evidence for the jury to find Concepcion guilty as a principal under § 2(b) for assaulting Ortiz and Reyes for the purpose of maintaining or increasing his position within the [enterprise]. Concepcion went to the location in question to protect the [enterprise]'s retail sales spot and provided leadership in that endeavor. Once

> there, [Concepcion] initiated the gun battle by shooting Gines several times and then turning and firing at others. Rival drug dealers returned his fire, and Concepcion continued shooting until his gun jammed. If the wounds to Ortiz and Reyes were not inflicted by Concepcion himself, they most certainly were inflicted by other participants in the gun battle, which had been set in motion by Concepcion's own willful actions. Accordingly, the jury was entitled to find Concepcion guilty . . . under § 2(b).

Id. at 384 (emphasis added).

Oddly, Persico asserts that Concepcion supports his motion for judgment of acquittal. He claims that "[n]o remotely similar evidence was presented here that Mr. Persico in fact caused Cutolo's death." (Persico Br. at 36). In making that argument, however, Persico completely ignores the ample evidence that Persico did induce Cutolo's death: (1) Persico's longstanding distrust of Cutolo as a result of the Colombo War; (2) Persico's impending prison term for his 1999 Florida gun arrest; (3) Persico's communications with Cutolo on May 25, 1999, the very day before he disappeared; (4) Marguerite Cutolo's testimony that her husband told her on May 26 that he was going to meet Persico; (5) Marguerite Cutolo's testimony that her husband would typically meet Persico on 92nd Street and Shore Road; (6) Joseph Gorga's testimony that on May 26 he dropped Cutolo off at 92nd Street and Shore Road; (7) Persico's lack of pages to Cutolo after May 26; (8) Persico's lack of investigation into Cutolo's disappearance; (9) Persico's admissions to

Salvatore Vitale; and (10) Persico's witness tampering. Comparing this and other evidence to the facts of Concepcion, we agree with Persico that Concepcion is "illuminating," (Persico Br. at 35), but only because it clearly supports a denial of Persico's Rule 29 motion.[12]

United States v. Paloscio, 2003 WL 1872657 (S.D.N.Y. Apr. 10, 2003), an unreported case, also does not support Persico's motion. In that decision, the district court concluded that the evidence was sufficient to sustain the jury's verdict that Paloscio, an organized crime associate, had participated in the murder of Masella, another organized crime associate, but found the evidence insufficient to establish that the murder was carried out in aid of racketeering. See id. at *8, *11. Persico relies on Paloscio primarily to discount the government's "'position-related' motive evidence." (Persico Br. at 37). The district court found the evidence insufficient to support the notion that Paloscio participated in the murder in aid of racketeering, in part because of testimony that organized crime murders often occur without approval from a boss. See id. at *11. What Persico fails to recognize, however, is that the

---

[12] Persico also argues that Concepcion somehow lends credence to the argument that there was "an equally valid inference that others in or associated with the Colombo family, and not Mr. Persico, desired Cutolo 'to go' for various reasons . . . ." (Persico Br. at 37). This statement completely ignores the evidence referenced above, as well as the evidence presented that an official underboss of an organized crime family may not be killed without a directive from the boss to do so.

evidence in his case established that Cutolo was not a low-ranking associate, but the official underboss of the crime family whose only superior was Persico. Multiple witnesses testified that underbosses are only killed (a) with authorization from that person's boss, or (b) in rare instances without authorization, but then with an extensive investigation by the boss to retaliate for such a devastating act of disrespect to the boss. (T 1747-48). In addition, there was considerable testimony and evidence that Cutolo was killed because he was a threat to Persico's mafia power. For example, as Persico's concedes (Persico Br. at 36), Joseph Campanella testified that DeRoss confirmed that Cutolo was killed because "[i]f, when Allie Boy [Persico] went away on a gun charge, Bill [Cutolo] would have took over the family."

