# EXHIBIT K

M. Cutolo - for the Government - Cross/Ms. Kedia

1020

1    what I'm marking as Defendant's Persico L for

2    identification.

3             Could you take a look at these.

4    A.    Yes.  Yes.

5    Q.    Do you recognize the people in those photographs?

6    A.    I recognize my husband and the girl that was there

7    and his daughter, his girlfriend.

8    Q.    I'm sorry.  Okay.  Look at H1 through H4.

9             Do you recognize the people in those

10   photographs, first?

11   A.    There's two photographs.  That's all I see.  What

12   other photographs?

13   Q.    Showing you what has been marked as Defendant's

14   Persico H1.  Do you recognize the people in that

15   photograph?

16   A.    I see my husband.  And I think that's Betty Anne.  I

17   can't make anything else out.

18   Q.    When you say Betty Anne, who is Betty Anne?

19   A.    His girlfriend.

20   Q.    H2, H3, and H4.  Do you recognize the persons in

21   those photographs?

22   A.    Yes.  My husband and Betty Anne.

23             My husband and Betty Anne.

24             What do you want me to say?  I knew.

25   Q.    And 119.

M. Cutolo - for the Government - Cross/Ms. Kedia

1021

1    A.    I knew.  His daughter's Communion.

2    Q.    L.  Do you recognize the people?

3    A.    Yes, I do.

4    Q.    Who are the people?

5    A.    My husband, Betty Anne, and his daughter.

6              MS. KEDIA:  I offer Defendant's --

7              MS. MAYER:  Judge, I'm going to object.  This is

8    not the proper way --

9              THE COURT:  Come up.

10             (Discussion ensued at sidebar as follows.)

11             THE COURT:  Your objection.

12             MS. MAYER:  Judge, there is no authenticity for

13   the photos.  These are marked as government exhibits with

14   the witnesses that are going to be called.  Miss Kedia

15   knows that this was introduced through the girlfriend at

16   the last trial.  And the same with this.  That she showed

17   it to the daughter.  There is no necessity to show the

18   photos.  We didn't object because she did it the last

19   time.  What is the point of this?

20             MS. KEDIA:  Your Honor --

21             THE COURT:  I guess to rattle the witness.

22             MS. MAYER:  Which is why she had to show the

23   photo.  It is not proper to admit them through this

24   witness.

25             MS. KEDIA:  I have two things.  One is, your

M. Cutolo - for the Government - Cross/Ms. Kedia

1024

1    THE COURT:  Your objection is sustained.

2    (Discussion at sidebar was concluded.)

3    THE COURT:  The objection is sustained at this

4  time.

5  BY MS. KEDIA:

6  Q.   Mrs. Cutolo, who is Betty Anne Fox?

7  A.   His girl -- it was his girlfriend.

8  Q.   When you say was his girlfriend, what period of time

9  was she his girlfriend?

10 A.   I think it was '91 and '92.

11 Q.   For how long a period of time?

12 A.   '95, '96.  I don't recall the exact date.

13 Q.   Well, do you know that he had a child with her in

14 1990?

15 A.   No, I didn't.

16 Q.   Are you aware that he had a daughter?

17 A.   Yes, I was.

18 Q.   You just didn't know what year it was?

19 A.   I think the year was '91.  After I started finding

20 out some things.

21 Q.   What did you start finding out?

22 A.   Just things that made me feel something was wrong.

23 And a phone call I overheard.

24 Q.   Did you know that he was with her the day he

25 disappeared?

M. Cutolo - for the Government - Cross/Ms. Kedia

1025

1    A.    I know he went to see his daughter.  I told him to go

2    see his daughter at any time.

3    Q.    And when you say to see his daughter, where would he

4    go see his daughter?

5    A.    At their house.  At her house.

6    Q.    Do you know that he was with her all day before he

7    disappeared --

8    A.    I don't know he was with her all day.  I know I've

9    never stopped him, and I told him to go see his daughter.

10   Q.    Do you know that there are many occasions that he saw

11   her and time that he spent with her --

12              MS. MAYER:  Objection.

13   BY MS. KEDIA:

14   Q.    -- that he was not in the presence of his daughter?

15              THE COURT:  Sustained.

16   BY MS. KEDIA:

17   Q.    Mrs. Cutolo, do you know that he supported Miss Fox

18   for some 10, 11 years?

19   A.    Yes.

20   Q.    Where did he get the money?

21   A.    I have no idea.  I don't know.  I didn't find this

22   out until '93.

23   Q.    Well, Mrs. Cutolo, were you aware of all of your

24   husband's financial dealings?

25   A.    I didn't know about that until '93, well, '92, '93,

# EXHIBIT L

M. Cutolo - for the Government - Cross/Ms. Kedia

997

1    A.    That's right.

2    Q.    And you said to Mr. DeRoss, you testified here that

3    you said to Mr. DeRoss that Mr. Persico hadn't paid you

4    back that money.  Is that right?

5    A.    That's right.

6    Q.    Well, first let me ask you, was this family money or

7    Mr. Cutolo's personal money?

8    A.    Personal money.

9    Q.    And what's the difference between his personal money

10   and family money?

11   A.    Two different, two different things.  Completely

12   different.  It was his own money he lent him.

13   Q.    What -- when you say his own money, what amount of

14   money did he have that was his own?

15   A.    What I counted at the end, that was his money.

16   Q.    The 1.65 million.

17   A.    Right.

18   Q.    So where was the family money?

19   A.    I have no clue.  Most of it was all out.  Half the

20   money I didn't get back.

21         That was the only money I found.  And that's

22   what I left with.  There was nothing else with me.

23         So you figure it out.  I can't.

24   Q.    Well, Mrs. Cutolo, you have testified that

25   Defendant's Exhibit G in evidence, this is the piece of

# EXHIBIT M

M. Cutolo - for the Government - Cross/Mr. LaRusso

653

```
 1   cooperating or had been cooperating with the FBI or other
 2   law enforcement agencies?
 3   A.   At that time, I did.
 4   Q.   Okay.
 5   A.   Yes.
 6   Q.   And at that point in time, I'll go back to what we
 7   were talking about.
 8        You put approximately 1.6 million dollars into a
 9   suitcase.  Is that correct?
10   A.   Correct.  Right.
11   Q.   And you knew this amount of money that you had in
12   your house after your husband's disappearance fit into a
13   flight bag that you just described.  Is that correct?
14   A.   Not a flight case.
15   Q.   A suitcase?
16   A.   A suitcase, a small suitcase.
17   Q.   Now, this money that you had, when did you remove it
18   from its secret location?
19   A.   Well, when I knew it was time to leave.
20   Q.   Approximately when was that?
21   A.   I don't remember.
22   Q.   Was it a week before you left?
23   A.   A couple of days before I left.
24   Q.   So again, we're talking about January of 2001,
25   February of 2001.  Is that correct?
```

Ellen S. Combs, CSR
Official US Court Reporter

M. Cutolo - for the Government - Cross/Mr. LaRusso

654

```
 1   A.   Something like that.  Yes.
 2   Q.   From the time that -- of your husband's disappearance
 3   to the time you were ready to leave, that money remained
 4   in a secret location.  Right?
 5   A.   Right.
 6   Q.   Now, just so that the record is clear.  When your
 7   husband disappears, people are coming, Mr. DeRoss
 8   particularly, looking for records and money.
 9        That 1.6 million dollars stayed either in the
10   vent area in your kitchen, or in the ducts up in the
11   attic.  Is that right?
12   A.   Right.
13   Q.   Can you tell us what was secreted in the duct, in the
14   vent in the kitchen.  Do you remember?
15   A.   It was heat lamps.
16   Q.   Heat lamps?
17   A.   It was a big Viking stove, and it had two big heat
18   lamps and inside was all open.
19   Q.   And what was inside there?
20   A.   Metal.
21   Q.   What did you secrete in there?
22   A.   Money.
23   Q.   How much money?
24   A.   A lot.
25   Q.   Would you say the bulk of the money was secreted in
```

Ellen S. Combs, CSR
Official US Court Reporter

M. Cutolo - for the Government - Cross/Mr. LaRusso

655

```
 1   that location?
 2   A.   Most of it was.
 3   Q.   And of the 1.6 millions dollars, how much would you
 4   say was in those heat lamps?
 5   A.   I can't recall.  I really can't recall.  I just know
 6   that I hid it.  That's all.
 7   Q.   Let me ask you, Mrs. Cutolo, when you took the money
 8   out, did you know exactly how much money was in those two
 9   locations?
10   A.   No, I didn't.
11   Q.   Well, there had to come a point in time where you
12   counted it.  Is that correct?
13   A.   Yes, I did.
14   Q.   When did you count it?
15   A.   When I went into the witness protection.
16   Q.   So it would be sometime after you left the location,
17   around January, February 2001.  Is that right?
18   A.   No, before I left I knew.
19   Q.   I know you say you knew how much money or you knew
20   you had money.  I asked you when did you count the money,
21   to be sure what was there?
22   A.   At my house.
23   Q.   Before you left?
24   A.   Yes.
25   Q.   So you took the money out of the secret compartment
```

