3101

1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF NEW YORK
2

3      -------------------------------X
       UNITED STATES OF AMERICA,
4                                      :    CR-04-911
                                            (JS)
5           -against-                  :    United States Courthouse
                                            Central Islip, New York
6      ALPHONSE T. PERSICO, and
       JOHN J. DEROSS,
7                                      :    December 3, 2007
                     Defendants.            9:35 a.m.
8      -------------------------------X

9                        TRANSCRIPT OF TRIAL
                   BEFORE THE HONORABLE JOANNA SEYBERT
10          UNITED STATES DISTRICT COURT JUDGE, and a jury.

11

       APPEARANCES:
12     For the Government:        ROSLYNN MAUSKOPF, ESQ.
                                  UNITED STATES ATTORNEY
13                                BY: JOHN BURETTA, AUSA
                                      DEBORAH MAYER, AUSA
14                                    JEFFREY GOLDBERG, AUSA
                                  One Pierrepont Plaza
15                                Brooklyn, New York 11201

16

       For the Defendants:       SARITA KEDIA, ESQ.
17                               JULIE JONES, ESQ.
                                 Five East 22nd Street, Suite 7B
18                               New York, New York 10010
                                 For Deft. A. Persico
19
                                 ROBERT LARUSSO, ESQ.
20                               LaRusso & Conway
                                 300 Old Country Road, Suite 341
21                               Mineola, New York 11501
                                 For Deft. J. DeRoss
22
       Official Court Reporter:   Paul J. Lombardi, RMR, CRR
23     Ph. (631) 712-6106         100 Federal Plaza - Suite 1180
       Fax (631) 712-6122         Central Islip, New York 11722
24
                   Proceedings recorded by mechanical stenography.
25                      Transcript produced by CAT.


                        Paul J. Lombardi, CRR, RPR
                     Official US District Court Reporter

3102

1           (Trial resumes.)

2           THE COURT:  Good morning.  Be seated for a

3    moment.

4           In terms of scheduling, you have gotten the

5    schedule, I assume, from Mr. Goldberg as to the next

6    series of witnesses, and also the letter that the

7    government prepared regarding its anticipated schedule for

8    the next week with the hopes that they will be resting

9    either on December 5th or Thursday, December 6th.

10          MS. KEDIA:  We received that last night.

11          MR. LARUSSO:  We did, your Honor.

12          THE COURT:  All right.

13          And, in addition, you received the 3500 material

14   with regard to one of the witnesses.  I believe you were

15   going to turn that over.

16          MR. BURETTA:  Yes, Judge.

17          We provided the rest of the 3500 to counsel with

18   the exception of Laura Fahmy who will be called on

19   Wednesday.

20          But we'll take care of that this evening.

21          THE COURT:  Okay.

22          MR. BURETTA:  I think they have it already, but

23   it hasn't technically been marked as 3500.

24          THE COURT:  All right.

25          And then you had disclosed the intention to call

1    one of the witnesses.  Has that been done?

2            MR. GOLDBERG:  Yes, your Honor.

3            We have turned over the 3500 material of

4    Dawn Sellers.

5            THE COURT:  All right.

6            That's the case.

7            Anything else?

8            MR. LARUSSO:  One other matter, your Honor,

9    regarding scheduling.

10            Next Tuesday my oldest son is having his fourth

11    knee operation, and I don't think it's necessary to go

12    into the history behind these occasions, Judge, but it's

13    been very traumatic for him.  I have been in attendance at

14    every one of them.

15            I'm not sure yet whether it's 7 o'clock in the

16    morning or 10:30.  I hope to find out today.  He went for

17    his blood tests last week.  I'm very happy to see that the

18    government curtailed their case because I'm going to ask

19    the court to consider possibly giving me at least a half a

20    day to be able to run in to the hospital in New York and

21    then come back out.

22            I don't know yet what the full schedule is and

23    the reason it's being scheduled this early, he gets out of

24    school, I think the 10th or the 11th.  He needs the

25    operation right away because it's a six-week period.  The

3104

1    kind of operation he has requires him to stay off his leg.

2          It's called microfracture surgery, your Honor.

3    They cut out a piece of cartilage and bleed the bone and

4    the bone coagulates and becomes an artificial substance in

5    replacing the cartilage.  So he can't walk on it.

6          It's not like other surgeries where they are

7    able to recover in a week or two weeks.  This is his

8    fourth one, and I'll request the court some leeway to

9    attend with my wife.  This is a very difficult situation

10    for both of us, and I'm asking you to consider that.

11          That's why I say I'm happy to see the letter

12    from the government.  Since that letter was received, I

13    have been going over my list to try and see how long the

14    case will actually be.  I can't give you a definitive

15    answer until I know what the government's case is in

16    conclusion because some of my witnesses may not be

17    relevant.

18          I'll give you a quick for example.

19          For example, if there's no testimony regarding

20    the movements of the conspirators in the Campanella

21    shooting before July 16th, I may not have to call

22    witnesses that worked for Mr. Carmine DeRoss at the

23    Narrows Body Collision that was two witnesses that we

24    would call.

25          So I have to wait to see what the end result is

3105

1    with the government's case before I can give you a

2    definitive answer.  But as it looks now, Judge, I'm

3    talking six, maybe seven hours, at most, if it comes to

4    that.

5            So I'm trying to give you, as best I can, an

6    idea of what I anticipate my defense case will be.  As

7    soon as I can, I'll be more definitive in that regard,

8    Judge.

9            THE COURT:  Where is your son having the

10   surgery?

11           MR. LARUSSO:  The special --

12           THE COURT:  Surgery.

13           MR. LARUSSO:  Yes, in New York City, 72nd and I

14   think it's on the East River Drive.

15           THE COURT:  Okay.  Thank you.

16           Yes.

17           MR. BURETTA:  Judge, with respect to the defense

18   case, we would renew our request for a list of potential

19   witnesses.

20           I understand it's somewhat variable, but it

21   really slows things down if we don't at least have a

22   potential list from them today.  We should start being

23   able to run criminal history checks, et cetera, if they

24   are potential witnesses, so there is no delay in the

25   trial.

1          One other specific witness, Ms. Kedia informed

2    me, I believe it was Friday evening they, quote, may wish,

3    unquote, to call Joseph Massino in the case and I

4    understand she's going to obtain a subpoena from the court

5    today.

6          A couple things on that note.

7          One, Ms. Kedia has agreed that her client will

8    pay for the cost of transporting Mr. Massino.  Due to his

9    security status, it's quite expensive to transport him.

10   In addition, I had written to Ms. Kedia several weeks ago

11   to ask if there was any possibility they were going to

12   call any cooperating witnesses of the government because

13   the marshals do need substantial lead time in order to

14   make sure that happens in a timely fashion.

15          And the response we had gotten to that was that

16   they might call Billy Cutolo Junior, and that subpoena

17   obviously was issued quite some time ago, appropriately.

18   Friday night's the first time I heard about Massino.

19          I only raise this because I don't control the

20   time that the marshals produce him, and I can't provide

21   assurance on their behalf they are going to get him here

22   in time for her to call him.

23          But I'll obviously do what you ask to try to

24   make sure that happens.

25          THE COURT:  Have the defendants agreed to give a

1    potential list of witnesses to the government?

2         MS. KEDIA:  Your Honor, since we just received

3    last night kind of a list of the remainder of the

4    government witnesses, we need a little time to sit with

5    our clients and discuss who now, in light of the

6    government's case, we actually wish to call.

7         We expect to do that tonight and/or -- actually,

8    I was going to ask the court if the court would be

9    willing -- I know we are not sitting tomorrow -- to, in

10   any event, have the defendants produced tomorrow.  I think

11   it was okay with the marshals, so that we may meet with

12   them here and make those decisions.

13        And as soon as we have made those decisions, we

14   will certainly inform the government.

15        MR. LARUSSO:  Judge, in that regard --

16        THE COURT:  You are definitely going to have to

17   give them at least a week's leeway in terms of producing

18   these people.

19        That should be apparent to you.

20        MS. KEDIA:  Well, with respect to someone like

21   Mr. Massino, yes.  I expect that I wouldn't be able to

22   call him until at least next week because I expect it

23   would take that much time for him to arrive here.

24        Some of the witnesses will be government agents.

25        THE COURT:  Let's talk about the witnesses that

3108

1     you want now.

2              You have Mr. Massino.

3              MS. KEDIA:  Yes.

4              THE COURT:  The defendant, Persico's, going to

5     pay for the expenses to transport Mr. Massino to New York.

6              Right?

7              MS. KEDIA:  Yes, your Honor.

8              THE COURT:  Okay.

9              And what who else do you have?

10             MS. KEDIA:  We advised the government,

11    obviously, about Mr. Cutolo Junior.

12             THE COURT:  Is that a definite?

13             MS. KEDIA:  I don't know what his position is in

14    terms of whether he's going to arrive and whether he's

15    going to testify.

16             But he is someone we wish to call.  Yes.

17             MR. BURETTA:  Judge, just so we are clear, the

18    government does not have a relationship with

19    Mr. Cutolo Junior.

20             He had many years ago been a cooperating

21    witness, but that terminated.  He is, as I understand it,

22    recently, and I haven't been given a date, back in the

23    witness security program.  So the marshals are the ones

24    arranging for his transport, which was a subject we had

25    taken up late last week with the court.

3109

1          We haven't communicated with Mr. Cutolo Junior.
2     I don't know if he still has counsel.  If he doesn't, he's
3     going to need counsel to advise him whether he's going to
4     invoke his Fifth Amendment rights or not.
5                THE COURT:  He's not in the witness security
6     program?
7                MR. BURETTA:  My understanding is he is back in
8     the witness security program.
9                THE COURT:  He's back in?
10               MR. BURETTA:  Exactly.
11               MS. KEDIA:  And we prepared a subpoena, as the
12    government requested, for him to be produced and arrive
13    here on Monday, December 10th.
14               THE COURT:  Okay.
15               MS. KEDIA:  I'm happy to hand that up to the
16    court.
17               THE COURT:  Do you know if he's represented by
18    counsel?
19               MR. BURETTA:  I don't think that he is, Judge.
20               I say that because I think one of the members of
21    our team had a discussion with his former counsel, I
22    believe it's a Michael Gold, who said he no longer
23    represents Mr. Cutolo Junior.
24               So we would ask that CJA counsel be appointed
25    for him this week so that counsel can arrange through the

3110

1   marshals to communicate with Mr. Cutolo Junior about what

2   he wishes to do.

3           THE COURT:  Okay.

4           Let's get somebody on it right now, and that

5   will save some time.

6           MS. KEDIA:  Your Honor, another thing that we

7   have, another person that we have determined we wish to

8   call, in light of Mr. Vitale's testimony on Thursday, is

9   former Special Agent Linley DeVecchio.  We will be

10  providing the government with expert witness notice.

11          As the court may know, Agent DeVecchio testified

12  as an expert witness in trials in the Eastern District of

13  New York during the war period, the Colombo war period.

14  His testimony that I seek to elicit will be limited to

15  that period of time between 1991 and 1994.

16          And I would be asking him questions regarding

17  the positions of various people during that period of

18  time.

19          MR. BURETTA:  Well, Judge, that really is going

20  to need to be briefed because there is a real risk of

21  prejudicial spillover given that Mr. DeVecchio obviously

22  just had a proceeding in state court.

23          MS. KEDIA:  I certainly don't intend to ask him

24  about any of his own proceedings.  I don't know that he

25  would testify to them anyway.

3111

1          But I expect his testimony would be limited to
2     matters to which he has testified as an expert witness in
3     prior cases.
4          THE COURT:  Well, do you have a list of the
5     testimony and transcripts of that testimony?
6          MS. KEDIA:  I'm in the process of obtaining
7     them, your Honor.
8          I know that he did testify at the trial against
9     Vic Orena in 1992.
10         THE COURT:  So you have known about his, shall
11    we say, expertise, for some time?
12         MS. KEDIA:  I just learned this weekend,
13    actually, your Honor.
14         THE COURT:  You just learned this weekend?
15         With all the publicity that Mr. DeVecchio's
16    being getting --
17         MS. KEDIA:  At the Vic Orena trial, Judge, I
18    wasn't even a lawyer in 1992.
19         I didn't know he testified in the Vic Orena
20    trial until this weekend.
21         THE COURT:  What other trials has he testified
22    in?
23         MS. KEDIA:  I'm sorry?
24         THE COURT:  What other trials has he testified
25    in?

3112

1           MS. KEDIA:  Michael Sessa, my client tells me.

2           THE COURT:  And do you know approximately when

3    that was?

4           MS. KEDIA:  Around the same time period, your

5    Honor, 1992-1993.

6           THE COURT:  All right.

7           Anybody else that you can think of?

8           MS. KEDIA:  In terms of agents, I expect to call

9    both Nora Conley and Kimberly McCaffrey.

10          One of these agents, I believe, was present and

11   took notes during the September 2003 interview of

12   Mr. Vitale regarding the Colombos, and that was Nora

13   Conley, I believe, your Honor.

14          And Ms. McCaffrey, the witness stated, was

15   present during this meeting some time earlier this year,

16   August or September, that the witness stated that he had

17   with Ms. Mayer and Ms. Peterson and another two agents.

18          THE COURT:  You want to see if that person took

19   any notes?

20          MS. KEDIA:  Yes.

21          THE COURT:  All right.

22          All the jurors are here.  Let's bring them in.

23   The government's first witness, I don't know if you gave

24   me this --

25          MR. LARUSSO:  Your Honor, one other matter.

1           Before the surveillance witness, Mr. Sullivan --

2           MR. GOLDBERG:  Mr. Zeumann --

3           MR. LARUSSO:  There is an agent by the name of

4    Sullivan who I believe is going to testify regarding

5    surveillances that were made May 26th of 2000 at the

6    anniversary party of Mr. DeRoss and his wife.

7           I'd like to be heard on that before that witness

8    testifies.  We don't have to do it now.

9           THE COURT:  All right.  Let's bring in the jury.

10          Your first witness is going to be Gary Vogel?

11          MR. GOLDBERG:  Matthew Zeumann.

12          We handed up information this morning regarding

13   his testimony.

14          Would you like him to come in now, Judge?

15          THE COURT:  Yes.

16          Tell him to come on in.

17          (Whereupon, there was a pause in the

18   proceedings.)

19          THE CLERK:  Jury entering.

20

21          (Jury enters the courtroom.)

22          THE COURT:  Good morning.

23          Nice to see your bright, shining, smiling faces.

24   Please be seated.

25          The government is calling their next witness.

Zeumann - Direct/Goldberg

3114

1          MR. GOLDBERG:  The government calls Matthew

2    Zeumann.

3          THE CLERK:  Raise your right hand to be sworn

4    in.

5    **MATTHEW ZEUMANN**,

6          having been duly sworn, was examined

7          and testified as follows:

8          THE CLERK:  Please take a seat.

9          Pick up that handheld microphone and state and

10   spell your name for the record.

11         THE WITNESS:  Matthew Zeumann, Z-E-U-M-A-N-N,

12   investigator, United States Attorney's Office,

13   Southern District of New York.

14   DIRECT EXAMINATION

15   BY MR. GOLDBERG:

16   Q.   Good morning, sir.

17   A.   Good morning.

18   Q.   Keep that microphone close to you.

19   A.   Okay.

20   Q.   And would it be fair to say you are a little hard of

21   hearing?

22   A.   Yes.

23   Q.   Okay.

24         Sir, did you at one time work for the NYPD?

25   A.   Yes, I did.

Zeumann - Direct/Goldberg

3115

1    Q.    From when to when?

2    A.    From 1968 to 1992.

3    Q.    I'd like to direct your attention to 1991, if I

4    could.  And, specifically, May 18, 1991.

5              Were you working that day?

6    A.    Yes, I was.

7    Q.    What were you assigned to do?

8    A.    I was assigned to do surveillance on Hylan Boulevard

9    at the Shalomar at the wedding of William Cutolo's

10   daughter.

11   Q.    What is the Shalomar?

12   A.    The Shalomar is a catering hall.

13   Q.    Were you alone on that surveillance or part of a

14   team?

15   A.    I was part of a team.

16   Q.    Was your team on foot or in vehicles?

17   A.    In vehicles.

18   Q.    Approximately how long did you surveil this event?

19   A.    From approximately 5 p.m. to 2 a.m.

20   Q.    Did you and your team memorialize your observations

21   that day?

22   A.    Yes.

23   Q.    Would it aid you in your testimony if you had a 1991

24   report near you?

25   A.    Yes, it would.

Zeumann - Direct/Goldberg

3116

1    MR. GOLDBERG:  May I approach, your Honor?

2    THE COURT:  Yes.

3    BY MR. GOLDBERG:

4    Q.    Sir, I placed before you 3500 MZ 1.

5          You see that document?

6    A.    Yes.

7    Q.    I'm going to ask you some questions, and if you need

8    to refresh your recollection, you can refer to that

9    report.

10         But I'd ask that you not read it out loud.

11   Okay?

12   A.    Okay.

13   Q.    I'd like to ask you a series of names, and if you

14   could tell us whether you saw -- you and your team saw

15   that person that day, just let us know.

16         Okay?

17   A.    Okay.

18   Q.    Did you see Vinny Aloi at that function?

19   A.    Yes.

20   Q.    Joey Amato?

21   A.    Yes.

22   Q.    Thomas Carbonaro?

23   A.    Yes.

24   Q.    William Cutolo?

25   A.    Yes.

Zeumann - Direct/Goldberg

3117

1    Q.    Jackie D'Amico?

2    A.    Yes.

3    Q.    Robert D'Onofrio?

4    A.    Yes.

5    Q.    Jimmy Failla?

6    A.    Yes.

7    Q.    Frank Fapiano?

8    A.    Yes.

9    Q.    Joey Gambale?

10   A.    Yes.

11   Q.    John Gotti Junior?

12   A.    Yes.

13   Q.    Peter Gotti?

14   A.    Yes.

15   Q.    Frank Ianacci?

16   A.    Yes.

17   Q.    Danny Marino?

18   A.    Yes.

19   Q.    Vic Orena?

20   A.    Yes.

21   Q.    Charles Panarella?

22   A.    Yes.

23   Q.    Teddy Persico Senior?

24   A.    Yes.

25   Q.    Joey Scopo?

Zeumann - Direct/Goldberg

3118

1  A.    Yes.

2  Q.    Anthony Spero?

3  A.    Yes.

4  Q.    And, lastly, Sal Vitale?

5  A.    Yes.

6  Q.    Now, sir, did you and your team make certain

7  observations of vehicles that day?

8  A.    Yes, we did.

9  Q.    In general, what observations did you make?

10 A.    Plate numbers of people going in and out of the

11 wedding.

12 Q.    What did you do with those license plate numbers?

13 A.    We ran them on a DMV machine to get the registration,

14 registered owners of those vehicles.

15 Q.    The registered owners?

16 A.    Yes.

17 Q.    And their addresses?

18 A.    Yes.

19 Q.    Did you memorialize that information in the report

20 you have before you, 3500 MZ 1?

21 A.    Yes, we did.

22 Q.    I'd like to ask you a few questions about that, and,

23 again, if you need to refresh your recollection, feel free

24 to do so.

25        Okay?

3119

1    A.    Okay.

2    Q.    Did you observe a vehicle registered to a Frank

3    Tormenia?

4          If you need to look at page four to refresh your

5    recollection.

6    A.    Yes.

7    Q.    Directing your attention to page six, if you need to

8    refresh your recollection.

9          Do you recall seeing a vehicle that was

10   registered to a Salvatore Gioeli?

11   A.    Yes.

12   Q.    And what town was that person -- was the car

13   registered to?

14   A.    Farmingdale, New York.

15   Q.    That was the address of Salvatore Gioeli?

16   A.    Yes.

17   Q.    Now directing your attention to page 12, again, if

18   you need to refresh your recollection, page 12, towards

19   the bottom.

20         Did you see a car that was registered to Lucille

21   DeRoss?

22   A.    Yes.

23   Q.    And what was the address of registration?

24   A.    168 Hope Avenue, Staten Island, New York.

25   Q.    Did you see a car registered to someone named Michael

Zeumann - Cross/Kedia

3120

1    Spataro?

2              Page 14, towards the top?

3    A.    Yes.

4    Q.    Thank you, sir.

5              MR. GOLDBERG:  No further questions, your Honor.

6    CROSS-EXAMINATION

7    BY MS. KEDIA:

8    Q.    Agent Zeumann, good morning.

9    A.    Good morning.

10   Q.    When you conducted this surveillance in May of 1991,

11   did you have -- were there other agents with you, or

12   police officers with you?

13   A.    Yes.

14   Q.    Who were they?

15   A.    One was Kenneth McCabe, and the other one was Chris

16   Favo.

17   Q.    And who are Kenneth McCabe and Chris Favo?

18   A.    Kenneth McCabe was an investigator for the United

19   States Attorney's Office, Southern District of New York.

20             And Chris Favo is -- or was -- an FBI agent.

21   Q.    And how is it that you came to be assigned to conduct

22   this surveillance with the two of them?

23             MR. GOLDBERG:  Objection, your Honor.

24             THE COURT:  Sustained.

25   BY MS. KEDIA:

Zeumann - Cross/Kedia

3121

1    Q.    You were assigned by whom?

2              MR. GOLDBERG:  Same objection, your Honor.

3              THE COURT:  Sustained.

4    BY MS. KEDIA:

5    Q.    Kenneth McCabe, you said he was an investigator for

6    the Southern District of New York?

7    A.    Yes, he was.

8    Q.    Did he have any sort of specialty?

9              MR. GOLDBERG:  Your Honor, I'm going to object.

10             THE COURT:  Please approach on this for a

11   moment.

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Zeumann - Cross/Kedia

3122

1          (Sidebar.)

2          THE COURT:  Your objection.

3          MR. GOLDBERG:  Your Honor, I don't see the

4    relevance here of this line of questioning.

5          He was called as a witness for a very specific

6    purpose, to talk about the observations that the team

7    made.  I didn't ask him any questions about who the other

8    people were on the team and their backgrounds.

9          By the way, Mr. McCabe, you may know, is

10   deceased.  I don't understand where we are going here.

11         MS. KEDIA:  The reason I'm asking these

12   questions is that, Kenneth McCabe was the expert witness

13   essentially that was called during this period of time

14   from the Southern District of New York.

15         And I think that your Honor may recall that John

16   Carillo testified that he actually replaced Kenneth

17   McCabe.

18         THE COURT:  Yes.

19         MS. KEDIA:  The point of the questions is to

20   show they had someone who had an expertise in organized

21   crime because I want to point out certain individuals that

22   weren't present and that certainly would have been

23   recognized by this person Kenneth McCabe.

24         THE COURT:  The point of all this is that

25   whoever was there, they noted that they were there.

Zeumann - Cross/Kedia

3123

1          If you want to then argue that other people

2     should have been there and weren't or whatever

3     significance that has, you are free to do so.

4          MS. KEDIA:  Right.

5          But this person, having been from the NYPD, may

6     not have known the significance of certain people, and

7     that could be the reason that he didn't know them.

8          As opposed to Kenneth McCabe, who certainly

9     would have known who these other people were.

10         THE COURT:  I would assume that Kenneth McCabe

11    would have noted them and it would have been included in

12    the report.

13         MS. KEDIA:  Right.

14         But the jury doesn't know that without knowing

15    who Kenneth McCabe is.

16         MR. GOLDBERG:  Your Honor, all the questions

17    about Kenneth McCabe are irrelevant.

18         I have no problem, so we are clear, if Ms. Kedia

19    wants to ask him if certain other individuals were not

20    observed there that day.

21         MS. KEDIA:  Of course.

22         MR. GOLDBERG:  I don't know why we need to go

23    into the whole Kenneth McCabe thing.

24         MS. KEDIA:  Because I expect that this witness,

25    certainly it wasn't brought out on direct examination,

Zeumann - Cross/Kedia

3124

1    didn't have a particular expertise as to all of the five

2    families in New York, and wouldn't necessarily have known

3    the relevance of certain individuals.

4              He's obviously with two agents who do know the

5    relevance of those people, and would be able to make that

6    determination.  I don't expect -- obviously they are not

7    calling Kenneth McCabe because he passed away.

8              Chris Favo, I don't know if he is still an agent

9    of the FBI.  I don't expect the government to call him.  I

10   can't ask these people these questions.

11             And, frankly, it would be a waste of time to

12   have them called to ask these questions.

13             THE COURT:  Your point is to show, what?  That

14   certain people weren't there?

15             MS. KEDIA:  Yes.

16             That there are agents conducting the

17   surveillance with this individual who have an expertise in

18   organized crime, who would have knowledge of these people,

19   would recognize them by face because obviously a lot of

20   this list is created because someone is recognized, that

21   they would have the ability to recognize them, that they

22   certainly would note their presence.

23             THE COURT:  Can you enter a stipulation?

24             MR. GOLDBERG:  Just so we are clear, your Honor,

25   everything she wants to argue is in the record.

Zeumann - Cross/Kedia

1          It's already been noted by Mr. Carillo that Ken

2     McCabe was an experienced investigator.  He already

3     indicated that he was with Kenneth McCabe that day.  I

4     don't understand why she can't ask him, did you see this

5     person there?  Did you see that person there?

6          And he'll say yes or no.

7          MS. KEDIA:  I don't understand the objection.

8          THE COURT:  Ask him if he's a qualified agent

9     and he has expertise pertaining to McCabe.

10         MS. KEDIA:  Okay.

11         THE COURT:  And then move on.

12         MS. KEDIA:  I'm moving on.

13         THE COURT:  And then go through your list.

14         Let's not waste a lot of time.

15         (Sidebar concluded.)

16         (Continued on next page.)

17

18

19

20

21

22

23

24

25

Zeumann - Cross/Kedia

3126

1                  (In open court.)

2      BY MS. KEDIA:

3      Q.    Mr. Zeumann.

4      A.    Yes.

5      Q.    We were speaking about a person by the name of

6      Kenneth McCabe.

7                  Do you know if he has any special expertise with

8      respect to organized crime?

9      A.    Yes.

10     Q.    Can you tell the jury what that is?

11     A.    He's been working on -- he was working on organized

12     crime for quite a few years.

13     Q.    For some period of time long before this

14     surveillance?

15     A.    Yes.

16     Q.    And at the time of this surveillance you regarded him

17     as someone with an expertise in organized crime.

18                 Right?

19     A.    Could you please repeat that.

20     Q.    At the time of this 1991 surveillance, you regarded

21     Agent -- Mr. McCabe as someone with an expertise in

22     organized crime.

23                 Is that right?

24     A.    Yes.

25     Q.    And did you, yourself, Mr. Zeumann, have any

Zeumann - Cross/Kedia

3127

1    expertise in organized crime?

2    A.    No.

3    Q.    How is it that you listed a number of individuals

4    that were present at this wedding reception -- and

5    certainly there were many, many more individuals present

6    other than the ones spoken about.

7          Right?

8    A.    Yes.

9    Q.    Hundreds?

10   A.    Excuse me?

11   Q.    Hundreds of people?

12         How many people were at this wedding reception?

13   A.    I don't know.

14   Q.    Can you give us any approximation?

15   A.    Maybe 200.

16         I really don't know.

17   Q.    And how is it that you were able to identify the

18   individuals that you did identify?

19   A.    Because the team knew who they were.

20   Q.    And when you say the team, do you mean you?

21         Or do you mean the other agents that were

22   present with you?

23   A.    Both.

24   Q.    And you were able to specifically, out of the

25   approximately 200, let's say, individuals that attended,

Zeumann - Cross/Kedia

3128

1    you were able to identify 100 of them, or so?

2    A.    As many that are on this sheet.

3          Maybe a hundred.

4    Q.    And then you were also able to identify a number of

5    vehicles, you ran the plates for a number of vehicles that

6    were also present.

7          Right?

8    A.    The cars that were present.

9          Right.

10   Q.    And with respect to certain of the vehicles that you

11   were able to identify, you weren't able to identify the

12   people who actually got out of the vehicles?

13   A.    No.

14   Q.    Now, you identified two people with the last name

15   Gotti who were present at the reception of Mr. Cutolo's

16   daughter.

17         Right?

18   A.    Yes.

19   Q.    John Junior, you said, John Gotti Junior?

20   A.    Yes.

21   Q.    And Peter Gotti.

22         Right?

23   A.    Yes.

24   Q.    Was there a person in attendance by the name of

25   Michael DiLeonardo?

3129

1   A.   He's not on the report.

2        He might have been there.  We maybe didn't see

3   him.

4   Q.   Well, when you say he might have been there, but you

5   didn't see him, certainly he is someone who was known to

6   you.

7   A.   He wasn't known to me.

8   Q.   Was he known to the other two individuals --

9        MR. GOLDBERG:  Objection.

10       THE COURT:  Sustained.

11  BY MS. KEDIA:

12  Q.   -- who were present.

13       Were John Gotti Junior and Peter Gotti known to

14  you?

15  A.   Yes.

16  Q.   The other people that you listed during your direct

17  testimony that were present, Sal Vitale, was he known to

18  you?

19  A.   Yes.

20  Q.   Anthony Spero?

21  A.   Yes.

22  Q.   Was a person by the name of Charles Panarella known

23  to you?

24  A.   Yes.

25  Q.   Person by the name of Teddy Persico Senior?

Zeumann - Cross/Kedia

3130

1    A.    No.

2    Q.    You didn't know who that was?

3    A.    I didn't personally know him, no.

4    Q.    Well, when you say personally know him, did you

5    personally know each of these other individuals?

6    A.    I knew them better than the others.

7    Q.    How did you know them?

8              MR. GOLDBERG:  Objection, Judge.

9              THE COURT:  Sustained.

10   BY MS. KEDIA:

11   Q.    Well, when you identified who Anthony Spero was, you

12   were able to make that identification.

13         Right?

14   A.    Yes.

15   Q.    How were you able to make that identification?

16             MR. GOLDBERG:  Judge, irrelevant.

17             Objection.

18             THE COURT:  Overruled.

19   A.    I have seen them on different occasions.

20   Q.    Meaning when you were --

21             MS. KEDIA:  Withdrawn.

22   BY MS. KEDIA:

23   Q.    Certainly you are not suggesting he was a friend of

24   yours, right?

25   A.    No.

Zeumann - Cross/Kedia

3131

1   Q.   When you say you have seen him, you are talking about

2   during surveillances.

3            Right?

4   A.   Yes.

5   Q.   And Michael DiLeonardo, was he someone you had seen

6   before?

7   A.   No.

8   Q.   Does the name mean something to you as I'm saying it

9   to you now?

10  A.   Now I know him.

11  Q.   In 1991 you did not?

12  A.   No.

13  Q.   Apart from Teddy Persico Senior, who you didn't know

14  during that time, was Alphonse Persico present at this?

15  A.   No.

16           Was he present at the wedding?

17  Q.   At the wedding reception.

18  A.   I don't know.  I didn't see him.

19           He could have been there.

20  Q.   Well, when you say you didn't see him, Mr. Zeumann,

21  that was the purpose of your surveillance, to write down

22  the people present.

23           MR. GOLDBERG:  Objection, argumentative.

24           THE COURT:  Sustained.

25

Zeumann - Cross/Kedia

3132

1    BY MS. KEDIA:

2    Q.    What was the purpose of your surveillance,

3    Mr. Zeumann?

4             MR. GOLDBERG:  Objection.

5             THE COURT:  Overruled.

6    A.    Could you repeat that.

7    Q.    What was the purpose of conducting this surveillance

8    for some nine hours on that day?

9    A.    To note people going in and out of the wedding.

10   Q.    Sal Vitale, do you know when he arrived and when he

11   left the wedding reception that day?

12   A.    No.

13   Q.    Do you have any idea how long he was present at the

14   wedding reception that day?

15   A.    No.

16   Q.    He is someone who also was known to you, you said?

17   A.    I know who he was.

18             Yes.

19   Q.    How did you know who he was?

20   A.    I knew him from other surveillances.

21   Q.    In relation to Mr. Cutolo Senior?

22             MR. GOLDBERG:  Objection, your Honor.

23             THE COURT:  Sustained.

24   BY MS. KEDIA:

25   Q.    Well, had you conducted other surveillances having to

Zeumann - Cross/LaRusso

3133

1    do with Cutolo -- Mr. Cutolo Senior's family?

2              MR. GOLDBERG:  Objection, your Honor.

3              THE COURT:  Overruled.

4    A.   I might have.

5    Q.   You don't have any specific recollection?

6    A.   No.

7    Q.   Do you have any specific recollection of going to his

8    son's wedding?

9    A.   No.

10   Q.   Thank you.

11             MS. KEDIA:  I have nothing further.

12             MR. LARUSSO:  May I just, your Honor?

13             THE COURT:  Yes.

14   CROSS-EXAMINATION

15   BY MR. LARUSSO:

16   Q.   Good morning.

17   A.   Good morning.

18   Q.   At the time of the surveillance in 1991, did you know

19   Jackie DeRoss?

20   A.   No.

21   Q.   After the surveillance, did you come to know who

22   Jackie DeRoss was?

23   A.   Just from the paper recently.

24             Not right after the wedding.  It happened in,

25   like, '03, '02, where around there.

**Zeumann - Redirect/Goldberg**

3134

1    Q.   At the time of the surveillance, did you know

2    Mr. DeRoss was incarcerated?

3            At the time of the surveillance?

4    A.   No.

5            I didn't know him.

6            MR. LARUSSO:  No further questions, your Honor.

7            MR. GOLDBERG:  Your Honor, just one question.

8            THE COURT:  Yes.

9    REDIRECT EXAMINATION

10   BY MR. GOLDBERG:

11   Q.   You were asked some questions about Kenneth McCabe.

12   A.   Yes.

13   Q.   Is Kenneth McCabe alive today?

14   A.   No, he's not.

15   Q.   Thank you.

16           THE COURT:  Thank you.

17           You are done.  Next witness.

18           MR. GOLDBERG:  The government calls Thomas

19   McWeeney.

20           (Whereupon, there was a pause in the

21   proceedings.)

22           THE CLERK:  Please step up and remain standing

23   to be sworn in.

24   **THOMAS MCWEENEY**,

25           having been duly sworn, was examined

McWeeney - Direct/Goldberg

3135

1           and testified as follows:

2                THE CLERK:  Take a seat, please.

3                Pick up the handheld microphone.  State and

4     spell your name for the record.

5                THE WITNESS:  Thomas S. McWeeney, M-C, capital

6     W-E-E-N-E-Y.

7                THE CLERK:  Thank you.

8     DIRECT EXAMINATION

9     BY MR. GOLDBERG:

10    Q.   Good morning, sir.

11    A.   Good morning.

12    Q.   Did you at one time work for the FBI?

13    A.   Yes, I did.

14           From 1997 until the end of 2004.

15    Q.   I'd like to direct your attention to 1998.

16           Where were you assigned in 1998?

17    A.   I was assigned to the New York field office, the

18    Colombo organized crime squad.

19    Q.   Now directing your attention specifically to May 20,

20    1998, were you working that day, sir?

21    A.   Yes, I was.

22    Q.   Briefly, what were you assigned to do?

23    A.   I was assigned to conduct surveillance of two

24    business establishments on 11th Avenue in Diker Heights,

25    Brooklyn.

McWeeney - Direct/Goldberg

3136

1    Q.    Which business establishments?

2    A.    Romantique Limousine and Perk's Coffee.

3    Q.    How far apart are those two establishments?

4    A.    Approximately three, four blocks.

5    Q.    I'd like to direct your attention to about 11:50 p.m.

6    that day.

7          What if anything did you see at that time?

8    A.    I saw Alphonse Persico and Michael Persico walking

9    towards Perk's Coffee from the direction of Romantique.

10   Q.    Do you see Alphonse Persico today?

11   A.    I do.

12   Q.    Can you tell us what he's wearing?

13   A.    He's wearing a gray V-neck sweater, and white

14   T-shirt.

15          MR. GOLDBERG:  Your Honor, indicating the

16   defendant Alphonse Persico?

17          THE COURT:  Yes.

18   BY MR. GOLDBERG:

19   Q.    After you saw Alphonse Persico and Michael Persico

20   walking from the direction of Romantique towards

21   Perk's Coffee, where did they go?

22   A.    They went inside Perk's Coffee.

23   Q.    What did you see next?

24   A.    I saw Joe Baudnanza pull up in a black SUV and enter

25   Perk's Coffee.

3137

1    Q.   How long after you saw Alphonse Persico and Michael

2    Persico walking on the street, did you see Joe Baudnanza

3    pull up to Perk's Coffee?

4    A.   Approximately five minutes.

5    Q.   After Joe Baudnanza entered Perk's, what if anything

6    did you do at that time?

7    A.   Approximately five minutes later I entered

8    Perk's Coffee also.

9    Q.   Can you describe for the jury what it looked like

10   inside Perk's Coffee.

11   A.   Similar to other coffee shops.

12        It had a bar along the entrance wall, and behind

13   the bar was where you would order your coffee.  And I saw

14   Alphonse Persico on one side and Michael Persico and Joe

15   Baudnanza on the other side of the bar engaged in

16   conversation.

17   Q.   Did you and your team --

18        MR. GOLDBERG:  Withdrawn.

19   BY MR. GOLDBERG:

20   Q.   Were you working with a team that day?

21   A.   I was working with one other agent.

22   Q.   Did you take surveillance photographs that day?

23   A.   The other agent did.

24        Yes.

25   Q.   Have you had a chance to review those photos?

McWeeney - Direct/Goldberg

3138

1   A.   Yes, I have.

2           MR. GOLDBERG:  May I approach, your Honor?

3           THE COURT:  Yes.

4           (Whereupon, there was a pause in the

5   proceedings.)

6

7   BY MR. GOLDBERG:

8   Q.   Showing you what's been marked as Government Exhibit

9   45 A, 45 B, 45 C, 45 D and 45, which is a blowup of those

10  photos.

11          Do you recognize those photos?

12  A.   Yes, I do.

13  Q.   Are those photos that were taken that day, May 20,

14  1998?

15  A.   Yes, they were.

16  Q.   And do they fairly and accurately depict your

17  observations that day?

18  A.   They do.

19  Q.   And some of the exhibits, all of them except for 45 D

20  have name labels on them.

21          Do you see those?

22  A.   Yes, I do.

23  Q.   Are those fair and accurate name attributions?

24  A.   Yes, they are.

25          MR. GOLDBERG:  Your Honor, we offer 45 A through

3139

1    D, and 45, itself.

2            MS. KEDIA:  No objection.

3            MR. LARUSSO:  No objection, your Honor.

4            THE COURT:  Received in evidence.

5            (Whereupon, Government Exhibits 45, and 45 A-D

6    were received in evidence, as of this date.)

7            MR. GOLDBERG:  Your Honor, I'm going to set this

8    here and put the photos on the ELMO, so the jury can see

9    them.

10           THE COURT:  Right.

11           MR. GOLDBERG:  If you could pull up that screen.

12   BY MR. GOLDBERG:

13   Q.   This is 45 A, Mr. McWeeney.

14           Could you tell us what we are seeing here?

15   A.   It's Alphonse Persico exiting Perk's.

16   Q.   45 B.

17   A.   Joseph Baudnanza exiting Perk's.

18   Q.   Showing you 45 A again.

19           Alphonse Persico?

20   A.   That's correct.

21   Q.   Now showing you 45 C.

22   A.   That's Michael Baudnanza -- I'm sorry -- Michael

23   Persico exiting Perk's on the right, and Alphonse Persico

24   with his back to the camera on the left.

25   Q.   And I think I may have misspoken before about 45 C.

McWeeney - Direct/Goldberg

3140

1              This is 45 B.

2    A.    That's Joseph Baudnanza exiting Perk's.

3              MR. GOLDBERG:  May I pass these out.

4              THE COURT:  Yes.

5              (Whereupon, the above-mentioned exhibits were

6    published to the jury.)

7    BY MR. GOLDBERG:

8    Q.    Now, sir, I'd like to direct your attention to the

9    year 2000.

10             Where were you working in 2000?

11   A.    I was on the Colombo organized crime squad in the

12   New York office.

13   Q.    Same place as 1998?

14   A.    Correct.

15   Q.    Now, directing your attention to April 27th of 2000.

16             Were you working that day?

17   A.    Yes, I was.

18   Q.    What were you assigned to do that day?

19   A.    I was assigned to, as part of the team, to surveil

20   Frank Persico.

21   Q.    What time did you and your team start the

22   surveillance of Frank Persico that day?

23   A.    We started at 7:30 in the morning at his residence on

24   Staten Island.

25   Q.    Did there come a time when you saw Frank Persico?

3141

1    A.    Yes.

2          At a little before 10 he exited his residence

3    and entered his vehicle, departed the area, went to a

4    bagel shop.

5          And then proceeded on to a business

6    establishment in Staten Island.

7    Q.    So you and your team followed him?

8    A.    That is correct.

9    Q.    What business establishment did he arrive at?

10   A.    He arrived at RCP Group Bryn Mawr Investing Group on

11   McLean Avenue on Staten Island.

12   Q.    Approximately what time did he arrive there?

13   A.    He arrived a little after 10 in the morning, about

14   10:10, 10:12.

15   Q.    Directing your attention to a little bit later, 11

16   o'clock in the morning.

17          What if anything did you see at that time?

18   A.    I saw -- the team saw Jackie DeRoss and Jimmy LaForte

19   pull up in a Lexus SUV and enter the business

20   establishment.

21   Q.    You said the team.

22          I assume you were in contact with each other?

23   A.    That's correct.

24   Q.    What did you see next?

25   A.    Approximately a half an hour later, we saw Jimmy

McWeeney - Direct/Goldberg

3142

1    LaForte and Jackie DeRoss exit the business establishment

2    and depart in their vehicle with Jimmy LaForte driving.

3    Q.   By the way, do you see Jackie DeRoss in court today?

4    A.   I do.

5    Q.   And what is he wearing?

6    A.   He's wearing a maroon jacket.

7         MR. GOLDBERG:  Your Honor, indicating the

8    defendant, John DeRoss.

9         THE COURT:  Yes.

10   BY MR. GOLDBERG:

11   Q.   After you saw Jimmy LaForte and Jackie DeRoss depart

12   that area, did you follow them?

13   A.   No, we didn't.

14        We maintained surveillance for Frank Persico.

15   Q.   And what did you see next?

16   A.   Approximately 20 minutes later, Frank Persico and

17   Anthony Stripoli exited the business establishment and

18   departed the area in a Mercedes driven by Mr. Stripoli.

19   Q.   Did you continue to follow Frank Persico that day?

20   A.   Yes, we did.

21   Q.   And did there come a time when you had to terminate

22   your surveillance?

23   A.   Yes.

24        About 2:30 in the afternoon we terminated the

25   surveillance because we lost visual contact with them.

McWeeney - Direct/Goldberg

3143

1    Q.   Were there photos taken that day?

2    A.   Yes, there were.

3              MR. GOLDBERG:  May I approach, your Honor?

4              THE COURT:  Yes.

5    BY MR. GOLDBERG:

6    Q.   Showing you what's been marked as 142, 142 A through

7    D, and the poster board 142.

8              They are both the same, the miniature and the

9    larger version.

10             Do you recognize those photos?

11   A.   Yes, I do.

12   Q.   Were those photos that were taken that day?

13   A.   Yes, they were.

14   Q.   Do they fairly and accurately depict some of the

15   observations you made that day?

16   A.   Yes, they do.

17   Q.   Most of those photos have name at contusions on them.

18             Are those fair and accurate name attributions?

19   A.   Yes, they are.

20             MR. GOLDBERG:  Your Honor, we offer both 142,

21   both the poster and miniature, and 142 A.

22             MS. KEDIA:  No objection.

23             MR. LARUSSO:  No objection, your Honor.

24             THE COURT:  Received in evidence.

25             (Whereupon, Government Exhibits 142 and 142 A

McWeeney - Direct/Goldberg

3144

1    were received in evidence, as of this date.)

2

3              (Whereupon, the above-mentioned exhibits were

4    published to the jury.)

5    BY MR. GOLDBERG:

6    Q.    Putting up on the screen 142 A.

7          You see that?

8    A.    Yes, I do.

9    Q.    Could you describe who we are looking at?

10   A.    We are looking at Jackie DeRoss on the left and Jimmy

11   LaForte on the right heading towards their vehicle after

12   exiting the business.

13   Q.    And 142 B.

14   A.    On the left is John DeRoss entering the vehicle.

15   Q.    And on the right?

16   A.    On the right's Jimmy LaForte inside the vehicle in

17   the driver's seat.

18   Q.    I'm going to show you 142 D, as in David.

19          Who is that?

20   A.    That's Frank Persico directly outside the business.

21   Q.    The Bryn Mawr Investing Group business you

22   identified?

23   A.    Correct.

24   Q.    Thank you.

25              MR. GOLDBERG:  No further questions, your Honor.

Zeumann - Cross/Kedia

3145

1          THE COURT:  Cross-examination.

2     CROSS-EXAMINATION

3     BY MS. KEDIA:

4     Q.    Mr. McWeeney, good morning.

5     A.    Good morning.

6     Q.    On the 20th of May of 1998, you actually began your

7     observation of a place called Romantique Limousine.

8          Right?

9     A.    That's correct.

10    Q.    And what did you know Romantique Limousine to be?

11    A.    A business establishment of Alphonse Persico.

12    Q.    How did you know that?

13    A.    From other agents on the squad.

14    Q.    And were you working with other agents on this day

15    that you conducted your surveillance?

16    A.    Yes.

17         I was working with one other agent.

18    Q.    Who was that?

19    A.    Special agent Kevin Lyons.

20    Q.    And who is Special Agent Kevin Lyons?

21    A.    He's an FBI agent.

22    Q.    That you had worked with in the past?

23    A.    I had worked with -- in the past and in the future

24    after that day.

25    Q.    Meaning after -- before and after 1998, May 20th of

Zeumann - Cross/Kedia

3146

1    1998 in particular?

2    A.    Correct.

3    Q.    And Special Agent Lyons was actually the case agent

4    for Mr. Persico.

5            Right?

6            MR. GOLDBERG:  Objection, your Honor.

7            THE COURT:  Sustained.

8    BY MS. KEDIA:

9    Q.    Now, on the 20th of May 1998, did you have a plan in

10   place of how long you were going to conduct surveillance

11   that day?

12   A.    No, we did not.

13   Q.    How is it that you decided to start at 11:45 in the

14   morning?

15   A.    There was no plan prior to it.

16           We went out from -- we discussed the matter in

17   the morning and went out in the late morning to Brooklyn.

18   Q.    Well, when you say we, you mean you and Agent Lyons?

19   A.    That's correct.

20   Q.    Anyone else?

21   A.    Not to my knowledge.

22   Q.    So prior to the morning of May 20th, 1998 you had no

23   intention of conducting surveillance of Mr. Persico on

24   that date.

25           Is that right?

Zeumann - Cross/Kedia

3147

1    MR. GOLDBERG:  Objection, your Honor.

2    THE COURT:  Sustained.

3  BY MS. KEDIA:

4  Q.   Well, did you have any intention of conducting

5  surveillance prior to that date?

6    MR. GOLDBERG:  Same objection.

7  BY MS. KEDIA:

8  Q.   On that date?

9    MR. GOLDBERG:  Same objection.

10    THE COURT:  Overruled.

11  A.   Could you repeat?

12  Q.   Prior to the morning of May 28, 1998, and having had

13  this discussion with Agent Lyons, did you have any

14  intention of conducting surveillance of Mr. Persico on

15  that date?

16  A.   The surveillance was not, necessarily, just about

17  Mr. Persico.

18    It was the business establishment and who would

19  be coming there.

20  Q.   When you say the business establishments, what do you

21  mean?

22  A.   Romantique Limousine and Perk's Coffee.

23  Q.   So when you set out this morning, you planned already

24  to go to both Romantique and Perk's Coffee?

25  A.   That's correct.

Zeumann - Cross/Kedia

3148

1    Q.    It wasn't that you saw Mr. Persico walking from one

2    to the other and, therefore, followed him there.

3              Is that right?

4    A.    We were already there when we saw him.

5    Q.    You were already where?

6    A.    We were already on 11th Avenue when we saw

7    Alphonse Persico and Michael Persico walking from

8    Romantique.

9    Q.    And your surveillance that day lasted for

10   approximately 40 minutes.

11             Is that right?

12   A.    It was less than an hour.

13   Q.    And why is that?

14   A.    There was -- we saw what we saw, and then we went

15   back to the office.

16             There was no reason to continue surveillance at

17   that point.

18   Q.    Well, when you say there was no reason to continue

19   surveillance, what does that mean?

20   A.    Oftentimes you don't want to continue staying on a

21   location and get yourself noticed by who was out there.

22             So we exited the area after seeing what we had

23   seen.

24   Q.    So meaning that you did not want to be noticed by the

25   persons you were surveilling?

Zeumann - Cross/Kedia

3149

1   A.   That's correct.

2   Q.   Well, Mr. McWeeney, you actually walked into

3   Perk's Coffee while Mr. Persico, his brother Michael

4   Persico, and Joe Baudnanza were inside there.

5        Is that right?

6   A.   That's correct.

7   Q.   How large is Perk's Coffee?

8   A.   It's --

9   Q.   Compared to the size of this courtroom?

10  A.   Significantly smaller.

11  Q.   Significantly smaller.

12       So anyone in there could see anyone else who was

13  in there.

14       Is that right?

15  A.   Yes.

16       That's correct.

17  Q.   And you weren't hiding behind something when you went

18  there in there.

19       Is that right?

20  A.   No, I wasn't.

21  Q.   You were certainly visible to Mr. Persico, his

22  brother Michael, and Joe Baudnanza.

23       Is that right?

24  A.   Yes, I was visible.

25  Q.   Now, when you say that, I believe that you said that

Zeumann - Cross/Kedia

3150

1    Alli Persico was on one side of the bar, and Michael

2    Persico and Joe Baudnanza were on the other side of the

3    bar.

4              What does that mean?  You mean a coffee bar?

5    A.   Correct.

6              Like Alphonse Persico was on this side, and the

7    other two were across from him.

8    Q.   So like one person was on the side where coffee is

9    being made?

10   A.   That's correct.

11   Q.   And the other two were on the other side?

12   A.   That's correct.

13   Q.   Where coffee is being served?

14   A.   That's correct.

15   Q.   And were there other people in the store, other

16   customers?

17   A.   There was one female customer and there was one male

18   employee.

19   Q.   And the female customer, was she someone who was

20   known to you?

21   A.   No, she was not.

22   Q.   She was just someone who appeared to be a customer?

23   A.   Yes.

24   Q.   Did she engage in any conversation that you saw with

25   either Mr. Persico or Joe Baudnanza?

Zeumann - Cross/Kedia

3151

1    A.    No.

2          Not that I saw.

3    Q.    During the time that you were conducting your

4    surveillance for 40 minutes on that day, you observed

5    Joe Baudnanza using a cell phone.

6          Right?

7    A.    That's correct.

8    Q.    And that is something that, in fact, you noted.

9          Right?

10   A.    Yes.

11   Q.    In a surveillance report?

12   A.    Yes, we did.

13   Q.    Why did you note that Joe Baudnanza was using a cell

14   phone?

15   A.    Noted it because after meeting with -- or after he

16   met with Alphonse and Michael Persico, he exited the

17   establishment and used a cell phone.

18   Q.    And that is something that you typically note when

19   you make an observation like that?

20   A.    That's correct.

21   Q.    Someone on a cell phone that you are specifically

22   observing?

23   A.    That's correct.

24   Q.    When you were in Perk's Coffee, you said it was

25   significantly smaller than this courtroom.

Zeumann - Cross/Kedia

3152

1          So certainly you had the opportunity to overhear

2     any conversation that was occurring.

3               Is that right?

4     A.   I heard part of the conversation, not the entire

5     conversation.

6     Q.   And that was done while you were inside of Perk's.

7               Is that right?

8     A.   That's correct.

9     Q.   Now, Mr. Persico, when you saw him walking down

10    11th Avenue, and when I say Mr. Persico, I'm referring to

11    the one sitting at this table, when you saw him walking

12    down 11th Avenue, did you immediately recognize him?

13    A.   Yes, I did.

14    Q.   How is it that you recognized him?

15    A.   I recognized him from photographs.

16    Q.   From?

17    A.   From photographs.

18    Q.   Is that the only way you recognized him because some

19    other agent had told you this is what Mr. Persico looks

20    like?

21               MR. GOLDBERG:  Objection, your Honor.

22               THE COURT:  Sustained.

23    BY MS. KEDIA:

24    Q.   Well, when you say you recognized him from

25    photographs, had you seen him before?

Zeumann - Cross/Kedia

3153

1    A.    I had not seen him before.

2    Q.    Mr. McWeeney, do you recall?

3            MS. KEDIA:  Withdrawn.

4    BY MS. KEDIA:

5    Q.    Let me ask you this.

6            You certainly conducted other surveillances of

7    Mr. Persico.

8            Right?

9            MR. GOLDBERG:  Objection, your Honor.

10           Beyond the scope.

11           THE COURT:  Sustained.

12           MS. KEDIA:  Your Honor, may we approach?

13           THE COURT:  Sure.

14           Come on up.

15           (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Zeumann - Cross/Kedia

3154

1          (Sidebar.)

2          THE COURT:  Do you have an offer of proof on

3     this?

4          MS. KEDIA:  Yes, Judge.

5          At the prior trial, this witness testified that

6     he has conducted in the range of 20 surveillances of

7     Mr. Persico.

8          Now, it's possible that the agent is going to

9     say that this is his first one, and that all of the other

10    ones are subsequent surveillances, and I want to give him

11    obviously that opportunity.

12         I don't want to ask him this question and answer

13    without knowing.

14         THE COURT:  He testified to this.

15         He said this was the first time I ever saw him.

16         MS. KEDIA:  I wanted to ask him if he ever

17    conducted a surveillance of him prior or --

18         THE COURT:  You have already brought out the

19    fact that this was the first time he saw him.

20         MS. KEDIA:  If he had conducted -- when he says

21    he conducted surveillances, and I'll tell you what the

22    question and answer is specifically, he was asked the

23    question:  How many times would you say over your seven

24    and a half year career at the FBI did you surveil

25    Mr. Persico?  He says I would be guessing.  I don't know.

Zeumann - Cross/Kedia

1                Question:  We know definitely, you said it's

2      more than one.  He says absolutely.

3                Would you say it's more than 20?  He says in

4      that range.

5                He may have conducted surveillances of

6      Mr. Persico and not seen him, like he went to surveil him

7      and didn't actually see him on that particular date.

8                THE COURT:  What does that matter?

9                MS. KEDIA:  I want to know when he started

10     surveilling him, Judge, and when he continues surveilling

11     him.

12               He obviously has seen him at other locations.

13               THE COURT:  I don't see the probative value of

14     that, whatsoever.

15               The objection is sustained.

16               (Sidebar concluded.)

17               (Continued on next page.)

18

19

20

21

22

23

24

25

Zeumann - Cross/Kedia

3156

1        (In open court.)

2        THE COURT:  Objection is sustained.

3    BY MS. KEDIA:

4    Q.   Mr. McWeeney, you know that both Romantique and

5    Perk's Coffee to be businesses owned by Mr. Persico.

6        Is that right?

7    A.   Yes.

8    Q.   And that's, in fact, the reason that you were going

9    to both of those establishments that day.

10       Right?

11   A.   Yes.

12   Q.   And do you know who manages the business Romantique?

13   A.   His brother, Michael Persico.

14   Q.   Do you know an individual by the name of John DiLeo?

15   A.   Yes.

16   Q.   Does he manage Romantique?

17   A.   I know he works there.

18       I don't know if he actually manages it or not.

19   Q.   Do you recall that at a prior proceeding, TM 6, page

20   1195, being asked this question and giving this answer,

21   line 6:

22       Question:  You also know, based on your

23   experience as an FBI agent, that Romantique Limousine was

24   actually managed by Mr. Persico's friend, John DiLeo, is

25   that right?

Zeumann - Cross/Kedia

3157

1           Answer:  That's correct.

2           Do you recall being asked that question and

3    giving that answer?

4    A.   Yes, I do now.

5    Q.   So that was just something you forgot today?

6           MR. GOLDBERG:  Objection, your Honor.

7           THE COURT:  Sustained.

8    BY MS. KEDIA:

9    Q.   Well, sitting here now and having heard the prior

10   question and answer, do you recall that John DiLeo is a

11   person who managed Romantique Limousine?

12          Is that right?

13   A.   Yes, I do.

14   Q.   Now, you spoke about another surveillance that you

15   conducted.

16          I believe it was on the 27th of April of 2000.

17   A.   That's correct.

18   Q.   And that was a surveillance of an individual by the

19   name of Frank Persico?

20   A.   That's correct.

21   Q.   And when is it that it was decided that you were

22   conducting the surveillance that day?

23   A.   I don't recall the exact time.

24          It would have been prior to that day, though.

25   Q.   Before that day?

Zeumann - Cross/Kedia

3158

1    A.    That's correct.

2    Q.    And on this particular occasion you say that it was

3    before that day, do you know how that came about?

4          Do you have any recollection of how it came

5    about?

6    A.    No, I don't.

7    Q.    And do you have any recollection of whether it was

8    the day before or a week before that you decided to

9    conduct the surveillance that day?

10   A.    I don't have a recollection.

11   Q.    When you made observations on the 27th of 2000, the

12   person that you decided you were going to surveil is

13   Frank Persico.

14         Is that right?

15   A.    That's correct.

16   Q.    Anyone else you happened to see that day were just

17   people you happened to see.

18         It wasn't that you were specifically looking to

19   see them.

20         Is that right?

21   A.    That is correct.

22   Q.    On the 27th of April, your surveillance lasted some

23   seven hours that day.

24         Right?

25   A.    That sounds right.

Zeumann - Cross/Kedia

3159

1                   Yes.

2    Q.    And on that day, you also made an observation of

3    Frank Persico being on the cell phone.

4                   Right?

5    A.    That's correct.

6    Q.    And that is something you also noted in a

7    surveillance report.

8                   Is that right?

9    A.    That's correct.

10   Q.    And, again, why is it that you noted that in a

11   surveillance report?

12   A.    Noted that because any time you are on a

13   surveillance, you want to make those types of observations

14   and document the time.

15   Q.    And that's something you typically do on any

16   surveillance?

17   A.    Yes.

18   Q.    On that day when you decided to stop surveillance,

19   you started at 7:30 in the morning, and you ended at 2:30

20   in the afternoon.

21                  Right?

22   A.    That's correct.

23   Q.    And why is it that you decided you were going to stop

24   surveilling Mr. Persico at 2:30 -- and we are talking

25   about Frank Persico.

Zeumann - Cross/Kedia

3160

1               Right?

2     A.    Yes.

3     Q.    Okay.

4     A.    We stopped surveillance because we lost visual

5     contact with him.

6     Q.    When you say you lost visual contact, he was in a

7     vehicle?

8     A.    He was driving his vehicle.

9     Q.    And you were following him and then he lost you.

10             Is that right?  Did you not try to follow him?

11    A.    No.

12             We lost contact with him due to traffic,

13    everything.

14    Q.    Okay.

15             So you were trying to follow him and then you

16    lost him through traffic.

17             Is that -- I'm asking you, once Mr. Persico got

18    into his vehicle on that day, did you actually try to

19    follow him in your vehicle?

20    A.    Yes.

21    Q.    So when you say you lost contact with him, you mean

22    there was other traffic hindering your ability to follow

23    him?

24    A.    That's correct.

25    Q.    And then you didn't try to catch up with him at any

Zeumann - Cross/LaRusso

3161

1    later time?

2    A.    That's correct.

3    Q.    Thank you.

4          MS. KEDIA:  I have nothing further.

5          MR. LARUSSO:  May I, your Honor?

6          THE COURT:  Yes.

7    CROSS-EXAMINATION

8    BY MR. LARUSSO:

9    Q.    Good morning.

10   A.    Good morning.

11   Q.    Talk to you about the April 27, 2000 surveillance.

12         I believe you testified that at some point

13   during the morning you received word that Mr. DeRoss and

14   Mr. LaForte had arrived.

15         Is that correct?

16   A.    That's correct.

17   Q.    You didn't make any observation of that.

18         Did you?

19   A.    I didn't make an observation of them arriving.

20   Q.    You had received communication from another

21   surveillance officer that was involved with you that day?

22   A.    That's correct.

23   Q.    And approximately what time did you recall receiving

24   that communication that Mr. DeRoss and Mr. LaForte had

25   arrived?

Zeumann - Cross/LaRusso

3162

1    A.    11:03 in the morning.

2            Approximately an hour after Frank Persico

3    entered.

4    Q.    And you actually made a surveillance of Mr. DeRoss

5    and Mr. LaForte later that morning.

6            Is that correct?

7    A.    Yes.

8            I saw Mr. DeRoss and Mr. LaForte exiting the

9    area.

10   Q.    When you say exiting the area, what was the first

11   observation you made of Mr. DeRoss and Mr. LaForte on this

12   day, and at what time, if you could?

13   A.    I was going -- I don't know the exact time, it was

14   approximately a half hour after they entered, or I was

15   informed that they entered.

16           And I saw them exiting the business

17   establishment going towards their vehicle, entering their

18   vehicle and departing the area.

19   Q.    And at that point is when the photographs were taken.

20           Is that correct?

21   A.    That's correct.

22   Q.    So these photographs are only of Mr. DeRoss and

23   Mr. LaForte leaving the vicinity of the location where

24   they were supposed to be, or where they were.

25           Is that correct?

Zeumann - Redirect/Goldberg

3163

1  A.    That is correct.

2  Q.    And during that half hour period when you were

3  notified that Mr. DeRoss and Mr. LaForte had arrived in

4  the time you had observed them, you didn't see who they

5  were talking with?

6  A.    No.

7  Q.    Obviously you wouldn't have overheard any

8  conversations then.

9  A.    No.

10  Q.    Did you observe any crimes being committed at that

11  point?

12           MR. GOLDBERG:  Objection, your Honor.

13           THE COURT:  Sustained.

14           MR. LARUSSO:  No further questions, your Honor.

15           MR. GOLDBERG:  Briefly, your Honor.

16  REDIRECT EXAMINATION

17  BY MR. GOLDBERG:

18  Q.    Just so we are clear on April 27, 2000, the

19  surveillance that Mr. LaRusso just asked you about, were

20  Jimmy LaForte, Alphonse Persico and John DeRoss inside the

21  establishment at that time?

22  A.    Yes.

23  Q.    And you were asked questions on cross-examination

24  about who was inside Perk's Coffee and you said there was

25  a customer and you also saw an employee?

3164

1    A.    That is correct.

2    Q.    Who was servicing the customer?

3    A.    The employee.

4    Q.    Thank you.

5              MR. GOLDBERG:  No further questions.

6              MR. LARUSSO:  Your Honor, just one.

7    RECROSS-EXAMINATION

8    BY MR. LARUSSO:

9    Q.    You did not observe Mr. DeRoss or Mr. LaForte enter

10   into the location where you saw Mr. Persico arrive and

11   enter earlier that day.

12             Is that correct?

13   A.    That's correct.

14             MR. LARUSSO:  No further questions, Judge.

15             THE COURT:  Thank you, sir.

16             You can step down.

17             THE WITNESS:  Thank you.

18             THE COURT:  Next witness.

19             MS. MAYER:  The government calls Special Agent

20   Scott Curtis.

21             (Whereupon, there was a pause in the

22   proceedings.)

23             THE CLERK:  Good morning.

24             Please step up and remain standing to be sworn

25   in.

Curtis - Direct/Mayer

3165

1    **SCOTT CURTIS**,

2              having been duly sworn, was examined

3              and testified as follows:

4                    THE CLERK:  Have a seat, please.

5                    Take the handheld microphone.  State and spell

6      your name for the record.

7                    THE WITNESS:  Scott R Curtis, C-U-R-T-I-S.

8                    THE CLERK:  Thank you.

9                    MS. MAYER:  May I inquire, Judge?

10                   THE COURT:  Yes.

11     DIRECT EXAMINATION

12     BY MS. MAYER:

13     Q.   Good morning.

14     A.   Good morning.

15     Q.   By whom are you employed?

16     A.   Federal Bureau of Investigation.

17     Q.   And what's your job?

18     A.   Special agent.

19     Q.   How long have you been a special agent with the FBI?

20     A.   11 and a half years.

21     Q.   Where are you assigned?

22     A.   The New York field office.

23     Q.   And to what squad?

24     A.   Squad C 38.

25     Q.   Which is what?

Curtis - Direct/Mayer

3166

1    A.    Squad that investigates the criminal activity of the

2    Colombo organized crime family.

3    Q.    How long have you been assigned to that squad?

4    A.    Ten and a half years.

5    Q.    Directing your attention to November 12th of 1998,

6    were you working that day?

7    A.    Yes.

8    Q.    What was your assignment that afternoon?

9    A.    To conduct surveillance in the vicinity of Fifth

10   Avenue and President's Street in Brooklyn, New York.

11   Q.    Approximately what time did your surveillance begin

12   that day?

13   A.    About 1:45 in the afternoon.

14   Q.    And approximately what time did it end?

15   A.    About 4 o'clock in the afternoon.

16   Q.    Did you conduct surveillance alone or with another

17   FBI agent?

18   A.    With another agent.

19   Q.    What if anything did you observe that day?

20   A.    I observed Joe Baudnanza sitting side Mike & Tony's

21   Restaurant.

22         And then later on that afternoon, I observed

23   Joe Baudnanza, Alphonse Persico, John Rosatti and John

24   Stilupi exiting the restaurant.

25   Q.    And when you say Mike & Tony's Restaurant, what area

1     is Mike & Tony's Restaurant located at?

2     A.    It's on the corner of Fifth Avenue and Carroll Street

3     on the northeast corner.

4     Q.    Did you or your partner take photographs in

5     connection with your surveillance that day?

6     A.    Yes.

7           My partner did.

8     Q.    Have you looked at the photos prior to your

9     appearance in court here today?

10    A.    Yes.

11          MS. MAYER:  Judge, may I approach the witness?

12          THE COURT:  Yes.

13    BY MS. MAYER:

14    Q.    I'm showing you what's been marked Government Exhibit

15    46 and 46 A through D.

16          Can you take a look at those, as well as the

17    board.

18    A.    Yes.

19    Q.    Do you recognize them?

20    A.    Yes.

21    Q.    What are they?

22    A.    They are the photographs that my partner took that

23    afternoon.

24    Q.    And are they a fair and accurate depiction of some of

25    your observations on November 12, 1998?

Curtis - Direct/Mayer

3168

1    A.    Yes.

2    Q.    And do you see that they have name attributions, both

3    on the photos and on the board?

4    A.    Yes.

5    Q.    Are the name attributions correctly identified?

6    A.    Yes.

7              MS. MAYER:  Judge, I offer 46 and 46 A through

8    D.

9              MS. KEDIA:  No objection.

10             MR. LARUSSO:  No objection, your Honor.

11             THE COURT:  Received in evidence.

12             (Whereupon, Government Exhibits 46 and 46 A-D

13   were received in evidence, as of this date.)

14

15   BY MS. MAYER:

16   Q.    Looking at 46 A, can you just tell the jury what that

17   is?

18   A.    It's a photograph of Joe Baudnanza exiting the

19   restaurant.

20   Q.    Now going to 46 B, the individuals there, and I see

21   that some of the names are cut off, I want to make sure we

22   are in close so we can see.

23             Can you tell us who they are?

24   A.    It's a photograph of Joe Baudnanza, John Rosatti and

25   John Stilupi exiting the restaurant.

Curtis - Direct/Mayer

1    Q.   And the Stilupi name is up here to the left.

2         And now looking at 46 C.

3    A.   It's a photograph of John Stilupi, Alphonse Persico,

4    Joe Baudnanza and John Rosatti.

5    Q.   And where is Alphonse Persico off the group of those

6    four men?

7    A.   He's in the center there.

8    Q.   And, finally, 46 D, I'm going to zoom out so the jury

9    can see.

10   A.   That's a follow-up photograph of the four of them

11   continuing to exit the restaurant.

12        MS. MAYER:  Judge, I'm just going to publish

13   these to the jury.

14        THE COURT:  Yes.

15        (Whereupon, the above-mentioned exhibits were

16   published to the jury.)

17

18   BY MS. MAYER:

19   Q.   Now, directing your attention, Special Agent Curtis,

20   to December 22nd of 1998, were you working that day?

21   A.   Yes.

22   Q.   What was your assignment?

23   A.   To conduct a surveillance outside the Torrese Social

24   Club in Brooklyn, New York.

25   Q.   And what was the address of the Torrese Social Club?

Curtis - Direct/Mayer

3170

1   A.    2005 West 8th Street.

2   Q.    Approximately what time did you begin your

3   surveillance that day?

4   A.    About 2:20 p.m.

5   Q.    And approximately what time did it end?

6   A.    About 4:45 p.m.

7   Q.    That day, were you conducting surveillance alone or

8   with another agent?

9   A.    Alone.

10  Q.    And tell the jury, what did you observe?

11  A.    I observed numerous individuals exiting and entering

12  the social club at about 3:50 p.m..

13         I observed Tommy Gioeli, Alphonse Persico and

14  Dino Calabro exit the social club, followed closely behind

15  by John DeRoss and Joe Baudnanza.

16  Q.    Now, you said that you saw Alphonse Persico that day

17  on December 22, 1998 outside the Torrese Social Club.

18         Do you see him in court today?

19  A.    Yes.

20  Q.    Can you identify him for the jury.

21  A.    Sitting right there with the blue sweater on.

22         MS. MAYER:  Judge, if the witness can reflect

23  that the witness has identified the defendant Persico.

24         THE COURT:  Yes.

25

Curtis - Direct/Mayer

3171

1    BY MS. MAYER:

2    Q.    And you also saw John DeRoss outside the Torrese

3    Social Club on that same day.

4          Can you identify him for the jury?

5    A.    Sitting with the maroon sweater on with glasses.

6          MS. MAYER:  Judge, if the record can reflect

7    that the witness has identified defendant DeRoss.

8          THE COURT:  Yes.

9    BY MS. MAYER:

10   Q.    What did you see Alphonse Persico do when he came out

11   of the club on December 22, 1998?

12   A.    He walked down the street a ways, to a black Cadillac

13   that was parallel parked on the side street.

14         And he opened the trunk up, retrieved three

15   boxes approximately 18 inches cubed, wrapped in Christmas

16   paper, handed two of them to Dino Calabro, handed one to

17   Tommy Gioeli and then he closed the trunk.

18   Q.    And what if anything did you hear?

19   A.    I heard Dino Calabro wish Mr. Persico a happy

20   holidays.

21   Q.    What if anything did you see John DeRoss do that day?

22   A.    He walked over to his blue Cadillac, which was

23   directly behind the black limousine Cadillac there.

24         He opened up his trunk, and he put some unknown

25   object in the trunk of his car.

Curtis - Direct/Mayer

3172

1    Q.    After you saw the observations you just told us about

2    what else, if anything, did you see Alphonse Persico do?

3    A.    He got into the driver's side of that black Cadillac,

4    and a couple minutes later, Michael Sessa exited the club.

5          He got into the passenger's side, and they

6    departed the area.

7    Q.    Did you follow Mr. Persico that day?

8    A.    No.

9    Q.    What else did you observe John DeRoss do, if

10   anything, after Mr. Persico drove away?

11   A.    He went back inside the Torrese Social Club for

12   approximately ten minutes.

13         And then he exited, got into his blue Cadillac,

14   and departed the area.

15   Q.    Now, you mentioned that you had also observed other

16   individuals going in and out of the social club that

17   afternoon.

18         Can you tell us some of the other people that

19   you observed going in and out of club?

20   A.    Benjamin Castellazzo, James Spitalere, Alphonse

21   D'Ambrosio and others.

22   Q.    Did you take photographs or make a video recording

23   that day?

24   A.    No.

25   Q.    Why not?

Curtis - Direct/Mayer

3173

1    A.   Because either I didn't have the camera with me, or

2    it wasn't accessible.  I couldn't get it without drawing

3    attention to myself, since I was parked, like, right

4    across the street.

5              So I didn't want to address attention to myself.

6    Q.   Directing your attention, now, to August 5th of 1999.

7    Were you working that day?

8    A.   Yes.

9    Q.   What did you do that afternoon?

10   A.   I was driving down West 8th Street in Brooklyn,

11   New York.

12             As I got between Avenue S and T, I observed

13   Benjamin Castellazzo and Frank Ianacci get into a vehicle.

14             So I decided to follow them.

15   Q.   Now, you said you were at a particular address on

16   8th Street in Brooklyn.

17             Was there anything that you knew to be located

18   in that area of Brooklyn on 8th Street?

19   A.   Torrese Social Club was just past Avenue T on the

20   left-hand side.

21   Q.   And is that the club that you just told us about the

22   surveillance on December 22nd of 1998?

23   A.   Yes.

24   Q.   So you said that you saw these two individuals, Frank

25   Ianacci and who was the other one?

Curtis - Direct/Mayer

3174

1   A.   Benjamin Castellazzo.

2   Q.   And you followed them.

3        Were you alone or were you with another agent?

4   A.   I was alone.

5   Q.   And approximately what time was it that you observed

6   Frank Ianacci and Benjamin Castellazzo leaving the area of

7   the Torrese Social Club?

8   A.   I don't recall, exactly.

9        It was in the afternoon.

10  Q.   What did you do in response to seeing their car pull

11  away?

12  A.   I had the video camera with me.

13       I pulled it up quickly to try to get a video of

14  them getting into the vehicle, then I followed them in my

15  vehicle.

16       They drove several blocks away to the

17  Del'Rio Diner, where I set up to do a surveillance at that

18  location.

19  Q.   And you said several blocks away.

20       Where was the Del'Rio Diner?

21  A.   Approximately west 13th Street and Kings Highway in

22  Brooklyn, New York.

23  Q.   And what did you see when you were at the

24  Del'Rio Diner?

25  A.   I saw Benjamin Castellazzo, Frank Ianacci get out of

Curtis - Direct/Mayer

3175

1    the vehicle.  They entered the diner.

2           A short period of time later, I observed Frank

3    Ianacci exit the diner with Dominick Dionisio.  They

4    engaged in a conversation in front of the diner there

5    outside.

6           Then they went back inside the diner, and I

7    observed Frank Ianacci and Castellazzo exit the diner

8    going back to their vehicle.

9           Then I observed Dominick Dionisio, Pauly Rizzuto

10   and John DeRoss in a vehicle exiting the parking lot of

11   the diner.

12   Q.   Now, you told us you made a video recording in

13   connection with your observations that day.

14          Did you have the video running the whole time?

15   A.   No.

16   Q.   Have you reviewed the video recording prior to

17   appearing in court today?

18   A.   Yes.

19          MS. MAYER:  Judge, may I approach the witness?

20          THE COURT:  Yes.

21   BY MS. MAYER:

22   Q.   I'm showing you what's been marked as

23   Government Exhibit 144 for identification.

24          Do you recognize it?

25   A.   Yes.

Curtis - Direct/Mayer

3176

1   Q.   What is it?

2   A.   It's a DVD of the surveillance that we just

3   mentioned.

4   Q.   And is it a fair and accurate depiction of some of

5   your observations that day?

6   A.   Yes.

7           MS. MAYER:  Judge, I offer 144.

8           MS. KEDIA:  Judge, may we just approach?

9           THE COURT:  Sure.

10          Come on up.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Curtis - Direct/Mayer

3177

1        (Sidebar.)

2        THE COURT:  Yes.

3        MS. KEDIA:  Judge, with respect to this

4   surveillance that he's testifying about now, neither

5   Mr. LaRusso nor I received any 3500 with respect to this.

6        THE COURT:  That makes three of us.

7        MS. MAYER:  There isn't any.  I was going to ask

8   him.

9        THE COURT:  Okay.

10       I looked.  I couldn't find it.

11       MS. MAYER:  He was driving down the street and

12  he saw them and he grabbed his video camera.

13       THE COURT:  Okay.

14       MS. KEDIA:  I don't think I have ever seen the

15  video be before.

16       But I don't have any objection to playing it.

17       MS. MAYER:  It was turned over.

18       THE COURT:  Are you playing it now?

19       MS. MAYER:  Yes, we are.

20       THE COURT:  Okay.

21       MR. BURETTA:  Judge, when do you think we will

22  take the mid-morning break.

23       THE COURT:  How long is the video?

24       MS. MAYER:  It's less than five minutes.

25       THE COURT:  Okay.

Curtis - Direct/Mayer

3178

1          Let's get it done.

2          MS. MAYER:  Okay.

3          (Sidebar concluded.)

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Curtis - Direct/Mayer

3179

1              (In open court.)

2              MS. KEDIA:  No objection, your Honor.

3              THE COURT:  It's received in evidence.

4              (Whereupon, Government Exhibit 144 was received

5      in evidence, as of this date.)

6

7              THE COURT:  And now it will be played for you.

8              MR. LARUSSO:  No objection, Judge.

9              THE COURT:  Thank you.

10             MS. MAYER:  Judge, if you will just bear with

11     me.

12             (Whereupon, there was a pause in the

13     proceedings.)

14

15             (Video played.)

16     BY MS. MAYER:

17     Q.   Agent Curtis, if you could tell the jury what we are

18     seeing here on the screen.

19     A.   That's outside the Torrese Social Club.

20     Q.   And if you see the men in the frame there, can you

21     identify the individuals who are in the frame there.

22     A.   Joseph Gorga is right by the door there of the club.

23     Q.   All the way to the left of our screen?

24     A.   Right.

25             That's Benjamin Castellazzo with the dark

Curtis - Direct/Mayer

3180

1    colored sweatshirt coming out.

2           And getting in the driver's side there is Frank

3    Ianacci.

4    Q.   So the person who just put on the sunglasses and is

5    coming around to the passenger's seat, who is that?

6    A.   That's Benjamin Castellazzo.

7    Q.   And --

8    A.   That's Benjamin Castellazzo followed by Frankie

9    Ianacci entering the diner.

10   Q.   And that's where you followed them to, as you just

11   told us?

12   A.   Yes.

13   Q.   And who is this now that we are seeing on the screen?

14   A.   The taller individual is Dominick Dionisio, and the

15   other individual's Frank Ianacci.

16   Q.   And, again, is this still outside the Del'Rio Diner?

17   A.   Yes.

18           I pulled back so I could get the sign of the

19   diner in there.

20   Q.   Now, could you hear what Dominick Dionisio and Frank

21   Ianacci were discussing?

22   A.   No.

23   Q.   And to be clear for the jury, you told us about how

24   you were driving down the street and saw individuals

25   outside the Torrese Social Club.

**Curtis - Direct/Mayer**

3181

1          Was this a preplanned surveillance that day?

2     A.    I don't believe so.

3     Q.    And as part of your routine, you said you took this

4     video.

5          Did you make a surveillance log in connection

6     with the surveillance that you did that day?

7     A.    I don't believe so.

8          Because I was alone, and I was -- I had the

9     video camera with me.

10    Q.    Now, could you see those individuals that just came

11    out that were walking down the ramp, did you see who that

12    was?

13    A.    That was Frank Ianacci and Benjamin Castellazzo

14    exiting the diner.

15    Q.    And who is that on the screen now?

16    A.    That's Dominick Dionisio, and behind him is Pauly

17    Rizzuto.

18    Q.    And prior to coming out of the diner, had you seen

19    Pauly Rizzuto on that day?

20    A.    No.

21          (Continued on next page.)

22

23

24

25

Curtis  -  Direct/Mayer

3182

1    BY MS. MAYER:

2    Q.   Did you ever go inside the diner that day as part of

3    your surveillance?

4    A.   No.

5    Q.   That car that's backing up there, who is driving?

6    A.   Dominick Dionisio.

7    Q.   Who, are you assuming, is on the back seat?

8    A.   Jackie DeRoss.

9    Q.   Who else did you see in that vehicle?

10            You identified Dominick Dionisio as the driver

11   and Jackie DeRoss in the back seat.

12            Was there anyone else in that car?

13   A.   I believe Paulie Rizzuto was in the front passenger

14   seat.  You can see him right here (indicating.)

15   Q.   As they come around.

16            Now, as they left, did you do anything else?

17   Did you follow them that day?

18   A.   No.

19            MS. MAYER:  Nothing further, Judge.

20            THE COURT:  Cross-examination.

21

22   CROSS-EXAMINATION

23   BY MS. KEDIA:

24   Q.   Agent Curtis, good morning.

25   A.   Good morning.

Curtis - Cross/Kedia

3183

1   Q.   You testified about a surveillance that you conducted

2   on November 12, 1998.

3         Who were you with that day?

4   A.   Kevin Lyons.

5   Q.   Who is Kevin Lyons?

6   A.   He was my partner.

7   Q.   For how long a period of time?

8   A.   On and off, whatever the time period was, he was on

9   the squad from '97 and I think he left in 2001.

10  Q.   Left what?

11  A.   The squad.

12  Q.   Meaning the squad that you were specifically assigned

13  to?

14  A.   Yes.

15  Q.   And he still works for the FBI?

16  A.   Yes.

17  Q.   On November 12, you began your surveillance at 1:45

18  and I believe that you said that you ended at 4:00.

19        You're saying that from memory?

20  A.   Yes.

21  Q.   And --

22  A.   It was 3:00 we ended I think.

23  Q.   3:00?

24  A.   3:00, 3:30 p.m.

25  Q.   An hour and 15 minutes?

**Curtis  -  Cross/Kedia**

3184

1   A.   Yes.

2   Q.   And when did you decide that you were going to

3   conduct surveillance that day?

4   A.   Agent Lyons received information that there was going

5   to be a possible meeting in that vicinity, and that's when

6   we decided to initiate the surveillance.

7   Q.   When was that?

8   A.   It was either the day before or that morning. I can't

9   recall exactly.

10   Q.   When did you learn about this?

11   A.   I think it was that morning.

12        He asked me if I would go along with him and

13   help him.

14   Q.   So you learned about it from Agent Lyons, not from

15   whatever source Agent Lyons got the information from; is

16   that right?

17   A.   Yes, that's correct.

18   Q.   And what is it that you believed you were going to be

19   surveilling that day?

20   A.   A meeting between Alphonse Persico and others.

21   Q.   Did you know who the others were that you expected to

22   see that day?

23   A.   I don't believe so.

24        I can't recall if he mentioned any other names

25   or not.  He definitely said Alphonse Persico.

Curtis  -  Cross/Kedia

1   Q.   As far as you knew, you were going to surveil

2   Mr. Persico and you didn't know who he was going to be

3   with as far as you knew?

4   A.   Yes.

5   Q.   And you specifically went to this Mike & Tony's.

6   It's a pizza place, a restaurant, what is it?

7   A.   Bar/restaurant.

8   Q.   Bar/restaurant.

9        You specifically went there believing that

10  Mr. Persico would be there?

11  A.   No.

12       We went to the vicinity of that intersection and

13  I got out of the vehicle on foot, walked up and down the

14  street on both sides looking in the businesses, and that's

15  when I observed Joseph Baudanza kicked back in the chair

16  inside the restaurant.

17  Q.   The information you had was simply that he would be

18  in the vicinity, not that it wasn't directly to a specific

19  location?

20  A.   Yes, I believe so.

21  Q.   And when you -- did you go inside that vicinity?

22  A.   No.

23       I looked through the windows.

24  Q.   You looked through the windows of the restaurant and

25  you could actually see the table?

Curtis  -  Cross/Kedia

3186

1   A.    It was a glass door.  The doors have a glass part of

2   the doors there.

3           I looked inside there, I observed the only

4   person I could observe, Joseph Baudanza kicked back in the

5   chair talking to somebody.

6           I couldn't see them.  They were out of my view.

7   Q.    You couldn't se anyone else?

8   A.    I saw Joseph Baudanza, but I couldn't see who he was

9   talking to.

10  Q.    At that point in time when you looked into the

11  window, you didn't know -- the window or the glass door --

12  what was it that you were looking into?

13  A.    The glass part of the doors.

14  Q.    You didn't even know that Mr. Persico was inside the

15  restaurant?

16  A.    No.

17  Q.    When is it that you first realized that Mr. Persico

18  was inside the restaurant?

19  A.    When he exited.

20  Q.    So that was at approximately 2:45?

21  A.    Yes.

22  Q.    So you stood outside the restaurant for an hour

23  without knowing that Mr. Persico was in there?

24  A.    We got a very good idea that he was in there.

25          That was not Joseph Baudanza's neighborhood.  If

3187

1   he was there, he would have been meeting with Mr. Persico.

2   Q.   Well, certainly other people lived in that

3   neighborhood, right, besides Mr. Persico?

4   A.   Yes.

5   Q.   And when you say if he would have been there, that's

6   who he would have been meeting with, we're talking about

7   what neighborhood in Brooklyn?

8   A.   Carroll Gardens.

9   Q.   How many people would you say live in Carroll

10   Gardens?

11           MS. MAYER:  Objection, Judge.

12           THE COURT:  Sustained.

13   BY MS. KEDIA:

14   Q.   Do you have any idea how many people Joseph Baudanza

15   knew in Carroll Gardens?

16           MS. MAYER:  Objection, Judge, as to how many

17   people somebody else knows.

18           THE COURT:  Sustained.

19   BY MS. KEDIA:

20   Q.   Well, did you -- when you say -- when you testified

21   here that if Joseph Baudanza was in that neighborhood,

22   this is the person who he would be meeting with, how do

23   you know that?

24   A.   Because I knew that was Persico's neighborhood.

25   Q.   Well, certainly it was the neighborhood of many other

3188

1    people known to Joseph Baudanza?

2            MS. MAYER:  Objection.

3    A.   No, I don't think so.

4            THE COURT:  Sustained.

5    BY MS. KEDIA:

6    Q.   Why didn't you go inside Mike & Tony's?

7    A.   Because they would know I was a member of law

8    enforcement.

9    Q.   What do you mean they would know?

10           Are you someone who is known to them?

11   A.   Yes.

12   Q.   And how is it that you were known to them?

13   A.   Because, routinely, I would go up and approach

14   members and associates of the Colombo family, pitch them,

15   try to get them to provide me information, and the word

16   spreads around pretty quickly who I am and what my name

17   is.

18   Q.   What do you mean pitch them?

19           MS. MAYER:  Objection, Judge.

20           THE COURT:  Sustained.

21   BY MS. KEDIA:

22   Q.   Well, you just testified that you would go up --

23           MS. MAYER:  Judge, may we approach?

24           THE COURT:  Come up.

25           Let's take our mid-morning break.  Don't talk

Curtis  -  Cross/Kedia

3189

1    about the case.

2              (The following takes place at sidebar.)

3              MS. MAYER:  Judge, my objection is this is

4    beyond the scope.

5              I'm trying to be reasonable in terms of not

6    objecting to every single question.

7              Ms. Kedia is consistently doing this with the

8    surveillance witnesses.

9              We went through this the first week of trial.

10   They're being called here to go through their

11   observations.

12             He's not called as a case agent, he's not being

13   called for anything else, and she's eliciting and wanting

14   to follow-up on it and say --

15             THE COURT:  Ms. Kedia, what's your purpose here?

16             MS. KEDIA:  Obviously, I was questioning this

17   agent about the specific surveillance and how is it that

18   he knew to go to this location, and how is it he knew

19   Mr. Persico would be in that location.

20             He says the reason he didn't go inside is that

21   these people would have known that he was an agent.  Then

22   he says the reason is that he routinely went up to these

23   people.

24             THE COURT:  I shouldn't have let you ask why

25   didn't you go inside.

Curtis  -  Cross/Kedia

3190

1           MS. KEDIA:  I can call him back on my direct

2    case to follow-up.  I think it's a waste of time, Judge.

3           THE COURT:  Let me determine what's a waste of

4    time.

5           The objection is sustained.

6           What else do you have with this witness?

7           MS. KEDIA:  The other surveillances, of course.

8           THE COURT:  Okay.

9           You're going to go into the other surveillances

10   where your client was not observed?

11          MS. KEDIA:  He was observed on the next one as

12   well.

13          THE COURT:  Yes.  There's one he wasn't though.

14          MS. KEDIA:  There's one he was not observed, but

15   I do have questions with respect to that as well.

16          MS. MAYER:  Thank you, Judge.

17          THE COURT:  Okay.

18          (Continued on next page.)

19

20

21

22

23

24

25

Curtis  -  Cross/Kedia

3191

1                (Recess taken.)

2                (After recess.)

3                THE COURT:  Where's the witness?

4                MR. GOLDBERG:  Judge, before the jury comes in,

5      the next witness after Agent Curtis is going to be Dawn

6      Sellers.

7                Before we do that, the government will be

8      offering outside the presence of that witness Government's

9      Exhibit 74-A, a phone record with her name on it.

10               I don't believe there's any objection, but I

11      don't want to speak to the defense.  It was submitted in

12      the last trial.  We gave certification a couple of weeks

13      before.

14               MS. KEDIA:  This is one of the ones you just

15      gave me?

16               MR. GOLDBERG:  Yes, it is.

17               MR. LARUSSO:  There's no objection.

18               MS. KEDIA:  No objection, Judge.

19               THE COURT:  Bring the jury in.

20               (The witness resumes the stand.)

21               THE CLERK:  Jury entering.

22               (The jury is present.)

23               THE COURT:  Please be seated.

24               We're ready to resume.

25               The last objection was sustained.

Curtis - Cross/Kedia

3192

1  BY MS. KEDIA:

2  Q.   Agent Curtis, at the time of your surveillance on

3  November 12, 1998, did you know any other organized crime

4  individuals to be in that neighborhood that you were

5  surveilling?

6           MS. MAYER:  Objection.

7           THE COURT:  Sustained.

8  BY MS. KEDIA:

9  Q.   On the day that you were conducting surveillance in

10 November of 1998, did you see any other people you

11 believed to be affiliated with organized crime?

12          MS. MAYER:  Objection, Judge.

13          Can we approach on this?

14          THE COURT:  No.

15          The objection is sustained.

16 BY MS. KEDIA:

17 Q.   Well, on this specific date, November 12, 1998, did

18 you prepare a surveillance report?

19 A.   Yes.

20 Q.   And did you prepare one surveillance report or more

21 than one surveillance report?

22 A.   One report.

23 Q.   And did you mark all of your observations on that

24 surveillance report?

25 A.   Yes, all of our pertinent observations.

Curtis  -  Cross/Kedia

3193

1    Q.    Everything you believed to be pertinent?

2    A.    Yes.

3    Q.    And when the individuals that you have identified

4    left -- did you recognize all of the individuals that you

5    have noted coming out of Mike & Tony's?

6    A.    Yes.

7    Q.    And you knew at that time when you saw this person

8    you've identified as John Staluppi, you knew he was John

9    Staluppi?

10   A.    Yes.

11   Q.    How did you know that?

12   A.    From photographs.

13   Q.    That you had seen during the course of your years as

14   an agent?

15   A.    Yes.

16   Q.    Other surveillance photographs?

17   A.    Surveillance or mug shots.

18   Q.    And similarly with John Rosatti?

19   A.    John Rosatti from photographs.

20   Q.    Also surveillance or mug shots, you don't recall

21   which one?

22   A.    Yes.

23   Q.    When the individuals left Mike & Tony's that day,

24   what did they do?

25   A.    They went their separate ways.

3194

1          We couldn't tell exactly where they ended up

2    from our vantage point.

3    Q.   So the entirety of the time that you knew these four

4    people to be together, they were inside of a restaurant

5    around lunchtime; is that right?

6    A.   Yes.

7               It was after lunch.

8    Q.   Well, it was between 1:45 and 2:45, right?

9    A.   3:00.  Yeah, 2:45.  You're right.  Between lunch and

10   dinner.

11   Q.   And when they left, did you follow any of the

12   individuals?

13   A.   No.

14   Q.   Why not?

15   A.   Because we would have drawn attention to ourselves.

16   Q.   You were on foot that day, right?

17   A.   I was on foot initially to pinpoint the location of

18   the meeting, alleged meeting, and then we both were in the

19   same vehicle across the intersection from the restaurant.

20   Q.   Meaning you and Agent Lyons?

21   A.   Yes.

22   Q.   These four individuals, after they left the

23   restaurant, did they get into vehicles, their own

24   vehicles?

25   A.   We couldn't tell.

Curtis - Cross/Kedia

3195

1    Q.    When you say you would have drawn attention to

2    yourselves, you saw Mr. Persico, for example, walking in a

3    certain direction?

4    A.    Yes.

5    Q.    And --

6    A.    There wasn't a lot of activity in the area.

7          By us moving would have drawn attention to

8    ourselves.

9    Q.    Meaning it wasn't crowded on the streets?

10   A.    No.

11   Q.    And there weren't a lot of vehicles on the street at

12   that time?

13   A.    No.

14   Q.    Where is this location, 5th Avenue and Carroll

15   Street, if you know, in relation to 242 5th Avenue?

16   A.    It is I believe southeast, across the street and to

17   the southeast.

18   Q.    Meaning on the same block?

19   A.    I believe so.  I believe it's between Carroll and

20   President.

21   Q.    And 242 5th Avenue you know to be a residence where

22   Mr. Persico's daughter resided, right?

23   A.    I learned that probably at least a year or two later

24   after the surveillance.

25   Q.    But now you know it to be the case certainly,

Curtis - Cross/Kedia

3196

1    correct?

2    A.    Yes.

3    Q.    And at the time in November of 1998, you weren't

4    aware of that?

5    A.    No, because I don't believe that she was residing

6    there at that point, that period.

7    Q.    As far as you know she wasn't?

8    A.    Yes.

9    Q.    Do you know that for a fact?

10           MS. MAYER:  Objection.

11           THE COURT:  Sustained.

12   BY MS. KEDIA:

13   Q.    Well, what do you base this on?

14           MS. MAYER:  Objection.

15           This is all beyond the scope, Judge.

16           THE COURT:  Sustained.

17   BY MS. KEDIA:

18   Q.    Do you know if Mr. Persico maintained a residence on

19   that block?

20   A.    At one point he did.

21   Q.    And when you say at one point, we're talking about

22   November 12, 1998.

23           Do you know whether he did or didn't?

24   A.    I don't know during that period whether he was

25   calling that a residence or not.

Curtis - Cross/Kedia

3197

1   Q.   And you didn't know that then and you don't know that

2   now; is that right?

3   A.   Well, now, he's not living there obviously.

4   Q.   Meaning you don't know even today whether he did at

5   that period of time?

6   A.   I'm not sure.

7   Q.   And you subsequently surveilled Mr. Persico -- let me

8   ask you this.

9        On November 12, 1998, you decided to discontinue

10  surveillance at 3:00, right?

11  A.   Yes.

12  Q.   And did you and Agent Lyons have a discussion saying

13  we don't want to continue surveillance anymore?

14  A.   Yes.

15  Q.   How did that happen?

16  A.   We decided that the surveillance was complete for

17  what we were tasked to surveil during that day.

18  Q.   When you conduct a surveillance of this nature, do

19  you make a decision beforehand whether you're going to

20  actually overhear any of the conversation or not?

21  A.   That's usually not discussed because we're hardly

22  ever close enough to overhear anything.

23  Q.   So you're not even in a position that you could

24  overhear?

25  A.   Most of the time not.

Curtis  -  Cross/Kedia

3198

1   Q.   On December 22nd, 1998, you were in a position to

2   overhear certain statements, right?

3   A.   Yes.

4   Q.   This is a surveillance that you were conducting at

5   the Torrese Social Club?

6   A.   Yes.

7   Q.   How is it that you decided to go to this Torrese

8   Social Club that day?

9   A.   Because I was assigned to start investigating the

10   activities of Benjamin Castellazzo and we knew that his

11   headquarters were his place of business was at Torrese

12   Social Club.

13   Q.   So when you went there that day, it wasn't for the

14   purpose of seeing Mr. Persico?

15   A.   No.

16   Q.   When is it that you decided you were going to go to

17   the Torrese Social Club on December 22nd, 1998?

18   A.   I don't know.  I can't recall.

19   Q.   How many agents were with you on that day?

20   A.   I was alone.

21   Q.   Were there any other agents, as far as you knew,

22   conducting surveillance in this area on that day?

23            MS. MAYER:  Objection.

24            THE COURT:  Sustained.

25

Curtis - Cross/Kedia

3199

1    BY MS. KEDIA:

2    Q.   Well, did you bring part of the surveillance team?

3              MS. MAYER:  Objection, asked and answered.

4              THE COURT:  Sustained.

5    BY MS. KEDIA:

6    Q.   You went by vehicle to this location?

7    A.   Yes.

8    Q.   And did you sit in your vehicle the entire time that

9    you were conducting surveillance?

10   A.   Yes.

11   Q.   Where was your vehicle parked in relation to where

12   this club was?

13   A.   Directly across the street from the limousine that

14   was registered to Romantique, the vehicle that Mr. Persico

15   got the boxes out of the trunk.

16             I was directly across the street.

17   Q.   You say this was a vehicle that was registered to

18   Romantique?

19   A.   I believe so, yes.

20   Q.   And this is the same vehicle that you say --

21   Romantique is the business that Mr. Persico owned, the

22   limousine business; is that right?

23   A.   Yes.

24   Q.   And this is the same vehicle that you saw Mr. Persico

25   drive off in, right?

Curtis - Cross/Kedia

3200

1   A.   Yes.

2   Q.   And when you parked directly across the street that

3   day, were you concerned about being seen?

4   A.   Yes.

5        You're always concerned, but I felt that I was

6   in a vehicle that would not draw attention to myself so I

7   could park a little bit close.

8   Q.   What kind of vehicle were you in?

9   A.   I was in a truck with a cap on it.

10  Q.   With a what on it?

11  A.   A cap on the back.

12  Q.   A cap?

13  A.   Yes.

14  Q.   What, like a pickup truck?

15  A.   Like a pickup truck with a cap on the back of the

16  bed, a cap on the bed.

17  Q.   Is that a vehicle that you generally used in

18  surveillances?

19  A.   It's a vehicle I was assigned during the time period.

20  Q.   Who assigned you to conduct surveillance on that day,

21  December 22nd, 1998?

22        MS. MAYER:  Objection, Judge, all beyond the

23  scope.

24        THE COURT:  Sustained.

25

Curtis - Cross/Kedia

3201

1    BY MS. KEDIA:

2    Q.    On this specific day was it predetermined that you

3    would be there from 2:20 in the afternoon until whatever

4    time you left that day?

5    A.    I think I decided I had time to do a surveillance and

6    I left the office and went out to Brooklyn to do a

7    surveillance.

8    Q.    When you did that, did you decide that you were going

9    to leave at a certain time?

10   A.    No.

11   Q.    So at the time that you went, you had no idea how

12   long you would be at the Torrese Club; is that right?

13   A.    Yes, that's correct.

14   Q.    And you said you saw Mr. Persico at some point in

15   time that afternoon?

16   A.    Yes.

17   Q.    You saw him where in relation to the club?

18   A.    He exited the club with Tommy Gioeli and Dino

19   Calabro.

20         The three exited together.  They walked down the

21   sidewalk together.

22         Mr. Persico was in between the two of them and

23   they walked over to the vehicle and Mr. Persico departed.

24   Q.    The vehicle was parked kind of right in front of the

25   club?

Curtis  -  Cross/Kedia

3202

1    A.    Three or four cars down the street from the entrance

2    of the club.

3    Q.    And this is three days before Christmas, right?

4    A.    Yes.

5    Q.    And were they carrying anything when they walked

6    outside the club?

7    A.    No.

8    Q.    You said you saw them walk over to the club and you

9    saw Mr. Persico give to Tommy Gioeli a box, right?

10   A.    He gave Tommy Gioeli and Dino Calabro two boxes.

11   Q.    These were wrapped in Christmas wrapping?

12   A.    Yes.

13   Q.    Do you know what was inside the boxes?

14   A.    No.

15   Q.    Did you see any other Christmas presents that day?

16   A.    No.

17   Q.    When you saw Mr. Persico give these boxes to the two

18   individuals you named, is that when Mr. Calabro said to

19   him *happy holidays*?

20   A.    Yes.

21   Q.    And that is the only discussion that you were able to

22   overhear?

23   A.    Yes.

24   Q.    And immediately after that you saw Mr. Persico depart

25   the area?

Curtis - Cross/Kedia

3203

1   A.   About three minutes later.

2   Q.   And did you see Mr. Persico again that day?

3   A.   No.

4   Q.   Do you know where he went from that location that

5   day?

6   A.   No.

7   Q.   Did you see him receive anything that day?

8   A.   No.

9   Q.   Directing your attention now to August 5th of 1999,

10  you testified that you again were outside the vicinity of

11  the same location, yes?

12  A.   Yes.

13  Q.   On this particular day you said you just happened to

14  drive by this location; is that right?

15  A.   Yes.

16       I was driving by several locations and that was

17  one of the locations I drove by.

18  Q.   So it was your intention to drive by and see what was

19  happening at that location; is that right?

20  A.   Yes.

21  Q.   When you say several locations, what other locations

22  are you talking about?

23       MS. MAYER:  Objection.

24       THE COURT:  Sustained.

25  BY MS. KEDIA:

Curtis  -  Cross/Kedia

3204

1    Q.    Well, Agent Curtis, you had a video camera with you

2    that day, right?

3    A.    Yes.

4    Q.    Was it your intention to take a video surveillance if

5    you could that day?

6    A.    If I observed something pertinent, yes.

7    Q.    And did you generally take a video camera with you

8    when you went out and conducted surveillances?

9    A.    I tried to.

10    Q.    But you didn't have one on November 12, for example,

11    1998?

12    A.    No.

13          I don't think I was issued it at that point.  I

14    think it was sometime after those first two surveillances

15    that I obtained the video camera and started using it

16    thereafter.

17    Q.    Meaning you didn't even use video cameras in 1998

18    during your surveillances?

19    A.    I don't believe so.

20    Q.    So on this particular day you started using your

21    video camera not at the Torrese club, but at a later time?

22    A.    I started at the club when I showed up there.

23    Q.    And once you made this video, obviously you had

24    parked somewhere, right?

25    A.    Yes.

Curtis  -  Cross/Kedia

3205

1    Q.    And, again, was it right across the street from the

2    club?

3    A.    No.  I was down -- up the street.

4    Q.    How far would you say?

5    A.    Three quarters of a block.

6    Q.    Were you visible to the people coming in and out of

7    the club?

8    A.    No.

9    Q.    Were you driving that same truck that day?

10   A.    I don't recall.

11   Q.    When you -- you obviously couldn't use the video

12   camera and drive at the same time, right?

13   A.    Probably not safely.

14   Q.    So when you're taking your video, you stopped to

15   follow these individuals to another location, right?

16   A.    I stopped filming, yes.

17   Q.    Stopped filming?

18   A.    Yes.

19   Q.    Then you went to this other location and continued

20   filming, right?

21   A.    Yes.

22   Q.    And prior to going to this other location, did you

23   have a plan to go to that location?

24   A.    I didn't know where they were heading.

25   Q.    So, prior to your seeing these individuals, I believe

Curtis - Cross/Kedia

3206

1    that you say it was Benji Castellazzo that you saw exiting

2    the Torrese club, right?

3            Prior to seeing him going to the other location,

4    did you have any intention of going to this other

5    location?

6    A.   No.

7    Q.   When you were at the other location, this is the Del

8    Rio Diner you were filming at, right?

9    A.   Yes.

10   Q.   And this is August 5, 1999?

11   A.   Yes.

12   Q.   Did you see Mr. Persico on that day?

13   A.   No.

14   Q.   Did you expect to see Mr. Persico on that day?

15   A.   No.

16           MS. MAYER:  Objection.

17   BY MS. KEDIA:

18   Q.   Do you know where Mr. Persico was on that day?

19   A.   I believe he was in Florida.

20   Q.   And do you know that was where he primarily resided?

21   A.   At that point I believe so.

22   Q.   And, Mr. Curtis, did you actually prepare any kind of

23   a report in connection with your video surveillance that

24   day?

25   A.   No.

Curtis  -  Cross/LaRusso

3207

1   Q.   Isn't that something that you typically do?

2   A.   Yes, but things were happening so fast that I had the

3   video camera and I believe the video would speak for

4   itself.

5   Q.   When you prepare reports, do you do it always

6   simultaneously with taking the pictures or taking the

7   video, or do you do it after?

8   A.   You take notes simultaneously.

9   Q.   In terms of identifying people who are on the video

10  that you're taking, do you generally make a note of that

11  somewhere so that when other agents look at this they can

12  know who it was that you identified on that day?

13  A.   I made a mental note.

14  Q.   A mental note, not a physical one?

15  A.   No.

16        MS. KEDIA:  Thank you.

17        I have nothing further.

18        MR. LARUSSO:  Thank you, your Honor.

19

20  CROSS-EXAMINATION

21  BY MR. LARUSSO:

22  Q.   Good morning.

23  A.   Good morning.

24  Q.   On November 12, 1998, that's the surveillance at Mike

25  & Tony's restaurant in Brooklyn, you did not see

Curtis  -  Cross/LaRusso

3208

1    Mr. DeRoss that day, did you?

2    A.    No.

3    Q.    Jumping to December 22nd, '98, at the Torrese Social

4    Club, you said you observed Mr. Persico giving gift

5    wrapped presents or gift wrapped objects to Mr. Calabro I

6    believe and Mr. Gioeli; is that right?

7    A.    Yes.

8    Q.    Approximately what time did you see that, do you

9    recall?

10   A.    3:50 p.m.

11   Q.    And did Mr. DeRoss get a Christmas gift that day?

12   Did you see that?

13   A.    No.

14   Q.    In relation to the surveillances of Mr. Persico and

15   the other two individuals, when did you see Mr. DeRoss

16   place that unknown object into the trunk of the car?

17   A.    Immediately after Mr. Persico was handing out the

18   boxes, Mr. DeRoss walked to the trunk of his vehicle,

19   opened it up, and put some unknown object in the trunk and

20   closed the trunk.

21   Q.    You were not able to see where Mr. DeRoss was coming

22   from until you saw him putting this unknown object in the

23   trunk?

24   A.    He exited the club right behind Gioeli, Persico, and

25   Calabro.

Curtis  -  Cross/LaRusso

3209

1              Mr. DeRoss and Joe Baudanza were steps behind

2     them as they were exiting.

3     Q.    Did you see Mr. DeRoss in the possession of this

4     object at the time you saw them exiting the club?

5     A.    I believe so.

6     Q.    What did you see?

7     A.    I couldn't tell exactly what it was.

8     Q.    When you saw him place this unknown object into the

9     trunk of the car, are you assuming that he placed it in

10    the trunk of the car or did you actually see him place an

11    object in the trunk of the car?

12    A.    He placed an object in the trunk of the car.

13    Q.    Do you know what was inside that object?

14    A.    No.

15    Q.    Was it gift wrapped?

16    A.    No, I don't believe so.

17    Q.    Was it in a bag?

18    A.    I couldn't tell.

19    Q.    On August 5, '99, at the Del Rio Diner, there was a

20    portion of the video where you identified a white car

21    being driven by Mr. Dionisio pulling out; is that correct?

22    A.    Yes.

23    Q.    What kind of car was that?

24    A.    A Mercedes I believe.

25    Q.    Do you know who it was registered to?

3210

1    A.    I believe it was Mr. Dionisio's girlfriend.

2    Q.    Do you know her name?

3    A.    Not offhand.

4    Q.    Dawn Sellers?

5    A.    I'm not sure.

6    Q.    I believe it's your testimony that after you made the

7    observation of the car and the individuals, at that point

8    you did not conduct any further surveillance; is that

9    right?

10   A.    Yes.

11   Q.    You didn't follow the car to another location?

12   A.    No.

13   Q.    It would be fair to say you broke-off surveillance at

14   the diner that day?

15   A.    Yes.

16         MR. LARUSSO:  I have no further questions,

17   Judge.

18         THE COURT:  Any redirect?

19         MS. MAYER:  No, Judge.

20         THE COURT:  Thank you.

21         You can step down.

22         Next witness.

23         (The witness steps down.)

24         MR. GOLDBERG:  Your Honor, before calling the

25   next witness, the Government offers exhibit 74-A.

3211

1          THE COURT:  There's no objection?

2          MS. KEDIA:  No objection.

3          MR. LARUSSO:  No objection, your Honor.

4          (Government's Exhibit 74-A in evidence.)

5          MR. GOLDBERG:  With the Court's permission, I

6     would like to publish a few entries in 74-A.

7          THE COURT:  Yes.

8          (Exhibit published to the jury.)

9          MR. BURETTA:  74-A is a phone record of customer

10    Dawn Sellers.

11          Customer, Dawn Sellers.

12          Billing period ending June 12, 1999, amount of

13    234.99.

14          Dawn Sellers, 245-A Kensington Avenue, Staten

15    Island.

16          Turning to the entry on May 26, 1999, entry 511,

17    showing a call to (917) 433-3052 at 4:20 in the afternoon,

18    one minute in duration.

19          MS. KEDIA:  Your Honor, may we approach?

20          THE COURT:  Yes.

21          Please come up.

22          (Continued on next page.)

23          (The following takes place at sidebar.)

24          THE COURT:  Yes?

25          MS. KEDIA:  I didn't have an objection to the

3212

1    government offering the document without a witness, but

2    now to have Mr. Goldberg read entries to the jury, I don't

3    think is something that should be done without a witness.

4          If they want to point out specific entries, I

5    believe a witness should be on the stand and we should be

6    permitted to question the witness.

7          MR. GOLDBERG:  Your Honor, two points.

8          The document is in evidence.

9          I'm pointing out two phone numbers that are

10   called a few times.

11         THE COURT:  On the 26th?

12         MR. GOLDBERG:  Yes.

13         I think one may be on the 27th.

14         It's just two phone numbers.  I'm not going

15   through all of the numbers.

16         MR. LARUSSO:  The only objection I would have,

17   Judge, I have no problem pointing out the number at the

18   particular time.

19         When you mention one minute, it leaves the

20   impression the call was for one minute.

21         That's not necessarily correct.

22         The call could be a second to a minute,

23   according to the testimony from all of the agents.

24         That's all I am saying.

25         MR. GOLDBERG:  I didn't mean to do anything

3213

1    inappropriate.

2              I was reading it because it said minutes, one.

3              MR. LARUSSO:  We know the explanation.

4              I would ask that be left until the witness can

5    take the stand and give it to us.

6              MR. GOLDBERG:  I'll be happy to read it without

7    that.

8              THE COURT:  Okay.  Let's go.

9              (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3214

1          (The following takes place in open court.)

2          MR. GOLDBERG:  Continuing.

3          On May 26, entry 533, 9:57 p.m., phone number

4    (917) 433-3052.

5          That same number is called for line item 535,

6    537, 542 on May 27, and 547.

7          Lastly, also, on May 27, item 566, a call to

8    (917) 348-0597, which is also called at line item 575.

9          Thank you, your Honor.

10          At this time the government calls Dawn Sellers.

11          THE COURT:  Will you be using the screen for

12    Ms. Sellers?

13          MR. GOLDBERG:  Yes, I will.

14          THE CLERK:  Step up, remain standing to be sworn

15    in first.

16

17    DAWN SELLERS,

18               called as a witness, having been first

19               duly sworn, was examined and testified

20               as follows:

21

22          THE CLERK:  Have a seat.

23          Pick up that hand-held microphone.

24          Please state and spell your name for the record.

25          THE WITNESS:  Dawn Sellers, D-A-W-N,

3215

1    S-E-L-L-E-R-S.

2

3    DIRECT EXAMINATION

4    BY MR. GOLDBERG:

5    Q.    Good morning.

6    A.    Good morning.

7    Q.    How old are you?

8    A.    36.

9    Q.    Are you married?

10   A.    Yes.

11   Q.    In what year did you get married?

12   A.    2005.

13   Q.    When did you meet your husband, what year?

14   A.    Labor Day.

15   Q.    I'm sorry?

16   A.    Labor Day 2005.

17   Q.    You met your husband in 2005?

18   A.    Married in 2005.  We met in 1999. Sorry.

19   Q.    It's okay.  A little nervous?

20   A.    Yes.

21   Q.    I'm showing you what's been marked in evidence as

22   2-BB.

23          Do you recognize that individual?

24   A.    Yes.

25   Q.    Who is that?

Sellers  -  Direct/Goldberg

3216

1   A.   Dominick Dionisio.

2   Q.   Did you meet Dominick Dionisio at some point?

3   A.   Yes.

4   Q.   When did you first meet Dominick Dionisio?

5   A.   Around 1989.

6   Q.   How old were you in 1989?

7   A.   18.

8   Q.   How did you come to meet Dominick Dionisio?

9   A.   Nightclubs, friends.

10  Q.   Did you become friendly with Dominick Dionisio?

11  A.   Yes.

12  Q.   During the time that you were friendly with Dominick

13  Dionisio, where were you living?

14  A.   Brooklyn.

15  Q.   Anyplace else?

16  A.   Yes.

17       Then I moved to Staten Island.

18  Q.   Sitting here today, do you recall your exact address

19  that you were living at in Staten Island at the time that

20  you knew Dominick Dionisio?

21  A.   No.

22       MR. GOLDBERG:  May I approach, your Honor?

23       THE COURT:  Yes.

24  BY MR. GOLDBERG:

25  Q.   Showing you what's in evidence as exhibit 74-A, if

Mary Ann Steiger, CSR
Official Court Reporter

Sellers  -  Direct/Goldberg

3217

1    you could look at the lower left corner there, there's

2    your name and an address.

3              Does that refresh your recollection of where you

4    were living for a period of time when you knew Dominick

5    Dionisio?

6    A.    Yes.

7    Q.    What was your address?

8    A.    245-A Kensington Avenue.

9    Q.    Staten Island?

10   A.    Staten Island.

11   Q.    During the time that you were friends with Dominick

12   Dionisio, did he ever come to that address?

13   A.    Yes.

14   Q.    So he knew where you lived?

15   A.    Yes.

16   Q.    Did you have a phone number at that residence, a home

17   phone?

18   A.    Yes.

19   Q.    Did you have a cell phone during that period of time?

20   A.    Yes.

21   Q.    I'm going to put up on the screen the same exhibit,

22   74-A, and return to the second page.

23             There's a phone number listed here, (917)

24   804-5900.

25             Was that your cell phone number in 1999?

Sellers  -  Direct/Goldberg

3218

1   A.   No.

2   Q.   Have you ever had that cell phone number?

3   A.   No.

4   Q.   Did you ever give Dominick Dionisio permission to

5   obtain a cell phone in your name?

6   A.   No.

7   Q.   Have you ever given anyone permission to obtain a

8   cell phone in your name?

9   A.   No.

10  Q.   Directing your attention to the 1999 time frame, how

11  often would you say you talked on the phone during that

12  period of your life?

13  A.   A lot.

14  Q.   Generally speaking, how much would your phone bills

15  be?

16  A.   About $300.

17  Q.   Would you always pay them?

18  A.   Yes.

19  Q.   When you paid them, would you review them?

20  A.   No.

21  Q.   How would you describe yourself in terms of your bill

22  paying habits back in 1999?

23  A.   Very lackadaisical.

24  Q.   Would it be common for you to pay a bill without even

25  checking to see if the charges were proper?

Sellers  -  Direct/Goldberg

3219

1    A.    Yes, absolutely.

2    Q.    Just a few more questions.

3          Have you ever heard or known someone named

4    William Cutolo Senior?

5    A.    No.

6    Q.    Have you ever heard or known someone named William

7    Cutolo Junior?

8    A.    No.

9    Q.    How about Frank Campanella?

10   A.    No.

11   Q.    Frank Tormenia?

12   A.    No.

13         MR. GOLDBERG:  No further questions, your Honor.

14         THE COURT:  You may inquire.

15

16   CROSS-EXAMINATION

17   BY MS. KEDIA:

18   Q.    Ms. Sellers, good afternoon.

19   A.    Hi.

20   Q.    When is it that you were first notified by the

21   government that you were going to be called as a witness

22   in this case?

23   A.    About a year ago.

24   Q.    About a year ago?

25   A.    No.

Sellers  -  Cross/Kedia

3220

1          The first time they spoke to me was about a year

2    ago.

3          The first time I was notified that I was going

4    to have to come in was probably around a month ago or so.

5    Q.    And you said the first time they met with you was

6    about a year ago?

7    A.    The FBI agents.

8    Q.    What FBI agents, do you recall?

9    A.    Gary Ponte --

10   Q.    Pontecorvo?

11   A.    Yes, and his partner.

12   Q.    James DeStefano, does that sound correct?

13   A.    I don't remember.

14   Q.    And just those two agents, no one else?

15   A.    Yes.

16   Q.    And prior to December of 2006, had anyone from the

17   FBI or the U.S. Attorney's Office or any law enforcement

18   official contacted you about your relationship with

19   Dominick Dionisio?

20   A.    No.

21   Q.    After you met with the agents in December 2006, did

22   you meet with them again?

23   A.    I had to go downtown once.

24   Q.    Explain when you say you had to go downtown?

25   A.    I had to go to a federal building.

Sellers - Cross/Kedia

3221

1   Q.    What was the purpose of your trip to the federal

2   building?

3   A.    To explain, I guess, anything in connection with a

4   phone.

5   Q.    Anything in connection with a phone?

6   A.    The cell phone.

7   Q.    And you say the cell phone you're referring to this

8   phone with the number (917) 804-5900; is that right?

9   A.    Yes.

10  Q.    And who did you meet with when you went downtown?

11  A.    The two FBI agents that had originally come to my

12  home.

13        And I couldn't even tell you who else was

14  sitting at that table.

15  Q.    And this was approximately how long after they came

16  to your home?

17  A.    I think about a month.

18  Q.    Did you speak with them at your home as well?

19  A.    Yes.

20  Q.    And did they ask you, at that time, about this phone?

21  A.    Yes.

22  Q.    And when you went downtown, is this a place like FBI

23  headquarters?

24  A.    Yes.

25  Q.    You were again asked the same type of questions you

Sellers - Cross/Kedia

3222

1   were asked at your home?

2   A.   Yes.

3   Q.   This was an informal meeting, meaning you just had a

4   meeting with some individuals at a table, or were you

5   actually testifying?

6   A.   No, it was at a table.  I wasn't testifying.

7   Q.   Did you receive a subpoena to testify?

8            MR. GOLDBERG:  Your Honor, objection.

9            THE COURT:  Sustained.

10  BY MS. KEDIA:

11  Q.   Well, were you ever called to a grand jury?

12           MR. GOLDBERG:  Objection.

13           THE COURT:  Sustained.

14  BY MS. KEDIA:

15  Q.   Ms. Sellers, when you were asked about Dominick

16  Dionisio -- explain the nature of your relationship with

17  Dominick Dionisio?

18  A.   We're friends.

19  Q.   How close of friends would you say you were at that

20  time?

21  A.   Friends, really just friends, hi, how are you, what

22  are you doing today, how's your day going.

23  Q.   I'm sorry?

24  A.   How's your day going.

25  Q.   And how often would you speak to him?

Sellers  -  Cross/Kedia

3223

1   A.   A couple times a week maybe.

2   Q.   From 1989 or so when you met him until 1999?

3   A.   Yeah.

4   Q.   And what about after 1999?

5        MR. GOLDBERG:  I object on relevance and beyond

6   the scope.

7        THE COURT:  Sustained.

8   BY MS. KEDIA:

9   Q.   Well, certainly through that 10 year period you had a

10  fairly close relationship with this man, right?

11  A.   We were friends.

12  Q.   And you testified that you did not give him

13  permission to get a cell phone in your name; is that

14  right?

15  A.   No.

16  Q.   Did he ever ask you permission to get a cell phone in

17  your name?

18  A.   No.

19  Q.   Do you know -- did you ever know that he used a cell

20  phone in your name?

21        MR. GOLDBERG:  Objection, your Honor.

22        THE COURT:  Sustained.

23  BY MS. KEDIA:

24  Q.   Well, do you know to this day whether he ever used a

25  cell phone in your name?

Sellers  -  Cross/Kedia

3224

1           MR. GOLDBERG:  Same objection.

2           THE COURT:  Sustained.

3    BY MS. KEDIA:

4    Q.    When you spoke to Dominick Dionisio, did you ever

5    speak about his relationship to organized crime?

6    A.    No.

7           MS. KEDIA:  Can I see 2-CC, 2-KK and 2-FF.

8           (Exhibits handed.)

9    BY MS. KEDIA:

10   Q.    When you saw -- you say you spoke to Mr. Dionisio

11   approximately twice a week during that period of time.

12          How often did you actually see him?

13   A.    Not often.

14   Q.    Could you give us any better idea of what that means?

15   A.    I mean when we were out at nightclubs, so whenever I

16   went out.

17   Q.    Did he ever speak about a person by the name of

18   Paulie Rizzuto?

19          MR. GOLDBERG:  Objection, your Honor.

20          May we approach?

21          THE COURT:  Come on up.

22          (Continued on next page.)

23

24

25

Sellers  -  Cross/Kedia

3225

1          (The following takes place at sidebar.)

2          MR. GOLDBERG:  Your Honor, my objection is

3     basically beyond the scope objection.

4          I was very careful to be very limited in what I

5     was I eliciting from the witness.  She's here for a very

6     specific purpose.

7          Ms. Kedia is getting into areas that go well

8     beyond her testimony and I have no reason to believe she

9     knows any of these individuals, and it's hearsay.

10         MS. KEDIA:  I have no idea whether she knows any

11    of these individuals.

12         The government specifically asked her whether

13    she knew William Cutolo Senior and I'm asking her about a

14    few other individuals that Dominick Dionisio is purported

15    to have associated with during that specific period of

16    time.

17         I'm not asking about everyone in the world.  I'm

18    asking about John The Barber, Paul Rizzuto and Enrico

19    Locascio.

20         MR. GOLDBERG:  I would ask she limit her

21    questions to who she saw and she may have spoken with and

22    people talking to her and that sort of thing.

23         THE COURT:  I'm not going to limit her to that

24    extent.

25         Let's move along.  How many do you have, three

Sellers  -  Cross/Kedia

3226

1     or four?

2              MS. KEDIA:  Yes.

3              (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3227

1          (The following takes place in open court.)

2          THE COURT:  The objection is overruled.

3     BY MS. KEDIA:

4     Q.   Ms. Sellers, when you had this relationship with

5     Mr. Dionisio, did you learn of an individual by the name

6     of Paulie Rizzuto?

7     A.   No.

8     Q.   I'm going to show you what's in evidence as

9     Government's Exhibit 2-KK.

10         Do you recognize that individual?

11    A.   No.

12    Q.   During this time period that you knew Mr. Dionisio,

13    did you learn of an individual named John The Barber?

14    A.   No.

15    Q.   John Floridia?

16    A.   No.

17    Q.   Giovanni Floridia?

18    A.   No.

19    Q.   I'm going to show you what's in evidence as

20    Government's Exhibit 2-CC.

21         Do you recognize the person depicted in that

22    photograph?

23    A.   No.

24    Q.   During this time period that you knew Mr. Dionisio,

25    did you learn about an individual named Enrico Locascio?

3228

1    A.    Yes.

2    Q.    Who is Enrico Locascio?

3    A.    A friend of Dominick's.

4    Q.    A friend of Dominick's?

5    A.    Yes.

6    Q.    Is he someone that you met?

7    A.    Yes.

8    Q.    How often did you meet him?

9    A.    Again, whenever we went out to nightclubs.

10   Q.    Meaning he was someone who was routinely around and

11   with Dom?

12        MR. GOLDBERG:  Objection, your Honor.

13        THE COURT:  Sustained.

14   BY MS. KEDIA:

15   Q.    Well, when you say when you went to nightclubs, how

16   often did you see Mr. Locascio during the course of your

17   relationship with Mr. Dionisio?

18   A.    Maybe out once a month.

19   Q.    And did you spend some significant amount of time

20   with Mr. Locascio as well?

21   A.    No, not really.

22   Q.    Well, you were out on those occasions once a month,

23   right?

24   A.    I wasn't really friends with Rico.

25   Q.    He was just friends with Dom?

**Sellers - Cross/Kedia**

3229

1  A.  Yes.

2  Q.  And he just came with Dom?

3  A.  I saw them mostly together out.

4  Q.  And I'm going to show you now what's in evidence as

5  Government's Exhibit 2-FF.

6      Is that the person you know to be Enrico or Rico

7  Locascio?

8  A.  Yes.

9  Q.  Did you know his name to be Rico?

10  A.  Yes.

11  Q.  Do you recall when you first met Rico Locascio?

12  A.  Probably around the same time.

13  Q.  What is around the same time, Ms. Sellers?

14  A.  1989.

15  Q.  Did you know him throughout the time period between

16  1989 and 1999?

17  A.  Yeah.

18  Q.  Now, do you recall whether you met any other friends

19  of Mr. Dionisio's?

20  A.  Sure.

21  Q.  Do you recall the names of any of those people?

22  A.  I think you just named one of them, Rico.

23  Q.  Right.

24  A.  Off the top of my head, no.

25  Q.  Does the name Joseph Petillo mean anything to you?

Sellers  -  Cross/Kedia

3230

1    A.    No.

2    Q.    Does the name Joe Campanella mean anything to you?

3    A.    No.

4    Q.    Frank Campanella?

5    A.    No.

6    Q.    You don't have any recollection, independent of my

7    mentioning names, of what the names of people would be

8    that you met during that period of time?

9    A.    No.

10   Q.    Ms. Sellers, you actually had occasion to speak to

11   Mr. Dionisio from prison as well, right?

12         MR. GOLDBERG:  Your Honor, objection.

13         THE COURT:  Sustained.

14   BY MS. KEDIA:

15   Q.    Well, do you know that Mr. Dionisio was in prison?

16         MR. GOLDBERG:  Objection, your Honor.

17         THE COURT:  Sustained.

18         MS. KEDIA:  Your Honor, may we approach?

19         THE COURT:  Please approach.

20         (Continued on next page.)

21

22

23

24

25

Sellers   -   Cross/Kedia

3231

1          (The following takes place at sidebar.)

2          MR. GOLDBERG:  The relevant portion of her

3     testimony is 1999.  Whether she may have spoken with

4     Dominick Dionisio after 1999 is not relevant and is

5     hearsay.

6          MS. KEDIA:  The conversations themselves may be

7     hearsay, but the fact of her speaking to this individual

8     is not hearsay.  Certainly the fact of her relationship

9     with this individual is relevant.

10          THE COURT:  How is it relevant to this

11     proceeding?

12          MS. KEDIA:  The government is maintaining that

13     this individual -- I'm assuming that the government is

14     maintaining that this person used a cell phone in her name

15     without her knowledge.

16          Certainly her relationship with Mr. Dionisio is

17     something the government elicited on direct examination

18     for that very purpose, and I just want to cross her to the

19     extent of her relationship with Mr. Dionisio.

20          I certainly don't want to elicit what

21     conversations she had specifically with Mr. Dionisio.

22          MR. GOLDBERG:  The nature of the relationship is

23     relevant up to and including 1999.

24          I didn't ask any questions beyond that.  She's

25     exploring the relationship at length up to and including

**Sellers  -  Cross/Kedia**

3232

1    1999.  I don't see the relevancy of the relationship

2    beyond 1999.

3         MS. KEDIA:  Your Honor, the nature of the

4    witness's relationship to someone who was the target of an

5    investigation and who the government maintains actually

6    took a cell phone out in her name is relevant even up

7    until to this day in terms of motive and bias of this

8    witness.

9         THE COURT:  What was the relationship after

10   1999?

11        MR. GOLDBERG:  Her relationship after 1999 was,

12   and she will testify if allowed to do so, that she met her

13   husband in 1999 and her relationship pretty much broke-off

14   with Dionisio.

15        They corresponded on a very infrequent basis as

16   friends.

17        Dionisio apparently knows that she's married.

18   It's just a friendly contact, a how are you doing.  I

19   think it's maybe once every couple of months.

20        THE COURT:  They still correspond to this day?

21        MR. BURETTA:  It has nothing to do with this

22   case and I think it's out of bounds, your Honor.

23        THE COURT:  Have you seen any of the

24   correspondence?

25        MR. GOLDBERG:  No, I haven't seen any of the

Sellers   -   Cross/Kedia

3233

1    correspondence.

2         MS. KEDIA:  With respect to correspondence,

3    first, I think I would have asked that to be produced even

4    as 3500 material.

5         MR. GOLDBERG:  We don't have any, Judge.

6         MS. KEDIA:  Obviously, I don't have it and I'm

7    not going into what the correspondence says with

8    Mr. Dionisio unless obviously he mentions the specific

9    people that she knew.  Someone he was involved in criminal

10   activity with now we learn that this witness actually knew

11   an associate.

12        MR. GOLDBERG:  It's hearsay.

13        MS. KEDIA:  I understand it's a nightclub

14   friendly relationship, but the fact that she continues to

15   correspond with him, the fact that she speaks to him from

16   prison, he's one of the people --

17        THE COURT:  Did she speak to him on the phone or

18   correspond?

19        MR. GOLDBERG:  I think it's a combination of

20   both.

21        MS. KEDIA:  She's one of the people that's on

22   his calling list, your Honor, that's marked as

23   Government's Exhibit --

24        THE COURT:  I'll allow you to bring out the fact

25   that she does write to him and receives messages from him,

Sellers  -  Cross/Kedia

3234

1    and then I want you to ask one more question after that.

2            I don't want a long scenario or litany of how

3    often does she write, does she write love, or any of that

4    other stuff.

5            MS. KEDIA:  Okay.

6            THE COURT:  Whether or not she advised him of

7    her testimony today, that is it.

8            MS. KEDIA:  And with respect to the fact that

9    she speaks to him from prison or has had occasion to speak

10   to him from prison?

11           THE COURT:  Yes.  That's it.

12           MS. KEDIA:  No problem, Judge.

13           THE COURT:  I don't want tremendous detail.

14           MS. KEDIA:  Okay.

15           (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Sellers  -  Cross/Kedia

3235

1          (The following takes place in open court.)

2          MS. KEDIA:  Thank you, your Honor.

3   BY MS. KEDIA:

4   Q.    Ms. Sellers, Mr. Dionisio is someone who you have

5   engaged in correspondence with over the years up until

6   very recently, right?

7   A.    Yes.

8   Q.    And this is a period of time from 1997 to 2007?

9   A.    I'm sorry?

10          THE COURT:  1997 to 1999.

11  BY MS. KEDIA:

12  Q.    1999 to 2007, you have been engaging in either phone

13  conversations or correspondence with Mr. Dionisio?

14  A.    Yes.

15  Q.    And did you advise him that you were called to

16  testify here today?

17  A.    Yes.

18  Q.    When is it that you advised him that you were called

19  to testify today?

20  A.    He called a few days after my birthday, so that was

21  November, end of November.

22  Q.    So meaning within the last week or so?

23  A.    Yes.

24  Q.    And did you discuss the nature of your testimony here

25  today?

Sellers  -  Redirect/Goldberg

3236

1   A.   Not really.

2   Q.   Did you discuss with him at any point the nature of

3   your testimony here today?

4   A.   Not really.

5   Q.   When he called you, this is from prison?

6   A.   Yes.

7   Q.   And he had routinely called you from prison over the

8   years?

9   A.   Once every two maybe three months.

10          MS. KEDIA:  Thank you.

11          I have nothing further.

12          MR. LARUSSO:  No questions, your Honor.

13          MR. GOLDBERG:  Just one question.

14

15   REDIRECT EXAMINATION

16   BY MR. GOLDBERG:

17   Q.   Your husband is aware of the communications you have

18   with Mr. Dionisio?

19   A.   Yes.

20   Q.   In a sentence or two, could you describe the nature

21   of those contacts with Mr. Dionisio?

22   A.   Yes.

23          He'll call, he'll ask how I'm doing, my children

24   are doing, how I am.

25   Q.   Basically platonic?

Sellers  -  Redirect/Goldberg

3237

1   A.    Yes.

2           MR. GOLDBERG:  No further questions, your Honor.

3           MS. KEDIA:  I have nothing further.

4           THE COURT:  Thank you.

5           You can step down.

6           THE WITNESS:  Thank you.

7           (The witness steps down.)

8           THE COURT:  The government's next witness.

9           MR. BURETTA:  The government calls Timothy

10   Walsh.

11           THE CLERK:  Please step up.

12           Remain standing to be sworn in.

13

14   TIMOTHY WALSH,

15           called as a witness, having been first

16           duly sworn, was examined and testified

17           as follows:

18

19           THE CLERK:  Pick up the microphone.

20           Please state and spell your name for the record.

21           THE WITNESS:  Timothy Walsh, W-A-L-S-H.

22           MR. BURETTA:  May I inquire, your Honor?

23           THE COURT:  Yes.

24

25

3238

1    DIRECT EXAMINATION

2    BY MR. BURETTA:

3    Q.    Good morning, sir.

4          What do you do for a living?

5    A.    Security systems.

6          THE COURT:  Security?

7          THE WITNESS:  Alarms.

8          THE COURT:  Thank you.

9    BY MR. BURETTA:

10   Q.    Did you know someone named William Cutolo Senior?

11   A.    Yes, I did.

12   Q.    Did you install an alarm in his house?

13   A.    Yes, I did.

14   Q.    In what borough is this house?

15   A.    Staten Island.

16   Q.    Do you remember the specific address?

17   A.    515 Butler Boulevard.

18   Q.    Approximately when in relation to the construction of

19   that home did you install the alarm?

20   A.    During construction.

21   Q.    As part of installing the alarm, did you hard wire

22   the alarm system to a phone line at that house?

23   A.    Yes, I did.

24   Q.    What is the purpose of that?

25   A.    To connect it to a central station.

Walsh  -  Direct/Buretta

3239

1   Q.   Do you recall, would it call the central station in

2   certain circumstances?

3   A.   Yes, in many circumstances.

4   Q.   Could you describe for the jury what some of those

5   many circumstances are in which the alarm system would

6   dial into the central system?

7   A.   Somebody turning the alarm on or off, somebody

8   interrupting the electrical power setting, the alarm off

9   via burglary, fire, and so on.

10  Q.   What phone number would the alarm system call as of

11  1999?

12  A.   (718) 966-4046.

13  Q.   What phone number is (718) 966-4046?

14  A.   In the industry it's referred to as a receiver line.

15  It's an alarm receiving machine that alarm dials and

16  communicates with.

17  Q.   Where was that phone number?

18  A.   At that time it was in my home which was also the

19  central station.

20  Q.   In what borough was that home?

21  A.   Staten Island also.

22  Q.   In whose name was (718) 966-4046 subscribed?

23  A.   My mother's.

24  Q.   What's her name?

25  A.   Reni Walsh.

**Walsh - Cross/Kedia**

3240

1        MR. BURETTA:  Thank you.

2        No further questions.

3

4    CROSS-EXAMINATION

5    BY MS. KEDIA:

6    Q.   Mr. Walsh, you just testified I believe that you

7    installed this alarm system during construction?

8    A.   Yes.

9    Q.   Do you recall what year that was?

10   A.   I think I believe it was '98, '97-'98.

11   Q.   You said you hard wired the alarm to a telephone

12   line; is that correct?

13   A.   Correct.

14   Q.   What does that mean?

15   A.   The phone line came into the building and went

16   directly to my alarm equipment for the ability to

17   communicate, and we sent the phone line out to the phone

18   system for use by the household.

19   Q.   So when is it that the phone would be dialed from the

20   home phone, meaning this (718) 966-4046 number?

21   A.   If for some reason the burglar alarm or fire alarm

22   would be activated, someone would push a hold-up button or

23   somebody would turn the alarm system on or off.

24   Q.   So each time either the alarm goes off itself, it's

25   activated, meaning the alarm starts running, what happens

**Walsh  -  Cross/Kedia**

3241

1    when the alarm goes off?

2    A.    Bells and sirens would ring, the video recorders

3    would be turned on, the video transmitter would transmit.

4    Q.    Each time something like that happened a call would

5    be placed from the home phone to this number (718)

6    966-4046?

7    A.    Correct.

8    Q.    In addition to when the alarm would go off, you said

9    each time someone turned the alarm on or turned it off?

10   A.    Yes.

11   Q.    This phone number would be dialed from the home

12   telephone number; is that right?

13   A.    Correct.

14   Q.    Those are the only three occasions on which this

15   number could be dialed from the home phone number?

16   A.    All alarm activity, yes.

17   Q.    Meaning there has to be an actual activity?

18   A.    There are maintenance signals where it would send us

19   a periodic signal to make sure the phone line was intact,

20   if the power or electrical power was interrupted, all

21   alarm-related activities.

22   Q.    Those other types of things you're talking about are

23   infrequent things?

24   A.    Very infrequent.

25   Q.    This phone number, (718) 966-4046, that's the only

**Walsh  -  Cross/Kedia**

3242

1    number that would be dialed from the home phone when the

2    alarm system was activated or turned on and off?

3    A.   Yes.

4    Q.   The phone number (718) 356-6530, is that something

5    that you set up to have dialed from the home phone?

6    A.   Not that I recall.

7    Q.   I'm going to show you what's in evidence as

8    Defendant's Persico J.

9         Mr. Walsh, this is the phone number that we're

10   talking about (718) 966-4046; is that right?

11   A.   Correct.  That's my phone.

12   Q.   That's the number in your mother's name that you had

13   the hard line from 515 Butler Boulevard dialing, right?

14   A.   Yes, correct.

15   Q.   Each of these times that it's dialed, can you see

16   that it's dialed at 2:58, 4:03 on the afternoon of May 26,

17   1999?

18   A.   Yes.

19   Q.   Each of the times that this number is dialed, that's

20   someone turning on and off the alarm system; is that

21   right?

22        MR. BURETTA:  Objection.

23        THE COURT:  Sustained.

24   BY MS. KEDIA:

25   Q.   Well, is that someone turning on and off the alarm

**Walsh  -  Cross/Kedia**

3243

1   system?

2         MR. BURETTA:  Objection.

3         THE COURT:  Sustained.

4   BY MS. KEDIA:

5   Q.   Do you know why that number was dialed on those

6   occasions?

7         MR. BURETTA:  Objection.

8         THE COURT:  Overruled.

9   A.   Something to do with the alarm made it dial, yes.

10  Q.   An activation on the alarm?

11        MR. BURETTA:  Objection.

12        THE COURT:  Sustained.

13  BY MS. KEDIA:

14  Q.   Some -- when you say something to do with the alarm,

15  what does that mean?

16  A.   It could have been a natural alarm condition, low

17  battery, AC power failure, something along those lines.

18  Q.   When you say low battery signal or something along

19  those lines, those are infrequent things, right?

20        MR. BURETTA:  Objection, asked and answered.

21        THE COURT:  Sustained.

22  BY MS. KEDIA:

23  Q.   This number above it 351 -- I'm sorry -- this number

24  (718) 351-2742, is that a number that you set up for the

25  home phone to dial at any point in time?

**Walsh  -  Cross/Kedia**

3244

1    A.    Not that I recall, no.

2    Q.    And when this number is dialed on the day I asked you

3    about at 2:58, 4:03, when the number is dialed at 4:43 and

4    8:31 and 9:35 and at 12:02 in the morning, again, your

5    testimony is that it had something to do with the alarm

6    being activated?

7              MR. BURETTA:  Objection.

8              THE COURT:  Sustained.

9    BY MS. KEDIA:

10   Q.    Does it have something to do with the alarm?

11   A.    I believe so, yes.

12             MS. KEDIA:  Thank you.

13             I have nothing further.

14             MR. LARUSSO:  Just a couple of questions.

15

16   CROSS-EXAMINATION

17   BY MR. LARUSSO:

18   Q.    Mr. Walsh, how much did you get paid for the work you

19   performed on Mr. Cutolo's house?

20             MR. BURETTA:  Objection.

21             THE COURT:  Sustained.

22   BY MR. LARUSSO:

23   Q.    Do you have any recollection of what time period you

24   worked there and how long?

25   A.    How long?

Walsh  -  Cross/LaRusso

3245

1          I worked in there in hours and days.  No, I

2     don't.  I didn't keep track.

3          The only correlation I can give you is I worked

4     on the house between '97 and 2003, because I know I worked

5     on the house when I lived in the neighborhood.  That's

6     when I owned the house I lived in.

7     Q.   Did you maintain any records for the work you

8     performed there?

9     A.   Actually I was specifically requested not to.

10    Q.   By whom?

11    A.   Mr. Cutolo.

12    Q.   Why was that?

13    A.   I didn't ask.  I had had that request before and I

14    acquiesce to it.

15    Q.   Do you know a person by the name of Carmine DeRoss?

16    A.   I believe that was the plumber on the job.

17    Q.   Was he there while you were working as well?

18    A.   Yeah, at times.

19    Q.   How was the introduction made to Mr. Cutolo?

20    A.   For me?  I'm not sure.  I believe he was either the

21    builder or the framer that I had done work with both

22    before.

23          MR. LARUSSO:  No further questions.

24          MR. BURETTA:  Nothing further.

25          THE COURT:  You can step down.

1           THE WITNESS:  Thank you.

2           (The witness steps down.)

3           THE COURT:  Ladies and gentlemen, that's what we

4    call perfect timing.

5           Your lunch is available and on time.

6           Don't talk about the case, and if you would be

7    good enough to return at 1:30.

8           Thank you.  See you then.

9           (The jury is excused.)

10          THE COURT:  Who do we have next after lunch?

11          MR. BURETTA:  I believe Walter Obando.

12          THE COURT:  And following him?

13          MR. BURETTA:  Yvonne Graham.

14          THE COURT:  Is there anyone that will take a

15   substantial period of time, from what we can tell?

16          MR. BURETTA:  No, Judge.

17          The longest witness would be Peter Tytell, a

18   handwriting expert.  Even his testimony I don't think is

19   particularly long.

20          MS. KEDIA:  Judge, with respect to Mr. Obando,

21   the government has informed me that it intends to

22   introduce a conversation had by Mr. Persico with an

23   individual by the name of John DiLeo in September of this

24   year.

25          The government, I don't know if the government

3247

1    has provided you with an excerpt of the portion that it

2    intends to introduce, but it's very limited.

3           It's essentially limited to Mr. DiLeo getting on

4    the phone and saying:  Hey, Al, and Mr. Persico responds

5    hey, whatever he says.

6           I would object to this being introduced in

7    evidence.  I do not believe it's admissible.  It's

8    certainly not admissible as an admission of Mr. Persico.

9           If the government wants to call John DiLeo to

10   find out if he ever called Mr. Persico by the name Al,

11   because I assume that's the purpose of the government's

12   introduction of this portion of the tape, certainly it has

13   the ability to do that.  The tape itself is hearsay and

14   inadmissible, your Honor.

15          MR. BURETTA:  It's not hearsay.  It's not

16   offered for the truth.  It's offered for the statement

17   that Mr. DiLeo made, which was identifying the defendant

18   as Al and the defendant responded to being called Al.

19          It is not hearsay.  There's nothing that

20   requires us to call Mr. DiLeo to say he called the

21   defendant Al, because we have a recording of him saying

22   that.

23          So your Honor understands the relevance, there

24   will be evidence introduced at trial identifying a pager

25   number with the name Al that was in the possession of

3248

1   Mr. Persico, which was a beeper contact number used at the

2   time of William Cutolo Senior's murder.

3          The defense, one of the defenses at the last

4   trial by Mr. Persico was that no one calls him Al.

5          That's the relevance of it.  It's, of course,

6   highly relevant because someone is calling him Al and he's

7   responding to it.

8          MS. KEDIA:  What happened at the last trial is

9   Ms. Mayer, in her opening statement, referred to the

10  defendant as Al Boy.  And, therefore, in summation it was

11  argued he wasn't ever called Al Boy.

12         Ms. Mayer said it was a transcription error and

13  she didn't mean to say Al Boy.  She meant to say Alli Boy.

14  Therefore, that argument that he wasn't called Al Boy

15  shouldn't have been made.

16         Judge, the fact that someone gets on the phone

17  and shortens someone's name does not mean he's referred to

18  by that name.

19         That's like, with all due respect, to Ms. Jones.

20  Her name is Julie.  I call her Jules.  I wouldn't write in

21  my phonebook Jules.  I write Julie.

22         That is the idea that because he gets on the

23  phone and shortens his name, this is the name by which he

24  is known, of course it's offered for the truth.  That is

25  the whole point of the offering is to say this is the name

3249

1  by which I call him.  Judge, that is the whole purpose of

2  its introduction.

3          MR. BURETTA:  It's a verbal act of calling

4  someone something.  That is not hearsay.  The defendant

5  responds to it.  He doesn't say who are you talking about.

6  I'm not Al.

7          If the defense would like to stipulate her

8  client has been called Al, or if they're going to

9  stipulate in writing we're not taking the position that my

10  client is never called Al, and we are not arguing that the

11  slip of paper that says Al with the pager number is not my

12  client, then there's no need for the evidence.

13          Obviously, that wasn't the position taken at the

14  last trial and I doubt it's the one being taken here.

15          THE COURT:  What is your position?

16          MS. KEDIA:  Judge, I don't intend to argue that

17  my client has never been referred to as Al.  I don't.

18          MR. BURETTA:  If she would like to stipulate --

19          THE COURT:  Then I'll let it in.

20          MS. KEDIA:  I'm not planning on arguing that my

21  client has never been referred to as Al.  I don't intend

22  to argue that.

23          THE COURT:  Will you stipulate --

24          MS. KEDIA:  Yes.

25          THE COURT:  -- that the number that's referred

3250

1    to on the pager was your client's number?

2            MS. KEDIA:  Absolutely not.  That's an entirely

3    different situation.

4            THE COURT:  Then I'll hear the testimony over

5    your objection.

6            Have a gun good lunch.

7            See you folks at 1:30.

8            MS. KEDIA:  With respect to that, the portion of

9    the transcript that Mr. Buretta has given me contains a

10   date at the top.

11           He has stated that he will take off the date so

12   that the jury is not informed that Mr. Persico is

13   currently in prison, and it will remain unclear as to when

14   the conversation occurred.

15           THE COURT:  I would hope so.

16           MR. BURETTA:  Absolutely.

17           THE COURT:  If you would tell me what the

18   exhibit number is, Mr. Buretta.

19           MR. BURETTA:  Sure, Judge.  It's 150.

20           So the record is clear, we're not playing the

21   call or using the transcript today with Mr. Obando.  He's

22   authenticated it and put it into evidence since obviously

23   he's not present and doesn't know Mr. DiLeo.

24           THE COURT:  See you folks then.

25           (A lunch recess is taken.)

3251

1                    **AFTERNOON SESSION**

2

3              THE COURT:  You have your next witness right

4    outside.

5              MR. BURETTA:  Yes, Judge.

6              THE COURT:  Bring him on in.

7              (Whereupon, there was a pause in the

8    proceedings.)

9              THE CLERK:  Jury entering.

10

11             (Jury enters the courtroom.)

12             THE COURT:  Please be seated, if you would.

13             The government's next witness.

14             MR. BURETTA:  The government calls Walter

15   Obando.

16             THE COURT:  Remain standing, raise your right

17   hand.

18   **WALTER OBANDO**,

19             having been duly sworn, was examined

20             and testified as follows:

21             THE CLERK:  Have a seat.

22             Pick up that microphone.  Please state and spell

23   your name for the record.

24             THE WITNESS:  Walter Obando, O-B-A-N-D-O.

25

**Obando - Direct/Buretta**

3252

1    DIRECT EXAMINATION

2    BY MR. BURETTA:

3    Q.    Good afternoon, Mr. Obando.

4    A.    Good afternoon.

5    Q.    Where do you work, sir.

6    A.    Metropolitan Detention Center Brooklyn, New York.

7    Q.    Can you describe for the jury, is that a federal or a

8    state prison?

9    A.    That's a federal prison.

10   Q.    How long have you worked there?

11   A.    Ten and a half years.

12   Q.    And what is your position there?

13   A.    Special investigative technician.

14   Q.    Can you describe for the jury what some of your

15   responsibilities are at the prison as a special

16   investigative technician?

17   A.    We conduct --

18          THE COURT:  Sir, if you would be good enough to

19   put the screen down so we can see you.

20          THE WITNESS:  Oh.

21          Okay.

22          THE COURT:  Put that screen down.

23   A.    As a special investigative technician, we conduct

24   investigations regarding inmate misconduct at the prison.

25          We monitor the inmate's incoming and outgoing

**Obando - Direct/Buretta**

3253

1   mail and their inmate conversations.  We randomly listen

2   to their phone conversations.

3   Q.   Do you monitor the phone conversation of every inmate

4   while they are speaking?

5   A.   No.

6        They are randomly monitored, but all phone calls

7   within the prison are recorded.

8   Q.   Do you monitor every piece of mail that goes out of

9   the prison?

10  A.   No.

11  Q.   Is it difficult for inmates in the prison to

12  communicate with people outside without the

13  Bureau of Prisons knowing?

14  A.   No.

15  Q.   Can you give the jury a few examples of the ways

16  inmates will communicate to get around restrictions that

17  exist in the Bureau of Prisons?

18        MS. KEDIA:  Objection, your Honor.

19        THE COURT:  Sustained.

20  BY MR. BURETTA:

21  Q.   Sir, have you ever confiscated cell phones inside the

22  prison?

23  A.   Yes.

24  Q.   Are inmates inside the Bureau of Prisons permitted to

25  visit with people who come in from the outside?

Obando - Direct/Buretta

3254

1    A.   Yes.

2         As long as they are on an approved visiting

3    list.

4    Q.   And is there a particular room where the visits

5    occur?

6    A.   Yes.

7    Q.   Where is that?

8    A.   In the visiting room.

9    Q.   Is the visiting room at the Metropolitan Detention

10   Center electronically monitored?

11        That is, are you listening in on what's being

12   said?

13   A.   No.

14   Q.   So when the visits occur at the Metropolitan

15   Detention Center between an inmate and someone from the

16   outside, does the Bureau of Prisons, or anyone else, have

17   any idea what they are talking about?

18   A.   No.

19        MR. BURETTA:  May I approach the witness, your

20   Honor?

21        THE COURT:  Yes.

22        MR. BURETTA:  Thank you.

23   BY MR. BURETTA:

24   Q.   Obando, I'm going to show you Government Exhibit 74

25   B, 148 -- sorry, 147, 148, 149, and also 136.

Obando - Direct/Buretta

3255

1               Are those Bureau of Prisons records?

2    A.    Yes.

3    Q.    Are those maintained by the Bureau of Prisons in the

4    ordinary course of business?

5    A.    Yes.

6    Q.    Were they generated in the ordinary course of the

7    Bureau of Prisons's business?

8    A.    Yes.

9               MR. BURETTA:  I offer Exhibits 74 B, 136, 147,

10   148 and 149.

11              MS. KEDIA:  Your Honor, may we just have is a

12   moment?

13              THE COURT:  Yes.

14              (Whereupon, there was a pause in the

15   proceedings.)

16

17              MS. KEDIA:  Your Honor, may we approach?

18              THE COURT:  Sure.

19              Come on up.

20              (Continued on next page.)

21

22

23

24

25

**Obando - Direct/Buretta**

3256

1            (Sidebar.)

2            MS. KEDIA:  With respect to Government Exhibit

3    147, your Honor, I'm assuming that the government wants to

4    show that Mr. Persico was incarcerated in 2001.

5            But, certainly, his incarceration from 2003 to

6    2007 is not relevant.

7            THE COURT:  Okay.

8            MR. BURETTA:  We agree.

9            THE COURT:  You will redact that portion.

10           MR. BURETTA:  Absolutely.

11           I wasn't going to show this record to the

12   witness or have him refer to anything after that.

13           THE COURT:  Okay.

14           MS. KEDIA:  And, similarly, Mr. Persico's

15   incarceration in 1983 is not relevant.

16           THE COURT:  No.

17           MS. KEDIA:  And his incarceration up until, I'd

18   say 1990, up until the war period.

19           Obviously the fact he's incarcerated during the

20   war is relevant, but up until that period of time --

21           THE COURT:  Okay.

22           MS. KEDIA:  -- I would object to.

23           MR. BURETTA:  That's fine.  We will make the

24   appropriate redactions.

25           He's not going to display the record.

**Obando - Direct/Buretta**

3257

1           MR. LARUSSO:  And with regard to 148, may I ask

2   what's being brought out so I don't have to object to the

3   entire document?

4           MR. BURETTA:  Yes.

5           It relates to the time he's incarcerated with

6   Giovanni Floridia.

7           MR. LARUSSO:  I have no problem with that.

8           That's May 4th of '04 until September 20th of

9   '04.

10          MR. BURETTA:  Correct.

11          MR. LARUSSO:  I have no problem with that.

12          What about the incarceration period from '86 to

13  June 18th?

14          MR. BURETTA:  It's up to you guys.

15          MR. LARUSSO:  You are not bringing that out?

16          MR. BURETTA:  No.  I'm not showing it to the

17  jury.

18          I wanted it in evidence for the time frame.

19          MR. LARUSSO:  I will stipulate to the period of

20  the time frame.

21          Other than that, Judge, that's the only concern

22  I had, that we didn't get into anything else other than

23  that.

24          THE COURT:  Okay.

25          MS. KEDIA:  Other than what we specifically

Obando - Direct/Buretta

3258

1    discussed here, the rest of the documents will be

2    redacted.

3                 THE COURT:  Yes.

4                 MR. BURETTA:  Correct.

5                 MS. KEDIA:  Okay.

6                 MR. LARUSSO:  Fine.

7                 (Sidebar concluded.)

8                 (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Obando - Direct/Buretta

3259

1              (In open court.)

2              MR. BURETTA:  Are those documents received in

3      evidence, subject to our discussion, your Honor?

4              THE COURT:  Yes.

5              MR. BURETTA:  Thank you, very much.

6              (Whereupon, Government Exhibits 74 B, 136, 147,

7      148 and 149 were received in evidence, as of this date.)

8

9      BY MR. BURETTA:

10     Q.   Mr. Obando, I'll also show you Government Exhibit

11     150.

12              Does that contain a telephone call between an

13     inmate Alphonse Persico and another individual, and did

14     you prepare that?

15              Does it have your handwriting on it?

16     A.   Yes.

17              MR. BURETTA:  I offer 150, subject to the

18     discussion we have already had on the record, your Honor.

19              THE COURT:  No objection.

20              It's received in evidence.

21              MR. BURETTA:  Thank you.

22              (Whereupon, Government Exhibit 150 was received

23     in evidence, as of this date.)

24     BY MR. BURETTA:

25     Q.   Mr. Obando, you mentioned that the visiting room is

Obando - Direct/Buretta

3260

1    not electronically monitored.

2             I'd like to show you Government Exhibit 149 on

3    the screen.

4             (Whereupon, there was a pause in the

5    proceedings.)

6    BY MR. BURETTA:

7    Q.   Describe for the jury what kind of record this is.

8    A.   It's a history of outcount history.

9             THE COURT:  What does outcount stand for?

10            THE WITNESS:  When an inmate leaves the housing

11   unit, he's in outcount.

12            He might be in the law library or the visiting

13   room.  That's what we call outcount.

14            THE COURT:  Thank you.

15   BY MR. BURETTA:

16   Q.   Is that word outcount listed at the top of the

17   document here, Government Exhibit 149?

18   A.   Yes.

19   Q.   And the inmate's name here?

20   A.   Alphonse Persico.

21   Q.   And the registration number for that inmate?

22   A.   05517-054.

23   Q.   And if I could direct your attention on

24   Government Exhibit 149, could you identify for the jury

25   the number of times, from early April of 2001, through

**Obando - Direct/Buretta**

3261

1   July of 2001, the number of times Alphonse Persico was in

2   the visiting room visiting?

3   A.    14 times.

4   Q.    And were any of the visits that Alphonse Persico had

5   those 14 times from April to July 2001 electronically

6   monitored by the Bureau of Prisons?

7   A.    No.

8   Q.    So do you know what was said during those 14 visits?

9   A.    No.

10  Q.    I'm going to show you Government Exhibit 136 on the

11  screen.

12        If you could identify for the jury what kind of

13  document Exhibit 136 is.

14  A.    This is a inmate history for quarters for inmate

15  Giovanni Floridia.

16  Q.    And what does that mean history for quarters?

17  A.    Quarters is basically assigned housing unit where the

18  inmate is housed at.

19  Q.    If I could direct your attention to the rest of this

20  record.

21        Could you describe for this jury where Giovanni

22  Floridia was housed at the Metropolitan Detention Center

23  and when it was.

24  A.    He was housed in unit I 61 from May 7, 2004 through

25  September 20, 2004.

Obando - Direct/Buretta

3262

1    Q.    Approximately how long is that?

2    A.    What's that, several months.

3    Q.    And the designation I 61, what does that mean?

4    A.    I 61 means the unit that's on the sixth floor of the

5    west building at MDC Brooklyn.

6    Q.    Now, on the document it stays IO 1.

7          Why does it say that if it's I 61?

8    A.    IO 1 basically is the designation of the certain

9    floors or units.

10         Basically I 61 for IO 1, IO 2 stands for I 61.

11   IO 3, IO 4, I 62, IO 5, IO 6, would be I 63.

12   Q.    And does that document indicate where Giovanni's

13   Floridia's bed was?

14   A.    Yes.

15         It was in cell 607, upper.

16   Q.    Can you describe for the jury whether the inmates are

17   in their cell all day in I 61 or not?

18   A.    Basically, when you serve breakfast, which is 6

19   o'clock in the morning the cell doors open by the unit

20   officer, that allows the inmates to eat breakfast, and

21   basically you won't lockdown until the count, 4 o'clock,

22   and the usual lockdown which is at 10 p.m.

23   Q.    And what are some of the types of things inmates in I

24   61 do during that many-hour period that they are not in

25   their cell?

**Obando - Direct/Buretta**

3263

1    A.   Some inmates may be assigned to a work detail, or

2    they might be assigned to clean the bathroom in the unit

3    itself.

4         They might work in the kitchen.  They might be

5    assigned to work maybe in the law library.

6         But most of the inmates congregate around the

7    common unit inside the unit.

8    Q.   And what is in that common area?

9    A.   You might have anywhere from six to eight tables.

10        You have four TVs and you have the actual TV

11   room which the inmates utilize for religious purposes or

12   to watch movies.

13   Q.   Where do the inmates in I 61 eat their meals?

14   A.   In the common area.

15   Q.   Do they play games of any sort in the common area?

16   A.   They play dominoes, cards.

17        They gamble.

18        MR. BURETTA:  If I could approach the witness

19   again, your Honor?

20        THE COURT:  Yes.

21   BY MR. BURETTA:

22   Q.   Showing you Government Exhibit 148, which is in

23   evidence as a inmate history quarters record for

24   John DeRoss.

25   A.   Yes.

Obando - Cross/Kedia

3264

1   Q.   During the time period that Giovanni Floridia was

2   located in I 61 from May 7th of 2004 through September

3   20th, 2004, was John DeRoss, during that time period, also

4   in that same unit?

5   A.   Yes.

6   Q.   And where was John DeRoss's bed located in I 61

7   during the period DeRoss was housed with

8   Giovanni Floridia?

9   A.   He was in the IO 1, 615 upper.

10  Q.   And approximately how far away was John DeRoss's bed

11  from Giovanni Floridia's bed while they were housed

12  together in that unit at MDC?

13  A.   You are basically looking eight cells.

14       Eight cells away.

15  Q.   Thank you.

16       MR. BURETTA:   I have no further questions.

17  CROSS-EXAMINATION

18  BY MS. KEDIA:

19  Q.   Mr. Obando, good afternoon.

20  A.   Good afternoon.

21  Q.   You testified that you were a special investigative

22  technician?

23  A.   Yes.

24  Q.   What does that mean, special investigative

25  technician?

3265

1  A.   Basically, it's kind of a big word that the

2  Bureau of Prisons uses.

3        But actually I'm an officer with the federal

4  Bureau of Prisons and I conduct investigations within the

5  confines of the MDC.

6  Q.   And when you conduct investigations, are certain

7  prisoners considered high-profile prisoners?

8  A.   Yes.

9  Q.   People that you monitor more closely, watch more

10  closely?

11  A.   Yes.

12  Q.   And those prisoners, their phone calls may be

13  monitored more often?

14  A.   Yes.

15  Q.   And their mail, their incoming and outgoing mail is

16  monitored more closely as well.

17        Is that right?

18  A.   Yes.

19  Q.   And that's part of something that you specifically

20  do?

21  A.   Yes.

22  Q.   Now, when you say that --

23        MS. KEDIA:  Withdrawn.

24  BY MS. KEDIA:

25  Q.   And you would agree with me that Mr. Persico was

3266

1   certainly one of those inmates that you would --

2   A.   I think, with the extensive media, yes.

3   Q.   Due to the extensive media?

4         Is that what you said?

5   A.   Extensive media.

6         Information that we receive from local law

7   enforcement.

8   Q.   So he was?

9   A.   Yes.

10  Q.   All right.

11        And you said you randomly listened to phone

12  calls that inmates have.

13  A.   Yes.

14  Q.   You agree with me that all of the phone calls that

15  are made from prison are recorded.

16        Right?

17  A.   Yes.

18  Q.   And people cannot call in to the prison.  An inmate

19  has to call out.

20        Right?

21  A.   No.

22        Inmates are not allowed to receive incoming

23  calls.

24  Q.   They are not allowed to receive.

25        They just can make outgoing calls?

1    A.    Exactly.

2    Q.    Where are the phones from which they make those

3    calls?

4    A.    Inside the housing unit.

5          Inside the housing unit.

6    Q.    Inside each individual prison's housing unit?

7    A.    Inside the common area, there should be anywhere

8    between four and six phone banks inside the unit.

9    Q.    And how many prisoners are inside a housing area?

10   A.    Well, the full capacity of each housing unit could be

11   120 intimates.

12         It could be upwards of 120 inmates.

13   Q.    How large an area are you talking about that covers

14   120 inmates?

15   A.    I don't know the actual specifications as far as, you

16   know, the width, height, and depth of the housing unit.

17         It's pretty large.

18   Q.    Certainly bigger than this courtroom?

19   A.    Yes.

20   Q.    And then within the housing unit, where are the

21   phones located?

22   A.    Inside the common area, which is right next to where

23   they have the tables where the inmates eat.

24   Q.    Are there guards present in each unit?

25   A.    There's one correction officer to oversee 120

3268

1    inmates.

2    Q.    And if there's a problem, then there may be other

3    correction officers that come on to the scene.

4          Right?

5    A.    Yeah.

6          In case there's a disturbance, a fight, an

7    assault, something that effect.

8    Q.    With mail, you said that mail in and out, coming in

9    and out is also monitored.

10         Right?

11   A.    Yes.

12   Q.    All mail that comes in and goes out from an inmate is

13   something that you have the ability to read.

14         Right?

15   A.    Yes.

16   Q.    You have the ability to open it, read it if you'd

17   like.

18   A.    Well, the outgoing mail, unless it's legal mail, it's

19   not supposed to be sealed.

20   Q.    Right.

21   A.    That means, basically, the officer on the shift, the

22   morning watch shift, 12 a.m. to 8 a.m., is supposed to

23   screen the mail.

24   Q.    And when you say, unless it's legal mail, meaning

25   unless the inmate is sending mail to his attorney?

1    A.    Yes.

2    Q.    And the remainder of it, the inmate is not even

3    allowed to seal?

4    A.    No.

5    Q.    And incoming mail, how is that monitored?

6    A.    Well, the basically the people in the mailroom that

7    take care of the mail, they screen the mail.

8          They open the mail to ascertain -- to make sure

9    there's no narcotics, no illegal contraband coming inside

10   the prison, or any type of illegal communication between

11   inmates.

12   Q.    So each piece of mail is opened before it's given to

13   the inmate?

14   A.    Yes.

15   Q.    You testified about people receiving visits while

16   they are incarcerated at the jail.

17         And you said that they have to be on their

18   approved visiting list.

19         Right?

20   A.    Yes.

21   Q.    How is it that someone gets on the approved visiting

22   list?

23   A.    Basically the inmate contacts his counselor.

24         Basically, he gets a notification of visitor

25   form that he can mail out to the person he wants to visit.

Obando - Cross/Kedia

3270

1    The councilman receives the form.

2          They do an NCIC check to make sure this person

3    doesn't have any outstanding warrants or isn't a convicted

4    felon.

5    Q.   And at the MDC, it's just anyone and everyone is

6    permitted to visit?

7    A.   Basically the policy now is immediate family, which

8    is includes mother, father, brother, sister, mother of

9    children.

10          That's happens a lot inside the prison --

11   Q.   Wait a minute.  I'm sorry.

12          Meaning if the inmate is not married to the

13   mother of his child?

14   A.   Exactly.

15   Q.   The mother is still permitted to visit?

16   A.   Yes.

17   Q.   All right.

18   A.   Son, daughter, and one friend.

19   Q.   So only one friend over what period of time?

20   A.   You can have that person as long as you want on the

21   list.

22   Q.   And you can identify who that person is?

23   A.   Well, I mean --

24   Q.   You ask for that person to be permitted to come to

25   meet with you?

1    A.    Yes.

2    Q.    And all other friends are excluded?

3    A.    Yes.

4    Q.    And, certainly, the Bureau of Prisons keeps records

5    as to who is on the approved visiting list.

6              Right?

7    A.    Yes.

8    Q.    You testified about a tape recording, I believe, that

9    was put into evidence.

10             It's Exhibit 150?

11   A.    Yes.

12   Q.    And this is one of a number of calls made by

13   Mr. Persico that's recorded.

14             Right?

15   A.    Yes.

16   Q.    Just as each and every call that he makes is

17   recorded.

18             Right?

19   A.    Exactly, yes.

20   Q.    When a person makes calls from the prison, how is it

21   that they are allowed to make those calls?

22   A.    Initially, when a inmate comes into the institution,

23   he's given a PAC number, which is a personal access code,

24   which allows him to place calls.

25             Basically he can transfer money from his

Obando - Cross/Kedia

3272

1   commissary account to his ITS account so he can make

2   calls.  Basically the money is deducted as they make

3   calls, and they are only allowed 300 minutes a month which

4   excludes the holidays which is November, December.

5           The federal Bureau of Prisons gives the federal

6   inmate 400 minutes a month.

7   Q.   Minutes per month?

8   A.   Yes.

9   Q.   So during those two months, they get an additional

10  hundred minutes?

11  A.   Yes.

12  Q.   And is there a dialing list?

13  A.   Well, inmate, he gets what you call a telephone

14  number request form he can issue up to 30 phone numbers on

15  his telephone list.

16          Anything more than 30 numbers, has to be

17  approved by the board.

18  Q.   And those 30 numbers have to be approved as well.

19          Right?

20  A.   Yes.

21  Q.   And there's a process in which the inmate fills out

22  who the numbers are?

23  A.   Yes.

24  Q.   Who the phone is registered to?

25  A.   Yes.

Obando - Cross/Kedia

3273

1   Q.   And the Bureau of Prisons looks at it, examines it?

2   A.   Yes.

3   Q.   And then approves the inmate calling those various

4   numbers.

5        Is that right?

6   A.   Yes.

7   Q.   And apart from the numbers that are on the approved

8   list, the inmate actually is unable to call any other

9   numbers.

10        Is that right?

11  A.   Exactly.

12  Q.   Now, you testified about -- let me show you what's in

13  evidence as Government Exhibit 149.

14        You testified about visits from early April to

15  July of 2001.  This is for the inmate Alphonse Persico.

16        Right?

17  A.   Yes.

18  Q.   And I believe that you said that he was visited 14

19  times during that period of time.

20        Right?

21  A.   Yes.

22  Q.   Do you know who he was visiting on each of those

23  occasions?

24  A.   No.

25  Q.   When an inmate visits with his attorney, is it noted

Obando - Cross/Kedia

3274

1    in any different way on this form?

2    A.    No.

3    Q.    So each of these visits could have been with his

4    attorney?

5    A.    Yes.

6    Q.    And, certainly, the Bureau of Prisons has the ability

7    to determine who each of these visits is with.

8              Right?

9    A.    Yes.

10   Q.    And, in fact, when attorneys or visitors come to

11   visit an inmate at the Bureau of Prisons at the MDC, in

12   particular, they have to fill out a form.

13             Right?

14   A.    Yes.

15   Q.    And those forms are maintained by the Bureau of

16   Prisons.

17             Right?

18   A.    Yeah, for approximately one year.

19   Q.    One year?

20   A.    Yeah, and then they are destroyed.

21   Q.    And the form, of course is for whether it's for an

22   attorney for a person on the approved visiting list of the

23   inmate or not.

24             Right?

25   A.    Yes.

Obando - Cross/Kedia

3275

1   Q.   Or they wouldn't be permitted inside.

2        Right?

3   A.   Yes.

4   Q.   And you said this form is maintained for one year,

5   but the Bureau of Prisons also maintains visiting logs.

6        Right?

7   A.   Yes.

8   Q.   And those visiting logs enable you to determine who

9   it is that visits the inmate during this period of time.

10       Right?

11  A.   Yes.

12  Q.   So on each of those 14 occasions that Mr. Persico

13  received a visit, between April of 2001 and July of 2001,

14  you, if asked to, would be able to determine exactly who

15  he was visiting with.

16       Is that right?

17  A.   All we have to do is go through the logbook, either

18  the attorney logbook or the social visitor.

19  Q.   Meaning all the MDC has to do in response to a

20  subpoena it received is to do that.

21       Right?

22  A.   Yes.

23  Q.   To go through the logbook?

24  A.   Yes.

25  Q.   Similarly, when it receives a subpoena on an inmate's

Obando - Cross/Kedia

3276

1    housing quarters, you pull up records like this.

2         Right?

3    A.   Yes.

4    Q.   Now, you testified about something called a lockdown.

5         Right?

6    A.   Yes.

7    Q.   And a lockdown occurs how often?

8    A.   Well, every day.

9    Q.   How often per day?

10   A.   Well, it varies.

11        I mean, sometimes you may have a lockdown

12   because there might be a disturbance inside the housing

13   unit when all the inmates have to lock in.

14        We have other times when we have to lock down

15   with inmates for count.

16   Q.   There are certain times meaning an inmate cannot move

17   every day?

18   A.   Exactly.

19   Q.   And I think you said something about 4 p.m.

20        Right?

21   A.   Yeah, the 4 p.m. count.

22   Q.   And then you said essentially there are also

23   intermittent lockdowns.

24        Is that right?

25   A.   Yes.

Obando - Cross/Kedia

3277

1    Q.   And the purpose of the intermittent lockdowns could

2    be what?

3    A.   Could be, like I said, there might have been an

4    assault or fight that occurred inside the housing unit.

5    It could be a census count where they are actually

6    counting bodies inside the unit.

7         It could be for various reasons.

8    Q.   I think that you identified this form,

9    Government Exhibit 149, if you recall, as an outcount

10   form.

11        Right?

12   A.   Yes.

13   Q.   And what is the outcount?

14   A.   Basically -- the outcount is basically any time an

15   inmate basically leaves the outside the housing unit,

16   basically he's on the outcount.

17   Q.   Well, there's something in the visiting room known as

18   the outcount as well.

19        Right?

20   A.   Yes.

21   Q.   And when an inmate is in the visiting room during the

22   outcount, that could only be with an attorney.

23        Right?

24   A.   Yes.

25   Q.   An inmate cannot be visiting -- being on a social

Obando - Cross/Kedia

3278

1    visit with his family member or his friend?

2    A.    No.

3    Q.    On the outcount.

4         Is that right?

5    A.    No.

6    Q.    I'm going to show you what I'm marking as

7    Defense Exhibit Persico AV.

8         If you can take a look at these two documents.

9         (Whereupon, there was a pause in the

10   proceedings.)

11

12   BY MS. KEDIA:

13   Q.    Mr. Obando, having looked at those documents, are you

14   able to determine whether Mr. Persico, Alphonse Persico

15   and Frank Campanella, were in the same housing unit for a

16   period of time in 2002?

17   A.    Yes.

18   Q.    And what housing unit was that?

19   A.    It was I 61.

20   Q.    And what does that mean?

21        What does that mean that they are in the same

22   housing unit?

23   A.    By looking at the document, they were basically -- in

24   terms we call cellies.

25        They were both housed in the same cell together.

3279

1    Q.    Meaning actually physically in the same cell?

2    A.    Yes.

3    Q.    One had the upper bunk, and one had the lower bunk?

4    A.    Yes.

5    Q.    And when people are housed -- when Mr. Campanella and

6    Mr. Persico are housed together in the same cell, there

7    are visits that occur in the visiting room during the same

8    time period as well.

9          Right?

10   A.    Yes, the social visits.

11         Yes.

12   Q.    Meaning if a member of Mr. Campanella's family comes

13   to visit him in the visiting room while the two of them

14   are housed together, Mr. Persico has visits, has his

15   social visits at that same period of time.

16   A.    Yes.

17   Q.    And that happens each and every week.

18         Is that right?

19   A.    Yes.

20         MS. KEDIA:  Just one moment, your Honor.

21         (Whereupon, there was a pause in the

22   proceedings.)

23   BY MS. KEDIA:

24   Q.    Now, I'm going to show you what I'm marking as

25   Defendant Persico AW.

1              I ask you to take a look at these documents.

2              (Whereupon, there was a pause in the

3     proceedings.)

4

5     A.    Okay.

6     Q.    You had an opportunity to look at those?

7     A.    Yes.

8     Q.    Those are records maintained by the

9     Bureau of Prisons?

10    A.    Yes.

11    Q.    As to inmates Tommy Cappa?

12    A.    Tommy Cappa, Giovanni Cerbone, Vincent DeMartino.

13           That's it.

14           MS. KEDIA:  I offer Defense Exhibit AW.

15           MR. BURETTA:  No objection.

16           THE COURT:  Received in evidence.

17           (Whereupon, Defense Exhibit AW was received in

18    evidence, as of this date.)

19    BY MS. KEDIA:

20    Q.    Let me show you what I have marked as Defense Exhibit

21    AX.

22           If you could take a look at those.

23           (Whereupon, there was a pause in the

24    proceedings.)

25

Obando - Cross/Kedia

3281

1   BY MS. KEDIA:

2   Q.   Mr. Obando, those are always documents maintained by

3   the Bureau of Prisons?

4   A.   Yes.

5   Q.   Documents with respect to an inmate by the name of

6   Andrew Russo?

7   A.   Yes.

8        MS. KEDIA:  I offer Defense Exhibit AX.

9        MR. BURETTA:  No objection.

10       THE COURT:  Received in evidence.

11       (Whereupon, Defense Exhibit AX was received in

12  evidence, as of this date.)

13  BY MS. KEDIA:

14  Q.   Mr. Obando, look at Defense Exhibit AX.

15       Can you determine when it is in the 1990s that

16  Mr. Russo was incarcerated?

17  A.   Basically, based on the information I see here at

18  hand, he was admitted to in-transit facility on May 14,

19  1993.

20  Q.   What does that mean, an in-transit facility?

21  A.   An in-transit facility could indicate a county jail

22  or a state prison, local prison, local jail.

23       Doesn't signify it's a federal facility.

24  Q.   And you are talking about this date, May 14, 1993.

25       Right?

1    A.    Yes.

2    Q.    And then he is actually released from prison July 29,

3    1994.

4          Is that what this mandatory release states?

5    A.    Yes.

6    Q.    And then he is incarcerated again September 11, 1996.

7          Is that right?

8    A.    Yes, at MCC New York.

9    Q.    And when is he released after that incarceration in

10   1996?

11   A.    Well, basically in 1996, let's see, he was changed,

12   and he was basically sent to in-transit facility.

13   Q.    Meaning he wasn't released.

14         He was simply in another facility within the

15   Bureau of Prisons.

16         Right?

17   A.    Yes.

18   Q.    And then he was sent to FCI Otisville?

19   Q.    Tell the jury when he was finally released after his

20   incarceration in September -- on September 11, 1996.

21   A.    Well, that was basically from July 29, 1994, to

22   September 11, 1996.

23         And he was incarcerated again September 11,

24   1996, through various periods of time.

25   Q.    When you say through various periods of time, he

Obando - Cross/Kedia

3283

1    wasn't released again until March 23rd of 2007.

2            Is that right?

3    A.    Yes.

4    Q.    So he was in prison, whether it was the MDC or some

5    other facility, that entire period of time, between

6    September 11th, 1996, and March of this year.

7            Right?

8    A.    Yes.

9    Q.    If you could look again at what's in evidence --

10           MS. KEDIA:  In fact, if I could have it.

11           I'll put it up on the screen, if I may.

12   BY MS. KEDIA:

13   Q.    Showing you what's in evidence as Defense Exhibit AW.

14           Are you similarly able to determine, by looking

15   at these documents, the incarceration period for Tommy

16   Cappa, Giovanni Cerbone, and Vincent DeMartino?

17   A.    Yes.

18   Q.    Is it easier for you just to look at them yourself?

19   A.    Yes.

20   Q.    Okay.

21           Can you tell the jury when Tommy Cappa was

22   released from prison?

23   A.    You are looking at full-time good count release time

24   of 2/1/2002.

25   Q.    2/1/2002?

3284

1    A.    Yes.

2    Q.    And when was he incarcerated?

3    A.    You are looking at 12/21 -- December 21st of 1993.

4    Q.    1993?

5    A.    Yes.

6    Q.    And was he released for any period of time between

7    December of 1993 and February of 2002?

8    A.    Yes.

9    Q.    When was that?

10   A.    That was -- hold on a second here.

11          Recently, his case was removed, I think, on May

12   17, 1996.  And he was admitted -- actually, he was

13   admitted to in-transit facility on May 17, 1996.

14   Q.    Mr. Obando, what is the Bates stamp number at the

15   bottom of the document you are looking at?

16   A.    Excuse me?

17   Q.    The Bates stamp number at the bottom of the document

18   you are looking at, so I can put it up on the screen for

19   the jury.

20   A.    Where's the number at?

21   Q.    Do you see a number at the bottom of the document

22   that you are looking at?

23   A.    No.

24          It doesn't have a number at the bottom.

25   Q.    With respect to Tommy Cappa?

3285

1    A.    No, it doesn't.

2    Q.    So in 1993 what you are saying is that he's first

3    incarcerated, according to these records.

4          Is that right?

5    A.    Yes.

6    Q.    And you said that he was released to an in-transit

7    facility June 14th of 1996?

8    A.    Actually, it was May 17, 1996.

9    Q.    May 16th.

10         What does that mean, an in-transit facility?

11   A.    He might have been housed in a private facility.

12         He might have been -- county jail, state prison.

13   Q.    Okay.

14         When is he actually released from jail,

15   according to these records?

16   A.    February 1, 2002.

17   Q.    And that is the first time he's released from jail

18   after he's incarcerated December 21, 1993?

19   A.    Yes.

20   Q.    Now, if you could look at the document that you have

21   in front of you with respect to the dates of incarceration

22   for Vincent DeMartino?

23   A.    Yes.

24   Q.    What is the date of Mr. DeMartino's incarceration?

25   A.    November 22, 1993.

Obando - Cross/Kedia

3286

1   Q.   And what you are looking at is the same thing that's

2   on the screen in front of you.

3            Is that right?

4   A.   Yes.

5   Q.   And when is Mr. DeMartino, according to these

6   records, released from prison?

7   A.   It was August 13, 1998 -- excuse me, I'm sorry.

8            June 10th, 1998.

9   Q.   June 10th, 1998.

10  A.   Yes.

11  Q.   And can you determine from these records if on that

12  date, June 10, 1998, Mr. DeMartino then goes to a halfway

13  house?

14  A.   Yes.

15  Q.   How do you determine that?

16  A.   The abbreviation where it says CNK.

17  Q.   Yes.

18  A.   CNK stands for halfway house.

19  Q.   So --

20  A.   Community corrections.

21  Q.   I'm sorry?

22  A.   It stands for community corrections.

23  Q.   So that means that on November 17th, 1997,

24  Mr. DeMartino goes to a halfway house?

25  A.   Yes.

Obando - Cross/Kedia

3287

1    Q.   And then from that period until June 10, 1998, that's

2    where he is?

3    A.   Yes.

4    Q.   And then as of June 10, 1998 he is officially

5    released.

6    A.   Yes.

7    Q.   Now, if you could look at what's in front of you for

8    Mr. Cerbone's period of incarceration.

9    A.   Yes.

10   Q.   Are you able to determine from this document the time

11   period that Mr. Cerbone is incarcerated?

12   A.   Yes.

13   Q.   And he starts?

14   A.   On December 21, 1993.

15   Q.   And that was the same year that Vincent DeMartino was

16   incarcerated.

17              Right?

18   A.   Actually, DeMartino -- I guess he started on November

19   22, 1993.

20   Q.   Right.

21              Just a month before.  Right?

22   A.   Yes.

23   Q.   And then Tommy Cappa -- actually you can look at what

24   I'm putting in front of you -- Tommy Cappa actually goes

25   in the same date as Mr. Cerbone.

Obando - Cross/Kedia

3288

1           Is that right?

2    A.    Yes.

3    Q.    December 21, 1993.

4           Right?

5    A.    Yes.

6    Q.    And Mr. Cerbone, after he's incarcerated in December

7    of '93, is first released when?

8    A.    He was released from an in-transit facility on

9    December 21, 1993.

10   Q.    When you say from in-transit facility, he's simply

11   put into another location?

12   A.    Yes.

13   Q.    He's not released from the custody of the

14   Bureau of Prisons.

15          Right?

16   A.    No.

17   Q.    He's still incarcerated until what date?

18   A.    Basically until November 6, 1995.

19   Q.    Now, going back to Mr. DeMartino.

20          Between his first date of incarceration,

21   November 22, 1993, and November 17, 1997, when he's placed

22   in that halfway house, is he released from prison between

23   that time at all?

24   A.    There's an indication that it was a furlough back in

25   July 18, 1997.

Obando - Cross/Kedia

3289

1   Q.   That there was a what?

2   A.   What they call a furlough.

3   Q.   A furlough, meaning a trip that he took somewhere?

4   A.   Yes.

5   Q.   July 18, 1997?

6   A.   Yes.

7   Q.   And you can't tell from the record where he went?

8   A.   No.

9   Q.   He was released out of the Bureau of Prisons for a,

10  what?

11          How long a period of time?

12  A.   Based on this, as you are looking at July 18, 1997

13  and then he was basically admitted to an in-transit

14  facility the same day.

15          And I guess they did a -- he went to CNK, which

16  is the halfway house, because it says CNK designated as

17  assigned facility on 7/18/1997.

18  Q.   And when is it that he is actually in the

19  Bureau of Prisons, within the custody of the

20  Bureau of Prisons?

21  A.   You are looking at 11/22/93.

22          He basically came into Fairton, FCI Fairton,

23  which is in New Jersey.

24  Q.   Right.

25          And he's in the custody of the Bureau of Prisons

Obando - Cross/LaRusso

3290

1    up until June 10, 1998.

2            Is that right?

3    A.    Yes.

4    Q.    Except for maybe this one-day furlough that he had?

5    A.    Yes.

6    Q.    And can you tell how many hours that furlough was on

7    the 18th of July 1997?

8    A.    You are looking at an hour, because --

9    Q.    One hour?

10   A.    Yes.

11   Q.    7:53 to 8:53, is that what you are looking at?

12   A.    Yes.

13   Q.    And, apart from that, he was in prison the whole

14   time?

15   A.    Yes.

16   Q.    Thank you.

17           MS. KEDIA:  I have nothing further.

18           MR. LARUSSO:  May I, your Honor?

19           THE COURT:  Yes.

20   CROSS-EXAMINATION

21   BY MR. LARUSSO:

22   Q.    Mr. Obando, good afternoon.

23   A.    Good afternoon.

24   Q.    You mentioned that the visitor's room was not -- is

25   not electronically monitored.

Obando - Cross/LaRusso

1          Is that correct?

2    A.   Yes.

3    Q.   Is there any kind of video monitoring that occurs in

4    the visitors' room at all?

5    A.   Yes.

6    Q.   What kind is that?

7    A.   Basically, we monitor by video surveillance to

8    basically interdict any type of drug interdiction that

9    goes on inside the visiting room.

10   Q.   And how often during the course of the day is the

11   video monitoring taking place of the visiting room?

12   A.   Basically during the visiting hours, which is

13   basically 12 to 3 and 5 to 8.

14   Q.   So any time the visiting room is being used for

15   non-Bureau of Prisons reasons, such as visits, the video

16   monitoring is taking place.

17          Is that correct?

18   A.   Yes.

19   Q.   Is there any kind of electronic monitoring in the

20   common area that you have referred to, or the TV area

21   where the inmates are?

22   A.   No.

23   Q.   What about video monitoring?

24   A.   Yes.

25   Q.   And, again, how often is the video monitoring taking

Obando - Cross/LaRusso

3292

1    place?

2    A.   Well, just recently we upgraded to new system, which

3    basically records 24 hours a day, seven days a week.

4         Previously we had no cameras, let's say up to,

5    maybe, I think a year or two years ago, we didn't have any

6    cameras inside the housing units.

7    Q.   And what kind of video monitoring did you have before

8    the new system was installed?

9    A.   We didn't have any.

10   Q.   Okay.

11        Now, is there any kind of electronic monitoring

12   permitted, either in the visitor's room or in the common

13   area?

14   A.   No.

15   Q.   Have you ever worked with law enforcement in

16   undercover operations?

17   A.   Yes.

18   Q.   Have any inmates ever been wired surreptitiously to

19   report conversations?

20   A.   Yes.

21        MR. BURETTA:  Objection.

22        THE COURT:  Sustained.

23        MR. LARUSSO:  Your Honor, this was --

24        THE COURT:  Come on up.

25        MR. LARUSSO:  All right.

**Obando - Cross/LaRusso**

1          (Sidebar.)

2          THE COURT:  Your objection.

3          MR. BURETTA:  This is beyond the scope, and

4    irrelevant.

5          I assume Mr. DeRoss's counsel is asking about in

6    the context of Giovanni Floridia, but he testified he

7    wasn't cooperating when he was in jail.

8          So the idea it's relevant that people wire up

9    against other people has nothing to do with this case.

10         THE COURT:  Okay.

11         MR. BURETTA:  If we are going to stop at that

12   question, fine.

13         But I don't want it to go further than that

14   because it's not relevant, who else was wiring up,

15   et cetera.

16         MR. LARUSSO:  I'm not getting into particular

17   people.

18         But it was brought out on direct examination

19   that they don't monitor in the visitor's room, but they

20   do, on occasion, electronically monitor.

21         THE COURT:  You are talking visitor's room.

22         MR. LARUSSO:  And in the common area as well.

23         THE COURT:  Okay.

24         MR. LARUSSO:  And I'm not bringing out any

25   specific time period.

Obando - Cross/LaRusso

1            I'm bringing out the fact it can be done in

2     connection with a law enforcement investigation.

3            Period, end of story.

4            MR. BURETTA:  That's fine.

5            I think we have done that.

6            MR. LARUSSO:  I don't think so.

7            You interrupted me just before that, John.

8            MR. BURETTA:  Okay.

9            THE COURT:  Ask those specific questions in

10     those two areas.

11            MR. LARUSSO:  Okay.

12            (Sidebar concluded.)

13            (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Obando - Cross/LaRusso

3295

1              (In open court.)

2              MR. LARUSSO:  May I, your Honor?

3              THE COURT:  Yes.

4       BY MR. LARUSSO:

5       Q.    I believe I asked whether or not surreptitious

6       electronic monitoring can occur in both the visitor's room

7       and the common area where the inmates are.

8              Is that correct?

9       A.    It can occur anywhere inside the institution.

10      Q.    And you participated in such investigations, haven't

11      you?

12      A.    Not directly.

13      Q.    Indirectly?

14      A.    Yes.

15      Q.    And those investigations are usually in conjunction

16      with other law enforcement agencies, or internal

17      investigations by the Bureau of Prisons?

18      A.    Yes.

19      Q.    And the inmates consent to being wired to

20      surreptitiously record conversations with other inmates.

21             Is that correct?

22      A.    Yes.

23             MR. LARUSSO:  May I approach, your Honor?

24             THE COURT:  Yes.

25             MR. LARUSSO:  Thank you.

Obando - Cross/LaRusso

3296

1    BY MR. LARUSSO:

2    Q.   Can you tell us what 148 is, again, please.

3         MR. LARUSSO:  May I stand here for a few

4    questions?

5         THE COURT:  Yes.

6    A.   It's an inmate history quarters for inmate

7    John DeRoss.

8    Q.   Can you tell, from looking at this, if Mr. DeRoss was

9    released from the Bureau of Prisons custody around June of

10   1993?

11   A.   Yes.

12   Q.   What date was he released?

13   A.   June 14th of 1993.

14   Q.   And how far back does his custody in the

15   Bureau of Prisons go?

16   A.   You are looking at --

17   Q.   If I could direct your attention to about November of

18   1986.

19   A.   Well, this goes back, actually, to October 31, 1984.

20   Q.   But I'm talking about in terms of a release date

21   going back from June of '93 to when he was first put in

22   custody in regards to that time period.

23   A.   Yes.

24   Q.   What was that date?

25   A.   You are looking at December 11, 1996.

Obando - Cross/LaRusso

3297

1    Q.    Maybe my question's a little misleading.

2          You indicated he was released June 14, 1993.  Is

3    that correct?

4    A.    Yes.

5    Q.    If you take the record back in time, when did he get

6    into the custody of the Bureau of Prisons in regards to

7    that time period?

8    A.    Like I said, he was initially incarcerated on October

9    31, 1984.

10   Q.    Tell us what happened then?

11   A.    Well, he was bounced around for many institutions.

12         He was at MCC New York.  He was transferred to

13   FCI Otisville.  He was transferred back to MCC New York.

14   He was transferred to USP Lewisburg.

15         I think TEX stands for Texarkana, which is in

16   Texas.  He went back into MCC, and that's basically when

17   he was released from MCC on June 14, 1993.

18   Q.    So he was in custody from what period to what period?

19   A.    You are looking at October 31, 1984 through 1993.

20   Q.    Now directing your attention to January of 2001.

21         Do you see any entry in regards to Mr. DeRoss's

22   inmate history?

23   A.    Yes.

24   Q.    What do you know?

25   A.    He was housed, basically came into MDC Brooklyn on

Obando - Redirect/Buretta

3298

1    January 31st of 2001.

2    Q.   And what's -- how long does he remain in the custody

3    of the Bureau of Prisons at this point?

4    A.   Basically, according to these records, he's still

5    housed at MDC Brooklyn.

6    Q.   Do you know whether or not he was released at all

7    around February of 2001?

8    A.   No.

9         It does not indicate.

10   Q.   Thank you.

11        MR. LARUSSO:  No further questions, your Honor.

12        THE COURT:  Redirect?

13        MR. BURETTA:  One question.

14   REDIRECT EXAMINATION

15   BY MR. BURETTA:

16   Q.   You were asked questions about the visiting room and

17   whether there's a video monitor.

18        Is that recorded?

19   A.   Previously we didn't have the system to record inside

20   the visiting room images.

21        But now we do.

22   Q.   And in 2001, was the visiting room recorded?

23   A.   No.

24   Q.   Are there side rooms in the visiting room that have

25   doors where inmates can visit with their visitors?

**Obando - Recross/Kedia**

3299

1    A.   Yes.

2              MR. BURETTA:  No further questions.

3              THE COURT:  Anything else?

4              MS. KEDIA:  Yes.

5    RECROSS-EXAMINATION

6    BY MS. KEDIA:

7    Q.   The visiting room at the MDC is one big open room.

8         Right?

9    A.   Yes.

10   Q.   And there are rooms where an inmate can visit with an

11   attorney.

12        Right?

13   A.   Yes.

14   Q.   But all social visits have to occur --

15   A.   In the common area.

16   Q.   In the common area which is one big area?

17   A.   Yes.

18   Q.   That can be seen by the correction officers on duty,

19   the entire area.

20        Right?

21   A.   Yes.

22   Q.   And we are talking about an area about the size of

23   this courtroom, fair to say?

24   A.   Yeah, yes.

25   Q.   And how many correction officers are on duty at any

Obando - Recross/LaRusso

3300

1    given time?

2    A.    Four.

3    Q.    And those four are present in that room?

4    A.    Supposed to be.

5    Q.    They are supposed to be, and they generally are.

6          Right?

7    A.    Yes.

8    Q.    Thank you.

9          MS. KEDIA:  I have nothing further.

10         MR. LARUSSO:  Your Honor, one point of

11   clarification, if I could.

12         THE COURT:  All right.

13   RECROSS-EXAMINATION

14   BY MR. LARUSSO:

15   Q.    Directing your attention back again to 148, you

16   indicated that Mr. DeRoss, on January 31st of 2001, is

17   noted as an inmate with the Bureau of Prisons.

18         Is that correct?

19   A.    Yes.

20   Q.    And if you take January 31, 2001, and go up two

21   entries to 2/16 of 2001, what does that note?

22   A.    It notes an assignment change.

23   Q.    Do you know if this record indicates that he was

24   released on bail February 16th of 2001?

25   A.    Yes.

### Obando - Recross/LaRusso

3301

1           There is a gap from 2/16 of 2001, to 2/6, 2002.

2   Q.   So does that indicate that he was in custody from

3   January 31, 2001, until February 16, 2001.

4           Is that correct?

5   A.   Yes.

6   Q.   And he is released.

7           He doesn't return to the Bureau of Prisons until

8   February 6th of 2002.

9           Is that correct?

10  A.   Yes.

11          MR. LARUSSO:  Thank you, your Honor.

12          THE COURT:  Anything else?

13          MR. BURETTA:  No, your Honor.

14          THE COURT:  You can step down, sir.

15          Next witness.

16          MS. MAYER:  The government calls Special Agent

17  Timothy Dinnan.

18          (Whereupon, there was a pause in the

19  proceedings.)

20

21          THE CLERK:  Please step up and remain standing

22  to be sworn in.

23  **TIMOTHY DINNAN**,

24          having been duly sworn, was examined

25          and testified as follows:

Dinnan - Direct/Mayer

3302

1          THE CLERK:  Have a seat, please.

2          Take hold of that microphone.  State and spell

3     your name for the record.

4          THE WITNESS:  Special Agent Timothy Dinnan,

5     D-I-N-N-A-N.

6     DIRECT EXAMINATION

7     BY MS. MAYER:

8     Q.    Good afternoon.

9     A.    Good afternoon.

10    Q.    Where do you work?

11    A.    I work for the FBI New York office.

12    Q.    And what's your job at the FBI?

13    A.    Special agent.

14    Q.    How long have you been a special agent with the FBI?

15    A.    Approximately 11 years.

16    Q.    What squad are you currently assigned to?

17    A.    I'm currently assigned to squad C 22.

18    Q.    In October of 2000, what squad were you assigned to?

19    A.    The surveillance squad SO 3.

20    Q.    Directing your attention to October 25th of 2000,

21    were you working that day?

22    A.    Yes, I was.

23    Q.    What was your assignment?

24    A.    There was a surveillance assignment on that day.

25    Q.    Did you conduct a surveillance alone or with other

Dinnan - Direct/Mayer

3303

1    agents?

2    A.    There was a team of agents.

3    Q.    Approximately what time did your surveillance begin

4    that day?

5    A.    I believe it was approximately at 8:40.

6    Q.    And approximately what time did it end?

7    A.    Some time after 1 o'clock.

8          I think it was about 1:10.

9    Q.    Directing your attention to approximately 12 noon

10   that day, what did you observe?

11   A.    At approximately 12 noon, I observed a vehicle being

12   driven by Jackie DeRoss at the Dakota Diner.

13   Q.    And that person you saw that day, October 25th of

14   2000, you told us was Jackie DeRoss.

15         Do you see him in court here today?

16   A.    Yes, I do.

17   Q.    Can you identify him for the jury?

18   A.    He's at the defendant's desk.

19   Q.    If you could indicate an article of clothing so the

20   record can reflect it.

21   A.    The red or maroon-colored sweater.

22         MS. MAYER:  Judge, if the record could

23   indicate --

24         THE COURT:  Yes.

25

3304

1    BY MS. MAYER:

2    Q.    You said you saw Jackie arrive at the Dakota Diner?

3    A.    That's correct.

4    Q.    And what did you observe him do, if anything?

5    A.    He pulled up along the side of the diner, stepped out

6    of the vehicle to motion to a -- in the direction of a

7    window of the diner.

8          And then got back into his vehicle.

9    Q.    And what else happened?

10   A.    Shortly thereafter, three gentlemen that we had

11   brought to the diner exited the diner, got into the

12   vehicle, and they departed together.

13   Q.    And when you say three gentlemen, could you identify

14   those gentlemen?

15   A.    By name?

16         Yes, I can.

17   Q.    Who were they?

18   A.    It was a Thomas Gioeli, Paul Bevilacqua and Frank

19   Miglia.

20   Q.    And I think you said that there were three gentlemen

21   that we had brought to the diner that day.

22         What do you mean by that?

23   A.    The surveillance started out on Long Island.

24         And we started with those three gentlemen in

25   Long Island and they went to the diner first.

Dinnan - Direct/Mayer

1    Q.    So when you say you brought, you mean you followed

2    them to the diner?

3    A.    That's correct.

4    Q.    And once they came out, where did those three

5    gentlemen go?

6    A.    They got into Jackie DeRoss's vehicle.

7    Q.    And did they leave?

8    A.    Yes, they did.

9    Q.    Did you follow them?

10   A.    Yes, we did.

11   Q.    What happened?

12         Where did they go to?

13   A.    They went to a pizza restaurant that was nearby.

14         I believe it was on Morning Star Road or

15   Morning Star Avenue.

16   Q.    Now, directing your attention to about 1 o'clock that

17   day, what if anything did you observe?

18   A.    The same four individuals that left that pizza

19   restaurant that went to the IHOP parking lot, which was

20   near the diner.

21   Q.    And what did you observe after those four men arrived

22   back near the Dakota Diner?

23   A.    They exited the vehicles.

24         They continued a conversation, and eventually

25   they departed.

Dinnan - Direct/Mayer

3306

1    Q.   Did your team take photographs in connection with

2    your surveillance that day?

3    A.   I'm sorry.

4         Can you repeat that please.

5    Q.   Sure.

6         Did your team take photographs in connection

7    with your surveillance that day, October 25th of 2000?

8    A.   Yes, we did.

9    Q.   Have you reviewed the photographs prior to appearing

10   in court today?

11   A.   Yes, I did.

12        MS. MAYER:  Judge, may I approach the witness?

13        THE COURT:  Yes.

14   BY MS. MAYER:

15   Q.   I'm showing you what's been marked Government Exhibit

16   26, 26 A and B for identification.

17        Can you take a look at them.

18   A.   Yes.

19   Q.   And the board as well.

20   A.   Yes.

21   Q.   Do you recognize them?

22   A.   Yes, I do.

23   Q.   What are they?

24   A.   Those are photos of the surveillance that day.

25   Q.   And are they a fair and accurate depiction of some of

3307

1    your observations on October 25, 2000?

2    A.   Yes, they are.

3    Q.   There are name attributions, both on the small photos

4    and on the board.

5         Are those name attributions accurate?

6    A.   Yes, they are.

7         MS. MAYER:  Judge, I offer 26 A, B, and 26.

8         MS. KEDIA:  No objection.

9         MR. LARUSSO:  No objection, your Honor.

10        THE COURT:  Received in evidence.

11        (Whereupon, Government Exhibits 26 26 A and B

12   were received in evidence, as of this date.)

13        MS. MAYER:  I'm just going to put these up on

14   the screen, Agent Dinnan.

15        (Whereupon, there was a pause in the

16   proceedings.)

17

18   BY MS. MAYER:

19   Q.   Looking at 26 A, can you identify the individuals for

20   the jury, the one on the left facing us?

21   A.   The one on the left is Jackie DeRoss.

22   Q.   And the one who's obscured by the pole in this photo?

23   A.   Yes.

24        That's Thomas Gioeli.

25   Q.   Obviously he's obscured by the pole.

**Dinnan - Cross/LaRusso**

3308

1           You made observations where you could see him?

2   A.   Yes.

3   Q.   And then looking at 26 B, those name attributions,

4   this is Jackie DeRoss with his back to us.

5           Is that right?

6   A.   That's correct.

7           MS. MAYER:  If I can publish these to the jury,

8   Judge.

9           THE COURT:  Yes.

10           (Whereupon, the above-mentioned exhibits were

11   published to the jury.)

12

13           MS. MAYER:  Nothing further.

14           THE COURT:  Cross-examination.

15           MR. LARUSSO:  Just a few questions, Judge.

16           Yes.

17   CROSS-EXAMINATION

18   BY MR. LARUSSO:

19   Q.   The individuals that you observed you say, can you

20   tell us who they were again?

21           The individuals that you observed at the IHOP?

22   I don't have the photographs with me.  I think they are

23   being published right now.

24   A.   Yes.

25           That was Jackie DeRoss, Thomas Gioeli, as well

**Dinnan - Cross/LaRusso**

3309

1    as Paul Bevilacqua and Frank Miglia.

2    Q.   Did you know Frank Miglia and Mr. Bevilacqua before

3    this surveillance that you conducted on this day?

4    A.   I believe I may have been part of previous

5    surveillances.

6    Q.   Were you at any time aware that both Miglia and

7    Bevilacqua what were associated with the Orena faction

8    during the Colombo war?

9              MS. MAYER:  Objection.

10             THE COURT:  Sustained.

11   BY MR. LARUSSO:

12   Q.   Did you come to learn after the surveillance who

13   Miglia and Bevilacqua were?

14   A.   No, I did not.

15             MR. LARUSSO:  No further questions, your Honor.

16             THE COURT:  Any questions?

17             MS. KEDIA:  No, your Honor.

18             THE COURT:  Redirect?

19             MS. MAYER:  No, Judge.

20             THE COURT:  Thank you, sir.  You can step down.

21             The government's next witness.

22             MR. GOLDBERG:  The government calls Yvonne

23   Graham.

24             (Whereupon, there was a pause in the

25   proceedings.)

### Graham - Direct/Goldberg

3310

1          THE COURT:  Just raise your right hand and face

2     me.

3     **YVONNE GRAHAM**,

4               having been duly sworn, was examined

5               and testified as follows:

6               THE COURT:  Have a seat.

7               State your name and spell it for the record.

8               THE WITNESS:  Yvonne, Y-V-O-N-N-E, Graham,

9     G-R-A-H-A-M.

10              THE COURT:  You may inquire.

11    DIRECT EXAMINATION

12    BY MR. GOLDBERG:

13    Q.   Did you at one time work for the FBI?

14    A.   Yes, I did.

15    Q.   From when to when?

16    A.   From March of 1978, until December 31, 2001.

17    Q.   You are retired now?

18    A.   Yes, I am.

19    Q.   What was your title when you were with the FBI?

20    A.   Special agent.

21    Q.   I'd like to direct your attention to 1996.

22              Where were you assigned within the FBI in 1996?

23    A.   The New York division, special agent operations

24    branch, squad SO 4.

25    Q.   Let me direct your attention specifically to April

Graham - Direct/Goldberg

3311

1    19, 1996.

2              THE COURT:  If you would be good enough, just

3    put the screen down for now.

4              MR. GOLDBERG:  I'll do it, Judge.

5              THE COURT:  All right.

6    BY MR. GOLDBERG:

7    Q.   I was asking you about April 19, 1996.

8              Were you working that day?

9    A.   Yes, I was.

10   Q.   What were you assigned to do that day?

11   A.   We were assigned to surveil Tommy Gioeli.

12   Q.   What time did you start your surveillance that day?

13   A.   At approximately 6 o'clock in the morning.

14   Q.   Where did you start?

15   A.   At Mr. Gioeli's residence in Farmingdale, New York,

16   Long Island.

17   Q.   Did there come a time when you saw Tommy Gioeli at

18   that residence?

19   A.   Yes.

20             He left the residence at about 10 after 10 that

21   morning.

22   Q.   Did he leave by foot or by car?

23   A.   By car.

24   Q.   Did you follow him?

25   A.   Yes, we did.

**Graham - Direct/Goldberg**

3312

1   Q.   Where did he go?

2   A.   He went to Rockville Centre arriving at Matthew's

3   Restaurant on Park Avenue in Rockville Centre.

4   Q.   Approximately what time did he arrive at Matthew's

5   Restaurant in Rockville Centre?

6   A.   At approximately 10:45 in the morning, quarter to 11.

7   Q.   What if anything did he do when he arrived?

8   A.   He entered Mathew's Restaurant.

9   Q.   That was at 10:45, you said?

10  A.   10:45, correct.

11  Q.   What happened next?

12  A.   At approximately ten after 12, Mr. Gioeli exited the

13  restaurant accompanied by Mr. Alphonse Persico.

14  Q.   Did you recognize or know who Alphonse Persico was at

15  the time?

16  A.   No, I did not.

17  Q.   Have you since learned who he is?

18  A.   Yes, I have.

19  Q.   Do you see him in the courtroom today?

20  A.   Yes, I do.

21  Q.   Can you say what he's wearing?

22  A.   He's wearing a gray-blue sweater.

23        MR. GOLDBERG:  Indicating the defendant, your

24  Honor.

25        THE COURT:  Yes.

Graham - Direct/Goldberg

3313

1    MR. GOLDBERG:  Indicating the defendant Persico.

2    I'm sorry.

3    BY MR. GOLDBERG:

4    Q.   Now, at 12:10 p.m., when Alphonse Persico and Tommy

5    Gioeli exited the restaurant, what if anything did they

6    do?

7    A.   They had a walk talk up and down Park Avenue in the

8    vicinity of the restaurant.

9    Q.   What is a walk talk?

10   A.   A walk talk is when two individuals in an outdoor

11   setting walk and talk, usually for the purpose of not

12   being overheard.

13   Q.   What did you see next?

14   A.   Approximately ten minutes later, at about 12:20,

15   Mr. Gioeli and Mr. Persico left each other.

16        Mr. Gioeli reentered Matthew's Restaurant, and

17   Mr. Persico entered a white Lexus and departed the area.

18   Q.   Did you stay in the area, or did you follow

19   Mr. Persico?

20   A.   No.

21        We followed Mr. Persico at that time.

22   Q.   Where did he go?

23   A.   Mr. Persico drove onto Old Country Road, and arrived

24   at a parking lot on Old Country Road in Westbury,

25   New York, on Long Island.

3314

1   Q.   Approximately what time did he arrive at that parking

2   lot?

3   A.   That was about 12:40.

4   Q.   What did you see, if anything, when he arrived?

5   A.   Mr. Persico met two individuals.

6            An individual a little older, salt and pepper

7   hair, and a younger individual, male, a little heavier

8   set, taller, maybe approximately 30 years old.

9            (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3315

1    BY MR. GOLDBERG:

2    Q.   Those two individuals that Mr. Persico met in the

3    parking lot, were they on foot or were they in a car?

4    A.   They were in a Toyota SUV, but exited the vehicle and

5    met with Mr. Persico at his vehicle.

6    Q.   What did you see next?

7    A.   The older of the two gentlemen entered Mr. Persico's

8    vehicle.

9         The younger one got into his vehicle and the two

10   cars left the area, one following the other.

11   Q.   Did you follow those cars?

12   A.   Yes.

13        They arrived about five minutes later at

14   Tesoro's Restaurant on Old Country Road in Westbury.

15   Q.   What happened when they arrived?

16   A.   The three of them exited their vehicles and entered

17   Tesoro's Restaurant.

18   Q.   What time was this again?

19   A.   About a quarter to one.

20   Q.   Did you stay in that vicinity?

21   A.   We stayed there until about 3:00 and then we

22   discontinued our surveillance around 3:00.

23   Q.   Why did you discontinue the surveillance?

24   A.   It was a decision that we had other things to do and

25   we had done what we needed to do at that point in time.

**Graham  -  Direct/Goldberg**

3316

1  Q.    From 12:45, the time that you saw these individuals

2  go into the restaurant, until 3:00 when you terminated

3  your surveillance, did you ever see these men leave the

4  restaurant?

5  A.    No, we did not.

6  Q.    Were photographs taken that day?

7  A.    Yes, they were.

8          MR. GOLDBERG:  May I approach, your Honor?

9          THE COURT:  Yes.

10  BY MR. GOLDBERG:

11  Q.    I'm showing you what's been marked as Government's

12  Exhibits 44-A, 44-B, 44-C, 44-D, and then 44-E which is a

13  compilation along with 44.

14          Do you recognize those photos?

15  A.    Yes.

16  Q.    Were those photos that your team took that day?

17  A.    Yes, they are.

18  Q.    Do they fairly and accurately depict some of the

19  observations that you made?

20  A.    Yes, they do.

21  Q.    A number of the photos have name labels.

22          Are they fair and accurate name attributions?

23  A.    Yes, they are.

24          MR. GOLDBERG:  We offer 44-A through E as well

25  as 44 itself.

**Graham  -  Direct/Goldberg**

3317

1          MS. KEDIA:  No objection.

2          MR. LARUSSO:  No objection, your Honor.

3          THE COURT:  Received in evidence.

4          (Government's Exhibits 44, 44-A through 44-E in

5     evidence.)

6     BY MR. GOLDBERG:

7     Q.   Now, just so we're clear, I know you don't have the

8     blowup visible.  You have seen it before.

9          The top two photos are from Rockville Centre

10    observations and the bottom two photos are from Westbury?

11    A.   Correct.

12    Q.   I'm showing you 44-A.

13         Was this in Rockville Centre?

14    A.   Yes, it was.

15    Q.   Who are we looking at here?

16    A.   We're looking at Tommy Gioeli in the ball cap and

17    Mr. Alphonse Persico in the multi-colored sweater.

18    Q.   44-B, same vicinity?

19    A.   Yes, it is.

20    Q.   Who are we looking at?

21    A.   Again, Mr. Gioeli in the ball cap and Mr. Persico in

22    the sweater.

23    Q.   Moving to your observations in Westbury, 44-C, could

24    you tell us what we're looking at here?

25    A.   These are the individuals who met Mr. Persico from

Graham  -  Direct/Goldberg

3318

1    the Toyota SUV, the older salt and pepper haired gentleman

2    to the right, and the younger gentleman to the left, dark

3    haired?

4    Q.   You described these two individuals were in a vehicle

5    and they met Mr. Persico, and which one got into the car

6    with Mr. Persico?

7    A.   The older of the two gentleman with the salt and

8    pepper hair.

9    Q.   The one on the right?

10   A.   On the right, correct.

11   Q.   You discussed them going to Tesoro's Restaurant?

12   A.   Correct, continuing up Old Country Road.

13   Q.   Showing you 44-D, could you tell us what that is?

14   A.   That is the same two individuals who had met

15   Mr. Persico, the salt and pepper hair gentleman on the

16   left, and the younger gentleman on the right, and the

17   three of them have now exited both their vehicles and are

18   entering Tesoro's Restaurant.

19            MR. GOLDBERG:  Thank you.

20            No further questions, your Honor.

21

22   CROSS-EXAMINATION

23   BY MS. KEDIA:

24   Q.   Agent Graham, good afternoon.

25   A.   Good afternoon.

Graham  -  Cross/Kedia

3319

1    Q.    On April 19, 1996, you said you began your

2    surveillance at 10:45 that day?

3    A.    No.

4          We began surveillance at 6:00 in the morning.

5    Q.    You saw Tommy Gioeli arrive at Matthew's at 10:45?

6    A.    Correct.

7    Q.    Was that time planned in advance?

8    A.    The time of the surveillance initiation at 6:00 in

9    the morning?

10   Q.    Yes.

11   A.    Yes, that was planned in advance.

12   Q.    When was that planned?

13   A.    We were given information -- we were given the

14   request to surveil Mr. Gioeli that day and we started our

15   surveillances anywhere from five, 6:00 in the morning,

16   going forward.

17   Q.    And was it predetermined as to what time the

18   surveillance would end that day?

19   A.    No, not necessarily.  It depends on the activity of

20   the day.

21   Q.    Was there anything unusual about beginning your

22   surveillance at six a.m. that day?

23   A.    We normally try to begin early in the morning, not

24   knowing where our particular individual he or she might be

25   leaving.

Graham  -  Cross/Kedia

3320

1    Q.    When you say leaving, you mean leaving his residence?

2    A.    The residence and the location we have them for the

3    day, yes.

4    Q.    Your assignment that day was to follow an individual

5    by the name of Tommy Gioeli, right?

6    A.    That's correct.

7    Q.    To see what his activities were that day?

8    A.    That's correct.

9    Q.    And were you specifically given any assignment that

10   day with respect to Mr. Persico?

11   A.    No.

12   Q.    When Tommy Gioeli first left his home that day, the

13   first time you saw him actually go anywhere was this

14   restaurant Matthew's, right?

15   A.    Correct.

16   Q.    And when you testified to all of this, certainly

17   these are not events that you have a clear recollection of

18   now 11 years later, right?

19   A.    It's information I can recall based on the

20   information I've been provided, yes.

21   Q.    When you say based on the information you've been

22   provided, what does that mean?

23   A.    I had access -- Mr. Goldberg had given me the

24   physical logs to refresh my memory.

25   Q.    Prior to coming to testify here, you reviewed a log

Graham  -  Cross/Kedia

3321

1    of what occurred that day?

2    A.    My activities of that day.  That's correct.

3    Q.    And when you went to Matthew's Restaurant you saw

4    Mr. Gioeli meeting with a fellow by the name of Ralph

5    Lombardo, right?

6    A.    Mr. Lombardo was there at the restaurant with

7    Mr. Persico and Mr. Gioeli, correct.

8    Q.    When you say was there at the restaurant, when is the

9    first time you saw Mr. Lombardo?

10   A.    I personally, which will be as the log indicates, did

11   not see Mr. Gioeli originally enter the restaurant where

12   he met Mr. Lombardo.

13         I personally first saw Mr. Gioeli exit the

14   restaurant with Mr. Persico at 12:10.

15   Q.    So meaning you were in a car and you didn't see him

16   walk in, you saw him walk out later?

17   A.    Correct.

18   Q.    You're not sure, yourself, from your own observation,

19   what time it was that Mr. Gioeli entered the restaurant?

20   A.    I am based on the information that we have as a

21   surveillance team.

22   Q.    So meaning --

23   A.    When he arrives.

24         When he arrives, as an example, when Mr. Gioeli

25   returned onto Park Avenue off Sunrise Highway, someone

Graham   -   Cross/Kedia

3322

1    else would be in a position to see him actually exit his

2    vehicle into the restaurant.

3           We had a moving surveillance from the time he

4    departed his residence and arrived at the restaurant.

5    Q.    When you say a moving surveillance, explain what that

6    means?

7    A.    A surveillance where we followed Mr. Gioeli's vehicle

8    from his residence.

9           As I indicated, he left at 10 after 10 in the

10   morning until approximately quarter to 11 when he arrived

11   at Matthew's Restaurant.

12   Q.    Now, when another agent was making the observation

13   that Mr. Gioeli entered Matthew's Restaurant, where were

14   you?

15   A.    I was in the vicinity of Matthew's Restaurant.

16   Q.    You were looking elsewhere?  You weren't focused on

17   Mr. Gioeli's activities?

18   A.    I wouldn't say I wasn't focused on Mr. Gioeli's

19   activities.

20          I was not in the position of physically seeing

21   him enter the restaurant.

22   Q.    How many people were in your party that day, on your

23   team that day?

24   A.    I believe it was six.

25   Q.    And how many vehicles were you in?

Graham   -   Cross/Kedia

3323

1   A.    Six vehicles.

2   Q.    Six separate vehicles, so you were alone in one

3   vehicle?

4   A.    Correct, with radio communication.

5   Q.    And from the vehicle that you were in, you weren't

6   able to observe Mr. Gioeli entering the restaurant; is

7   that right?

8         MR. GOLDBERG:  Objection, asked and answered.

9         THE COURT:  Sustained.

10  BY MS. KEDIA:

11  Q.    Where was your vehicle parked?

12  A.    I do not recall exactly where my vehicle was parked.

13        As I indicated, we had followed Mr. Gioeli from

14  his residence to Park Avenue in Rockville Centre.

15        At that time, the way a surveillance works is

16  that teams work together and so Mr. Gioeli parks his

17  vehicle, one of the agents would have seen him park his

18  vehicle and enter the restaurant, whereby I would be

19  perhaps still on Sunrise Highway off the corner in a

20  position to see where his activity was going to take him.

21  Until he parks his vehicle we are not going to all be in

22  the same location.

23  Q.    So meaning if he was going to depart the parking lot

24  and go elsewhere, you were ready to follow him?

25  A.    Correct.

3324

1    Q.    That's what you were doing that day?

2    A.    I can't recall exactly where I was at that particular

3    10:45 in the morning, to be very honest.

4    Q.    Mr. Gioeli, when he exited his house, did you know

5    that was Mr. Gioeli's house?

6    A.    Yes, I did.

7    Q.    How did you know that?

8    A.    We know Mr. Gioeli from other surveillances.

9    Q.    When you say *we*, who are you referring to?

10    A.    I'm sorry.

11         I know Mr. Gioeli from other surveillances and

12    the team has as well.

13    Q.    This team that was with you on that day, those six

14    people, are they part of a team that you always work with?

15    A.    In general at that point in time, yes.

16    Q.    You testified at some point Ralph Lombardo was seen,

17    right?

18    A.    I didn't testify to that.

19         The information indicates that Mr. Lombardo was

20    in the company of Mr. Gioeli and Mr. Persico.

21    Q.    When you say the information indicates, you weren't

22    the person making that observation, is that what you're

23    saying?

24    A.    I did not sign the entry of Mr. Lombardo meeting with

25    Mr. Persico and Mr. Gioeli as Mr. Gioeli entered Matthew's

Graham  -  Cross/Kedia

3325

1    restaurant, that's correct.

2    Q.    Did you know who Mr. Lombardo was?

3          MR. GOLDBERG:  Objection, your Honor.

4          THE COURT:  Sustained.

5    BY MS. KEDIA:

6    Q.    Well, did you see Mr. Lombardo on that day at all

7    yourself?

8    A.    No, I did not.

9    Q.    When you saw -- you testified that you saw

10   Mr. Persico, right?

11   A.    Yes, I did.

12   Q.    And Mr. Persico was someone you did not recognize; is

13   that right?

14   A.    That's correct.

15   Q.    And, in fact, you testified that you had reviewed

16   this report of yours prior to testifying here today.  It

17   wasn't indicated in the report who Mr. Persico was, right?

18   A.    The photo log indicates who Mr. Persico is which is

19   done the day after the surveillance is conducted.

20   Q.    Well, you testified that you saw Mr. Gioeli and

21   Mr. Persico?

22   A.    That's correct.

23   Q.    Walking up and down Park Avenue?

24   A.    That's correct.

25   Q.    During that period of time you didn't know that it

Graham   -   Cross/Kedia

1    was Mr. Persico, right?

2    A.   Not by name, correct.

3    Q.   He was not someone who was familiar to you at that

4    time?

5    A.   Not by name, sight.  By sight, I'm sorry.

6    Q.   When did you learn it was Mr. Persico?

7    A.   The following day by name.  By name.

8    Q.   Now, when Mr. Gioeli and Mr. Persico were walking up

9    and down the street, how long a period of time are you

10   talking about?

11   A.   Approximately 10 minutes.

12   Q.   And where were these six vehicles of yours and the

13   other agents?

14   A.   I do not recall exactly their locations.

15   Q.   Well, were they in such a position that they could be

16   observed?

17   A.   That's correct.

18   Q.   All of them?

19   A.   I won't say all of them.

20        I was in a position to observe Mr. Persico and

21   Mr. Gioeli walking up and down Park Avenue.

22   Q.   Was your vehicle parked in such a position they could

23   have seen you?

24   A.   They may have been in a position to see me.  I can't

25   testify to that.

Graham  -  Cross/Kedia

3327

1  Q.   Similarly, the other vehicles that were parked

2  belonging to the other agents, you don't know one way or

3  the other?

4  A.   I do not know that.

5  Q.   What did Mr. Gioeli do after this walk up and down

6  Park Avenue?

7  A.   Mr. Gioeli reentered Matthew's Restaurant and

8  Mr. Persico reentered his vehicle and left the area.

9  Q.   Your assignment that day was to follow Mr. Gioeli,

10  right?

11  A.   That's correct.

12  Q.   You didn't even know who Mr. Persico was?

13  A.   To begin with Mr. Gioeli, to surveil Mr. Gioeli.

14  Q.   And you didn't even know who Mr. Persico was that

15  day, right?

16  A.   That's correct.

17       We knew him as a person who had met the person

18  we were asked to surveil.

19  Q.   But you followed Mr. Persico?

20  A.   Correct.

21  Q.   You and all of the other five agents?

22  A.   That's correct.

23  Q.   And no one stayed to observe, to see what Tommy

24  Gioeli was doing?

25  A.   That's correct.

Graham  -  Cross/Kedia

3328

1    Q.   And how is it that that decision was made?

2    A.   The decision was made because in order to further

3    identify a person who has met with our person of interest,

4    Mr. Gioeli, we would go ahead and attempt to follow

5    Mr. Persico to see where that might lead us to indicate

6    who, in fact, this person was and what activities he might

7    conduct as a result of meeting with Mr. Gioeli that

8    particular morning.

9    Q.   Was anyone -- before you arrived at Matthew's, did

10   you know that Matthew's was a location that Mr. Gioeli was

11   going to be?

12   A.   No, I did not.

13   Q.   Was anyone in a position to overhear any of the

14   conversation that was taking place inside Matthew's?

15   A.   No, we did not.

16   Q.   When you followed the vehicle of the person you now

17   know to be Mr. Persico, did you -- you have the ability to

18   conduct a physical surveillance log of vehicle

19   surveillance, right?

20        You find out what the plate is and find out who

21   the car is registered to?

22        MR. GOLDBERG:  Objection as to form.

23        THE COURT:  Sustained.

24   A.   Yes, you can.

25   Q.   On certain surveillances you identify who a certain

Graham   -   Cross/Kedia

3329

1   plate is registered to, right?

2   A.   Yes, you can.

3   Q.   And did you do that on this occasion?

4   A.   I do not recall if we did.

5        What I do recall is that Mr. Persico's vehicle

6   was I believe a dealer plate or a plate that was not a

7   personal plate that would come back to a name and address

8   if I'm not mistaken.

9   Q.   How would you have identified it to be a dealer

10  plate?

11  A.   By the numbers and the letters on the particular

12  plate.

13  Q.   Would you have noticed that it was a dealer plate?

14  A.   We would not have necessarily put on a log that it

15  was a dealer plate.

16       We would have noted the number, the plate

17  itself, the number on the plate.

18  Q.   Do you know if, at any point in time up until today,

19  the vehicle was identified as belonging to any particular

20  individual?

21  A.   I do not recall.

22  Q.   You testified about two individuals that Mr. Persico

23  met with on that day late that afternoon?

24  A.   That's correct.

25  Q.   Do you know if those individuals -- those individuals

Graham  -  Cross/Kedia

3330

1  aren't people you had seen with Tommy Gioeli that day,

2  right?

3  A.    That's correct.

4  Q.    And do you know if those individuals were known to

5  Tommy Gioeli?

6  A.    I do not.

7  Q.    After Mr. Persico's vehicle again went to a

8  restaurant, right?

9  A.    Mr. Persico's vehicle, after meeting the two

10 individuals in the parking lot, the two vehicles, yes,

11 continued on and arrived at Tesoro's Restaurant in

12 Westbury.

13 Q.    When you say a parking lot, what are you referring to

14 exactly?

15 A.    The two vehicles -- again, it was just a parking lot

16 on Old Country Road.  It wasn't assigned to any particular

17 building that I can recall.  Maybe in the 600 block.  I

18 don't recall off the top of my head.

19         It's a parking lot outside of Tesoro's

20 Restaurant where the two vehicles met.  A number of

21 vehicles were parked there.

22 Q.    Maybe there's a shopping center or something?

23 A.    Could have been.  I do not recall.

24 Q.    These vehicles proceeded to Tesoro's?

25 A.    Correct, just up the block there on Old Country Road?

Graham   -   Cross/Kedia

3331

1    Q.    The all three individuals walked into this restaurant

2    at lunchtime?

3    A.    At approximately 12:45, that's correct.

4    Q.    Did you go inside the restaurant?

5    A.    No, we did not.

6    Q.    Did any of the other individuals that you were with

7    go inside the restaurant?

8    A.    No, they did not.

9    Q.    At some point shortly thereafter you decided to

10   terminate surveillance?

11   A.    At approximately 3:00 we decided to terminate

12   surveillance, that's correct.

13   Q.    Between 12:45 and 3:00, where did you remain, right

14   at the restaurant?

15   A.    Correct, with an eye on the restaurant and on their

16   vehicles.

17   Q.    So you didn't notice any of these individuals

18   leaving?

19   A.    No, we did not.

20   Q.    How is it that you decided to terminate your

21   surveillance at that point in time?

22   A.    Again, we started 6:00 in the morning and it was just

23   a decision that at that point we would just terminate the

24   surveillance.

25         I can't recall exactly the reasons at that

3332

1    particular point in time.

2              MS. KEDIA:  Thank you.

3              I have nothing further.

4              THE COURT:  Mr. LaRusso, any questions?

5              MR. LARUSSO:  No questions, your Honor.

6              MR. GOLDBERG:  Nothing your Honor.

7              THE COURT:  Thank you.

8              You can step down.

9              (The witness steps down.)

10             THE COURT:  Now, we will take our 15 minute

11   mid-afternoon break and then resume with the next witness.

12             (The jury is excused.)

13             THE COURT:  Next is going to be whom?

14             MR. BURETTA:  Special Agent Eileen White.

15             THE COURT:  Hopefully we can get done with the

16   balance of the surveillance witnesses today.

17             MR. BURETTA:  I hope so, Judge, yes.

18             (Recess taken.)

19             (After recess.)

20             THE COURT:  The next witness is where?

21             MR. BURETTA:  Right outside, Judge.

22             MS. MAYER:  I'll go get her.

23             MR. GOLDBERG:  I did have something to raise

24   before the jury comes in.

25             THE COURT:  What issue do you want to raise?

3333

1              MR. GOLDBERG:  Very briefly, at some point

2     either at the end of today or Monday we will be --

3     Wednesday, we will be presenting the guilty plea of

4     Mr. Persico from 2001.

5              In that guilty plea it refers to an enterprise

6     charged in the indictment.

7              At the end of the presentation I would ask that

8     the government give us an acknowledgment that the

9     enterprise --

10             THE COURT:  That the defendants give an

11    acknowledgment.

12             MR. GOLDBERG:  I'm sorry.

13             That the Court acknowledge for the jury and the

14    defense, I suppose, that the enterprise charged in the

15    indictment is the Colombo Family.

16             I have handed 121-A which indicates that.  Sorry

17    for rushing.  I want to beat the jury.

18             MS. KEDIA:  We will talk to the government about

19    this at the end of the day.

20             THE CLERK:  Jury entering.

21             (The jury is present.)

22             THE COURT:  Please be seated.

23             The government's next witness.

24             MS. MAYER:  Judge, the government calls Special

25    Agent Eileen White.

                    Mary Ann Steiger, CSR
                    Official Court Reporter

White  -  Direct/Mayer

3334

1    EILEEN WHITE,

2                    called as a witness, having been first

3                    duly sworn, was examined and testified

4                    as follows:

5

6                    THE CLERK:  Please have a seat.

7                    Hold on to the microphone.

8                    State and spell your name for the record.

9                    THE WITNESS:  Eileen White, E-I-L-E-E-N,

10   W-H-I-T-E.

11

12   DIRECT EXAMINATION

13   BY MS. MAYER:

14   Q.    Good afternoon.

15         Where do you work?

16   A.    The FBI.

17   Q.    What's your job?

18   A.    Special Agent.

19   Q.    How long have you been an FBI Special Agent?

20   A.    A little over nine years.

21   Q.    What squad are you currently assigned to?

22   A.    SO-8.

23   Q.    What is that type of squad?

24   A.    Joint Terrorist Task Force.

25   Q.    In March of 2000, what squad were you assigned to?

3335

1    A.   C-38.

2    Q.   What squad was that?

3    A.   Colombo squad.

4    Q.   Directing your attention to March 2nd of 2000, were

5    you working that day?

6    A.   I was.

7    Q.   What was your assignment?

8    A.   Surveillance.

9    Q.   Where were you doing surveillance?

10   A.   The Victory Diner.

11   Q.   Do you recall the address of the Victory Diner?

12   A.   1781 Richmond Road.

13   Q.   What borough is that in?

14   A.   Staten Island.

15   Q.   Approximately what time did you begin your

16   surveillance that day?

17   A.   Around 10:30.

18   Q.   About what time did you end it?

19   A.   11:45.

20   Q.   Were you conducting that surveillance alone or with

21   other agents?

22   A.   I believe other agents were out there at the time.

23   Q.   Did you have anyone with you in your vehicle?

24   A.   No.

25   Q.   Did you take photographs in connection with your

White  -  Direct/Mayer

3336

1    surveillance that day?

2    A.   I did.

3    Q.   Have you reviewed the photographs prior to your

4    appearance in Court here today?

5    A.   Yes.

6         MS. MAYER:  Judge, may I approach the witness?

7         THE COURT:  Yes.

8    BY MS. MAYER:

9    Q.   I'm showing you what's been marked Government's

10   Exhibit 31 and 31-A through C.

11        Can you take a look at all of these?

12   A.   Yes.

13   Q.   Do you recognize them?

14   A.   Yes.

15   Q.   What are they?

16   A.   They are pictures of individuals outside the Victory

17   Diner in Staten Island.

18   Q.   Did you take these photographs?

19   A.   I did.

20   Q.   On March 2nd, 2000?

21   A.   Yes.

22   Q.   Are they fair and accurate depictions of some of your

23   observations that day?

24   A.   Yes.

25        MS. MAYER:  Judge, I offer Government's Exhibits

White - Direct/Mayer

3337

1    31 and 31-A through C.

2              THE COURT:  Any objection?

3              MS. KEDIA:  No objection.

4              MR. LARUSSO:  No objection.

5              THE COURT:  Received in evidence.

6              (Government's Exhibits 31, 31-A through 31-C in

7    evidence.)

8    BY MS. MAYER:

9    Q.   Now, you said these are individuals that you observed

10   outside the Victory Diner; is that correct?

11   A.   Yes.

12   Q.   Were you able to identify these individuals?

13   A.   At the time, no.

14             MS. MAYER:  Judge, I have nothing further.

15             Can I publish 31-A through C to the jury?

16             THE COURT:  Yes.

17             (Exhibits published to the jury.)

18             THE COURT:  Any cross-examination?

19             MR. LARUSSO:  No, your Honor.

20             MS. KEDIA:  No, Judge.

21             Thank you.

22             THE COURT:  You're free to go.

23             (The witness steps down.)

24             THE COURT:  The government's next witness.

25             MR. BURETTA:  The government calls Special Agent

**Carrie  -  Direct/Buretta**

3338

1    Jeff Carrie.

2              THE CLERK:  Please step up and remain standing

3    to be sworn in.

4

5    JEFFREY CARRIE,

6                    called as a witness, having been first

7                    duly sworn, was examined and testified

8                    as follows:

9

10             THE CLERK:  Have a seat.

11             Please take the microphone.

12             State and spell your name for the record.

13             THE WITNESS:  Jeffrey P. Carrie, C-A-R-R-I-E.

14

15   DIRECT EXAMINATION

16   BY MR. BURETTA:

17   Q.   Good afternoon, sir.

18   A.   Good afternoon.

19   Q.   Did you work for the FBI?

20   A.   Yes.

21   Q.   Which years?

22   A.   From October 1984 through March of this year, 2007.

23   Q.   Are you currently retired from the FBI?

24   A.   Yes.

25   Q.   I would like to direct your attention to some

**Carrie - Direct/Buretta**

3339

1  surveillances you conducted.

2             Were you on a surveillance squad?

3  A.   Yes.

4  Q.   Directing your attention to May 25th of 1999, was

5  there a particular individual you were surveilling on May

6  25th, 1999?

7  A.   Yes.

8  Q.   Who was that?

9  A.   William Cutolo.

10  Q.   Junior or senior?

11  A.   Senior.

12  Q.   Could you describe for the jury, sir, approximately

13  when surveillance was initiated on May 25th, 1999?

14  A.   Around noon time.

15  Q.   Could you describe to the jury what you observed

16  William Cutolo Senior do as you observed him that day?

17  A.   I observed him driving his vehicle which was a Ford

18  Expedition with Florida tags in the area of Avenue U and

19  East 2nd Street in Brooklyn.

20  Q.   What happened next?

21  A.   He eventually departed that area.

22  Q.   Where did he go?

23  A.   The next time I recall seeing him was in Staten

24  Island.

25  Q.   Do you know where he went in Staten Island?

Carrie  -  Direct/Buretta

3340

1   A.   The street name I believe was Gunton, G-U-N-T-O-N.

2   Q.   What did you observe him do in Staten Island?

3   A.   I observed him later depart that location with a

4   white female with blonde hair.

5   Q.   Did you know who the white female with blonde hair

6   was?

7   A.   By name, no, but I had been told by the case agent

8   that it was his girlfriend.

9   Q.   What did you observe Mr. Cutolo and the female do at

10   that point?

11   A.   They went to a strip mall and went to a hardware

12   store and pastry shop.

13   Q.   Approximately what time of day was it that you saw

14   William Cutolo Senior and the female first together.

15   A.   It was mid-afternoon, but I would want to look at my

16   surveillance log to get the exact time.

17         MR. BURETTA:  May I approach the witness, your

18   Honor?

19         THE COURT:  Yes.

20   BY MR. BURETTA:

21   Q.   I show you 3500-FC-14.

22   A.   Yes.

23         This is my surveillance log from May 25th, 1999.

24         The first time I personally observed Mr. Cutolo

25   and this female together was at 4:46 p.m. when they parked

Carrie  -  Direct/Buretta

3341

1    in that strip mall.

2    Q.   After they went to the strip mall what, if anything,

3    did you see them do?

4    A.   They returned Gunton address.

5    Q.   What happened at that point?

6    A.   We maintained surveillance until about 7:30 p.m., and

7    then we discontinued our surveillance.

8    Q.   Approximately what time did you see William Cutolo

9    Senior and the female arrive at the Gunton address?

10   A.   They returned there at 5:08 p.m., according to my

11   log.

12   Q.   What was the address on Gunton?

13   A.   44 Gunton Place.

14   Q.   Did you take certain photographs that day, May 25th,

15   1999?

16   A.   Yes.

17        MR. BURETTA:  May I approach the witness, your

18   Honor?

19        THE COURT:  Yes.

20   BY MR. BURETTA:

21   Q.   Showing you Government's Exhibit 141 and also

22   Government's Exhibit 141-A through D.

23   A.   Yes.

24        These are photographs I took on that date.

25   Q.   Do they fairly and accurately represent certain

Carrie  -  Direct/Buretta

3342

1   things you saw that day as you took the photos?

2   A.   Yes, they do.

3           MR. BURETTA:  I offer 141-A through D.

4           MS. KEDIA:  We have no objection, your Honor.

5           Just for the record they were previously marked

6   during the course of the trial as defendant's exhibits.

7   What are they?

8           MR. BURETTA:  One through four.

9           (Government's Exhibits 141-A through D in

10   evidence.)

11           MR. BURETTA:  Could I have the agent step down?

12           MS. KEDIA:  They were previously marked

13   Defendant Persico's H-1 through 4.

14           THE COURT:  Okay.

15           (The witness steps down.)

16   BY MR. BURETTA:

17   Q.   Starting with the upper left-hand photograph, could

18   you describe for the jury where this location is?

19   A.   This is the strip mall which I described earlier.

20           I know one of the cross streets was Woodrow.

21   Q.   Could you point out for the jury who the individuals

22   are that you took note that day?

23   A.   This is William Cutolo Senior here and the white

24   female with the blonde hair that I described earlier here.

25   Q.   Is this the woman you had identified that you

Carrie  -  Direct/Buretta

3343

1    understood was his girlfriend?

2    A.    Yes. Yes, it is.

3    Q.    Turning your attention to the upper right-hand

4    photograph, where is this location?

5    A.    Same location, the strip mall.

6    Q.    And, again, you have William Cutolo Senior and the

7    female?

8    A.    That's correct.

9    Q.    And the two lower photographs, what do these depict?

10         First of all, where are we?

11   A.    Same location at the strip mall.

12   Q.    The vehicle there that the female it appears is

13   opening, whose vehicle was that?

14   A.    It was the vehicle she was driving.

15         I would have to check the log to see who it was

16   registered to.

17   Q.    Now, when you first picked up William Cutolo Senior

18   with this female on Gunton Place, I think you indicated --

19   did they drive in the Ford Expedition or did they drive in

20   this car to get to the strip mall?

21   A.    They drove in this vehicle.

22   Q.    Where was Mr. Cutolo's Ford Expedition left?

23   A.    Back Gunton Place address.

24   Q.    Okay.

25         Approximately what time of day are these four

Carrie  -  Direct/Buretta

3344

1  specific photographs of the strip mall taken?

2  A.   I believe that was four or 5:00 p.m., as I stated

3  earlier.

4        MR. BURETTA:  Thank you.

5        You can retake the witness stand.

6        (Whereupon, the witness resumes the stand.)

7  BY MR. BURETTA:

8  Q.   Special Agent, approximately what time was the

9  surveillance terminated?

10  A.   7:30 p.m.

11  Q.   Did you take note of anything between the time of

12  5:00 p.m. and 7:30 p.m. that is the time you saw them go

13  into Gunton Place and the time you terminated your

14  surveillance?

15  A.   I personally did not, no.

16        MR. BURETTA:  May I publish 141-A through D to

17  the jury, your Honor?

18        THE COURT:  Yes.

19        (Exhibits published to the jury.)

20  BY MR. BURETTA:

21  Q.   Is it fair to say that at the time William Cutolo

22  Senior and the female arrived at 44 Gunton Place, it was

23  dinnertime?

24  A.   Yes.

25  Q.   I now would like to direct your attention to the next

Carrie  -  Direct/Buretta

3345

1    day, May 26, 1999.

2              Were you on a surveillance team conducting

3    surveillance on that day?

4    A.    Yes.

5    Q.    And where did you start your surveillance that day?

6    A.    In Manhattan on Broadway.

7    Q.    Had you been to the Manhattan Broadway location

8    before that day, May 26?

9    A.    Yes, we had.

10   Q.    What did you understand that location to be when you

11   were conducting surveillance?

12   A.    It was a place of business for Mr. Cutolo.

13   Q.    Do you recall the specific address of that location

14   on Broadway in Manhattan?

15   A.    I believe it was 1435.

16   Q.    Did you know what type of establishment was located

17   there?

18   A.    I don't recall at this time.  It was a large office

19   building.

20   Q.    Tell the jury approximately what time did you start

21   surveillance there on May 26, 1999?

22   A.    It was just before 2 p.m.

23   Q.    Was there a reason the surveillance started at two

24   that point?

25   A.    Yes.

Carrie  -  Direct/Buretta

3346

1          Mr. Cutolo, when we would pick him up and follow

2     him to that location in the past, would depart there

3     between two and three p.m.

4     Q.    That was a routine that you had seen in the past for

5     him?

6     A.    Yes.

7     Q.    And on that date, May 26, 1999, was Mr. Cutolo Senior

8     adhering to that routine of leaving between two and three

9     p.m. from 1435 Broadway?

10    A.    No.

11    Q.    Explain that to the jury.

12    A.    We had learned that he had already departed that

13    location prior to us setting up surveillance there.

14    Q.    So when you got to 1435 Broadway in the afternoon of

15    May 26, 1999, was Mr. Cutolo Senior at that location?

16    A.    No.

17    Q.    Did you ever see him that day?

18    A.    No.

19    Q.    Approximately how long did you remain in the vicinity

20    of 1435 Broadway on May 26, 1999?

21    A.    I remained there for a couple of hours, two or three

22    hours.

23    Q.    What was the purpose of remaining there?

24    A.    To see if we could observe Mr. Cutolo at some point.

25    Q.    Did you observe him there?

**Carrie  -  Direct/Buretta**

3347

1    A.    No.

2    Q.    At some point did you personally go to another

3    location to try and find William Cutolo Senior?

4    A.    Yes.

5    Q.    Where did you go?

6    A.    To a social club where he was known to frequent.

7    Q.    Do you recall the approximate address or area of that

8    social club?

9    A.    It was in the area of 65th Street and 11th Avenue,

10    but probably a block or two from there.

11          If I checked my log, I could give you the exact

12    location.

13          MR. BURETTA: May I approach the witness, your

14    Honor?

15          THE COURT: Yes.

16    Q.    I show you 3500-PS-1.

17    A.    Yes.

18          This is my surveillance log from May 26, 1999,

19    and the social club was in the area of 11th Avenue and

20    63rd Street.

21    Q.    When you got to the social club, approximately how

22    long did you personally spend there?

23    A.    I arrived there at 6:45 p.m.

24    Q.    How long did you stay?

25    A.    I didn't leave until 9:30 p.m.

Carrie  -  Direct/Buretta

3348

1    Q.    Describe to the jury what you saw while you were

2    watching that social club on the evening of May 26, 1999?

3    A.    Generally I just saw activity which was consistent

4    with the activity we had seen there in the past, a lot of

5    white males coming and going, but no sign of Mr. Cutolo.

6    Q.    Did anything stand out that you observed at the

7    social club that evening?

8    A.    Yes.

9    Q.    What stood out?

10   A.    Dominick Dionisio was quite familiar to us, and at

11   one point during the evening, it was 8:05 p.m., I was

12   advised over the radio that he had departed the club.

13          I was within a block or two of the club and I

14   saw him depart the area in his vehicle at a very high rate

15   of speed.

16   Q.    Why was that unusual?

17   A.    Normally, when we saw him leave the club, he would

18   obey the speed limit and all traffic laws.

19          At this time, it just appeared that he was in a

20   big hurry to get out of that area.

21   Q.    Could you hear what anyone at the social club was

22   talking about that night?

23   A.    No.

24   Q.    And while you watched the social club, did you see

25   William Cutolo Senior?

**Carrie - Direct/Buretta**

3349

1  A.    No.

2  Q.    I would like to draw your attention to a few days

3  later, to June 1st of 1999.

4         Did you again conduct surveillance that day?

5  A.    Yes.

6  Q.    Where did you initiate your surveillance on June 1st,

7  1999?

8  A.    Butler Boulevard in Staten Island, Mr. Cutolo's

9  residence.

10  Q.    For approximately -- what time did you start the

11  surveillance on June 1st, 1999, at Cutolo's residence?

12  A.    That was earlier, about seven a.m.

13  Q.    Did you see William Cutolo Senior at all that day,

14  June 1st, 1999?

15  A.    No.

16  Q.    What did you observe?

17  A.    I observed an individual believed to be William

18  Cutolo Junior exit the residence and depart in a vehicle.

19  Q.    What vehicle?

20  A.    Could I just check my log on that date to make sure I

21  believe I have the right vehicle?

22         I believe it's Mr. Cutolo's Senior vehicle, but

23  I want to confirm that.

24  Q.    I show you government 3500-JX-1.

25  A.    That's our surveillance log from June 1st, 1999, and

Carrie  -  Direct/Buretta

3350

1    it was Mr. Cutolo Senior's burgundy Ford Expedition which

2    departed 12:50 p.m. and we believe to be operated by his

3    son William Cutolo Junior.

4    Q.    When you say you believe it to be operated, what do

5    you mean by that?

6    A.    It was operated by an individual that through

7    discussion with the case agent and my description of him,

8    it was believed to be William Cutolo Senior's son.

9    Q.    Where did you see that person go?

10   A.    We saw him near a Pathmark store near Hylan

11   Boulevard.

12   Q.    Did he meet with anyone there?

13   A.    No.

14   Q.    What happened next?

15   A.    He departed the area.

16         I'm sorry, he did depart with a passenger, an

17   unknown white female.  No further description.

18   Q.    What happened after he went with that person to Hylan

19   to the grocery store?

20   A.    My next observation was at 2:04 p.m. when he parked

21   in Brooklyn on 3rd Avenue near 91st Street.

22   Q.    What did he do at that point?

23   A.    He exited the vehicle and I made no further personal

24   observations at that time.

25   Q.    Did you pick him up any other time that day?

Carrie  -  Direct/Buretta

3351

1   A.   I did not, no.

2          MR. BURETTA:  May I approach the witness, your

3   Honor?

4          THE COURT:  Yes.

5   BY MR. BURETTA:

6   Q.   Special Agent Carrie, just drawing your attention

7   back to May 25th, 1999, for a moment, did you observe

8   William Cutolo Senior enter any specific stores that date,

9   May 25th, 1999?

10  A.   Personally, I saw him enter a pastry shop and I see

11  the name is handwritten here.  I can tell you it begins

12  with an L.  I can't read the rest.

13          It's a pastry shop in the strip mall we saw

14  earlier in the photos.

15  Q.   Any other locations you saw him go to?

16  A.   I actually saw him exit a hardware store in that same

17  strip mall.

18  Q.   Was that the last location you saw him go into and

19  come out of?

20  A.   The last one was the pastry shop.

21          MR. BURETTA:  Thank you.

22          I have no further questions.

23          THE COURT:  Cross-examination.

24

25

3352

1    CROSS-EXAMINATION

2    BY MS. KEDIA:

3    Q.    Agent Carrie, good afternoon?

4    A.    Good afternoon.

5    Q.    Starting with your surveillance of Mr. Cutolo on May

6    25th, 1999, that was a Tuesday, right?

7    A.    Yes.

8    Q.    And did you -- you testified that you ordinarily

9    surveilled him on Wednesday.

10            Did you typically surveil Mr. Cutolo on Tuesday

11    as well?

12            MR. BURETTA:  Objection.

13            THE COURT:  Sustained.

14    BY MS. KEDIA:

15    Q.    Well, how is it that you came to surveil Mr. Cutolo

16    on that date, May 25th, 1999?

17    A.    I was instructed to do so by the case agent, Special

18    Agent Gary Pontecorvo.

19    Q.    When were you instructed to do so?

20    A.    Specifically it would have been that morning.

21    Q.    And you were part of a team that day, right?

22    A.    Yes, I was the team leader.

23    Q.    How many agents were part of your team?

24    A.    May 25th, there were seven of us.

25    Q.    In fact, you were team two, right, on that date?

3353

1  A.  No, I don't believe so.  I believe we were the only

2  team that day.

3  Q.  Well, let me show you what I'll mark as Defendant

4  Persico's AY.

5        THE COURT:  Can you tell me what it was

6  previously?

7        MS. KEDIA:  I'm sorry, Judge?

8        THE COURT:  What was the marking on it

9  previously?

10        MS. KEDIA:  I believe it was part of FC.  FC-14.

11        THE COURT:  Thank you.

12  BY MS. KEDIA:

13  Q.  If you could take a look at that document.

14        Agent Carrie, having looked at that document,

15  does that refresh your recollection that actually you were

16  part of team two on that date?

17  A.  Not the second surveillance team of the day.  I'm

18  team two of the squad.  The squad was SO-13 and it had as

19  many as three surveillance teams at any given time,

20  sometimes just two.

21        My team is the number two team and it was often

22  called the 1320 team.  In this instance, it's referred to

23  as team two.

24  Q.  I'm sorry, please explain that.  What does that mean?

25  There were three separate teams?

3354

1   A.   Our squad consisted of enough agents to comprise

2   three different surveillance teams.

3            Some people refer to them as team one, two or

4   three, but more commonly they were referred to as 1310,

5   1320 and 1330 team, and the 13 comes from the squad

6   designation of SO-13, meaning special operations squad 13

7   and they were up to as many as 25 special operations

8   squads at one point.

9   Q.   The seven agents that were part of your team, were

10  they part of this team two or were they all divided up

11  between the three teams that we're talking about?

12  A.   They were all part of my team.

13  Q.   They're all part of your team?

14  A.   Yes.

15  Q.   There were still two other teams, you're saying?

16  A.   Two other teams on that squad, but they weren't

17  working with us that day and they weren't assigned to

18  Mr. Cutolo that day.

19  Q.   So were you the only team that was actually assigned

20  to Mr. Cutolo that day, as far as you know?

21  A.   Yes.

22  Q.   You picked up Mr. Cutolo, you started your

23  surveillance at 11:45, right?

24  A.   Correct.

25  Q.   And this was -- how many vehicles were the seven

3355

1   agents in?

2   A.   I can't tell by looking at the log, but I can tell

3   you there was at least five.

4        And the final two names on the cover sheet are

5   new agents and at some point they would be riding with a

6   seasoned agent and at some point they would get their own

7   cars.

8        So there was anywhere between five and seven

9   vehicles out that day.

10   Q.   You say there were at least five because there were

11   five seasoned agents as part of your team that day?

12   A.   That's correct.

13   Q.   You went to start your surveillance to this location

14   Avenue U and East 2nd Street; is that right?

15   A.   Yes.

16   Q.   What is that location?

17   A.   There's a restaurant there where we frequently

18   observed Mr. Cutolo, so we felt it was a good place to

19   start to try to find him and follow him.

20   Q.   When you say you frequently observed him there, is

21   that on any day of the week particularly or generally?

22   A.   Generally.

23   Q.   What is the name of the restaurant?

24   A.   I don't recall at this point.  I don't believe it's

25   named in the log.

Carrie - Cross/Kedia

3356

1    Q.    You observed him actually carrying something out of

2    the place, right?

3    A.    Can I check my notes to refresh my memory?

4    Q.    Certainly.

5              (Pause in proceedings.)

6    A.    I observed him carrying an unknown dark item into the

7    restaurant.

8    Q.    I'm sorry?

9    A.    I observed Mr. Cutolo carrying an unknown dark item

10   into the restaurant.

11   Q.    Into the restaurant?

12   A.    Yes, at 11:56 a.m.

13   Q.    Then he was carrying an item out of the restaurant as

14   well, right?

15   A.    Yes, a black carry bag.

16   Q.    Was that the same item that he was carrying into the

17   restaurant, or you don't know?

18   A.    We didn't know then and I don't know now.

19   Q.    Did you know what was in this black carry bag that he

20   carried out of the restaurant?

21   A.    No, I don't.

22   Q.    I'm going to show you what's marked as Defendant

23   Persico's AZ for identification.

24             Agent Carrie, do you recognize the place that's

25   depicted in that photograph?

Carrie  -  Cross/Kedia

3357

1    A.    I've seen it before and it may be the restaurant I

2    was referring to on Avenue U, but I can't say for sure,

3    but I have seen the restaurant before.

4    Q.    Well, have you seen the restaurant?

5    A.    I don't recall when I saw it.  I have seen it and it

6    may in fact be that restaurant, but that was eight years

7    ago.

8    Q.    You don't have a specific recollection one way or

9    another today?

10   A.    That's correct.

11   Q.    Agent Carrie, after Mr. Cutolo exited the restaurant

12   carrying the black bag, he went to another location

13   shortly thereafter, right?

14   A.    My next personal observation was Mr. Cutolo at the

15   strip mall with the female in Staten Island.

16   Q.    After you left the -- after you left this location,

17   Avenue U and East 2nd Street, where did you go?

18   A.    I moved along with the surveillance and in the

19   direction they were going, but that doesn't mean I see

20   everything that's listed on the log.

21         I was with the team the whole time but not

22   necessarily in a position to always see Mr. Cutolo.

23   Q.    Some member of your team was in a position to see

24   him, right?

25   A.    Yes.

Carrie  -  Cross/Kedia

3358

1  Q.    And, in fact, you were the team leader so these

2  observations were certainly being reported to you, right?

3  A.    Yes, they were.

4  Q.    And Mr. Cutolo on the -- after leaving the restaurant

5  on Avenue U and East 2nd, went into a cigar store; is that

6  right?

7  A.    I can read that from the log, but I didn't make that

8  personal observation.

9  Q.    This was an observation that a member of your team

10  actually made, right?

11           MR. BURETTA:  Objection.

12           THE COURT:  Sustained.

13  BY MS. KEDIA:

14  Q.    When you saw him next, Agent Carrie, was in the

15  afternoon with his girlfriend; is that correct?

16  A.    Yes.

17  Q.    And you said, I believe, that it was told to you that

18  it was his girlfriend by the case agent?

19  A.    Right.

20  Q.    When is it that was told to you?

21  A.    Sometime prior to that day or it may have been that

22  day when we reported the activity.  I don't recall.

23  Q.    So on the date that you were making these

24  observations, were you reporting the activity as you made

25  the observations?

Carrie  -  Cross/Kedia

3359

1    A.   Reporting them to whom?

2    Q.   To the case agent?

3    A.   Not immediately as we saw them.

4         It would be something that maybe at the end of

5    the shift we would tell them or mid-shift, but not as we

6    observed each observation, no.

7    Q.   But you don't have a specific recollection, now, as

8    to whether mid-shift you were reporting your observation

9    or the observations of your other team members?

10   A.   No, I don't recall.

11   Q.   You said you had seen this woman before?

12   A.   I don't believe so.  I have no recollection of it, if

13   I did.

14   Q.   You didn't know who she was until the agent told you?

15   A.   Right.

16   Q.   When you say the case agent, you're referring to this

17   Agent Gary Pontecorvo again?

18   A.   That's correct.

19   Q.   After -- when you saw Mr. Cutolo and his girlfriend

20   at 4:46, was their daughter with them?

21   A.   There was no one else with them at that time.

22   Q.   Just the two of them?

23   A.   Right.

24   Q.   And, in fact, you said they were at a strip mall.

25        They had gone into a hardware store, right?

Carrie  -  Cross/Kedia

3360

1    A.    We surmised -- I surmised that because eventually I

2    saw them exit the hardware store.

3    Q.    Meaning you don't know exactly when they walked in,

4    but you saw them walk out?

5    A.    I saw them exit the vehicle near the hardware store

6    at 4:46, and I saw them exit the hardware store at 5:03.

7    Q.    And this hardware store was actually located in an

8    intersection in Staten Island, right?

9    A.    Yes, the strip mall at the intersection, yes.

10   Q.    The strip mall was located at the intersection of

11   Rossville Road and Woodrow Road, right?

12   A.    Correct.

13   Q.    Do you know where 116 Henderson Street is in relation

14   to Rossville Road and Woodrow Road?

15   A.    No.

16   Q.    Are you familiar with Staten Island?

17              MR. BURETTA:  Objection.

18              THE COURT:  Sustained.

19   BY MS. KEDIA:

20   Q.    You testified that Mr. Cutolo, the vehicle that he

21   was driving was actually at the Gunton Place address; is

22   that right?

23   A.    I'm sorry, could you repeat the question?

24   Q.    The vehicle that you had seen Mr. Cutolo driving was

25   actually at the Gunton Place address at this time in the

3361

1    afternoon; is that right?

2    A.    I'll have to check my log to see.

3          No.  I see, now, that the vehicle at the strip

4    mall was Mr. Cutolo's vehicle with the Florida tags.

5    Q.    Now, on this date on this afternoon that you were

6    surveilling Mr. Cutolo, you didn't note any observations

7    of him being on his cell phone, right?

8    A.    I don't see any observations here indicating that he

9    was, no.

10   Q.    And that was for the entirety of the day?

11   A.    If you want, I'll check the log to make sure that's

12   correct.

13   Q.    Certainly.

14         (Pause in proceedings.)

15   A.    My personal observations indicate that I did not see

16   him using a cell phone that day.

17   Q.    Now, at some point after you saw Mr. Cutolo and this

18   girlfriend go into the hardware store and then the pastry

19   shop, they went back to this residence at 44 Gunton Place,

20   right?

21   A.    Correct.

22   Q.    Was that a residence that was known to you?

23   A.    I don't recall it from sitting here now.  I don't

24   recall if I knew it back then.

25         It was certainly not a residence that we

3362

1    frequently surveilled.

2    Q.    When you went back there, you saw Mr. Cutolo and his

3    girlfriend go inside the residence?

4    A.    No, I did not.

5    Q.    When you decided to terminate your surveillance that

6    day, where were Mr. Cutolo and his girlfriend?

7    A.    They were last observed at the Gunton Place

8    residence, so our conclusion was they were still inside

9    there at 7:30 p.m.

10   Q.    Do you have any idea if or when Mr. Cutolo left that

11   evening?

12   A.    I don't know.

13   Q.    Now, turning to May 26, 1999, you were again

14   surveilling Mr. Cutolo that day, right?

15   A.    We were attempting to.

16   Q.    Well, your assignment was to surveil Mr. Cutolo that

17   day, right?

18   A.    That's correct.

19   Q.    And, again, you were the team leader?

20   A.    Yes.

21   Q.    And you testified, Agent Carrie, that you went to

22   this location at 1435 Broadway in the afternoon, that you

23   commenced your surveillance at 1:45 in the afternoon

24   because you knew Mr. Cutolo had a routine of leaving

25   between two and three p.m., leaving 1435 Broadway; is that

Carrie  -  Cross/Kedia

3363

1    right?

2    A.    Yes, based upon our past surveillances.

3    Q.    Now, Agent Carrie, in fact, when you surveilled

4    Mr. Cutolo a couple of weeks prior to that, he didn't

5    leave 1435 Broadway between two and three p.m., right?

6    A.    I would have to look at the log to see which date

7    you're referring to and to see if we did see him leave and

8    at what time.

9    Q.    Let me show you what's previously been marked as

10   FC-12 -- FC-13.  I'm sorry.

11         Having looked at that, Agent Carrie, does that

12   refresh your recollection that, in fact, when you had

13   surveilled Mr. Cutolo Senior two weeks prior to this

14   surveillance on May 26, he doesn't leave between two and

15   three p.m., he didn't leave the union between two and

16   three p.m.; is that right?

17   A.    No.

18         On that particular day he left at 4:18 p.m.

19   Q.    And, similarly, when you surveilled him two weeks

20   prior to that, he also didn't leave between two and three

21   p.m.; is that right?

22   A.    I'll have to look at the log again.

23   Q.    Showing you what's previously been marked as FC-7,

24   3500-FC-7.

25   A.    That's my surveillance log I wrote for April 28,

Carrie  -  Cross/Kedia

3364

1    1999.

2    Q.    And on that occasion, April 28, 1999, having looked

3    at that log, does that refresh your recollection that on

4    that date also Mr. Cutolo Senior did not leave the union

5    between two and three p.m.?

6    A.    Yes.

7              On that day the number is cut off but it appears

8    he left sometime prior to 1:30.

9    Q.    Now, on May 26, you testified that you remained at

10   the union while other agents went elsewhere; is that

11   right, after you didn't observe Mr. Cutolo that day,

12   right?

13   A.    Yes.

14             I remained there for a period of time.

15   Q.    And you had instructed other members of your team to

16   go elsewhere?

17   A.    Yes.

18   Q.    And why did you instruct them to go elsewhere?

19   A.    So they could attempt to locate Mr. Cutolo's vehicle.

20   Q.    Did you actually look for Mr. Cutolo's vehicle at the

21   union that day?

22   A.    Personally I was watching for it and he had often

23   parked his car in a parking garage around the corner from

24   1435 Broadway.

25             So although it's not in my notes, I'm pretty

3365

1    sure I walked in there and looked for the vehicle.

2    Q.   Because that's something you typically did?

3    A.   Right.

4    Q.   And, in fact, you typically noted that you would walk

5    into the garage and look for his vehicle, right?

6    A.   We wouldn't always note it, no.

7    Q.   But you often noted it, right?

8    A.   I don't know what you mean by often.  Sometimes we

9    would and sometimes we wouldn't.  If we saw it there, we

10   would note it.  If we didn't see it, we wouldn't note that

11   it wasn't there necessarily.

12   Q.   In any event, you believe you probably went to look

13   for it and it wasn't there on May 26, 1999?

14   A.   Right, because if it was there, I wouldn't send other

15   people somewhere else to look for it.

16   Q.   When you sent other people elsewhere, why did you do

17   that?

18           MR. BURETTA:  Objection, asked and answered.

19   BY MS. KEDIA:

20   Q.   Well, how is it that you sent them to a certain

21   location in particular?

22           MR. BURETTA:  Objection.

23           THE COURT:  Sustained.

24   BY MS. KEDIA:

25   Q.   Well, where did you send people, Agent Carrie?

Carrie  -  Cross/Kedia

3366

1          MR. BURETTA:  Objection.

2          THE COURT:  Overruled.

3   A.   One of the locations was the garage at 65th Street in

4   Brooklyn.

5   Q.   Why is it that you sent people to this garage?

6   A.   I don't recall exactly why now.

7          It may have been a case where this agent was en

8   route to a location in that area, like the social club,

9   and on the way to the social club he just happened to

10  observe the burgundy vehicle, Mr. Cutolo's vehicle, at

11  this garage.

12  Q.   Well, Agent Carrie, you testified that, in fact, you

13  went yourself from the union to the social club that day,

14  right?

15  A.   Eventually I did, yes.

16  Q.   And your testimony is that you believe that another

17  agent previously went from the union, was on the way to

18  the social club and stopped at this location at 65th?

19  A.   It was so long ago, I don't know exactly where he was

20  going, but I know he did find the vehicle at the garage on

21  65th Street.

22  Q.   And you don't have any recollection of how --

23  A.   Well, he saw it.

24          I don't know if he was going right to that

25  location or to another one, but that's where he saw it and

3367

1    he notified me on the radio.

2    Q.   Well, do you have a recollection of instructing

3    agents to go to that location on 65th Street?

4    A.   That particular location, I don't recall if I sent

5    them there by design or, like I said, if they just

6    stumbled across the vehicle en route to another location

7    in that area.  I don't recall.

8    Q.   Now, why is it that you stayed at the union, Agent

9    Carrie?

10   A.   We needed to leave someone back there in case

11   Mr. Cutolo was, in fact, there and we didn't see his car

12   where it normally was or he was going to show up there.

13         Why it was me specifically I don't recall, but I

14   was one of the ones that stayed there.

15   Q.   But you made the decision that even though his

16   vehicle wasn't there, it had been spotted elsewhere, that

17   you thought it necessary to stay at the union?

18              MR. BURETTA:  Objection.

19              THE COURT:  Sustained.

20   BY MS. KEDIA:

21   Q.   You decided to stay at the union, nonetheless?

22              MR. BURETTA:  Objection.

23              THE COURT:  Sustained.

24   BY MS. KEDIA:

25   Q.   Now, Agent Carrie, you testified that after you left

Carrie  -  Cross/Kedia

3368

1    the union you went to the Bocce Club because it was

2    Mr. Cutolo's routine on Wednesday to go to this club; is

3    that right?

4              MR. BURETTA:  Objection.

5              THE COURT:  Sustained.

6    BY MS. KEDIA:

7    Q.   Well, Agent Carrie, why is it that you went, when you

8    left the union, to the Bocce Club?

9    A.   I went to that social club because we had seen

10   Mr. Cutolo there numerous times on Wednesday evenings.

11   Q.   And, in fact, Agent Carrie, he was not at the Bocce

12   Club.

13             Mr. Cutolo was not seen at the Bocce Club when

14   you surveilled him two weeks prior to May 26, 1999, right?

15   A.   I'll have to check the log again to see.

16   Q.   If you could do that.  I believe it's in front of you

17   marked as FC-13.

18   A.   That's May 12, 1999?

19   Q.   Yes.

20             That was the day you were surveilling

21   Mr. Cutolo, right?

22   A.   Yes.

23   Q.   Another Wednesday, right?

24   A.   Yes.

25             (Pause in proceedings.)

Carrie  -  Cross/Kedia

3369

1   A.   The last time I saw Mr. Cutolo that day was at 7:31

2   p.m.

3        He was in his vehicle and it was not at the

4   social club to which we were referring.

5   Q.   Where was it?

6   A.   It was at Bruno's, which is Bruno's Hairmaster's, at

7   8509 21st Avenue in Brooklyn.

8   Q.   Then you observed the vehicle departing that location

9   and it never went to the Bocce Club, right?

10  A.   I last observed it leaving that area.  Whether it

11  went to the Bocce Club, I don't know.

12       There are areas in the parking lot at the club

13  where he could have parked and I wouldn't have seen it.

14  Q.   Well, you saw the vehicle actually driven by

15  Mr. Cutolo that day, right?

16  A.   Yes.

17  Q.   And it was going in what direction when it was last

18  seen?

19  A.   I don't have that noted here.

20  Q.   And you subsequently went to the Bocce Club, right,

21  you and other members of your team?

22  A.   I'll check.

23  Q.   If I could direct your attention to 7:53 that

24  evening.  In fact, 7:47 that evening, right?

25  A.   Yes.

Carrie  -  Cross/Kedia

3370

1           At that time I'm at the club.

2    Q.   This was some 16 minutes after your last observation

3    of Mr. Cutolo's vehicle, right?

4    A.   Yes.

5    Q.   Being driven by Mr. Cutolo, right?

6    A.   Yes.

7    Q.   You were at the Bocce Club from 7:47 until 10:00 in

8    the evening on May 12, 1999, right?

9    A.   Yes.

10   Q.   No observation of Mr. Cutolo or his vehicle was made

11   on that date, right?

12           MR. BURETTA:  Objection, asked and answered.

13           THE COURT:  Sustained.

14   BY MS. KEDIA:

15   Q.   And similarly two weeks prior to that, Agent

16   Carrie --

17           MR. BURETTA:  This is beyond the scope, your

18   Honor.

19           THE COURT:  Sustained.

20           MS. KEDIA:  Your Honor, may we approach?

21           THE COURT:  Sure.  Come on up.

22           (Continued on next page.)

23

24

25

Carrie  -  Cross/Kedia

3371

1        (The following takes place at sidebar.)

2        MS. KEDIA:  Your Honor, this is a report from

3   April 28, 1999.  It's one that the agent said is in his

4   own handwriting.

5        And he testified that on May 26, 1999, the

6   reason that he goes from the union to the Bocce Club is

7   that Mr. Cutolo, typically, that's what he does, goes to

8   the Bocce Club.

9        The reports that I have from the weeks preceding

10  May 26, 1999, I don't have the May 5th report, the one in

11  between the two that I've shown the agent.  It was never

12  produced and I think the government said they weren't able

13  to actually locate it.

14       But the two that I have, April 28, 1999, and May

15  12, 1999, specifically show that Mr. Cutolo doesn't go to

16  the Bocce Club on those two dates.

17       I think that's relevant, Judge.

18       THE COURT:  I thought he testified --

19       MS. KEDIA:  I haven't asked him.

20       MR. BURETTA:  He testified already where he

21  doesn't say he didn't go there.  He didn't see him.

22       MS. KEDIA:  He didn't observe him on May 12.

23  I'm asking the same question on April 28.

24       THE COURT:  I thought he did testify earlier

25  that he didn't see him on the 28th of April.

Carrie - Cross/Kedia

3372

1        MS. KEDIA:  I haven't asked him a question about

2    the 28th yet, Judge.

3        MR. BURETTA:  If it's going to be short, it's

4    fine.  It's beyond the scope.

5        THE COURT:  Then you're done?

6        MS. KEDIA:  Then I'll move to June 1st.

7        THE COURT:  Okay.

8        (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Carrie  -  Cross/Kedia

3373

1          (The following takes place in open court.)

2          THE COURT:  The objection is overruled.

3     BY MS. KEDIA:

4     Q.   Agent Carrie, we're talking about the surveillance

5     you also conducted on April 28, 1999, right?

6     A.   Yes.

7     Q.   And, again, you and several of your team members were

8     surveilling Mr. Cutolo that Wednesday, right?

9     A.   Yes.

10    Q.   And that was two weeks prior to this other

11    surveillance that we just spoke about, May 12, 1999,

12    right?

13    A.   Correct.

14    Q.   And on April 28, 1999, there was no observation made

15    of Mr. Cutolo being at the club, right?

16    A.   Let me check.  One moment, please.

17              (Pause in proceedings.)

18              No.  We did not observe Mr. Cutolo at the club

19    that evening.

20              (Continued on next page.)

21

22

23

24

25

Carrie - Cross/Kedia

3374

1    BY MS. KEDIA (Cont'd):

2    Q.    And your surveillance continued that evening until

3    9:30 in the evening.

4            Right?

5    A.    That's correct.

6    Q.    Now, on --

7            MS. KEDIA:  Withdrawn.

8    BY MS. KEDIA:

9    Q.    Frank Campanella is someone who you had observed with

10   Mr. Cutolo on these Wednesdays that you were surveilling

11   Mr. Cutolo.

12           Right?

13           MR. BURETTA:  Objection.

14           Beyond the scope.

15           THE COURT:  Sustained.

16   BY MS. KEDIA:

17   Q.    On May 26, 1999, did you observe an individual by the

18   name of Frank Campanella?

19   A.    No.

20   Q.    Were you ever able to identify the person -- you

21   observed a person entering the vehicle that Mr. Cutolo was

22   known to drive, right, the vehicle with the license plate

23   WPG 72E, at 7:57.

24           Right?

25   A.    I didn't observe that.

Carrie - Cross/Kedia

3375

1         No.  I personally was not able to identify that

2    individual.

3    Q.   Were you --

4         MS. KEDIA:  Withdrawn.

5    BY MS. KEDIA:

6    Q.   You weren't able to identify that individual that

7    evening.

8         Were you ever able to identify that individual?

9    A.   I don't ever recall them being identified to me.

10        No.

11   Q.   And that was at what location that the person entered

12   the vehicle that had previously been driven by Mr. Cutolo?

13   A.   That was the garage on 65th Street, Ralph and John's

14   Auto Repair at 65th Street, between 13th and 14th Avenue.

15   Q.   Agent Carrie, at 7:43, you made a notation that both

16   surveillances were terminated on May 26th, 1999.

17        Right?

18        MR. BURETTA:  Objection.

19        THE COURT:  Sustained.

20   BY MS. KEDIA:

21   Q.   What does it mean to have a surveillance terminated?

22        MR. BURETTA:  Objection.

23        THE COURT:  Sustained.

24   BY MS. KEDIA:

25   Q.   Well, Agent Carrie, you testified that you were at

1    the union and then your surveillance was terminated.

2         Right?

3         MR. BURETTA:  Objection, your Honor.

4         THE COURT:  This is on May 26th?

5         MS. KEDIA:  May 26, 1999.

6         Yes, Judge.

7         THE COURT:  Overruled.

8    A.   Repeat the question, please.

9    Q.   You were at the union and then your surveillance was

10   terminated.

11        Right?

12   A.   Yes.

13        It was terminated at 9:30 p.m.

14   Q.   When was it terminated at the union itself, at the

15   location of 1435 Broadway?

16   A.   I'm sorry.  I thought you meant the club in Brooklyn.

17        I terminated that surveillance there at 3:20

18   p.m.

19   Q.   And then you traveled to the Bocce Club at 6:45.

20        You were outside.  You commenced surveillance at

21   the Bocce Club.

22        Right?

23   A.   Correct.

24   Q.   And where were you between 3:20 and 6:45 p.m.?

25   A.   At least part of that time, traveling from Manhattan

Carrie - Cross/Kedia

3377

1    to Brooklyn.

2              I can't give you every location I stopped at.

3    I'm sure I stopped at a men's room somewhere along the

4    way.

5    Q.    You don't have any specific recollection, though --

6    A.    Absolutely not.

7    Q.    -- of what was happening in that three-hour,

8    25-minute period?

9    A.    No, nothing significant to the surveillance, because

10    there's no entries made.

11    Q.    And then at 7:43 you terminated your surveillance at

12    the Bocce Club.

13              Is that right?

14    A.    That's correct.

15    Q.    And why did you terminate it within an hour of

16    commencing it that day?

17    A.    Because we were looking for Mr. Cutolo and his

18    vehicle wasn't there.

19              It was at another location.

20    Q.    So you proceeded to that location?

21    A.    On 65th Street.

22              Yes.

23    Q.    And did you, yourself, terminate another surveillance

24    at that time that day, 7:43?

25    A.    I terminated the surveillance where I was at the

Carrie - Cross/Kedia

3378

1    social club.

2    Q.   On May 26, 1999, did you tell anyone that you had not

3    seen Mr. Cutolo's vehicle -- or Mr. Cutolo in his vehicle

4    that day?

5              MR. BURETTA:  Objection.

6              THE COURT:  Sustained.

7    BY MS. KEDIA:

8    Q.   Well, you testified on direct examination that you

9    were communicating with Agent Pontecorvo.

10             In fact, he told you that --

11             MR. BURETTA:  Objection.

12   BY MS. KEDIA:

13   Q.   -- it was the girlfriend that you observed on May 25,

14   1999.

15             Right?

16             MR. BURETTA:  Objection.

17             THE COURT:  Sustained.

18   BY MS. KEDIA:

19   Q.   Agent Carrie, on May 26, 1999, when you didn't

20   observe Mr. Cutolo that day, did you know him to be

21   missing?

22   A.   On the 26th?

23   Q.   Yes.

24   A.   No.

25   Q.   And, in fact, you went to his house on June 1, 1999.

Carrie - Cross/Kedia

3379

1          Right?

2          MR. BURETTA:  Objection.

3          THE COURT:  Overruled.

4          MR. BURETTA:  To the form, your Honor.

5          THE COURT:  Okay.

6          Did you surveil the house on June 1, 1999?

7          THE WITNESS:  Yes.

8    BY MS. KEDIA:

9    Q.    And you went to the home at 515 Butler Boulevard for

10   the purpose of trying to locate William Cutolo Senior?

11   A.    At that point, I'm going to have to say I don't

12   believe we were looking for him because at that point we

13   knew he was missing.

14          So we were just looking for any activity.

15   Q.    And when is it that you learned that he was missing?

16   A.    You know, I don't really recall.

17          It was so long ago.  It wasn't the night of the

18   26th, but it was sometime after that.

19   Q.    Sometime during those five days, and you don't know

20   if it would have been the 31st of May, or the 27th of May.

21          Is that fair to say?

22   A.    Right.

23          It was sometime in there, and, once again, it's

24   not as if I was called and told that a body was found.

25          It's just that he was missing, and he's been

Carrie - Cross/Kedia

3380

1    missing since.  So that's my recollection of the

2    information provided to me by Gary Pontecorvo.

3    Q.    And then you went to the residence at 515 Butler

4    Boulevard.

5          Right?

6    A.    On June 1st.

7    Q.    On June 1st.

8    A.    Yes.

9    Q.    And you observed Mr. Cutolo's vehicle at the

10   residence.

11         Is that right?

12   A.    Yes.

13   Q.    And on that day, there was another vehicle at the

14   residence.

15         Right?

16   A.    Yeah.

17         I believe we saw a few vehicles there.

18   Q.    One of the vehicles, if I could direct your attention

19   to the entry at 12:02 p.m., one of the vehicles had a

20   New York tag E78 6P, as in Peter, Y.

21         Right?

22   A.    Yes.

23   Q.    And, in fact, that was a vehicle that was registered

24   to Carmine DeRoss.

25         Right?

Carrie - Cross/Kedia

3381

1    A.    That's correct, Carmine DeRoss III.

2    Q.    And did you see that vehicle depart the residence

3    that day?

4    A.    I personally did not.

5          No.

6    Q.    And you were at the residence that day until 12:50

7    p.m.?

8    A.    Yes.

9    Q.    And at that point in time, you actually followed the

10   truck that had previously been driven by Cutolo Senior to

11   another location.

12         Right?

13   A.    That's correct.

14   Q.    And you testified that you believed it to be

15   William Cutolo Junior.

16   A.    Yes.

17   Q.    Why is it that you believed it to be

18   William Cutolo Junior?

19   A.    Because of his age and because of the vehicle he was

20   driving and because of information provided me by Special

21   Agent Pontecorvo.

22   Q.    Is he someone you had observed in your prior

23   surveillances at the Bocce Club?

24   A.    No.

25   Q.    You then followed him to a few locations.

Carrie - Cross/Kedia

3382

1           Is that right?

2    A.    I don't know the exact number.

3           But we followed him to at least one location.

4    If you want, I can name them for you.

5    Q.    What was he wearing that day?

6    A.    Wearing sunglasses, a white tank top shirt.

7    Q.    And you said that he was with, at some point, an

8    unidentified female.

9           Is that right?

10   A.    Yes.

11          When he left the residence at 12:50 p.m., he was

12   with her.

13   Q.    And to this day, you don't know who that person is?

14   A.    No.

15          I don't know.

16   Q.    Now, a little over approximately an hour after he

17   left the residence that day, Mr. Cutolo Junior parked the

18   vehicle, his father's truck, on 3rd Avenue and

19   91st Street.

20          Right?

21   A.    Yes, at 2:04 p.m. in Brooklyn.

22   Q.    Now, if I could ask you for just a moment to step

23   down, Agent Carrie.

24          I want to show you a map.

25          (Witness steps down.)

Carrie - Cross/Kedia

3383

1    BY MS. KEDIA:

2    Q.    Agent Carrie, are you able to determine, looking at

3    this map, where this location is that you followed

4    Mr. Cutolo Junior to?

5    A.    Yes.

6              Here's 3rd Avenue, and --

7              THE COURT:  If you could just step back,

8    Ms. Kedia.

9              MS. KEDIA:  Yes.

10   A.    And 91st Street.

11             It's right here, 3rd Avenue and 91st Street

12   right here.

13   Q.    And you followed him from what location?

14             Where is 515 Butler Boulevard?

15   A.    It's on Staten Island.

16   Q.    That's way off the map somewhere?

17   A.    Over here, across the Verrazano Bridge.

18   Q.    Do you have any idea about how far that is?

19   A.    Probably about 10, 15 miles.

20   Q.    And this location that you followed him to,

21   3rd Avenue and 91st Street where he parked his father's

22   truck that he was driving, how far is that from 92nd and

23   Shore Road?

24   A.    92nd Street and Shore Road?

25   Q.    Yes.

3384

```
 1   A.   Here's Shore Road.

 2        And here's 92nd Street, right by my left thumb.

 3   Q.   And in relation to that, he parked his vehicle just a

 4   couple of blocks away, is that right?

 5        91st and 3rd Avenue, is that where your finger

 6   is now?

 7   A.   Yeah.

 8        It looks like about four blocks.

 9   Q.   And then he actually went to a location at

10   270 89th Street.

11        Right?

12   A.   I believe that observation was made by another agent.

13        I could check the notes and see.

14   Q.   If you can check your notes.

15        (Whereupon, there was a pause in the

16   proceedings.)

17   A.   Yes.

18        That observation was made by another agent.

19   Q.   And could you show the jury where 270 89th Street is?

20        You could bring your notes with you, if it helps

21   you.

22   A.   I could show you 89th Street.

23        But where 270 is, I don't know the cross

24   streets, unless it's marked on here.

25   Q.   The vehicle was actually parked on 91st and 3rd,
```

Carrie - Cross/Kedia

3385

1    right?

2    A.    Right.

3    Q.    And Mr. Cutolo walked to 270 89th Street from there,

4    from where the vehicle was parked?

5    A.    That's what someone else saw.

6          I didn't see that.

7    Q.    Well, you didn't see him get into his vehicle again.

8          Is that right?

9    A.    At some point I might have, but not right away.

10         No.

11   Q.    Not right away, right?

12   A.    No.

13   Q.    An observation was made that he went into

14   270 89th Street.

15         Right?

16   A.    It came over the radio.

17         MR. BURETTA:  Your Honor --

18   BY MS. KEDIA:

19   Q.    And you don't know exactly where it is now?

20   A.    I could point out 89th Street, but 270 --

21   Q.    Okay.  That's fine.

22         You don't know.

23         (Witness resumes the stand.)

24   BY MS. KEDIA:

25   Q.    Now, do you know --

Carrie - Cross/Kedia

3386

1          THE COURT:  Just one second.

2          Paul has to get back.

3          MS. KEDIA:  Sorry, Judge.

4    BY MS. KEDIA:

5    Q.   Do you know where Mr. Cutolo Junior actually entered

6    into this basement apartment on 89th Street that day?

7          MR. BURETTA:  Objection.

8          Lack of foundation.

9          THE COURT:  Sustained.

10   BY MS. KEDIA:

11   Q.   Do you have any information as to who might have been

12   at 89th Street on June 1, 1999?

13         MR. BURETTA:  Your Honor, I object.

14         THE COURT:  Sustained.

15   BY MS. KEDIA:

16   Q.   Agent Carrie, after having seen Mr. Cutolo Junior, I

17   believe that you said the last you saw him is when he

18   parked his car on 3rd Avenue, south of 91st Street.

19         Right?

20         MR. BURETTA:  This is asked and answered.

21         THE COURT:  Sustained.

22   BY MS. KEDIA:

23   Q.   Well, after having seen Mr. Cutolo Junior park his

24   car on 3rd Avenue, south of 91st Street, did you have the

25   opportunity to see him again that day?

Carrie - Cross/Kedia

3387

1    A.    The answer is no.

2          I just want to point out that we are calling him

3    Mr. Cutolo Junior.  I don't know that for sure.  We

4    thought it was him.

5          But I'm not going to say for sure it was him.

6    Q.    And you thought that based on your conversations with

7    Agent Pontecorvo?

8                MR. BURETTA:  Objection.

9                THE COURT:  Sustained.

10               MS. KEDIA:  I have nothing further, your Honor.

11               MR. LARUSSO:  No questions, your Honor.

12               MR. BURETTA:  Nothing further.

13               THE COURT:  You can step down, sir.

14               THE WITNESS:  Thank you.

15               THE COURT:  Next witness.

16               MR. BURETTA:  Special agent Bruce Kindeley.

17               THE CLERK:  Please step up.

18               Just remain standing for a moment to be sworn

19    in.

20    **BRUCE KINDELEY**,

21               having been duly sworn, was examined

22               and testified as follows:

23               THE CLERK:  Have a seat.

24               Pick up that microphone.  State and spell your

25    name for the record.

Kindley - Direct/Buretta

3388

1          THE WITNESS:  Bruce Wayne Kindeley, last name is

2     K-I-N-D-E-L-E-Y.

3          MR. BURETTA:  May I inquire, your Honor?

4          THE COURT:  Yes.

5     DIRECT EXAMINATION

6     BY MR. BURETTA:

7     Q.   Good afternoon, sir.

8     A.   Hello.

9     Q.   Where do you work?

10    A.   I work for the Federal Bureau of Investigation in

11    Quantico, Virginia.

12    Q.   What's your job?

13    A.   Forensic examiner of electronic devices.

14         MR. BURETTA:  May I approach the witness, your

15    Honor?

16         THE COURT:  Yes.

17    BY MR. BURETTA:

18    Q.   I'll show you Government Exhibit 52 and

19    Government Exhibit 53.

20         Do you recognize Government Exhibit 52, which is

21    in evidence?

22    A.   Yes, I do.

23    Q.   What is that?

24    A.   It's a Sharp electronic organizer.

25    Q.   And does it bear a serial number?

Kindley - Voir Dire/Kedia

3389

1    A.    Yes.

2          It is 5N178732.

3    Q.    Were you given that item, Exhibit 52, that Sharp

4    organizer?

5    A.    Yes, I was.

6    Q.    Approximately when?

7    A.    It was received on October 29th of 1999.

8    Q.    And did you do something with the organizer after

9    that?

10   A.    Yes.

11         On November 2nd, I examined the device and

12   downloaded the data from the memory, from the organizer.

13   Q.    And what is Government Exhibit 53?

14   A.    This is a printout of the data that I downloaded.

15         MR. BURETTA:  I offer Exhibit 53.

16         THE COURT:  Any questions?

17         MS. KEDIA:  Yes, your Honor.

18         May I voir dire?

19         THE COURT:  Yes.

20   VOIR DIRE EXAMINATION

21   BY MR. KEDIA:

22   Q.    Mr. Kindley, did you actually note anywhere on

23   Government Exhibit 53 that it was, in fact, the

24   information retrieved from Government Exhibit 52?

25         I could show you 53.

## Kindeley - Voir Dire/Kedia

1    A.   Yes.

2              MR. BURETTA:  Judge, I'm going to object on

3    relevance grounds.

4              He's identified it as what he downloaded.

5              THE COURT:  The objection is sustained.

6    BY MS. KEDIA:

7    Q.   Well, Mr. Kindeley, do you have any idea when entries

8    were made or whether they were altered or whether they

9    were deleted?

10             MR. BURETTA:  Objection.

11             This is not pertinent to --

12             THE COURT:  At what point in time?

13             Get a clarification.

14   BY MS. KEDIA:

15   Q.   Prior to the time that you received the organizer,

16   Government Exhibit 52?

17             MR. BURETTA:  Objection.

18             THE COURT:  Sustained.

19   BY MS. KEDIA:

20   Q.   Who is it that gave you this organizer?

21   A.   This electronic organizer was sent to me by Special

22   Agent Gary Pontecorvo, from the New York field office.

23   Q.   And when was that?

24   A.   I received it via FedEx.

25             It came to our evidence control facility on

**Kindeley - Cross/Kedia**

1    October 29th of 1999.

2    Q.    October 29th of '99?

3    A.    Yes.

4    Q.    And do you know where it came from?

5              MR. BURETTA:  Objection.

6              THE COURT:  Sustained.

7              MS. KEDIA:  Your Honor, I have no objection to

8    the admission of this.

9              THE COURT:  Any objection to the admission?

10             MR. LARUSSO:  No, your Honor.

11             THE COURT:  52 and 53 are in.

12             (Whereupon, Government Exhibits 52 and 53 were

13    received in evidence, as of this date.)

14

15             MR. BURETTA:  No further questions.

16   CROSS-EXAMINATION

17   BY MS. KEDIA:

18   Q.    Agent Kindeley, I'm going to show you what's in

19   evidence as Government Exhibit 53.

20             How is it that you were able to download the

21   information from the organizer?

22   A.    It was just via a cable connected to an examination

23   computer.

24   Q.    And --

25   A.    Is that your question?

**Kindeley - Cross/Kedia**

3392

1  Q.   Yes.

2        So you connected the organizer physically to a

3  computer?

4  A.   Yes, I did.

5  Q.   And the information that was on the organizer just

6  appeared on the computer?

7  A.   No.

8        There's some -- Sharp has some manufacturer

9  software they use.

10       Originally I backed the device up.  There was a

11  password on the device.  I determined the password from

12  the file that was backed up.

13       And then I transferred the information after I

14  entered the password back to the computer using the same

15  manufacturer software.

16  Q.   How was it that you were able to determine the

17  password?

18  A.   The password is embedded in a backup file that Sharp,

19  the manufacturer, creates when you back up the data.

20  Q.   And so it automatically appeared on the computer when

21  you hooked up the organizer to the computer?

22  A.   It didn't automatically.  It was embedded in a file.

23       If you use a software to view that file, you can

24  see the password.

25  Q.   So you had the experience in the past to be able to

**Kindeley - Cross/Kedia**

1    know that a password is embedded in this file?

2    A.    Yes.

3          We keep a library of -- I have been an examiner

4    since 1995 -- and we keep a library of what we call

5    electronic organizer, personal digital assistance.  And

6    when we get a device in that has a password on it, we go

7    to the library and analyze a device that is a similar make

8    and model, the software.

9          And we find a way to determine the password on

10   the sample, and using that same method, we find the

11   password on the evidence.

12   Q.    And what was the password in this case?

13   A.    I believe it was the number, if I recall, like 1584.

14   Q.    And what you did is, you punch up the number 1584

15   into the computer, and then the information comes up?

16   A.    No.

17          You put the password on Exhibit 52.

18   Q.    On the organizer, itself?

19   A.    On the organizer, itself, and that allows you to

20   transfer the data to the computer.

21   Q.    Now, prior to entering this data on the --

22          MS. KEDIA:  Withdrawn.

23   BY MS. KEDIA:

24   Q.    The password is something you have to determine,

25   yourself, right?

1          That isn't provided to you --

2      A.   That is correct.

3      Q.   And prior to your determining what the password is,

4      were you actually able to see the entries that were in the

5      organizer?

6      A.   You could only see just a few of the entries.

7          I think, if I recall, there were 315 telephone

8      entries, another single telephone entry and, like, 12 memo

9      entries.

10         Of the ones you can view without the password

11     entered there were four, I believe.  There's, like, four.

12     So there's five telephone entries and two memo entries.

13     Q.   Now, if I could show you Government Exhibit 53,

14     Mr. Kindeley, could you tell us what entries were password

15     protected, or which of the entries weren't password

16     protected?

17         You said there were a few that weren't.  Right?

18     A.   That's correct.

19     Q.   And could you tell us the information that were not

20     password protected?

21     A.   Not from this printout, no.

22     Q.   Did you make another printout of entries that were

23     not password protected?

24     A.   This printout is part of a fax that I sent to Special

25     Agent Gary Pontecorvo on November 3rd.

## Kindeley - Cross/Kedia

1        I actually issued a report later on where I

2   added headers to the report that indicated which entries

3   were password protected, and which were not.

4   Q.   And that was something that you sent along with this

5   what's in evidence as Government Exhibit 53?

6   A.   Right.

7   Q.   To Agent Pontecorvo?

8   A.   Right.

9        This was faxed on November 3rd of 1999 to

10  Agent Pontecorvo.

11       And on, I believe, November 26th, when I FedExed

12  the evidence back to Special Agent Pontecorvo, I sent the

13  final report with it.

14       And it also had the enclosure, had the

15  differentiation between the entries.

16  Q.   So there were certain entries that weren't password

17  protected.

18       Did you actually print those out before you did

19  this?  Or did you do them simultaneously and then just

20  delineate which was which?

21  A.   I did those simultaneously and compared them back to

22  the display of the electronic organizer.

23  Q.   You said that there were ten memo entries as well.

24       Right?

25  A.   There were 12 memo entries total.

**Kindeley - Cross/Kedia**

3396

1           There were ten that were password protected.

2     There were two that were not password protected, but one

3     of those memo entries were blank, did not have any

4     information.

5     Q.    One of the two --

6     A.    One of the two that were not password protected.

7     Q.    Was blank?

8     A.    Was a blank entry.

9           Yes.

10    Q.    And one had some information?

11    A.    That is correct.

12    Q.    And then there were ten others with information that

13    were password protected?

14    A.    That is correct.

15    Q.    And is that part of the information that's on this

16    Exhibit 53?

17    A.    Yes.

18          This is all the information that was downloaded

19    from Exhibit 52, and faxed to Agent Pontecorvo.

20          And then later on I issued the report.  About

21    three weeks later, I went back with the evidence bag and

22    differentiated between the entries.

23    Q.    Now, what is a memo entry, if you look at

24    Government Exhibit 53, what is a memo entry as opposed to

25    a telephone entry?

Kindeley - Cross/Kedia

3397

1  A.    A memo entry typically consists of a block of text.

2          The user can enter whatever character is

3  available on the keyboard of the electronic organizer.

4          A telephone entry is typically broken up into

5  fields.  The user, whoever is entering the data, has the

6  option of entering, like, a name, a telephone number, an

7  e-mail address and so forth, in the different fields.

8  Q.    Well, Mr. Kindeley, looking at Exhibit 53, can you

9  tell us what you called a memo entry and what you called a

10  telephone entry?

11  A.    Not from this exhibit.

12          No.

13  Q.    So when you actually printed it out, you weren't able

14  to distinguish what was a telephone entry, what was a memo

15  entry?

16  A.    When I printed it out, I printed out the raw data.

17          And then after that, I went back and compared.

18  This was actually faxed to Special Agent Pontecorvo before

19  I issued the report.

20  Q.    Well, when you printed this document out, are you

21  saying that it includes the memo entries?

22  A.    It does.

23          MR. BURETTA:  May we have a brief sidebar, your

24  Honor?

25          THE COURT:  Come on up.

Kindeley - Cross/Kedia

1          MR. BURETTA:  Thank you.

2          THE COURT:  Excuse us. Folks.

3          (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Kindeley - Cross/Kedia

1      (Sidebar.)

2      MR. BURETTA:  Judge, when the agent came up

3  today, he handed me this report.

4      I didn't look at it.  The first two pages had

5  been turned over to the defense.  I'm looking at this now

6  for the first time.

7      I see that what he brought up with him is what

8  he's now referring to as the differentiation, and I'm

9  happy to provide that to the defense.  I didn't know it

10  was a different document until we just heard it.

11      I didn't want there to be --

12      THE COURT:  When you say differentiation, you

13  are referring to their being password protected, not

14  password protected?

15      Or are you referring to the phone entries versus

16  the memo entries?

17      MR. BURETTA:  I'm just looking now.

18      I see a header on the first page that says TEL

19  1.  It looks like all the information below that's the

20  same.

21      THE COURT:  It also has this here, password

22  protected.

23      MR. BURETTA:  Right.

24      I'm happy the provide this and put it into

25  evidence.  I didn't know it was different until I heard

Kindeley - Cross/Kedia

3400

1    him start to talk about it.

2            I looked back at the report he gave me.

3            MS. KEDIA:  Your Honor, I would ask for the

4    opportunity to obviously review this since I was never

5    produced this before.

6            In addition, the agent said he produced a report

7    to Agent Pontecorvo that I have never seen.

8            MR. BURETTA:  This looks like the report.

9            THE COURT:  Okay.

10           Have you ever had that before?

11           MR. BURETTA:  Which I have provided to the

12   defense.

13           MS. KEDIA:  If this is the only report that the

14   agent is referring to, it's fine.

15           He said the report delineates what specifically

16   is password protected and what is not.  This doesn't do

17   that.

18           MR. BURETTA:  I think it does.

19           MS. KEDIA:  It says the number of entries that

20   are password protected, but it doesn't say which entries

21   are password protected and which are not.

22           Nor does it specify which entries are memo

23   entries and which entries are, again, password protected

24   and not password protected.

25           THE COURT:  It has here under the heading

Kindeley - Cross/Kedia

1    password protected.

2              MS. KEDIA:  Right.

3              THE COURT:  Nonpassword protected.

4              MS. KEDIA:  Right.

5              But I can't tell now, if I look at this, which

6    ones of those they are, and which ones are not.

7              THE COURT:  Okay.

8              MS. KEDIA:  Obviously, I need an opportunity to

9    look at this.

10             If I could take a five-minute recess.

11             MR. BURETTA:  It says toward the end here

12   nonpassword protected.

13             It looks like he --

14             THE COURT:  He distinguished it.

15             MR. BURETTA:  He did do it.

16             I'll add this now.

17             THE COURT:  I'll give you five minutes, and then

18   we'll resume.

19             MR. BURETTA:  Okay.

20             Thanks.

21             (Sidebar concluded.)

22             (Continued on next page.)

23

24

25

Kindeley - Cross/Kedia

3402

1          (In open court.)

2          THE COURT:  How about a quick five-minute break.

3          Don't talk about the case.  We'll resume in five

4    minutes.

5          (Jury leaves the courtroom.)

6          THE COURT:  You can step outside, sir.

7          THE WITNESS:  Thank you.

8          (Witness is excused.)

9

10          THE COURT:  Mr. Buretta.

11          MR. BURETTA:  Yes, Judge.

12          THE COURT:  This witness wasn't on the list.

13          MR. BURETTA:  Judge, which list do you mean?

14          THE COURT:  The two I have.

15          MR. BURETTA:  We had notified the defense.

16          THE COURT:  Okay.

17          I was kind of surprised he came up.  Is he

18    replacing someone?

19          MR. BURETTA:  No,judge.

20          We turned over 3500 for him, and told them.

21          My apologies for not telling you.

22          THE COURT:  All right.

23          Five minutes.

24          (Recess.)

25

1           THE COURT:  Ms. Kedia, did you have an

2    application to make before I bring the jury out?

3           MS. KEDIA:  Judge, yes.

4           I'm sorry.  We were looking at what Mr. Buretta

5    just handed us and we were trying to make a comparison,

6    but the pages are in a different order.  I think we are

7    going to need a couple of more minutes to sort this out

8    and go through it.

9           THE COURT:  Let's break for the day, and I will

10   tell the jury that the government intends to rest its case

11   on Thursday and the defense will be starting, to give them

12   some idea of what's to come.

13          Okay?

14          MR. BURETTA:  Yes, your Honor.

15          MS. KEDIA:  Very well, your Honor.

16          THE COURT:  We'll bring the jury back in.

17          Do you have any other witnesses, Mr. Buretta,

18   after this list, at least the list that I have?  Is it

19   completed?

20          Agent Pontecorvo, I assume.

21          MR. BURETTA:  No, Judge.

22          We e-mailed -- I'll e-mail the court a new list

23   of witnesses, to make sure.

24          THE COURT:  Remaining on my list here is Gary

25   Bogle, John Sullivan and Peter Tytell.

1          MR. BURETTA:  For today, that's correct, Judge.

2          THE COURT:  And you have additional witnesses

3     coming in for Wednesday and possibly Thursday.

4          MR. BURETTA:  Correct, Judge.

5          And we e-mailed defense counsel, and I think I

6     forwarded to your law clerk that list.

7          THE COURT:  I have the list you sent out 11/30,

8     one at 10:45, and a second one at 11:19.

9          MR. BURETTA:  I think what happened was, we sent

10    an intervening short memo to defense counsel and I

11    neglected to include that.

12         THE COURT:  All right.

13         (Jury enters the courtroom.)

14

15         THE COURT:  Please be seated, if you would.

16    Have a seat, sir.

17         Ladies and gentlemen, I think I'm going to give

18    you off for about ten minutes' worth, today.  What I do

19    want to advise you is the prospective schedule and, as you

20    know, schedules are sometimes not adhered to.

21         But it's expected that the government will rest

22    its case on this coming Thursday, and I'm advised that the

23    defense, although defendants do not have to prove

24    anything, will be submitting a defense case.

25         The defense will start the defendants' case, if

**Kindeley - Cross/Kedia**

1    they do finally decide to go forward, will start on

2    Thursday, or Friday -- I'm sorry -- Thursday or the coming

3    Monday, December 10th.  I will give you updates as they

4    come in, and I do thank you for your patience and your

5    attention.

6           You are advised that you must not talk to anyone

7    about this case.  I know it's been going on for a while.

8    And I certainly can appreciate, sometimes, the feeling

9    that you have to discuss things that go on in the

10   courtroom with other individuals.  Do not give in to such

11   feelings.

12          Additionally, if anyone tries to influence you

13   in any way, immediately let me know that by telling

14   Mr. Baran by way of a note and not discussing the attempt

15   with other jurors.  Do not read, view or listen to

16   anything that might be reported in the media concerning

17   the facts of this case.  And, of course, don't do any

18   independent research or investigation concerning the

19   facts.

20          Continue to keep an open mind.  We'll see you

21   folks at 9:30 on Wednesday morning.  Have a nice day off.

22   See you then.

23          (Jury leaves the courtroom.)

24

25          THE COURT:  Thank you.

**Kindeley - Cross/Kedia**

1          You can step down, sir.

2          MS. KEDIA:  Your Honor, just a couple of things.

3          If the government doesn't intend to call

4     Agent Pontecorvo, who was not on the list that the

5     government submitted to us last night, and if the

6     government does not intend to call him, we ask that he be

7     made available as a defense witness.

8          I don't know if the government wants a subpoena.

9     Obviously I will provide one if they request a subpoena.

10         MR. BURETTA:  We don't need a subpoena.

11         MS. KEDIA:  I'm sorry?

12         MR. BURETTA:  We do not need a subpoena.

13         THE COURT:  They will not need a subpoena.

14         MS. KEDIA:  Very good.

15         THE COURT:  Okay.

16         MR. LARUSSO:  Just one other matter, your Honor.

17         I spoke with Mr. Buretta this morning.

18         I told him that I would like, if they agree, to

19    turn over some grand jury testimony of a person we have

20    identified as Jimmy Island Wide.  If Mr. Buretta after

21    tonight feels that he will turn it over, I won't burden

22    the court.

23         Otherwise, Mr. Buretta, if you would be kind

24    enough to tell me your position, and I need to file a

25    letter in regards to it, I would like to do so before we

**Kindeley - Cross/Kedia**

1    meet again on Wednesday.

2           MR. BURETTA:  We'll look for whatever his

3    testimony is tomorrow.

4           I would ask that the defense provide now

5    whatever their potential witness list is.

6           THE COURT:  Yes.

7           MS. KEDIA:  Your Honor, we are just going to

8    need a little bit of an opportunity to discuss it.

9           We will e-mail Mr. Buretta tomorrow with the

10   list.

11          THE COURT:  And e-mail the court as well.

12          MS. KEDIA:  Certainly, Judge.

13          I am handing to Mr. Buretta a subpoena for

14   William Cutolo Junior, as well as Joseph Massino which has

15   been so ordered by the court.

16          MR. BURETTA:  Thank you.

17          THE COURT:  Have a nice evening, and see you

18   folks on Wednesday.

19          MS. KEDIA:  Your Honor, just as a reminder, the

20   defendants will be produced here tomorrow for us to go

21   over the case?

22          THE COURT:  We have the most cooperative

23   deputies in the world.

24          MS. KEDIA:  Thank you, your Honor.

25          One additional thing.  We have certainly turned

1  over the vast majority, if not all, of the documents we

2  intend to introduce in our case.

3       If we come up with any additional, we will

4  certainly provide them to the government.  I expect that

5  with respect to, as the court is aware, a lot of them are

6  phone records.

7       I expect that with respect to phone records and

8  records of that nature, most of them, or all of them that

9  we intend to introduce some business record certifications

10  and the government has no objection to their being

11  introduced through these business record certifications,

12  as they did today.

13       MR. BURETTA:  When we know -- we have about

14  three boxes of phone records.  So we have marked exhibits.

15       We would ask the defense to mark exhibits and

16  tell us what they seek to admit, so we can avoid

17  authentication examinations, if appropriate.

18       THE COURT:  Okay.

19       MS. KEDIA:  Very good.

20       THE COURT:  Get them marked and witness list

21  tomorrow by 3 p.m.

22       MR. BURETTA:  Thank you.

23       (Whereupon, the trial was adjourned until

24  Wednesday, December 5th, at 9:30 a.m.)

25

1                        I N D E X

2

3    Witnesses                                           Page

4

5

6    **MATTHEW ZEUMANN**                                 3114

7    DIRECT EXAMINATION

8    BY MR. GOLDBERG                                     3114

9    CROSS-EXAMINATION

10   BY MS. KEDIA                                        3120

11   CROSS-EXAMINATION

12   BY MR. LARUSSO                                      3133

13   REDIRECT EXAMINATION

14   BY MR. GOLDBERG                                     3134

15

16   **THOMAS MCWEENEY**                                 3134

17   DIRECT EXAMINATION

18   BY MR. GOLDBERG                                     3135

19   CROSS-EXAMINATION

20   BY MS. KEDIA                                        3145

21   CROSS-EXAMINATION

22   BY MR. LARUSSO                                      3161

23   REDIRECT EXAMINATION

24   BY MR. GOLDBERG                                     3163

25   RECROSS-EXAMINATION                                 3164

1  BY MR. LARUSSO

2

3  **SCOTT CURTIS**                                          3164

4  DIRECT EXAMINATION

5  BY MS. MAYER                                             3165

6

7  CROSS-EXAMINATION                                        3182

8                                                           3182

9  BY MS. KEDIA                                             3182

10

11  CROSS-EXAMINATION

12  BY MR. LARUSSO                                           3207

13  DAWN SELLERS                                             3214

14

15  DIRECT EXAMINATION

16  BY MR. GOLDBERG                                          3215

17

18  CROSS-EXAMINATION

19  BY MS. KEDIA                                             3219

20  REDIRECT EXAMINATION

21  BY MR. GOLDBERG                                          3236

22  TIMOTHY WALSH                                            3237

23  DIRECT EXAMINATION

24  BY MR. BURETTA                                           3238

25  CROSS-EXAMINATION                                        3240

1  BY MS. KEDIA

2  CROSS-EXAMINATION

3  BY MR. LARUSSO                                              3244

4

5  **WALTER OBANDO**                                          3251

6  DIRECT EXAMINATION

7  BY MR. BURETTA                                             3252

8  CROSS-EXAMINATION

9  BY MS. KEDIA                                               3264

10 CROSS-EXAMINATION

11 BY MR. LARUSSO                                             3290

12 REDIRECT EXAMINATION

13 BY MR. BURETTA                                             3298

14 RECROSS-EXAMINATION

15 BY MS. KEDIA                                               3299

16 RECROSS-EXAMINATION

17 BY MR. LARUSSO                                             3300

18

19 **TIMOTHY DINNAN**                                         3301

20 DIRECT EXAMINATION

21 BY MS. MAYER                                               3302

22 CROSS-EXAMINATION

23 BY MR. LARUSSO                                             3308

24

25 **YVONNE GRAHAM**                                          3310

```
 1    DIRECT EXAMINATION

 2    BY MR. GOLDBERG                                  3310

 3

 4    CROSS-EXAMINATION

 5    BY MS. KEDIA                                     3318

 6    EILEEN WHITE                                     3334

 7

 8    DIRECT EXAMINATION

 9    BY MS. MAYER                                     3334

10    JEFFREY CARRIE                                   3338

11    DIRECT EXAMINATION

12    BY MR. BURETTA                                   3338

13

14

15    CROSS-EXAMINATION

16    BY MS. KEDIA                                     3351

17

18    BRUCE KINDELEY                                   3387

19    DIRECT EXAMINATION

20    BY MR. BURETTA                                   3388

21    VOIR DIRE EXAMINATION

22    BY MR. KEDIA                                     3389

23    CROSS-EXAMINATION

24    BY MS. KEDIA                                     3391

25
```

1                           **E X H I B I T S**

2                                                              Page

3

4

5    Government's Exhibit 74-A in evidence                     3211

6    Government's Exhibits 44, 44-A through 44-E in evidence   3317

7    Government's Exhibits 31, 31-A through 31-C in evidence   3337

8    Government's Exhibits 141-A through D in evidence         3342

9    Government Exhibits 45, and 45 A-D were received in       3139

10   evidence

11   Government Exhibits 142 and 142 A were received in        3143

12   evidence

13   Government Exhibits 46 and 46 A-D were received in        3168

14   evidence

15   Government Exhibit 144 was received in evidence           3179

16   Government Exhibits 74 B, 136, 147, 148 and 149 were      3259

17   received in evidence

18   Government Exhibit 150 was received in evidence           3259

19   Government Exhibits 26 26 A and B were received in        3307

20   evidence

21   Government Exhibits 52 and 53 were received in evidence   3391

22   Defense Exhibit AW was received in evidence               3280

23   Defense Exhibit AX was received in evidence               3281

24

25

**$**

**$300** [1] - 3218:16

**'**

**'02** [1] - 3133:25
**'03** [1] - 3133:25
**'04** [2] - 3257:8
**'86** [1] - 3257:12
**'93** [2] - 3288:7; 3296:21
**'97** [2] - 3183:9; 3245:4
**'97-'98** [1] - 3240:10
**'98** [2] - 3208:3; 3240:10
**'99** [2] - 3209:19; 3391:2

**0**

**05517-054** [1] - 3260:22

**1**

**1** [13] - 3116:4; 3118:20; 3262:6, 8, 10; 3264:9; 3285:16; 3303:7; 3305:16; 3378:25; 3379:6; 3386:12; 3399:19
**10** [14] - 3141:2, 13; 3223:9; 3262:22; 3286:12; 3287:1, 4; 3290:1; 3311:20; 3322:9; 3326:11; 3383:19
**100** [2] - 3101:23; 3128:1
**10010** [1] - 3101:18
**10:00** [1] - 3370:7
**10:10** [1] - 3141:14
**10:12** [1] - 3141:14
**10:30** [2] - 3103:16; 3335:17
**10:45** [7] - 3312:6, 9-10; 3319:2, 5; 3324:3; 3404:8
**10th** [5] - 3103:24; 3109:13; 3286:8; 3405:3
**11** [11] - 3141:15; 3165:20; 3282:6, 20, 22-23; 3296:25; 3302:15; 3312:6; 3320:18; 3322:10
**11/22/93** [1] - 3289:21

**11/30** [1] - 3404:7
**11201** [1] - 3101:15
**11501** [1] - 3101:21
**116** [1] - 3360:13
**11722** [1] - 3101:23
**1180** [1] - 3101:24
**1195** [1] - 3156:20
**11:03** [1] - 3162:1
**11:19** [1] - 3404:8
**11:45** [3] - 3146:13; 3335:19; 3354:23
**11:50** [1] - 3136:5
**11:56** [1] - 3356:12
**11th** [8] - 3103:24; 3135:24; 3148:6; 3152:10, 12; 3283:6; 3347:9, 19
**12** [24] - 3119:17; 3167:25; 3183:2, 17; 3192:3, 17; 3196:22; 3197:9; 3204:10; 3207:24; 3211:12; 3268:22; 3291:13; 3303:9, 11; 3312:12; 3368:18; 3370:8; 3371:15, 22; 3373:11; 3394:8; 3395:25
**12/21** [1] - 3284:3
**120** [4] - 3267:11, 14, 25
**121-A** [1] - 3333:16
**12:02** [2] - 3244:4; 3380:19
**12:10** [2] - 3313:4; 3321:14
**12:20** [1] - 3313:14
**12:40** [1] - 3314:3
**12:45** [3] - 3316:1; 3331:3, 13
**12:50** [3] - 3350:2; 3381:6; 3382:11
**12th** [1] - 3166:5
**13** [3] - 3286:7; 3354:5
**1310** [1] - 3354:4
**1320** [2] - 3353:22; 3354:5
**1330** [1] - 3354:5
**136** [6] - 3254:25; 3255:9; 3259:6; 3261:10, 13; 3413:16
**13th** [2] - 3174:21; 3375:14
**14** [10] - 3120:2;

3261:3, 5, 8; 3273:18; 3275:12; 3281:18, 24; 3297:2, 17
**141** [1] - 3341:21
**141-A** [5] - 3341:22; 3342:3, 9; 3344:16; 3413:8
**142** [12] - 3143:6, 20-21, 25; 3144:6, 13, 18; 3413:11
**1435** [9] - 3345:15; 3346:9, 14, 20; 3362:22, 25; 3363:5; 3364:24; 3376:15
**144** [4] - 3175:23; 3176:7; 3179:4; 3413:15
**147** [5] - 3254:25; 3255:9; 3256:3; 3259:6; 3413:16
**148** [9] - 3254:25; 3255:10; 3257:1; 3259:7; 3263:22; 3296:2; 3300:15; 3413:16
**149** [9] - 3254:25; 3255:10; 3259:7; 3260:2, 17, 24; 3273:13; 3277:9; 3413:16
**14th** [3] - 3285:7; 3296:13; 3375:14
**15** [3] - 3183:25; 3332:10; 3383:19
**150** [6] - 3250:19; 3259:11, 17, 22; 3271:10; 3413:18
**1584** [2] - 3393:13
**16** [2] - 3301:3; 3370:2
**168** [1] - 3119:24
**16th** [3] - 3104:21; 3285:9; 3300:24
**17** [4] - 3284:12; 3285:8; 3288:21
**1781** [1] - 3335:12
**17th** [1] - 3286:23
**18** [6] - 3115:4; 3171:15; 3216:7; 3288:25; 3289:5, 12
**18th** [2] - 3257:13; 3290:7
**19** [3] - 3311:1, 7; 3319:1
**1968** [1] - 3115:2
**1978** [1] - 3310:16

**1983** [1] - 3256:15
**1984** [4] - 3296:19; 3297:9, 19; 3338:22
**1986** [1] - 3296:18
**1989** [5] - 3216:5; 3223:2; 3229:14, 16
**1990** [1] - 3256:18
**1990s** [1] - 3281:15
**1991** [8] - 3110:15; 3115:3, 23; 3120:10; 3126:20; 3131:11; 3133:18
**1992** [3] - 3111:9, 18; 3115:2
**1992-1993** [1] - 3112:5
**1993** [18] - 3281:19, 24; 3284:3, 7; 3285:2, 18, 25; 3287:14, 19; 3288:3, 9, 21; 3296:10, 13; 3297:2, 17, 19
**1994** [3] - 3110:15; 3282:3, 21
**1995** [2] - 3288:18; 3393:4
**1996** [17] - 3282:6, 10-11, 20, 22, 24; 3283:6; 3284:12; 3285:7; 3296:25; 3310:21; 3311:1, 7; 3319:1
**1997** [9] - 3135:14; 3235:8, 10; 3286:23; 3288:21, 25; 3289:5, 12; 3290:7
**1998** [37] - 3135:15, 20; 3138:14; 3140:13; 3145:6, 25; 3146:1, 9, 22; 3147:12; 3166:5; 3167:25; 3169:20; 3170:17; 3171:11; 3173:22; 3183:2; 3192:3, 10, 17; 3196:3, 22; 3197:9; 3198:1, 17; 3200:21; 3204:11, 17; 3207:24; 3286:7-9, 12; 3287:1, 4; 3290:1
**1999** [72] - 3173:6; 3203:9; 3206:10; 3211:12, 16; 3215:18; 3217:25; 3218:10, 22; 3223:2, 4; 3229:16; 3231:3, 23; 3232:1, 10-11, 13; 3235:10, 12; 3239:11; 3242:17; 3339:4, 6, 13; 3340:23;

3341:15; 3345:1, 21;
3346:7, 15, 20;
3347:18; 3348:2;
3349:3, 7, 11, 14, 25;
3351:7, 9; 3352:6, 16;
3362:13; 3364:1;
3365:13; 3368:14, 18;
3370:8; 3371:3, 5, 10,
14-15; 3373:5, 11, 14;
3374:17; 3375:16;
3376:5; 3378:2, 14, 19,
25; 3379:6; 3386:12;
3389:7; 3391:1; 3395:9
**1:10** [1] - 3303:8
**1:30** [3] - 3246:7;
3250:7; 3364:8
**1:45** [4] - 3166:13;
3183:17; 3194:8;
3362:23
**1st** [8] - 3349:3, 6,
11, 14, 25; 3372:6;
3380:6

---

## 2

**2** [3] - 3115:19;
3262:10; 3345:22
**2-BB** [1] - 3215:22
**2-CC** [2] - 3224:7;
3227:20
**2-FF** [2] - 3224:7;
3229:5
**2-KK** [2] - 3224:7;
3227:9
**2/1/2002** [2] - 3283:24
**2/16** [2] - 3300:21;
3301:1
**2/6** [1] - 3301:1
**20** [6] - 3135:19;
3138:13; 3142:16;
3154:6; 3155:3; 3261:25
**200** [2] - 3127:15, 25
**2000** [16] - 3113:5;
3140:9, 15; 3157:16;
3158:11; 3161:11;
3163:18; 3302:18, 20;
3303:14; 3306:7;
3307:1; 3334:25;
3335:4; 3336:20
**2001** [21] - 3183:9;
3256:4; 3260:25;
3261:1, 5; 3273:15;
3275:13; 3297:20;
3298:1, 7, 22; 3300:16,
20-21, 24; 3301:1, 3;
3310:16; 3333:4

**2002** [5] - 3278:14;
3284:7; 3285:16;
3301:1, 8
**2003** [3] - 3112:11;
3245:4; 3256:5
**2004** [5] - 3135:14;
3261:24; 3264:2
**2005** [5] - 3170:1;
3215:12, 16
**2006** [2] - 3220:16, 21
**2007** [6] - 3101:7;
3235:8, 12; 3256:6;
3283:1; 3338:22
**20th** [6] - 3145:6, 25;
3146:9, 22; 3257:8;
3264:3
**21** [4] - 3285:18;
3287:14; 3288:3, 9
**21st** [2] - 3284:3;
3369:7
**22** [6] - 3170:17;
3171:11; 3285:25;
3287:19; 3288:21;
3302:17
**22nd** [7] - 3101:17;
3169:20; 3173:22;
3198:1, 17; 3200:21;
3208:3
**234.99** [1] - 3211:13
**23rd** [1] - 3283:1
**24** [1] - 3292:3
**242** [2] - 3195:15, 21
**245-A** [2] - 3211:14;
3217:8
**25** [3] - 3307:1;
3354:7; 3378:13
**25-minute** [1] - 3377:8
**25th** [13] - 3302:20;
3303:13; 3306:7;
3339:4, 6, 13; 3340:23;
3341:14; 3351:7, 9;
3352:6, 16, 24
**26** [32] - 3211:16;
3214:3; 3242:16;
3306:16; 3307:7, 11,
19; 3308:3; 3345:1, 8,
21; 3346:7, 15, 20;
3347:18; 3348:2;
3362:13; 3363:14;
3364:9; 3365:13;
3368:14; 3371:5, 10;
3374:17; 3376:5;
3378:2, 19; 3413:19
**26th** [7] - 3113:5;

**3212**:11; 3375:16;
3376:4; 3378:22;
3379:18; 3395:11
**27** [4] - 3161:11;
3163:18; 3214:6
**270** [6] - 3384:10, 19,
23; 3385:3, 14, 20
**27th** [6] - 3140:15;
3157:16; 3158:11, 22;
3212:13; 3379:20
**28** [3] - 3147:12;
3363:25; 3364:2;
3371:3, 14, 23; 3373:5,
14
**28th** [2] - 3371:25;
3372:2
**29** [2] - 3282:2, 21
**29th** [3] - 3389:7;
3391:1
**2:04** [2] - 3350:20;
3382:21
**2:20** [2] - 3170:4;
3201:3
**2:30** [3] - 3142:24;
3159:19, 24
**2:45** [3] - 3186:20;
3194:8
**2:58** [2] - 3242:16;
3244:3
**2nd** [7] - 3335:4;
3336:20; 3339:19;
3355:14; 3357:17;
3358:5; 3389:11

---

## 3

**3** [5] - 3101:7;
3262:11; 3291:13;
3302:19; 3408:21
**30** [4] - 3272:14, 16,
18; 3314:8
**300** [2] - 3101:20;
3272:3
**31** [10] - 3296:19;
3297:9, 19; 3300:20;
3301:3; 3310:16;
3336:10; 3337:1, 6;
3413:7
**31-A** [5] - 3336:10;
3337:1, 6, 15; 3413:7
**31-C** [2] - 3337:6;
3413:7
**3114** [2] - 3409:6, 8
**3120** [1] - 3409:10
**3133** [1] - 3409:12

**3134** [2] - 3409:14, 16
**3135** [1] - 3409:18
**3139** [1] - 3413:9
**3143** [1] - 3413:11
**3145** [1] - 3409:20
**315** [1] - 3394:7
**3161** [1] - 3409:22
**3163** [1] - 3409:24
**3164** [2] - 3409:25;
3410:3
**3165** [1] - 3410:5
**3168** [1] - 3413:13
**3179** [1] - 3413:15
**3182** [3] - 3410:7
**31st** [3] - 3298:1;
3300:16; 3379:20
**3207** [1] - 3410:12
**3211** [1] - 3413:5
**3214** [1] - 3410:13
**3215** [1] - 3410:16
**3219** [1] - 3410:19
**3236** [1] - 3410:21
**3237** [1] - 3410:22
**3238** [1] - 3410:24
**3240** [1] - 3410:25
**3244** [1] - 3411:3
**3251** [1] - 3411:5
**3252** [1] - 3411:7
**3259** [2] - 3413:16, 18
**3264** [1] - 3411:9
**3280** [1] - 3413:22
**3281** [1] - 3413:23
**3290** [1] - 3411:11
**3298** [1] - 3411:13
**3299** [1] - 3411:15
**3300** [1] - 3411:17
**3301** [1] - 3411:19
**3302** [1] - 3411:21
**3307** [1] - 3413:19
**3308** [1] - 3411:23
**3310** [2] - 3411:25;
3412:2
**3317** [1] - 3413:6
**3318** [1] - 3412:5
**3334** [2] - 3412:6, 9
**3337** [1] - 3413:7
**3338** [2] - 3412:10, 12
**3342** [1] - 3413:8
**3351** [1] - 3412:16
**3387** [1] - 3412:18
**3388** [1] - 3412:20

**3389** [1] - 3412:22
**3391** [2] - 3412:24; 3413:21
**341** [1] - 3101:20
**348-0597** [1] - 3214:8
**3500** [9] - 3102:13, 17, 23; 3103:3; 3116:4; 3118:20; 3177:5; 3233:4; 3402:20
**3500-FC-14** [1] - 3340:21
**3500-FC-7** [1] - 3363:24
**3500-JX-1** [1] - 3349:24
**3500-PS-1** [1] - 3347:16
**351** [1] - 3243:23
**351-2742** [1] - 3243:24
**356-6530** [1] - 3242:4
**36** [1] - 3215:8
**38** [1] - 3165:24
**3:00** [10] - 3183:22-24; 3194:9; 3197:10; 3315:21; 3316:2; 3331:11, 13
**3:20** [2] - 3376:17, 24
**3:30** [1] - 3183:24
**3:50** [2] - 3170:12; 3208:10
**3rd** [11] - 3350:21; 3382:18; 3383:6, 11, 21; 3384:5, 25; 3386:18, 24; 3394:25; 3395:9

**4**

**4** [7] - 3166:15; 3262:11, 21; 3276:19, 21; 3310:24; 3342:13
**40** [2] - 3148:10; 3151:4
**400** [1] - 3272:6
**433-3052** [2] - 3211:17; 3214:4
**44** [7] - 3316:13, 25; 3317:4; 3341:13; 3344:22; 3361:19; 3413:6
**44-A** [5] - 3316:12, 24; 3317:4, 12; 3413:6
**44-B** [2] - 3316:12; 3317:18

**44-C** [2] - 3316:12; 3317:23
**44-D** [2] - 3316:12; 3318:13
**44-E** [3] - 3316:12; 3317:4; 3413:6
**45** [18] - 3138:9, 19, 25; 3139:1, 5, 13, 16, 18, 21, 25; 3140:1; 3413:9
**46** [12] - 3167:15; 3168:7, 12, 16, 20; 3169:2, 8; 3413:13
**4:00** [1] - 3183:18
**4:03** [2] - 3242:16; 3244:3
**4:18** [1] - 3363:18
**4:20** [1] - 3211:17
**4:43** [1] - 3244:3
**4:45** [1] - 3170:6
**4:46** [3] - 3340:25; 3359:20; 3360:6
**4th** [1] - 3257:8

**5**

**5** [5] - 3115:19; 3206:10; 3209:19; 3262:11; 3291:13
**511** [1] - 3211:16
**515** [5] - 3238:17; 3242:13; 3379:9; 3380:3; 3383:14
**52** [10] - 3388:18, 20; 3389:3, 24; 3390:16; 3391:11; 3393:17; 3396:19; 3413:21
**53** [14] - 3388:19; 3389:13, 15, 23, 25; 3391:11, 19; 3394:13; 3395:5; 3396:16, 24; 3397:8; 3413:21
**533** [1] - 3214:3
**535** [1] - 3214:5
**537** [1] - 3214:6
**542** [1] - 3214:6
**547** [1] - 3214:6
**566** [1] - 3214:7
**575** [1] - 3214:8
**5:00** [2] - 3344:2, 12
**5:03** [1] - 3360:6
**5:08** [1] - 3341:10
**5N178732** [1] - 3389:2
**5th** [8] - 3102:9;

3173:6; 3195:14, 21; 3203:9; 3371:10; 3408:24

**6**

**6** [6] - 3156:19, 21; 3262:11, 18; 3288:18; 3311:13
**600** [1] - 3330:17
**607** [1] - 3262:15
**61** [12] - 3261:24; 3262:3, 7, 10, 17, 24; 3263:13; 3264:2, 6; 3278:19
**615** [1] - 3264:9
**62** [1] - 3262:11
**63** [1] - 3262:11
**631** [2] - 3101:23
**63rd** [1] - 3347:20
**65th** [8] - 3347:9; 3366:3, 18, 21; 3367:3; 3375:13; 3377:21
**6:00** [4] - 3319:4, 8, 15; 3331:22
**6:45** [3] - 3347:23; 3376:19, 24
**6P** [1] - 3380:20
**6th** [2] - 3102:9; 3301:8

**7**

**7** [2] - 3103:15; 3261:24
**7/18/1997** [1] - 3289:17
**712-6106** [1] - 3101:23
**712-6122** [1] - 3101:23
**718** [9] - 3239:12, 22; 3240:20; 3241:5, 25; 3242:4, 10; 3243:24
**72E** [1] - 3374:23
**72nd** [1] - 3105:13
**74** [4] - 3254:24; 3255:9; 3259:6; 3413:16
**74-A** [8] - 3191:9; 3210:25; 3211:4, 6, 9; 3216:25; 3217:22; 3413:5
**7:30** [6] - 3140:23; 3159:19; 3341:6; 3344:10, 12; 3362:9
**7:31** [1] - 3369:1
**7:43** [3] - 3375:15;

3377:11, 24
**7:47** [2] - 3369:24; 3370:7
**7:53** [2] - 3290:11; 3369:23
**7:57** [1] - 3374:23
**7B** [1] - 3101:17
**7th** [1] - 3264:2

**8**

**8** [2] - 3268:22; 3291:13
**804-5900** [2] - 3217:24; 3221:8
**8509** [1] - 3369:7
**89th** [8] - 3384:10, 19, 22; 3385:3, 14, 20; 3386:6, 12
**8:05** [1] - 3348:11
**8:31** [1] - 3244:4
**8:40** [1] - 3303:5
**8:53** [1] - 3290:11
**8th** [4] - 3170:1; 3173:10, 16, 18

**9**

**917** [5] - 3211:17; 3214:4, 8; 3217:23; 3221:8
**91st** [9] - 3350:21; 3382:19; 3383:10, 21; 3384:5, 25; 3386:18, 24
**92nd** [3] - 3383:22, 24; 3384:2
**966-4046** [7] - 3239:12, 22; 3240:20; 3241:6, 25; 3242:10
**9:30** [5] - 3347:25; 3374:3; 3376:13; 3405:21; 3408:24
**9:35** [2] - 3101:7; 3244:4
**9:57** [1] - 3214:3

**A**

**a.m** [8] - 3101:7; 3115:19; 3268:22; 3319:22; 3349:12; 3356:12; 3408:24
**abbreviation** [1] - 3286:16
**ability** [8] - 3124:21; 3160:22; 3240:16; 3247:13; 3268:13, 16;

3274:6; 3328:17

**able** [32] - 3103:20; 3104:7; 3105:23; 3107:21; 3124:5; 3127:17, 24; 3128:1, 4, 11; 3130:12, 15; 3202:21; 3208:21; 3275:14; 3278:14; 3283:14; 3287:10; 3323:6; 3337:12; 3371:12; 3374:20; 3375:1, 6, 8; 3383:2; 3391:20; 3392:16, 25; 3394:4; 3397:13

**above-mentioned** [4] - 3140:5; 3144:3; 3169:15; 3308:10

**Absolutely** [4] - 3250:2, 16; 3256:10; 3377:6

**absolutely** [2] - 3155:2; 3219:1

**AC** [1] - 3243:17

**access** [2] - 3271:23; 3320:23

**accessible** [1] - 3173:2

**accompanied** [1] - 3312:13

**according** [6] - 3212:23; 3285:3, 15; 3286:5; 3298:4; 3341:10

**account** [2] - 3272:1

**accurate** [8] - 3138:23; 3143:18; 3167:24; 3176:4; 3306:25; 3307:5; 3316:22; 3336:22

**accurately** [4] - 3138:16; 3143:14; 3316:18; 3341:25

**acknowledge** [1] - 3333:13

**acknowledgment** [2] - 3333:8, 11

**acquiesce** [1] - 3245:14

**act** [1] - 3249:3

**activated** [4] - 3240:22, 25; 3242:2; 3244:6

**activation** [1] - 3243:10

**activities** [7] -

3198:10; 3241:21; 3320:7; 3321:2; 3322:17, 19; 3328:6

**activity** [12] - 3166:1; 3195:6; 3233:10; 3241:16; 3319:19; 3323:20; 3348:3; 3358:22, 24; 3379:14

**actual** [3] - 3241:17; 3263:10; 3267:15

**AD** [4] - 3139:5; 3168:12; 3413:9, 13

**add** [1] - 3401:16

**added** [1] - 3395:2

**addition** [4] - 3102:13; 3106:10; 3241:8; 3400:6

**additional** [4] - 3272:9; 3404:2; 3407:25; 3408:3

**Additionally** [1] - 3405:12

**address** [21] - 3119:15, 23; 3169:25; 3173:5, 15; 3216:18; 3217:2, 7, 12; 3238:16; 3329:7; 3335:11; 3341:4, 9, 12; 3343:23; 3345:13; 3347:7; 3360:21, 25; 3397:7

**addresses** [1] - 3118:17

**adhered** [1] - 3404:20

**adhering** [1] - 3346:8

**adjourned** [1] - 3408:23

**admissible** [2] - 3247:7

**admission** [3] - 3247:8; 3391:8

**admit** [1] - 3408:16

**admitted** [4] - 3281:18; 3284:12; 3289:13

**advance** [2] - 3319:7, 11

**advise** [3] - 3109:3; 3235:15; 3404:19

**advised** [6] - 3108:10; 3234:6; 3235:18; 3348:12; 3404:22; 3405:6

**affiliated** [1] -

3192:11

**afternoon** [40] - 3142:24; 3159:20; 3166:8, 13, 15, 22; 3167:23; 3172:17; 3173:9; 3174:9; 3201:3, 15; 3211:17; 3219:18; 3242:16; 3252:3; 3264:19; 3290:22; 3302:8; 3318:24; 3329:23; 3332:11; 3334:14; 3338:17; 3340:15; 3346:14; 3352:3; 3358:15; 3361:1, 5; 3362:22; 3388:7

**AFTERNOON** [1] - 3251:1

**age** [1] - 3381:19

**agencies** [1] - 3295:16

**agent** [47] - 3113:3; 3120:20; 3124:8; 3125:8; 3137:21, 23; 3145:17, 19, 21; 3146:3; 3152:19; 3154:8; 3156:23; 3165:18; 3166:17; 3170:8; 3174:3; 3189:12, 17, 21; 3193:14; 3302:13; 3310:20, 23; 3322:12; 3340:7; 3342:11; 3350:7; 3352:17; 3355:6; 3358:18; 3359:2, 14, 16; 3366:7, 17; 3371:3, 11; 3384:12, 18; 3387:16; 3399:2; 3400:6, 14

**Agent** [69] - 3110:9, 11; 3120:8; 3126:21; 3145:20; 3146:3, 18; 3147:13; 3164:19; 3169:19; 3179:17; 3182:24; 3184:4, 14-15; 3191:5; 3192:2; 3194:20; 3197:12; 3204:1; 3301:16; 3302:4; 3307:14; 3318:24; 3332:14; 3333:25; 3334:18; 3337:25; 3344:8; 3351:6; 3352:3, 18; 3353:14; 3356:24; 3357:11; 3358:14; 3359:17; 3362:21; 3363:3, 11; 3365:25; 3366:12; 3367:8, 25;

3368:7, 11; 3370:15; 3373:4; 3375:15, 25; 3378:9, 19; 3381:21; 3382:23; 3383:2; 3386:16; 3387:7; 3390:22; 3391:18; 3394:25; 3395:7, 10, 12; 3396:19; 3397:18; 3400:7; 3403:20; 3406:4

**agents** [35] - 3107:24; 3112:8, 10, 17; 3120:11; 3124:4, 16; 3127:21; 3145:13; 3198:19, 21; 3207:11; 3212:23; 3220:7, 14, 21; 3221:11; 3303:1; 3323:17; 3326:13; 3327:2, 21; 3335:21; 3352:23; 3354:1, 9; 3355:1, 5, 11; 3364:10; 3367:3

**ago** [12] - 3106:10, 17; 3108:20; 3219:23; 3220:2, 4, 6; 3292:5; 3357:7; 3366:19; 3379:17

**agree** [4] - 3256:8; 3265:25; 3266:14; 3406:18

**agreed** [2] - 3106:7, 25

**ahead** [1] - 3328:4

**aid** [1] - 3115:23

**Al** [18] - 3247:4, 10, 18, 21, 25; 3248:4, 6, 10-11, 13-14; 3249:6, 8, 10-11, 17, 21

**alarm** [32] - 3238:12, 19, 21-22; 3239:5, 7-8, 10, 15; 3240:7, 11, 16, 21, 23-25; 3241:1, 8-9, 16, 21; 3242:2, 20, 25; 3243:9, 14, 16; 3244:5, 10

**alarm-related** [1] - 3241:21

**Alarms** [1] - 3238:7

**alive** [1] - 3134:13

**alleged** [1] - 3194:18

**Alli** [2] - 3150:1; 3248:13

**allow** [1] - 3233:24

**allowed** [6] - 3232:12; 3266:22, 24; 3269:3; 3271:21; 3272:3

**allows** [3] - 3262:20;

3271:24; 3393:19
**Aloi** [1] - 3116:18
**Alone** [1] - 3170:9
**alone** [10] - 3115:13;
3166:16; 3170:7;
3174:3; 3181:8;
3198:20; 3302:25;
3323:2; 3335:20
**Alphonse** [35] -
3131:14; 3136:8, 10,
16, 19; 3137:1, 14;
3139:15, 19, 23;
3145:11; 3148:7;
3150:6; 3151:16;
3163:20; 3166:23;
3169:3, 5; 3170:13, 16;
3171:10; 3172:2, 20;
3184:20, 25; 3259:13;
3260:20; 3261:1, 4;
3273:15; 3278:14;
3312:13; 3313:4;
3317:17
**ALPHONSE** [1] - 3101:6
**altered** [1] - 3390:8
**Amato** [1] - 3116:20
**Amendment** [1] - 3109:4
**AMERICA** [1] - 3101:3
**amount** [2] - 3211:12;
3228:19
**analyze** [1] - 3393:7
**Andrew** [1] - 3281:6
**anniversary** [1] -
3113:6
**Answer** [1] - 3157:1
**answer** [8] - 3104:15;
3105:2; 3154:12, 22;
3156:20; 3157:3, 10;
3387:1
**answered** [6] - 3199:3;
3243:20; 3323:8;
3365:18; 3370:12;
3386:20
**Anthony** [4] - 3118:2;
3129:20; 3130:11;
3142:17
**anticipate** [1] -
3105:6
**anticipated** [1] -
3102:7
**Anyplace** [1] - 3216:15
**anyway** [1] - 3110:25
**Apart** [1] - 3131:13
**apart** [3] - 3136:3;
3273:7; 3290:13

**apartment** [1] - 3386:6
**apologies** [1] -
3402:21
**apparent** [1] - 3107:19
**appearance** [2] -
3167:9; 3336:4
**APPEARANCES** [1] -
3101:11
**appeared** [4] -
3150:22; 3348:19;
3392:6, 20
**appearing** [2] -
3175:17; 3306:9
**application** [1] -
3403:2
**appointed** [1] -
3109:24
**appreciate** [1] -
3405:8
**approach** [29] -
3116:1; 3121:10;
3138:2; 3143:3;
3153:12; 3167:11;
3175:19; 3176:8;
3188:13, 23; 3192:13;
3211:19; 3216:22;
3224:20; 3230:18;
3254:19; 3255:17;
3263:18; 3295:23;
3306:12; 3316:8;
3336:6; 3340:17;
3341:17; 3347:13;
3351:2; 3370:20;
3388:14
**appropriate** [2] -
3256:24; 3408:17
**appropriately** [1] -
3106:17
**approved** [8] - 3254:2;
3269:18, 21; 3271:5;
3272:17; 3273:7;
3274:22
**approves** [1] - 3273:3
**approximate** [1] -
3347:7
**approximation** [1] -
3127:14
**April** [20] - 3140:15;
3157:16; 3158:22;
3161:11; 3163:18;
3260:25; 3261:5;
3273:14; 3275:13;
3310:25; 3311:7;
3319:1; 3363:25;

3364:2; 3371:3, 14, 23,
25; 3373:5, 14
**area** [47] - 3141:3;
3142:12, 18; 3148:22;
3162:9, 18; 3166:25;
3172:6, 14; 3173:18;
3174:6; 3195:6;
3198:22; 3202:25;
3263:8, 14-15; 3267:7,
9, 13, 22; 3291:20;
3292:13; 3293:22;
3295:7; 3299:15, 19,
22; 3313:17; 3315:10;
3327:8; 3339:18, 21;
3347:7, 9, 19; 3348:14,
20; 3350:15; 3366:8;
3367:7; 3369:10
**areas** [3] - 3225:7;
3294:10; 3369:12
**argue** [4] - 3123:1;
3124:25; 3249:16, 22
**argued** [1] - 3248:11
**arguing** [2] - 3249:10,
20
**argument** [1] - 3248:14
**argumentative** [1] -
3131:23
**arrange** [1] - 3109:25
**arranging** [1] -
3108:24
**arrive** [11] - 3107:23;
3108:14; 3109:12;
3141:9, 12; 3164:10;
3304:2; 3312:4; 3314:1;
3319:5; 3341:9
**arrived** [18] - 3132:10;
3141:10, 13; 3161:14,
25; 3163:3; 3305:21;
3312:7; 3313:23;
3314:4; 3315:13, 15;
3322:4, 10; 3328:9;
3330:11; 3344:22;
3347:23
**arrives** [2] - 3321:23
**arriving** [2] -
3161:19; 3312:2
**article** [1] - 3303:19
**artificial** [1] -
3104:4
**ascertain** [1] - 3269:8
**assault** [2] - 3268:7;
3277:4
**assigned** [32] -
3115:7; 3120:21;

3121:1; 3135:16, 22-23;
3140:18; 3165:21;
3166:3; 3183:12;
3198:9; 3200:19;
3261:17; 3263:1, 5;
3289:17; 3302:16-18;
3310:22; 3311:10;
3330:16; 3334:21, 25;
3354:17, 19
**assignment** [10] -
3166:8; 3169:22;
3300:22; 3302:23;
3320:4, 9; 3327:9;
3335:7; 3362:16
**assistance** [1] -
3393:5
**associate** [1] -
3233:11
**associated** [2] -
3225:15; 3309:7
**associates** [1] -
3188:14
**assume** [6] - 3102:5;
3123:10; 3141:22;
3247:11; 3293:5;
3403:20
**assuming** [4] - 3182:7;
3209:9; 3231:13; 3256:3
**assurance** [1] -
3106:21
**attempt** [3] - 3328:4;
3364:19; 3405:14
**attempting** [1] -
3362:15
**attend** [1] - 3104:9
**attendance** [2] -
3103:13; 3128:24
**attended** [1] - 3127:25
**attention** [40] -
3115:3; 3119:7, 17;
3135:15, 19; 3136:5;
3140:8, 15; 3141:15;
3166:5; 3169:19;
3173:3, 5-6; 3194:15;
3195:1, 7; 3200:6;
3203:9; 3218:10;
3260:23; 3261:19;
3296:17; 3297:20;
3300:15; 3302:20;
3303:9; 3305:16;
3310:21, 25; 3335:4;
3338:25; 3339:4;
3343:3; 3344:25;
3349:2; 3351:6;
3369:23; 3380:18;

3405:5

**attorney** [7] - 3268:25; 3273:25; 3274:4, 22; 3275:18; 3277:22; 3299:11

**ATTORNEY** [1] - 3101:12

**Attorney's** [3] - 3114:12; 3120:19; 3220:17

**attorneys** [1] - 3274:10

**attributions** [8] - 3138:23; 3143:18; 3168:2, 5; 3307:3, 5; 3308:3; 3316:22

**August** [6] - 3112:16; 3173:6; 3203:9; 3206:10; 3209:19; 3286:7

**AUSA** [3] - 3101:13

**authenticated** [1] - 3250:22

**authentication** [1] - 3408:17

**Auto** [1] - 3375:14

**automatically** [2] - 3392:20, 22

**AV** [1] - 3278:7

**available** [3] - 3246:5; 3397:3; 3406:7

**Avenue** [40] - 3119:24; 3135:24; 3141:11; 3148:6; 3152:10, 12; 3166:10; 3167:2; 3173:12, 19; 3195:14, 21; 3211:14; 3217:8; 3305:15; 3312:3; 3313:7; 3321:25; 3323:14; 3325:23; 3326:21; 3327:6; 3339:18; 3347:9, 19; 3350:21; 3355:14; 3357:2, 17; 3358:5; 3369:7; 3375:14; 3382:18; 3383:6, 11, 21; 3384:5; 3386:18, 24

**avoid** [1] - 3408:16

**AW** [5] - 3279:25; 3280:14, 17; 3283:13; 3413:22

**aware** [4] - 3196:4; 3236:17; 3309:6; 3408:5

**AX** [5] - 3280:21; 3281:8, 11, 14; 3413:23

**AY** [1] - 3353:4

**AZ** [1] - 3356:23

---

**B**

**backed** [2] - 3392:10, 12

**backgrounds** [1] - 3122:8

**backing** [1] - 3182:5

**backup** [1] - 3392:18

**bag** [5] - 3209:17; 3356:15, 19; 3357:12; 3396:21

**bagel** [1] - 3141:4

**bail** [1] - 3300:24

**balance** [1] - 3332:16

**ball** [2] - 3317:16, 21

**banks** [1] - 3267:8

**bar** [6] - 3137:12, 15; 3150:1, 3

**Bar/restaurant** [2] - 3185:7

**Baran** [1] - 3405:14

**Barber** [2] - 3225:18; 3227:13

**base** [1] - 3196:13

**Based** [1] - 3289:12

**based** [7] - 3156:22; 3281:17; 3320:19, 21; 3321:20; 3363:2; 3387:6

**basement** [1] - 3386:6

**basis** [1] - 3232:15

**Bates** [2] - 3284:14, 17

**bathroom** [1] - 3263:2

**battery** [2] - 3243:17

**Baudanza** [7] - 3185:15; 3186:4, 8; 3187:14, 21; 3188:1; 3209:1

**Baudanza's** [1] - 3186:25

**Baudnanza** [19] - 3136:24; 3137:2, 5, 15; 3139:17, 22; 3140:2; 3149:4, 22; 3150:2, 25; 3151:5, 13; 3166:20, 23; 3168:18, 24; 3169:4; 3170:15

**bear** [2] - 3179:10; 3388:25

**beat** [1] - 3333:17

**become** [1] - 3216:10

**becomes** [1] - 3104:4

**bed** [6] - 3200:16; 3262:13; 3264:6, 10

**beeper** [1] - 3248:1

**BEFORE** [1] - 3101:9

**beforehand** [1] - 3197:19

**began** [4] - 3145:6; 3183:17; 3319:1, 4

**begin** [6] - 3166:11; 3170:2; 3303:3; 3319:23; 3327:13; 3335:15

**beginning** [1] - 3319:21

**begins** [1] - 3351:11

**behalf** [1] - 3106:21

**behind** [8] - 3103:12; 3137:12; 3149:17; 3170:14; 3171:23; 3181:16; 3208:24; 3209:1

**Bells** [1] - 3241:2

**belonging** [2] - 3327:2; 3329:19

**below** [1] - 3399:19

**Benjamin** [10] - 3172:20; 3173:13; 3174:1, 6, 25; 3179:25; 3180:6, 8; 3181:13; 3198:10

**Benji** [1] - 3206:1

**best** [1] - 3105:5

**better** [2] - 3130:6; 3224:14

**between** [32] - 3110:15; 3173:12; 3184:20; 3194:8; 3195:19; 3201:22; 3229:15; 3245:4; 3254:15; 3259:12; 3267:8; 3269:10; 3275:13; 3283:5; 3284:6; 3288:22; 3344:11; 3346:3, 8; 3354:11; 3355:8; 3362:25; 3363:5, 14-15, 20; 3364:5; 3371:11; 3375:14; 3376:24; 3395:15; 3396:22

**Between** [3] - 3194:9; 3288:20; 3331:13

**Bevilacqua** [5] - 3304:18; 3309:1, 7, 13

**Beyond** [2] - 3153:10;

3374:14

**beyond** [11] - 3189:4; 3196:15; 3200:22; 3223:5; 3225:3, 8; 3231:24; 3232:2; 3293:3; 3370:17; 3372:4

**bias** [1] - 3232:7

**big** [4] - 3265:1; 3299:7, 16; 3348:20

**bigger** [1] - 3267:18

**bill** [2] - 3218:21, 24

**Billing** [1] - 3211:12

**bills** [1] - 3218:14

**Billy** [1] - 3106:16

**birthday** [1] - 3235:20

**bit** [3] - 3141:15; 3200:7; 3407:8

**black** [7] - 3136:24; 3171:12, 23; 3172:3; 3356:15, 19; 3357:12

**blank** [3] - 3396:3, 7

**bleed** [1] - 3104:3

**block** [8] - 3195:18; 3196:19; 3205:5; 3330:17, 25; 3347:10; 3348:13; 3397:1

**blocks** [5] - 3136:4; 3174:16, 19; 3384:4, 8

**blonde** [3] - 3340:4; 3342:24

**blood** [1] - 3103:17

**blowup** [2] - 3138:9; 3317:8

**blue** [4] - 3170:21; 3171:22; 3172:13; 3312:22

**board** [6] - 3143:7; 3167:17; 3168:3; 3272:17; 3306:19; 3307:4

**Bocce** [15] - 3368:1, 8, 11, 13; 3369:9, 11, 20; 3370:7; 3371:6, 8, 16; 3376:19, 21; 3377:12; 3381:23

**bodies** [1] - 3277:6

**body** [1] - 3379:24

**Body** [1] - 3104:23

**Bogle** [1] - 3403:25

**bone** [2] - 3104:3

**borough** [3] - 3238:14; 3239:20; 3335:13

**bottom** [6] - 3119:19;

3284:15, 17, 21, 24;
3317:10
**Boulevard** [8] -
3115:8; 3238:17;
3242:13; 3349:8;
3350:11; 3379:9;
3380:4; 3383:14
**bounced** [1] - 3297:11
**bounds** [1] - 3232:22
**box** [1] - 3202:9
**boxes** [7] - 3171:15;
3199:15; 3202:10, 13,
17; 3208:18; 3408:14
**Boy** [5] - 3248:10, 13
**branch** [1] - 3310:24
**break** [5] - 3177:22;
3188:25; 3332:11;
3402:2; 3403:9
**breakfast** [2] -
3262:18, 20
**Bridge** [1] - 3383:17
**brief** [1] - 3397:23
**briefed** [1] - 3110:20
**briefly** [1] - 3333:1
**Briefly** [2] - 3135:22;
3163:15
**bright** [1] - 3113:23
**Bring** [2] - 3191:19;
3251:6
**bring** [7] - 3112:22;
3113:9; 3199:2;
3233:24; 3384:20;
3403:2, 16
**bringing** [3] -
3257:15; 3293:24;
3294:1
**Broadway** [11] -
3345:6, 14; 3346:9, 14,
20; 3362:22, 25;
3363:5; 3364:24;
3376:15
**broke** [2] - 3210:13;
3232:13
**broke-off** [2] -
3210:13; 3232:13
**broken** [1] - 3397:4
**Brooklyn** [24] -
3101:15; 3135:25;
3146:17; 3166:10;
3169:24; 3173:10, 16,
18; 3174:22; 3187:7;
3201:6; 3207:25;
3216:14; 3252:6;
3262:5; 3297:25;

3298:5; 3339:19;
3350:21; 3366:4;
3369:7; 3376:16;
3377:1; 3382:21
**brother** [4] - 3149:3,
22; 3156:13; 3270:8
**brought** [8] - 3123:25;
3154:18; 3257:2;
3293:18; 3304:11, 21;
3305:1; 3399:7
**Bruce** [2] - 3387:16;
3388:1
**BRUCE** [2] - 3387:20;
3412:18
**Bruno's** [2] - 3369:6
**Bryn** [2] - 3141:10;
3144:21
**builder** [1] - 3245:21
**building** [6] -
3220:25; 3221:2;
3240:15; 3262:5;
3330:17; 3345:19
**bunk** [2] - 3279:3
**burden** [1] - 3406:21
**Bureau** [35] - 3165:16;
3253:13, 17, 24;
3254:16; 3255:1, 3, 7;
3261:6; 3265:2, 4;
3271:4; 3272:5; 3273:1;
3274:6, 11, 15; 3275:5;
3280:9; 3281:3;
3282:15; 3288:14;
3289:9, 19-20, 25;
3291:15; 3295:17;
3296:9, 15; 3297:6;
3298:3; 3300:17;
3301:7; 3388:10
**Buretta** [10] - 3250:9,
18; 3402:10; 3403:4,
17; 3406:17, 20, 23;
3407:9, 13
**BURETTA** [162] -
3101:13; 3102:16, 22;
3105:17; 3108:17;
3109:7, 10, 19;
3110:19; 3177:21;
3211:9; 3232:21;
3237:9, 22; 3238:2, 9;
3240:1; 3242:22;
3243:2, 7, 11, 20;
3244:7, 20; 3245:24;
3246:11, 13, 16;
3247:15; 3249:3, 18;
3250:16, 19; 3251:5,
14; 3252:2; 3253:20;

3254:19, 22-23; 3255:9;
3256:8, 10, 23; 3257:4,
10, 14, 16; 3258:4;
3259:2, 5, 9, 17, 21,
24; 3260:6, 15;
3263:18, 21; 3264:16;
3280:15; 3281:9;
3292:21; 3293:3, 11;
3294:4, 8; 3298:13, 15;
3299:2; 3301:13;
3332:14, 17, 21;
3337:25; 3338:16;
3340:17, 20; 3341:17,
20; 3342:3, 8, 11, 16;
3344:4, 7, 16, 20;
3347:13; 3351:2, 5, 21;
3352:12; 3358:11;
3360:17; 3365:18, 22;
3366:1; 3367:18, 22;
3368:4; 3370:12, 17;
3371:20; 3372:3;
3374:13; 3375:18, 22;
3376:3; 3378:5, 11, 16;
3379:2, 4; 3385:17;
3386:7, 13, 20; 3387:8,
12, 16; 3388:3, 6, 14,
17; 3389:15; 3390:2,
10, 17; 3391:5, 15;
3397:23; 3398:1;
3399:2, 17, 23; 3400:8,
11, 18; 3401:11, 16,
19; 3402:11, 13, 15,
19; 3403:14, 21;
3404:1, 4, 9; 3406:10,
12; 3407:2, 16;
3408:13, 22; 3410:24;
3411:7, 13; 3412:12, 20
**burglar** [1] - 3240:21
**burglary** [1] - 3239:9
**burgundy** [2] - 3350:1;
3366:10
**business** [23] -
3135:24; 3136:1;
3141:5, 9, 19; 3142:1,
17; 3144:12, 20-21;
3145:11; 3147:18, 20;
3156:12; 3162:16;
3198:11; 3199:21;
3255:4, 7; 3345:12;
3408:9, 11
**businesses** [2] -
3156:5; 3185:14
**Butler** [6] - 3238:17;
3242:13; 3349:8;
3379:9; 3380:3; 3383:14
**button** [1] - 3240:22

**BY** [202] - 3101:13;
3114:15; 3116:3;
3120:7, 25; 3121:4;
3126:2; 3129:11;
3130:10, 22; 3132:1,
24; 3133:15; 3134:10;
3135:9; 3136:18;
3137:19; 3138:7;
3139:12; 3140:7;
3142:10; 3143:5;
3144:5; 3145:3; 3146:8;
3147:3, 7; 3152:23;
3153:4; 3156:3; 3157:8;
3161:8; 3163:17;
3164:8; 3165:12;
3167:13; 3168:15;
3169:18; 3171:1, 9;
3175:21; 3179:16;
3182:1, 23; 3187:13,
19; 3188:5, 21; 3192:1,
8, 16; 3196:12, 17;
3199:1, 5; 3201:1;
3203:25; 3206:17;
3207:21; 3215:4;
3216:24; 3219:17;
3222:10, 14; 3223:8,
23; 3224:3, 9; 3227:3;
3228:14; 3230:14;
3235:3, 11; 3236:16;
3238:2, 9; 3240:5;
3242:24; 3243:4, 13,
22; 3244:9, 17, 22;
3252:2; 3253:20;
3254:23; 3259:9, 24;
3260:6, 15; 3263:21;
3264:18; 3265:24;
3278:12; 3279:23;
3280:19; 3281:1, 13;
3283:12; 3290:21;
3295:4; 3296:1;
3298:15; 3299:6;
3300:14; 3302:7;
3304:1; 3306:14;
3307:18; 3308:18;
3309:11; 3310:12;
3311:6; 3313:3; 3315:1;
3316:10; 3317:6;
3318:23; 3323:10;
3325:5; 3334:13;
3336:8; 3337:8;
3338:16; 3340:20;
3341:20; 3342:16;
3344:7, 20; 3351:5;
3352:2, 14; 3353:12;
3358:13; 3360:19;
3365:19, 24; 3367:20;
24; 3368:6; 3370:14;

3373:3; 3374:1, 8, 16; 3375:5, 20, 24; 3378:7, 12, 18; 3379:8; 3383:1; 3385:18, 24; 3386:4, 10, 15, 22; 3388:6, 17; 3389:21; 3390:6, 14, 19; 3391:17; 3393:23; 3409:8, 10, 12, 14, 18, 20, 22, 24; 3410:1, 5, 9, 12, 16, 19, 21, 24; 3411:1, 3, 7, 9, 11, 13, 15, 17, 21, 23; 3412:2, 5, 9, 12, 16, 20, 22, 24

**C**

**C-38** [1] - 3335:1
**C-A-R-R-I-E** [1] - 3338:13
**C-U-R-T-I-S** [1] - 3165:7
**cable** [1] - 3391:22
**Cadillac** [5] - 3171:12, 22-23; 3172:3, 13
**Calabro** [8] - 3170:14; 3171:16, 19; 3201:19; 3202:10, 18; 3208:5, 25
**camera** [11] - 3139:24; 3173:1; 3174:12; 3177:12; 3181:9; 3204:1, 7, 15, 21; 3205:12; 3207:3
**cameras** [3] - 3204:17; 3292:4, 6
**Campanella** [8] - 3104:20; 3219:9; 3230:2, 4; 3278:15; 3279:5; 3374:9, 18
**Campanella's** [1] - 3279:12
**cannot** [3] - 3266:18; 3276:16; 3277:25
**cap** [7] - 3200:9, 11-12, 15-16; 3317:16, 21
**capacity** [1] - 3267:10
**capital** [1] - 3135:5
**Cappa** [7] - 3280:11; 3283:16, 21; 3284:25; 3287:23
**car** [27] - 3119:12, 20, 25; 3171:25; 3174:10; 3182:5, 12; 3208:16; 3209:9-12, 20, 23;

3210:7, 11; 3311:22; 3315:3; 3318:5; 3321:15; 3328:21; 3343:20; 3364:23; 3367:11; 3386:18, 24
**Carbonaro** [1] - 3116:22
**cards** [1] - 3263:16
**care** [2] - 3102:20; 3269:7
**career** [1] - 3154:24
**careful** [1] - 3225:4
**Carillo** [2] - 3122:16; 3125:1
**Carmine** [4] - 3104:22; 3245:15; 3380:24; 3381:1
**Carrie** [25] - 3338:1, 13; 3351:6; 3352:3; 3353:14; 3356:24; 3357:11; 3358:14; 3362:21; 3363:3, 11; 3365:25; 3366:12; 3367:9, 25; 3368:7, 11; 3370:16; 3373:4; 3375:15, 25; 3378:19; 3382:23; 3383:2; 3386:16
**CARRIE** [2] - 3338:5; 3412:10
**carried** [1] - 3356:20
**Carroll** [6] - 3167:2; 3187:8, 15; 3195:14, 19
**carry** [2] - 3356:15, 19
**carrying** [7] - 3202:5; 3356:1, 6, 9, 13, 16; 3357:12
**cars** [5] - 3128:8; 3202:1; 3315:10; 3355:7
**cartilage** [2] - 3104:3, 5
**case** [38] - 3103:6, 18; 3104:14; 3105:1, 6, 18; 3106:3; 3107:6; 3146:3; 3189:1, 12; 3190:2; 3195:25; 3219:22; 3232:22; 3246:6; 3268:6; 3284:11; 3293:9; 3340:7; 3350:7; 3352:17; 3358:18; 3359:2, 16; 3366:7; 3367:10; 3393:12; 3402:3; 3403:10; 3404:22, 24-25; 3405:7, 17; 3407:21; 3408:2

**cases** [1] - 3111:3
**Castellazzo** [12] - 3172:20; 3173:13; 3174:1, 6, 25; 3175:7; 3179:25; 3180:6, 8; 3181:13; 3198:10; 3206:1
**CAT** [1] - 3101:25
**catch** [1] - 3160:25
**catering** [1] - 3115:12
**cell** [28] - 3151:5, 13, 17, 21; 3159:3; 3217:19, 25; 3218:2, 5, 8; 3221:6; 3223:13, 16, 19, 25; 3231:14; 3232:6; 3253:21; 3262:15, 17, 19, 25; 3278:25; 3279:1, 6; 3361:7, 16
**cellies** [1] - 3278:24
**cells** [2] - 3264:13
**census** [1] - 3277:5
**Center** [4] - 3252:6; 3254:10, 15; 3261:22
**center** [2] - 3169:7; 3330:22
**central** [4] - 3238:25; 3239:1, 6, 19
**Central** [2] - 3101:5, 23
**Centre** [6] - 3312:2, 5; 3317:9, 13; 3323:14
**Cerbone** [5] - 3280:12; 3283:16; 3287:11, 25; 3288:6
**Cerbone's** [1] - 3287:8
**certain** [20] - 3118:6; 3122:21; 3123:6, 19; 3124:3, 14; 3128:10; 3195:3; 3198:2; 3201:9; 3239:2; 3262:8; 3265:6; 3276:16; 3328:25; 3341:14, 25; 3365:20; 3395:16
**Certainly** [7] - 3130:23; 3231:8, 16; 3267:18; 3356:4; 3361:13; 3407:12
**certainly** [28] - 3107:14; 3110:23; 3122:22; 3123:8, 25; 3124:22; 3127:5; 3129:5; 3149:21; 3152:1; 3153:6; 3187:2,

25; 3195:25; 3223:9; 3231:20; 3247:8, 12; 3256:5; 3266:1; 3271:4; 3274:6; 3320:16; 3358:2; 3361:25; 3405:8; 3407:25; 3408:4
**certification** [1] - 3191:12
**certifications** [2] - 3408:9, 11
**cetera** [2] - 3105:23; 3293:15
**chair** [2] - 3185:15; 3186:5
**chance** [1] - 3137:25
**change** [1] - 3300:22
**changed** [1] - 3282:11
**character** [1] - 3397:2
**charged** [2] - 3333:6, 14
**charges** [1] - 3218:25
**Charles** [1] - 3117:21; 3129:22
**check** [11] - 3270:2; 3343:15; 3349:20; 3356:3; 3361:2, 11; 3368:15; 3369:22; 3373:16; 3384:13
**checked** [1] - 3347:11
**checking** [1] - 3218:25
**checks** [1] - 3105:23
**child** [1] - 3270:13
**children** [2] - 3236:23; 3270:9
**Chris** [4] - 3120:15, 17, 20; 3124:8
**Christmas** [5] - 3171:15; 3202:3, 11, 15; 3208:11
**cigar** [1] - 3358:5
**circumstances** [3] - 3239:2, 5
**City** [1] - 3105:13
**CJA** [1] - 3109:24
**clarification** [2] - 3300:11; 3390:13
**clean** [1] - 3263:2
**clear** [8] - 3108:17; 3123:18; 3124:24; 3163:18; 3180:23; 3250:20; 3317:7; 3320:17
**CLERK** [24] - 3113:19;

3114:3, 8; 3134:22; 3135:2, 7; 3164:23; 3165:4, 8; 3191:21; 3214:14, 22; 3237:11, 19; 3251:9, 21; 3301:21; 3302:1; 3333:20; 3334:6; 3338:2, 10; 3387:17, 23

**clerk** [1] - 3404:6

**client** [8] - 3106:7; 3112:1; 3190:10; 3249:8, 10, 12, 17, 21

**client's** [1] - 3250:1

**clients** [1] - 3107:5

**close** [6] - 3114:18; 3168:22; 3197:22; 3200:7; 3222:19; 3223:10

**closed** [2] - 3171:17; 3208:20

**closely** [4] - 3170:14; 3265:9, 16

**clothing** [1] - 3303:19

**Club** [30] - 3169:24; 3170:17; 3171:3; 3172:11; 3173:19; 3174:7; 3179:19; 3180:25; 3198:5, 8, 12, 17; 3201:12; 3208:4; 3368:1, 8, 12-13; 3369:9, 11, 20; 3370:7; 3371:6, 8, 16; 3376:19, 21; 3377:12; 3381:23

**club** [46] - 3170:12, 14; 3171:11; 3172:4, 16, 19; 3173:21; 3179:22; 3199:12; 3201:17, 25; 3202:2, 6, 8; 3204:21; 3205:2, 7; 3206:2; 3208:24; 3209:4; 3347:6, 8, 19, 21; 3348:2, 7, 12-13, 17, 21, 24; 3366:8, 13, 18; 3368:2, 9; 3369:4, 12; 3370:1; 3373:15, 18; 3376:16; 3378:1

**CNK** [4] - 3286:16, 18; 3289:15

**coagulates** [1] - 3104:4

**code** [1] - 3271:23

**Coffee** [15] - 3136:2, 9, 21-22, 25; 3137:3, 8, 10; 3147:22, 24; 3149:3, 7; 3151:24;

3156:5; 3163:24

**coffee** [5] - 3137:11, 13; 3150:4, 8, 13

**Collision** [1] - 3104:23

**Colombo** [8] - 3110:13; 3135:18; 3140:11; 3166:2; 3188:14; 3309:8; 3333:15; 3335:3

**Colombos** [1] - 3112:12

**colored** [3] - 3180:1; 3303:21; 3317:17

**combination** [1] - 3233:19

**coming** [14] - 3147:19; 3180:1, 5; 3181:18; 3193:5; 3205:6; 3208:21; 3268:8; 3269:9; 3320:25; 3348:5; 3404:3, 22; 3405:2

**commenced** [2] - 3362:23; 3376:20

**commencing** [1] - 3377:16

**commissary** [1] - 3272:1

**committed** [1] - 3163:10

**common** [13] - 3218:24; 3263:7, 14-15; 3267:7, 22; 3291:20; 3292:12; 3293:22; 3295:7; 3299:15

**commonly** [1] - 3354:4

**communicate** [4] - 3110:1; 3240:17; 3253:12, 16

**communicated** [1] - 3109:1

**communicates** [1] - 3239:16

**communicating** [1] - 3378:9

**communication** [4] - 3161:20, 24; 3269:10; 3323:4

**communications** [1] - 3236:17

**Community** [1] - 3286:20

**community** [1] - 3286:22

**company** [1] - 3324:20

**compared** [2] - 3395:21; 3397:17

**Compared** [1] - 3149:9

**comparison** [1] - 3403:5

**compilation** [1] - 3316:13

**complete** [1] - 3197:16

**completed** [1] - 3403:19

**comprise** [1] - 3354:1

**computer** [8] - 3391:23; 3392:3, 6, 14, 20-21; 3393:15, 20

**concern** [1] - 3257:21

**concerned** [2] - 3200:3, 5

**concerning** [2] - 3405:16, 18

**concluded** [6] - 3125:15; 3155:16; 3178:3; 3258:7; 3294:12; 3401:21

**conclusion** [2] - 3104:16; 3362:8

**condition** [1] - 3243:16

**conduct** [19] - 3120:21; 3135:23; 3146:10; 3158:9; 3166:9, 16; 3169:23; 3184:3; 3197:18; 3200:20; 3210:8; 3252:17, 23; 3265:4, 6; 3302:25; 3328:7, 18; 3349:4

**conducted** [16] - 3120:10; 3132:25; 3145:15; 3153:6; 3154:6, 17, 20-21; 3155:5; 3157:15; 3183:1; 3204:8; 3309:3; 3325:19; 3339:1; 3373:5

**conducting** [15] - 3124:16; 3132:7; 3146:23; 3147:4, 14; 3151:3; 3157:22; 3170:7; 3192:9; 3198:4, 22; 3199:9; 3335:20; 3345:2, 11

**confines** [1] - 3265:5

**confirm** [1] - 3349:23

**confiscated** [1] - 3253:21

**congregate** [1] -

3263:6

**conjunction** [1] - 3295:15

**Conley** [2] - 3112:9, 13

**connect** [1] - 3238:25

**connected** [2] - 3391:22; 3392:2

**connection** [10] - 3167:5; 3175:13; 3181:5; 3206:23; 3221:3, 5; 3294:2; 3306:1, 6; 3335:25

**consent** [1] - 3295:19

**consider** [2] - 3103:19; 3104:10

**considered** [1] - 3265:7

**consisted** [1] - 3354:1

**consistent** [1] - 3348:3

**consistently** [1] - 3189:7

**consists** [1] - 3397:1

**conspirators** [1] - 3104:20

**construction** [3] - 3238:18, 20; 3240:7

**Cont'd** [1] - 3374:1

**contact** [8] - 3141:22; 3142:25; 3160:5, 12, 21; 3232:18; 3248:1

**contacted** [1] - 3220:18

**contacts** [2] - 3236:21; 3269:23

**contain** [1] - 3259:12

**contains** [1] - 3250:9

**context** [1] - 3293:6

**continue** [5] - 3142:19; 3148:16, 18, 20; 3197:13

**Continue** [1] - 3405:20

**continued** [4] - 3205:19; 3305:24; 3330:11; 3374:2

**Continued** [23] - 3121:12; 3125:16; 3153:15; 3155:17; 3176:11; 3178:4; 3181:21; 3190:18; 3211:22; 3213:9; 3224:22; 3226:3; 3230:20; 3234:15; 3255:20; 3258:8;

3294:13; 3314:9;
3370:22; 3372:8;
3373:20; 3398:3;
3401:22
**continues** [2] -
3155:10; 3233:14
**continuing** [2] -
3169:11; 3318:12
**Continuing** [1] -
3214:2
**contraband** [1] -
3269:9
**control** [2] - 3106:19;
3390:25
**contusions** [1] -
3143:17
**conversation** [12] -
3137:16; 3150:24;
3152:2, 4-5; 3175:4;
3197:20; 3246:22;
3250:14; 3253:3;
3305:24; 3328:14
**conversations** [9] -
3163:8; 3231:6, 21;
3235:13; 3253:1;
3292:19; 3295:20;
3387:6
**convicted** [1] - 3270:3
**Conway** [1] - 3101:20
**cooperating** [3] -
3106:12; 3108:20;
3293:7
**cooperative** [1] -
3407:22
**corner** [5] - 3167:2;
3217:1; 3323:19;
3364:23
**correct** [94] - 3139:20;
3141:8, 23; 3145:9;
3146:19; 3147:25;
3149:1, 6, 16; 3150:10,
12, 14; 3151:7, 20, 23;
3152:8; 3157:1, 17, 20;
3158:1, 15, 21; 3159:5,
9, 22; 3160:24; 3161:2,
15-16, 22; 3162:6,
20-21, 25; 3163:1;
3164:1, 12-13; 3184:17;
3196:1; 3201:13;
3209:21; 3212:21;
3220:12; 3240:12;
3242:14; 3291:1, 17;
3295:8, 21; 3297:3;
3300:18; 3301:4, 9;
3304:3; 3305:3; 3308:6;

3312:10; 3318:10;
3320:6, 8; 3321:2, 7;
3325:1, 14, 22, 24;
3326:2, 17; 3327:11,
16, 22, 25; 3329:24;
3330:3; 3331:3, 12;
3337:10; 3343:8;
3355:12; 3357:10;
3358:15; 3359:18;
3361:12; 3362:18;
3374:5; 3377:14;
3381:1, 13; 3394:2, 18;
3396:11, 14; 3404:1
**Correct** [26] - 3140:14;
3144:23; 3146:2;
3150:5; 3240:13;
3241:7, 13; 3242:11;
3257:10; 3258:4;
3317:11; 3318:12;
3319:6; 3320:15;
3321:17; 3323:4, 25;
3327:20; 3330:25;
3331:15; 3354:24;
3360:12; 3361:21;
3373:13; 3376:23;
3404:4
**correction** [4] -
3267:25; 3268:3;
3299:18, 25
**corrections** [2] -
3286:20, 22
**correctly** [1] - 3168:5
**correlation** [1] -
3245:3
**correspond** [3] -
3232:20; 3233:15, 18
**corresponded** [1] -
3232:15
**correspondence** [6] -
3232:24; 3233:1, 7;
3235:5, 13
**cost** [1] - 3106:8
**councilman** [1] -
3270:1
**counsel** [10] - 3102:17;
3109:2, 18, 21, 24-25;
3293:5; 3404:5, 10
**counselor** [1] -
3269:23
**count** [5] - 3262:21;
3276:15, 21; 3277:5;
3283:23
**counting** [1] - 3277:6
**Country** [7] - 3101:20;
3313:23; 3315:14;

3318:12; 3330:16, 25
**county** [2] - 3281:21;
3285:12
**couple** [11] - 3106:6;
3172:4; 3191:12;
3223:1; 3232:19;
3244:14; 3346:21;
3363:4; 3384:4; 3403:7;
3406:2
**course** [12] - 3123:21;
3190:7; 3193:13;
3228:16; 3248:5, 24;
3255:4, 6; 3274:21;
3291:10; 3342:6;
3405:17
**court** [30] - 3103:19;
3104:8; 3106:4; 3107:8;
3108:25; 3109:16;
3110:11, 22; 3126:1;
3142:3; 3156:1; 3167:9;
3170:18; 3175:17;
3179:1; 3214:1; 3227:1;
3235:1; 3259:1; 3295:1;
3303:15; 3306:10;
3373:1; 3402:1;
3403:22; 3406:22;
3407:11, 15; 3408:5
**Court** [3] - 3101:22;
3333:13; 3336:4
**COURT** [345] - 3101:1,
10; 3102:2, 12, 21, 24;
3103:5; 3105:9, 12, 15;
3106:25; 3107:16, 25;
3108:4, 8, 12; 3109:5,
9, 14, 17; 3110:3;
3111:4, 10, 14, 21, 24;
3112:2, 6, 18, 21;
3113:9, 15, 22; 3116:2;
3120:24; 3121:3, 10;
3122:2, 18, 24;
3123:10; 3124:13, 23;
3125:8, 11, 13;
3129:10; 3130:9, 18;
3131:24; 3132:5, 23;
3133:3, 13; 3134:8, 16;
3136:17; 3138:3;
3139:4, 10; 3140:4;
3142:9; 3143:4, 24;
3145:1; 3146:7; 3147:2,
10; 3152:22; 3153:11,
13; 3154:2, 14, 18;
3155:8, 13; 3156:2;
3157:7; 3161:6;
3163:13; 3164:15, 18;
3165:10; 3167:12;
3168:11; 3169:14;

3170:24; 3171:8;
3175:20; 3176:9;
3177:2, 6, 9, 13, 18,
20, 23, 25; 3179:3, 7,
9; 3182:20; 3187:12,
18; 3188:4, 20, 24;
3189:15, 24; 3190:3, 8,
13, 17; 3191:3, 19, 23;
3192:7, 14; 3196:11,
16; 3198:24; 3199:4;
3200:24; 3203:24;
3210:18, 20; 3211:1, 7,
20, 24; 3212:11;
3213:8; 3214:11;
3216:23; 3219:14;
3222:9, 13; 3223:7, 22;
3224:2, 21; 3225:23;
3227:2; 3228:13;
3230:13, 17, 19;
3231:10; 3232:9, 20,
23; 3233:17, 24;
3234:6, 11, 13;
3235:10; 3237:4, 8, 23;
3238:6, 8; 3242:23;
3243:3, 8, 12, 21;
3244:8, 21; 3245:25;
3246:3, 10, 12, 14;
3249:15, 19, 23, 25;
3250:4, 15, 17, 24;
3251:3, 6, 12, 16;
3252:18, 22; 3253:19;
3254:21; 3255:13, 18;
3256:7, 9, 13, 16, 21;
3257:24; 3258:3;
3259:4, 19; 3260:9, 14;
3263:20; 3280:16;
3281:10; 3290:19;
3292:22, 24; 3293:2,
10, 21, 23; 3294:9;
3295:3, 24; 3296:5;
3298:12; 3299:3;
3300:12; 3301:12, 14;
3303:24; 3306:13;
3307:10; 3308:9, 14;
3309:10, 16, 18, 20;
3310:1, 6, 10; 3311:2,
5; 3312:25; 3316:9;
3317:3; 3323:9; 3325:4;
3328:23; 3332:4, 7, 10,
13, 15, 20, 25;
3333:10, 22; 3336:7;
3337:2, 5, 16, 18, 22,
24; 3340:19; 3341:19;
3342:14; 3344:18;
3347:15; 3351:4, 23;
3352:13; 3353:5, 8, 11;
3358:12; 3360:18;

3365:23; 3366:2; 3367:19, 23; 3368:5; 3370:13, 19, 21; 3371:18, 24; 3372:5, 7; 3373:2; 3374:15; 3375:19, 23; 3376:4, 7; 3378:6, 17; 3379:3, 5; 3383:7; 3386:1, 9, 14, 21; 3387:9, 13, 15; 3388:4, 16; 3389:16, 19; 3390:5, 12, 18; 3391:6, 9, 11, 3397:25; 3398:2; 3399:12, 21; 3400:9, 25; 3401:3, 7, 14, 17; 3402:2, 6, 10, 12, 14, 16, 22; 3403:1, 9, 16, 24; 3404:2, 7, 12, 15; 3405:25; 3406:13, 15; 3407:6, 11, 17, 22; 3408:18, 20

**Court's** [1] - 3211:5
**Courthouse** [1] - 3101:5
**courtroom** [11] - 3113:21; 3149:9; 3151:25; 3251:11; 3267:18; 3299:23; 3312:19; 3402:5; 3404:13; 3405:10, 23
**cover** [1] - 3355:4
**covers** [1] - 3267:13
**CR-04-911** [1] - 3101:4
**created** [1] - 3124:20
**creates** [1] - 3392:19
**crime** [13] - 3122:21; 3124:18; 3126:8, 12, 17, 22; 3127:1; 3135:18; 3140:11; 3166:2; 3192:3, 11; 3224:5
**crimes** [1] - 3163:10
**criminal** [3] - 3105:23; 3166:1; 3233:9
**Cross** [4] - 3145:1; 3182:20; 3308:14; 3351:23
**CROSS** [30] - 3120:6; 3133:14; 3145:2; 3161:7; 3182:22; 3207:20; 3219:16; 3240:4; 3264:17; 3290:20; 3308:17; 3318:22; 3352:1; 3391:16; 3409:9, 11, 19, 21;

3410:7, 11, 18, 25; 3411:2, 8, 10, 22; 3412:4, 15, 23
**cross** [5] - 3163:23; 3231:18; 3337:18; 3342:20; 3384:23
**Cross-examination** [4] - 3145:1; 3182:20; 3308:14; 3351:23
**cross-examination** [2] - 3163:23; 3337:18
**CROSS-EXAMINATION** [30] - 3120:6; 3133:14; 3145:2; 3161:7; 3182:22; 3207:20; 3219:16; 3240:4; 3244:16; 3264:17; 3290:20; 3308:17; 3318:22; 3352:1; 3391:16; 3409:9, 11, 19, 21; 3410:7, 11, 18, 25; 3411:2, 8, 10, 22; 3412:4, 15, 23
**crowded** [1] - 3195:9
**CRR** [1] - 3101:22
**cubed** [1] - 3171:15
**curtailed** [1] - 3103:18
**Curtis** [9] - 3164:20; 3165:7; 3169:19; 3179:17; 3182:24; 3191:5; 3192:2; 3204:1; 3206:22
**CURTIS** [2] - 3165:1; 3410:3
**custody** [10] - 3288:13; 3289:19, 25; 3296:9, 14, 22; 3297:6, 18; 3298:2; 3301:2
**customer** [6] - 3150:17, 19, 22; 3163:25; 3164:2; 3211:9
**Customer** [1] - 3211:11
**customers** [1] - 3150:16
**cut** [3] - 3104:3; 3168:21; 3364:7
**Cutolo** [100] - 3106:16; 3108:11, 19; 3109:1, 23; 3110:1; 3116:24; 3132:21; 3133:1; 3219:4, 7; 3225:13; 3238:10; 3245:11, 19; 3248:2; 3339:9, 16; 3340:9, 14, 24; 3341:8;

3342:23; 3343:6, 17; 3344:21; 3345:12; 3346:1, 7, 15, 24; 3347:3; 3348:5, 25; 3349:13, 18; 3350:1, 3, 8; 3351:8; 3352:5, 10, 15; 3354:18, 20, 22; 3355:18; 3356:9; 3357:11, 14, 22; 3358:4; 3359:19; 3360:20, 24; 3361:6, 17; 3362:2, 6, 10, 14, 16, 24; 3363:4, 13; 3364:4, 11; 3367:11; 3368:10, 13, 21; 3369:1, 15; 3370:5, 10; 3371:7, 15; 3373:8, 15, 18; 3374:10, 21; 3375:12; 3377:17; 3378:3, 20; 3379:10; 3381:10, 15, 18; 3382:17; 3383:4; 3385:3; 3386:5, 16, 23; 3387:3; 3407:14
**Cutolo's** [15] - 3115:9; 3128:15; 3244:19; 3343:22; 3349:8, 11, 22; 3361:4; 3364:19; 3366:10; 3368:2; 3370:3; 3378:3; 3380:9

## D

**D'Ambrosio** [1] - 3172:21
**D'Amico** [1] - 3117:1
**D'Onofrio** [1] - 3117:3
**D-I-N-N-A-N** [1] - 3302:5
**Dakota** [3] - 3303:12; 3304:2; 3305:22
**Danny** [1] - 3117:17
**dark** [4] - 3179:25; 3318:2; 3356:6, 9
**data** [7] - 3389:12, 14; 3392:19; 3393:20; 3397:5, 16
**date** [40] - 3108:22; 3139:6; 3144:1; 3146:24; 3147:5, 8, 15; 3155:7; 3168:13; 3179:5; 3192:17; 3250:10; 3259:7, 23; 3280:18; 3281:12, 24; 3285:24; 3286:12;

3287:25; 3288:17, 20; 3296:12, 20, 24; 3307:12; 3341:24; 3346:7; 3349:20; 3351:8; 3352:16, 25; 3353:16; 3358:23; 3361:5; 3363:6; 3364:4; 3370:11; 3391:13
**dates** [2] - 3285:21; 3371:16
**daughter** [5] - 3115:10; 3128:16; 3195:22; 3270:18; 3359:20
**David** [1] - 3144:18
**DAWN** [3] - 3214:17, 25; 3410:13
**Dawn** [8] - 3103:4; 3191:5; 3210:4; 3211:10, 14; 3214:10, 25
**days** [6] - 3202:3; 3235:20; 3245:1; 3292:3; 3349:2; 3379:19
**dealer** [4] - 3329:6, 9, 13, 15
**DEBORAH** [1] - 3101:13
**deceased** [1] - 3122:10
**December** [26] - 3101:7; 3102:9; 3109:13; 3169:20; 3170:17; 3171:11; 3173:22; 3198:1, 17; 3200:21; 3208:3; 3220:16, 21; 3272:4; 3284:3, 7; 3285:18; 3287:14; 3288:3, 6, 9; 3296:25; 3310:16; 3405:3; 3408:24
**decide** [3] - 3184:2; 3201:8; 3405:1
**decided** [18] - 3146:13; 3157:21; 3158:8, 12; 3159:18, 23; 3173:14; 3184:6; 3197:9, 16; 3198:7, 16; 3201:5; 3331:9, 11, 20; 3362:5; 3367:21
**decision** [6] - 3197:19; 3315:24; 3328:1; 3331:23; 3367:15
**decisions** [2] - 3107:12
**deducted** [1] - 3272:2

**Defendant** [4] - 3279:25; 3342:13; 3353:3; 3356:22

**defendant** [12] - 3108:4; 3136:16; 3142:8; 3170:23; 3171:7; 3247:17, 21; 3248:10; 3249:4; 3312:23; 3313:1

**defendant's** [2] - 3303:18; 3342:6

**Defendant's** [1] - 3242:8

**Defendants** [2] - 3101:7, 16

**defendants** [5] - 3106:25; 3107:10; 3333:10; 3404:23; 3407:20

**defendants'** [1] - 3404:25

**defense** [19] - 3105:6, 17; 3191:11; 3248:3; 3249:7; 3333:14; 3399:5, 9; 3400:12; 3402:15; 3403:11; 3404:5, 10, 23-25; 3406:7; 3407:4; 3408:15

**Defense** [10] - 3278:7; 3280:14, 17, 20; 3281:8, 11, 14; 3283:13; 3413:22

**defenses** [1] - 3248:3

**definite** [1] - 3108:12

**definitely** [3] - 3107:16; 3155:1; 3184:25

**definitive** [3] - 3104:14; 3105:2, 7

**Deft** [2] - 3101:18, 21

**Del** [2] - 3206:7; 3209:19

**Del'Rio** [4] - 3174:17, 20, 24; 3180:16

**delay** [1] - 3105:24

**deleted** [1] - 3390:9

**delineate** [1] - 3395:20

**delineates** [1] - 3400:15

**DeMartino** [9] - 3280:12; 3283:16; 3285:22; 3286:5, 12, 24; 3287:15, 18;

**DeMartino's** [1] - 3285:24

**depart** [10] - 3142:2, 11; 3202:24; 3323:23; 3340:3; 3346:2; 3348:14; 3349:18; 3350:16; 3381:2

**departed** [14] - 3141:3; 3142:18; 3172:6, 14; 3201:23; 3304:12; 3305:25; 3313:17; 3322:4; 3339:21; 3346:12; 3348:12; 3350:2, 15

**departing** [2] - 3162:18; 3369:8

**depict** [4] - 3138:16; 3143:14; 3316:18; 3343:9

**depicted** [2] - 3227:21; 3356:25

**depiction** [3] - 3167:24; 3176:4; 3306:25

**depictions** [1] - 3336:22

**depth** [1] - 3267:16

**deputies** [1] - 3407:23

**DeRoss** [52] - 3101:21; 3104:22; 3113:6; 3119:21; 3133:19, 22; 3134:2; 3141:18; 3142:1, 3, 8, 11; 3144:10, 14; 3161:13, 24; 3162:4, 8, 11, 22; 3163:3, 20; 3164:9; 3170:15; 3171:2, 7, 21; 3172:9; 3175:10; 3182:8, 11; 3208:1, 11, 15, 18, 21; 3209:1, 3; 3245:15; 3263:24; 3264:3, 7; 3296:7; 3300:16; 3303:12, 14; 3307:21; 3308:4, 25; 3380:24; 3381:1

**DEROSS** [1] - 3101:6

**DeRoss's** [5] - 3264:6, 10; 3293:5; 3297:21; 3305:6

**describe** [12] - 3137:9; 3144:9; 3218:21; 3236:20; 3239:4; 3252:7, 14; 3261:21; 3262:16;

3339:12, 15; 3342:18

**Describe** [2] - 3260:7; 3348:1

**described** [3] - 3318:4; 3342:19, 24

**description** [2] - 3350:7, 17

**design** [1] - 3367:5

**designated** [1] - 3289:16

**designation** [3] - 3262:3, 8; 3354:6

**desk** [1] - 3303:18

**DeStefano** [1] - 3220:12

**destroyed** [1] - 3274:20

**detail** [2] - 3234:13; 3263:1

**Detention** [4] - 3252:6; 3254:9, 15; 3261:22

**determination** [1] - 3124:6

**determine** [14] - 3190:3; 3274:7; 3275:8, 14; 3278:14; 3281:15; 3283:14; 3286:11, 15; 3287:10; 3383:2; 3392:16; 3393:9, 24

**determined** [2] - 3110:7; 3392:11

**determining** [1] - 3394:3

**DeVecchio** [3] - 3110:9, 11, 21

**DeVecchio's** [1] - 3111:15

**device** [5] - 3389:11; 3392:10; 3393:6

**devices** [1] - 3388:13

**dial** [3] - 3239:6; 3243:9, 25

**dialed** [11] - 3240:19; 3241:11, 15; 3242:1, 5, 15-16, 19; 3243:5; 3244:2

**dialing** [2] - 3242:13; 3272:12

**dials** [1] - 3239:15

**different** [8] - 3130:19; 3250:3; 3274:1; 3354:2; 3397:7; 3399:10, 25; 3403:6

**differentiated** [1] - 3396:22

**differentiation** [3] - 3395:15; 3399:8, 12

**difficult** [2] - 3104:9; 3253:11

**digital** [1] - 3393:5

**Diker** [1] - 3135:24

**DiLeo** [9] - 3156:14, 24; 3157:10; 3246:23; 3247:3, 9, 17, 20; 3250:23

**DiLeonardo** [2] - 3128:25; 3131:5

**Diner** [13] - 3174:17, 20, 24; 3180:16; 3206:8; 3209:19; 3303:12; 3304:2; 3305:22; 3335:10; 3336:17; 3337:10

**diner** [20] - 3175:1, 3-4, 6-7, 11; 3180:9, 19; 3181:14, 18; 3182:2; 3210:14; 3304:5, 7, 11, 21, 25; 3305:2, 20

**Dinnan** [3] - 3301:17; 3302:4; 3307:14

**DINNAN** [2] - 3301:23; 3411:19

**dinner** [1] - 3194:10

**dinnertime** [1] - 3344:23

**Dino** [5] - 3170:14; 3171:16, 19; 3201:18; 3202:10

**Dionisio** [42] - 3175:3, 9; 3180:14, 20; 3181:16; 3182:6, 10; 3209:21; 3216:1, 4, 8, 10, 13, 20; 3217:5, 12; 3218:4; 3220:19; 3222:16; 3224:4, 10; 3225:14; 3227:5, 12, 24; 3228:17; 3230:11, 15; 3231:4, 16, 19, 21; 3232:14, 17; 3233:8; 3235:4, 13; 3236:18, 21; 3348:10

**Dionisio's** [2] - 3210:1; 3229:19

**dire** [1] - 3389:18

**DIRE** [2] - 3389:20; 3412:21

**DIRECT** [22] - 3114:14; 3135:8; 3165:11; 3215:3; 3238:1; 3252:1; 3302:6; 3310:11; 3334:12; 3338:15; 3388:5; 3409:7, 17; 3410:4, 15, 23; 3411:6, 20; 3412:1, 8, 11, 19

**direct** [19] - 3115:3; 3123:25; 3129:16; 3135:15; 3136:5; 3140:8; 3190:1; 3231:17; 3260:23; 3261:19; 3293:18; 3296:17; 3310:21, 25; 3338:25; 3344:25; 3369:23; 3378:8; 3380:18

**Directing** [11] - 3119:7; 3141:15; 3166:5; 3173:6; 3203:9; 3218:10; 3300:15; 3302:20; 3303:9; 3335:4; 3339:4

**directing** [6] - 3119:17; 3135:19; 3140:15; 3169:19; 3297:20; 3305:16

**direction** [6] - 3136:9, 20; 3195:3; 3304:6; 3357:19; 3369:17

**Directly** [1] - 3199:13

**directly** [7] - 3144:20; 3171:23; 3185:18; 3199:16; 3200:2; 3240:16; 3295:12

**disclosed** [1] - 3102:25

**discontinue** [2] - 3197:9; 3315:23

**discontinued** [2] - 3315:22; 3341:7

**discuss** [5] - 3107:5; 3235:24; 3236:2; 3405:9; 3407:8

**discussed** [4] - 3146:16; 3197:21; 3258:1; 3318:11

**discussing** [2] - 3180:21; 3405:14

**discussion** [7] - 3109:21; 3147:13; 3197:12; 3202:21;

**display** [2] - 3256:25; 3395:22

**distinguish** [1] - 3397:14

**distinguished** [1] - 3401:14

**DISTRICT** [3] - 3101:1, 10

**District** [5] - 3110:12; 3114:13; 3120:19; 3121:6; 3122:14

**disturbance** [2] - 3268:6; 3276:12

**divided** [1] - 3354:10

**division** [1] - 3310:23

**DMV** [1] - 3118:13

**document** [19] - 3116:5; 3159:14; 3212:1, 8; 3257:3; 3260:17; 3261:13; 3262:6, 12; 3278:23; 3284:15, 17, 21; 3285:20; 3287:10; 3353:13; 3397:20; 3399:10

**Documents** [1] - 3281:5

**documents** [8] - 3258:1; 3259:2; 3278:8, 13; 3280:1; 3281:2; 3283:15; 3408:1

**Dom** [3] - 3228:11, 25; 3229:2

**Dominick** [24] - 3175:3, 9; 3180:14, 20; 3181:16; 3182:6, 10; 3216:1, 4, 8, 10, 12, 20; 3217:4, 11; 3218:4; 3220:19; 3222:15, 17; 3224:4; 3225:14; 3231:4; 3348:10

**Dominick's** [2] - 3228:3

**dominoes** [1] - 3263:16

**done** [12] - 3103:1; 3134:17; 3152:6; 3178:1; 3212:3; 3245:21; 3294:1, 5; 3315:25; 3325:19; 3332:15; 3372:5

**door** [3] - 3179:22; 3186:1, 11

**doors** [5] - 3186:1, 13;

**doubt** [1] - 3249:14

**down** [40] - 3105:21; 3131:21; 3152:9, 12; 3164:16; 3171:12; 3173:10; 3177:11; 3180:24; 3181:11; 3185:13; 3201:20; 3202:1; 3205:3; 3210:21, 23; 3237:5, 7; 3245:25; 3246:2; 3252:19, 22; 3276:14; 3301:14; 3309:20; 3311:3; 3313:7; 3325:23; 3326:9, 21; 3327:5; 3332:8; 3337:23; 3342:11, 15; 3382:23, 25; 3387:13; 3406:1

**download** [1] - 3391:20

**downloaded** [4] - 3389:12, 14; 3390:4; 3396:18

**downtown** [4] - 3220:23; 3221:10, 22

**draw** [2] - 3200:6; 3349:2

**drawing** [2] - 3173:2; 3351:6

**drawn** [3] - 3194:15; 3195:1, 7

**Drive** [1] - 3105:14

**drive** [7] - 3199:25; 3203:14, 18; 3205:12; 3343:19; 3374:22

**driven** [7] - 3142:18; 3209:21; 3303:12; 3369:14; 3370:5; 3375:12; 3381:10

**driver** [1] - 3182:10

**driver's** [3] - 3144:17; 3172:3; 3180:2

**driving** [14] - 3142:2; 3160:8; 3173:10; 3177:11; 3180:24; 3182:5; 3203:16; 3205:9; 3339:17; 3343:14; 3360:21, 24; 3381:20; 3383:22

**drove** [5] - 3172:10; 3174:16; 3203:17; 3313:23; 3343:21

**drug** [1] - 3291:8

**Due** [2] - 3106:8; 3266:3

**due** [2] - 3160:12; 3248:19

**duly** [11] - 3114:6; 3134:25; 3165:2; 3214:19; 3237:16; 3251:19; 3301:24; 3310:4; 3334:3; 3338:7; 3387:21

**duration** [1] - 3211:18

**During** [8] - 3151:3; 3216:12; 3217:11; 3227:12, 24; 3238:20; 3264:1; 3325:25

**during** [38] - 3110:13, 17; 3112:11, 15; 3122:13; 3129:16; 3131:2, 14; 3161:13; 3163:2; 3193:13; 3196:24; 3197:17; 3200:19; 3204:18; 3217:19; 3218:11; 3224:11; 3225:15; 3228:16; 3230:8; 3240:7; 3256:19; 3261:8; 3262:24; 3264:3, 7; 3272:9; 3273:19; 3275:9; 3277:21; 3279:7; 3291:10, 12; 3309:8; 3342:6; 3348:11; 3379:19

**duty** [2] - 3299:18, 25

**DVD** [1] - 3176:2

### E

**e-mail** [4] - 3397:7; 3403:22; 3407:9, 11

**e-mailed** [2] - 3403:22; 3404:5

**E78** [1] - 3380:20

**early** [4] - 3103:23; 3260:25; 3273:14; 3319:23

**easier** [1] - 3283:18

**East** [6] - 3101:17; 3105:14; 3339:19; 3355:14; 3357:17; 3358:5

**Eastern** [1] - 3110:12

**EASTERN** [1] - 3101:1

**eat** [3] - 3262:20; 3263:13; 3267:23

**effect** [1] - 3268:7

**eight** [3] - 3263:9;

3264:13; 3357:6

**Eight** [1] - 3264:14

**Eileen** [3] - 3332:14; 3333:25; 3334:9

**EILEEN** [3] - 3334:1, 9; 3412:6

**either** [10] - 3102:9; 3150:25; 3173:1; 3184:8; 3235:12; 3240:24; 3245:20; 3275:17; 3292:12; 3333:2

**electrical** [2] - 3239:8; 3241:20

**electronic** [9] - 3291:19; 3292:11; 3295:6; 3388:13, 24; 3390:21; 3393:5; 3395:22; 3397:3

**electronically** [5] - 3254:10; 3260:1; 3261:5; 3290:25; 3293:20

**elicit** [2] - 3110:14; 3231:20

**elicited** [1] - 3231:17

**eliciting** [2] - 3189:13; 3225:5

**ELMO** [1] - 3139:8

**elsewhere** [7] - 3322:16; 3323:24; 3364:10, 16, 18; 3365:16; 3367:16

**embedded** [3] - 3392:18, 22; 3393:1

**employed** [1] - 3165:15

**employee** [3] - 3150:18; 3163:25; 3164:3

**en** [2] - 3366:7; 3367:6

**enable** [1] - 3275:8

**enclosure** [1] - 3395:14

**end** [14] - 3104:25; 3135:14; 3166:14; 3170:5; 3235:21; 3294:3; 3303:6; 3319:18; 3333:2, 7, 19; 3335:18; 3359:4; 3401:11

**ended** [4] - 3159:19; 3183:18, 22; 3194:1

**ending** [1] - 3211:12

**enforcement** [6] -

3188:8; 3220:17; 3266:7; 3292:15; 3294:2; 3295:16

**engage** [1] - 3150:24

**engaged** [3] - 3137:15; 3175:4; 3235:5

**engaging** [1] - 3235:12

**Enrico** [4] - 3225:18; 3227:25; 3228:2; 3229:6

**enter** [11] - 3124:23; 3136:24; 3141:19; 3164:9, 11; 3321:11; 3322:21; 3323:18; 3351:8, 10; 3397:2

**entered** [18] - 3137:5, 7; 3141:3; 3162:3, 14-15; 3175:1; 3312:8; 3313:17; 3315:7, 16; 3321:19; 3322:13; 3324:25; 3375:11; 3386:5; 3392:14; 3394:11

**entering** [14] - 3113:19; 3144:14; 3162:17; 3170:11; 3180:9; 3191:21; 3251:9; 3318:18; 3323:6; 3333:20; 3374:21; 3393:21; 3397:5

**enterprise** [3] - 3333:5, 9, 14

**enters** [3] - 3113:21; 3251:11; 3404:13

**entire** [5] - 3152:4; 3199:8; 3257:3; 3283:5; 3299:19

**entirely** [1] - 3250:2

**entirety** [2] - 3194:3; 3361:10

**entrance** [2] - 3137:12; 3202:1

**entries** [30] - 3211:6; 3212:2, 4; 3300:21; 3377:10; 3390:7; 3394:4, 6, 8-9, 12, 14-15, 22; 3395:2, 15-16, 23, 25; 3396:3, 22; 3397:21; 3399:15; 3400:19, 22

**entry** [17] - 3211:16; 3214:3; 3297:21; 3324:24; 3380:19; 3394:8; 3396:8, 23-25; 3397:1, 4, 9-10, 14

**equipment** [1] - 3240:16

**error** [1] - 3248:12

**ESQ** [4] - 3101:12, 16-17, 19

**essentially** [3] - 3122:13; 3247:3; 3276:22

**establishment** [11] - 3141:6, 9, 20; 3142:1, 17; 3145:11; 3147:18; 3151:17; 3162:17; 3163:21; 3345:16

**establishments** [5] - 3135:24; 3136:1, 3; 3147:20; 3156:9

**et** [2] - 3105:23; 3293:15

**evening** [14] - 3102:20; 3106:2; 3348:2, 7, 11; 3362:11; 3369:24; 3370:8; 3373:19; 3374:2; 3375:7; 3407:17

**evenings** [1] - 3368:10

**event** [3] - 3107:10; 3115:18; 3365:12

**events** [1] - 3320:17

**Eventually** [1] - 3366:15

**eventually** [3] - 3305:24; 3339:21; 3360:1

**evidence** [64] - 3139:4, 6; 3143:24; 3144:1; 3168:11, 13; 3179:3, 5; 3211:4; 3212:8; 3215:21; 3216:25; 3227:8, 19; 3229:4; 3242:7; 3247:7, 24; 3249:12; 3250:22; 3257:18; 3259:3, 7, 20, 23; 3263:23; 3271:9; 3273:13; 3280:16, 18; 3281:10, 12; 3283:9, 13; 3307:10, 12; 3317:3, 5; 3337:5, 7; 3342:10; 3388:21; 3390:25; 3391:13, 19; 3393:11; 3395:5, 12; 3396:21; 3399:25; 3413:5-8, 10, 12, 14-15, 17-18, 20

**exact** [6] - 3157:23; 3162:13; 3216:18; 3340:16; 3347:11;

3382:2

**Exactly** [6] - 3109:10; 3267:1; 3270:14; 3271:19; 3273:11; 3276:18

**exactly** [14] - 3174:8; 3184:9; 3194:1; 3209:7; 3275:14; 3323:12; 3324:2; 3326:14; 3330:14; 3331:25; 3360:3; 3366:6, 19; 3385:19

**examination** [11] - 3123:25; 3145:1; 3163:23; 3182:20; 3231:17; 3293:18; 3308:14; 3337:18; 3351:23; 3378:8; 3391:22

**EXAMINATION** [68] - 3114:3; 3120:6; 3133:14; 3134:9; 3135:8; 3145:2; 3161:7; 3163:16; 3164:7; 3165:11; 3182:22; 3207:20; 3215:3; 3219:16; 3236:15; 3238:1; 3240:4; 3244:16; 3252:1; 3264:17; 3290:20; 3298:14; 3299:5; 3300:13; 3302:6; 3308:17; 3310:11; 3318:22; 3334:12; 3338:15; 3352:1; 3388:5; 3389:20; 3391:16; 3409:7, 9, 11, 13, 17, 19, 21, 23, 25; 3410:4, 7, 11, 15, 18, 20, 23, 25; 3411:2, 6, 8, 10, 12, 14, 16, 20, 22; 3412:1, 4, 8, 11, 15, 19, 21, 23

**examinations** [1] - 3408:17

**examined** [12] - 3114:6; 3134:25; 3165:2; 3214:19; 3237:16; 3251:19; 3301:24; 3310:4; 3334:3; 3338:7; 3387:21; 3389:11

**examiner** [2] - 3388:13; 3393:3

**examines** [1] - 3273:1

**example** [5] - 3104:18;

3195:2; 3204:10; 3321:24

**examples** [1] - 3253:15

**Except** [1] - 3290:4

**except** [1] - 3138:19

**exception** [1] - 3102:18

**excerpt** [1] - 3247:1

**excluded** [1] - 3271:2

**excludes** [1] - 3272:4

**Excuse** [3] - 3127:10; 3284:16; 3398:2

**excuse** [1] - 3286:7

**excused** [3] - 3246:9; 3332:12; 3402:8

**exhibit** [5] - 3210:25; 3216:25; 3217:21; 3250:18; 3397:11

**Exhibit** [58] - 3138:8; 3167:14; 3175:23; 3179:4; 3191:9; 3211:4, 8; 3227:9, 20; 3229:5; 3233:23; 3254:24; 3256:2; 3259:10, 22; 3260:2, 17, 24; 3261:10, 13; 3263:22; 3271:10; 3273:13; 3277:9; 3278:7; 3280:14, 17, 20; 3281:8, 11, 14; 3283:13; 3306:15; 3336:10; 3341:21; 3388:18-20; 3389:3, 13, 15, 23-24; 3390:16; 3391:19; 3393:17; 3394:13; 3395:5; 3396:16, 19, 24; 3397:8; 3413:5, 15, 18, 22

**exhibits** [8] - 3138:19; 3140:5; 3144:3; 3169:15; 3308:10; 3342:6; 3408:14

**Exhibits** [24] - 3139:5; 3143:25; 3168:12; 3224:8; 3255:9; 3259:6; 3307:11; 3316:12; 3317:4; 3336:25; 3337:6, 17; 3342:9; 3344:19; 3391:12; 3413:6-9, 11, 13, 16, 19, 21

**exist** [1] - 3253:17

**exit** [12] - 3142:1; 3169:11; 3170:14; 3175:3, 7; 3321:13; 3322:1; 3349:18; 3351:16; 3360:2, 5

**exited** [20] - 3141:2; 3142:17; 3148:22; 3151:16; 3172:4, 13; 3186:19; 3201:18, 20; 3208:24; 3304:11; 3305:23; 3312:12; 3313:5; 3315:4, 16; 3318:17; 3324:4; 3350:23; 3357:11

**exiting** [17] - 3139:15, 17, 23; 3140:2; 3144:12; 3162:8, 10, 16; 3166:24; 3168:18, 25; 3170:11; 3175:10; 3181:14; 3206:1; 3209:2, 4

**expect** [11] - 3107:7, 21-22; 3111:1; 3112:8; 3123:24; 3124:6, 9; 3206:14; 3408:4, 7

**expected** [2] - 3184:21; 3404:21

**Expedition** [4] - 3339:18; 3343:19, 22; 3350:1

**expenses** [1] - 3108:5

**expensive** [1] - 3106:9

**experience** [2] - 3156:23; 3392:25

**experienced** [1] - 3125:2

**expert** [5] - 3110:10, 12; 3111:2; 3122:12; 3246:18

**expertise** [9] - 3111:11; 3122:20; 3124:1, 17; 3125:9; 3126:7, 17, 21; 3127:1

**Explain** [2] - 3220:24; 3346:11

**explain** [4] - 3221:3; 3222:16; 3322:5; 3353:24

**explanation** [1] - 3213:3

**exploring** [1] - 3231:25

**extensive** [2] - 3266:2

**Extensive** [1] - 3266:5

**extent** [2] - 3225:24; 3231:19

**eye** [1] - 3331:15

---

**F**

**face** [2] - 3124:19; 3310:1

**faces** [1] - 3113:23

**facility** [16] - 3281:18, 20-21, 23; 3282:12, 14; 3283:5; 3284:13; 3285:7, 10-11; 3288:8, 10; 3289:14, 17; 3390:25

**facing** [1] - 3307:20

**fact** [32] - 3151:8; 3154:19; 3156:8; 3196:9; 3231:7; 3233:14, 24; 3234:8; 3248:16; 3256:19; 3274:10; 3283:10; 3294:1; 3325:15; 3328:6; 3352:25; 3357:6; 3358:1; 3359:24; 3363:3, 12; 3365:4; 3366:12; 3367:11; 3368:11; 3369:24; 3378:10, 25; 3380:23; 3389:23

**faction** [1] - 3309:7

**facts** [2] - 3405:17, 19

**Fahmy** [1] - 3102:18

**Failla** [1] - 3117:5

**failure** [1] - 3243:17

**fair** [12] - 3114:20; 3138:23; 3143:18; 3167:24; 3176:4; 3210:13; 3299:23; 3306:25; 3316:22; 3336:22; 3344:21; 3379:21

**fairly** [5] - 3138:16; 3143:14; 3223:10; 3316:18; 3341:25

**Fairton** [2] - 3289:22

**familiar** [3] - 3326:3; 3348:10; 3360:16

**families** [1] - 3124:2

**Family** [1] - 3333:15

**family** [6] - 3133:1; 3166:2; 3188:14; 3270:7; 3278:1; 3279:12

**Fapiano** [1] - 3117:7

**far** [12] - 3136:3;

**extent** [2] - 3225:24; 3231:19

**eye** [1] - 3331:15

3185:1, 3; 3196:7; 3198:21; 3205:4; 3264:10; 3267:15; 3296:14; 3354:20; 3383:18, 22

**Farmingdale** [2] - 3119:14; 3311:15

**fashion** [1] - 3106:14

**fast** [1] - 3207:2

**father** [1] - 3270:8

**father's** [2] - 3382:18; 3383:21

**Favo** [4] - 3120:16, 20; 3124:8

**fax** [1] - 3394:24

**Fax** [1] - 3101:23

**faxed** [3] - 3395:9; 3396:19; 3397:18

**FBI** [24] - 3120:20; 3124:9; 3135:12; 3145:21; 3154:24; 3156:23; 3165:19; 3166:17; 3183:15; 3220:7, 17; 3221:11, 22; 3302:11, 14; 3310:13, 19, 22; 3334:16, 19; 3338:19, 23

**FC** [1] - 3353:10

**FC-12** [1] - 3363:10

**FC-13** [2] - 3363:10; 3368:17

**FC-14** [1] - 3353:10

**FC-7** [1] - 3363:23

**FCI** [3] - 3282:18; 3289:22; 3297:13

**February** [6] - 3284:7; 3285:16; 3298:7; 3300:24; 3301:3, 8

**federal** [8] - 3220:25; 3221:1; 3252:7, 9; 3265:3; 3272:5; 3281:23

**Federal** [3] - 3101:23; 3165:16; 3388:10

**FedEx** [1] - 3390:24

**FedExed** [1] - 3395:11

**feelings** [1] - 3405:11

**fellow** [1] - 3321:4

**felon** [1] - 3270:4

**felt** [2] - 3200:5; 3355:18

**female** [16] - 3150:17, 19; 3340:4, 9, 14, 25;

3341:9; 3342:24; 3343:7, 12, 18; 3344:22; 3350:17; 3357:15; 3382:8

**few** [15] - 3118:22; 3126:12; 3211:6; 3212:10; 3219:2; 3225:14; 3235:20; 3253:15; 3296:3; 3308:15; 3349:2; 3380:17; 3381:25; 3394:6, 17

**field** [3] - 3135:17; 3165:22; 3390:22

**fields** [2] - 3397:5, 7

**Fifth** [3] - 3109:4; 3166:9; 3167:2

**fight** [2] - 3268:6; 3277:4

**file** [6] - 3392:12, 18, 22-23; 3393:1; 3406:24

**fill** [1] - 3274:12

**fills** [1] - 3272:21

**filming** [4] - 3205:16, 20; 3206:8

**final** [2] - 3355:4; 3395:13

**finally** [3] - 3169:8; 3282:19; 3405:1

**fine** [6] - 3256:23; 3293:12; 3294:4; 3372:4; 3385:21; 3400:14

**Fine** [1] - 3258:6

**finger** [1] - 3384:5

**fire** [2] - 3239:9; 3240:21

**first** [38] - 3106:18; 3112:23; 3113:10; 3154:9, 15, 19; 3162:10; 3186:17; 3189:9; 3204:14; 3214:15, 18; 3216:4; 3219:20; 3220:1, 3, 5; 3229:11; 3235:2; 3237:15; 3285:2, 17; 3288:7, 20; 3296:21; 3304:25; 3320:12; 3321:9, 13; 3334:2; 3338:6; 3340:14, 24; 3343:17; 3399:4, 6, 18

**First** [1] - 3343:10

**five** [17] - 3124:1; 3137:4, 7; 3177:24;

3315:13; 3319:15; 3327:21; 3355:3, 8, 10-11; 3379:19; 3394:12; 3401:10, 17; 3402:2

**Five** [2] - 3101:17; 3402:23

**five-minute** [2] - 3401:10; 3402:2

**floor** [1] - 3262:4

**floors** [1] - 3262:9

**Florida** [3] - 3206:19; 3339:18; 3361:4

**Floridia** [8] - 3227:15, 17; 3257:6; 3261:15, 22; 3264:1, 8; 3293:6

**Floridia's** [2] - 3262:13; 3264:11

**focused** [2] - 3322:16, 18

**folks** [4] - 3250:7, 24; 3405:21; 3407:18

**Folks** [1] - 3398:2

**follow** [25] - 3142:12, 19; 3160:10, 15, 19, 22; 3169:10; 3172:7; 3173:14; 3182:17; 3189:14; 3190:2; 3194:11; 3205:15; 3210:11; 3305:9; 3311:24; 3313:18; 3315:11; 3320:4; 3323:24; 3327:9; 3328:4; 3346:1; 3355:19

**follow-up** [3] - 3169:10; 3189:14; 3190:2

**followed** [19] - 3141:7; 3148:2; 3170:14; 3174:2, 14; 3180:8, 10; 3305:1; 3313:21; 3322:7; 3323:13; 3327:19; 3328:16; 3381:9, 25; 3382:3; 3383:3, 13, 20

**following** [13] - 3160:9; 3189:2; 3211:23; 3214:1; 3225:1; 3227:1; 3231:1; 3235:1; 3246:12; 3315:10; 3326:7; 3371:1; 3373:1

**follows** [11] - 3114:7; 3135:1; 3165:3;

3214:20; 3237:17; 3251:20; 3301:25; 3310:5; 3334:4; 3338:8; 3387:22

**foot** [6] - 3115:16; 3185:13; 3194:16; 3311:22; 3315:3

**Force** [1] - 3334:24

**Ford** [4] - 3339:17; 3343:19, 22; 3350:1

**Forensic** [1] - 3388:13

**forgot** [1] - 3157:5

**form** [11] - 3269:25; 3270:1; 3272:14; 3274:1, 12, 21; 3275:4; 3277:8, 10; 3328:22; 3379:4

**former** [2] - 3109:21; 3110:9

**forms** [1] - 3274:15

**forth** [1] - 3397:7

**forward** [2] - 3319:16; 3405:1

**forwarded** [1] - 3404:6

**foundation** [1] - 3386:8

**Four** [1] - 3300:2

**four** [19] - 3119:4; 3136:4; 3169:6, 10; 3194:3, 22; 3202:1; 3226:1; 3263:10; 3267:8; 3300:3; 3305:18, 21; 3342:8; 3343:25; 3344:2; 3384:8; 3394:11

**fourth** [2] - 3103:10; 3104:8

**frame** [5] - 3179:20; 3218:10; 3257:18, 20

**framer** [1] - 3245:21

**Frank** [34] - 3117:7, 15; 3119:2; 3140:20, 22, 25; 3142:14, 16, 19; 3144:20; 3157:19; 3158:13; 3159:3, 25; 3162:2; 3173:13, 24; 3174:6, 25; 3175:2, 7; 3180:2, 15, 20; 3181:13; 3219:9, 11; 3230:4; 3278:15; 3304:18; 3309:1; 3374:9, 18

**Frankie** [1] - 3180:8

**frankly** [1] - 3124:11

**free** [3] - 3118:23; 3123:3; 3337:22

**frequent** [1] - 3347:6

**frequently** [3] - 3355:17, 20; 3362:1

**Friday** [3] - 3106:2, 18; 3405:2

**friend** [7] - 3130:23; 3156:24; 3228:3; 3270:18; 3278:1

**friendly** [4] - 3216:10, 12; 3232:18; 3233:14

**Friends** [1] - 3222:21

**friends** [11] - 3216:9; 3217:11; 3222:18, 21; 3223:11; 3228:24; 3229:18; 3232:16; 3271:2

**front** [8] - 3175:4; 3182:13; 3201:24; 3285:21; 3286:2; 3287:7, 24; 3368:16

**full** [3] - 3103:22; 3267:10; 3283:23

**full-time** [1] - 3283:23

**function** [1] - 3116:18

**furlough** [5] - 3288:24; 3289:2; 3290:4, 6

**future** [1] - 3145:23

### G

**G-R-A-H-A-M** [1] - 3310:9

**G-U-N-T-O-N** [1] - 3340:1

**Gambale** [1] - 3117:9

**gamble** [1] - 3263:17

**games** [1] - 3263:15

**gap** [1] - 3301:1

**garage** [7] - 3364:23; 3365:5; 3366:3, 5, 11, 20; 3375:13

**Gardens** [3] - 3187:8, 10, 15

**Gary** [8] - 3113:10; 3220:9; 3352:18; 3359:17; 3380:2; 3390:22; 3394:25; 3403:24

**general** [2] - 3118:9; 3324:15

**Generally** [3] - 3218:14; 3348:3; 3355:22

**generally** [5] - 3200:17; 3204:7; 3207:10; 3300:5; 3355:21

**generated** [1] - 3255:6

**gentleman** [5] - 3318:1, 7, 15

**gentlemen** [9] - 3246:3; 3304:10, 13-14, 20, 24; 3305:5; 3315:7; 3404:17

**gift** [4] - 3208:4, 11; 3209:15

**Gioeli** [54] - 3119:10, 15; 3170:13; 3171:17; 3201:18; 3202:9; 3208:6, 24; 3304:18; 3307:24; 3308:2; 3311:11, 17; 3312:12; 3313:5, 15-16; 3317:16, 21; 3319:5, 14; 3320:5, 12; 3321:4, 7, 11, 13, 19, 24; 3322:13; 3323:6, 13, 16; 3324:4, 8, 11, 20, 25; 3325:20; 3326:8, 21; 3327:5, 7, 9, 13, 24; 3328:4, 7, 10; 3330:1, 5

**Gioeli's** [5] - 3311:15; 3322:7, 17-18; 3324:5

**Giovanni** [10] - 3227:17; 3257:6; 3261:15, 21; 3264:1, 8, 11; 3280:12; 3283:16; 3293:6

**Giovanni's** [1] - 3262:12

**girlfriend** [10] - 3210:1; 3340:8; 3343:1; 3358:15, 18; 3359:19; 3361:18; 3362:3, 6; 3378:13

**given** [13] - 3108:22; 3110:21; 3218:7; 3250:9; 3269:12; 3271:23; 3300:1; 3319:13; 3320:9, 23; 3353:19; 3389:3

**glass** [4] - 3186:1, 11, 13

**glasses** [1] - 3171:5

**Gold** [1] - 3109:22

**Goldberg** [3] - 3102:5; 3212:2; 3320:23

**GOLDBERG** [119] - 3101:14; 3103:2; 3113:2, 11; 3114:1, 15; 3116:1, 3; 3120:5, 23; 3121:2, 9; 3122:3; 3123:16, 22; 3124:24; 3129:9; 3130:8, 16; 3131:23; 3132:4, 22; 3133:2; 3134:7, 10, 18; 3135:9; 3136:15, 18; 3137:18; 3138:2, 7, 25; 3139:7, 11-12; 3140:3, 7; 3142:7, 10; 3143:3, 5, 20; 3144:5, 25; 3146:6; 3147:1, 6, 9; 3152:21; 3153:9; 3157:6; 3163:12, 15, 17; 3164:5; 3191:4, 16; 3210:24; 3211:5; 3212:7, 12, 25; 3213:6; 3214:2, 13; 3215:4; 3216:22, 24; 3219:13; 3222:8, 12; 3223:5, 21; 3224:1, 19; 3225:2, 20; 3228:12; 3230:12, 16; 3231:2, 22; 3232:11, 25; 3233:5, 12, 19; 3236:13, 16; 3237:2; 3309:22; 3310:12; 3311:4, 6; 3312:23; 3313:1, 3; 3315:1; 3316:8, 10, 24; 3317:6; 3318:19; 3323:8; 3325:3; 3328:22; 3332:6, 23; 3333:1, 12; 3409:8, 14, 18, 24; 3410:16, 21; 3412:2

**Gorga** [1] - 3179:22

**Gotti** [7] - 3117:11, 13; 3128:15, 19, 21; 3129:13

**government** [49] - 3102:7; 3103:18; 3104:12; 3106:12; 3107:1, 4, 14, 24; 3108:10, 18; 3109:12; 3110:10; 3113:25; 3114:1; 3124:9; 3134:18; 3164:19; 3191:7; 3212:1; 3214:10; 3219:21; 3225:12; 3231:12, 17; 3232:5; 3237:9;

3246:21, 25; 3247:9; 3251:14; 3256:3; 3301:16; 3309:22; 3333:8, 18, 24; 3337:25; 3349:24; 3371:12; 3403:10; 3404:21; 3406:3, 5-6, 8; 3408:4, 10

**Government** [43] - 3101:12; 3138:8; 3139:5; 3143:25; 3167:14; 3168:12; 3175:23; 3179:4; 3210:25; 3254:24; 3256:2; 3259:6, 10, 22; 3260:2, 17, 24; 3261:10; 3263:22; 3273:13; 3277:9; 3306:15; 3307:11; 3388:18-20; 3389:13, 23-24; 3390:16; 3391:12, 19; 3394:13; 3395:5; 3396:24; 3413:9, 11, 13, 15-16, 18-19, 21

**government's** [10] - 3104:15; 3105:1; 3107:6; 3112:23; 3237:8; 3247:11; 3251:13; 3309:21; 3333:23; 3337:24

**Government's** [18] - 3191:8; 3211:4; 3227:9, 20; 3229:5; 3233:23; 3316:11; 3317:4; 3336:9, 25; 3337:6; 3341:21; 3342:9; 3413:5

**grabbed** [1] - 3177:12

**Graham** [4] - 3246:13; 3309:23; 3310:8; 3318:24

**GRAHAM** [2] - 3310:3; 3411:25

**grand** [2] - 3222:11; 3406:19

**gray** [2] - 3136:13; 3312:22

**gray-blue** [1] - 3312:22

**grocery** [1] - 3350:19

**grounds** [1] - 3390:3

**group** [1] - 3169:5

**Group** [3] - 3141:10; 3144:21

**guards** [1] - 3267:24

**guess** [3] - 3221:3; 3287:18; 3289:15

**guessing** [1] - 3154:25

**guilty** [2] - 3333:3, 5

**gun** [1] - 3250:6

**Gunton** [13] - 3340:1; 3341:4, 9, 12-13; 3343:18, 23; 3344:13, 22; 3360:21, 25; 3361:19; 3362:7

**guys** [1] - 3257:14

**H**

**H-1** [1] - 3342:13

**habits** [1] - 3218:22

**hair** [6] - 3314:7; 3318:8, 15; 3340:4; 3342:24

**haired** [2] - 3318:1, 3

**Hairmaster's** [1] - 3369:6

**half** [8] - 3103:19; 3141:25; 3154:24; 3162:14; 3163:2; 3165:20; 3166:4; 3252:11

**halfway** [5] - 3286:12, 18, 24; 3288:22; 3289:16

**hall** [1] - 3115:12

**hand** [9] - 3109:15; 3114:3; 3173:20; 3214:23; 3251:17; 3281:18; 3310:1; 3342:17; 3343:3

**hand-held** [1] - 3214:23

**handed** [7] - 3113:12; 3171:16; 3224:8; 3333:16; 3399:3; 3403:5

**handheld** [3] - 3114:9; 3135:3; 3165:5

**handing** [2] - 3208:17; 3407:13

**handwriting** [3] - 3246:18; 3259:15; 3371:4

**handwritten** [1] - 3351:11

**happy** [8] - 3103:17; 3104:11; 3109:15; 3171:19; 3202:19; 3213:6; 3399:9, 24

**hard** [4] - 3114:20;

3238:21; 3240:11; 3242:13
**hardly** [1] - 3197:21
**hardware** [8] - 3340:11; 3351:16; 3359:25; 3360:2, 5-7; 3361:18
**head** [2] - 3229:24; 3330:18
**header** [1] - 3399:18
**headers** [1] - 3395:2
**heading** [3] - 3144:11; 3205:24; 3400:25
**headquarters** [2] - 3198:11; 3221:23
**hear** [4] - 3171:18; 3180:20; 3250:4; 3348:21
**heard** [9] - 3106:18; 3113:7; 3152:4; 3157:9; 3171:19; 3219:3, 6; 3399:10, 25
**hearing** [1] - 3114:21
**hearsay** [9] - 3225:9; 3231:5, 7-8; 3233:12; 3247:13, 15, 19; 3249:4
**heavier** [1] - 3314:7
**height** [1] - 3267:16
**Heights** [1] - 3135:24
**held** [1] - 3214:23
**Hello** [1] - 3388:8
**help** [1] - 3184:13
**helps** [1] - 3384:20
**Henderson** [1] - 3360:13
**Hi** [1] - 3219:19
**hi** [1] - 3222:21
**hiding** [1] - 3149:17
**high** [2] - 3265:7; 3348:14
**high-profile** [1] - 3265:7
**highly** [1] - 3248:6
**Highway** [3] - 3174:21; 3321:25; 3323:19
**hindering** [1] - 3160:22
**history** [9] - 3103:12; 3105:23; 3260:8; 3261:14, 16; 3263:23; 3296:6; 3297:22
**Hold** [1] - 3334:7
**hold** [3] - 3240:22;

3284:10; 3302:2
**hold-up** [1] - 3240:22
**holidays** [3] - 3171:20; 3202:19; 3272:4
**home** [17] - 3217:16; 3221:12, 16, 18; 3222:1; 3238:19; 3239:18, 20; 3240:20; 3241:5, 11, 15; 3242:1, 5; 3243:25; 3320:12; 3379:9
**honest** [1] - 3324:3
**Honor** [131] - 3102:11; 3103:2, 8; 3104:2; 3107:2; 3108:7; 3110:6; 3111:7, 13; 3112:5, 13, 25; 3116:1; 3120:5, 23; 3121:2, 9; 3122:3, 15; 3123:16; 3124:24; 3132:22; 3133:2, 12; 3134:6; 3136:15; 3138:2, 25; 3139:3, 7; 3142:7; 3143:3, 20, 23; 3144:25; 3146:6; 3147:1; 3152:21; 3153:9, 12; 3157:6; 3161:5; 3163:12, 14-15; 3164:6; 3168:10; 3179:2; 3207:18; 3210:24; 3211:3, 19; 3212:7; 3214:9; 3216:22; 3219:13; 3222:8; 3223:21; 3224:19; 3225:2; 3228:12; 3230:12, 16, 18; 3232:3, 22; 3233:22; 3235:2; 3236:12; 3237:2, 22; 3247:14, 23; 3253:18; 3254:20; 3255:11, 17; 3256:3; 3259:3, 18; 3263:19; 3279:20; 3290:18; 3292:23; 3295:2, 23; 3298:11; 3300:10; 3301:11, 13; 3307:9; 3309:15, 17; 3312:24; 3316:8; 3317:2; 3318:20; 3325:3; 3332:5; 3337:19; 3340:18; 3341:18; 3342:4; 3344:17; 3347:14; 3351:3; 3370:18, 20; 3371:2; 3376:3; 3379:4; 3385:17; 3386:13;

3387:10; 3388:3, 15; 3389:17; 3391:7, 10; 3397:24; 3400:3; 3403:14; 3406:2, 16; 3407:7, 19, 24
**HONORABLE** [1] - 3101:9
**hooked** [1] - 3392:21
**Hope** [1] - 3119:24
**hope** [3] - 3103:16; 3250:15; 3332:17
**Hopefully** [1] - 3332:15
**hopes** [1] - 3102:8
**hospital** [1] - 3103:20
**hour** [13] - 3141:25; 3148:12; 3162:2, 14; 3163:2; 3183:25; 3186:22; 3262:24; 3290:8; 3377:7, 15; 3382:16
**hours** [9] - 3105:3; 3132:8; 3158:23; 3245:1; 3290:6; 3291:12; 3292:3; 3346:21
**house** [16] - 3238:12, 14, 22; 3244:19; 3245:4-6; 3286:13, 18, 24; 3288:22; 3289:16; 3324:4; 3378:25; 3379:6
**housed** [12] - 3261:18, 22, 24; 3264:7, 11; 3278:25; 3279:5, 14; 3285:11; 3297:25; 3298:5
**household** [1] - 3240:18
**housing** [17] - 3260:10; 3261:17; 3267:4-6, 9-10, 16, 20; 3276:1, 12; 3277:4, 15; 3278:15, 18, 22; 3292:6
**hundred** [2] - 3128:3; 3272:10
**Hundreds** [2] - 3127:9, 11
**hurry** [1] - 3348:20
**husband** [4] - 3215:13, 17; 3232:13; 3236:17
**Hylan** [3] - 3115:8; 3350:10, 18

---
**I**
---
**Ianacci** [12] - 3117:15;

3173:13, 25; 3174:6, 25; 3175:3, 7; 3180:3, 9, 15, 21; 3181:13
**idea** [14] - 3105:6; 3132:13; 3186:24; 3187:14; 3201:11; 3224:14; 3225:10; 3248:22; 3254:17; 3293:8; 3362:10; 3383:18; 3390:7; 3403:12
**identification** [5] - 3130:12, 15; 3175:23; 3306:16; 3356:23
**identified** [18] - 3128:14; 3130:11; 3144:22; 3168:5; 3170:23; 3171:7; 3182:10; 3193:3, 8; 3207:12; 3209:20; 3277:8; 3329:9, 19; 3342:25; 3375:9; 3390:4; 3406:20
**identify** [22] - 3127:17; 3128:1, 4, 11; 3170:20; 3171:4; 3179:21; 3260:24; 3261:12; 3270:22; 3303:17; 3304:13; 3307:19; 3328:3, 25; 3337:12; 3374:20; 3375:1, 6, 8
**identifying** [3] - 3207:9; 3247:17, 24
**IHOP** [2] - 3305:19; 3308:21
**III** [1] - 3381:1
**illegal** [2] - 3269:9
**images** [1] - 3298:20
**immediate** [1] - 3270:7
**Immediately** [1] - 3208:17
**immediately** [4] - 3152:12; 3202:24; 3359:3; 3405:13
**impression** [1] - 3212:20
**in-transit** [10] - 3281:18, 20-21; 3282:12; 3284:13; 3285:6, 10; 3288:8, 10; 3289:13
**inadmissible** [1] - 3247:14
**inappropriate** [1] -

3213:1
**incarcerated** [16] -
3134:2; 3256:4, 19;
3257:5; 3269:16;
3281:16; 3282:6, 23;
3284:2; 3285:3, 18;
3287:11, 16; 3288:6,
17; 3297:8
**incarceration** [11] -
3256:5, 15, 17;
3257:12; 3282:9, 20;
3283:15; 3285:21, 24;
3287:8; 3288:20
**inches** [1] - 3171:15
**include** [1] - 3404:11
**included** [1] - 3123:11
**includes** [2] - 3270:8;
3397:21
**including** [2] -
3231:23, 25
**incoming** [4] -
3252:25; 3265:15;
3266:22; 3269:5
**independent** [2] -
3230:6; 3405:18
**indicate** [8] -
3262:12; 3281:21;
3298:9; 3301:2;
3303:19, 23; 3328:5;
3361:15
**indicated** [8] -
3125:3; 3297:2;
3300:16; 3322:9;
3323:13; 3325:17;
3343:18; 3395:2
**indicates** [6] -
3300:23; 3321:10;
3324:19, 21; 3325:18;
3333:16
**Indicating** [2] -
3312:23; 3313:1
**indicating** [4] -
3136:15; 3142:7;
3182:14; 3361:8
**indication** [1] -
3288:24
**indictment** [2] -
3333:6, 15
**Indirectly** [1] -
3295:13
**individual** [27] -
3124:17; 3156:14;
3157:18; 3180:14;
3215:23; 3227:5, 10,

13, 25; 3231:7, 9, 13;
3246:23; 3259:13;
3267:6; 3314:6;
3319:24; 3320:4;
3329:20; 3339:5;
3349:17; 3350:6;
3374:17; 3375:2, 6, 8
**individual's** [1] -
3180:15
**individuals** [55] -
3122:21; 3123:19;
3124:3; 3127:3, 5, 18,
25; 3129:8; 3130:5;
3168:20; 3170:11;
3172:16; 3173:24;
3179:21; 3180:24;
3181:10; 3192:4;
3193:3, 23; 3194:12,
22; 3202:18; 3205:15,
25; 3208:15; 3210:7;
3222:4; 3225:9, 11, 14;
3305:18; 3307:19;
3308:19, 21; 3313:10;
3314:5; 3315:2; 3316:1;
3317:25; 3318:4, 14;
3329:22, 25; 3330:4,
10; 3331:1, 6, 17;
3336:16; 3337:9, 12;
3342:21; 3405:10
**industry** [1] - 3239:14
**influence** [1] -
3405:12
**inform** [1] - 3107:14
**informal** [1] - 3222:3
**information** [29] -
3113:12; 3118:19;
3184:4, 15; 3185:17;
3188:15; 3281:17;
3319:13; 3320:19-21;
3321:20; 3324:19, 21;
3380:2; 3381:20;
3386:11; 3389:24;
3391:21; 3392:5, 13;
3393:15; 3394:19;
3396:4, 10, 12, 15, 18;
3399:19
**Information** [1] -
3266:6
**informed** [4] - 3106:1;
3162:15; 3246:21;
3250:12
**infrequent** [4] -
3232:15; 3241:23;
3243:19
**initiate** [2] - 3184:6;

3349:6
**initiated** [1] -
3339:13
**initiation** [1] -
3319:8
**inmate** [39] - 3252:24;
3253:1, 3; 3254:15;
3259:13; 3260:10, 21;
3261:14, 18; 3263:23;
3266:18; 3268:12, 25;
3269:2, 13, 23;
3270:12; 3271:22;
3272:6, 13, 21; 3273:3,
8, 15, 25; 3274:11, 23;
3275:9; 3276:16;
3277:15, 21, 25;
3281:5; 3296:6;
3297:22; 3299:10;
3300:17
**inmate's** [3] -
3252:25; 3260:19;
3275:25
**Inmates** [1] - 3266:22
**inmates** [26] - 3253:11,
16, 24; 3262:16, 20,
23; 3263:1, 6, 11, 13;
3266:1, 12; 3267:12,
14, 23; 3268:1;
3269:11; 3276:13, 15;
3280:11; 3291:21;
3292:18; 3295:7, 19-20;
3298:25
**inquire** [5] - 3165:9;
3219:14; 3237:22;
3310:10; 3388:3
**Inside** [5] - 3267:4-7,
22
**inside** [41] - 3136:22;
3137:10; 3144:16;
3149:4; 3152:6;
3163:20, 24; 3172:11;
3175:6; 3182:2;
3185:16, 21; 3186:3,
14, 18; 3188:6;
3189:20, 25; 3194:4;
3202:13; 3209:13;
3253:21, 24; 3263:7;
3267:8; 3269:9;
3270:10; 3275:1;
3276:12; 3277:4, 6;
3291:9; 3292:6; 3295:9;
3298:19; 3328:14;
3331:4, 7; 3362:3, 8
**install** [2] - 3238:12,
19

**installed** [2] -
3240:7; 3292:8
**installing** [1] -
3238:21
**instance** [1] - 3353:22
**institution** [2] -
3271:22; 3295:9
**institutions** [1] -
3297:11
**instruct** [1] - 3364:18
**instructed** [3] -
3352:17, 19; 3364:15
**instructing** [1] -
3367:2
**intact** [1] - 3241:19
**intend** [7] - 3110:23;
3249:16, 21; 3406:3, 6;
3408:2, 9
**intends** [3] - 3246:21;
3247:2; 3403:10
**intention** [7] -
3102:25; 3146:23;
3147:4, 14; 3203:18;
3204:4; 3206:4
**interdict** [1] - 3291:8
**interdiction** [1] -
3291:8
**interest** [1] - 3328:3
**intermittent** [2] -
3276:23; 3277:1
**internal** [1] - 3295:16
**interrupted** [2] -
3241:20; 3294:7
**interrupting** [1] -
3239:8
**intersection** [5] -
3185:12; 3194:19;
3360:8
**intervening** [1] -
3404:10
**interview** [1] -
3112:11
**intimates** [1] -
3267:11
**introduce** [4] -
3246:22; 3247:2;
3408:2, 9
**introduced** [3] -
3247:6, 24; 3408:11
**introduction** [3] -
3245:19; 3247:12;
3249:2
**investigates** [1] -

3166:1

**investigating** [1] - 3198:9

**investigation** [3] - 3232:5; 3294:2; 3405:18

**Investigation** [2] - 3165:16; 3388:10

**investigations** [6] - 3252:24; 3265:4, 6; 3295:10, 15, 17

**investigative** [5] - 3252:13, 16, 23; 3264:21, 24

**investigator** [4] - 3114:12; 3120:18; 3121:5; 3125:2

**Investing** [2] - 3141:10; 3144:21

**invoke** [1] - 3109:4

**involved** [2] - 3161:21; 3233:9

**IO** [9] - 3262:6, 8, 10-11; 3264:9

**irrelevant** [3] - 3123:17; 3130:16; 3293:4

**Island** [26] - 3119:24; 3140:24; 3141:6, 11; 3211:15; 3216:17, 19; 3217:9; 3238:15; 3239:21; 3304:23, 25; 3311:16; 3313:25; 3335:14; 3336:17; 3339:24; 3340:2; 3349:8; 3357:15; 3360:8, 16; 3383:15; 3406:20

**Islip** [2] - 3101:5, 23

**issue** [2] - 3272:14; 3332:25

**issued** [5] - 3106:17; 3204:13; 3395:1; 3396:20; 3397:19

**item** [8] - 3214:5, 7-8; 3356:6, 9, 13, 16; 3389:3

**ITS** [1] - 3272:1

**itself** [10] - 3139:1; 3207:4; 3240:24; 3247:13; 3263:3; 3316:25; 3329:17; 3376:14; 3393:18

## J

**jacket** [1] - 3142:6

**Jackie** [17] - 3117:1; 3133:19, 22; 3141:18; 3142:1, 3, 11; 3144:10; 3182:8, 11; 3303:12, 14; 3304:2; 3305:6; 3307:21; 3308:4, 25

**jail** [7] - 3269:16; 3281:21; 3285:12, 14, 17; 3293:7

**James** [2] - 3172:20; 3220:12

**January** [5] - 3297:20; 3298:1; 3300:16, 20; 3301:3

**Jeff** [1] - 3338:1

**JEFFREY** [3] - 3101:14; 3338:5; 3412:10

**Jeffrey** [1] - 3338:13

**Jersey** [1] - 3289:23

**Jimmy** [9] - 3117:5; 3141:18, 25; 3142:2, 11; 3144:10, 16; 3163:20; 3406:20

**JOANNA** [1] - 3101:9

**job** [5] - 3165:17; 3245:16; 3302:12; 3334:17; 3388:12

**Joe** [18] - 3136:24; 3137:2, 5, 14; 3149:4, 22; 3150:2, 25; 3151:5, 13; 3166:20, 23; 3168:18, 24; 3169:4; 3170:15; 3209:1; 3230:2

**Joey** [3] - 3116:20; 3117:9, 25

**JOHN** [2] - 3101:6, 13

**John** [38] - 3117:11; 3122:15; 3128:19; 3129:13; 3142:8; 3144:14; 3156:14, 24; 3157:10; 3163:20; 3166:23; 3168:24; 3169:3; 3170:15; 3171:2, 21; 3172:9; 3175:10; 3193:8, 18-19; 3225:18; 3227:13, 15; 3246:23; 3247:9; 3263:24; 3264:3, 6, 10; 3294:7; 3296:7; 3403:25

**John's** [1] - 3375:13

**Joint** [1] - 3334:24

**Jones** [1] - 3248:19

**JONES** [1] - 3101:17

**Joseph** [13] - 3106:3; 3139:17; 3140:2; 3179:22; 3185:15; 3186:4, 8, 25; 3187:14, 21; 3188:1; 3229:25; 3407:14

**JS** [1] - 3101:4

**Judge** [83] - 3102:16; 3103:12; 3105:2, 8, 17; 3107:15; 3108:17; 3109:19; 3110:19; 3111:17; 3113:14; 3130:8, 16; 3154:4; 3155:10; 3164:14; 3165:9; 3167:11; 3168:7; 3169:12; 3170:22; 3171:6; 3175:19; 3176:7; 3177:3, 21; 3179:8, 10; 3182:19; 3187:11, 16; 3188:19, 23; 3189:3; 3190:2, 16; 3191:4, 18; 3192:12; 3196:15; 3200:22; 3210:17, 19; 3212:17; 3233:5; 3234:12; 3246:16, 20; 3248:16; 3249:1, 16; 3250:19; 3251:5; 3257:21; 3303:22; 3306:12; 3307:7; 3308:8, 15; 3309:19; 3311:4; 3332:17, 21; 3333:24; 3336:6, 25; 3337:14, 20; 3353:7; 3371:17; 3372:2; 3376:6; 3386:3; 3390:2; 3399:2; 3402:11, 13; 3403:3, 21; 3404:1, 4; 3407:12

**JUDGE** [1] - 3101:10

**Jules** [2] - 3248:20

**Julie** [2] - 3248:20

**JULIE** [1] - 3101:17

**July** [11] - 3104:21; 3261:1, 5; 3273:15; 3275:13; 3282:2, 21; 3288:25; 3289:5, 12; 3290:7

**Jumping** [1] - 3208:3

**June** [25] - 3211:12; 3257:13; 3285:7; 3286:8, 12; 3287:1, 4; 3290:1; 3296:9, 13, 21; 3297:2, 17; 3349:3, 6,

**JONES** [1] - 3101:17

**Junior** [23] - 3106:16; 3108:11, 19; 3109:1, 23; 3110:1; 3117:11; 3128:19; 3129:13; 3219:7; 3339:10; 3349:18; 3350:3; 3381:15, 18; 3382:17; 3383:4; 3386:5, 16, 23; 3387:3; 3407:14

**jurors** [2] - 3112:22; 3405:15

**jury** [63] - 3101:10; 3113:9; 3123:14; 3126:10; 3137:9; 3139:8; 3140:6; 3144:4; 3168:16; 3169:8, 13, 16; 3170:10, 20; 3171:4; 3179:17; 3180:23; 3191:4, 19, 22; 3211:8; 3212:2; 3222:11; 3239:4; 3246:9; 3250:12; 3252:7, 14; 3253:15; 3257:17; 3260:7, 24; 3261:12, 21; 3262:16; 3282:19; 3283:21; 3284:19; 3303:17; 3307:20; 3308:7, 11; 3332:12, 24; 3333:13, 17, 21; 3337:15, 17; 3339:12, 15; 3342:18, 21; 3344:17, 19; 3345:20; 3346:11; 3348:1; 3384:19; 3403:2, 10, 16; 3406:19

**Jury** [9] - 3113:19, 21; 3191:21; 3251:9, 11; 3333:20; 3402:5; 3404:13; 3405:23

## K

**K-I-N-D-E-L-E-Y** [1] - 3388:2

**KEDIA** [250] - 3101:16; 3102:10; 3107:2, 20; 3108:3, 7, 10, 13; 3109:11, 15; 3110:6, 23; 3111:6, 12, 17, 23; 3112:1, 4, 8, 20; 3120:7, 25; 3121:4; 3122:11, 19; 3123:4, 13, 21, 24; 3124:15; 3125:7, 10, 12; 3126:2;

3129:11; 3130:10, 21-22; 3132:1, 24; 3133:11; 3139:2; 3143:22; 3145:3; 3146:8; 3147:3, 7; 3152:23; 3153:3, 12; 3154:4, 16, 20; 3155:9; 3156:3; 3157:8; 3161:4; 3168:9; 3176:8; 3177:3, 14; 3179:2; 3182:23; 3187:13, 19; 3188:5, 21; 3189:16; 3190:1, 7, 11, 14; 3191:14, 18; 3192:1, 8, 16; 3196:12, 17; 3199:1, 5; 3201:1; 3203:25; 3206:17; 3207:16; 3211:2, 19, 25; 3219:17; 3222:10, 14; 3223:8, 23; 3224:3, 7, 9; 3225:10; 3226:2; 3227:3; 3228:14; 3230:14, 18; 3231:6, 12; 3232:3; 3233:2, 6, 13, 21; 3234:5, 8, 12, 14; 3235:2, 11; 3236:10; 3237:3; 3240:5; 3242:24; 3243:4, 13, 22; 3244:9, 12; 3246:20; 3248:8; 3249:16, 20, 24; 3250:2, 8; 3253:18; 3255:11, 17; 3256:2, 14, 17, 22; 3257:25; 3258:5; 3264:18; 3265:23; 3278:12; 3279:20, 23; 3280:14, 19; 3281:1, 8, 13; 3283:10, 12; 3290:17; 3299:4, 6; 3300:9; 3307:8; 3309:17; 3317:1; 3318:23; 3323:10; 3325:5; 3332:2; 3333:18; 3337:3, 20; 3342:4, 12; 3352:2, 14; 3353:7, 10, 12; 3358:13; 3360:19; 3365:19, 24; 3367:20, 24; 3368:6; 3370:14, 20; 3371:2, 19, 22; 3372:1, 6; 3373:3; 3374:1, 7-8, 16; 3375:4, 20, 24; 3376:5; 3378:7, 12, 18; 3379:8; 3383:1, 9; 3385:18, 24; 3386:3, 10, 15, 22; 3387:10; 3389:17, 21; 3390:6, 14, 19; 3391:7,

17; 3393:22; 3400:3, 13, 19; 3401:2, 4, 8; 3403:3, 15; 3406:2, 11, 14; 3407:7, 12, 19, 24; 3408:19; 3409:10, 20; 3410:9, 19; 3411:1, 9, 15; 3412:5, 16, 22, 24
**Kedia** [9] - 3106:1, 7, 10; 3123:18; 3189:7, 15; 3225:7; 3383:8; 3403:1
**Keep** [1] - 3114:18
**keep** [4] - 3245:2; 3393:3; 3405:20
**keeps** [1] - 3271:4
**Ken** [1] - 3125:1
**Kenneth** [17] - 3120:15, 17-18; 3121:5; 3122:12, 16, 23; 3123:8, 10, 15, 17, 23; 3124:7; 3125:3; 3126:6; 3134:11, 13
**Kensington** [2] - 3211:14; 3217:8
**Kevin** [4] - 3145:19; 3183:4
**keyboard** [1] - 3397:3
**kicked** [2] - 3185:15; 3186:4
**Kimberly** [1] - 3112:9
**kind** [16] - 3104:1; 3107:3; 3200:8; 3201:24; 3206:22; 3209:23; 3260:7; 3261:12; 3265:1; 3291:3, 6, 19; 3292:7, 11; 3402:17; 3406:23
**Kindeley** [7] - 3387:16; 3388:1; 3389:22; 3390:7; 3391:18; 3394:14; 3397:8
**KINDELEY** [2] - 3387:20; 3412:18
**Kings** [1] - 3174:21
**kitchen** [1] - 3263:4
**knee** [1] - 3103:11
**knowing** [5] - 3123:14; 3154:13; 3186:23; 3253:13; 3319:24
**knowledge** [3] - 3124:18; 3146:21; 3231:15
**known** [24] - 3111:10; 3123:6, 9; 3124:2;

3129:5, 7-8, 13, 17, 22; 3132:16; 3150:20; 3188:1, 10, 12; 3189:21; 3219:3, 6; 3248:24; 3277:17; 3330:4; 3347:6; 3361:22; 3374:22
**knows** [4] - 3187:17; 3225:9; 3232:17

---

## L

**labels** [2] - 3138:20; 3316:21
**Labor** [2] - 3215:14, 16
**Lack** [1] - 3386:8
**lackadaisical** [1] - 3218:23
**Ladies** [2] - 3246:3; 3404:17
**LaForte** [15] - 3141:18; 3142:1, 11; 3144:11, 16; 3161:14, 24; 3162:5, 8, 11, 23; 3163:3, 20; 3164:9
**large** [4] - 3149:7; 3267:13, 17; 3345:18
**larger** [1] - 3143:9
**LARUSSO** [78] - 3101:19; 3102:11; 3103:8; 3105:11, 13; 3107:15; 3112:25; 3113:3; 3133:12, 15; 3134:6; 3139:3; 3143:23; 3161:5, 8; 3163:14; 3164:6, 8, 14; 3168:10; 3179:8; 3191:17; 3207:18, 21; 3210:16; 3211:3; 3212:16; 3213:3; 3236:12; 3244:14, 17, 22; 3245:23; 3257:1, 7, 11, 15, 19; 3258:6; 3290:18, 21; 3292:23, 25; 3293:16, 22, 24; 3294:6, 11; 3295:2, 4, 23, 25; 3296:1, 3; 3298:11; 3300:10, 14; 3301:11; 3307:9; 3308:15, 18; 3309:11, 15; 3317:2; 3332:5; 3337:4, 19; 3387:11; 3391:10; 3406:16; 3409:12, 22; 3410:1, 12; 3411:3, 11, 17, 23
**LaRusso** [4] - 3101:20;

3163:19; 3177:5; 3332:4
**last** [21] - 3102:10; 3103:17; 3107:3; 3108:25; 3128:14; 3191:12, 25; 3235:22; 3248:3, 8; 3249:14; 3351:18, 20; 3362:7; 3369:1, 10, 17; 3370:2; 3386:17; 3388:1; 3406:5
**lasted** [2] - 3148:9; 3158:22
**Lastly** [1] - 3214:7
**lastly** [1] - 3118:4
**late** [3] - 3108:25; 3146:17; 3329:23
**Laura** [1] - 3102:18
**law** [9] - 3188:7; 3220:17; 3260:12; 3263:5; 3266:6; 3292:15; 3294:2; 3295:16; 3404:6
**laws** [1] - 3348:18
**lawyer** [1] - 3111:18
**lead** [2] - 3106:13; 3328:5
**leader** [3] - 3352:22; 3358:1; 3362:19
**learn** [7] - 3184:10; 3227:5, 13, 25; 3233:10; 3309:12; 3326:6
**learned** [7] - 3111:12, 14; 3184:14; 3195:23; 3312:17; 3346:12; 3379:15
**least** [10] - 3103:19; 3105:21; 3107:17, 22; 3195:23; 3355:3, 10; 3376:25; 3382:3; 3403:18
**leave** [13] - 3201:9; 3305:7; 3311:22; 3316:3; 3347:25; 3348:17; 3363:5, 7, 14-15, 20; 3364:4; 3367:10
**leaves** [5] - 3212:19; 3260:10; 3277:15; 3402:5; 3405:23
**leaving** [11] - 3162:23; 3174:6; 3319:25; 3320:1; 3331:18; 3346:8; 3358:4; 3362:24; 3369:10

**leeway** [2] - 3104:8; 3107:17

**left** [40] - 3132:11; 3139:24; 3144:10, 14; 3169:1; 3173:20; 3179:23; 3182:16; 3183:9; 3193:4, 23; 3194:11, 22; 3201:4, 6; 3213:4; 3217:1; 3305:18; 3307:20; 3311:20; 3313:15; 3315:10; 3318:2, 16; 3320:12; 3322:9; 3327:8; 3342:17; 3343:22; 3357:16; 3362:10; 3363:18; 3364:8; 3367:25; 3368:8; 3382:11, 17; 3384:2

**Left** [1] - 3183:10

**left-hand** [2] - 3173:20; 3342:17

**leg** [1] - 3104:1

**legal** [2] - 3268:18, 24

**length** [1] - 3231:25

**less** [2] - 3148:12; 3177:24

**letter** [4] - 3102:6; 3104:11; 3406:25

**letters** [1] - 3329:11

**Lewisburg** [1] - 3297:14

**Lexus** [2] - 3141:19; 3313:17

**library** [5] - 3260:12; 3263:5; 3393:3, 7

**license** [2] - 3118:12; 3374:22

**life** [1] - 3218:12

**light** [2] - 3107:5; 3110:8

**limit** [3] - 3225:20, 23; 3348:18

**limited** [5] - 3110:14; 3111:1; 3225:4; 3247:2

**limousine** [3] - 3171:23; 3199:13, 22

**Limousine** [6] - 3136:2; 3145:7, 10; 3147:22; 3156:23; 3157:11

**line** [11] - 3122:4; 3156:21; 3214:5, 8; 3238:22; 3239:14;

3240:12, 15, 17; 3241:19; 3242:13

**lines** [2] - 3243:17, 19

**Linley** [1] - 3110:9

**list** [30] - 3104:13; 3105:18, 22; 3107:1, 3; 3111:4; 3124:20; 3125:13; 3233:22; 3254:3; 3269:18, 22; 3270:21; 3271:5; 3272:12, 15; 3273:8; 3274:22; 3402:12; 3403:18, 22, 24; 3404:6; 3406:4; 3407:5, 10; 3408:20

**listed** [5] - 3127:3; 3129:16; 3217:23; 3260:16; 3357:20

**listen** [2] - 3253:1; 3405:15

**listened** [1] - 3266:11

**listening** [1] - 3254:11

**litany** [1] - 3234:2

**live** [1] - 3187:9

**lived** [4] - 3187:2; 3217:14; 3245:5

**living** [5] - 3197:3; 3216:13, 19; 3217:4; 3238:4

**local** [3] - 3266:6; 3281:22

**Locascio** [7] - 3225:19; 3227:25; 3228:2, 16, 20; 3229:7, 11

**locate** [3] - 3364:19; 3371:13; 3379:10

**located** [8] - 3167:1; 3173:17; 3264:2, 6; 3267:21; 3345:16; 3360:7, 10

**location** [64] - 3148:21; 3162:23; 3164:10; 3174:18; 3185:19; 3189:18; 3194:17; 3195:14; 3199:6; 3203:4, 11, 14, 19; 3205:15, 19, 22-23; 3206:3, 5, 7; 3210:11; 3288:11; 3320:2; 3323:22; 3328:10; 3340:3; 3342:18; 3343:4, 11; 3345:7, 10, 13; 3346:2, 13, 15;

3347:3, 12; 3351:18; 3355:13, 16; 3357:12, 16; 3362:22; 3365:21; 3366:8, 18, 25; 3367:3, 6; 3369:8; 3375:11; 3376:15; 3377:2, 19-20; 3381:11; 3382:3; 3383:3, 13, 20; 3384:9

**locations** [9] - 3155:12; 3203:16, 21; 3326:14; 3351:15; 3366:3; 3381:25

**lock** [2] - 3276:13

**lockdown** [5] - 3262:21; 3276:4, 7, 11

**lockdowns** [2] - 3276:23; 3277:1

**log** [25] - 3181:5; 3320:25; 3321:10; 3325:18; 3328:18; 3329:14; 3340:16, 23; 3341:11; 3343:15; 3347:11, 18; 3349:20, 25; 3355:2, 25; 3357:20; 3358:7; 3361:2, 11; 3363:6, 22, 25; 3364:3; 3368:15

**logbook** [3] - 3275:17, 23

**logs** [3] - 3275:5, 8; 3320:24

**Lombardi** [1] - 3101:22

**Lombardo** [9] - 3321:5, 9, 12; 3324:16, 19, 24; 3325:2, 6

**longest** [1] - 3246:17

**look** [29] - 3119:4; 3167:16; 3207:11; 3217:1; 3278:8; 3280:1, 6, 22; 3281:14; 3283:9, 18; 3285:20; 3287:7, 23; 3306:17; 3336:11; 3340:15; 3353:13; 3363:6, 22; 3364:20; 3365:5, 12, 15; 3396:23; 3399:4; 3401:5, 9; 3407:2

**looked** [13] - 3137:9; 3167:8; 3177:10; 3185:23; 3186:3, 10; 3278:13; 3353:14; 3363:11; 3364:2; 3365:1; 3400:2

**Looking** [2] - 3168:16; 3307:19

**looking** [38] - 3144:9; 3158:18; 3169:2; 3185:14; 3186:12; 3264:13; 3278:23; 3283:14, 23; 3284:3, 15, 18, 22; 3286:1; 3289:12, 21; 3290:8, 11; 3296:8, 16, 25; 3297:19; 3308:3; 3317:15, 20, 24; 3322:16; 3355:2; 3377:17; 3379:12, 14; 3383:2; 3397:8; 3399:5, 17; 3403:4

**looks** [7] - 3105:2; 3152:19; 3273:1; 3384:8; 3399:19; 3400:8; 3401:13

**lost** [7] - 3142:25; 3160:4, 6, 9, 12, 16, 21

**loud** [1] - 3116:10

**love** [1] - 3234:3

**low** [2] - 3243:16, 18

**lower** [3] - 3217:1; 3279:3; 3343:9

**Lucille** [1] - 3119:20

**lunch** [6] - 3194:7, 9; 3246:5, 10; 3250:6, 25

**lunchtime** [2] - 3194:5; 3331:2

**Lyons** [3] - 3145:19; 3146:3, 18; 3147:13; 3183:4; 3184:4, 14-15; 3194:20; 3197:12

---

**M**

**machine** [2] - 3118:13; 3239:15

**mail** [22] - 3253:1, 8; 3265:15; 3268:8, 12, 18, 23-25; 3269:5, 7-8, 12, 25; 3397:7; 3403:22; 3407:9, 11

**mailed** [2] - 3403:22; 3404:5

**mailroom** [1] - 3269:6

**maintain** [1] - 3245:7

**maintained** [8] - 3142:14; 3196:18; 3255:3; 3274:15; 3275:4; 3280:8; 3281:2; 3341:6

**maintaining** [2] -

3231:12, 14

**maintains** [2] - 3232:5; 3275:5

**maintenance** [1] - 3241:18

**majority** [1] - 3408:1

**male** [2] - 3150:17; 3314:7

**males** [1] - 3348:5

**mall** [15] - 3340:11; 3341:1; 3342:19; 3343:5, 11, 20; 3344:1; 3351:13, 17; 3357:15; 3359:24; 3360:9; 3361:4

**man** [1] - 3223:10

**manage** [1] - 3156:16

**managed** [2] - 3156:24; 3157:11

**manages** [2] - 3156:12, 18

**mandatory** [1] - 3282:4

**Manhattan** [4] - 3345:6, 14; 3376:25

**manufacturer** [3] - 3392:8, 15, 19

**many-hour** [1] - 3262:24

**map** [3] - 3382:24; 3383:3, 16

**March** [7] - 3283:1, 6; 3310:16; 3334:25; 3335:4; 3336:20; 3338:22

**Marino** [1] - 3117:17

**mark** [3] - 3192:23; 3353:3; 3408:15

**marked** [20] - 3102:23; 3138:8; 3143:6; 3167:14; 3175:22; 3215:21; 3233:22; 3280:20; 3306:15; 3316:11; 3336:9; 3342:5, 12; 3356:22; 3363:9, 23; 3368:17; 3384:24; 3408:14, 20

**marking** [3] - 3278:6; 3279:24; 3353:8

**maroon** [3] - 3142:6; 3171:5; 3303:21

**maroon-colored** [1] - 3303:21

**married** [4] - 3215:9, 11; 3232:17; 3270:12

**Married** [1] - 3215:18

**marshals** [5] - 3106:13, 20; 3107:11; 3108:23; 3110:1

**Massino** [7] - 3106:3, 8, 18; 3107:21; 3108:2, 5; 3407:14

**material** [3] - 3102:13; 3103:3; 3233:4

**Mathew's** [1] - 3312:8

**matter** [5] - 3103:8; 3112:25; 3146:16; 3155:8; 3406:16

**matters** [1] - 3111:2

**Matthew** [3] - 3113:11; 3114:1, 11

**MATTHEW** [2] - 3114:5; 3409:6

**Matthew's** [14] - 3312:2, 4; 3313:16; 3319:5; 3320:14; 3321:3; 3322:11, 13, 15; 3324:25; 3327:7; 3328:9, 14

**MAUSKOPF** [1] - 3101:12

**Mawr** [2] - 3141:10; 3144:21

**MAYER** [68] - 3101:13; 3164:19; 3165:9, 12; 3167:11, 13; 3168:7, 15; 3169:12, 18; 3170:22; 3171:1, 6, 9; 3175:19, 21; 3176:7; 3177:7, 11, 17, 19, 24; 3178:2; 3179:10, 16; 3182:1, 19; 3187:11, 16; 3188:2, 19, 23; 3189:3; 3190:16; 3192:6, 12; 3196:10, 14; 3198:23; 3199:3; 3200:22; 3203:23; 3206:16; 3210:19; 3301:16; 3302:7; 3303:22; 3304:1; 3306:12, 14; 3307:7, 13, 18; 3308:7, 13; 3309:9, 19; 3332:22; 3333:24; 3334:13; 3336:6, 8, 25; 3337:8, 14; 3410:5; 3411:21; 3412:9

**Mayer** [3] - 3112:17; 3248:9, 12

**MC** [1] - 3135:5

**MCC** [5] - 3282:8; 3297:12, 16

**McCabe** [21] - 3120:15, 17-18; 3121:5; 3122:9, 12, 17, 23; 3123:8, 10, 15, 17, 23; 3124:7; 3125:2, 9; 3126:6, 21; 3134:11, 13

**McCaffrey** [2] - 3112:9, 14

**McLean** [1] - 3141:11

**McWeeney** [7] - 3134:19; 3135:5; 3139:13; 3145:4; 3149:2; 3153:2; 3156:4

**MCWEENEY** [2] - 3134:24; 3409:16

**MDC** [10] - 3262:5; 3264:12; 3265:5; 3270:5; 3274:11; 3275:19; 3283:4; 3297:25; 3298:5; 3299:7

**meals** [1] - 3263:13

**mean** [38] - 3127:20; 3131:8; 3146:18; 3147:21; 3148:19; 3150:4; 3160:21; 3188:9, 18; 3212:25; 3224:15; 3229:25; 3230:2; 3240:14; 3243:15; 3248:13, 17; 3261:16; 3262:3; 3264:24; 3270:23; 3276:11; 3278:20; 3281:20; 3285:10; 3304:22; 3305:1; 3320:1, 22; 3350:5; 3353:24; 3357:19; 3365:8; 3375:21; 3402:13

**meaning** [12] - 3148:24; 3222:3; 3235:22; 3240:20, 25; 3268:24; 3276:16; 3289:3; 3321:15, 22; 3323:23; 3354:6

**Meaning** [16] - 3130:20; 3145:25; 3183:12; 3194:20; 3195:9, 18; 3197:4; 3204:17; 3228:10; 3241:17; 3270:12; 3275:19; 3279:1, 12; 3282:13; 3360:3

**means** [5] - 3224:14; 3262:4; 3268:21; 3286:23; 3322:6

**meant** [2] - 3248:13; 3376:16

**mechanical** [1] - 3101:24

**media** [4] - 3266:2, 5; 3405:16

**meet** [11] - 3107:11; 3215:13; 3216:2, 4, 8; 3220:22; 3221:10; 3228:8; 3270:25; 3350:12; 3407:1

**meeting** [15] - 3112:15; 3151:15; 3184:5, 20; 3187:1, 6, 22; 3194:18; 3222:3; 3321:4; 3324:24; 3328:7; 3330:9

**member** [5] - 3188:7; 3278:1; 3279:12; 3357:23; 3358:9

**members** [6] - 3109:20; 3188:14; 3359:9; 3364:15; 3369:21; 3373:7

**memo** [14] - 3394:8, 12; 3395:23, 25; 3396:3, 23-24; 3397:1, 9, 14, 21; 3399:16; 3400:22; 3404:10

**memorialize** [2] - 3115:20; 3118:19

**memory** [4] - 3183:19; 3320:24; 3356:3; 3389:12

**men** [4] - 3169:6; 3179:20; 3305:21; 3316:3

**men's** [1] - 3377:3

**mental** [2] - 3207:13

**mention** [1] - 3212:19

**mentioned** [9] - 3140:5; 3144:3; 3169:15; 3172:15; 3176:3; 3184:24; 3259:25; 3290:24; 3308:10

**mentioning** [1] - 3230:7

**mentions** [1] - 3233:8

**Mercedes** [2] - 3142:18; 3209:24

**messages** [1] - 3233:25

**met** [22] - 3151:16; 3215:17; 3220:5, 21; 3223:2; 3228:6;

3229:11, 18; 3230:8; 3232:12; 3314:5; 3315:2, 5; 3317:25; 3318:5, 14; 3321:12; 3327:17; 3328:3; 3329:23; 3330:20

method [1] - 3393:10

Metropolitan [4] - 3252:6; 3254:9, 14; 3261:22

Michael [18] - 3109:22; 3112:1; 3119:25; 3128:25; 3131:5; 3136:8, 19; 3137:1, 14; 3139:22; 3148:7; 3149:3, 22; 3150:1; 3151:16; 3156:13; 3172:4

microfracture [1] - 3104:2

microphone [11] - 3114:9, 18; 3135:3; 3165:5; 3214:23; 3237:19; 3251:22; 3302:2; 3334:7; 3338:11; 3387:24

mid [6] - 3177:22; 3188:25; 3332:11; 3340:15; 3359:5, 8

mid-afternoon [2] - 3332:11; 3340:15

mid-morning [2] - 3177:22; 3188:25

mid-shift [2] - 3359:5, 8

might [19] - 3106:16; 3129:2, 4; 3133:4; 3260:12; 3263:2, 4, 9; 3276:12; 3277:3; 3285:11; 3319:24; 3328:5; 3385:9; 3386:11; 3405:16

Miglia [5] - 3304:19; 3309:1, 6, 13

Mike [8] - 3166:20, 25; 3167:1; 3185:5; 3188:6; 3193:5, 23; 3207:24

miles [1] - 3383:19

mind [1] - 3405:20

Mineola [1] - 3101:21

miniature [2] - 3143:8, 21

minute [8] - 3211:18; 3212:19, 22; 3270:11; 3332:10; 3401:10;

3402:2

Minutes [1] - 3272:7

minutes [22] - 3137:4, 7; 3142:16; 3148:10; 3151:4; 3172:4, 12; 3177:24; 3183:25; 3203:1; 3213:2; 3272:3, 6, 10; 3313:14; 3315:13; 3326:11; 3370:2; 3401:17; 3402:4, 23; 3403:7

minutes' [1] - 3404:18

misconduct [1] - 3252:24

misleading [1] - 3297:1

missing [5] - 3378:21; 3379:13, 15, 25; 3380:1

misspoken [1] - 3139:25

mistaken [1] - 3329:8

model [1] - 3393:8

moment [8] - 3102:3; 3121:11; 3255:12; 3279:20; 3351:7; 3373:16; 3382:22; 3387:18

Monday [3] - 3109:13; 3333:2; 3405:3

money [2] - 3271:25; 3272:2

monitor [8] - 3252:25; 3253:3, 8; 3265:9; 3291:7; 3293:19; 3298:17

monitored [9] - 3253:6; 3254:10; 3260:1; 3261:6; 3265:13, 16; 3268:9; 3269:5; 3290:25

monitoring [9] - 3291:3, 11, 16, 19, 23, 25; 3292:7, 11; 3295:6

month [8] - 3220:4; 3221:17; 3228:18, 22; 3272:3, 6-7; 3287:21

months [4] - 3232:19; 3236:9; 3262:2; 3272:9

morning [60] - 3102:2; 3103:16; 3113:12, 22; 3114:16; 3120:8; 3133:16; 3135:10; 3140:23; 3141:13, 16; 3145:4; 3146:14, 17,

22; 3147:12, 23; 3159:19; 3161:9, 13; 3162:1, 5; 3164:23; 3165:13; 3177:22; 3182:24; 3184:8, 11; 3188:25; 3207:22; 3215:5; 3238:3; 3244:4; 3262:19; 3268:22; 3311:13, 21; 3312:6; 3319:4, 9, 15, 23; 3322:10; 3324:3; 3328:8; 3331:22; 3352:20; 3405:21; 3406:17

Morning [2] - 3305:14

most [4] - 3105:3; 3263:6; 3407:22; 3408:8

Most [2] - 3143:17; 3197:25

mostly [1] - 3229:3

mother [4] - 3270:8, 13, 15

mother's [2] - 3239:23; 3242:12

motion [1] - 3304:6

motive [1] - 3232:7

move [4] - 3125:11; 3225:25; 3276:16; 3372:6

moved [2] - 3216:17; 3357:18

movements [1] - 3104:20

movies [1] - 3263:12

moving [4] - 3125:12; 3195:7; 3322:3, 5

Moving [1] - 3317:23

MR [358] - 3102:11, 16, 22; 3103:2, 8; 3105:11, 13, 17; 3107:15; 3108:17; 3109:7, 10, 19; 3110:19; 3112:25; 3113:2, 11; 3114:1, 15; 3116:1, 3; 3120:5, 23; 3121:2, 9; 3122:3; 3123:16, 22; 3124:24; 3129:9; 3130:8, 16; 3131:23; 3132:4, 22; 3133:2, 12, 15; 3134:6, 10, 18; 3135:9; 3136:15, 18; 3137:18; 3138:2, 7, 25; 3139:3, 7, 11-12; 3140:3, 7; 3142:7, 10; 3143:3, 5, 20, 23; 3144:5, 25;

3146:6; 3147:1, 6, 9; 3152:21; 3153:9; 3157:6; 3161:5, 8; 3163:12, 14-15, 17; 3164:5, 8, 14; 3168:10; 3177:21; 3179:8; 3191:4, 16-17; 3207:18, 21; 3210:16, 24; 3211:3, 5, 9; 3212:7, 12, 16, 25; 3213:3, 6; 3214:2, 13; 3215:4; 3216:22, 24; 3219:13; 3222:8, 12; 3223:5, 21; 3224:1, 19; 3225:2, 20; 3228:12; 3230:12, 16; 3231:2, 22; 3232:11, 21, 25; 3233:5, 12, 19; 3236:12, 16; 3237:2, 9, 22; 3238:2, 9; 3240:1; 3242:22; 3243:2, 7, 11, 20; 3244:7, 14, 17, 20, 22; 3245:23; 3246:11, 13, 16; 3247:15; 3249:3, 18; 3250:16, 19; 3251:5, 14; 3252:2; 3253:20; 3254:19, 22-23; 3255:9; 3256:8, 10, 23; 3257:1, 4, 7, 10-11, 14-16, 19; 3258:4, 6; 3259:2, 5, 9, 17, 21, 24; 3260:6, 15; 3263:18, 21; 3264:16; 3280:15; 3281:9; 3290:18, 21; 3292:21, 23, 25; 3293:3, 11, 16, 22, 24; 3294:4, 6, 8, 11; 3295:2, 4, 23, 25; 3296:1, 3; 3298:11, 13, 15; 3299:2; 3300:10, 14; 3301:11, 13; 3307:9; 3308:15, 18; 3309:11, 15, 22; 3310:12; 3311:4, 6; 3312:23; 3313:1, 3; 3315:1; 3316:8, 10, 24; 3317:2, 6; 3318:19; 3323:8; 3325:3; 3328:22; 3332:5, 14, 17, 21, 23; 3333:1, 12; 3337:4, 19, 25; 3338:16; 3340:17, 20; 3341:17, 20; 3342:3, 8, 11, 16; 3344:4, 7, 16, 20; 3347:13; 3351:2, 5, 21; 3352:12; 3358:11; 3360:17; 3365:18, 22;

3366:1; 3367:18, 22; 3368:4; 3370:12, 17; 3371:20; 3372:3; 3374:13; 3375:18, 22; 3376:3; 3378:5, 11, 16; 3379:2, 4; 3385:17; 3386:7, 13, 20; 3387:8, 11-12, 16; 3388:3, 6, 14, 17; 3389:15, 21; 3390:2, 10, 17; 3391:5, 10, 15; 3397:23; 3398:1; 3399:2, 17, 23; 3400:8, 11, 18; 3401:11, 15, 19; 3402:11, 13, 15, 19; 3403:14, 21; 3404:1, 4, 9; 3406:10, 12, 16; 3407:2, 16; 3408:13, 22; 3409:8, 12, 14, 18, 22, 24; 3410:1, 12, 16, 21, 24; 3411:3, 7, 11, 13, 17, 23; 3412:2, 12, 20, 22

MS [314] - 3102:10; 3107:2, 20; 3108:3, 7, 10, 13; 3109:11, 15; 3110:6, 23; 3111:6, 12, 17, 23; 3112:1, 4, 8, 20; 3120:7, 25; 3121:4; 3122:11, 19; 3123:4, 13, 21, 24; 3124:15; 3125:7, 10, 12; 3126:2; 3129:11; 3130:10, 21-22; 3132:1, 24; 3133:11; 3139:2; 3143:22; 3145:3; 3146:8; 3147:3, 7; 3152:23; 3153:3, 12; 3154:4, 16, 20; 3155:9; 3156:3; 3157:8; 3161:4; 3164:19; 3165:9, 12; 3167:11, 13; 3168:7, 9, 15; 3169:12, 18; 3170:22; 3171:1, 6, 9; 3175:19, 21; 3176:7; 3177:3, 7, 11, 14, 17, 19, 24; 3178:2; 3179:2, 10, 16; 3182:1, 19, 23; 3187:11, 13, 16, 19; 3188:2, 5, 19, 21, 23; 3189:3, 16; 3190:1, 7, 11, 14, 16; 3191:14, 18; 3192:1, 6, 8, 12, 16; 3196:10, 12, 14, 17; 3198:23; 3199:1, 3, 5; 3200:22; 3201:1; 3203:23, 25; 3206:16;

3207:16; 3210:19; 3211:2, 19, 25; 3219:17; 3222:10, 14; 3223:8, 23; 3224:3, 7, 9; 3225:10; 3226:2; 3227:3; 3228:14; 3230:14, 18; 3231:6, 12; 3232:3; 3233:2, 6, 13, 21; 3234:5, 8, 12, 14; 3235:2, 11; 3236:10; 3237:3; 3240:5; 3242:24; 3243:4, 13, 22; 3244:9, 12; 3246:20; 3248:8; 3249:16, 20, 24; 3250:2, 8; 3253:18; 3255:11, 17; 3256:2, 14, 17, 22; 3257:25; 3258:5; 3264:18; 3265:23; 3278:12; 3279:20, 23; 3280:14, 19; 3281:1, 8, 13; 3283:10, 12; 3290:17; 3299:4, 6; 3300:9; 3301:16; 3302:7; 3303:22; 3304:1; 3306:12, 14; 3307:7, 13, 18; 3308:7, 13; 3309:9, 17, 19; 3317:1; 3318:23; 3323:10; 3325:5; 3332:2, 22; 3333:18, 24; 3334:13; 3336:6, 8, 25; 3337:3, 8, 14, 20; 3342:4, 12; 3352:2, 14; 3353:7, 10, 12; 3358:13; 3360:19; 3365:19, 24; 3367:20, 24; 3368:6; 3370:14, 20; 3371:2, 19, 22; 3372:1, 6; 3373:3; 3374:1, 7-8, 16; 3375:4, 20, 24; 3376:5; 3378:7, 12, 18; 3379:8; 3383:1, 9; 3385:18, 24; 3386:3, 10, 15, 22; 3387:10; 3389:17; 3390:6, 14, 19; 3391:7, 17; 3393:22; 3400:3, 13, 19; 3401:2, 4, 8; 3403:3, 15; 3406:2, 11, 14; 3407:7, 12, 19, 24; 3408:19; 3409:10, 20; 3410:5, 9, 19; 3411:1, 9, 15, 21; 3412:5, 9, 16, 24

mug [2] - 3193:17, 20

multi [1] - 3317:17
multi-colored [1] - 3317:17
murder [1] - 3248:2
must [1] - 3405:6
MZ [2] - 3116:4; 3118:20

N

name [80] - 3113:3; 3114:10; 3126:5; 3128:14, 24; 3129:22, 25; 3131:8; 3135:4; 3138:20, 23; 3143:17; 3156:14; 3157:19; 3165:6; 3168:2, 5; 3169:1; 3188:16; 3191:9; 3210:2; 3214:24; 3217:2; 3218:5, 8; 3223:13, 17, 20, 25; 3224:17; 3227:5; 3229:9, 25; 3230:2; 3231:14; 3232:6; 3237:20; 3239:22, 24; 3242:12; 3245:15; 3246:23; 3247:10, 25; 3248:17, 20, 23, 25; 3251:23; 3260:19; 3281:5; 3302:3; 3304:15; 3307:3, 5; 3308:3; 3310:7; 3316:21; 3320:5; 3321:4; 3326:2, 5, 7; 3329:7; 3334:8; 3338:12; 3340:1, 7; 3351:11; 3355:23; 3374:18; 3382:4; 3387:25; 3388:1; 3397:6
named [9] - 3119:25; 3202:18; 3219:3, 6; 3227:13, 25; 3229:22; 3238:10; 3355:25
names [7] - 3116:13; 3168:21; 3184:24; 3229:21; 3230:7; 3355:4
narcotics [1] - 3269:9
Narrows [1] - 3104:23
natural [1] - 3243:16
nature [8] - 3197:18; 3222:16; 3231:22; 3232:3; 3235:24; 3236:2, 20; 3408:8
NCIC [1] - 3270:2
near [7] - 3115:24; 3305:20, 22; 3350:10,

21; 3360:5
nearby [1] - 3305:13
necessarily [7] - 3124:2; 3147:16; 3212:21; 3319:19; 3329:14; 3357:22; 3365:11
necessary [2] - 3103:11; 3367:17
neck [1] - 3136:13
need [18] - 3106:13; 3107:4; 3109:3; 3110:20; 3116:7; 3118:23; 3119:4, 7, 18; 3123:22; 3249:12; 3401:8; 3403:7; 3406:10, 12-13, 24; 3407:8
needed [2] - 3315:25; 3367:10
needs [1] - 3103:24
neglected [1] - 3404:11
neighborhood [8] - 3186:25; 3187:3, 7, 21, 24-25; 3192:4; 3245:5
nervous [1] - 3215:19
never [7] - 3249:10, 17, 21; 3369:9; 3371:11; 3400:4, 7
new [4] - 3292:2, 8; 3355:5; 3403:22
NEW [1] - 3101:1
New [35] - 3101:5, 15, 18, 21, 23; 3103:20; 3105:13; 3108:5; 3110:13; 3114:13; 3119:14, 24; 3120:19; 3121:6; 3122:14; 3124:2; 3135:17; 3140:12; 3165:22; 3166:10; 3169:24; 3173:11; 3174:22; 3252:6; 3282:8; 3289:23; 3297:12; 3302:11; 3310:23; 3311:15; 3313:25; 3380:20; 3390:22
next [53] - 3102:5, 8; 3107:22; 3113:25; 3121:12; 3125:16; 3136:23; 3141:24; 3142:15; 3153:15; 3155:17; 3176:11; 3178:4; 3181:21;

3190:11, 18; 3191:5;
3210:25; 3211:22;
3213:9; 3224:22;
3226:3; 3230:20;
3234:15; 3237:8;
3246:10; 3251:3, 13;
3255:20; 3258:8;
3267:22; 3294:13;
3309:21; 3312:11;
3313:13; 3314:9;
3315:6; 3332:11, 20;
3333:23; 3337:24;
3339:20, 23; 3344:25;
3350:14, 20; 3357:14;
3358:14; 3370:22;
3372:8; 3373:20;
3398:3; 3401:22
**Next** [7] - 3103:10;
3134:17; 3164:18;
3210:22; 3301:15;
3332:13; 3387:15
**Nice** [1] - 3113:23
**nice** [2] - 3405:21;
3407:17
**night** [5] - 3102:10;
3107:3; 3348:22;
3379:17; 3406:5
**night's** [1] - 3106:18
**nightclub** [1] -
3233:13
**Nightclubs** [1] -
3216:9
**nightclubs** [3] -
3224:15; 3228:9, 15
**nine** [2] - 3132:8;
3334:20
**No,judge** [1] - 3402:19
**non** [1] - 3291:15
**non-Bureau** [1] -
3291:15
**nonetheless** [1] -
3367:21
**Nonpassword** [1] -
3401:3
**nonpassword** [1] -
3401:12
**noon** [3] - 3303:9, 11;
3339:14
**Nora** [2] - 3112:9, 12
**Normally** [1] - 3348:17
**normally** [2] -
3319:23; 3367:12
**northeast** [1] - 3167:3
**notation** [1] - 3375:15

**note** [17] - 3106:6;
3124:22; 3132:9;
3151:13, 18; 3207:10,
13-14; 3300:21;
3342:22; 3344:11;
3361:6; 3365:6, 10;
3389:22; 3405:14
**noted** [13] - 3122:25;
3123:11; 3125:1;
3151:8; 3159:6, 10;
3193:5; 3273:25;
3300:17; 3329:16;
3365:4, 7; 3369:19
**Noted** [2] - 3151:15;
3159:12
**notes** [9] - 3112:11,
19; 3207:8; 3300:22;
3356:3; 3364:25;
3384:13, 20
**nothing** [15] - 3133:11;
3161:4; 3207:17;
3232:21; 3236:11;
3237:3; 3244:13;
3247:19; 3290:17;
3293:9; 3300:9; 3332:3;
3337:14; 3377:9;
3387:10
**Nothing** [5] - 3182:19;
3245:24; 3308:13;
3332:6; 3387:12
**notice** [2] - 3110:10;
3331:17
**noticed** [3] - 3148:21,
24; 3329:13
**notification** [1] -
3269:24
**notified** [5] - 3163:3;
3219:20; 3220:3;
3367:1; 3402:15
**November** [26] -
3166:5; 3167:25;
3183:2, 17; 3192:3, 10,
17; 3196:3, 22; 3197:9;
3204:10; 3207:24;
3235:21; 3272:4;
3285:25; 3286:23;
3287:18; 3288:18, 21;
3296:17; 3389:11;
3394:25; 3395:9, 11
**number** [61] - 3127:3;
3128:4; 3212:17;
3214:3, 5; 3217:16, 23,
25; 3218:2; 3221:8;
3239:10, 13, 17;
3240:20; 3241:5, 11-12,

15, 25; 3242:1, 4, 9,
12, 19; 3243:5, 23-24;
3244:2; 3247:25;
3248:1; 3249:11, 25;
3250:1, 18; 3260:21,
25; 3261:1; 3271:12,
23; 3272:14; 3284:14,
17, 20-21, 24; 3316:21;
3329:16; 3330:20;
3353:21; 3364:7;
3382:2; 3388:25;
3393:13; 3397:6;
3400:19
**numbers** [13] - 3118:10,
12; 3212:9, 14-15;
3272:14, 16, 18, 22;
3273:4, 7, 9; 3329:11
**numerous** [2] -
3170:11; 3368:10
**NYPD** [2] - 3114:24;
3123:5

---

**O**

**o'clock** [8] - 3103:15;
3141:16; 3166:15;
3262:19, 21; 3303:7;
3305:16; 3311:13
**O-B-A-N-D-O** [1] -
3251:24
**Obando** [15] - 3246:11,
20; 3250:21; 3251:15,
24; 3252:3; 3254:24;
3259:10, 25; 3264:19;
3278:13; 3281:2, 14;
3284:14; 3290:22
**OBANDO** [2] - 3251:18;
3411:5
**obey** [1] - 3348:18
**object** [16] - 3121:9;
3171:25; 3208:16, 19,
22; 3209:4, 8, 11-13;
3223:5; 3247:6;
3256:22; 3257:2;
3386:13; 3390:2
**objecting** [1] - 3189:6
**Objection** [69] -
3120:23; 3129:9;
3130:8, 17; 3131:23;
3132:4, 22; 3133:2;
3146:6; 3147:1;
3152:21; 3153:9;
3156:2; 3157:6;
3163:12; 3187:11, 16;
3188:2, 19; 3192:6, 12;
3196:10, 14; 3198:23;

3199:3; 3200:22;
3203:23; 3206:16;
3222:12; 3223:21;
3224:19; 3228:12;
3230:16; 3242:22;
3243:2, 7, 11, 20;
3244:7, 20; 3253:18;
3292:21; 3309:9;
3323:8; 3325:3;
3328:22; 3352:12;
3358:11; 3360:17;
3365:18, 22; 3366:1;
3367:18, 22; 3368:4;
3370:12; 3374:13;
3375:18, 22; 3376:3;
3378:5, 11, 16; 3379:2;
3386:7; 3387:8;
3390:10, 17; 3391:5
**objection** [51] -
3121:2; 3122:2; 3125:7;
3139:2; 3143:22;
3147:6, 9; 3155:15;
3168:9; 3177:16;
3179:2, 8; 3189:3;
3190:5; 3191:10, 17-18,
25; 3192:15; 3211:1-3,
25; 3212:16; 3222:8;
3224:1; 3225:2; 3227:2;
3230:12; 3250:5;
3259:19; 3280:15;
3281:9; 3293:2; 3307:8;
3317:1; 3337:2-4;
3342:4; 3373:2; 3390:5;
3391:7, 9; 3408:10
**objects** [1] - 3208:5
**obscured** [2] -
3307:22, 25
**observation** [22] -
3145:7; 3151:19;
3159:2; 3161:17, 19;
3162:11; 3210:7;
3321:18; 3322:12;
3324:22; 3350:20;
3357:14; 3358:8;
3359:6, 8; 3370:2, 10;
3373:14; 3384:12, 18;
3385:13
**observations** [29] -
3115:20; 3118:7, 9;
3122:6; 3138:17;
3143:15; 3158:11;
3159:13; 3167:25;
3172:1; 3175:13;
3176:5; 3189:11;
3192:23, 25; 3307:1;
3308:1; 3316:19;

3317:10, 23; 3336:23;
3350:24; 3358:2, 24-25;
3359:9; 3361:6, 8, 15

**observe** [27] - 3119:2;
3163:10; 3164:9;
3166:19; 3170:10;
3172:9; 3186:4;
3303:10; 3304:4;
3305:17, 21; 3323:6;
3326:20; 3327:23;
3340:2, 9; 3346:24;
3349:16; 3351:7;
3364:11; 3366:10;
3371:22; 3373:18;
3374:17, 25; 3378:20

**observed** [47] -
3123:20; 3151:4;
3163:4; 3166:20, 22;
3170:11, 13; 3172:15,
19; 3173:12; 3174:5;
3175:2, 7, 9; 3185:15;
3186:3; 3190:10, 14;
3204:6; 3208:4;
3303:11; 3308:19, 21;
3326:16; 3337:9;
3339:15-17; 3340:3, 24;
3348:6; 3349:17;
3355:18, 20; 3356:1, 6,
9; 3359:6; 3362:7;
3369:8, 10; 3374:9, 21;
3378:13; 3380:9;
3381:22

**observing** [1] -
3151:22

**obtain** [3] - 3106:4;
3218:5, 7

**obtained** [1] - 3204:15

**obtaining** [1] - 3111:6

**obviously** [15] -
3106:17, 23; 3108:11;
3110:21; 3124:4, 6, 19;
3154:11; 3155:12;
3197:3; 3204:23;
3205:11; 3233:8;
3250:22; 3400:4

**Obviously** [8] -
3163:7; 3189:16;
3233:6; 3249:13;
3256:19; 3307:25;
3401:8; 3406:9

**occasion** [6] - 3158:2;
3230:10; 3234:9;
3293:20; 3329:3; 3364:2

**occasions** [7] -
3103:12; 3130:19;

3228:22; 3241:14;
3243:6; 3273:23;
3275:12

**occur** [6] - 3254:5, 14;
3279:7; 3295:6, 9;
3299:14

**occurred** [3] -
3250:14; 3277:4; 3321:1

**occurring** [1] - 3152:2

**occurs** [2] - 3276:7;
3291:3

**October** [12] - 3296:19;
3297:8, 19; 3302:18,
20; 3303:13; 3306:7;
3307:1; 3338:22;
3389:7; 3391:1

**OF** [3] - 3101:1, 3, 9

**offer** [14] - 3138:25;
3143:20; 3154:2;
3168:7; 3176:7; 3255:9;
3259:17; 3280:14;
3281:8; 3307:7;
3316:24; 3336:25;
3342:3; 3389:15

**offered** [3] - 3247:16;
3248:24

**offering** [3] - 3191:8;
3212:1; 3248:25

**offers** [1] - 3210:25

**offhand** [1] - 3210:3

**office** [8] - 3135:17;
3140:12; 3148:15;
3165:22; 3201:6;
3302:11; 3345:18;
3390:22

**Office** [3] - 3114:12;
3120:19; 3220:17

**officer** [5] - 3161:21;
3262:20; 3265:3;
3267:25; 3268:21

**officers** [4] -
3120:12; 3268:3;
3299:18, 25

**Official** [1] - 3101:22

**official** [1] - 3220:18

**officially** [1] -
3287:4

**often** [16] - 3218:11;
3222:25; 3224:12;
3228:8, 16; 3234:3;
3265:13; 3276:7, 9;
3291:10, 25; 3353:21;
3364:22; 3365:7

**Oftentimes** [1] -

3148:20

**Old** [7] - 3101:20;
3313:23; 3315:14;
3318:12; 3330:16, 25

**old** [3] - 3215:7;
3216:6; 3314:8

**older** [4] - 3314:6;
3315:7; 3318:1, 7

**oldest** [1] - 3103:10

**once** [8] - 3160:17;
3204:23; 3220:23;
3228:18, 22; 3232:19;
3305:4; 3379:23

**Once** [1] - 3236:9

**one** [96] - 3102:14;
3103:1, 14; 3104:8;
3109:20; 3112:25;
3114:24; 3120:15;
3134:7; 3135:12;
3137:14, 21; 3145:17;
3148:1; 3150:1, 8, 17;
3152:11; 3154:9;
3155:2; 3164:6;
3171:16; 3173:25;
3190:11, 13-14;
3191:14; 3192:20;
3193:21; 3196:20;
3203:17; 3204:10;
3207:14; 3211:18;
3212:13, 19-20; 3213:2;
3220:14; 3229:22;
3233:16, 21; 3234:1;
3236:13; 3248:3;
3249:14; 3266:1;
3267:25; 3270:18;
3271:12; 3274:18;
3275:4; 3279:3, 20;
3290:4; 3299:7, 16;
3300:10; 3307:20-22;
3310:13; 3315:9, 19;
3318:5, 9; 3323:2, 17;
3327:2, 23; 3342:20;
3348:11; 3351:20;
3354:3, 8; 3357:8;
3359:21; 3366:25;
3367:14; 3371:3, 10;
3380:19; 3382:3;
3386:1; 3396:2, 10;
3404:8; 3406:9, 16

**One** [18] - 3101:14;
3103:8; 3106:1, 7;
3112:10; 3120:15;
3192:22; 3274:19;
3279:3; 3290:9;
3298:13; 3342:8;
3366:3; 3373:16;

3380:18; 3396:5;
3407:25

**one-day** [1] - 3290:4

**ones** [8] - 3108:23;
3127:6; 3154:10;
3191:14; 3367:14;
3394:10; 3401:6

**open** [15] - 3126:1;
3156:1; 3179:1; 3214:1;
3227:1; 3235:1; 3259:1;
3262:19; 3268:16;
3269:8; 3295:1; 3299:7;
3373:1; 3402:1; 3405:20

**opened** [4] - 3171:14,
24; 3208:19; 3269:12

**opening** [2] - 3248:9;
3343:13

**operated** [3] - 3350:2,
4, 6

**operation** [3] -
3103:11, 25; 3104:1

**operations** [4] -
3292:16; 3310:23;
3354:6

**opportunity** [7] -
3152:1; 3154:11;
3280:6; 3386:25;
3400:4; 3401:8; 3407:8

**opposed** [2] - 3123:8;
3396:24

**option** [1] - 3397:6

**order** [4] - 3106:13;
3137:13; 3328:2; 3403:6

**ordered** [1] - 3407:15

**ordinarily** [1] -
3352:8

**ordinary** [2] - 3255:4,
6

**Orena** [5] - 3111:9, 17,
19; 3117:19; 3309:7

**organized** [13] -
3122:20; 3124:18;
3126:8, 11, 17, 22;
3127:1; 3135:18;
3140:11; 3166:2;
3192:3, 11; 3224:5

**organizer** [17] -
3388:24; 3389:4, 8, 12;
3390:15, 20-21;
3391:21; 3392:2, 5, 21;
3393:5, 18-19; 3394:5;
3395:22; 3397:3

**originally** [2] -
3221:11; 3321:11

Originally [1] - 3392:10

Otherwise [1] - 3406:23

Otisville [2] - 3282:18; 3297:13

ourselves [2] - 3194:15; 3195:8

outcount [12] - 3260:8, 11, 13, 16; 3277:9, 13-14, 16, 18, 22; 3278:3

outdoor [1] - 3313:10

outgoing [4] - 3252:25; 3265:15; 3266:25; 3268:18

outside [23] - 3144:20; 3169:23; 3170:17; 3171:2; 3175:5; 3179:19; 3180:16, 25; 3186:22; 3191:8; 3202:6; 3203:10; 3251:4; 3253:12, 25; 3254:16; 3277:15; 3330:19; 3332:21; 3336:16; 3337:10; 3376:20; 3402:6

outstanding [1] - 3270:3

overhear [7] - 3152:1; 3197:20, 22, 24; 3198:2; 3202:22; 3328:13

overheard [2] - 3163:7; 3313:12

overruled [2] - 3227:2; 3373:2

Overruled [8] - 3130:18; 3132:5; 3133:3; 3147:10; 3243:8; 3366:2; 3376:7; 3379:3

oversee [1] - 3267:25

own [5] - 3110:24; 3194:23; 3321:18; 3355:6; 3371:4

owned [3] - 3156:5; 3199:21; 3245:6

owners [2] - 3118:14

---

**P**

p.m [43] - 3115:19; 3136:5; 3170:4, 6; 3183:24; 3208:10;

---

3214:3; 3262:22; 3276:19, 21; 3313:4; 3340:25; 3341:6, 10; 3344:2, 10, 12; 3345:22; 3346:3, 9; 3347:23, 25; 3348:11; 3350:2, 20; 3362:9, 25; 3363:5, 15-16, 18, 21; 3364:5; 3369:2; 3376:13, 18, 24; 3380:19; 3381:7; 3382:11, 21; 3408:21

p.m. [1] - 3170:12

PAC [1] - 3271:23

Page [3] - 3120:2; 3409:3; 3413:2

page [30] - 3119:4, 7, 17-18; 3121:12; 3125:16; 3153:15; 3155:17; 3156:19; 3176:11; 3178:4; 3181:21; 3190:18; 3211:22; 3213:9; 3217:22; 3224:22; 3226:3; 3230:20; 3234:15; 3255:20; 3258:8; 3294:13; 3314:9; 3370:22; 3372:8; 3373:20; 3398:3; 3399:18; 3401:22

pager [3] - 3247:24; 3249:11; 3250:1

pages [2] - 3399:4; 3403:6

paid [2] - 3218:19; 3244:18

Panarella [2] - 3117:21; 3129:22

paper [3] - 3133:23; 3171:16; 3249:11

parallel [1] - 3171:13

park [3] - 3200:7; 3323:17; 3386:23

Park [7] - 3312:3; 3313:7; 3321:25; 3323:14; 3325:23; 3326:21; 3327:6

parked [21] - 3171:13; 3173:3; 3199:11; 3200:2; 3201:24; 3204:24; 3323:11; 3326:22; 3327:1; 3330:21; 3340:25; 3350:20; 3364:23;

---

3369:13; 3382:17; 3383:21; 3384:3, 25; 3385:4; 3386:18

parking [12] - 3175:10; 3305:19; 3313:24; 3314:1; 3315:3; 3323:23; 3330:10, 13, 15, 19; 3364:23; 3369:12

parks [2] - 3323:16, 21

part [25] - 3115:13, 15; 3140:19; 3152:4; 3181:3; 3182:2; 3186:1, 13; 3199:2; 3238:21; 3265:19; 3309:4; 3324:14; 3352:21, 23; 3353:10, 16; 3354:9, 12-13; 3355:11; 3376:25; 3394:24; 3396:15

participated [1] - 3295:10

particular [22] - 3124:1; 3146:1; 3155:7; 3158:2; 3173:15; 3203:13; 3204:20; 3212:18; 3254:4; 3274:12; 3293:16; 3319:24; 3324:2; 3328:8; 3329:11, 19; 3330:16; 3332:1; 3339:5; 3363:18; 3365:21; 3367:4

particularly [2] - 3246:19; 3355:21

partner [5] - 3167:4, 7, 22; 3183:6; 3220:11

party [2] - 3113:6; 3322:22

pass [1] - 3140:3

passed [1] - 3124:7

passenger [2] - 3182:13; 3350:16

passenger's [2] - 3172:5; 3180:5

password [34] - 3392:11, 14, 17-18, 24; 3393:1, 6, 9, 11-12, 17, 24; 3394:3, 10, 14-15, 20, 23; 3395:3, 16; 3396:1, 6, 13; 3399:13, 21; 3400:16, 20-21, 23-24; 3401:1

past [8] - 3145:22; 3173:19; 3346:2, 4;

---

3348:4; 3363:2; 3392:25

pastry [5] - 3340:12; 3351:10, 13, 20; 3361:18

Pathmark [1] - 3350:10

patience [1] - 3405:4

Paul [5] - 3101:22; 3225:18; 3304:18; 3309:1; 3386:2

Paulie [3] - 3182:13; 3224:18; 3227:6

Pauly [3] - 3175:9; 3181:16, 19

pause [16] - 3113:17; 3134:20; 3138:4; 3164:21; 3179:12; 3251:7; 3255:14; 3260:4; 3278:9; 3279:21; 3280:2, 23; 3301:18; 3307:15; 3309:24; 3384:15

Pause [4] - 3356:5; 3361:14; 3368:25; 3373:17

pay [4] - 3106:8; 3108:5; 3218:17, 24

paying [1] - 3218:22

People [1] - 3265:9

people [55] - 3107:18; 3110:17; 3118:10; 3122:8; 3123:1, 6, 9; 3124:5, 10, 14, 18; 3127:11; 3128:12, 14; 3129:16; 3131:22; 3132:9; 3150:15; 3158:17; 3172:18; 3187:2, 9, 14, 17; 3188:1; 3189:21, 23; 3192:10; 3194:4; 3205:6; 3207:9; 3225:22; 3229:21; 3230:7; 3233:9, 16, 21; 3253:12, 25; 3266:18; 3269:6, 15; 3279:5; 3293:8, 17; 3322:22; 3324:14; 3330:1; 3354:3; 3365:15, 25; 3366:5

pepper [4] - 3314:6; 3318:1, 8, 15

per [2] - 3272:7; 3276:9

perfect [1] - 3246:4

performed [2] - 3244:19; 3245:8

**perhaps** [1] - 3323:19
**Period** [1] - 3294:3
**period** [60] - 3103:25; 3110:13, 15, 17; 3112:4; 3122:13; 3126:13; 3163:2; 3175:2; 3183:7; 3196:6, 24; 3197:5; 3200:19; 3211:12; 3217:4, 19; 3218:12; 3223:9; 3224:11; 3225:15; 3227:12, 24; 3229:15; 3230:8; 3235:8; 3244:23; 3246:15; 3256:18, 20; 3257:12, 19; 3262:24; 3264:1, 3, 7; 3270:19; 3273:19; 3275:9; 3278:16; 3279:8, 15; 3283:5, 15; 3284:6; 3287:1, 8, 11; 3289:11; 3293:25; 3296:22; 3297:7, 18; 3325:25; 3326:9; 3364:14; 3377:8
**periodic** [1] - 3241:19
**periods** [2] - 3282:24
**Perk's** [21] - 3136:2, 9, 21-22, 25; 3137:3, 5, 8, 10; 3139:15, 17, 23; 3140:2; 3147:22, 24; 3149:3, 7; 3151:24; 3152:6; 3156:5; 3163:24
**permission** [5] - 3211:5; 3218:4, 7; 3223:13, 16
**permitted** [7] - 3212:6; 3253:24; 3270:6, 15, 24; 3275:1; 3292:12
**PERSICO** [1] - 3101:6
**Persico** [165] - 3101:18; 3117:23; 3129:25; 3131:13; 3136:8, 10, 16, 19; 3137:1, 14; 3139:15, 19, 23; 3140:20, 22, 25; 3142:14, 16, 19; 3144:20; 3145:11; 3146:4, 23; 3147:14, 17; 3148:1, 7; 3149:3, 21; 3150:1, 6, 25; 3151:16; 3152:9, 19; 3153:7; 3154:7, 25; 3155:6; 3156:5, 13; 3157:19; 3158:13;

3159:3, 24-25; 3160:17; 3162:2; 3163:20; 3164:10; 3166:23; 3169:3, 5; 3170:13, 16, 23; 3171:10, 19; 3172:2, 7, 10; 3184:20, 25; 3185:2, 10; 3186:14, 17, 23; 3187:1, 3; 3189:19; 3195:2; 3196:18; 3197:7; 3198:14; 3199:14, 21, 24; 3201:14, 22-23; 3202:9, 17, 24; 3203:2; 3206:12, 14, 18; 3208:4, 14, 17, 24; 3242:8; 3246:22; 3247:4, 8, 10; 3248:1, 4; 3250:12; 3256:4; 3259:13; 3260:20; 3261:1, 4; 3265:25; 3271:13; 3273:15; 3275:12; 3278:7, 14; 3279:6, 14, 25; 3312:13; 3313:1, 4, 15, 17, 19, 21, 23; 3314:5; 3315:2, 5; 3317:17, 21, 25; 3318:5, 15; 3320:10; 3321:7, 14; 3324:20, 25; 3325:10, 12, 17-18, 21; 3326:1, 6, 8, 20; 3327:8, 12, 14, 19; 3328:5, 17; 3329:22; 3333:4
**Persico's** [12] - 3108:4; 3156:24; 3187:24; 3195:22; 3256:14; 3315:7; 3329:5; 3330:7, 9; 3342:13; 3353:4; 3356:23
**Person** [1] - 3129:25
**person** [45] - 3110:7; 3112:18; 3116:15; 3119:12; 3122:23; 3123:5; 3125:5; 3126:5; 3128:24; 3129:22; 3150:8; 3157:11; 3158:12; 3180:4; 3186:4; 3187:22; 3193:7; 3224:17; 3227:21; 3229:6; 3231:14; 3245:15; 3269:25; 3270:2, 20, 22, 24; 3271:20; 3274:22; 3303:13;

3324:22; 3327:17; 3328:3, 6, 16; 3350:9, 18; 3374:20; 3375:11; 3382:13; 3406:19
**personal** [7] - 3271:23; 3329:7; 3350:23; 3357:14; 3358:8; 3361:15; 3393:5
**Personally** [2] - 3351:10; 3364:22
**personally** [11] - 3130:3-5; 3321:10, 13; 3340:24; 3344:15; 3347:2, 22; 3375:1; 3381:4
**persons** [1] - 3148:25
**pertaining** [1] - 3125:9
**pertinent** [4] - 3192:25; 3193:1; 3204:6; 3390:11
**Peter** [6] - 3117:13; 3128:21; 3129:13; 3246:17; 3380:20; 3403:25
**Peterson** [1] - 3112:17
**Petillo** [1] - 3229:25
**Ph** [1] - 3101:23
**phone** [72] - 3151:5, 14, 17, 21; 3159:3; 3191:9; 3211:9; 3212:9, 14; 3214:3; 3217:16, 19, 23, 25; 3218:2, 5, 8, 11, 14; 3221:4-8, 20; 3223:13, 16, 20, 25; 3231:14; 3232:6; 3233:17; 3235:12; 3238:22; 3239:10, 13, 17; 3240:15, 17, 19-20; 3241:5, 11, 15, 19, 25; 3242:1, 4-5, 9, 11; 3243:25; 3247:4; 3248:16, 23; 3253:2, 6; 3265:12; 3266:11, 14; 3267:8; 3272:14, 24; 3361:7, 16; 3399:15; 3408:6, 14
**phonebook** [1] - 3248:21
**phones** [3] - 3253:21; 3267:2, 21
**photo** [2] - 3307:22; 3325:18
**photograph** [8] - 3168:18, 24; 3169:3,

10; 3227:22; 3342:17; 3343:4; 3356:25
**photographs** [24] - 3137:22; 3152:15, 17, 25; 3162:19, 22; 3167:4, 22; 3172:22; 3193:12, 16, 19; 3306:1, 6, 9; 3308:22; 3316:6; 3335:25; 3336:3, 18; 3341:14, 24; 3343:9; 3344:1
**photos** [20] - 3137:25; 3138:10, 13; 3139:8; 3143:1, 10, 12, 17; 3167:8; 3168:3; 3306:24; 3307:3; 3316:14, 16, 21; 3317:9; 3342:1; 3351:14
**physical** [3] - 3207:14; 3320:24; 3328:18
**physically** [3] - 3279:1; 3322:20; 3392:2
**pick** [2] - 3346:1; 3350:25
**Pick** [6] - 3114:9; 3135:3; 3214:23; 3237:19; 3251:22; 3387:24
**picked** [2] - 3343:17; 3354:22
**pickup** [2] - 3200:14
**pictures** [2] - 3207:6; 3336:16
**piece** [3] - 3104:3; 3253:8; 3269:12
**Pierrepont** [1] - 3101:14
**pinpoint** [1] - 3194:17
**pitch** [2] - 3188:14, 18
**pizza** [3] - 3185:6; 3305:13, 18
**Place** [9] - 3341:13; 3343:18, 23; 3344:13, 22; 3360:21, 25; 3361:19; 3362:7
**place** [27] - 3140:13; 3145:7; 3146:10; 3185:6; 3189:2; 3198:11; 3208:16; 3209:8, 10; 3211:23; 3214:1; 3221:22; 3225:1; 3227:1; 3231:1; 3235:1; 3271:24; 3291:11, 16; 3292:1;

3328:14; 3345:12;
3355:18; 3356:2, 24;
3371:1; 3373:1
**placed** [5] - 3116:4;
3209:9, 12; 3241:5;
3288:21
**plan** [3] - 3146:9, 15;
3205:23
**planned** [4] - 3147:23;
3319:7, 11
**planning** [1] - 3249:20
**Plate** [1] - 3118:10
**plate** [13] - 3118:12;
3328:20; 3329:1, 6-7,
10, 12-13, 15-17;
3374:22
**plates** [1] - 3128:5
**platonic** [1] - 3236:25
**play** [1] - 3263:15
**played** [2] - 3179:7, 15
**playing** [3] - 3177:16,
18; 3250:20
**Plaza** [2] - 3101:14, 23
**plea** [2] - 3333:3, 5
**plumber** [1] - 3245:16
**point** [54] - 3122:19,
21, 24; 3124:13;
3148:17; 3161:12;
3162:19; 3163:11;
3186:10; 3194:2;
3196:6, 20-21; 3201:14;
3204:13; 3206:21;
3210:7; 3212:4; 3216:2;
3236:2; 3243:25;
3248:25; 3298:3;
3300:10; 3315:25;
3324:15; 3329:18;
3331:9, 21, 23; 3332:1;
3333:1; 3340:10;
3341:5; 3342:21;
3345:24; 3346:24;
3347:2; 3348:11;
3350:22; 3354:8;
3355:5, 24; 3361:17;
3379:11; 3381:9;
3382:7; 3385:9, 20;
3387:2; 3390:12
**pointing** [2] - 3212:9,
17
**points** [1] - 3212:7
**pole** [2] - 3307:22, 25
**police** [1] - 3120:12
**policy** [1] - 3270:7
**Ponte** [1] - 3220:9

**Pontecorvo** [17] -
3220:10; 3352:18;
3359:17; 3378:9;
3380:2; 3381:21;
3387:7; 3390:22;
3394:25; 3395:7, 10,
12; 3396:19; 3397:18;
3400:7; 3403:20; 3406:4
**portion** [6] - 3209:20;
3231:2; 3247:1, 12;
3250:8; 3256:9
**position** [18] -
3108:13; 3197:23;
3198:1; 3249:9, 13, 15;
3252:12; 3322:1, 20;
3323:20; 3326:15, 20,
22, 24; 3328:13;
3357:22; 3406:24
**positions** [1] -
3110:17
**possession** [2] -
3209:3; 3247:25
**possibility** [1] -
3106:11
**possible** [2] - 3154:8;
3184:5
**possibly** [2] -
3103:19; 3404:3
**poster** [2] - 3143:7, 21
**potential** [5] -
3105:18, 22, 24;
3107:1; 3407:5
**power** [4] - 3239:8;
3241:20; 3243:17
**preceding** [1] - 3371:9
**predetermined** [2] -
3201:2; 3319:17
**prejudicial** [1] -
3110:21
**prepare** [5] - 3192:18,
20; 3206:22; 3207:5;
3259:14
**prepared** [2] - 3102:7;
3109:11
**preplanned** [1] -
3181:1
**presence** [2] -
3124:22; 3191:8
**present** [20] - 3112:10,
15; 3122:22; 3127:4,
22; 3128:6, 8, 15;
3129:12, 17; 3131:14,
16, 22; 3132:13;
3191:22; 3250:23;

3267:24; 3300:3;
3333:21
**presentation** [1] -
3333:7
**presenting** [1] -
3333:3
**presents** [2] -
3202:15; 3208:5
**President** [1] -
3195:20
**President's** [1] -
3166:10
**pretty** [4] - 3188:16;
3232:13; 3267:17;
3364:25
**previous** [1] - 3309:4
**previously** [9] -
3342:5, 12; 3353:6, 9;
3363:9, 23; 3366:17;
3375:12; 3381:10
**Previously** [2] -
3292:4; 3298:19
**primarily** [1] -
3206:20
**print** [1] - 3395:18
**printed** [4] - 3397:13,
16, 20
**printout** [4] -
3389:14; 3394:21, 24
**prison** [30] - 3230:11,
15; 3233:16; 3234:9;
3236:5, 7; 3250:13;
3252:8, 15, 24; 3253:7,
9, 11, 22; 3266:15, 18;
3269:10; 3270:10;
3271:20; 3281:22;
3282:2; 3283:4, 22;
3285:12; 3286:6;
3288:22; 3290:13
**prison's** [1] - 3267:6
**prisoners** [4] -
3265:7, 12; 3267:17
**Prisons** [32] - 3253:13,
17, 24; 3254:16;
3255:1, 3; 3261:6;
3265:2, 4; 3271:4;
3272:5; 3273:1; 3274:6,
11, 16; 3275:5; 3280:9;
3281:3; 3282:15;
3288:14; 3289:9, 19-20,
25; 3291:15; 3295:17;
3296:9, 15; 3297:6;
3298:3; 3300:17; 3301:7
**Prisons's** [1] - 3255:7

**private** [1] - 3285:11
**probative** [1] -
3155:13
**problem** [6] - 3123:18;
3212:17; 3234:12;
3257:7, 11; 3268:2
**proceeded** [3] -
3141:5; 3330:24;
3377:20
**proceeding** [3] -
3110:22; 3156:19;
3231:11
**Proceedings** [1] -
3101:24
**proceedings** [21] -
3110:24; 3113:18;
3134:21; 3138:5;
3164:22; 3179:13;
3251:8; 3255:15;
3260:5; 3278:10;
3279:22; 3280:3, 24;
3301:19; 3307:16;
3309:25; 3356:5;
3361:14; 3368:25;
3373:17; 3384:16
**process** [2] - 3111:6;
3272:21
**produce** [1] - 3106:20
**produced** [8] -
3101:25; 3107:10;
3109:12; 3233:3;
3371:12; 3400:5;
3407:20
**producing** [1] -
3107:17
**profile** [1] - 3265:7
**program** [3] - 3108:23;
3109:6, 8
**proof** [1] - 3154:2
**proper** [1] - 3218:25
**prospective** [1] -
3404:19
**protected** [21] -
3394:15, 20, 23;
3395:3, 17; 3396:1, 6,
13; 3399:13, 22;
3400:16, 20-21, 23-24;
3401:1, 3, 12
**prove** [1] - 3404:23
**provide** [7] - 3106:20;
3188:15; 3399:9, 24;
3406:9; 3407:4; 3408:4
**provided** [8] -
3102:17; 3247:1;

3320:20, 22; 3380:2; 3381:20; 3394:1; 3400:11

**providing** [1] - 3110:10

**publicity** [1] - 3111:15

**publish** [5] - 3169:12; 3211:6; 3308:7; 3337:15; 3344:16

**published** [8] - 3140:6; 3144:4; 3169:16; 3211:8; 3308:11, 23; 3337:17; 3344:19

**pull** [6] - 3136:24; 3137:3; 3139:11; 3141:19; 3174:10; 3276:1

**pulled** [3] - 3174:13; 3180:18; 3304:5

**pulling** [1] - 3209:21

**punch** [1] - 3393:14

**purported** [1] - 3225:14

**purpose** [16] - 3122:6; 3131:21; 3132:2, 7; 3189:15; 3198:14; 3221:1; 3225:6; 3231:18; 3238:24; 3247:11; 3249:1; 3277:1; 3313:11; 3346:23; 3379:10

**purposes** [1] - 3263:11

**push** [1] - 3240:22

**put** [17] - 3139:8; 3171:24; 3180:4; 3208:19; 3217:21; 3250:22; 3252:19; 3271:9; 3283:11; 3284:18; 3288:11; 3296:21; 3307:13; 3311:3; 3329:14; 3393:17; 3399:24

**Put** [1] - 3252:22

**putting** [2] - 3208:22; 3287:24

**Putting** [1] - 3144:6

---

**Q**

**qualified** [1] - 3125:8

**Quantico** [1] - 3388:11

**quarter** [3] - 3312:6; 3315:19; 3322:10

**Quarters** [1] - 3261:17

**quarters** [6] - 3205:5; 3261:14, 16; 3263:23; 3276:1; 3296:6

**question's** [1] - 3297:1

**questioning** [2] - 3122:4; 3189:16

**questions** [45] - 3110:16; 3116:7; 3118:22; 3120:5; 3122:7, 12, 19; 3123:16; 3124:10, 12; 3134:6, 11; 3144:25; 3163:14, 23; 3164:5, 14; 3190:15; 3210:16; 3219:2, 13; 3221:25; 3225:21; 3231:24; 3236:12; 3237:2; 3240:2; 3244:14; 3245:23; 3264:16; 3294:9; 3296:4; 3298:11, 16; 3299:2; 3308:15; 3309:15; 3318:20; 3332:4; 3351:22; 3387:11; 3389:16; 3391:15

**quick** [2] - 3104:18; 3402:2

**quickly** [2] - 3174:13; 3188:16

**quite** [4] - 3106:9, 17; 3126:12; 3348:10

**quote** [1] - 3106:2

---

**R**

**radio** [4] - 3323:4; 3348:12; 3367:1; 3385:16

**raise** [5] - 3106:19; 3251:16; 3310:1; 3332:23, 25

**Raise** [1] - 3114:3

**Ralph** [3] - 3321:4; 3324:16; 3375:13

**ramp** [1] - 3181:11

**ran** [2] - 3118:13; 3128:5

**randomly** [3] - 3253:1, 6; 3266:11

**range** [3] - 3154:6; 3155:4

**rate** [1] - 3348:14

**raw** [1] - 3397:16

**RCP** [1] - 3141:10

**read** [8] - 3116:10; 3212:2; 3213:6; 3268:13, 16; 3351:12; 3358:7; 3405:15

**reading** [1] - 3213:2

**ready** [2] - 3191:24; 3323:24

**real** [1] - 3110:20

**realized** [1] - 3186:17

**really** [9] - 3105:21; 3110:19; 3127:16; 3222:21; 3228:21, 24; 3236:1, 4; 3379:16

**reason** [12] - 3103:23; 3122:11; 3123:7; 3148:16, 18; 3156:8; 3189:20, 22; 3225:8; 3240:21; 3345:23; 3371:6

**reasonable** [1] - 3189:5

**reasons** [3] - 3277:7; 3291:15; 3331:25

**receive** [5] - 3203:7; 3222:7; 3266:6, 22, 24

**received** [36] - 3102:10, 13; 3104:12; 3107:2; 3139:6; 3144:1; 3161:13, 20; 3168:13; 3177:5; 3179:3; 3184:4; 3259:2, 7, 20, 22; 3275:13, 20; 3280:17; 3281:11; 3307:12; 3389:7; 3390:15, 24; 3391:13; 3413:9, 11, 13, 15, 17-19, 21

**Received** [8] - 3139:4; 3143:24; 3168:11; 3280:16; 3281:10; 3307:10; 3317:3; 3337:5

**receiver** [1] - 3239:14

**receives** [3] - 3233:25; 3270:1; 3275:25

**receiving** [3] - 3161:23; 3239:15; 3269:15

**Recently** [1] - 3284:11

**recently** [4] - 3108:22; 3133:23; 3235:6; 3292:2

**reception** [6] - 3127:4, 12; 3128:15;

**3131:17; 3132:11, 14**

**Recess** [3] - 3191:1; 3332:18; 3402:24

**recess** [4] - 3191:2; 3250:25; 3332:19; 3401:10

**recognize** [18] - 3124:19, 21; 3138:11; 3143:10; 3152:12; 3167:19; 3175:24; 3193:4; 3215:23; 3227:10, 21; 3306:21; 3312:14; 3316:14; 3325:12; 3336:13; 3356:24; 3388:20

**recognized** [6] - 3122:23; 3124:20; 3152:14, 18, 24

**recollection** [24] - 3116:8; 3118:23; 3119:5, 8, 18; 3133:5, 7; 3158:4, 7, 10; 3217:3; 3230:6; 3244:23; 3320:17; 3353:15; 3357:8; 3359:7, 12; 3363:12; 3364:3; 3366:22; 3367:2; 3377:5; 3380:1

**record** [32] - 3114:10; 3124:25; 3135:4; 3165:6; 3171:6; 3191:9; 3211:9; 3214:24; 3237:20; 3250:20; 3251:23; 3256:11, 25; 3259:18; 3260:7; 3261:20; 3263:23; 3289:7; 3295:20; 3297:5; 3298:19; 3300:23; 3302:3; 3303:20, 22; 3310:7; 3334:8; 3338:12; 3342:5; 3387:25; 3408:9, 11

**recorded** [7] - 3101:24; 3253:7; 3266:15; 3271:13, 17; 3298:18, 22

**recorders** [1] - 3241:2

**recording** [5] - 3172:22; 3175:12, 16; 3247:21; 3271:8

**records** [15] - 3245:7; 3255:1; 3271:4; 3276:1; 3280:8; 3285:3, 15; 3286:6, 11; 3292:3;

3298:4; 3408:6-8, 14

**recover** [1] - 3104:7

**RECROSS** [6] - 3164:7; 3299:5; 3300:13; 3409:25; 3411:14, 16

**RECROSS-EXAMINATION** [6] - 3164:7; 3299:5; 3300:13; 3409:25; 3411:14, 16

**red** [1] - 3303:21

**redact** [1] - 3256:9

**redacted** [1] - 3258:2

**redactions** [1] - 3256:24

**REDIRECT** [8] - 3134:9; 3163:16; 3236:15; 3298:14; 3409:13, 23; 3410:20; 3411:12

**redirect** [1] - 3210:18

**Redirect** [2] - 3298:12; 3309:18

**reentered** [3] - 3313:16; 3327:7

**refer** [3] - 3116:8; 3256:12; 3354:3

**referred** [9] - 3239:14; 3248:9, 17; 3249:17, 21, 25; 3291:20; 3353:22; 3354:4

**referring** [12] - 3152:10; 3221:7; 3324:9; 3330:13; 3357:2; 3359:16; 3363:7; 3369:4; 3399:8, 13, 15; 3400:14

**refers** [1] - 3333:5

**reflect** [3] - 3170:22; 3171:6; 3303:20

**refresh** [11] - 3116:8; 3118:23; 3119:4, 8, 18; 3217:3; 3320:24; 3353:15; 3356:3; 3363:12; 3364:3

**regard** [4] - 3102:14; 3105:7; 3107:15; 3257:1

**regarded** [2] - 3126:16, 20

**regarding** [8] - 3102:7; 3103:9; 3104:19; 3110:16; 3112:12; 3113:4, 12; 3252:24

**regards** [4] - 3296:22;

3297:6, 21; 3406:25

**registered** [15] - 3118:14; 3119:2, 10, 13, 20, 25; 3199:14, 17; 3209:25; 3272:24; 3328:21; 3329:1; 3343:16; 3380:23

**registration** [3] - 3118:13; 3119:23; 3260:21

**related** [1] - 3241:21

**relates** [1] - 3257:5

**relation** [8] - 3132:21; 3195:15; 3199:11; 3201:17; 3208:14; 3238:18; 3360:13; 3384:3

**relationship** [18] - 3108:18; 3220:18; 3222:16; 3223:10; 3224:5; 3227:4; 3228:17; 3231:8, 16, 19, 22, 25; 3232:1, 4, 9, 11, 13; 3233:14

**release** [3] - 3282:4; 3283:23; 3296:20

**released** [24] - 3282:2, 9, 13, 19; 3283:1, 22; 3284:6; 3285:6, 14, 17; 3286:6; 3287:5; 3288:7, 13, 22; 3289:9; 3296:9, 12; 3297:2, 17; 3298:6; 3300:24; 3301:6

**relevance** [7] - 3122:4; 3124:3, 5; 3223:5; 3247:23; 3248:5; 3390:3

**relevancy** [1] - 3232:1

**relevant** [14] - 3104:17; 3231:2, 4, 9-10, 23; 3232:6; 3248:6; 3256:6, 15, 20; 3293:8, 14; 3371:17

**religious** [1] - 3263:11

**remain** [10] - 3134:22; 3164:24; 3214:14; 3250:13; 3298:2; 3301:21; 3331:13; 3338:2; 3346:19; 3387:18

**Remain** [2] - 3237:12; 3251:16

**remainder** [2] -

3107:3; 3269:2

**remained** [3] - 3346:21; 3364:9, 14

**Remaining** [1] - 3403:24

**remaining** [1] - 3346:23

**remember** [2] - 3220:13; 3238:16

**reminder** [1] - 3407:19

**removed** [1] - 3284:11

**renew** [1] - 3105:14

**Reni** [1] - 3239:25

**Repair** [1] - 3375:14

**repeat** [5] - 3126:19; 3132:6; 3147:11; 3306:4; 3360:23

**Repeat** [1] - 3376:8

**replaced** [1] - 3122:16

**replacing** [2] - 3104:5; 3402:18

**report** [30] - 3115:24; 3116:9; 3118:19; 3123:12; 3129:1; 3151:11; 3159:7, 11; 3192:18, 20-22, 24; 3206:23; 3292:19; 3325:16; 3371:2, 10; 3395:1, 13; 3396:20; 3397:19; 3399:3; 3400:2, 6, 8, 13, 15

**reported** [3] - 3358:2, 22; 3405:16

**Reporter** [1] - 3101:22

**reporting** [2] - 3358:24; 3359:8

**Reporting** [1] - 3359:1

**reports** [2] - 3207:5; 3371:9

**represent** [1] - 3341:25

**represented** [1] - 3109:17

**represents** [1] - 3109:23

**request** [6] - 3104:8; 3105:18; 3245:13; 3272:14; 3319:14; 3406:9

**requested** [2] - 3109:12; 3245:9

**requires** [2] - 3104:1; 3247:20

**research** [1] - 3405:18

**resided** [2] - 3195:22; 3206:20

**residence** [29] - 3140:23; 3141:2; 3195:21; 3196:18, 25, 20; 3320:1; 3322:4, 8; 3323:14; 3349:9, 11, 18; 3361:19, 22, 25; 3362:3, 8; 3380:3, 10, 14; 3381:2, 6; 3382:11, 17

**residing** [1] - 3196:5

**respect** [19] - 3105:17; 3107:20; 3126:8; 3128:10; 3177:3, 5; 3190:15; 3233:2; 3234:8; 3246:20; 3248:19; 3250:8; 3256:2; 3281:5; 3284:25; 3285:21; 3320:10; 3408:5, 7

**responded** [1] - 3247:18

**responding** [1] - 3248:7

**responds** [2] - 3247:4; 3249:5

**response** [3] - 3106:15; 3174:10; 3275:19

**responsibilities** [1] - 3252:15

**rest** [6] - 3102:17; 3258:1; 3261:19; 3351:12; 3403:10; 3404:21

**Restaurant** [18] - 3166:21, 25; 3167:1; 3312:3, 5, 8; 3313:16; 3315:14, 17; 3318:11, 18; 3321:3; 3322:11, 13, 15; 3327:7; 3330:11, 20

**restaurant** [53] - 3166:24; 3168:19, 25; 3169:11; 3185:6, 16, 24; 3186:15, 18, 22; 3194:4, 19, 23; 3207:25; 3305:13, 19; 3312:13; 3313:5, 8; 3316:2, 4; 3320:14; 3321:6, 8, 11, 14, 19; 3322:2, 4, 21; 3323:6,

18; 3325:1; 3330:8; 3331:1, 4, 7, 14-15; 3355:17, 23; 3356:7, 10-11, 13, 17, 20; 3357:1, 3-4, 6, 11; 3358:4

**resting** [1] - 3102:8

**restrictions** [1] - 3253:16

**result** [2] - 3104:25; 3328:7

**resume** [4] - 3191:24; 3332:11; 3401:18; 3402:3

**resumes** [4] - 3102:1; 3191:20; 3344:6; 3385:23

**retake** [1] - 3344:5

**retired** [2] - 3310:17; 3338:23

**retrieved** [2] - 3171:14; 3389:24

**return** [3] - 3217:22; 3246:7; 3301:7

**returned** [3] - 3321:25; 3341:4, 10

**review** [3] - 3137:25; 3218:19; 3400:4

**reviewed** [5] - 3175:16; 3306:9; 3320:25; 3325:15; 3336:3

**Richmond** [1] - 3335:12

**Rico** [5] - 3228:24; 3229:6, 9, 11, 22

**riding** [1] - 3355:5

**right's** [1] - 3144:16

**right-hand** [1] - 3343:3

**rights** [1] - 3109:4

**ring** [1] - 3241:2

**Rio** [2] - 3206:8; 3209:19

**risk** [1] - 3110:20

**River** [1] - 3105:14

**Rizzuto** [7] - 3175:9; 3181:17, 19; 3182:13; 3224:18; 3225:18; 3227:6

**RMR** [1] - 3101:22

**Road** [16] - 3101:20; 3305:14; 3313:23; 3315:14; 3318:12; 3330:16, 25; 3335:12;

3360:11, 14; 3383:23; 3384:1

**Robert** [1] - 3117:3

**ROBERT** [1] - 3101:19

**Rockville** [6] - 3312:2, 5; 3317:9, 13; 3323:14

**Romantique** [16] - 3136:2, 9, 20; 3145:7, 10; 3147:22, 24; 3148:8; 3156:4, 12, 16, 23; 3157:11; 3199:14, 18, 21

**room** [28] - 3254:4, 8-9; 3259:25; 3260:13; 3261:2; 3263:11; 3277:17, 21; 3279:7, 13; 3290:24; 3291:4, 9, 11, 14; 3292:12; 3293:19, 21; 3295:6; 3298:16, 20, 22, 24; 3299:7; 3300:3; 3377:3

**rooms** [2] - 3298:24; 3299:10

**Rosatti** [5] - 3166:23; 3168:24; 3169:4; 3193:18

**ROSLYNN** [1] - 3101:12

**Rossville** [2] - 3360:11, 14

**route** [2] - 3366:8; 3367:6

**routine** [5] - 3181:3; 3346:4, 8; 3362:24; 3368:2

**routinely** [4] - 3188:13; 3189:22; 3228:10; 3236:7

**run** [2] - 3103:20; 3105:23

**running** [2] - 3175:14; 3240:25

**rushing** [1] - 3333:17

**Russo** [2] - 3281:6, 16

---

## S

**S-E-L-L-E-R-S** [1] - 3215:1

**safely** [1] - 3205:13

**Sal** [3] - 3118:4; 3129:17; 3132:10

**salt** [4] - 3314:6; 3318:1, 7, 15

**Salvatore** [2] -

3119:10, 15

**sample** [1] - 3393:10

**SARITA** [1] - 3101:16

**save** [1] - 3110:5

**saw** [95] - 3116:14; 3136:8, 19, 24; 3137:1, 13; 3140:25; 3141:18, 25; 3142:11; 3148:1, 4, 6, 14; 3150:24; 3151:2; 3152:9, 11; 3154:15, 19; 3162:8, 16; 3163:25; 3164:10; 3170:16; 3171:2; 3172:1; 3173:24; 3174:25; 3177:12; 3180:24; 3186:8; 3193:7; 3195:2; 3199:24; 3201:14, 17; 3202:8, 17, 24; 3206:1; 3208:22; 3209:4, 8; 3224:10; 3225:21; 3229:3; 3303:13; 3304:2; 3311:17; 3316:1; 3319:5; 3320:13; 3321:3, 9, 13, 16; 3325:9, 20; 3340:13; 3342:1; 3344:12; 3348:1, 3, 14, 17; 3350:10; 3351:10, 13, 15-16, 18; 3357:5; 3358:14; 3359:3, 19; 3360:2, 4-6; 3361:17; 3362:2; 3365:9; 3366:23, 25; 3369:1, 14; 3380:17; 3385:5; 3386:17

**scenario** [1] - 3234:2

**scene** [1] - 3268:3

**schedule** [4] - 3102:5, 7; 3103:22; 3404:19

**scheduled** [1] - 3103:23

**schedules** [1] - 3404:20

**scheduling** [2] - 3102:4; 3103:9

**school** [1] - 3103:24

**scope** [10] - 3153:10; 3189:4; 3196:15; 3200:23; 3223:6; 3225:3; 3293:3; 3370:17; 3372:4; 3374:14

**Scopo** [1] - 3117:25

**Scott** [2] - 3164:20;

3165:7

**SCOTT** [2] - 3165:1; 3410:3

**screen** [19] - 3139:11; 3144:6; 3179:18, 23; 3180:13; 3181:15; 3214:11; 3217:21; 3252:19, 22; 3260:3; 3261:11; 3268:23; 3269:7; 3283:11; 3284:18; 3286:2; 3307:14; 3311:3

**se** [1] - 3186:7

**seal** [1] - 3269:3

**sealed** [1] - 3268:19

**seasoned** [2] - 3355:6, 11

**seat** [16] - 3114:8; 3135:2; 3144:17; 3165:4; 3180:5; 3182:7, 11, 14; 3214:22; 3251:21; 3302:1; 3310:6; 3334:6; 3338:10; 3387:23; 3404:16

**seated** [6] - 3102:2; 3113:24; 3191:23; 3251:12; 3333:22; 3404:15

**second** [6] - 3212:22; 3217:22; 3284:10; 3353:17; 3386:1; 3404:8

**security** [4] - 3106:9; 3108:23; 3109:5, 8

**Security** [1] - 3238:5

**See** [4] - 3246:8; 3250:7, 24; 3405:22

**see** [131] - 3103:17; 3104:11, 13, 25; 3112:18; 3113:23; 3116:5, 18; 3119:20, 25; 3122:3; 3125:4; 3129:2, 5; 3131:18, 20; 3136:7, 10, 23; 3137:2; 3138:21; 3139:8; 3141:17, 24; 3142:3, 15; 3144:7; 3149:12; 3155:7, 13; 3158:16, 19; 3163:4; 3168:2, 20, 22; 3169:9; 3170:18; 3171:10, 21; 3172:2; 3174:23; 3179:20; 3181:10; 3182:9, 14; 3184:22; 3185:25; 3186:6, 8; 3192:10;

3202:15; 3203:2, 7, 18; 3206:12, 14; 3207:25; 3208:8, 12, 15, 21; 3209:3, 6, 10; 3218:25; 3224:7, 12; 3228:16; 3232:1; 3242:15; 3252:19; 3281:17; 3282:11; 3284:21; 3297:21; 3303:15; 3308:1; 3312:19; 3313:13; 3314:4; 3315:6; 3316:3; 3320:7; 3321:11, 15; 3322:1; 3323:20; 3325:6; 3326:24; 3327:23; 3328:5; 3341:3, 8; 3343:15; 3346:17, 24; 3348:24; 3349:13; 3350:9; 3351:10; 3357:19, 22-23; 3361:2, 8, 15; 3363:6; 3365:10; 3367:11; 3368:15; 3371:21, 25; 3381:2; 3384:13; 3385:6; 3386:25; 3392:24; 3394:4, 6; 3399:7, 18; 3405:20; 3407:17

**seeing** [11] - 3119:9; 3139:14; 3148:22; 3174:10; 3179:18; 3180:13; 3198:14; 3205:25; 3206:3; 3322:20; 3339:23

**seek** [2] - 3110:14; 3408:16

**SELLERS** [2] - 3214:17; 3410:13

**Sellers** [15] - 3103:4; 3191:6; 3210:4; 3211:10, 14; 3214:10, 12, 25; 3219:18; 3222:15; 3227:4; 3229:13; 3230:10; 3235:4

**send** [3] - 3241:18; 3365:14, 25

**sending** [1] - 3268:25

**senior** [1] - 3339:10

**Senior** [26] - 3117:23; 3129:25; 3131:13; 3132:21; 3219:4; 3225:13; 3238:10; 3339:11, 16; 3340:14; 3341:9; 3342:23; 3343:6, 17; 3344:22; 3346:7, 15; 3347:3;

3348:25; 3349:13, 22; 3351:8; 3363:13; 3364:4; 3379:10; 3381:10

**Senior's** [4] - 3133:1; 3248:2; 3350:1, 8

**sent** [13] - 3240:17; 3282:12, 18; 3365:16, 20; 3366:5; 3367:4; 3390:21; 3394:24; 3395:4, 12; 3404:7, 9

**sentence** [1] - 3236:20

**separate** [3] - 3193:25; 3323:2; 3353:25

**September** [12] - 3112:11, 16; 3246:23; 3257:8; 3261:25; 3264:2; 3282:6, 20, 22-23; 3283:6

**serial** [1] - 3388:25

**series** [2] - 3102:6; 3116:13

**serve** [1] - 3262:18

**served** [1] - 3150:13

**servicing** [1] - 3164:2

**Sessa** [2] - 3112:1; 3172:4

**SESSION** [1] - 3251:1

**set** [6] - 3139:7; 3147:23; 3174:17; 3242:5; 3243:24; 3314:8

**setting** [3] - 3239:8; 3313:11; 3346:13

**seven** [9] - 3105:3; 3154:23; 3158:23; 3292:3; 3349:12; 3352:24; 3354:9, 25; 3355:8

**several** [7] - 3106:10; 3174:16, 19; 3203:16, 21; 3262:2; 3373:7

**SEYBERT** [1] - 3101:9

**shall** [1] - 3111:10

**Shalomar** [3] - 3115:9, 11

**Sharp** [4] - 3388:24; 3389:3; 3392:8, 18

**sheet** [3] - 3128:2; 3355:4

**shift** [5] - 3268:21; 3359:5, 8

**shining** [1] - 3113:23

**shirt** [2] - 3136:14;

3382:6

**shooting** [1] - 3104:21

**shop** [6] - 3141:4; 3340:12; 3351:10, 13, 20; 3361:19

**shopping** [1] - 3330:22

**shops** [1] - 3137:11

**Shore** [3] - 3383:23; 3384:1

**short** [3] - 3175:2; 3372:3; 3404:10

**shortens** [2] - 3248:17, 23

**shortly** [2] - 3331:9; 3357:13

**Shortly** [1] - 3304:10

**shots** [2] - 3193:17, 20

**show** [32] - 3122:20; 3124:13; 3144:18; 3227:8, 19; 3229:4; 3242:7; 3254:24; 3256:4, 11; 3259:10; 3260:2; 3261:10; 3273:12; 3278:6; 3279:24; 3280:20; 3340:21; 3347:16; 3349:24; 3353:3; 3356:22; 3363:9; 3367:12; 3371:15; 3382:24; 3384:19, 22; 3388:18; 3389:25; 3391:18; 3394:13

**showed** [1] - 3204:22

**Showing** [9] - 3138:8; 3139:18; 3143:6; 3216:25; 3263:22; 3283:13; 3318:13; 3341:21; 3363:23

**showing** [10] - 3139:21; 3167:14; 3175:22; 3211:17; 3215:21; 3257:16; 3306:15; 3316:11; 3317:12; 3336:9

**shown** [1] - 3371:11

**side** [15] - 3137:14; 3150:1, 6, 8, 11; 3166:20; 3171:13; 3172:3, 5; 3173:20; 3180:2; 3298:24; 3304:5

**sidebar** [6] - 3189:2; 3211:23; 3225:1; 3231:1; 3371:1; 3397:23

**Sidebar** [12] - 3122:1;

3125:15; 3154:1; 3155:16; 3177:1; 3178:3; 3256:1; 3258:7; 3293:1; 3294:12; 3399:1; 3401:21

**sides** [1] - 3185:14

**sidewalk** [1] - 3201:21

**sight** [2] - 3326:5

**sign** [3] - 3180:18; 3324:24; 3348:5

**signal** [2] - 3241:19; 3243:18

**signals** [1] - 3241:18

**significance** [2] - 3123:3, 6

**significant** [2] - 3228:19; 3377:9

**Significantly** [2] - 3149:10

**significantly** [1] - 3151:25

**signify** [1] - 3281:23

**similar** [1] - 3393:7

**Similar** [1] - 3137:11

**Similarly** [2] - 3275:25; 3327:1

**similarly** [5] - 3193:18; 3256:14; 3283:14; 3363:19; 3370:15

**simply** [3] - 3185:17; 3282:14; 3288:10

**simultaneously** [4] - 3207:6, 8; 3395:19, 21

**single** [2] - 3189:6; 3394:8

**sirens** [1] - 3241:2

**sister** [1] - 3270:8

**sit** [2] - 3107:4; 3199:8

**Sitting** [3] - 3170:21; 3171:5; 3216:18

**sitting** [6] - 3107:9; 3152:11; 3157:9; 3166:20; 3221:14; 3361:23

**situation** [2] - 3104:9; 3250:3

**Six** [2] - 3323:1

**six** [9] - 3103:25; 3105:3; 3119:7; 3263:9; 3267:8; 3319:22; 3322:24; 3324:13;

3326:12

**six-week** [1] - 3103:25

**sixth** [1] - 3262:4

**size** [2] - 3149:9; 3299:22

**slip** [1] - 3249:11

**slows** [1] - 3105:21

**small** [1] - 3307:3

**smaller** [3] - 3149:10; 3151:25

**smiling** [1] - 3113:23

**SO** [2] - 3302:19; 3310:24

**SO-13** [2] - 3353:18; 3354:6

**SO-8** [1] - 3334:22

**Social** [14] - 3169:23, 25; 3170:17; 3171:3; 3172:11; 3173:19; 3174:7; 3179:19; 3180:25; 3198:5, 8, 12, 17; 3208:3

**social** [23] - 3170:12, 14; 3172:16; 3275:18; 3277:25; 3279:10, 15; 3299:14; 3347:6, 8, 19, 21; 3348:2, 7, 21, 24; 3366:8, 13, 18; 3368:9; 3369:4; 3378:1

**software** [4] - 3392:9, 15, 23; 3393:8

**someone** [37] - 3107:20; 3108:16; 3119:25; 3122:20; 3124:20; 3126:17, 21; 3129:5; 3131:5; 3132:16; 3150:19, 22; 3188:10; 3219:3, 6; 3228:6, 10; 3232:4; 3235:4; 3238:10; 3240:22; 3241:9; 3242:20, 25; 3248:6, 16; 3249:4; 3254:15; 3269:21; 3321:25; 3325:12; 3326:3; 3367:10; 3374:9; 3381:22; 3385:5; 3402:18

**Someone** [2] - 3151:21; 3233:9

**sometime** [4] - 3204:14; 3364:8; 3379:18, 23

**Sometime** [2] - 3358:21; 3379:19

**sometimes** [5] - 3276:11; 3353:20; 3365:9; 3404:20; 3405:8

**Sometimes** [1] - 3365:8

**somewhat** [1] - 3105:20

**somewhere** [6] - 3204:24; 3207:11; 3289:3; 3365:15; 3377:3; 3383:16

**Son** [1] - 3270:18

**son** [4] - 3103:10; 3105:9; 3350:3, 8

**son's** [1] - 3133:8

**soon** [2] - 3105:7; 3107:13

**Sorry** [3] - 3215:18; 3333:16; 3386:3

**sorry** [25] - 3111:23; 3139:22; 3215:15; 3222:23; 3235:9; 3243:23; 3254:25; 3270:11; 3286:7, 21; 3306:3; 3313:2; 3324:10; 3326:5; 3333:12; 3350:16; 3353:7, 24; 3356:8; 3360:23; 3363:10; 3376:16; 3403:4; 3405:2; 3406:11

**sort** [4] - 3121:8; 3225:22; 3263:15; 3403:7

**sound** [1] - 3220:12

**sounds** [1] - 3158:25

**source** [1] - 3184:15

**south** [2] - 3386:18, 24

**southeast** [2] - 3195:16

**Southern** [4] - 3114:13; 3120:19; 3121:6; 3122:14

**Spataro** [1] - 3120:1

**speaking** [4] - 3126:5; 3218:14; 3231:7; 3253:4

**speaks** [2] - 3233:15; 3234:9

**Special** [26] - 3110:9; 3145:19; 3146:3; 3164:19; 3165:18; 3169:19; 3252:13; 3301:16; 3302:4, 13; 3310:20; 3332:14; 3333:24; 3334:18; 3337:25; 3344:8;

3351:6; 3352:17; 3381:20; 3387:16; 3390:21; 3394:24; 3395:12; 3397:18

**special** [11] - 3105:11; 3126:7; 3165:19; 3252:15, 23; 3264:21, 24; 3302:14; 3310:23; 3354:6

**specialty** [1] - 3121:8

**specific** [21] - 3106:1; 3122:5; 3133:5, 7; 3185:18; 3189:17; 3192:17; 3201:2; 3212:4; 3225:6, 15; 3233:8; 3238:16; 3293:25; 3294:9; 3344:1; 3345:13; 3351:8; 3357:8; 3359:7; 3377:5

**specifically** [19] - 3115:4; 3127:24; 3135:19; 3151:21; 3154:22; 3158:18; 3183:12; 3185:5, 9; 3225:12; 3231:21; 3245:9; 3257:25; 3265:19; 3310:25; 3320:9; 3367:13; 3371:15; 3400:15

**Specifically** [1] - 3352:20

**specifications** [1] - 3267:15

**specify** [1] - 3400:22

**speed** [2] - 3348:15, 18

**spell** [11] - 3114:10; 3135:4; 3165:5; 3214:24; 3237:20; 3251:22; 3302:2; 3310:7; 3334:8; 3338:12; 3387:24

**spend** [2] - 3228:19; 3347:22

**Spero** [3] - 3118:2; 3129:20; 3130:11

**spillover** [1] - 3110:21

**Spitalere** [1] - 3172:20

**spoken** [3] - 3127:6; 3225:21; 3231:3

**spotted** [1] - 3367:16

**spreads** [1] - 3188:16

**Squad** [2] - 3165:24;

3166:1

**squad** [25] - 3135:18; 3140:11; 3145:13; 3165:23; 3166:3; 3183:9, 11-12; 3302:16-19; 3310:24; 3334:21, 23, 25; 3335:2; 3339:2; 3353:18; 3354:1, 5-6, 16

**squads** [1] - 3354:8

**Staluppi** [2] - 3193:8

**stamp** [2] - 3284:14, 17

**stand** [9] - 3191:20; 3212:5; 3213:5; 3260:9; 3296:3; 3344:5; 3348:6; 3385:23

**standing** [8] - 3134:22; 3164:24; 3214:14; 3237:12; 3251:16; 3301:21; 3338:2; 3387:18

**stands** [4] - 3262:10; 3286:18, 22; 3297:15

**Star** [2] - 3305:14

**start** [14] - 3105:22; 3140:21; 3146:13; 3198:9; 3311:12, 14; 3345:5, 20; 3349:10; 3355:13, 19; 3400:1; 3404:25; 3405:1

**started** [13] - 3140:23; 3155:9; 3159:19; 3204:15, 20, 22; 3287:18; 3304:23; 3319:14; 3331:22; 3345:23; 3354:22

**Starting** [2] - 3342:17; 3352:5

**starting** [1] - 3403:11

**starts** [2] - 3240:25; 3287:13

**State** [7] - 3135:3; 3165:5; 3302:2; 3310:7; 3334:8; 3338:12; 3387:24

**state** [8] - 3110:22; 3114:9; 3214:24; 3237:20; 3251:22; 3252:8; 3281:22; 3285:12

**statement** [2] - 3247:16; 3248:9

**statements** [1] - 3198:2

**Staten** [21] - 3119:24; 3140:24; 3141:6, 11; 3211:14; 3216:17, 19; 3217:9; 3238:15; 3239:21; 3335:14; 3336:17; 3339:23, 25; 3340:2; 3349:8; 3357:15; 3360:8, 16; 3383:15

**STATES** [4] - 3101:1, 3, 10, 12

**states** [1] - 3282:4

**States** [3] - 3101:5; 3114:12; 3120:19

**station** [3] - 3238:25; 3239:1, 19

**status** [1] - 3106:9

**stay** [6] - 3104:1; 3313:18; 3315:20; 3347:24; 3367:17, 21

**stayed** [4] - 3315:21; 3327:23; 3367:8, 14

**staying** [1] - 3148:20

**stays** [1] - 3262:6

**stenography** [1] - 3101:24

**Step** [1] - 3214:14

**step** [19] - 3134:22; 3164:16, 24; 3210:21; 3237:5, 11; 3245:25; 3301:14, 21; 3309:20; 3332:8; 3338:2; 3342:11; 3382:22; 3383:7; 3387:13, 17; 3402:6; 3406:1

**stepped** [1] - 3304:5

**steps** [8] - 3209:1; 3210:23; 3237:7; 3246:2; 3332:9; 3337:23; 3342:15; 3382:25

**still** [11] - 3109:2; 3124:8; 3180:16; 3183:15; 3232:20; 3270:15; 3288:17; 3298:4; 3323:19; 3354:15; 3362:8

**Stilupi** [4] - 3166:24; 3168:25; 3169:1, 3

**stipulate** [5] - 3249:7, 9, 18, 23; 3257:19

**stipulation** [1] - 3124:23

**stood** [2] - 3186:22; 3348:9

**stop** [3] - 3159:18, 23; 3293:11

**Stopped** [1] - 3205:17

**stopped** [6] - 3160:4; 3205:14, 16; 3366:18; 3377:2

**store** [12] - 3150:15; 3340:12; 3350:10, 19; 3351:16; 3358:5; 3359:25; 3360:2, 5-7; 3361:18

**stores** [1] - 3351:8

**story** [1] - 3294:3

**Street** [38] - 3101:17; 3166:10; 3167:2; 3170:1; 3173:10, 16, 18; 3174:21; 3195:15; 3339:19; 3347:9, 20; 3350:21; 3355:14; 3357:17; 3360:13; 3366:3, 21; 3367:3; 3375:13; 3377:21; 3382:19; 3383:10, 21, 24; 3384:2, 10, 19, 22; 3385:3, 14, 20; 3386:6, 12, 18, 24

**street** [17] - 3137:2; 3171:12; 3173:4; 3177:11; 3180:24; 3185:14; 3195:11, 16; 3199:13, 16; 3200:2; 3202:1; 3205:1, 3; 3326:9; 3340:1

**streets** [3] - 3195:9; 3342:20; 3384:24

**strip** [15] - 3340:11; 3341:1; 3342:19; 3343:5, 11, 20; 3344:1; 3351:13, 17; 3357:15; 3359:24; 3360:9; 3361:3

**Stripoli** [2] - 3142:17

**stuff** [1] - 3234:4

**stumbled** [1] - 3367:6

**subject** [3] - 3108:24; 3259:3, 17

**submitted** [2] - 3191:11; 3406:5

**submitting** [1] - 3404:24

**subpoena** [12] - 3106:4, 16; 3109:11; 3222:7; 3275:20, 25;

3406:8-10, 12-13; 3407:13

**subscribed** [1] - 3239:22

**subsequent** [1] - 3154:10

**subsequently** [2] - 3197:7; 3369:20

**substance** [1] - 3104:4

**substantial** [2] - 3106:13; 3246:15

**suggesting** [1] - 3130:23

**Suite** [3] - 3101:17, 20, 23

**Sullivan** [3] - 3113:1, 4; 3403:25

**summation** [1] - 3248:10

**sunglasses** [2] - 3180:4; 3382:6

**Sunrise** [2] - 3321:25; 3323:19

**suppose** [1] - 3333:14

**supposed** [4] - 3162:24; 3268:19, 22; 3300:5

**Supposed** [1] - 3300:4

**surgeries** [1] - 3104:6

**Surgery** [1] - 3105:12

**surgery** [2] - 3104:2; 3105:10

**surmised** [2] - 3360:1

**surprised** [1] - 3402:17

**surreptitious** [1] - 3295:5

**surreptitiously** [2] - 3292:18; 3295:20

**surveil** [15] - 3115:18; 3140:19; 3154:24; 3155:6; 3158:12; 3185:1; 3197:17; 3311:11; 3319:14; 3327:13, 18; 3352:10, 15; 3362:16; 3379:6

**surveillance** [175] - 3113:1; 3115:8, 13; 3120:10, 22; 3124:17; 3126:14, 16, 20; 3131:21; 3132:2, 7; 3133:18, 21; 3134:1, 3; 3135:23; 3137:22; 3140:22; 3142:14, 22,

25; 3145:15; 3146:10, 23; 3147:5, 14, 16; 3148:9, 16, 19; 3151:4, 11; 3154:17; 3157:14, 18, 22; 3158:9, 22; 3159:7, 11, 13, 16, 18; 3160:4; 3161:11, 21; 3162:4; 3163:19; 3166:9, 11, 16; 3167:5; 3169:23; 3170:3, 7; 3173:22; 3174:17; 3176:2; 3177:4; 3181:1, 5-6; 3182:3; 3183:1, 17; 3184:3, 6; 3189:8, 17; 3192:2, 9, 18, 20-21, 24; 3193:16, 20; 3195:24; 3197:10, 13, 16, 18; 3198:4, 22; 3199:2, 9; 3200:20; 3201:5, 7; 3204:4; 3206:23; 3207:24; 3210:8, 13; 3291:7; 3302:19, 24-25; 3303:3; 3304:23; 3306:2, 7, 24; 3309:3, 12; 3311:12; 3315:22; 3316:3; 3319:2, 4, 8, 18, 22; 3321:21; 3322:3, 5, 7; 3323:15; 3325:19; 3328:18; 3331:10, 12, 21, 24; 3332:16; 3335:9, 16, 20; 3336:1; 3339:2, 13; 3340:16, 23; 3341:6; 3344:9, 14; 3345:2, 5, 11, 21, 23; 3346:13; 3347:18; 3349:4, 6, 11, 25; 3352:5; 3353:17, 19; 3354:2, 23; 3355:13; 3357:18; 3362:5, 23; 3363:14, 25; 3373:4, 11; 3374:2; 3375:21; 3376:1, 9, 17, 20; 3377:9, 11, 23, 25

**Surveillance** [2] - 3193:17; 3335:8

**surveillances** [25] - 3113:5; 3131:2; 3132:20, 25; 3153:6; 3154:6, 10, 21; 3155:5; 3190:7, 9; 3200:18; 3204:8, 14, 18; 3208:14; 3309:5; 3319:15; 3324:8, 11; 3328:25; 3339:1; 3363:2; 3375:16;

surveilled [7] - 3197:7; 3352:9; 3362:1; 3363:3, 13, 19; 3368:14

surveilling [12] - 3148:25; 3155:10; 3159:24; 3184:19; 3192:5; 3339:5; 3361:6; 3362:14; 3368:20; 3373:8; 3374:10

sustained [6] - 3155:15; 3156:2; 3190:5; 3191:25; 3192:15; 3390:5

Sustained [63] - 3120:24; 3121:3; 3129:10; 3130:9; 3131:24; 3132:23; 3146:7; 3147:2; 3152:22; 3153:11; 3157:7; 3163:13; 3187:12, 18; 3188:4, 20; 3192:7; 3196:11, 16; 3198:24; 3199:4; 3200:24; 3203:24; 3222:9, 13; 3223:7, 22; 3224:2; 3228:13; 3230:13, 17; 3242:23; 3243:3, 12, 21; 3244:8, 21; 3253:19; 3292:22; 3309:10; 3323:9; 3325:4; 3328:23; 3352:13; 3358:12; 3360:18; 3365:23; 3367:19, 23; 3368:5; 3370:13, 19; 3374:15; 3375:19, 23; 3378:6, 17; 3386:9, 14, 21; 3387:9; 3390:18; 3391:6

SUV [4] - 3136:24; 3141:19; 3315:4; 3318:1

sweater [7] - 3136:13; 3170:21; 3171:5; 3303:21; 3312:22; 3317:17, 22

sweatshirt [1] - 3180:1

sworn [19] - 3114:3, 6; 3134:23, 25; 3164:24; 3165:2; 3214:14, 19; 3237:12, 16; 3251:19; 3301:22, 24; 3310:4; 3334:3; 3338:3, 7; 3387:18, 21

system [13] - 3238:22; 3239:5, 10; 3240:7, 18,

23; 3242:2, 20; 3243:1; 3292:2, 8; 3298:19

systems [1] - 3238:5

---

## T

T-shirt [1] - 3136:14

table [5] - 3152:11; 3185:25; 3221:14; 3222:4, 6

tables [2] - 3263:9; 3267:23

tag [1] - 3380:20

tags [2] - 3339:18; 3361:4

taller [2] - 3180:14; 3314:8

tank [1] - 3382:6

tape [3] - 3247:12; 3271:8

target [1] - 3232:4

Task [1] - 3334:24

tasked [1] - 3197:17

team [58] - 3109:21; 3115:14-16, 20; 3116:14; 3118:6; 3122:6, 8; 3127:19; 3137:17, 20; 3140:19, 21; 3141:7, 18, 21; 3199:2; 3303:2; 3306:1, 6; 3316:16; 3321:21; 3322:23; 3324:12-14; 3345:2; 3352:21-23, 25; 3353:2, 16-18, 21-23; 3354:3, 5, 9-10, 12-13, 19; 3355:11; 3357:21, 23; 3358:1, 9; 3359:9; 3362:19; 3364:15; 3369:21; 3373:7

teams [7] - 3323:16; 3353:19, 25; 3354:2, 11, 15

technically [1] - 3102:23

technician [5] - 3252:13, 16, 23; 3264:22, 25

Teddy [3] - 3117:23; 3129:25; 3131:13

TEL [1] - 3399:18

telephone [13] - 3240:11; 3241:12; 3259:12; 3272:13, 15; 3394:7, 12; 3396:25; 3397:4, 6, 10, 14

ten [7] - 3172:12; 3312:12; 3313:14; 3395:23; 3396:1, 12; 3404:18

Ten [2] - 3166:4; 3252:11

terminate [8] - 3142:21; 3331:10, 20, 23; 3362:5; 3377:15, 23

terminated [14] - 3108:21; 3142:24; 3316:2; 3344:9, 13; 3375:16, 21; 3376:1, 10, 13-14, 17; 3377:11, 25

terms [10] - 3102:4; 3107:17; 3108:14; 3112:8; 3189:5; 3207:9; 3218:21; 3232:7; 3278:24; 3296:20

Terrorist [1] - 3334:24

Tesoro's [7] - 3315:14, 17; 3318:11, 18; 3330:11, 19, 24

testified [51] - 3110:11; 3111:2, 19, 21, 24; 3114:7; 3122:16; 3135:1; 3154:5, 14; 3161:12; 3165:3; 3183:1; 3187:20; 3188:22; 3203:10; 3214:19; 3223:12; 3237:16; 3240:6; 3251:20; 3264:21; 3269:15; 3271:8; 3273:12, 14; 3276:4; 3293:6; 3301:25; 3310:5; 3320:16; 3324:16; 3325:9, 15, 20; 3329:22; 3334:3; 3338:7; 3352:8; 3360:20; 3362:21; 3364:9; 3366:12; 3367:25; 3371:5, 18, 20; 3375:25; 3378:8; 3381:14; 3387:22

testifies [1] - 3113:8

testify [12] - 3108:15; 3110:25; 3111:8; 3113:4; 3222:7; 3232:12; 3235:16, 19; 3320:25; 3324:18; 3326:25; 3371:24

testifying [4] - 3177:4; 3222:5; 3325:16

testimony [22] - 3104:19; 3110:8, 14; 3111:1, 5; 3113:13; 3115:23; 3129:17; 3210:6; 3212:23; 3225:8; 3231:3; 3234:7; 3235:24; 3236:3; 3244:5; 3246:18; 3250:4; 3366:16; 3406:19; 3407:3

tests [1] - 3103:17

TEX [1] - 3297:15

Texarkana [1] - 3297:15

Texas [1] - 3297:16

text [1] - 3397:1

THE [388] - 3101:9; 3102:2, 12, 21, 24; 3103:5; 3105:9, 12, 15; 3106:25; 3107:16, 25; 3108:4, 8, 12; 3109:5, 9, 14, 17; 3110:3; 3111:4, 10, 14, 21, 24; 3112:2, 6, 18, 21; 3113:9, 15, 19, 22; 3114:3, 8, 11; 3116:2; 3120:24; 3121:3, 10; 3122:2, 18, 24; 3123:10; 3124:13, 23; 3125:8, 11, 13; 3129:10; 3130:9, 18; 3131:24; 3132:5, 23; 3133:3, 13; 3134:8, 16, 22; 3135:2, 5, 7; 3136:17; 3138:3; 3139:4, 10; 3140:4; 3142:9; 3143:4, 24; 3145:1; 3146:7; 3147:2, 10; 3152:22; 3153:11, 13; 3154:2, 14, 18; 3155:8, 13; 3156:2; 3157:7; 3161:6; 3163:13; 3164:15, 17-18, 23; 3165:4, 7-8, 10; 3167:12; 3168:11; 3169:14; 3170:24; 3171:8; 3175:20; 3176:9; 3177:2, 6, 9, 13, 18, 20, 23, 25; 3179:3, 7, 9; 3182:20; 3187:12, 18; 3188:4, 20, 24; 3189:15, 24; 3190:3, 8, 13, 17; 3191:3, 19, 21, 23;

3192:7, 14; 3196:11, 16; 3198:24; 3199:4; 3200:24; 3203:24; 3210:18, 20; 3211:1, 7, 20, 24; 3212:11; 3213:8; 3214:11, 14, 22, 25; 3216:23; 3219:14; 3222:9, 13; 3223:7, 22; 3224:2, 21; 3225:23; 3227:2; 3228:13; 3230:13, 17, 19; 3231:10; 3232:9, 20, 23; 3233:17, 24; 3234:6, 11, 13; 3235:10; 3237:4, 6, 8, 11, 19, 21, 23; 3238:6-8; 3242:23; 3243:3, 8, 12, 21; 3244:8, 21; 3245:25; 3246:1, 3, 10, 12, 14; 3249:15, 19, 23, 25; 3250:4, 15, 17, 24; 3251:3, 6, 9, 12, 16, 21, 24; 3252:18, 20, 22; 3253:19; 3254:21; 3255:13, 18; 3256:7, 9, 13, 16, 21; 3257:24; 3258:3; 3259:4, 19; 3260:9, 14; 3263:20; 3280:16; 3281:10; 3290:19; 3292:22, 24; 3293:2, 10, 21, 23; 3294:9; 3295:3, 24; 3296:5; 3298:12; 3299:3; 3300:12; 3301:12, 14, 21; 3302:1, 4; 3303:24; 3306:13; 3307:10; 3308:9, 14; 3309:10, 16, 18, 20; 3310:1, 6, 8, 10; 3311:2, 5; 3312:25; 3316:9; 3317:3; 3323:9; 3325:4; 3328:23; 3332:4, 7, 10, 13, 15, 20, 25; 3333:10, 20, 22; 3334:6, 9; 3336:7; 3337:2, 5, 16, 18, 22, 24; 3338:2, 10, 13; 3340:19; 3341:19; 3342:14; 3344:18; 3347:15; 3351:4, 23; 3352:13; 3353:5, 8, 11; 3358:12; 3360:18; 3365:23; 3366:2; 3367:19, 23; 3368:5; 3370:13, 19, 21;

3371:18, 24; 3372:5, 7; 3373:2; 3374:15; 3375:19, 23; 3376:4, 7; 3378:6, 17; 3379:3, 5, 7; 3383:7; 3386:1, 9, 14, 21; 3387:9, 13-15, 17, 23; 3388:1, 4, 16; 3389:16, 19; 3390:5, 12, 18; 3391:6, 9, 11; 3397:25; 3398:2; 3399:12, 21; 3400:9, 25; 3401:3, 7, 14, 17; 3402:2, 6-7, 10, 12, 14, 16, 22; 3403:1, 9, 16, 24; 3404:2, 7, 12, 15; 3405:25; 3406:13, 15; 3407:6, 11, 17, 22; 3408:18, 20

themselves [1] - 3231:6

thereafter [4] - 3204:16; 3304:10; 3331:9; 3357:13

therefore [2] - 3148:2; 3248:10

Therefore [1] - 3248:14

Thomas [6] - 3116:22; 3134:18; 3135:5; 3304:18; 3307:24; 3308:25

THOMAS [2] - 3134:24; 3409:16

Three [2] - 3202:1; 3205:5

three [34] - 3136:4; 3171:14; 3177:6; 3201:20; 3202:3; 3203:1; 3225:25; 3236:9; 3241:14; 3304:10, 13, 20, 24; 3305:4; 3315:16; 3318:17; 3331:1; 3346:3, 8, 21; 3353:19, 25; 3354:2, 4, 11; 3362:25; 3363:5, 15-16, 20; 3364:5; 3377:7; 3396:21; 3408:14

three-hour [1] - 3377:7

throughout [1] - 3229:15

thumb [1] - 3384:2

Thursday [7] - 3102:9; 3110:8; 3403:11;

3404:3, 22; 3405:2

timely [1] - 3106:14

timing [1] - 3246:4

Timothy [4] - 3237:9, 21; 3301:17; 3302:4

TIMOTHY [4] - 3237:14; 3301:23; 3410:22; 3411:19

title [1] - 3310:19

TM [1] - 3156:19

today [32] - 3103:16; 3105:22; 3106:5; 3134:13; 3136:10; 3142:3; 3157:5; 3167:9; 3170:18; 3175:17; 3197:4; 3216:18; 3222:22; 3234:7; 3235:16, 19, 25; 3236:3; 3250:21; 3303:15; 3306:10; 3312:19; 3325:16; 3329:18; 3332:16; 3333:2; 3336:4; 3357:9; 3399:3; 3404:1, 18; 3408:12

together [12] - 3194:4; 3201:20; 3229:3; 3264:12; 3278:25; 3279:6, 14; 3304:12; 3323:16; 3340:14, 25

Tommy [22] - 3170:13; 3171:17; 3201:18; 3202:9; 3280:11; 3283:15, 21; 3284:25; 3287:23; 3311:11, 17; 3313:4; 3317:16; 3319:5; 3320:5, 12; 3327:23; 3330:1, 5

tomorrow [6] - 3107:9; 3407:3, 9, 20; 3408:21

tonight [2] - 3107:7; 3406:21

Tony's [8] - 3166:20, 25; 3167:1; 3185:5; 3188:6; 3193:5, 23; 3207:25

took [10] - 3112:11, 18; 3167:22; 3181:3; 3232:6; 3289:3; 3316:16; 3341:24; 3342:1, 22

top [7] - 3120:2; 3229:24; 3250:10; 3260:16; 3317:9;

3330:18; 3382:6

Tormenia [2] - 3119:3; 3219:11

Torrese [17] - 3169:23, 25; 3170:17; 3171:2; 3172:11; 3173:19; 3174:7; 3179:19; 3180:25; 3198:5, 7, 11, 17; 3201:12; 3204:21; 3206:2; 3208:3

total [1] - 3395:25

toward [1] - 3401:11

towards [6] - 3119:18; 3120:2; 3136:9, 20; 3144:11; 3162:17

town [1] - 3119:12

Toyota [2] - 3315:4; 3318:1

track [1] - 3245:2

traffic [4] - 3160:12, 16, 22; 3348:18

TRANSCRIPT [1] - 3101:9

transcript [2] - 3250:9, 21

Transcript [1] - 3101:25

transcription [1] - 3248:12

transcripts [1] - 3111:5

transfer [2] - 3271:25; 3393:20

transferred [4] - 3297:12-14; 3392:13

transit [10] - 3281:18, 20-21; 3282:12; 3284:13; 3285:6, 10; 3288:8, 10; 3289:13

transmit [1] - 3241:3

transmitter [1] - 3241:3

transport [3] - 3106:9; 3108:5, 24

transporting [1] - 3106:8

traumatic [1] - 3103:13

traveled [1] - 3376:19

traveling [1] - 3376:25

tremendous [1] - 3234:13

**TRIAL** [1] - 3101:9
**Trial** [1] - 3102:1
**trial** [13] - 3105:25; 3111:8, 17, 20; 3154:5; 3189:9; 3191:12; 3247:24; 3248:4, 8; 3249:14; 3342:6; 3408:23
**trials** [3] - 3110:12; 3111:21, 24
**tried** [1] - 3204:9
**tries** [1] - 3405:12
**trip** [2] - 3221:1; 3289:3
**truck** [7] - 3200:9, 14-15; 3205:9; 3381:10; 3382:18; 3383:22
**trunk** [14] - 3171:14, 17, 24-25; 3199:15; 3208:16, 18-20, 23; 3209:9
**truth** [2] - 3247:16; 3248:24
**try** [10] - 3104:13; 3106:23; 3160:10, 18, 25; 3174:13; 3188:15; 3319:23; 3347:3; 3355:19
**trying** [5] - 3105:5; 3160:15; 3189:5; 3379:10; 3403:5
**Tuesday** [3] - 3103:10; 3352:6, 10
**turn** [4] - 3102:15; 3240:23; 3406:19, 21
**turned** [9] - 3103:3; 3177:17; 3241:3, 9; 3242:2; 3399:5; 3402:20; 3407:25
**turning** [4] - 3239:7; 3242:20, 25; 3362:13
**Turning** [2] - 3211:16; 3343:3
**TV** [2] - 3263:10; 3291:20
**TVs** [1] - 3263:10
**twice** [1] - 3224:11
**two** [85] - 3104:7, 23; 3112:17; 3120:22; 3124:4; 3128:14; 3129:8; 3135:23; 3136:3; 3150:7, 11; 3171:16; 3173:24; 3195:23; 3201:22;

3202:10, 17; 3204:14; 3208:15; 3212:7, 9, 14; 3220:14; 3221:11; 3236:9, 20; 3272:9; 3278:8; 3279:13; 3292:5; 3294:10; 3300:20; 3313:10; 3314:5; 3315:2, 7, 9; 3317:9; 3318:4, 7, 14; 3329:22; 3330:9, 15, 20; 3343:9; 3345:23; 3346:3, 8, 21; 3347:10; 3348:13; 3352:25; 3353:16, 18, 20-21, 23; 3354:3, 10, 15; 3355:4; 3359:22; 3362:25; 3363:5, 13-15, 19-20; 3364:5; 3368:14; 3370:15; 3371:11, 14, 16; 3373:10; 3394:12; 3396:2, 5-6; 3399:4; 3402:14
**Two** [1] - 3354:16
**type** [5] - 3221:25; 3269:10; 3291:8; 3334:23; 3445:16
**types** [3] - 3159:13; 3241:22; 3262:23
**typically** [9] - 3151:18; 3159:15; 3207:1; 3352:10; 3365:2, 4; 3371:7; 3397:1, 4
**Tytell** [2] - 3246:17; 3403:25

---

**U**

**U.S** [1] - 3220:17
**unable** [1] - 3273:8
**unclear** [1] - 3250:13
**under** [1] - 3400:25
**undercover** [1] - 3292:16
**understood** [1] - 3343:1
**unidentified** [1] - 3382:8
**union** [15] - 3363:15; 3364:4, 10, 21; 3366:13, 17; 3367:8, 17, 21; 3368:1, 8; 3371:6; 3376:1, 9, 14
**unit** [25] - 3260:11; 3261:17, 24; 3262:4, 19; 3263:2, 7; 3264:4,

12; 3267:4-6, 8, 10, 16, 20, 24; 3276:13; 3277:4, 6, 15; 3278:15, 18, 22
**UNITED** [4] - 3101:1, 3, 10, 12
**United** [3] - 3101:5; 3114:12; 3120:18
**units** [2] - 3262:9; 3292:6
**unknown** [8] - 3171:24; 3208:16, 19, 22; 3209:8; 3350:17; 3356:6, 9
**unless** [5] - 3233:8; 3268:18, 24-25; 3384:24
**unquote** [1] - 3106:3
**unusual** [2] - 3319:21; 3348:16
**up** [98] - 3108:25; 3109:15; 3113:12; 3114:9; 3134:22; 3135:3; 3136:24; 3137:3; 3139:11; 3141:19; 3144:6; 3153:14; 3160:25; 3164:24; 3169:1, 10; 3171:14, 24; 3174:13, 17; 3176:10; 3182:5; 3185:13; 3188:13, 22, 24; 3189:14, 24; 3190:2; 3194:1; 3204:22; 3205:3; 3208:19; 3211:21; 3214:14, 23; 3217:21; 3224:21; 3231:23, 25; 3232:6; 3235:5; 3237:11, 19; 3240:22; 3242:5; 3243:24; 3251:22; 3255:19; 3256:17, 20; 3257:14; 3272:14; 3276:1; 3283:11; 3284:18; 3290:1; 3292:4, 24; 3293:8, 14; 3300:20; 3301:21; 3304:5; 3307:13; 3313:7; 3318:12; 3325:23; 3326:8, 21; 3327:5; 3329:18; 3330:25; 3338:2; 3343:17; 3346:1, 13; 3350:25; 3354:7, 10, 22; 3367:12; 3370:21; 3387:17, 24; 3392:10, 12, 19, 21; 3393:14;

3397:4, 25; 3399:2, 7; 3402:17; 3408:3
**updates** [1] - 3405:3
**upgraded** [1] - 3292:2
**upper** [5] - 3262:15; 3264:9; 3279:3; 3342:17; 3343:3
**upwards** [1] - 3267:12
**user** [2] - 3397:2, 5
**uses** [1] - 3265:2
**USP** [1] - 3297:14
**usual** [1] - 3262:22
**utilize** [1] - 3263:11

---

**V**

**V-neck** [1] - 3136:13
**value** [1] - 3155:13
**vantage** [1] - 3194:2
**variable** [1] - 3105:20
**varies** [1] - 3276:10
**various** [5] - 3110:17; 3273:3; 3277:7; 3282:24
**vast** [1] - 3408:1
**vehicle** [110] - 3119:2, 9; 3141:3; 3142:2; 3144:11, 14, 16; 3160:7, 18-19; 3162:17; 3173:13; 3174:14; 3175:1, 8, 10; 3182:9; 3185:13; 3194:19; 3199:6, 8, 11, 14, 17, 20, 24; 3200:6, 8, 17, 19; 3201:23; 3208:18; 3303:11; 3304:6, 8, 12; 3305:6; 3315:4, 8-9; 3318:4; 3322:2, 7; 3323:3, 5, 11-12, 17-18, 21; 3326:22; 3327:8; 3328:16, 18; 3329:5, 19; 3330:7, 9; 3335:23; 3339:17; 3343:12-14, 21; 3348:14; 3349:18, 21-22; 3350:23; 3360:5, 20, 24; 3361:3; 3364:19; 3365:1, 5; 3366:10, 20; 3367:6, 16; 3369:3, 8, 14; 3370:3, 10; 3374:21; 3375:12; 3377:18; 3378:3; 3380:9, 13, 23; 3381:2, 19; 3382:18; 3384:3, 25; 3385:4, 7
**vehicles** [30] -

3115:16; 3118:7, 14;
3128:5, 10, 12;
3194:23; 3195:11;
3305:23; 3315:16;
3318:17; 3322:25;
3323:1; 3326:12;
3327:1; 3330:10, 15,
20-21, 24; 3331:16;
3354:25; 3355:9;
3380:17
**verbal** [1] - 3249:3
**Verrazano** [1] -
3383:17
**version** [1] - 3143:9
**versus** [1] - 3399:15
**via** [3] - 3239:9;
3390:24; 3391:22
**Vic** [3] - 3111:9, 17,
19; 3117:19
**vicinity** [12] -
3162:23; 3166:9;
3184:5; 3185:12, 18,
21; 3203:10; 3313:8;
3315:20; 3317:18;
3322:15; 3346:19
**Victory** [4] - 3335:10;
3336:16; 3337:10
**video** [36] - 3172:22;
3174:12; 3175:12, 14,
16; 3177:12, 15, 23;
3181:4, 9; 3204:1, 4,
7, 15, 17, 21, 23;
3205:11, 14; 3206:23;
3207:3, 7, 9; 3209:20;
3241:2; 3291:3, 7, 11,
15, 23, 25; 3292:7;
3298:17
**Video** [1] - 3179:15
**view** [4] - 3186:6;
3392:23; 3394:10;
3405:15
**Vincent** [4] - 3280:12;
3283:16; 3285:22;
3287:15
**Vinny** [1] - 3116:18
**Virginia** [1] - 3388:11
**visible** [4] - 3149:21,
24; 3205:6; 3317:8
**visit** [10] - 3253:25;
3269:25; 3270:6, 15;
3274:11; 3275:13;
3278:1; 3279:13;
3298:25; 3299:10
**visited** [1] - 3273:18

**visiting** [29] -
3254:2, 8-9; 3259:25;
3260:12; 3261:2;
3269:18, 21; 3271:5;
3273:22; 3274:22;
3275:5, 8, 15; 3277:17,
21, 25; 3279:7, 13;
3291:9, 11-12, 14;
3298:16, 20, 22, 24;
3299:7
**visitor** [2] - 3269:24;
3275:18
**visitor's** [5] -
3290:24; 3292:12;
3293:19, 21; 3295:6
**visitors** [2] -
3274:10; 3298:25
**visitors'** [1] - 3291:4
**visits** [16] - 3254:4,
14; 3261:4, 8; 3269:15;
3273:14, 25; 3274:3, 7;
3275:9; 3279:7, 10,
14-15; 3291:15; 3299:14
**visual** [3] - 3142:25;
3160:4, 6
**Vitale** [4] - 3112:12;
3118:4; 3129:17;
3132:10
**Vitale's** [1] - 3110:8
**Vogel** [1] - 3113:10
**voir** [1] - 3389:18
**VOIR** [2] - 3389:20;
3412:21

---

**W**

**W-A-L-S-H** [1] -
3237:21
**W-E-E-N-E-Y** [1] -
3135:6
**W-H-I-T-E** [1] -
3334:10
**Wait** [1] - 3270:11
**wait** [1] - 3104:25
**walk** [11] - 3104:5;
3202:8; 3313:7, 9-11;
3321:16; 3327:5;
3360:4; 3365:4
**walked** [12] - 3149:2;
3171:12, 22; 3185:13;
3201:20, 23; 3202:5;
3208:18; 3331:1;
3360:3; 3365:1; 3385:3
**Walking** [1] - 3325:23
**walking** [11] - 3136:8,

20; 3137:2; 3148:1, 7;
3152:9, 11; 3181:11;
3195:2; 3326:8, 21
**wall** [1] - 3137:12
**Walsh** [6] - 3237:10,
21; 3239:25; 3240:6;
3242:9; 3244:18
**WALSH** [3] - 3237:14;
3410:22
**Walter** [3] - 3246:11;
3251:14, 24
**WALTER** [2] - 3251:18;
3411:5
**wants** [6] - 3123:19;
3124:25; 3247:9;
3256:3; 3269:25; 3406:8
**war** [5] - 3110:13;
3256:18, 20; 3309:8
**warrants** [1] - 3270:3
**waste** [4] - 3124:11;
3125:14; 3190:2
**watch** [3] - 3263:12;
3265:9; 3268:22
**watched** [1] - 3348:24
**watching** [2] - 3348:2;
3364:22
**Wayne** [1] - 3388:1
**ways** [3] - 3171:12;
3193:25; 3253:15
**wearing** [7] - 3136:12;
3142:5; 3312:21; 3382:5
**Wearing** [1] - 3382:6
**wedding** [11] - 3115:9;
3118:11; 3127:4, 12;
3131:16; 3132:9, 11,
14; 3133:8, 24
**Wednesday** [12] -
3102:19; 3333:3;
3352:9; 3368:2, 10, 23;
3373:8; 3404:3;
3405:21; 3407:1, 18;
3408:24
**Wednesdays** [1] -
3374:10
**week** [15] - 3102:8;
3103:17, 25; 3104:7;
3107:22; 3108:25;
3109:25; 3158:8;
3189:9; 3223:1;
3224:11; 3235:22;
3279:17; 3292:3;
3355:21
**week's** [1] - 3107:17
**weekend** [3] - 3111:12,

14, 20
**weeks** [11] - 3104:7;
3106:10; 3191:12;
3363:4, 13, 19;
3368:14; 3370:15;
3371:9; 3373:10;
3396:21
**West** [2] - 3170:1;
3173:10
**west** [2] - 3174:21;
3262:5
**Westbury** [5] -
3313:24; 3315:14;
3317:10, 23; 3330:12
**whatsoever** [1] -
3155:14
**whereby** [1] - 3323:18
**white** [9] - 3136:13;
3209:20; 3313:17;
3340:4; 3342:23;
3348:5; 3350:17; 3382:6
**White** [3] - 3332:14;
3333:25; 3334:9
**WHITE** [2] - 3334:1;
3412:6
**whole** [6] - 3123:23;
3175:14; 3248:25;
3249:1; 3290:13;
3357:21
**Wide** [1] - 3406:20
**width** [1] - 3267:16
**wife** [2] - 3104:9;
3113:6
**William** [26] - 3115:9;
3116:24; 3219:4, 6;
3225:13; 3238:10;
3248:2; 3339:9, 16;
3340:14; 3341:8;
3342:23; 3343:6, 17;
3344:21; 3347:3;
3348:25; 3349:13, 17;
3350:3, 8; 3351:8;
3379:10; 3381:15, 18;
3407:14
**willing** [1] - 3107:9
**window** [3] - 3186:11;
3304:7
**windows** [2] - 3185:23
**wire** [2] - 3238:21;
3293:8
**wired** [3] - 3240:11;
3292:18; 3295:19
**wiring** [1] - 3293:14
**wish** [5] - 3106:2;

3107:6; 3108:16;
3110:7; 3171:19
wishes [1] - 3110:2
Withdrawn [7] -
3130:21; 3137:18;
3153:3; 3265:23;
3374:7; 3375:4; 3393:22
Witness [3] - 3382:25;
3385:23; 3402:8
WITNESS [20] - 3114:11;
3135:5; 3164:17;
3165:7; 3214:25;
3237:6, 21; 3238:7;
3246:1; 3251:24;
3252:20; 3260:10;
3302:4; 3310:8; 3334:9;
3338:13; 3379:7;
3387:14; 3388:1; 3402:7
witness [79] - 3106:1;
3108:21, 23; 3109:5, 8;
3110:10, 12; 3111:2;
3112:14, 16, 23;
3113:1, 7, 10, 25;
3122:5, 12; 3123:24;
3134:17; 3154:5;
3164:18; 3167:11;
3170:22; 3171:7;
3175:19; 3190:6;
3191:3, 5, 8, 20;
3210:22, 25; 3212:1, 3,
5-6; 3213:4; 3214:18;
3219:21; 3225:5;
3232:8; 3233:10;
3237:7, 15; 3246:2, 17;
3251:3, 13; 3254:19;
3256:12; 3263:18;
3301:15; 3306:12;
3309:21; 3332:9, 11,
20; 3333:23; 3334:2;
3336:6; 3337:23;
3338:6; 3340:17;
3341:17; 3342:15;
3344:5; 3347:13;
3351:2; 3387:15;
3388:14; 3402:12;
3406:7; 3407:5; 3408:20
witness's [1] - 3232:4
witnesses [18] -
3102:6, 14; 3103:1;
3104:16, 22-23;
3105:19, 24; 3106:12;
3107:1, 4, 24-25;
3189:8; 3332:16;
3403:17, 23; 3404:2
Witnesses [1] - 3409:3
woman [2] - 3342:25;

3359:11
Woodrow [3] - 3342:20;
3360:11, 14
word [4] - 3161:13;
3188:15; 3260:16;
3265:1
works [3] - 3156:17;
3183:15; 3323:15
world [2] - 3225:17;
3407:23
worth [1] - 3404:18
WPG [1] - 3374:23
wrapped [5] - 3171:15;
3202:11; 3208:5;
3209:15
wrapping [1] - 3202:11
write [6] - 3131:21;
3233:25; 3234:3;
3248:20
writing [1] - 3249:9
written [1] - 3106:10
wrote [1] - 3363:25

Y

year [20] - 3112:15;
3140:9; 3154:24;
3195:23; 3215:11, 13;
3219:23; 3220:1, 6;
3223:9; 3240:9;
3246:24; 3274:18;
3275:4; 3283:6;
3287:15; 3292:5;
3338:22
years [15] - 3108:20;
3126:12; 3165:20;
3166:4; 3193:13;
3235:5; 3236:8;
3252:11; 3292:5;
3302:15; 3314:8;
3320:18; 3334:20;
3338:21; 3357:6
YORK [1] - 3101:1
York [34] - 3101:5, 15,
18, 21, 23; 3103:20;
3105:13; 3108:5;
3110:13; 3114:13;
3119:14, 24; 3120:19;
3121:6; 3122:14;
3124:2; 3135:17;
3140:12; 3165:22;
3166:10; 3169:24;
3173:11; 3174:22;
3252:6; 3282:8;
3297:12; 3302:11;
3310:23; 3311:15;

3313:25; 3380:20;
3390:22
younger [4] - 3314:7;
3315:9; 3318:2, 16
yourself [9] -
3126:25; 3148:21;
3218:21; 3283:18;
3321:18; 3325:7;
3366:13; 3377:23;
3393:25
yourselves [1] -
3195:2
YVONNE [3] - 3310:3, 8;
3411:25
Yvonne [3] - 3246:13;
3309:22; 3310:8

Z

Zeumann [9] - 3113:2,
11; 3114:2, 11; 3120:8;
3126:3, 25; 3131:20;
3132:3
ZEUMANN [3] - 3114:5,
11; 3409:6
zoom [1] - 3169:8