More to the point, however, the district court in Paloscio rejected the same Rule 29 challenge that Persico makes here — that the evidence was insufficient to show that Persico participated in Cutolo's murder. The court in Paloscio concluded that a rational juror could find that Paloscio was involved in Masella's murder when the evidence showed that Paloscio "lured" Masella to a particular location, where he was killed by another person. Paloscio, 2003 WL 1872657 at *3, *8. Persico claims that Paloscio is "marked[ly] differen[t]" than his case, because in Paloscio the shooter was identified and the body was found. (Persico Br. at 37). Again, however, the Second Circuit has made clear that "a prosecution for murder may succeed without a body

having been found or without evidence of the means of death being provided." United States v. Sureff, 15 F.3d 225, 228 (2d Cir. 1994). In addition, Persico claims that Paloscio is distinguishable because of Paloscio's involvement with the shooter and the victim (Masella) "very close in time" to the murder. (Persico Br. at 37). But a review of the facts in that case reveal that Masella was killed 16 days after Paloscio contacted him to initiate his murderous plan. Paloscio, 2003 WL 1872657 at *3. Here, by contrast, Cutolo was murdered less than 24 hours after Persico summoned Cutolo to a meeting with him.[13]

Lastly, Persico relies on United States v. Diaz, 176 F.3d 52 (2d Cir. 1999), another case in which the Second Circuit denied the defendant's sufficiency challenge. In Diaz, the defendant Morales was convicted for murder in aid of racketeering when he authorized two other individuals to shoot and kill the victim. On appeal, Morales argued that the murder occurred "solely because of a personal vendetta" on the part of one of the two shooters, and that the evidence was insufficient to prove that Morales murdered the victim to maintain or increase his position in the charged enterprise. Id. at 95. The Second

---

[13] Notably, Paloscio put forth some of the same arguments that Persico now makes in this case. For example, Paloscio asserted that persons other than the defendant had motives to murder Masella, and — much like Persico's claims regarding the "overlapping" phone calls on May 25 — Paloscio contended a "timing flaw" in the government's theory as to the sequence of events. The district court rejected both of these arguments. See Paloscio, 2003 WL 1872657, at *8.

Circuit, characterizing these arguments as "groundless," held that the jury could properly infer that the victim posed a threat, Morales — as a high-ranking leader of an illegal enterprise — authorized the murder to protect against the threat, and that his failure to do so would have undermined his position in the enterprise. Id. at 95-96. Persico cites Diaz in discussing his claim that there was insufficient evidence of the circumstances surrounding Cutolo's murder. (Persico Br. at 38). But Diaz is inapplicable on this point, because the Second Circuit's decision in that case did not focus on whether Morales was involved in the murder, but rather on whether the murder was in aid of racketeering.

In sum, the defendants' various factual and legal arguments are not a basis for grant of a Rule 29 motion as to Count One.

## II. The Evidence Was More than Sufficient to Sustain the Jury's Verdict as to Counts Five and Six (Witness Tampering)

The defendants arguments for acquittal on the witness tampering charges, Counts Five and Six, are also without merit.

### A. Elements of the Offense

Count Five charged each defendant with conspiring to engage in witness tampering in violation of 18 U.S.C. §§ 1512(b)(1) and 1512(b)(2)(A). Count Six charged each defendant with substantive violations of those statutory provisions, both as principals and aidors and abettors.

Section 1512(b), the relevant statutory provision for both counts, provides in relevant part:

> (b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to--
>
> (1) influence, delay, or prevent the testimony of any person in an official proceeding;
>
> [or]
>
> (2) cause or induce any person to--
>
> (A) withhold testimony . . . from an official proceeding
>
> . . . shall be [punished in accordance with law].

Section 1512(f)(1) further provides that "[f]or purposes of this section . . . an official proceeding need not be pending or about to be instituted at the time of the offense" and that "the testimony . . . need not be admissible in evidence."