Ellen S. Combs, CSR
Official US Court Reporter

M. Cutolo - for the Government - Cross/Mr. LaRusso

656

```
 1   before -- a week before you left and counted it.  Is that
 2   your testimony?
 3   A.   Correct.
 4   Q.   Who else was there?
 5   A.   Me and my daughter.
 6   Q.   Which daughter?
 7   A.   Barbara Jean.
 8   Q.   Did you ask your son to come with you?
 9   A.   No.
10   Q.   Was your son present when you were counting this
11   money?
12   A.   No.
13   Q.   Did you deliberately withhold from your son the fact
14   that there was 1.6 millions dollars, or thereabouts,
15   secreted in the house?
16   A.   Nobody knew but me and my daughter.
17   Q.   Well, let me ask you.  After your husband
18   disappeared, did you ever speak to your son or were you
19   ever asked by your son where the money was?
20   A.   Yes.
21   Q.   How often did you speak to your son about where your
22   husband's money was?
23   A.   Once, twice.
24   Q.   What did you tell him?
25   A.   I said it's mine.
```

Ellen S. Combs, CSR
Official US Court Reporter

M. Cutolo - for the Government - Cross/Mr. LaRusso

657

```
1   Q.   Did you tell him, I have the money and you're not
2   getting it?
3   A.   I didn't tell him anything.  I just said, it's my
4   business.  Period.
5   Q.   Did he continue to look for the money?
6   A.   No.  He wasn't there then.
7   Q.   I'm saying after May 26.
8   A.   After May 26, yes.  He asked a lot of times.  And I
9   said I wouldn't tell anybody.  The only one that knew was
10  Barbara Jean.
11  Q.   And when you told your son it was none of his
12  business, what was his response to you?
13  A.   Nothing.  Okay.  Ma, whatever you say.
14  Q.   But he persisted.  He asked again?
15  A.   A few times.
16  Q.   And you kept telling him, No?
17  A.   Right.
18  Q.   Did he make any effort to look through the house for
19  the money that belonged to your husband?
20  A.   He would never find it.
21  Q.   And why not --
22  A.   Because I know he wouldn't.
23            THE COURT:  Wait for the question.
24  BY MR. LaRUSSO:
25  Q.   Mrs. Cutolo, you know he wouldn't find it because you
```

Ellen S. Combs, CSR
Official US Court Reporter

M. Cutolo - for the Government - Cross/Mr. LaRusso

658

```
1   were the one that secreted it, and you knew where the
2   locations were.  Is that right?
3   A.   Yes.  My daughter knew, too.
4   Q.   Barbara Jean?
5   A.   Right.
6   Q.   And when did she learn?
7   A.   She learned the day I did it.
8   Q.   The day you did what?
9   A.   Put the money away.
10  Q.   And is that before your husband's disappearance or
11  after your husband's disappearance?
12  A.   After.
13  Q.   How long after?
14  A.   Very soon after.
15  Q.   So when you say very soon after, are you referring to
16  the fact that you and your daughter now had the money from
17  the secret locations that you had taken it out?
18  A.   Right.
19  Q.   Mrs. Cutolo, were you confused with my earlier
20  questions?
21            MS. MAYER:  Objection.
22            MR. LaRUSSO:  Judge, I think it's proper.
23            THE COURT:  You can rephrase it better than
24  that.
25  BY MR. LaRUSSO:
```

Ellen S. Combs, CSR
Official US Court Reporter

M. Cutolo - for the Government - Cross/Mr. LaRusso

659

```
1   Q.   Mrs. Cutolo, you told us, number one, ten or 15
2   minutes ago, that you first counted the money within a
3   week or so before you left the area.  It would have been
4   January or February of 2001.
5            You recall testifying to that?
6   A.   I didn't understand what you meant.
7   Q.   Were you confused?
8   A.   Yes.
9   Q.   Okay.  Is it your testimony now that after your
10  husband's disappearance, there came a time when, in fact,
11  you counted the money well before you left the area?  Is
12  that correct?
13  A.   Oh, yes.
14  Q.   By the way, do you talk to your daughter Barbara
15  Jean?
16  A.   Yes.
17  Q.   And how often do you talk with her?
18  A.   I don't -- often.
19  Q.   I didn't hear you.  I'm sorry?
20  A.   I said, often.
21  Q.   Often.  So would it be fair to say that almost on a
22  regular basis, a daily basis you would have a conversation
23  with your daughter in person or on the telephone?
24  A.   My daughter came and lived with me.
25  Q.   So you have been with your daughter for approximately
```

Ellen S. Combs, CSR
Official US Court Reporter

M. Cutolo - for the Government - Cross/Mr. LaRusso

660

```
1   five or six years, and you're living together right now.
2   Is that correct?
3   A.   No, didn't say that.  I said my daughter came and
4   lived with me in Staten Island.
5   Q.   After you leave the location -- after you leave
6   Staten Island, didn't you reside with your daughter?
7   A.   On witness protection, yes.
8   Q.   Did you talk with her?
9   A.   We were together.
10  Q.   I'm sorry?
11  A.   We lived together.  Me and my daughter.
12  Q.   From the time -- I just want to make sure that we're
13  clear, Mrs. Cutolo.
14            From the time that you and your family leave the
15  Staten Island area, to today, have you been with your
16  daughter on a daily basis?
17            MS. MAYER:  Objection.  Relevance.
18            THE COURT:  Ask a leading question.
19  BY MR. LaRUSSO:
20  Q.   Mrs. Cutolo, did you talk to your daughter about your
21  testimony here today?
22  A.   Not at all.
23  Q.   Did you talk to your daughter that you were coming
24  here and testifying?
25  A.   We both came.  I don't understand what you mean.
```

Ellen S. Combs, CSR
Official US Court Reporter

# EXHIBIT N

MEF:TJS:NB
F. #2003R00452

GOVERNMENT
EXHIBIT
3500-GF-1
04CR911(S-3)(SJ)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -

GIOVANNI FLORIDIA,

               Defendant.

- - - - - - - - - - - - - - -X

COOPERATION AGREEMENT

03 CR 285 (S-1) (RJD)

       Pursuant to Rule 11 of the Federal Rules of Criminal Procedure, the United States Attorney's Office for the Eastern District of New York (the "Office") and GIOVANNI FLORIDIA (the "defendant") agree to the following:

       1.    The defendant was convicted following a jury trial of Counts One, Two and Three in an indictment captioned <u>United States v. Vincent DeMartino and Giovanni Floridia</u>, 03 CR 285 (RJD). Count One charged a conspiracy to murder in violation of 18 U.S.C. 1959(a)(5), Count Two charged an assault with a dangerous weapon in violation of 18 U.S.C. § 1959(a)(3), and Count Three charged use of a firearm in connection with a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii).    As part of this agreement, the defendant concedes that he was in fact guilty of those crimes as the jury found, and agrees not to challenge those convictions on appeal or by collateral attack.

2

2.  The defendant will waive indictment and plead guilty to a superseding information to be filed in this district charging a violation of 18 U.S.C. § 1962(d) (Racketeering Acts One (loansharking) and Two (robbery)). The count carries the following statutory penalties:

a.  Maximum term of imprisonment: 20 years (18 U.S.C. § 1963(a)).

b.  Minimum term of imprisonment: 0 years (18 U.S.C. § 1963(a)).

c.  Maximum supervised release term: 3 years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to 2 years without credit for pre-release imprisonment or time previously served on post-release supervision (18 U.S.C. § 3583(b), (e)).

d.  Maximum fine: The greater of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to a person other than the defendant as a result of the offense (18 U.S.C. § 3571(b)(3), (d)).

e.  $100 special assessment (18 U.S.C. § 3013).

f.  Restitution: As determined by Court. (18 U.S.C. §§ 3663 and 3663A).

3.  The defendant agrees that his sentence is governed by the United States Sentencing Guidelines (the "Guidelines"). Additionally, the defendant (a) waives any right to have facts that

3

determine the offense level[1/] under the Guidelines alleged in an indictment and found by a jury beyond a reasonable doubt, (b) agrees that facts that determine the offense level will be found by the court at sentencing by a preponderance of the evidence, and that the court may consider any reliable evidence, including hearsay and (c) waives any constitutional challenge to the validity of the Guidelines.

4.    The Office will advise the Court and the Probation Department of information relevant to sentencing, including all criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. Because the defendant proceeded to trial on the underlying indictment, the parties agree that no adjustment for acceptance of responsibility should apply.

5.    The defendant will provide truthful, complete and accurate information and will cooperate fully with the Office. This cooperation will include, but is not limited to, the following:

        a.    The defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested, concerning his participation in and knowledge of all criminal activities.

        b.    The defendant agrees to furnish to the Office all documents and other material that may be relevant to the investigation and that are in

---

[1/]    The term "offense level" includes the base offense level plus all specific offense characteristics, enhancements and adjustments.