B. The Evidence Established a Specific Intent and Agreement to Intimidate

Persico asserts there was no evidence from which the jury could deduce that Persico intended or agreed to intimidate the Cutolo family, or that he even knew of the intimidation. (Persico Br. at 48-49, 54-55). That argument is without merit.

As with Persico's other Rule 29 arguments, here Persico asks the Court to construe the facts in his favor, rather than draw all reasonable inferences in the government's favor as is

required. Thus, Persico claims that there is no evidence Persico "had knowledge of the plan to tamper with the Cutolo family or that he willingly participated in it" (Persico Br. at 54), when in fact there was ample evidence that Persico directed that intimidation occur, as reflected by (1) the recording of DeRoss admitting that Persico, without the knowledge of his attorney or investigator, sent DeRoss to threaten the Cutolo family (see p. 23 supra), (2) DeRoss in fact repeatedly threatened the Cutolo family until he felt comfortable they would provide fabricated information helpful to Persico (see pp. 23-28 supra),[14] and (3) once DeRoss was satisfied, DeRoss stated that he would inform Persico of the Cutolo family's agreement to disclose only fabricated, and exculpatory, information (see p. 26-27 supra).

Persico makes a related claim that he could not possibly have directed DeRoss to tamper with the Cutolo family because Persico was incarcerated at the time (Persico Br. at 54), when in fact the evidence amply demonstrated that he not only could, but that he did. First, as noted above, the March 28, 2000 recording itself reveals that it was Persico who directed DeRoss to pay a visit to the Cutolo family, and that DeRoss was

---

[14] In this regard, DeRoss make various meritless arguments based on inferences he requests be drawn in his favor, rather than in favor of the government, including claiming that (1) "there simply was no threat being communicated" (DeRoss Br. at 18 n.5), even though DeRoss made explicit and repeated threats, and (2) DeRoss "never threatened physical harm to the Cutolo family" (id. at 19), despite specific threats of physical harm. (See pp. 23-28 supra).

expected to report back to Persico. At the very outset of the meeting, DeRoss informed the Cutolo family that he was meeting with them because DeRoss "got a message" from Persico, revealing that it was Persico who was the driving force behind having DeRoss intimidate the Cutolo family. Moreover, towards the end of the meeting, DeRoss told the Cutolo family that he would "get back to [Persico] today," revealing again that Persico was in charge, not DeRoss. Thus, the jury was entitled to infer that DeRoss's intimidating statements came not only from DeRoss, but also from Persico. Second, the evidence at trial defeated any argument that Persico could not possibly have been behind DeRoss's threats due to Persico's incarceration. Multiple witnesses testified about how organized crime figures communicate with others from prison. For example, Salvatore Vitale explained how he used to communicate with people in jail:

> Q. Were you able to communicate with the ones you wanted to communicate with?
>
> A. All the time.
>
> Q. How would you do that?
>
> A. Through a relative. Go visit them yourself. Get on their visiting list. Go see them. Have a goodfella see a captain who was incarcerated, send messages that way.
>
> Q. Did you use any other kinds of people to send messages?

A. You could use a guy's wife. You could use my sister.

(T 2880). Third, the testimony of Margaret Clemons and Barry Levin provided additional evidence of Persico's intent with regard to the witness tampering charges. Both witnesses testified that they were unaware that DeRoss had met the Cutolo family in advance of Clemons visit two days thereafter (T 3666-67, 4989), a fact that, far from supporting Persico's suggested inference that he did not communicate with DeRoss (see Persico Br. at 54) (an inference to which Persico is not entitled under Rule 29), demonstrated that Persico did communicate with DeRoss.

C. The Evidence Established a Connection Between the Obstruction and an Actual or Potential "Official Proceeding"

Both defendants also argue that the evidence failed to establish a connection between the defendants' obstructive conduct and an actual or potential "official proceeding." (Persico Br. at 50-53; DeRoss Br. at 16-21). That argument is also without merit.