4

the defendant's possession or control and to participate in undercover activities pursuant to the specific instructions of law enforcement agents or this Office.

c.     The defendant agrees not to reveal his cooperation, or any information derived therefrom, to any third party without prior consent of the Office.

d.     The defendant agrees to testify at any proceeding in the Eastern District of New York or elsewhere as requested by the Office.

e.     The defendant consents to adjournments of his sentence as requested by the Office.

f.     The defendant agrees to cooperate fully with the Internal Revenue Service in the ascertainment, computation and payment of his correct federal income tax liability for the years 1996 to and including 2003.  To that end, the defendant will file amended tax returns for the years 1996 to and including 2003 one month before his sentence and consents to the disclosure to the Internal Revenue Service of information relating to his financial affairs that is in the possession of third parties.

6.   The Office agrees that:

a.     Except as provided in paragraphs 1, 2, 10, and 11, no criminal charges will be brought against the defendant for his heretofore disclosed participation in criminal activity involving the attempted murder of Joseph Campanella, conspiracy to obstruct justice through witness tampering between 2003 and 2004, financing and collecting extortionate extensions of credit from 1996 through 2003, arson involving burning down a pigeon coop and garage between 1999 and 2001, insurance fraud involving the destruction of an automobile between 1999 and 2001, robbery of marijuana from Peter LNU between January 1998 to May 1999, robbery of marijuana from individuals associated with Joseph Petillo from January

5

1998 to May 1999, credit card fraud from 1996 through 2003, mortgage fraud from 1996 through 2003, distribution of marijuana from 1996 through 2003, and illegal gambling involving sports betting from 1996 through 2003.

b.    No statements made by the defendant during the course of this cooperation will be used against him except as provided in paragraphs 4, 10, and 11.

7.    The defendant agrees that the Office may meet with and debrief him without the presence of counsel, unless the defendant specifically requests counsel's presence at such debriefings and meetings. Upon request of the defendant, the Office will endeavor to provide advance notice to counsel of the place and time of meetings and debriefings, it being understood that the Office's ability to provide such notice will vary according to time constraints and other circumstances. The Office may accommodate requests to alter the time and place of such debriefings. It is understood, however, that any cancellations or reschedulings of debriefings or meetings requested by the defendant that hinder the Office's ability to prepare adequately for trials, hearings or other proceedings may adversely affect the defendant's ability to provide substantial assistance. Matters occurring at any meeting or debriefing may be considered by the Office in determining whether the defendant has provided substantial assistance or otherwise complied with this agreement and may be considered by the Court in imposing sentence regardless of whether counsel was present at the meeting or debriefing.

6

8.    If the Office determines that the defendant has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office will file a motion pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) with the sentencing Court setting forth the nature and extent of his cooperation.  Such a motion will permit the Court, in its discretion, to impose a sentence below the applicable Sentencing Guidelines range and also below any applicable mandatory minimum sentence.  In this connection, it is understood that a good faith determination by the Office as to whether the defendant has cooperated fully and provided substantial assistance and has otherwise complied with the terms of this agreement, and the Office's good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him.  The defendant agrees that, in making this determination, the Office may consider facts known to it at this time.  The Office will not recommend to the Court a specific sentence to be imposed.  Further, the Office cannot and does not make a promise or representation as to what sentence will be imposed by the Court.

9.    The defendant agrees that with respect to all charges referred to in paragraphs 1, 2 and 6(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law.

7

The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

10. The defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes. Should it be judged by the Office that the defendant has failed to cooperate fully, has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including to file the motion described in paragraph 8 above. Moreover, this Office may withdraw the motion described in paragraph 8 above, if such motion has been filed prior to sentencing. The defendant will also be subject to prosecution for any federal criminal violation of which the Office has knowledge, including, but not limited to, the criminal activity described in paragraph 6 above, perjury and obstruction of justice.

11. Any prosecution resulting from the defendant's failure to comply with the terms of this agreement may be premised upon, among other things: (a) any statements made by the defendant to the Office or to other law enforcement agents on or after

8

September 17, 2004; (b) any testimony given by him before any grand jury or other tribunal, whether before or after the date this agreement is signed by the defendant; and (c) any leads derived from such statements or testimony. Prosecutions that are not time-barred by the applicable statutes of limitation on the date this agreement is signed may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statutes of limitation between the signing of this agreement and the commencement of any such prosecutions Furthermore, the defendant waives all claims under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or rule, that statements made by him on or after September 17, 2004, or any leads derived therefrom, should be suppressed.

12. If the defendant requests, and in the Office's judgment the request is reasonable, the Office will make application and recommend that the defendant and, if appropriate, other individuals be placed in the Witness Security Program, it being understood that the Office has authority only to recommend and that the final decision to place an applicant in the Witness Security Program rests with the Department of Justice, which will make its decision in accordance with applicable Departmental regulations.

9

13.    This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

10

14. No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties. This agreement supersedes any prior promises, agreements or conditions between the parties. To become effective, this agreement must be signed by all signatories listed below.

Dated:    Brooklyn, New York
          November 23, 2004

                              ROSLYNN R. MAUSKOPF
                              United States Attorney
                              Eastern District of New York

                    By:    _____
                              Nicolas Bourtin
                              Assistant United States Attorney

                    Approved by:

                           _____
                              Thomas Seigel
                              Supervising Assistant U.S. Attorney

I have read the entire agreement and discussed it with my attorney. I understand all of its terms and am entering into it knowingly and voluntarily.

_____
Giovanni Floridia
Defendant

Approved by:

_____
Anthony Ricco, Esq.
Counsel to Defendant

EXHIBIT
3500-CL-1
04CR911(S-3)(S3)

MEF:JAW:jaw
F. # 1998R0297
COOP.AGR 8/9/99

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    COOPERATION AGREEMENT

    - against -                            Cr. Nos. 99-520 (ERK)
                                           and   00-1204 (ERK)
CHRISTIAN LUDWIGSEN,

            Defendant

- - - - - - - - - - - - - -X

      Pursuant to Rule 11 of the Federal Rules of Criminal
Procedure, the United States Attorney's Office for the Eastern
District of New York (the "Office") and CHRISTIAN LUDWIGSEN (the
"defendant") agree to the following:

      1.   The defendant pled guilty on October 13, 2000, to
Count One of indictment number 99-CR-520 (S-5)(ERK), charging
racketeering conspiracy, in violation of Title 18, United States
Code, Section 1962(d) (the "Prior Plea"), under the terms of a plea
agreement (the "Prior Agreement"). The defendant agrees that the
Prior Plea was knowingly and voluntarily entered. The provisions
of the Prior Agreement continue to apply to the Prior Plea. The
provisions of this agreement supplement the provisions of the Prior
Agreement.

      2.   The defendant will waive indictment, waive venue,
waive the defense of the statute of limitations and plead guilty to
a four-count information to be filed in this district, charging (a)

a violation of 18 U.S.C. § 1959(a)(5), (b) a violation of 18 U.S.C. § 2113(a), (c) a violation of 18 U.S.C. § 1956(a)(1), and (d) a violation of 18 U.S.C. § 1956(a)(1). These counts carry the following statutory penalties:

## Count One (18 U.S.C. § 1959(a)(5))

    a.    Maximum term of imprisonment: Ten years (18 U.S.C. § 1959(a)(5))

    b.    Minimum term of imprisonment: 0 years (18 U.S.C. § 1959(a)(5))

    c.    Maximum supervised release term: Three years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced up to two years imprisonment without credit for pre-release imprisonment or time previously served on post-release supervision. (18 U.S.C. § 3583(b), (e))

    d.    Maximum fine: $250,000 (18 U.S.C. § 3571(b)(3))

    e.    Restitution: Applicable, in an amount to be determined by the Court (18 U.S.C. § 3663)

    f.    Special assessment: $100, to be paid by check payable to Clerk of the Court at or before sentencing. (18 U.S.C. § 3013)

## Count Two (18 U.S.C. § 2113(a))

    a.    Maximum term of imprisonment: Twenty years (18 U.S.C. § 2113(a))

    b.    Minimum term of imprisonment: 0 years (18 U.S.C. § 2113(a))

    c.    Maximum supervised release term: Three years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced to up to two years without credit for pre-release

imprisonment or time previously served on post-release supervision.
(18 U.S.C. §§ 3583 (b), (e)).

d.   Maximum fine: $250,000
(18 U.S.C. § (b)(3)).

e.   Restitution: Applicable, in an amount to be determined by the Court.
(18 U.S.C. § 3663).

f.   Special assessment: $150, to be paid by check payable to Clerk of the Court at or before sentencing.
(18 U.S.C. § 3013).