For liability to exist under Section 1512 in this regard, the government must at most establish "some nexus between the effort to tamper . . . and awareness that such conduct was likely to affect" a pending or future proceeding. United States v. Quattrone, 441 F.3d 153, 181 (2d Cir. 2006). That nexus is satisfied so long as some official proceeding is foreseeable and contemplated and the tampering relates to a witness or document

that could be considered material to the proceeding. United States v. Arthur Anderson, 544 U.S. 696, 707 (2005). Here, that nexus plainly existed. As demonstrated at trial, at the time the defendants were tampering, it was not only foreseeable that there would be a proceeding, but the tampering was carried out with specific awareness and precisely because of the government's grand jury investigation of Persico's involvement in murdering Cutolo. Indeed, at the same time DeRoss was threatening the Cutolos and conveying that they must provide false exculpatory information, DeRoss informed the Cutolos that the reason the Cutolos needed to lie to Persico's investigator was because the government was "trying to build a case" against Persico. (Supra p. 23). That admission was plainly sufficient to support a finding that the defendants' obstruction was occurring in direct response to the government's recent initiation of grand jury investigation of Persico. Moreover, it was plain that the Cutolo family's information was material to the contemplated proceeding, given that, as described in detail in the fact section herein, of the Cutolos possessed information implicating the defendants in Cutolo's murder.

Persico asserts, despite this straightforward satisfaction of the nexus requirement, that at most the jury could infer the defendants were seeking to tamper with the Cutolos for purposes of supplying Persico's investigator with false information. (Persico Br. at 50). That argument fails for

two reasons. First, Persico is seeking to draw inferences against, rather than in favor, of the government. Second, even if Persico's argument were accepted as true, the only logical reason Persico would be seeking to have the Cutolos provide false information to Persico's investigator is because it would obstruct the government's pending grand jury investigation as well as hinder the Cutolos' ability to testify effectively or at all about the truth at any future official proceeding, conduct which plainly falls within the purview of Section 1512.

Persico's related argument that there was no specific discussion during the obstruction about the Cutolos testifying in a specific proceeding (Persico Br. at 50) is similarly flawed. As noted above, the only logical reason for the obstruction was to achieve precisely that. There was no reason the defendants would seek to have the Cutolos provide false information to the investigator unless they believed that provision of that false information would aid them in an official proceeding.

The cases the defendants cite in alleged support of their "nexus" arguments are likewise inapplicable, and if anyting support a finding of nexus here. For example, relying on the Supreme Court's holding in United States v. Aguilar, 515 U.S. 593 (1995), the defendants argue that their obstructive act is required to have the "'natural and probable effect' of interfering with the due administration of justice," meaning a pending proceeding. Aguilar, 515 U.S. at 599; see also id.

(requiring under Section 1503 some "relationship in time, causation or logic" with a proceeding). As an initial matter, the Aquilar test is inapposite, given that Aquilar was addressing a different statute, 18 U.S.C. § 1503, which requires a pending grand jury proceeding, see Aquilar, 515 U.S. at 598, whereas the statute here, Section 1512, specifically provides that no official proceeding of any kind need be "pending or about to be instituted" for an obstruction crime to occur. 18 U.S.C. § 1512(f).[15] This distinction is of particular relevance in this case. Whereas Section 1503 pertains to direct efforts to