## Count Three (18 U.S.C. § 1956(a)(1))

a.   Maximum term of imprisonment: Twenty years
(18 U.S.C. § 1956)

b.   Minimum term of imprisonment: 0 years
(18 U.S.C. § 1956)

c.   Maximum supervised release term: Three years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced up to two years imprisonment without credit for pre-release imprisonment or time previously served on post-release supervision.
(18 U.S.C. § 3583(b), (e))

d.   Maximum fine: $250,000, or twice the gross profits or other proceeds from the aforementioned activity, whichever is greater.
(18 U.S.C. §§ 1956(a)(1) & 3571(b)(3))

e.   Restitution: Applicable, in an amount to be determined by the Court.
(18 U.S.C. § 3663)

4

    f.   Special assessment: $~~200~~ *50*, to be paid by check payable to Clerk of the Court at or before sentencing. (18 U.S.C. § 3013)

## Count Four (18 U.S.C. § 1956(a)(1))

    a.   Maximum term of imprisonment: Twenty years (18 U.S.C. § 1956)

    b.   Minimum term of imprisonment: 0 years (18 U.S.C. § 1956)

    c.   Maximum supervised release term: Three years, to follow any term of imprisonment; if a condition of release is violated, the defendant may be sentenced up to two years imprisonment without credit for pre-release imprisonment or time previously served on post-release supervision. (18 U.S.C. § 3583(b), (e))

    d.   Maximum fine:  $250,000, or twice the gross profits or other proceeds from the aforementioned activity, whichever is greater. (18 U.S.C. §§ 1956(a)(1) & 3571(b)(3))

    e.   Restitution: Applicable, in an amount to be determined by the Court. (18 U.S.C. § 3663)

    f.   Special assessment: $~~200~~ *50*, to be paid by check payable to Clerk of the Court at or before sentencing. (18 U.S.C. § 3013)

The sentences imposed on each count may run consecutively, and may also run consecutively to the sentence imposed for the Prior Plea.

    3.   The defendant's sentences are governed by the United States Sentencing Guidelines. The Office will advise the Court and the Probation Department of information relevant to sentencing, including all criminal activity engaged in by the defendant, and such information may be used by the Court in determining the

5

defendant's sentence. Based on information known to it now, the Office will not oppose a downward adjustment of three levels for acceptance of responsibility under U.S.S.G. § 3E1.1 for the four counts referred to in paragraph 2 above.

4.    The defendant will provide truthful, complete and accurate information and will cooperate fully with the Office. This cooperation will include, but is not limited to, the following:

a.    The defendant agrees to be fully debriefed and to attend all meetings at which his presence is requested, concerning his participation in and knowledge of all criminal activities.

b.    The defendant agrees to furnish to the Office all documents and other material that may be relevant to the investigation and that are in the defendant's possession or control and to participate in undercover activities pursuant to the specific instructions of law enforcement agents or this Office.

c.    The defendant agrees not to reveal his cooperation, or any information derived therefrom, to any third party without prior consent of the Office.

d.    The defendant agrees to testify at any proceeding in the Eastern District of New York or elsewhere as requested by the Office.

e.    The defendant consents to adjournments of his sentence as requested by the Office.

f.    The defendant agrees to cooperate fully with the Internal Revenue Service in the ascertainment, computation and payment of his correct federal income tax liability for the years 1993 through 2000. To that end, the defendant will file amended tax returns for the years 1993 through 2000, if required to do

so, prior to imposition of sentence and consents to the disclosure to the Internal Revenue Service of information relating to his financial affairs that is in the possession of third parties.

5.  The Office agrees that:

    a.  Except as provided in paragraphs 2, 8 and 9, no criminal charges will be brought against the defendant for his heretofore disclosed participation in criminal activity, including armed robbery, commercial burglaries, tax fraud, stock fraud, murder conspiracy of Jerry "Green Eyes," conspiracy to commit assault in aid of racketeering against "J.P.," other assaults in aid of racketeering, weapons possession, and money laundering, all in the period January 1990 and October 2000.

    b.  No statements made by the defendant during the course of this cooperation will be used against him except as provided in paragraphs 2, 3, 8 and 9.

6.  The defendant agrees that the Office may meet with and debrief him without the presence of counsel, unless the defendant specifically requests counsel's presence at such debriefings and meetings.  Upon request of the defendant, the Office will endeavor to provide advance notice to counsel of the place and time of meetings and debriefings, it being understood that the Office's ability to provide such notice will vary according to time constraints and other circumstances.  The Office may accommodate requests to alter the time and place of such debriefings.  It is understood, however, that any cancellations or reschedulings of debriefings or meetings requested by the defendant that hinder the Office's ability to prepare adequately for trials,

hearings or other proceedings may adversely affect the defendant's ability to provide substantial assistance.  Matters occurring at any meeting or debriefing may be considered by the Office in determining whether the defendant has provided substantial assistance or otherwise complied with this agreement and may be considered by the Court in imposing sentence regardless of whether counsel was present at the meeting or debriefing.

7.   If the Office determines that the defendant has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office will file a motion pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) with the sentencing Court setting forth the nature and extent of his cooperation.  Such a motion will permit the Court, in its discretion, to impose a sentence below the applicable Sentencing Guidelines range for the above-described counts and for the charge covered by the Prior Agreement.  In this connection, it is understood that a good faith determination by the Office as to whether the defendant has cooperated fully and provided substantial assistance and has otherwise complied with the terms of this agreement, and the Office's good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him.  The defendant agrees that, in making this determination, the Office may consider facts known to it at this time.  The Office will not recommend to the Court a

8

specific sentence to be imposed.  Further, the Office cannot and does not make a promise or representation as to what sentence will be imposed by the Court.

8.   The defendant agrees that with respect to all charges referred to in paragraphs 2 and 5(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," Section 617, P.L. 105-119 (Nov. 26, 1997), and will not file any claim under that law.  The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

9.   The defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes.  Should it be judged by the Office that the defendant has failed to cooperate fully, has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including (a) not to oppose a downward adjustment of three levels for acceptance of responsibility described in paragraph 2 above, and (b) to file the motion described in paragraph 6 above.  Moreover, this Office may withdraw the motion

described in paragraph 6 above, if such motion has been filed prior to sentencing. The defendant will also be subject to prosecution for any federal criminal violation of which the Office has knowledge, including, but not limited to, the criminal activity described in paragraph 4 above, perjury and obstruction of justice.

10. Any prosecution resulting from the defendant's failure to comply with the terms of this agreement may be premised upon, among other things: (a) any statements made by the defendant to the Office or to other law enforcement agents on or after October 26, 2000; (b) any testimony given by him before any grand jury or other tribunal, whether before or after the date this agreement is signed by the defendant; and (c) any leads derived from such statements or testimony. Prosecutions that are not time-barred by the applicable statutes of limitation on the date this agreement is signed may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statutes of limitation between the signing of this agreement and the commencement of any such prosecutions. Furthermore, the defendant waives all claims under the United States Constitution, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or rule, that statements made by him on or after October 26, 2000, or any leads derived therefrom, should be suppressed.

11. If the defendant requests, and in the Office's

judgment the request is reasonable, the Office will make application and recommend that the defendant and, if appropriate, other individuals be placed in the Witness Security Program, it being understood that the Office has authority only to recommend and that the final decision to place an applicant in the Witness Security Program rests with the Department of Justice, which will make its decision in accordance with applicable Departmental regulations.

12.  The parties agree that (a) at or before the time of sentencing under the terms of this agreement, the defendant will plead guilty to all three counts contained in a criminal information docketed as F00-8641 in the Circuit Court for the Eleventh Judicial Circuit, Dade County, Florida (the "Florida plea"), and (b) if the Office determines that the defendant has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office will request that the State Attorney's Office for Dade County, Florida, agree that the sentence imposed for the Florida plea run concurrently with the sentences imposed for the pleas referred to herein. The defendant understands that the Office has power only to recommend to such consent, and that this agreement does not bind the State Attorney's Office for Dade County, Florida, who retains discretion to request the imposition of consecutive sentences for the Florida plea.

13.   This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

14.   No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties.   Except as provided in paragraph one above, this agreement supersedes any prior promises, agreements or conditions

12

between the parties. To become effective, this agreement must be signed by all signatories listed below.

Dated: Brooklyn, New York
December 4, 2000

Respectfully submitted,

LORETTA E. LYNCH
United States Attorney
Eastern District of New York

By: _____
Greg Andres
Assistant United States Attorney

Agreed and consented to:

_____
Christian Ludwigsen
Defendant

Approved by:

_____
Benjamin Brafman, Esq.
Counsel to Defendant

Approved by:

_____
Mark Feldman
Chief, Organized Crime &
Racketeering Section

# EXHIBIT O



U.S. Department of Justice

*United States Attorney*
*Southern District of New York*



GOVERNMENT
EXHIBIT
3500-MDL-1
04CR911(S-3)(SJ)

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

April 29, 2003

Craig A. Gillen, Esq.
Gillen, Cromwell, Parker & Withers, LLC
One Securities Centre, Suite 1050
3490 Piedmont Road, N.E.
Atlanta, Georgia 30305

Re: United States v. Michael DiLeonardo
S2 02 Cr. 743 (RCC)

Dear Mr. Gillen:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office") will accept a guilty plea from MICHAEL DiLEONARDO, a/k/a "Mikey Scars," (the "defendant") to a four-count superseding information, S2 02 Cr. 743 (RCC) (the "Information").