---

[15] Nor does United States v. Arthur Anderson, 544 U.S. 696 (2005), or United States v. Quattrone, 441 F.3d 153 (2d Cir. 2006), cited by the defendants, aid them. Those cases suggest not that the "nexus" requirement of Section 1503 applies equally to Section 1512, but that a lesser nexus standard applies. see Quattrone, 441 F.3d at 176 ("the Supreme Court's recent decision in Arthur Anderson makes clear that Aguilar's nexus requirement applies to some degree to section 1512(b)") (emphasis added); id. at 176 n.22 ("The question of whether the nexus requirement applies in the same way to section 1512(b) as it does to section 1503 and 1505 is not relevant to resolution of this appeal."); Arthur Anderson, 544 U.S. at 707 ("It is, however, one thing to say that a proceeding 'need not be pending or about to be instituted at the time of the offense,' and quite another to say a proceeding need not even been foreseen. A 'knowingly . . . corrup[t] persuade[r]' cannot be someone who persuades others to shred documents under a document retention policy when he does not have in contemplation any particular official proceeding in which those documents might be material."). The only Second Circuit authority even addressing the nexus issue in regard to Section 1512 addresses, again, a different subprovision, Section 1512(c), and indicated in dicta that, given that there the parties were not disputing that issue, the Aguilar nexus requirement applied to Section 1512(c)(2). See United States v. Reich, 479 F.3d 179, 186 (2d Cir. 2007); see also United States v. Ortiz, 220 Fed. Appx. 13 (2d Cir. 2007) (Summary Order) (post-Reich decision that "[a]ssum[es] without deciding" that the Aguilar nexus test applies to Section 1512(b)(2)).

interfere with a specific pending grand jury proceeding, Section 1512 much more broadly encompasses efforts to influence or prevent testimony that contemplate a foreseeable proceeding. Arthur Anderson, 544 U.S. at 707. Here, the defendants' obstruction – which the evidence showed could only be logically intended to allow Persico to neutralize the Cutolo family in the federal proceeding already underway as well as in future proceedings Persico and DeRoss contemplated the government might bring regarding the Cutolo murder – falls well within Section 1512's broad scope.

Persico's similar effort to analogize to the facts of cases such as Aguilar and United States v. Schwartz, 283 F.3d 76 (2d Cir. 2002), which hold that an investigative suspect who lies to a federal investigator does not violate a different statute, Section 1503, is unavailing. First, those cases did not involve acts of intimidation against witnesses, which acts inherently establish an intent to obstruct a proceeding. Second, those cases did not involve evidence that the acts of intimidation were carried out specifically because of an official proceeding. Here, by contrast, the acts of intimidation were made expressly because of the pendency of such a proceeding. Third, because those cases only address the limited scope of Section 1503's current-proceeding requirement, they are inapplicable to Section 1512, which contains no current-proceeding requirement and thus has a much broader scope of criminal liability that clearly

encompasses the defendants' criminal acts here – acts of intimidation through which the defendants sought to induce false exculpatory statements that would either force the Cutolo family into adhering to those statements in any future proceeding, or to neutralize them by impeaching them with the recorded false exculpatory statements should they.[16]

United States v. Johnson, 1998 WL 259920 (E.D.N.Y. May 20, 1998), cited by Persico (Persico Br. at 49), is also inapplicable. There, the government had succeeded in proving only that the defendants robbed an individual, not that they had done anything to influence what they victims might say about what had occurred. Id. at *5. Here, by contrast, the defendants engaged in obstructive conduct which explicitly sought to influence the ability of witnesses to truthfully convey what they knew.

---

[16] In any case, even applying the Section 1503/Aguilar nexus requirement, that requirement was plainly met here. The defendants' obstructive inducement of the Cutolos to provide false exculpatory information to Persico's investigator had the "'natural and probable effect' of interfering with the due administration of justice," Aguilar, 515 U.S. at 599, by hindering the Cutolo family's ability to be effective witnesses against Persico both in the pending grand jury investigation and in future federal proceedings (such as a trial) against Persico. Moreover, given that the defendants engaged in the obstruction explicitly because of the pending grand jury investigation, the obstruction had a direct relationship in time, causation and logic with that proceeding. Aguilar, 515 U.S. at 599. Accordingly, the evidence amply satisfies Aguilar's nexus requirement as well.

## CONCLUSION

For the foregoing reasons, the defendants' motions should be denied.

Dated: Brooklyn, New York
May 2, 2008

BENTON J. CAMPBELL
United States Attorney
Eastern District of New York

JOHN D. BURETTA
JEFFREY A. GOLDBERG
Assistant U.S. Attorneys
(718) 254-6314/6034