Count One of the Information charges that, from at least in or about the late 1970s, up through and including in or about 2002, the defendant participated in the conduct of the affairs of the racketeering enterprise identified in Count One of the Information, namely, the Gambino Organized Crime Family of La Cosa Nostra, through a pattern of racketeering activity, which included racketeering acts of murder, conspiracy to commit murder, conspiracy to commit extortion, illegal gambling, loansharking and loansharking conspiracies, wire fraud, and conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1962(c). The offense charged in Count One of the Information carries a maximum sentence of life imprisonment; a maximum term of five years' supervised release; a maximum fine, pursuant to Title 18, United States Code, Section 3571 of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

01/02

Craig A. Gillen, Esq.
April 29, 2003
Page 2

Count Two of the Information charges that, from in or
about the late 1970s, up through and including in or about 2002,
the defendant conspired with others to participate in the conduct
of the affairs of the Gambino Organized Crime Family through the
pattern of racketeering activity set forth in Count One of the
Information.  The offense charged in Count Two of the Information
carries a maximum sentence of life imprisonment; a maximum term
of five years' supervised release; a maximum fine, pursuant to
Title 18, United States Code, Section 3571 of the greatest of
$250,000, twice the gross pecuniary gain derived from the
offense, or twice the gross pecuniary loss to persons other than
the defendant resulting from the offense; and a $100 mandatory
special assessment.

Count Three of the Information charges that in or about
1992, the defendant conspired to assault Curtis Sliwa with a
deadly weapon in aid of racketeering, in violation of Title 18,
United States Code, Section 1959(a)(6).  The offense charged in
Count Three of the Information carries a maximum sentence of
three years' imprisonment; a maximum term of one year of
supervised release; a maximum fine, pursuant to Title 18, United
States Code, Section 3571, of the greatest of $250,000; twice the
gross pecuniary gain derived from the offense, or twice the gross
pecuniary loss to a person other than the defendant as a result
of the offense; and a mandatory $100 special assessment.

Count Four of the Information charges that from in or
about the mid-1990s, up to and including in or about 2002, the
defendant transferred and possessed machine guns, in violation of
Title 18, United States Code, Sections 922(o)(1) and 2.  The
offense charged in Count Four of the Information carries a
maximum sentence of ten years' imprisonment; a maximum term of
three years' supervised release; a maximum fine, pursuant to
Title 18, United States Code, Section 3571, of the greatest of
$250,000, twice the gross pecuniary gain derived from the
offense, or twice the gross pecuniary loss to a person other than
the defendant as a result of the offense; and a mandatory $100
special assessment.

The total maximum sentence of incarceration on all four
counts of the Information is life imprisonment.  In addition to
the foregoing, the Court must order restitution in accordance
with Sections 3663, 3663A and 3664 of Title 18, United States
Code.

01/02

Craig A. Gillen, Esq.
April 29, 2003
Page 3

        With respect to the charges contained in the
Information, the defendant agrees to waive any objections,
challenges, or defenses he may have as to venue, and further
agrees to submit to prosecution for the offenses charged in the
Information in the Southern District of New York.  In addition,
with respect to the charges contained in the Information, the
defendant agrees to waive any objections, challenges, or defenses
he may have with respect to the statute of limitations and any
objections, challenges, or defenses he may have based on claims
of double jeopardy.

        It is further understood that the defendant agrees to
forfeit to the United States, pursuant to 18 U.S.C. § 981, the
51-acre property located on Burnt Hill Road in Roscoe, New York.
The defendant further agrees to execute all documentation
necessary to effect the forfeiture of such property and its
transfer to the United States.  It is further understood that, in
the event that the United States files a civil action seeking to
forfeit the property, the defendant will not file a claim with
the Court or otherwise contest such a civil forfeiture action and
will not assist a third party in asserting any claim to the
property.  To the extent the defendant or a third party has
already filed a claim contesting such forfeiture of the property,
the defendant agrees to withdraw the claim.  It is further
understood that the defendant will not file or assist anyone in
filing a petition for remission or mitigation with the Department
of Justice concerning the property.

        It is understood that the defendant (a) shall
truthfully and completely disclose all information with respect
to the activities of himself and others concerning all matters
about which this Office inquires of him, which information can be
used for any purpose; (b) shall cooperate fully with this Office,
the Federal Bureau of Investigation and any other law enforcement
agency designated by this Office; (c) shall attend all meetings
at which this Office requests his presence; (d) shall provide to
this Office, upon request, any document, record, or other
tangible evidence relating to matters about which this Office or
any designated law enforcement agency inquires of him; (e) shall
truthfully testify before the grand jury and at any trial and
other court proceeding with respect to any matters about which
this Office may request his testimony; (f) shall bring to this
Office's attention all crimes which he has committed, and all
administrative, civil, or criminal proceedings, investigations,

21/02

Craig A. Gillen, Esq.
April 29, 2003
Page 4

or prosecutions in which he has been or is a subject, target, party, or witness; and, (g) shall commit no further crimes whatsoever.  Moreover, any assistance the defendant may provide to federal criminal investigators shall be pursuant to the specific instructions and control of this Office and designated investigators.

It is understood that this Office cannot, and does not, agree not to prosecute the defendant for criminal tax violations. However, if the defendant fully complies with the understandings specified in this Agreement, no testimony or other information given by him (or any other information directly or indirectly derived therefrom) will be used against him in any criminal tax prosecution.  Moreover, if the defendant fully complies with the understandings specified in this Agreement, he will not be further prosecuted criminally by this Office for any crimes, except for criminal tax violations, related to his participation in the following, to the extent that he has disclosed such participation to this Office as of the date of this Agreement:

(1) the affairs of the Gambino Organized Crime Family, through a pattern of racketeering activity, consisting of murder, conspiracy to commit murder, extortion of various businesses and individuals, illegal gambling, loansharking, wire fraud, securities fraud, money laundering, and assaults (and conspiring to participate in the affairs of the Gambino Organized Crime Family through the same pattern of racketeering activity) from in or about the late 1970s, through and including in or about 2002, as charged in Counts One and Two of the Information;

(2) the scheme to assault Curtis Sliwa with a dangerous weapon in or about 1992, as charged in Count Three of the Information;

(3) the scheme to transfer and possess several machine guns from in or about the mid-1990s to in or about 2002, as charged in Count Four of the Information; and

(4) various other criminal acts, including numerous assaults from in or about the 1960s through in or about 2002 (including an assault with a stickball bat in or about the early 1970s); the possession of firearms at

Craig A. Gillen, Esq.
April 29, 2003
Page 5

various times from in or about the early 1970s to in or about 2002; the sale by the defendant of telephone cards which he received from others, in or about the mid-1990s, that resulted in losses to some of the purchasers of the telephone cards; the construction of two homes on Staten Island (located on Oceanside Avenue and Seacrest Avenue) without full payment of all the labor costs; and the provision of money at various times to associates and members of the Gambino Organized Crime Family who were facing criminal charges (and, in some instances, to their family members) (the prosecution of certain of these crimes is barred by either the applicable statute of limitations or the lack of federal jurisdiction).

This Agreement does not provide any protection against prosecution for any crimes except as set forth above, including any acts of violence.

It is understood that the defendant's truthful cooperation with this Office is likely to reveal activities of individuals who might use violence, force, and intimidation against the defendant, his family, and loved ones. Should the defendant's cooperation present a significant risk of physical harm, this Office, upon the written request of the defendant, will take steps that it determines to be reasonable and necessary to attempt to ensure his safety and that of his family and loved ones. These steps may include application to the Witness Security Program of the United States Marshal's Service, whereby the defendant, his family, and loved ones, if approved, could be relocated under a new identity. It is understood, however, that the Witness Security Program is under the direction and control of the United States Marshal's Service and not of this Office.

It is understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office. This Office will, however, bring the cooperation of the defendant to the attention of other prosecuting offices, if requested by him.

It is understood that the sentence to be imposed upon the defendant is within the sole discretion of the Court. This Office cannot, and does not, make any promise or representation as to what sentence the defendant will receive, and will not

Craig A. Gillen, Esq.
April 29, 2003
Page 6

recommend any specific sentence to the Court.  However, this
Office will inform the Probation Department and the Court of (a)
this Agreement; (b) the nature and extent of the defendant's
activities with respect to this case and all other activities of
the defendant which this Office deems relevant to sentencing; and
(c) the nature and extent of the defendant's cooperation with
this Office.  In so doing, this Office may use any information it
deems relevant, including information provided by the defendant
both prior to and subsequent to the signing of this Agreement.
In addition, if this Office determines that the defendant has
provided substantial assistance in an investigation or
prosecution, and if he has fully complied with the understandings
specified in this Agreement, this Office will file a motion,
pursuant to Section 5K1.1 of the Sentencing Guidelines,
requesting the Court to sentence the defendant in light of the
factors set forth in Section 5K1.1(a)(1)-(5).  It is understood
that, even if such a motion is filed, the sentence to be imposed
on the defendant remains within the sole discretion of the Court.
Moreover, nothing in this Agreement limits this Office's right to
present any facts and make any arguments relevant to sentencing
to the Probation Department and the Court, or to take any
position on post-sentencing motions.  The defendant hereby
consents to such adjournments of his sentence as may be requested
by this Office.

          It is understood that, should this Office determine
either that the defendant has not provided substantial assistance
in an investigation or prosecution, or that the defendant has
violated any provision of this Agreement, such a determination
will release this Office from any obligation to file a motion
pursuant to Section 5K1.1 of the Sentencing Guidelines, but will
not entitle the defendant to withdraw his guilty plea once it has
been entered.

          It is understood that, should this Office determine,
subsequent to the filing of a motion pursuant to Section 5K1.1 of
the Sentencing Guidelines, that the defendant has violated any
provision of this Agreement, this Office shall have the right to
withdraw such motion.

          It is understood that, should the defendant commit any
further crimes or should it be determined that he has given
false, incomplete, or misleading testimony or information, or
should he otherwise violate any provision of this Agreement, the

01/02

Craig A. Gillen, Esq.
April 29, 2003
Page 7

defendant shall thereafter be subject to prosecution for any
federal criminal violation of which this Office has knowledge,
including perjury and obstruction of justice.  Any such
prosecution that is not time-barred by the applicable statute of
limitations on the date of the signing of this Agreement may be
commenced against the defendant, notwithstanding the expiration
of the statute of limitations between the signing of this
Agreement and the commencement of such prosecution.  It is the
intent of this Agreement to waive all defenses based on the
statute of limitations with respect to any prosecution that is
not time-barred on the date that this Agreement is signed.

        It is understood that in the event that it is
determined that the defendant has committed any further crimes,
given false, incomplete, or misleading testimony or information,
or otherwise violated any provision of this Agreement, (a) all
statements made by the defendant to this Office or other
designated law enforcement agents, and any testimony given by the
defendant before a grand jury or other tribunal, whether prior to
or subsequent to the signing of this Agreement, and any leads
from such statements or testimony shall be admissible in evidence
in any criminal proceeding brought against the defendant; and (b)
the defendant shall assert no claim under the United States
Constitution, any statute, Rule 11(e)(6) of the Federal Rules of
Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or
any other federal rule that such statements or any leads
therefrom should be suppressed.  It is the intent of this
Agreement to waive all rights in the foregoing respects.

01/02

Craig A. Gillen, Esq.
April 29, 2003
Page 8

     This Agreement supersedes any prior understandings, promises, or conditions between this Office and the defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

          Very truly yours,

          JAMES B. COMEY
          United States Attorney

By:           
          MICHAEL G. McGOVERN /JOON H. KIM
          Assistant U.S. Attorneys
          (212) 637-2198 / 2212

          APPROVED:

          KAREN PATTON SEYMOUR RB
          Chief, Criminal Division

AGREED AND CONSENTED TO:

MICHAEL DiLEONARDO     DATE 5/1/03

APPROVED:

CRAIG A. GILLEN, ESQ.     DATE 5/1/03
Attorney for MICHAEL DiLEONARDO

01/02

United States Attorney
Southern District of New York

The Silvio J. Mollo Building
One Saint Andrew's Plaza
New York, New York 10007

January 3, 2002

BY HAND
Steven K. Frankel, Esq.
Frankel, Rudder & Lowery
319 Broadway, 5th Floor
New York, New York 10007

　　　　　　Re: United States v. Anthony Rotondo
　　　　　　　　S8 99 Cr. 1199 (LMM)

Dear Mr. Frankel:

　　　　On the understandings specified below, the Office of
the United States Attorney for the Southern District of New York
("this Office") will accept a guilty plea from Anthony Rotondo
(the "Defendant") to the enclosed two-count superseding
information, S8 99 Cr. 1199 (LMM) (the "Information").

　　　　Count One of the Information charges that, from in or
about 1970 up to and including in or about May 2001, Anthony
Rotondo participated in the affairs of a racketeering enterprise
made up of members and associates of the Decavalcante Organized
Crime Family of the Mafia or "La Cosa Nostra" (hereinafter the
"Decavalcante Organized Crime Family"), through a pattern of
racketeering activity, including predicate acts of murder,
conspiracy to murder, extortion, armed robbery, gambling, and
arson, in violation of Title 18, United States Code,
Section 1962(c), as detailed in Count One in the Information.
The offense charged in Count One carries a maximum sentence of
life imprisonment; a maximum term of 5 years' supervised release;
a maximum fine, pursuant to Title 18, United States Code,
Sections 3571 and 1963, of the greatest of $250,000, twice the
gross pecuniary gain derived from the offense, or twice the gross
pecuniary loss to a person other than the Defendant as a result
of the offense; and a mandatory $100 special assessment.  In
addition, the Defendant shall be ordered to pay restitution,
pursuant to Title 18, United States Code, Sections 3663, 3663A
and 3664.

GOVERNMENT
EXHIBIT
3500-AR-1
04CR911(S-3)(SJ)

Steven K. Frankel, Esq.
January 3, 2002
Page 2

Count Two of the Information charges the Defendant with
using and carrying a firearm at various times during the
commission of the various murders charged in Count One of the
Information, during the period 1970 through December 1999, in
violation of Title 18, United States Code, Sections 924(c) and 2.
The offense charged in Count Two of the Information carries a
maximum sentence of life imprisonment; a mandatory sentence of at
least five years' imprisonment, which must run consecutive to any
other sentence, including the sentence on Count One of the
Information; a maximum term of five years' supervised release; a
maximum fine, pursuant to Title 18, United States Code, Section
3571, of the greatest of $250,000, twice the gross pecuniary gain
derived from the offense, or twice the gross pecuniary loss to a
person other than the Defendant as a result of the offense; and a
mandatory $100 special assessment.

The maximum term of imprisonment faced by the Defendant
as a result of his guilty plea to these offenses is life plus a
mandatory consecutive sentence of at least five years.

With respect to the charges contained in the
Information, the Defendant agrees to waive any challenges he may
have as to venue in the Southern District of New York.

It is understood that the Defendant (a) shall
truthfully and completely disclose all information with respect
to the activities of himself and others concerning all matters
about which this Office inquires of him, which information can be
used for any purpose; (b) shall cooperate fully with this Office,
the Federal Bureau of Investigation, and any other law
enforcement agency designated by this Office; (c) shall attend
all meetings at which this Office requests his presence; (d)
shall provide to this Office, upon request, any document, record,
or other tangible evidence relating to matters about which this
Office or any designated law enforcement agency inquires of him;
(e) shall truthfully testify before the grand jury and at any
trial and other court proceeding with respect to any matters
about which this Office may request his testimony; (f) shall
bring to this Office's attention all crimes which he has
committed, and all administrative, civil, or criminal
proceedings, investigations, or prosecutions in which he has been
or is a subject, target, party, or witness; and, (g) shall commit
no further crimes whatsoever. Moreover, any assistance the
Defendant may provide to Federal criminal investigators shall be

08/09/99

Steven K. Frankel, Esq.
January 3, 2002
Page 3

pursuant to the specific instructions and control of this Office and designated investigators.

It is understood that this Office cannot, and does not, agree not to prosecute the Defendant for criminal tax violations. However, if the Defendant fully complies with the understandings specified in this Agreement, no testimony or other information given by him (or any other information directly or indirectly derived therefrom) will be used against him in any criminal tax prosecution. Moreover, if the Defendant fully complies with the understandings specified in this Agreement, he will not be further prosecuted criminally by this Office for any crimes, except for criminal tax violations, related to his participation in the following, to the extent that he has disclosed such participation to this Office as of the date of the signing of this Agreement:

1. His participation in the affairs of a racketeering enterprise made up of members and associates of the Decavalcante Organized Crime Family, through a pattern of racketeering activity from in or about 1970 through in or about May 2001, consisting of his heretofore disclosed acts of murder, murder conspiracy, armed robbery and theft, extortion, assault, loan sharking, gambling, and arson, including specifically the following Racketeering Acts charged in Count One of the Information:

(i) his participation in the murder of Frederick Weiss as charged in Racketeering Act One;

(ii) his participation in the conspiracy to murder Daniel Annunziatta and Gaetano Vastola, a/k/a "Corky," as charged in Racketeering Act Two;

(iii) his participation in the murder of Joseph Garofano as charged in Racketeering Act Three;

(iv) his participation in the murder of Louis Larasso, a/k/a "Fat Lou," as charged in Racketeering Act Four;

Steven K. Frankel, Esq.
January 3, 2002
Page 4

(v) his participation in the murder of John D'Amato as charged in Racketeering Act Five;

(vi) his participation in the conspiracy to murder Frank D'Amato as charged in Racketeering Act Six;

(vii) his participation in the extortion of Barr Industries as charged in Racketeering Act Seven;

(viii) his participation in a conspiracy to finance and collect extortionate extensions of credit ("loansharking") as charged in Racketeering Act Eight;

(ix) his participation in a conspiracy to commit armed robberies of various business establishments and warehouses in New Jersey and Queens, New York, as charged in Racketeering Act Nine;

(x) his participation in a home-invasion robbery in Long Island, New York, as charged in Racketeering Act Ten;

(xi) his participation in an illegal gambling business, as charged in Racketeering Act Eleven; and

(xii) his participation in various acts of arson, as charged in Racketeering Acts Twelve, Thirteen, and Fourteen.

2.  His participation in various conspiracies to assault and in various assaults committed from in or about 1970 up through and including in or about December 1999, which assaults were committed in part for maintaining and increasing his position in the Decavalcante Organized Crime Family.  These assaults include a beating in the vicinity of "Embers" restaurant, 9519 Third Avenue, in Brooklyn, New York in or about 1989, and a 1989 beating in Saddle River, New Jersey.

08 09 94

Steven K. Frankel, Esq.
January 3, 2002
Page 5

3. His participation, from in or about 1970 up to and including in or about December 1999, in various acts of labor union-related extortion, and other types of extortion, including his supervision of acts of extortion by other members of the Decavalcante Organized Crime Family.

4. His participation, in or about 1988, in discussions relating to the possibility of assaulting or murdering two individuals parked outside of his Brooklyn, New York home.

This Agreement does not provide any protection against prosecution for any crimes except as set forth above, including any acts of violence. It is further understood that, for purposes of sentencing, the Court will be entitled to consider, as relevant conduct, the Defendant's participation in the uncharged criminal conduct described in the preceding sub-paragraphs.

It is understood that the Defendant's truthful cooperation with this Office is likely to reveal activities of individuals who might use violence, force, and intimidation against the Defendant, his family, and loved ones. Should the Defendant's cooperation present a significant risk of physical harm, this Office, upon the written request of the Defendant, will take steps that it determines to be reasonable and necessary to attempt to ensure his safety and that of his family and loved ones. These steps may include application to the Witness Security Program of the United States Marshal's Service, whereby the Defendant, his family, and loved ones, if approved, could be relocated under a new identity. It is understood, however, that the Witness Security Program is under the direction and control of the United States Marshal's Service and not of this Office.

It is understood that this Agreement does not bind any federal, state, or local prosecuting authority other than this Office. This Office will, however, bring the cooperation of the Defendant to the attention of other prosecuting offices, if requested by him.

It is understood that the sentence to be imposed upon the Defendant is within the sole discretion of the Court. This Office cannot, and does not, make any promise or representation as to what sentence the Defendant will receive, and will not recommend any specific sentence to the Court. However, this

Steven K. Frankel, Esq.
January 3, 2002
Page 6

Office will inform the Probation Department and the Court of (a) this Agreement; (b) the nature and extent of the Defendant's activities with respect to this case and all other activities of the Defendant which this Office deems relevant to sentencing; and (c) the nature and extent of the Defendant's cooperation with this Office. In so doing, this Office may use any information it deems relevant, including information provided by the Defendant both prior to and subsequent to the signing of this Agreement. In addition, if this Office determines that the Defendant has provided substantial assistance in an investigation or prosecution, and if he has fully complied with the understandings specified in this Agreement, this Office will file a motion, pursuant to Section 5K1.1 of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e), requesting the Court to sentence the Defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5). It is understood that, even if such a motion is filed, the sentence to be imposed on the Defendant remains within the sole discretion of the Court. Moreover, nothing in this Agreement limits this Office's right to present any facts and make any arguments relevant to sentencing to the Probation Department and the Court, or to take any position on post-sentencing motions. The Defendant hereby consents to such adjournments of his sentence as may be requested by this Office.

It is understood that, should this Office determine either that the Defendant has not provided substantial assistance in an investigation or prosecution, or that the Defendant has violated any provision of this Agreement, such a determination will release this Office from any obligation to file a motion pursuant to Section 5K1.1 of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e), but will not entitle the Defendant to withdraw his guilty plea once it has been entered.

It is understood that, should this Office determine, subsequent to the filing of a motion pursuant to Section 5K1.1 of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e), that the Defendant has violated any provision of this Agreement, this office shall have the right to withdraw such motion.

It is understood that, should the Defendant commit any further crimes or should it be determined that he has given false, incomplete, or misleading testimony or information, or should he otherwise violate any provision of this Agreement, the Defendant shall thereafter be subject to prosecution for any

08/04/99

Steven K. Frankel, Esq.
January 3, 2002
Page 7

federal criminal violation of which this Office has knowledge, including perjury and obstruction of justice. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against the Defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is understood that in the event that it is determined that the Defendant has committed any further crimes, given false, incomplete, or misleading testimony or information, or otherwise violated any provision of this Agreement, (a) all statements made by the Defendant to this Office or other designated law enforcement agents, and any testimony given by the Defendant before a grand jury or other tribunal, whether prior to or subsequent to the signing of this Agreement, and any leads from such statements or testimony shall be admissible in evidence in any criminal proceeding brought against the Defendant; and (b) the Defendant shall assert no claim under the United States Constitution, any statute, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

Steven K. Frankel, Esq.
January 3, 2002
Page 8

This Agreement supersedes any prior understandings, promises, or conditions between this Office and the Defendant. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

MARY JO WHITE
United States Attorney

By: _Dani R. James_
Dani R. James
Assistant United States Attorney
(718) 422-5414

APPROVED:

_Alan R. Kaufman_
ALAN R. KAUFMAN
Chief, Criminal Division

AGREED AND CONSENTED TO:

_Anthony Rotondo_
Anthony Rotondo

_January 7 2002_
DATE

APPROVED:

_Steven K. Frankel_
Steven K. Frankel, Esq.
Attorney for the Defendant

_January 7, 2002_
DATE

08/09 v9

# EXHIBIT P



# Memorandum

| Subject | | Date |
|---|---|---|
| <u>United States v. Joseph Anemone, et al.</u> 01 CR 56 (RR) | | February 26, 2002 |

| To | From |
|---|---|
| The 11(e)(1)(C) Committee | AUSAs Amy Walsh & Noah Perlman |

I.    <u>Background</u>

This memorandum seeks approval for a plea offer pursuant to Rule 11(e)(1)(c) for the defendant Joseph Petillo, who is one of six remaining defendants in the Persico case scheduled for trial on April 15, 2002.  The trial is expected to last approximately two weeks.

The other five remaining defendants are willing to take a guidelines plea on the condition that they get a 1-point reduction for the global disposition.  Petillo, however, will not take a guidelines plea because he is a career offender and faces 14 years if he pleads to the guidelines.

Petillo is charged with racketeering, racketeering conspiracy, loansharking conspiracy, money laundering conspiracy, gambling and conspiracy to distribute marijuana (the amount of marijuana is approximately 900 kilograms (level 28)).  **We seek approval for a Rule 11(e)(1)(c) plea offer of 10 years.**

Petillo is 40 years old, and is a career offender based on two assaults that he was convicted of in 1985.[1]  The remaining defendants in the second phase of the case face guidelines sentences from 2 to 8 years.  Alphonse Persico, a co-defendant in the first phase of the case, pled guilty to an 11(e)(1)(C) plea of 13 years.

As discussed below, this plea offer secures a global disposition of all remaining six defendants in the Persico case, which is currently jeopardized by post-indictment conduct of the main witness, William Cutolo, Jr.  Moreover, this plea offer would be consistent with other plea offers authorized by the 11(e)(1)(C) Committee for other defendants charged with similar conduct.

---

[1]    Petillo served a 9-year sentence for the manslaughter conviction.

## II.    Reasons for a Rule 11(e)(1)(c) Plea

We seek to reach a global resolution of this second phase of the case based on Cutolo, Jr.'s significant deterioration as a witness since the time of indictment.

The backdrop of his deterioration started with serious psychological problems Cutolo was experiencing being away from Brooklyn and the rest of his family. Since the winter of 2001, he has vacillated between violent behavior, as exhibited by his kicking in the wall of a safehouse he was staying in, and depression, often manifested by his abuse of alcohol. We have finally convinced him to get psychological counseling, which he is doing once a week.

In addition to Cutolo's inability to cope with his new circumstances, the following events took place.

In the spring of 2001, Cutolo accused his handling agent of pocketing money from the FBI that was due to Cutolo. Almost immediately after he made this accusation, he recanted it, saying that he was just angry at the agent because he felt as though the agent had made him promises about receiving money that the agent did not fulfill.[2] He then later claimed that he never accused the agent of anything, but rather, the agents had misunderstood what he had said.

In the summer of 2001, Cutolo met with AUSA John Kroger, two FBI agents and Cutolo's defense attorney in order to prepare for trial. At the outset of the meeting, Cutolo told Kroger that he did not actually commit the extortion that he pled guilty to, but rather, his handling agent and AUSA Amy Walsh forced him to plead guilty. After 1-2 hours of discussing this issue, Kroger became convinced that Cutolo was lying about his conduct regarding the extortion -- Cutolo said that he had never threatened the victim, when in fact he had. Kroger then told Cutolo that he was planning on breaching Cutolo, because he thought Cutolo was lying. They then took a break, during which time Cutolo met with his attorney in the adjoining room. Kroger and the agents could hear Cutolo screaming obscenities about Kroger and the agents, and believed that Cutolo might assault one of them upon re-entering the room. When Cutolo came back into the room, Cutolo said, in substance, that he did not want to ruin everything, and if we wanted him to get up on the witness stand and lie, he would do so. Kroger then warned him that he absolutely cannot lie, and ended the meeting. Kroger met with Cutolo and his attorney the next

---

[2]    This false accusation caused the FBI to open an OPR investigation of the agent, which is still pending.

2

day, during which Cutolo seemed substantially calmer. During this meeting, Cutolo admitted that he lied when he told Kroger that he had not threatened the victim.

As recently as last week, however, Cutolo's attorney informed us that Cutolo still believed that he had not committed the extortion, and that he was coerced into pleading guilty.

In addition to this, we recently learned from another cooperator that Cutolo shot someone in the back in the early 1990s (which if he did, he never told us about). After investigating the allegation, the agents located the victim, debriefed him and found him to be credible. According to the victim, Cutolo shot him with a .22 caliber gun in approximately 1991 while the victim was in Cutolo's backyard painting the fence. The victim heard the shot, and felt a searing pain in his back. When he turned around, he saw Cutolo closing the window of the house with a .22 in his hand. Cutolo then said to him that he liked how the victim jumped like a rabbit, and proceeded to tell him that if the victim told anyone about this, Cutolo would harm his family. This threat made the victim too scared to go to the hospital, and the wound seemed to heal on its own. Later, the victim was x-rayed in the hospital for an unrelated reason, and was told that he has a bullet lodged in his back. The agents are getting the x-rays and medical records from the victim. We have scheduled a neutral site in mid-March to confront Cutolo with this information, and in the meantime, we will interview the victim myself and collect any corroborating information.

In short, Cutolo has (1) falsely accused an agent of embezzling FBI funds, and then recanted the accusation; (2) admitted that he lied about his own culpability when he pled guilty to extortion; (3) told the government that he would commit perjury if we wanted him to; (4) returned to the position that he really is not guilty of the extortion; and (5) possibly held back the most serious crime that he has committed (the shooting). Because of Cutolo's central role in this racketeering case, we think an 11(e)(1(C) plea of 10 years for Joseph Petillo is appropriate in order to secure the conviction of 6 Colombo family associates and avoid a 6-defendant trial.

## III. The Evidence Against Petillo

### A. Overview of the Enterprise

Petillo is a member of a crew of associates that was run by William Cutolo, Sr., a powerful captain in the Colombo family ("the Cutolo crew"). When Cutolo, Sr. disappeared on May 26, 1999, Jack DeRoss took over the operations of the crew. From approximately 1993

3

through December 2000, members of the Cutolo crew engaged in, among other things, loansharking, money laundering, extortion, gambling, and marijuana dealing.

Cutolo is the only witness who can provide the enterprise evidence against Petillo and the other defendants. Although we would call other cooperators who have evidence about the predicate acts, neither of these cooperators know how those predicates relate to the Colombo family or who occupied leadership positions within the family.

B.    The Charges against Petillo

1.    Loansharking

Cutolo is one of two cooperators who would provide the evidence against Petillo regarding Petillo's loansharking business.

Cutolo would testify that from approximately 1993 through 1994, he collected loansharking proceeds on behalf of Cutolo, Sr., who was incarcerated at the time. Two of the crew members he collected from was Petillo and Petillo's partner, Ralph Guccione (who is a co-defendant). After 1994, he observed Petillo pay Vincent Paladino (another Cutolo crew associate) the loansharking proceeds, because Paladino had taken over the job of collecting on behalf of Cutolo, Sr.

In addition to Cutolo, Anthony Molinaro would testify that from 1998 through September 1999, he collected loansharking proceeds on behalf of Petillo and Guccione from retail customers.

These two witnesses are corroborated by a loansharking sheet that was found in Alphonse Persico's apartment in October 1999, which lists "Joe P" and "Ralph," the amount per week that they collected and multiplied the interest rate on the loans.

Cutolo's testimony is critical to the loansharking charge because he establishes the relationship between Petillo's loansharking business and the Colombo family, as well as the evidence regarding the early part of the charged time period (Molinaro's participation is limited to 1998 through 1999).

2.    Money Laundering

The money laundering in the case consisted of passing the money from the loansharking activity to DeRoss and then to Persico in order to promote the continuation of the ongoing illegal activity. Cutolo would provide the evidence on this charge by testifying that

4

his father lent the money out to Petillo, Guccione and others for the purpose of loansharking on the condition that they would pay him a percentage of the proceeds, some of which Cutolo, Sr. would pass to higher-ups in the Colombo family.  This testimony is corroborated by the fact that the loansharking sheet in Persico's apartment was wrapped around a bundle of cash.

3.    Gambling Charges

The gambling charges depend primarily on Cutolo's testimony.  Cutolo would testify that between 1993 and 1995, he placed numerous sports bets with Guccione and Petillo, who ran a gambling operation.  Cutolo bet 4-5 times per day, and lost a total of approximately $100,000.  Cutolo usually paid his gambling debts directly to Petillo or Guccione, and sometimes to Anthony Gambale, (one of Petillo and Guccione's collectors).

Cutolo is corroborated in part by Molinaro, who would testify that during the course of collecting loansharking proceeds for Petillo and Guccione, he learned that they operated a gambling business as well.  From approximately 1998 through September 1999, Molinaro placed a few bets through this gambling operation, and collected gambling proceeds from some of the gambling customers.

4.    Narcotics Charges

The bulk of the evidence against Petillo on the narcotics charge comes from Cutolo, Molinaro and another cooperator, Andrew DiDonato.

Cutolo would testify that in approximately 1993 through 1995, he and Andrew DiDonato bought marijuana several times from Petillo and Guccione.  Cutolo would usually pick up the marijuana from either Petillo or Guccione, and deliver it to DiDonato.  Cutolo would also testify about several conversations he had with Petillo in the Spring of 1999 about a dispute over marijuana that Petillo was having at the time with Dominick Dionisio, another Cutolo crew associate (and a co-defendant who already pled guilty).  The dispute involved Dionisio's theft of a load of marijuana that Petillo was responsible for to the supplier.  During one of these conversations, Petillo told Cutolo that Dionisio had suggested that Petillo invoke Cutolo, Sr.'s name, when explaining to the supplier what happened to the missing marijuana, so that the supplier would forgive the debt (evidencing the relationship of the marijuana dealing to the Colombo family).

Molinaro will testify that from 1997 through September 1999, he transported marijuana several times from Albany to Brooklyn

5

on behalf of Petillo and Guccione.

DiDonato will testify that from approximately 1993 through 1995 he engaged in several marijuana transactions with Guccione and Petillo, some of which involved Cutolo.

IV.    Other Plea Offers Authorized by this Committee

Although we realize that every case is unique, the proposed offer seems to be consistent with plea offers that have been authorized by the 11(e)(1)(C) Committee ("the committee") for other defendants charged with a similar crime.

For example, in United States v. Kennedy, Kennedy was charged with selling 294 grams of crack (level 34/151 months). The main witness became unusable because she denied continued drug use. The committee approved a 10-year plea. In United States v. Reyes, the defendant was charged with international cocaine trafficking. The defendant's son was offering to cooperate if the defendant was offered the plea. The committee approved a telephone count plea of 4 years.

The committee also approved of an 11-year plea in United States v. Fenoaltea, where the defendant participated in a felony murder, because one of the two cooperators was breached for lying and the plea was only 3 levels below what the Court would likely find to be the applicable guideline level.

Conclusion

In sum, the case has significant problems aside from the usual risk of any jury trial. Our main cooperator, Cutolo, has stated, among other things, that he did not commit the extortion he pled guilty to, that he will testify falsely regarding this issue if asked to, and has falsely accused an FBI agent of embezzlement (and then denied that he made the accusation).

We believe that the certainty of convictions for all six remaining defendants, and a 10-year sentence for Petillo, far outweighs the risk of going through a trial that might result in his acquittal (and the acquittal of others), thereby releasing him back on the streets to commit more crimes.

We believe that the benefit of the certainty of this lengthy term of incarceration on a marijuana case, coupled with the savings of resources from avoiding a 2-week trial, weighs in favor of extending this plea offer.

6