3414

1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
2

3    ------------------------------X
    UNITED STATES OF AMERICA,
4                                :    CR-04-911
                                     (JS)
5        -against-              :    United States Courthouse
                                     Central Islip, New York
6    ALPHONSE T. PERSICO, and
    JOHN J. DEROSS,
7                                :    December 5, 2007
                Defendants.        9:20 a.m.
8    ------------------------------X

9                   TRANSCRIPT OF TRIAL
            BEFORE THE HONORABLE JOANNA SEYBERT
10        UNITED STATES DISTRICT COURT JUDGE, and a jury.

11
    APPEARANCES:
12   For the Government:      ROSLYNN MAUSKOPF, ESQ.
                            UNITED STATES ATTORNEY
13                            BY: JOHN BURETTA, AUSA
                                DEBORAH MAYER, AUSA
14                                JEFFREY GOLDBERG, AUSA
                            One Pierrepont Plaza
15                            Brooklyn, New York 11201

16
    For the Defendants:      SARITA KEDIA, ESQ.
17                            JULIE JONES, ESQ.
                            Five East 22nd Street, Suite 7B
18                            New York, New York 10010
                            For Deft. A. Persico
19
                            ROBERT LARUSSO, ESQ.
20                            LaRusso & Conway
                            300 Old Country Road, Suite 341
21                            Mineola, New York 11501
                            For Deft. J. DeRoss
22
    Official Court Reporter:    Paul J. Lombardi, RMR, CRR
23   Ph. (631) 712-6106          100 Federal Plaza - Suite 1180
    Fax (631) 712-6122          Central Islip, New York 11722
24
              Proceedings recorded by mechanical stenography.
25              Transcript produced by CAT.

                      Mary Ann Steiger, CSR
                      Official Court Reporter

3415

1          (Trial resumes.)
2
3          (In open court; jury not present.)
4          THE COURT:  Good morning, folks.  Nice to see
5    you all.
6               I received a letter from the government
7    requesting that I allow them to treat Mr. Barry Levin,
8    former counsel, as a hostile witness.  I'll review that in
9    more detail and listen to defense arguments.
10              I also understand that arrangements have been
11   made for Mr. Cutolo Junior's counsel to speak to him
12   regarding the defendants' subpoena.  So it seems like we
13   are good to go.
14              In terms of the witnesses today, have I gotten a
15   revised list?  Let me check.  No.  I have the old list,
16   right?
17              So today you have Gary Bogle.
18              MR. BURETTA:  Yes, Judge.
19              THE COURT:  John Sullivan.
20              MR. BURETTA:  He'll be coming tomorrow, Judge.
21              THE COURT:  Peter Tytell.
22              MR. BURETTA:  Yes.
23              THE COURT:  He's the handwriting expert.
24              MR. BURETTA:  Correct.
25              THE COURT:  Who else do you have?

3416

1          MR. BURETTA:  Barry Levin.

2          THE COURT:  All right.

3          MR. BURETTA:  Tom Krall.

4          THE COURT:  And when do you plan on putting

5    Mr. Levin on?

6          MR. BURETTA:  He's supposed to be here at 9:30,

7    Judge, but we can wait.

8          We have to finish Bruce Kindeley on the stand,

9    then Gary Bogle, then Peter Tytell, then Barry Levin.

10          THE COURT:  He's the last of the day.

11          MR. BURETTA:  He's not the last of the day.

12          But I think we would probably get to him after a

13    few hours.

14          THE COURT:  Do you have anything you want to

15    preliminarily want to add, Ms. Kedia?

16          Or should we wait until the luncheon recess?

17          MS. KEDIA:  Judge, I have other matters I would

18    like to raise to the court.

19          I certainly have a response to Mr. Levin as

20    well, but we can wait.

21          THE COURT:  Are your matters absolutely pressing

22    in that they concern the next several witnesses other than

23    Mr. Levin?

24          MS. KEDIA:  Judge, I'm moving for an immediate

25    mistrial and I renew my application to dismiss the case

3417

1    based on double jeopardy grounds.

2         THE COURT:  Immediate mistrial.

3         MS. KEDIA:  Based on additional Rule 16

4    violations.

5         The government, at approximately midnight last

6    night, sent me and I received additional Rule 16

7    discovery, your Honor, which I understand that Mr. LaRusso

8    received in court here this morning.

9         MR. LARUSSO:  About 20 minutes ago, your Honor.

10        MS. KEDIA:  Much of this material, and I have

11   not had a chance to review it thoroughly, but I did

12   certainly take a cursory glance at it last night, much of

13   this material is material that the government has had in

14   its possession since 1999.

15        It is turning it over for the first time today

16   including information, apparently, on Mr. Persico's

17   whereabouts.  There seem to be some documents that show

18   some cell site locations that it appears was provided to

19   the government either July 26th of 2001, or August 30th of

20   2001, obviously some more than six years ago.

21        In addition to that, the government has turned

22   over, for the first time, records with respect to the

23   phones and the pager that William Cutolo Senior was using

24   or the several phones that Agent Pontecorvo testified at

25   the last trial that William Cutolo, he knew

3418

1    William Cutolo Senior to be using at the time of his

2    disappearance.  I haven't had a chance to thoroughly

3    review those documents, your Honor.

4         But I will say that there is a fax to

5    Agent Pontecorvo that I have seen for the very first time

6    that shows that he has had documents dating back to March

7    of 1999, which show --

8         THE COURT:  March of '99?

9         That's before Mr. Cutolo disappeared.

10        MS. KEDIA:  Yes, because Mr. Pontecorvo had

11   apparently asked for a pen register on these phones, and

12   then subsequently asked for phone records to be produced.

13        These are documents that we have been requesting

14   for a number of years.  These are documents that the

15   government didn't provide for the last trial, some of

16   which it provided additional documents before this trial.

17   And now, for the first time, two days before it's planning

18   on resting, it's providing additional documents.

19        This is completely improper.  At a minimum, if

20   the court doesn't grant my application for an immediate

21   mistrial and dismissal of the case, I request that, at a

22   minimum, the government be precluded from introducing any

23   of these documents.  It's clearly a Rule 16 violation.

24        I don't know if the government has read Rule 16,

25   but it has cited Rule 16 on numerous occasions in this

3419

1    courtroom during the course of the trial.  Under Rule 16,

2    the defense actually has no obligation to produce anything

3    before trial.  The case law makes that quite clear.  The

4    government has an obligation not only to produce the

5    documents it intends to introduce, but anything that is

6    material to preparing the defense.

7            These are documents that we have requested

8    repeatedly.  There are additional surveillances that have

9    now been turned over.  Mr. Buretta specifically

10   represented to the court that all surveillances that the

11   government possessed on William Cutolo Senior had been

12   previously turned over, even including Monday when I was

13   cross-examining Agent Carrie, I made the representation to

14   the court that there was a surveillance conducted on May

15   5th.

16           We believed that we had asked Mr. Buretta for

17   that surveillance, and that he said no such surveillance

18   existed.  Apparently, it did.  The FBI agents continued

19   surveillance at Mr. Cutolo's home after June 1, 1999.

20           The surveillances show that Mrs. Cutolo, who

21   testified here at the beginning of this case, in fact,

22   continued to go to the Embassy Terrace where she says she

23   was fired the very next day.  Now we have a surveillance

24   of her going there on June 8, 1999.

25           That is clearly Brady material.  And, Judge,

3420

1    there may be more.  Again, I have only had a very, very

2    limited opportunity to go over these documents.

3              And for these reasons, I move for an immediate

4    mistrial.

5              MR. BURETTA:  Judge, almost all of the material

6    provided last night was turned over in discovery

7    previously.

8              It's just been marked with exhibit stickers.

9    It's almost all phone records that Agent DeStefano will be

10   putting into evidence tomorrow.  As he was being prepared

11   by the team yesterday, we went through the discovery to

12   see if there were certain items that hadn't been marked as

13   exhibits, and they were marked as an exhibit number and

14   provided as exhibits to the defense.

15             Some of the other phone material was produced by

16   the defense in this case.  They had admitted a page or two

17   of it into evidence during the course of the trial, and we

18   marked the full records that they provided to us as an

19   exhibit with an exhibit number.  That came from them, not

20   from us.

21             The only thing I'm aware of that's new in there

22   are a couple of surveillance reports and I'll explain how

23   that happened.

24             THE COURT:  Please do.

25             MR. BURETTA:  Special Agent Cultrera came in at

3421

1    7 a.m. to prep with me yesterday morning.

2              He advised me there was a separate off-site

3    location not at the FBI, but another location where the

4    surveillance squad kept reports archived.  I didn't know

5    about that.

6              I asked him to go there.  He went there

7    yesterday morning.  He looked.  He found some additional

8    surveillances.

9              I turned them over as soon as I got them.

10             THE COURT:  What are the dates on the additional

11   surveillances?

12             MR. BURETTA:  I don't know each day.

13             I think there are four or five surveillances,

14   including May 5th of 1999.

15             THE COURT:  None on May 26th?

16             MR. BURETTA:  No, Judge.

17             May 26th they have had.

18             THE COURT:  Okay.

19             MR. BURETTA:  So that's what we have here.

20             To summarize, there is virtually nothing new

21   and, obviously, no basis for dismissal or preclusion,

22   et cetera.

23             MS. KEDIA:  Your Honor, there are things that

24   are new, and I can specifically point them out to the

25   court that were not previously turned over.  It is not an

3422

1    accurate representation.

2            I can show the court specifically what I know

3    was not turned over previously.  If Mr. Buretta wants to

4    give me a Bates stamp number for the documents that he

5    believes were previously turned over, I think that he is

6    incorrect because I have personally reviewed all the

7    documents that have been turned over, the 17,000 pages of

8    documents.

9            And I can show the court specifically what was

10   not.

11           THE COURT:  Okay.

12           MR. BURETTA:  What I would suggest, if counsel

13   thinks that's true, is Mr. Goldberg and Ms. Kedia sit down

14   together at the lunch hour today, and they can figure that

15   out.

16           Mr. Goldberg's in charge of the phone records.

17           THE COURT:  Are we talking phone records now,

18   pager and phone records?

19           MS. KEDIA:  We are talking phone records, your

20   Honor.  And you know what?  I don't want to sit down with

21   Mr. Goldberg.

22           This is a matter now that is within the purview

23   of the court because --

24           THE COURT:  Correct.

25           MS. KEDIA:  The government has failed to do this

3423

1    in a timely fashion, midnight, I don't even know if the

2    government was planning on resting today or tomorrow.

3           I guess it says tomorrow now it intends on

4    calling Agent DeStefano.  Two days before the government

5    intends to rest is not an appropriate time to, for the

6    first time, hand the defense documents that it had in its

7    possession since 1999, Judge.

8           THE COURT:  If it's the first time, I certainly

9    agree with you.

10          If you had them previously, then I might not

11   agree with you.

12          MS. KEDIA:  I understand that.

13          THE COURT:  The fact that they mark them as an

14   exhibit, really, is of minimal consequence, in view of the

15   fact that you have indicated you have had an opportunity

16   to review, personally, 17,000 pages.

17          Let's see where you are at, and I'll allow the

18   government to respond to the items, as they have, and see

19   if you can locate not Bates stamped items, some indication

20   of when you believe these items were turned over to the

21   defendants.

22          I'm going to bring the jury in now, and let's

23   have Mr. Kindeley resume the stand.

24          MR. BURETTA:  Just for the record, Judge, we

25   brought these documents at 2 p.m. to the courtroom

3424

1    yesterday where we understood defense counsel were.  They

2    were not here.

3          We contacted them and offered to have them come

4    and get them at the courthouse yesterday evening, early in

5    the evening, and they didn't take us up on that offer.

6          Late last night, arrangements were made to

7    deliver them to against counsel.

8          THE COURT:  Okay.

9          I know everyone's working overtime on the case.

10   Let's bring the jury in.

11         MR. LARUSSO:  Judge, I just got them and I just

12   skimmed through them, Judge.

13         THE COURT:  All right.

14         Let's see if you can coordinate to see if you

15   ever received them before, and which ones you may have

16   had.

17         (Whereupon, there was a pause in the

18   proceedings.)

19

20         MS. KEDIA:  Your Honor, I'd just like to add for

21   the record, and I don't mind doing it in front of

22   Mr. Kindeley, that the government, for the first time,

23   actually turned over this document that apparently

24   Mr. Kindeley provided to Agent Pontecorvo back in 1999 as

25   well, only during my cross-examination of Mr. Kindeley,

3425

1    when I was first learning about it.

2              MR. BURETTA:  Judge, it's not appropriate to say

3    that in front of the jury.

4              I object to that.

5              MS. KEDIA:  I didn't say that in front of the

6    jury.

7              MR. BURETTA:  I thought you just said you don't

8    mind doing it in front of the jury.

9              MS. KEDIA:  I said I didn't mind saying it in

10   front of Mr. Kindeley.

11             MR. BURETTA:  Oh, very good.

12             (Jury enters the courtroom.)

13

14             THE COURT:  Good morning, folks.  Please be

15   seated, if you will.

16             Mr. Kindeley, you are still under oath.  Have a

17   seat.

18             You may inquire, Ms. Kedia.

19             MS. KEDIA:  Thank you, your Honor.

20   BRUCE KINDELEY,

21        having been previously sworn, resumed the stand

22        and testified further as follows:

23   CROSS-EXAMINATION

24   BY MS. KEDIA:

25   Q.   Mr. Kindeley, good morning.

3426

1    A.    Good morning.

2    Q.    Mr. Kindeley, when we left off on Monday, I was

3    asking you about the information that you were able to

4    retrieve from the electronic organizer that you provided

5    in October of 1999 by Agent Pontecorvo.

6          Right?

7    A.    Yes, that's correct.

8    Q.    And you testified that, in fact, some of the entries

9    had a password on them, were password encoded.

10         You weren't able to access them until, in fact,

11   you were able to locate the password and put in the

12   password.

13         Is that right?

14   A.    That's correct.

15   Q.    And then there were other entries that did not have

16   any password associated with them.

17         Right?

18   A.    Yes.

19   Q.    And then there were certain entries that were put in

20   a memo portion of the electronic organizer?

21   A.    That is correct.

22   Q.    Now, when you say a memo portion of the organizer,

23   explain what the difference is between the memo portion

24   and the phone portion, please.

25   A.    The memo portion typically has one or two fields.

3427

1          One field could be some kind of header.  The

2    other field would be a block of text.

3          The telephone entry, the user has the option of

4    entering information in a number of different fields.

5    Typically, a name field, an address field, a telephone

6    field and so forth.

7    Q.   When you say a header, what do you mean when you say

8    a header?

9          Is there a name at the top?

10   A.   A place where a title or a name or something of that

11   sort.

12   Q.   So showing you what's now in evidence as

13   Government Exhibit 53, can you look at this document and

14   explain to the jury which of the entries would constitute

15   this header in the memo section.

16   A.   The data that was downloaded by the Sharp software

17   that I used did not differentiate between the different

18   fields and the data.

19          So I cannot specifically tell you which of these

20   lines of data that was downloaded from the organizer was

21   in which field.

22   Q.   So when you actually looked --

23          MS. KEDIA:  Withdrawn.

24   BY MS. KEDIA:

25   Q.   When you viewed the organizer, there wasn't a

3428

1    separate button for a memo section and a telephone

2    directory section.

3          Is that right?

4    A.   Yes.

5          There was a button that differentiated the data

6    from the telephone and memo.

7          But what I was stating that when I downloaded

8    the data from the device, Exhibit 52 to this document, it

9    did not differentiate between fields.

10   Q.   Now, when you looked at this organizer, Mr. Kindeley,

11   was there any information in the organizer as to when the

12   last entry in the organizer was made?

13   A.   No, there was not.

14   Q.   Would you have been able to obtain such information?

15   A.   Typically, no.

16   Q.   And was there any indication of whether entries had

17   been altered prior to your receiving them in the recent

18   weeks prior to your receiving the organizer?

19   A.   No.

20         I have no idea what -- when I received it,

21   that's the date I downloaded and returned to the --

22   Q.   So between May 26th of 1999 and the date that you

23   received the organizer, in October of 1999, you have no

24   way of knowing whether information was added during that

25   period of time.

3429

1           Is that right?

2    A.   That's correct.

3    Q.   You have no way of knowing whether information was

4    deleted during that period of time.

5           Is that right?

6    A.   That is correct.

7    Q.   And you have no way of knowing whether entries that

8    already existed were then altered during that period of

9    time.

10          Is that right?

11   A.   That is correct.

12   Q.   Does the FBI, to your knowledge, or was it within

13   your expertise to retrieve that type of information from

14   electronic data such as the organizer?

15   A.   I'm sorry.

16          What was the question, again?

17   Q.   Are you able to obtain any of that information from

18   an electronic organizer?

19   A.   As far as being changed or altered?

20   Q.   Yes.

21          When the last entry was made, whether entries

22   were deleted.

23   A.   On this electronic organizer, no.

24          On newer ones, yes.

25   Q.   But on this type of electronic organizer, you are

3430

1    not --

2    A.    No.

3    Q.    -- able to make that determination.

4    A.    That's correct.

5    Q.    Were you asked to make that determination?

6    A.    No, I was not.

7    Q.    Do you know if prior to or after your receiving the

8    electronic organizer, whether any fingerprint analysis was

9    done on the organizer?

10    A.    To my knowledge, no.

11            I returned the evidence directly to

12    Agent Pontecorvo upon the completion of my examination.

13    Q.    And you received it directly from Agent --

14    A.    That is correct.

15    Q.    -- Pontecorvo.

16            Is that right?

17    A.    Yes.

18    Q.    When you received it, how was it packaged?

19    A.    It was received in a FedEx box, sealed.

20    Q.    And were you given any information as to when and

21    where Agent Pontecorvo obtained this organizer?

22            MR. BURETTA:  Objection.

23            THE COURT:  Sustained.

24    BY MS. KEDIA:

25    Q.    Let me ask you, looking at the information -- if I

3431

1    may take Government Exhibit 53.

2             Looking, for example, at the first page, there

3    is an entry here that says Al pizza.

4             You see that?

5    A.    Yes.

6    Q.    And then there are a series of letters and numbers

7    following this.

8             Right?

9    A.    That's correct.

10   Q.    Pizza and a phone number, or pizz, and there's the A

11   left off, and a phone number.

12            Correct?

13   A.    That's correct.

14   Q.    And another phone number that says home?

15   A.    Um-hmm.

16   Q.    Another name Natalie Ethaloe, All Good Leasing.

17            You see all of those?

18   A.    Yes.

19   Q.    When you look at the organizer, do those all appear

20   in that fashion on the organizer?

21   A.    Yes, they did.

22            That's how they appeared.

23   Q.    So this is how the spacing was on the organizer

24   itself?

25   A.    Yes.

3432

1   Q.   And that is true with respect to all of the entries

2   in the organizer?

3   A.   That is correct.

4   Q.   And when you viewed the entries in the organizer,

5   were they listed in this particular fashion?

6        I guess in the beginning it's in alphabetical

7   order.  Right?

8   A.   Yes.

9        It starts with A.

10  Q.   Okay.

11       And when it says A at the top, was there, in the

12  electronic organizer itself, this letter, or is that

13  something you add to this?

14  A.   No.

15       There was an A.

16  Q.   Okay.

17       So then all the As were listed and it went on,

18  so on and so forth.

19       Right?

20  A.   That's correct.

21  Q.   At some point towards the back, there is a page I'll

22  show you what's page 33 of Government Exhibit 53.

23       On page 33 it starts again with different, it's

24  not in the same alphabetical order.  You see that, now it

25  starts with Betty Ann Fox and it goes to Ravioli Factory.

3433

1          You see that?

2     A.    Yes.

3     Q.    Do you know why those entries are not in the same

4     alphabetical order?

5     A.    I believe that's what the memo entries started.

6          It downloaded the telephone entries first, and

7     then the memo entries, telephone would have been

8     alphabetical, and then memo would have been alphabetical.

9     Q.    So this is the manner in which you downloaded the

10    information?

11    A.    Right.

12         That is the manner, when I used the software to

13    download the data, that's the output that I received.

14    Q.    Now, looking at the organizer, were you able to

15    determine when it is that the first entry was made in the

16    organizer?

17    A.    No.

18    Q.    Were you able to determine how old the organizer was?

19    A.    No.

20    Q.    When you say no, is that a determination you were

21    asked to make?

22    A.    No, it was not.

23    Q.    Is that a determination you would have been able to

24    make, if asked?

25    A.    I could have determined when the organizer was

3434

1    manufactured and produced.

2              Yes.

3    Q.    What year?

4    A.    That's correct.

5    Q.    Approximately, and what month, maybe?

6    A.    Maybe.

7    Q.    But that's not something that you have ever done?

8    A.    No.

9    Q.    Apart from the actual entries that we see on

10   Government Exhibit 53, in fact, the very first page

11   starts, as we saw, with the letter A and then there are

12   entries.

13             Right?

14   A.    Yes.

15   Q.    Were there any identifying marks on the organizer,

16   such as the owner's name or address?

17   A.    Not on the organizer.

18             No.

19   Q.    Not on the organizer.

20   A.    No.

21   Q.    Now, when you say not on the organizer, was there

22   identifying information such as the owner's name or

23   address elsewhere?

24   A.    No.

25             The only information was the data that I

3435

1    downloaded, in addition to the password I gave you.

2    Q.   So there was no information anywhere, either on the

3    organizer, itself, or within the organizer --

4    A.   On the outside, no.

5         The internal data I did not analyze.  I was only

6    asked to download it.  So whoever owned this organizer,

7    whether that person's name was in there or not.

8         I did not search it.

9    Q.   But if you look at Government Exhibit 53, is there

10   anything in the entries, themselves, that would suggest

11   who, in fact, used that organizer, or owned that

12   organizer?

13             MR. BURETTA:  Objection.

14             THE COURT:  Sustained.

15   BY MS. KEDIA:

16   Q.   Well, when you say that you didn't analyze whether

17   the owner's information was actually within the entries --

18   A.   That's correct.

19        Yes.

20   Q.   -- could you look at the information that you were

21   able to download and be able to tell that information from

22   the downloaded information?

23   A.   Who was the owner?

24   Q.   Yes.

25   A.   Yes.

3436

1    Can you provide that name?

2    Q.    I'm asking you.

3    Can you look at the information that you have

4    downloaded from this organizer and tell us whether you

5    could determine, from looking at that information --

6    A.    If I knew the owner's name?

7    I could look through it and tell you.

8    Q.    Without knowing the owner's name, can you look

9    through it and tell us?

10   A.    No.

11   Q.    Thank you.

12        MS. KEDIA:  I have nothing further.

13        THE COURT:  Mr. LaRusso?

14        MR. LARUSSO:  No questions, your Honor.

15        THE COURT:  Any redirect?

16        MR. BURETTA:  Yes, Judge.

17   REDIRECT EXAMINATION

18   BY MR. BURETTA:

19   Q.    Sir, do you have --

20        MR. BURETTA:  May I approach the witness, your

21   Honor?

22        THE COURT:  Yes.

23   BY MR. BURETTA:

24   Q.    Sir, do you have with you another copy of the

25   document I'm showing you?

3437

1  A.    No.

2           I provided that to you yesterday.

3  Q.    Okay.

4           MR. BURETTA:  I'd like to have this marked as 53

5  A, your Honor.

6           And I'll offer a clean copy into evidence.

7           MS. KEDIA:  Your Honor, may we approach?

8           THE COURT:  Sure, come on.

9           Excuse us.

10           (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3438

1          (Sidebar.)

2          THE COURT:  You are holding something that has

3    all kinds of nice Post-Its.

4          MS. KEDIA:  Which are my Post-Its, actually.

5          MR. BURETTA:  I handed my only copy to Ms. Kedia

6    on Monday.

7          THE COURT:  That was very kind of you.

8          What's the difference in changing the exhibits

9    now?

10         MR. BURETTA:  I want to change them and add this

11   one.

12         This one has the full observation.

13         THE COURT:  What's your objection on that?

14         MS. KEDIA:  Yes.

15         My objection is that, again, this is a document

16   that the government didn't disclose until during my

17   cross-examination of the witness, and it can certainly not

18   now seek to introduce this document, as a Rule 16

19   violation.

20         THE COURT:  When was this document created?

21         MR. BURETTA:  Well, I think he testified it was

22   created in '99.

23         THE COURT:  Okay.

24         MR. BURETTA:  And he provided it to me on

25   Monday.

3439

1           THE COURT:  The document he provided you on

2   Monday has this enclosure one password protected?

3           MR. BURETTA:  Correct.

4           THE COURT:  That wasn't on the original

5   document?

6           MR. BURETTA:  Correct.

7           THE COURT:  What was the reason for him now

8   adding this?

9           MR. BURETTA:  I don't think he added that.

10          I think he prepared it in 1999, but he brought

11  his original -- he testified on Monday he prepared two

12  documents.

13          THE COURT:  Correct.

14          MR. BURETTA:  The first was a fax he sent up to

15  the FBI in New York.

16          THE COURT:  And I had did not have this.

17          MR. BURETTA:  Correct.  That's what I had.

18          On Monday I asked him, obviously when he came

19  up, bring all your stuff with you.  He provided this on

20  Monday, which was what he said was attached to his formal

21  report that was subsequently reported in 1999 to the FBI

22  in New York.

23          THE COURT:  When did you get this?

24          MR. BURETTA:  On Monday.

25          MS. KEDIA:  Your Honor, this witness has

3440

1   testified that he provided this to Agent Pontecorvo back

2   in 1999.

3           MR. LARUSSO:  Right.

4           MS. KEDIA:  I don't know when Mr. Buretta first

5   saw it.

6           MR. BURETTA:  I just told you.

7           MS. KEDIA:  It certainly was in the government's

8   possession since 1999.

9           If the government had sought to introduce this,

10   it should have been turned over many, many years ago and

11   the government cannot now, just because Mr. Buretta first

12   knows about it, seek to introduce it in this case.

13          THE COURT:  Anything further?

14          MR. BURETTA:  No, Judge.

15          THE COURT:  The only difference is it has

16   enclosure one password protected, and the other did not?

17          MR. BURETTA:  Correct.

18          THE COURT:  And it's on each of the pages,

19   enclosure one, it cites a number, password protected.

20          MR. BURETTA:  Correct.

21          MS. KEDIA:  And this was not the information

22   contained in the organizer.

23          This was information added by this witness back

24   in '99.

25          THE COURT:  Okay.

3441

1            MS. KEDIA:  Given to the government back in

2       1999.

3            The government never produced this.

4            THE COURT:  The point of your objection is, it

5       wasn't produced?

6            MS. KEDIA:  Yes.  Two points.

7            Point one is, it wasn't produced in a timely

8       fashion, obviously.

9            The second point is that this is not the

10      information that was in the organizer.  This is

11      information in this header that the witness added to the

12      organizer.

13           The government --

14           THE COURT:  I think it's much ado about nothing.

15           But I'm not going to let you get this one in.

16           MR. BURETTA:  That's fine, Judge.

17           THE COURT:  Okay.

18           MR. BURETTA:  I just have one or two more

19      questions.

20           THE COURT:  Sure.

21           (Sidebar concluded.)

22           (Continued on next page.)

23

24

25

3442

1        (In open court.)

2            THE COURT:  The objection is sustained.

3    BY MR. BURETTA:

4    Q.    Mr. Kindeley, directing your attention to the first

5    page of Exhibit 53, there is an entry, Al, 888-943-1762.

6            Do you see that?

7    A.    Yes, I do.

8    Q.    Was that in the organizer when you downloaded it?

9    A.    Yes.

10   Q.    And was that entry password protected?

11   A.    Yes.

12   Q.    Explain to the jury what you mean by that entry was

13   password protected.

14   A.    The electronic organizer, itself, has a security

15   feature that allows you to enter data and records.

16           And if the user of the device does not want

17   other people to see that, they can protect certain records

18   with a password so that whoever enters the password would

19   be able to view such a record.

20   Q.    And so who would have been able to access the Al

21   888-943-1762 entry?

22   A.    Whoever the owner of the electronic organizer was.

23           Whoever entered the password to protect the

24   data.

25           MR. BURETTA:  I have no further questions.

3443

1          THE COURT:  Anything else?

2          MS. KEDIA:  Yes, your Honor.

3          THE COURT:  All right.

4     RECROSS-EXAMINATION

5     BY MS. KEDIA:

6     Q.    Looking at Government Exhibit 53, these other entries

7     under the A section here before the one that you were just

8     asked about, Mr. Kindeley?

9     A.    Yes.

10    Q.    And the ones on the first page and the second page

11    and the third page, after the one you were just asked

12    about, they were all password protected.

13          Right?

14    A.    With the exception of that A, there were four entries

15    that were not password protected.

16          If you went back to page -- if you went back to

17    page 35, there were four entries that were not password

18    protected in the telephone section.

19    Q.    So if I can show you on page four this entry for

20    Betty Ann Fox car, that entry was password protected as

21    well.

22          Is that right?

23    A.    That's correct.

24    Q.    And so was the entry for Bob DiSalvio.

25          Right?

3444

1    A.    That is correct.

2    Q.    And so was the entry for this person Pat Grosso.

3          Right?

4    A.    Yes.

5    Q.    So all of these phone numbers for Pat Grosso,

6    914-476-9000, the cell phone number, 914-584-9432, this

7    farm number, 518-398-1303, those were all password

8    protected.

9          Right?

10   A.    Yes.

11   Q.    And you would not have been able to actually obtain

12   that information without entering --

13   A.    That's correct.

14   Q.    -- the password in the organizer.

15   A.    That's correct.

16   Q.    Now, there's an entry on page 32 here for you see Joe

17   C, and there is a phone number, 917-629-0874.

18         You see it on the screen?  You can look at it.

19   I'm sorry.  You are going to need to refer to that

20   document.

21         You see that?

22   A.    Yes, I do.

23   Q.    That's not password protected.

24         Right?

25   A.    No, it is not.

3445

1    Q.   Is there any information that you are able to

2    determine, from looking at the information in this

3    organizer, who Joe C is?

4    A.   I have no idea.

5    Q.   Or whether this entry for Joe C related to any of the

6    other entries that were in the organizer?

7    A.   No.

8            As I previously mentioned, I did not analyze the

9    data on the device.

10   Q.   Okay.

11           Thank you.

12           MS. KEDIA:  I have nothing further.

13           THE COURT:  Anything else?

14           MR. BURETTA:  No, your Honor.

15           Thank you.

16           THE COURT:  Thank you.  You can step down.

17           The government's next witness.

18           MR. BURETTA:  The government calls Special Agent

19   Gary Bogle.

20           THE CLERK:  Good morning.

21           Please step up.  Remain standing for a moment to

22   be sworn in.

23   GARY BOGLE,

24           having been duly sworn, was examined

25           and testified as follows:

3446

1          THE CLERK:  Have a seat.

2          Please pick up the handheld microphone.  State

3   and spell your name for the record.

4          THE WITNESS:  Gary Bogle, G-A-R-Y, B-O-G-L-E.

5          THE CLERK:  Thank you.

6          MR. BURETTA:  May I inquire, your Honor?

7          THE COURT:  Yes.

8   DIRECT EXAMINATION

9   BY MR. BURETTA:

10  Q.   Good morning, sir.

11  A.   Good morning.

12  Q.   Where do you work?

13  A.   With the FBI.

14  Q.   How long have you worked with the FBI?

15  A.   For approximately 12 years.

16  Q.   I'd like to direct your attention to May the 12th,

17  1999.

18          Did you conduct surveillance on that day?

19  A.   I did.

20  Q.   What was the location that you were surveilling?

21  A.   It was a location on 21st Avenue, I believe, in

22  Brooklyn.

23  Q.   Do you know what the specific location was?

24  A.   It was Bruno's Hair, I believe, salon, something like

25  that.

3447

1   Q.   And did you see any individuals there that day?

2   A.   I did.

3   Q.   Did you take photographs?

4   A.   I did.

5        MR. BURETTA:  May I approach the witness, your

6   Honor?

7        THE COURT:  Yes.

8   BY MR. BURETTA:

9   Q.   Showing you what's been marked 188 B through F.

10       (Whereupon, there was a pause in the

11  proceedings.)

12

13  BY MR. BURETTA:

14  Q.   Do you recognize those?

15  A.   I do.

16  Q.   Are those photographs you took that day?

17  A.   Yes, they are.

18  Q.   Do they fairly and accurately depict the things you

19  saw as you were photographing them?

20  A.   Yes.

21       MR. BURETTA:  I offer 188 B through F.

22       MS. KEDIA:  No objection.

23       THE COURT:  In objection --

24       MS. KEDIA:  I'm sorry, Judge.

25       MR. LARUSSO:  No objection, your Honor.

3448

1          THE COURT:  Received in evidence.

2          (Whereupon, Government Exhibits 188 B-F were

3    received in evidence, as of this date.)

4

5    BY MR. BURETTA:

6    Q.   Starting with Government Exhibit 188 B, can you

7    describe for the jury what we are looking at here.

8    A.   That's an individual known to me as Frank Campanella

9    walking on the sidewalk.

10   Q.   And what sidewalk is he walking on?

11   A.   I believe that's going to be on 21st Avenue.

12   Q.   And there is a street sign here.

13          Can you make that out there at the top?

14   A.   I cannot.

15          But I think that that location was around

16   86th Street.

17   Q.   Okay.

18          And where are we in relationship to

19   Bruno's Hair Shop?

20   A.   Directionally -- I have been out of New York for a

21   while -- I don't know exactly which direction if I was

22   north or south.

23          But I believe I'm on the avenue there.

24   Q.   Okay.

25          On that block?

3449

1    A.    Correct.

2    Q.    Okay.

3          Showing you 188 C, is this in about the same

4    location that you had photographed Frank Campanella in

5    188 B?

6    A.    It is.

7    Q.    Do you know who the -- did you know at the time who

8    the individuals are here standing in 188 C?

9    A.    Yes.

10         The individual on the left is Dominick Dionisio,

11   and the individual on the right is Billy Cutolo Junior.

12   Q.    Is Billy Cutolo Junior the person in the pink shirt

13   there with the sunglasses?

14   A.    The lighter colored shirt.

15   Q.    Okay.

16   A.    I don't know if it's pink.

17   Q.    Looking at 188 D, are we at the same location that

18   you are photographing?

19   A.    Yes.

20   Q.    Can you identify for the jury who the individuals are

21   you know in this photograph?

22   A.    That's a very blurred photograph.

23         When I looked at the one that you handed me, I

24   could see Billy Cutolo Senior, Ronnie Califano is also in

25   that photograph.

3450

1    Q.    Looking here where I'm pointing on the right-hand

2    side of the photograph, do you recognize that person?

3    A.    That's Cutolo Senior.

4    Q.    And over here on the left, who is this individual

5    that I'm pointing to?

6    A.    I believe that's Cutolo -- go ahead and move your

7    finger, if you don't mind -- that's Cutolo Junior.

8    Q.    Looking here at 188 E, do you recognize the

9    individuals here?

10   A.    Yes.

11   Q.    Who are these individuals?

12   A.    I see Cutolo Junior there facing toward where the

13   camera was I took the photograph.

14   Q.    Is that the individual here in the sunglasses?

15   A.    Yes.

16         It looks like Frank Campanella there.

17   Q.    Is that him here?

18   A.    That's correct.

19   Q.    Anyone else?

20   A.    Cutolo Senior, again, and I believe that's Ronald

21   Califano behind him.

22   Q.    The individual on the far right?

23   A.    I believe so.

24   Q.    Okay.

25         Finally, 188 F.  Do you recognize those two

3451

1    individuals?

2    A.   I believe that is Cutolo Senior walking toward the

3    curb.  That's his son Cutolo Junior behind him.

4         I think on the very far right may be the back

5    view of Frank Campanella.

6    Q.   Frank Campanella here on the right?

7    A.   I think so, yes.

8         It's pretty blurry, but I believe that's him.

9    Q.   Do you recall where William Cutolo Senior and

10   William Cutolo Junior went as they were walking into the

11   street that day?

12   A.   Depending upon a time frame, they may have left the

13   area.

14        That may have been one of the last photographs

15   taken for that day.

16   Q.   Is there a report that would refresh your memory

17   where, if you knew, that they went?

18   A.   There was a report that was completed.

19        MR. BURETTA:  May I approach the witness, your

20   Honor?

21        THE COURT:  Yes.

22        MR. BURETTA:  Thank you.

23        (Whereupon, there was a pause in the

24   proceedings.)

25   A.   That is photograph frame 23.

3452

1    Q.    What time of day was that taken?

2    A.    7:28 p.m.

3    Q.    And did you surveil at that time that photograph was

4    taken?

5    A.    I don't recall if I did or not.

6          I know this particular surveillance was

7    terminated at 7:35.

8    Q.    About the same time?

9    A.    A few minutes later.

10    Q.    I'd like to direct your attention now to a different

11    date, which is July the 27th, 1999.

12          MR. BURETTA:  Your Honor, may I publish 188 to

13    the jury?

14          THE COURT:  Yes.

15          MR. BURETTA:  Thank you.

16          (Whereupon, the above-mentioned exhibit was

17    published to the jury.)

18

19    BY MR. BURETTA:

20    Q.    On July 27, 1999, Agent, did you also conduct

21    surveillance that day?

22    A.    I did.

23    Q.    And where were you conducting surveillance?

24    A.    I believe it was on the 1400 block of Broadway in

25    Manhattan.

3453

1          MS. KEDIA:  Your Honor, may we approach?

2          THE COURT:  Come on up.

3          Excuse us.

4          (Continued on next page.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3454

1          (Sidebar.)

2          MS. KEDIA:  I don't know if there was a

3    surveillance report prepared.

4           But I don't recall ever having seen a

5    surveillance report for July 27th of 1999.

6          MR. LARUSSO:  I don't have it either.

7          THE COURT:  I don't have it.

8          MR. BURETTA:  There was one prepared, and I know

9    we did provide that to you.

10          MR. LARUSSO:  I went through it.

11          MR. BURETTA:  Yes.

12          MR. LARUSSO:  I haven't found it.

13          THE COURT:  It was in the 3500 material?

14          MR. BURETTA:  I know it was in the discovery.

15          THE COURT:  Okay.

16          MR. BURETTA:  I have to go check the 3500 as

17    well.

18          THE COURT:  Did he prepare the report?

19          MR. BURETTA:  I think he did, Judge, and he took

20    the photographs, which I know also were provided in

21    discovery.

22          MS. KEDIA:  I need to see the report.

23          I don't know that I have ever seen it before.

24          MR. BURETTA:  I'll go find a copy right now.

25          THE COURT:  Okay.

1          MS. KEDIA:  We may need to take a few-minute

2   recess, Judge, if the witness is going to be examined

3   about this.

4          THE COURT:  Let's see how long the report is.

5          MR. BURETTA:  Let me get the report.

6          (Whereupon, there was a pause in the

7   proceedings.)

8

9          MR. BURETTA:  I'm sorry, Judge.

10         I have to take a minute to find it.

11         THE COURT:  You don't have the report?

12         MR. BURETTA:  I don't have it in the folder

13  here.

14         THE COURT:  All right.

15         It's kind of early to take our mid-morning

16  break, but that's what we'll do.

17         MR. BURETTA:  I'm sorry, Judge.

18         (Sidebar concluded.)

19         (Continued on next page.)

20

21

22

23

24

25

3456

1          (In open court.)

2          THE COURT:  Folks, we are going to take an early

3     mid-morning break.

4          (Jury leaves the courtroom.)

5          (Recess.)

6

7          MR. BURETTA:  Judge, I located the report.

8          It was produced in discovery as Bates numbers

9     12668 and 12669, and marked as 3500 GB 10 and provided

10    Monday morning of this week as a marked 3500 material for

11    this witness.

12          I know that our --

13          THE COURT:  I didn't go up to that number.

14          MR. BURETTA:  I left a stack for your Honor.  It

15    looks like it might be sitting up there.

16          Maybe it didn't make its way into your binder.

17          MS. KEDIA:  Your Honor, we had GB 1 through GB

18    9, but we had an opportunity to go through it now.

19          THE COURT:  All right.  We are ready to go

20    forward.

21          Let's bring the jury out.

22          (Whereupon, there was a pause in the

23    proceedings.)

24

25          (Jury enters the courtroom.)

3457

1          THE COURT:  Please be seated.

2          We are ready to resume.

3          MR. BURETTA:  Thank you, your Honor.

4     BY MR. BURETTA:

5     Q.   Special Agent, we left off on July 27, 1999.

6          You were in the vicinity of 1435 Broadway in

7     Manhattan.

8          Is that right?

9     A.   That is correct.

10    Q.   And what location was it that you were surveilling

11    that day?

12    A.   Local 400 hall.

13    Q.   Is that a union?

14    A.   Yes, it is.

15    Q.   Approximately what time did you start surveillance

16    that day?

17    A.   I believe it was around quarter until 10 in the

18    morning.

19    Q.   Did you take note of any individuals after you began

20    your surveillance?

21    A.   Yes, I did.

22    Q.   Who?

23    A.   John Gannone and Frank Persico.

24    Q.   And approximately what time did you first see?

25    A.   It was approximately one hour after I began the

3458

1   surveillance.

2   Q.   What did you see John --

3        MR. BURETTA:  Withdrawn.

4   BY MR. BURETTA:

5   Q.   Well, were they together?

6   A.   At that yes, they were.

7        They were walking up the sidewalk.

8   Q.   And what did you see them do?

9   A.   Mr. Gannone went into 1435, which is the local 400

10  hall.

11       And Mr. Persico entered a deli for a couple of

12  minutes and then exited and went into 1435 Broadway.

13  Q.   And, to be clear, when you say Mr. Persico, that's

14  Frank Persico?

15  A.   That is correct.

16  Q.   What happened next?

17  A.   A couple minutes later, I think John Gannone came

18  out.  He was at about that location about five minutes and

19  went back into the hall, the 1435 Broadway.

20       Probably about an hour later both of them left

21  that location and I saw them walking toward a parking

22  garage and a vehicle in the parking garage driven by

23  Mr. Persico.

24  Q.   Who was in the vehicle that Mr. Frank Persico was

25  driving?

3459

1    A.    John Gannone.

2    Q.    What time did you terminate your surveillance,

3    approximately?

4    A.    I don't know, recalling right now, because I did

5    continue.

6          I lost sight of them, and then I went to a

7    location on Staten Island, I believe.  So it may have been

8    a couple hours later.

9    Q.    Was there a document that would refresh your

10   recollection?

11   A.    Yes.

12         MR. BURETTA:  May I approach the witness?

13         THE COURT:  Yes.

14   BY MR. BURETTA:

15   Q.    Showing you Government Exhibit 3500 GB 10.

16   A.    Surveillance was terminated at 2:20 p.m.

17   Q.    And approximately when did you go to Staten Island?

18   A.    I was at the location on Salamander Court, 129

19   Salamander Court at 12:51 p.m.

20   Q.    And why did you go there?

21   A.    That was an address I knew to be the residence of

22   Mr. Persico.

23   Q.    Frank Persico?

24   A.    That's correct.

25   Q.    Did you see Frank Persico go there that day?

3460

1    A.    I don't think I saw him go there.

2              I did see him leave later in that vehicle.

3    Q.    Did you take photographs that day?

4    A.    I did.

5              MR. BURETTA:  May I approach the witness, your

6    Honor?

7              THE COURT:  Yes.

8    BY MR. BURETTA:

9    Q.    Showing you Government Exhibit 123, which is a board,

10   and also Government Exhibits 123 A through 123 D.

11             (Whereupon, there was a pause in the

12   proceedings.)

13

14   BY MR. BURETTA:

15   Q.    Are those photographs that you took that day, July

16   27, 1999?

17   A.    Yes, they are.

18   Q.    Do they fairly and accurately represent things that

19   you saw as you took those photos?

20   A.    Yes, they do.

21             MR. BURETTA:  I offer 123 and 123 A through D.

22             MS. KEDIA:  If I may just have a moment.

23             THE COURT:  Yes.

24             (Whereupon, there was a pause in the

25   proceedings.)

3461

1           MS. KEDIA:  No objection.

2           MR. LARUSSO:  No objection, your Honor.

3           THE COURT:  They are received.

4           (Whereupon, Government Exhibits 123 and 123 A-D

5    were received in evidence, as of this date.)

6    BY MR. BURETTA:

7    Q.   There are some labels contained on these exhibits

8    with some names.

9           Do they correctly attribute who it is that's in

10   the photo?

11   A.   Yes, they do.

12          MR. BURETTA:  May I publish to the jury, your

13   Honor?

14          THE COURT:  Yes.

15          (Whereupon, the above-mentioned exhibits were

16   published to the jury.)

17          MR. BURETTA:  Could I have the witness step

18   down.

19          THE COURT:  You want to bring it closer to the

20   jury.

21          (Witness steps down.)

22

23   BY MR. BURETTA:

24   Q.   Special Agent Bogle, if you could start with the

25   upper left-hand photo in Exhibit 123, and describe for the

Mary Ann Steiger, CSR
Official Court Reporter

3462

1    jury what location you photographed.

2    A.   This is the 1400 block of Broadway in Manhattan.

3         And the individual here is John Gannone.

4    Q.   And the upper right-hand photograph, describe that

5    location to the jury and who is in it.

6    A.   That's the same block.

7         The individual on the left is John Gannone, the

8    one on the right is Frank Persico.

9    Q.   When you saw John Gannone and Frank Persico, were

10   they speaking at all?

11   A.   I don't recall if they were speaking.

12        I do recall that Frank Persico had a briefcase

13   with him.

14   Q.   Okay.

15   A.   And I believe you can see those in some of the

16   photographs.

17   Q.   And if you look at the lower left-hand photograph,

18   where is that?

19   A.   That's also on the same block.

20        Again, that's John Gannone on the left and to

21   the right is Frank Persico.

22   Q.   And, finally, the lower right-hand photograph.

23        Can you tell they jury who is in that

24   photograph?

25   A.   The same individuals, John Gannone on the left and

3463

1    Frank Persico on the right.

2    Q.    Thank you.

3              MR. BURETTA:  You can retake the stand.

4              (Witness resumes the stand.)

5

6              MR. BURETTA:  May I publish 123 A through D to

7    the jury, your Honor?

8              THE COURT:  Yes.

9              MR. BURETTA:  Thank you.

10             (Witness resumes the stand.)

11

12             (Whereupon, the above-mentioned exhibits were

13    published to the jury.)

14   BY MR. BURETTA:

15   Q.    I'd like to direct your attention to October of 1999.

16             Did you participate in a search of a location

17   that day?

18   A.    October 8th of 1999.

19             That's correct.

20   Q.    And what was that location?

21   A.    It was the Fifth Avenue apartment, located on Fifth

22   Avenue in Brooklyn.

23   Q.    Was it Apartment 2 R?

24   A.    I believe it was.

25             And the address may be 242, I think.

3464

1    Q.    When you went to that location to conduct the search,

2    what type of location was it?

3    A.    It was an apartment.

4    Q.    And was anyone there other than people from the FBI

5    when you were there?

6    A.    Yes.

7    Q.    Who?

8    A.    Mr. Persico.

9    Q.    And when you say Mr. Persico, who do you mean?

10   A.    Alphonse Persico.

11   Q.    Is he here today?

12   A.    Yes, he is.

13   Q.    Could you describe what he is wearing?

14   A.    An argyle sweater, black and gray.

15            MR. BURETTA:  Can the record indicate that the

16   witness has identified the defendant Alphonse Persico?

17            THE COURT:  Yes.

18            MR. BURETTA:  Thank you.

19   BY MR. BURETTA:

20   Q.    And when you were conducting the search, did you

21   retrieve any items?

22   A.    I did.

23            MR. BURETTA:  May I approach the witness, your

24   Honor?

25            THE COURT:  Yes.

3465

1  BY MR. BURETTA:

2  Q.    I'm going to show you Government Exhibit 56, 58, 59

3  and 60.

4          (Whereupon, there was a pause in the

5  proceedings.)

6  BY MR. BURETTA:

7  Q.    Do you see those documents?

8  A.    I do.

9  Q.    Are those the documents you seized that day?

10 A.    Yes, they are.

11 Q.    Did you make a notation on the documents to indicate

12 that?

13 A.    I did.

14 Q.    What did you indicate?

15 A.    I have my initials, GB, and the date 10/8/99.

16          MR. BURETTA:  I offer 56, 58, 59 and 60.

17          MS. KEDIA:  Your Honor, we just need one moment.

18          We are just pulling them out of our file.

19          THE COURT:  All right.

20          (Whereupon, there was a pause in the

21 proceedings.)

22          MS. KEDIA:  No objection, your Honor.

23          THE COURT:  Received in evidence.

24          No objection, Mr. LaRusso?

25          MR. LARUSSO:  I have no objection.

3466

1          (Whereupon, Government Exhibits 56, 58, 59 and

2     60 were received in evidence, as of this date.)

3          MR. BURETTA:  May I publish to the jury, your

4     Honor?

5          THE COURT:  Yes.

6          (Whereupon, the above-mentioned exhibits were

7     published to the jury.)

8

9     BY MR. BURETTA:

10    Q.   Special Agent Bogle, starting with Government Exhibit

11    56, was this a slip of paper handwritten that you seized

12    October 8, 1999 at the residence where Alphonse Persico

13    was located?

14    A.   Yes, it was.

15    Q.   And starting with the first entry at the top, can you

16    read the name?

17    A.   The first one is Dom, D-O-M.

18    Q.   And is there a number listed to the right of that?

19    A.   27.

20    Q.   And are there a series of other names that follow

21    that on this page?

22    A.   Yes, there are.

23    Q.   Such as green eyes?

24    A.   Correct.

25    Q.   Frank Camp?

3467

1    A.    Yes.

2    Q.    And the list goes on and contains other numeric

3    notations?

4    A.    Yes, it does.

5    Q.    And at the bottom, can you make out what it says

6    there?

7            For something?

8    A.    No.  I cannot make that out.

9    Q.    Turning this document over.

10            What is the upper left-hand notation on the back

11    of the document?

12    A.    Spatts.

13    Q.    And is there a question mark right after that?

14    A.    Yes.

15    Q.    The next notation?

16    A.    Joe C.

17    Q.    And it goes on to list other names?

18    A.    It does.

19    Q.    What is the name here towards the middle of the page

20    that I'm pointing to?

21    A.    Chuckie.

22    Q.    And the next name?

23    A.    Looks like -- it's either Don or Dom.

24    Q.    And the name here towards the bottom?

25    A.    Vito.

3468

1    Q.    Where was Exhibit 56 retrieved by you, Special Agent?

2    A.    That was located in a shoebox that was in a walk-in

3    closet in the apartment.

4    Q.    And turning to Government Exhibit 60 next.

5          This is a typewritten document?

6    A.    Yes.

7    Q.    And the first entry at the top reads what?

8    A.    Dom, 27,000.

9    Q.    27,000.

10         If you compare that to the handwritten document,

11   which is Government Exhibit 56, does the Dom 27,000 that's

12   typed appear to correspond to Dom 27 on the handwritten

13   list?

14   A.    It does.

15   Q.    And does the list then --

16         MR. BURETTA:  Withdrawn.

17   BY MR. BURETTA:

18   Q.    The typewritten list, Government Exhibit 60, does it

19   continue with a series of names that also appear to

20   correspond to the handwritten list, which is

21   Government Exhibit 56?

22   A.    I believe it does.

23   Q.    Towards the bottom of the typewritten list,

24   Government Exhibit 60, could you read the two names that

25   I'm pointing to next to the figure 2,000 here?

3469

1  A.    Tom and Rich Cap.

2  Q.    And then there's a handwritten notation on

3  Government Exhibit 60.

4        Could you read what that says, please.

5  A.    It says same on 6/27/99.

6  Q.    Looking at Government Exhibit 59, is this another

7  document you seized?

8  A.    It is.

9  Q.    It contains a series of numeric notations?

10  A.    It does.

11  Q.    Including notations for August and September 1999?

12  A.    It does.

13  Q.    And on the right-hand side of Government Exhibit 59,

14  there's a notation towards the middle of minus 50,000,

15  CHKY, June 27th.

16        Do you see that?

17  A.    I do.

18  Q.    Then, finally, Exhibit 58 is also a typed document

19  that was seized by you?

20  A.    Yes.

21  Q.    And it indicates a series of numbers on the left side

22  and some totals?

23  A.    Yes.

24  Q.    Thank you.

25        MR. BURETTA:  I have no further questions.

3470

1    CROSS-EXAMINATION

2    BY MS. KEDIA:

3    Q.    Agent Bogle, good morning.

4    A.    Good morning.

5    Q.    You spoke about a surveillance that you had conducted

6    on May 12, 1999.

7          Is that right?

8    A.    Yes.

9    Q.    Who was with you on that surveillance?

10   A.    May I see the surveillance log again?

11   Q.    Showing you what's been previously marked as 3500

12   GB 7 for identification.

13   A.    Thank you.

14          On surveillance that day were myself, Special

15   Agent Gary Pontecorvo, Special Agent Mark Imes, Special

16   Agent Frank Cultrera, and Special Agent Wiley Borum II.

17   Q.    And you were part of -- you named five agents, agent

18   Borum, you, Agent Pontecorvo, Agent Cultrera and

19   Agent Imes.

20          Correct?

21   A.    That's correct.

22   Q.    And you were all part of one surveillance team.

23          Is that right?

24   A.    We were on this surveillance at the same time.

25          That's correct.

3471

1    Q.    When you say you were on the surveillance at the same

2    time, were you one part of one surveillance team or no?

3          Or was it more than one surveillance team?

4    A.    Two of the individuals there are actually assigned to

5    a surveillance operational group.

6          That would be Frank Cultrera and Wiley Borum.

7    The other three agents I mentioned, myself,

8    Agent Pontecorvo, and Agent Imes, were all agents on the

9    Colombo organized crime family squad.

10    Q.    And --

11    A.    That day we were together.

12          So, I guess, yes.  We were on the same team that

13    day.

14    Q.    But typically you were not?

15    A.    That's correct.

16    Q.    Now, on that day, May 12, 1999, you said that you

17    were part, you personally were part of the Colombo squad.

18          Is that right?

19    A.    Correct.

20    Q.    And how long had you been part of the Colombo squad

21    at that point?

22    A.    Since '96.

23    Q.    And Agent Pontecorvo, who was he?

24    A.    He was an agent on the squad.

25    Q.    And did you at that time have any particular

3472

1    assignment, meaning any particular people that you were

2    surveilling?

3    A.    For this particular day?

4    Q.    That general time period, May of 1999.

5    A.    It was at this location, to see who was coming and

6    going on that particular day.

7    Q.    Well, when you say on that particular day, talking

8    about May 12, 1999, you started your surveillance at a

9    place called Bruno's.

10          Right?

11   A.    That's correct.

12   Q.    And was it a particular person that you were looking

13   to surveil at Bruno's?

14   A.    That is correct.

15          That'll be Bill Cutolo Senior.

16   Q.    And was Mr. Cutolo Senior someone that you had been

17   surveilling at that period of time?

18   A.    I can't recall if we had done previous surveillances

19   with him because at that time we had, again, special

20   operations groups that were assigned to do certain things.

21          I know that there are several times I went out

22   on surveillance where we were looking for him.  Yes,

23   that's correct.

24   Q.    When you say we were looking for him, who do you mean

25   when you say we?

3473

1    A.    If I was with Agent Pontecorvo or previously agent

2    Corrin Hera, and Corrin was also on the squad at that

3    time.

4    Q.    And Agent Pontecorvo was, in fact, the case agent

5    assigned to William Cutolo Senior.

6          Is that right?

7          MR. BURETTA:  Objection.

8          THE COURT:  Sustained.

9    BY MS. KEDIA:

10   Q.    When you say that you had been out on surveillances

11   with Agent Pontecorvo, how often had that been in relation

12   to William Cutolo Senior?

13         MR. BURETTA:  Objection.

14         THE COURT:  Sustained.

15   BY MS. KEDIA:

16   Q.    On May 12, 1999, I believe you said you observed an

17   individual by the name of Frank Campanella.

18         Is that right?

19   A.    That is correct.

20   Q.    When you observed Frank Campanella, did you know

21   immediately who he was?

22   A.    Correct.

23   Q.    You did?

24   A.    Yes.

25   Q.    And how did you know?

3474

1  A.   By photographs.

2  Q.   Had you actually seen him in person before?

3  A.   I probably have because I have done surveillances in

4  the past.

5       But I can't recall to definitely say yes or no.

6  Q.   And Mr. Cutolo is someone you identified as having

7  seen that day as well, both junior and senior.

8       Is that right?

9  A.   Yes.

10  Q.   Had you seen William Cutolo Senior prior to that day?

11  A.   Yes.

12  Q.   And, again, with was this through surveillances?

13  A.   Yes.

14  Q.   And do you have any idea how often you had seen him?

15  A.   No.

16       I do not.

17  Q.   Had you seen Frank Campanella and

18  William Cutolo Senior together?

19  A.   Besides on May 12th?

20  Q.   Yes.

21  A.   I can't recall.

22  Q.   Now, prior to your coming in here to testify in this

23  matter, had you reviewed your May 12th surveillance

24  report?

25  A.   I did.

3475

1    Q.    So you are not doing this from memory.

2          You are doing this from having reviewed that

3    particular report?

4    A.    Both; memory, what I recall from this particular

5    date, and looking at the report.

6    Q.    Well, when you say what you recall from this

7    particular date, we are talking about a time period about

8    eight and a half years ago.

9          Is that right?

10          MR. BURETTA:  Objection.

11          THE COURT:  Sustained.

12    BY MS. KEDIA:

13    Q.    We are talking about more than eight years ago that

14    this event occurred, right, that this surveillance

15    occurred.

16          Is that right?

17    A.    It occurred on May 12th, '99.

18    Q.    Now, you have a memory of something that occurred on

19    May 12, 1999, but you do not recall if you had ever seen

20    Frank Campanella before May 12, 1999.

21          Is that right?

22          MR. BURETTA:  Objection.

23          THE COURT:  Sustained.

24

25

3476

1    BY MS. KEDIA:

2    Q.    Well, Agent Bogle, before coming in here, did you

3    review other of your surveillance reports besides May 12,

4    1999?

5              MR. BURETTA:  Objection.

6              THE COURT:  Overruled.

7    A.    Yes, I did.

8    Q.    What surveillance reports were those?

9    A.    I recall reviewing the July 27th '99 surveillance.

10   Q.    The one that you testified also about on direct

11   examination?

12   A.    That's correct

13   Q.    With John Gannone and Frank Persico?

14   A.    That's correct.

15              And then I did review a surveillance that was on

16   May 26th, I believe, '99.

17   Q.    Any others?

18   A.    Yes, I have reviewed them.

19              But I don't recall the dates on those.  But

20   there were probably two or three other ones.

21   Q.    And when was that?

22   A.    That I reviewed them?

23   Q.    Yes.

24   A.    As late as last evening I looked at them again.

25   Q.    And do you have any recollection as to whether there

3477

1    was surveillance prior to this May 12, 1999 surveillance

2    that you are testifying about now?

3    A.    I don't believe that there were.

4    Q.    You believe that they were subsequent to that?

5    A.    I think so.

6    Q.    Do you have any recollection of when they were?

7    A.    I would be guessing.

8          But I believe they were afterward.

9    Q.    And when you say you have reviewed those

10   surveillances, you are talking about having reviewed

11   reports that were prepared in connection with those

12   surveillances.

13         Is that right?

14   A.    That is right.

15   Q.    As late as last evening?

16   A.    That is correct.

17   Q.    Now, Agent Bogle, on this date, May 12, 1999, you

18   also observed a person by the name of Ronald Califano.

19         Is that right?

20   A.    That's correct.

21   Q.    And when you observed Ronald Califano, did you know

22   who he was immediately?

23   A.    By photograph.

24   Q.    When you say by photograph, you are talking about

25   photographs that you had at the FBI headquarters?

3478

1    A.    I remember reviewing photographs of Mr. Califano.

2          And, therefore, I'd be able to identify him if I

3    saw him.

4    Q.    Was it you that, in fact, identified him when he was

5    first seen?

6    A.    I did not call out that he was on the scene, no.

7          But I did see him subsequent to that.

8    Q.    Did someone call out that he was on the scene?

9    A.    Yes.

10   Q.    Who was that?

11   A.    Agent Pontecorvo.

12   Q.    And when Agent Pontecorvo called out that Ronald

13   Califano is on the scene, you knew immediately who it was

14   that he was talking about?

15   A.    Yes.

16   Q.    And is that true, do you know, with respect to the

17   other agents as well?

18             MR. BURETTA:  Objection.

19             THE COURT:  Sustained.

20   BY MS. KEDIA:

21   Q.    Well, when you reviewed the photographs at FBI

22   headquarters, was that something you did individually or

23   is that something you did with other agents?

24             MR. BURETTA:  Objection.

25             THE COURT:  Sustained.

3479

1    BY MS. KEDIA:

2    Q.    When you were on this surveillance on May 12, 1999,

3    how was it determined what time you would begin your

4    surveillance that day?

5    A.    I believe information was obtained that Mr. Cutolo

6    was going to be at this location at a certain time.

7          And we set up just prior to that time to see who

8    would show up.

9    Q.    And how did you obtain such information?

10   A.    I did not obtain that information.

11         So I don't know.

12   Q.    Well, when you say that it was obtained, how do you

13   know that?

14   A.    Well, we had to receive the information from

15   someplace saying that he was meeting, or at least using

16   this location for us to go out and see if he does show up

17   and who comes to meet with him.

18   Q.    And who was it that obtained that information?

19         MR. BURETTA:    Objection.

20         THE COURT:    Sustained.

21   BY MS. KEDIA:

22   Q.    Well, you said you had that information.

23         Right?

24   A.    Correct.

25         I was aware of that.

3480

1    Q.    You were aware of that information.

2          But it wasn't information that you received,

3    right?

4    A.    That's correct.

5    Q.    Do you know where this information came from?

6          MR. BURETTA:  Objection.

7          THE COURT:  Overruled.

8          Answer it again.

9    A.    I don't know.

10   Q.    How was it conveyed to you?

11   A.    It was conveyed to me through Agent Pontecorvo.

12   Q.    Now, on this date, were you aware that there was

13   another surveillance team also out surveilling

14   Mr. Cutolo Senior?

15         MR. BURETTA:  Objection.

16         Lack of foundation.

17         THE COURT:  Overruled.

18   A.    I don't know if someone was actually out on

19   Mr. Cutolo this day or not.

20   Q.    Well, let's --

21   A.    I see on the 12th that we did have two special

22   operations, or SO guys, that were out there with us.

23   Q.    Well, when you say SO guys that were out there with

24   you, you are talking about two of the five people that you

25   named earlier, and, specifically, you are talking about

3481

1  Agent Cultrera and Agent Borum.

2          Is that right?

3  A.   That's correct.

4  Q.   Now, let me show you what's been previously marked as

5  3500 FC 13 for identification.

6          (Whereupon, there was a pause in the

7  proceedings.)

8

9  BY MS. KEDIA:

10 Q.   Having reviewed that document marked as FC 13,

11 Agent Bogle, does that refresh your recollection that, in

12 fact, there was another surveillance team out also

13 surveilling William Cutolo Senior on that day May 12,

14 1999?

15 A.   It does not refresh my recollection because I did not

16 know that.

17         But I will tell you from this report that it

18 appears to be so, that on May 12th, earlier in the day,

19 there was a team out.

20         And I do see Mr. Cutolo's name listed.

21 Q.   Well --

22 A.   -- on the log.

23 Q.   Well, when you say earlier in the day, in fact, there

24 were two teams overlapping.

25         Is that right?

3482

1    A.    Time frame wise, that's correct.

2          In fact, Frank Cultrera was listed on this,

3    along with Agent Borum, were the two individuals who were

4    also on my -- on this surveillance log, that I know.

5    Q.    I'm sorry.

6          You said that two of the agents were also on an

7    additional surveillance log.

8          Is that what you said?

9    A.    Their names and their observations are listed also on

10   the one that you originally gave me.

11   Q.    And, in fact, their observations are not listed on

12   the same report where your observations are listed.

13         Is that right?

14         MR. BURETTA:  I object, Judge.

15         THE COURT:  Sustained.

16   BY MS. KEDIA:

17   Q.    Agent Bogle, you understand that there were two teams

18   that actually were overlapping.

19         Is that right?

20         MR. BURETTA:  Asked and answered.

21         THE COURT:  Overruled.

22         There were two teams, right?

23   A.    There were two groups of individuals out there.

24         Yes.

25   Q.    And yours particular -- you in particular were

3483

1    conducting surveillance from 4:50 until approximately, I

2    believe you said 7:35 is when you discontinued

3    surveillance that day.

4             Right?

5    A.    That is correct.

6    Q.    And another team, including Agent Cultrera, was

7    conducting surveillance from 2 o'clock in the evening

8    until 10 o'clock in the evening that day.

9             Right?

10   A.    According to this, that is correct.

11   Q.    Now, you said that you weren't aware of the other

12   team.

13            Is that right?

14   A.    I said I was not aware if there was a team out

15   previous to our team.

16   Q.    And were you aware that there was a team out

17   simultaneously with your team?

18   A.    I know that there were individuals that were out

19   there that were not a part of our squad, specifically,

20   Agent Cultrera and Agent Borum, that were out at the same

21   time that we were.

22            That is correct.

23   Q.    And what about other agents like Jeffrey Carrie and

24   Agent Suozzi?

25   A.    I don't recall seeing them, and I don't recall

3484

1    talking to them.

2            So I can't -- and they are not listed on our

3    surveillance logs.  So I can't speak to that.

4    Q.    But Agent Cultrera, you said, is listed on the log

5    and you recall actually having contact with him.

6            Right?

7    A.    No.

8            He is listed on the log, along with Agent Borum.

9    Q.    He is listed on the log.

10   A.    Yeah, he is listed on the log that I am listed on

11   also.

12   Q.    Right.

13   A.    But I don't recall, right now, having actual

14   conversation with him that particular day.

15   Q.    Well, when five of you go out to conduct a

16   surveillance on any given date, do you stay in contact

17   with each other and discuss your observations?

18   A.    Yes.

19   Q.    You don't have a specific recollection right now as

20   to whether you did that on that day with Agent Cultrera.

21           Is that what you are saying?

22   A.    That is a team that was out.  They would have their

23   own frequency.

24           And it wouldn't be like I would be listening to

25   the radio and hearing them speak.  Does that make sense?

3485

1          So...

2    Q.    Well, when you say you wouldn't be hearing them

3    speak, were you actually trying to communicate with each

4    other?

5          Did you contact, do you have any recollection --

6    you knew Agent Cultrera was one of the people out on

7    surveillance that day.

8          Is that right?

9          MR. BURETTA:  This is asked and answered, your

10   Honor.

11         THE COURT:  Sustained.

12   BY MS. KEDIA:

13   Q.    Did you try to contact Agent Cultrera?

14   A.    I did not.

15         No.

16   Q.    And did he try to contact you, to your knowledge?

17   A.    Not that I recall.

18   Q.    At 4:54 --

19         MS. KEDIA:  Withdrawn.

20   BY MS. KEDIA:

21   Q.    Let me ask you this.

22         When you prepare a surveillance report where

23   there is a typewritten surveillance report that you are

24   looking at to refresh your recollection.

25         Is that right?

3486

1   A.   Correct.

2   Q.   And when you are preparing this, you are actually

3   recording your observations simultaneously with having

4   made that.

5        Right?

6   A.   That is correct.

7   Q.   And when you are doing that recording, you are doing

8   it by hand, not by typewriter or computer.

9        Right?

10  A.   That is correct.

11  Q.   And then when you make these observations, you make

12  yours, and Agent Pontecorvo makes his, and whatever other

13  agents are out surveilling that day make theirs.  And then

14  you combine it into a report.

15       Is that right?

16  A.   Usually when we are out, we would have one individual

17  taking the notes, and an individual calling out what they

18  see.

19       One person taking the notes, that would generate

20  the log, and then they would go back and initial off on

21  observations that were noted by that agent.

22  Q.   So meaning this particular log?

23       One that you were on this particular day, May

24  12, 1999, is that something that you were actually taking

25  note of?

3487

1  A.   No, not on this day.

2  Q.   Agent Pontecorvo was taking the notes that day?

3  A.   I believe so.

4  Q.   When you say you believe so, you are able to

5  determine that by looking at the report.

6       Is that right?

7  A.   That is correct.

8  Q.   And you specifically don't recall taking any notes

9  yourself.

10      You just convey the information that you see to

11 Agent Pontecorvo?

12 A.   Normally that is how it occurs.

13      I cannot say on this particular day if we make

14 an observation and we can't get in touch with the person

15 taking the notes, if we don't write it down on a piece of

16 paper noting the hour time and then combining that to

17 this.

18      But, normally, and I don't know how it occurred

19 on this particular day, if it was this way or there were

20 other observations that were noted and then brought on

21 because they cannot make contact with the agent taking the

22 notes for that day.

23 Q.   On May 12, 1999, you saw Frank Campanella.

24      Did you know who Joe Campanella was?

25 A.   Yes.

3488

1   Q.   And how did you know who he was?

2   A.   Through my history on the organized crime squad

3   family.

4        That was one of the things we do.  We try to be

5   aware of who are identified as associate members and so

6   forth.

7   Q.   And that's true with all of the agents that are

8   conducting these types of surveillances.

9        Is that right?

10       MR. BURETTA:  Objection.

11       THE COURT:  Sustained.

12  BY MS. KEDIA:

13  Q.   Well, that's something you are trained to do.

14       Right?

15  A.   That's something that, as being on the organized

16  crime squad for the Colombo family, it would be beneficial

17  for me, as an agent, to know who is part of that family.

18  Q.   Now, on this day May 12, 1999, you made an

19  observation at 4:54 in the afternoon of a white Lexus with

20  New York plates V16 4SH.

21       Is that right?

22  A.   I did.

23  Q.   And when it has that plate number, V16 4SH, that's

24  the type-written plate number on your report.

25       Right?

3489

1  A.    It is.

2  Q.    Now, that's converted from a handwriting.

3        Is that right?

4  A.    It should be.

5        Yes.

6  Q.    And, in fact, at that point in time, Agent Bogle, you

7  are aware that Joe Campanella was driving a white vehicle

8  with the license plate number Y16 45H.

9        Is that right?

10  A.    I don't know that.

11        No.

12  Q.    Well, had you seen Joe Campanella prior to this

13  surveillance on May 12, 1999?

14  A.    Probably so.

15  Q.    And had you observed him in a white Mercedes?

16  A.    I don't recall.

17  Q.    Now, if you had made such an observation, certainly

18  it would be indicated in this surveillance report.

19        Is that right?

20  A.    Someplace that should be correct.

21  Q.    And that should be something you should be able to

22  obtain if asked to obtain it.

23        Correct?

24  A.    If it were there, if there was one that had

25  surveillance of him, there should be one log.

3490

1          Yes.

2    Q.   Well, when you go out and conduct surveillance like

3    on May 12, 1999, it's part of your obligation to prepare a

4    surveillance log.

5          Right?

6    A.   If there was a surveillance that Mr. Campanella was

7    in where he drove away, if it was identified being

8    observed that he drove a white, I think you said, Lexus --

9    whatever vehicle it was, that would have been on the log.

10         That's correct.

11   Q.   Now, on May 12th, what was Ronald Califano driving?

12   A.   According to the log, he was operating a black

13   Mercedes Benz convertible.

14   Q.   And it had California plates on it.

15         Is that right?

16   A.   According to the log, it had California tag 3RXB 584.

17   Q.   And when you write down a vehicle make and tag

18   number, do you run it to find out who it's registered to?

19   A.   Normally afterward, yes.

20   Q.   Do you know if you did that on that particular

21   occasion?

22   A.   I don't know if it was done.

23         I did not.

24   Q.   Someone in the team is assigned to do a vehicle

25   registration.

3491

1          Is that right?

2    A.    Normally, whoever does the log would also run that

3    information because they would have it.

4    Q.    So in this case it would be Agent Pontecorvo?

5    A.    That's correct.

6    Q.    Now, at 7:02 on May 12, 1999, Frank Campanella is

7    observed retrieving a cigar from his vehicle.

8          Is that right?

9    A.    That's correct.

10   Q.    Do you know who that cigar was for?

11   A.    No, I do not.

12   Q.    Did you observe anyone actually smoking the cigar?

13   A.    I can't recall.

14   Q.    On that particular occasion, did you or

15   Agent Pontecorvo, or the other members of your

16   surveillance, team go -- this is on a Wednesday.

17        Right?

18   A.    That is correct.

19   Q.    Did you go to the Bocce Club to conduct surveillance?

20   A.    I don't recall if we did or not.

21        According to this log that I'm looking at now,

22   the surveillance was terminated at 7:35, which would mean

23   that the surveillance for me, or for this group, was over

24   at that time.

25        If it were to be continued on, it would have

3492

1  been listed in the log, I believe.

2  Q.    Meaning it would have been listed in the same log as

3  opposed to a separate log being prepared.

4  A.    If it was the same group out, that's normally how it

5  is done.

6  Q.    Well, if you could look at FC 13, Agent Bogle,

7  Agent Cultrera certainly was one of the people that

8  continued on conducting surveillance that day.

9          Right?

10          MR. BURETTA:  Objection.

11          THE COURT:  Sustained.

12  BY MS. KEDIA:

13  Q.    Well, Agent Bogle, when you stopped conducting

14  surveillance at 7:35, did you have any communication with

15  the other agents as to whether they were going to also

16  stop conducting surveillance at that time?

17  A.    Specific to the C 38 agents, I believe the ones that

18  are listed here, terminated at that time too.

19  Q.    And when you say the C 38 agents, you are referring

20  to yourself, Agent Pontecorvo and Agent Imes?

21  A.    That's correct.

22  Q.    And you don't know what Agent Cultrera or Agent Borum

23  continued to do.

24          Is that right?

25  A.    That's correct.

3493

1   Q.   And was it communicated at any point in time what the

2   other agents were doing that evening?

3   A.   Not that I recall.

4   Q.   How was a decision --

5            MS. KEDIA:   Withdrawn.

6   BY MS. KEDIA:

7   Q.   When I said the Bocce Club, whether you continued

8   your surveillance at the Bocce Club that night, you know

9   that that's a club that belonged to William Cutolo Senior.

10           Right?

11  A.   Correct.

12  Q.   And that's a club that you could conducted

13  surveillance at.

14           Right?

15  A.   Yes.

16  Q.   And that particular evening you said you did not

17  conduct surveillance at that location.

18           Do you recall why that is?

19  A.   No, I do not.

20  Q.   Do you have any information as to why you terminated

21  your surveillance at 7:35 that day?

22           MR. BURETTA:   Objection.

23           Asked and answered.

24           THE COURT:   Sustained.

25

3494

1    BY MS. KEDIA:

2    Q.    Are you aware, Agent Bogle, that

3    William Cutolo Senior did not show up to the Bocce Club

4    that night?

5              MR. BURETTA:  Objection.

6              THE COURT:  Sustained.

7    BY MS. KEDIA:

8    Q.    Where is it that you last saw William Cutolo Senior

9    on May 12, 1999?

10   A.    Where I last saw him would have been here on

11   21st Avenue.

12   Q.    Well, you saw him actually entering a vehicle.

13            Right?

14   A.    Right.

15   Q.    His vehicle, right?

16   A.    I don't know if it was his vehicle.

17            But I did see him enter a vehicle.

18   Q.    A vehicle certainly that you had seen him in prior to

19   that particular occasion.

20            Right?

21   A.    I don't recall.

22   Q.    You don't recall whether you had --

23   A.    I don't recall if I have seen him in that particular

24   vehicle that he was in that night before.

25   Q.    The vehicle that he was in that particular night bore

3495

1    the plate number what?

2    A.    It was a Florida vehicle license, WPE 72E.

3    Q.    And you are stating that from the report.

4          Is that right?

5    A.    That is correct.

6    Q.    Not from your memory.

7          Right?

8    A.    That's correct.

9    Q.    You certainly don't remember the license plate.

10         That's something that you are reading off of the

11    report.

12         Right?

13   A.    That is correct.

14   Q.    And sitting there now, are you sure that the license

15   plate number was, in fact, WPE 72E, or might that be a

16   mistake?

17         MR. BURETTA:    Objection.

18         THE COURT:    Sustained.

19   BY MS. KEDIA:

20   Q.    Well, do you recall having seen Mr. Cutolo in a

21   vehicle bearing the license plate number WPG 72E?

22   A.    I don't recall.

23   Q.    When surveillance reports like this are prepared,

24   does anyone go back and check, or did you go back and

25   check and compare it to the handwritten notes --

3496

1                MR. BURETTA:  Objection.

2    BY MS. KEDIA:

3    Q.   -- to see if it was correct?

4                THE COURT:  Sustained.

5    BY MS. KEDIA:

6    Q.   Well, Agent Bogle, when you take handwritten

7    notations, and then you convert it to a typewritten

8    report, do you make a comparison between the two?

9                MR. BURETTA:  Objection.

10               THE COURT:  Sustained.

11   BY MS. KEDIA:

12   Q.   You said you conducted surveillance that you reviewed

13   a report in preparation for your testimony of May 26, 1999

14   as well.

15               Is that right?

16   A.   Yes.

17   Q.   And that is another date on which you conducted

18   surveillance of William Cutolo Senior.

19               Is that right?

20   A.   That was the day that we were at the same location, I

21   believe.

22   Q.   That the --

23   A.   That --

24   Q.   That the goal was to conduct surveillance of

25   William Cutolo Senior.

3497

1          Right?

2     A.    Whoever shows up at that location.

3          Correct.

4     Q.    Well, when you say whoever shows up at that location,

5     you are talking about Bruno's.

6          Right?

7     A.    That is correct.

8     Q.    And the person that you were looking to show up at

9     that location was William Cutolo Senior.

10         Right?

11    A.    That's correct.

12    Q.    And on that particular day, what time did you start

13    your surveillance?

14    A.    I don't recall.

15         But there was a log that was --

16    Q.    If I could show you --

17    A.    -- made --

18    Q.    -- what has been previously marked as 3500 GV, as in

19    Victor, 1.

20    A.    And the question was what time we initiated the

21    surveillance?

22    Q.    Yes.

23    A.    It was at 4:50 p.m.

24    Q.    And who was with you on that date?

25    A.    Special Agent Gina Vila.

3498

1      THE COURT:  I'm sorry.

2      What was the last name?

3      THE WITNESS:  Vila, V-I-L-A.

4  A.   And Special Agent Gary Pontecorvo.

5  Q.   Just the three of you together?

6  A.   I believe so.

7  Q.   And on this particular date, were you traveling in

8  one vehicle or more than one vehicle?

9  A.   Multiple vehicles.

10 Q.   How many?

11 A.   I believe three.

12 Q.   So each of you were separate?

13 A.   That's correct.

14 Q.   And do you know if there was another surveillance

15 team out on that date?

16 A.   I believe there was.

17 Q.   And what do you base that belief on?

18 A.   Looking at this, I believe this was the day where

19 Cutolo Senior did not show up.

20      And I believe we met with another surveillance

21 squad later.

22 Q.   You believe you met with another surveillance squad

23 later?

24 A.   Well, not the squad itself, but just one individual.

25 Q.   Who was the one individual?

3499

1   A.   I think it was Jeff Carrie.

2   Q.   And when you say that that's the day, you are saying

3   that you met with him because William Cutolo Senior did

4   not show up?

5   A.   I think they were -- they were -- it was known that

6   they were out and about.

7        And myself and Agent Pontecorvo hooked up with

8   Mr. Carrie.

9   Q.   And on that particular occasion, Agent Bogle, were

10  you aware that Mr. Cutolo Senior also had not shown up on

11  May 12, 1999, and April 28, 1999?

12       MR. BURETTA:  Objection.

13       THE COURT:  Sustained.

14  BY MS. KEDIA:

15  Q.   Well, when you say that he did not show up, was there

16  an unusual occurrence, in your view?

17       MR. BURETTA:  Objection.

18       THE COURT:  Sustained.

19  BY MS. KEDIA:

20  Q.   Do you recall who else was conducting surveillance on

21  that date, May 26, 1999, besides the three of you and

22  Agent Carrie?

23  A.   No, I don't.

24  Q.   I'm going to show you what's previously been marked

25  as 3500 PS 1 for identification.

3500

1          (Whereupon, there was a pause in the

2   proceedings.)

3   BY MS. KEDIA:

4   Q.   Having looked at that, does that refresh your

5   recollection as to who else was conducting surveillance on

6   May 26, 1999?

7   A.   Only looking at this report I can tell you who is

8   listed out there.

9          The only individual I saw out there was Jeff

10  Carrie.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3501

1    BY MS. KEDIA:

2    Q.    How many agents in total were out there?

3              MR. BURETTA:  Objection.

4              THE COURT:  Sustained.

5    BY MS. KEDIA:

6    Q.    Well, Agent Bogle, did you have any communication

7    about how many agents were conducting surveillance on May

8    26, 1999?

9              MR. BURETTA:  Objection.

10             THE COURT:  Sustained.

11   BY MS. KEDIA:

12   Q.    On May 26, 1999, do you recall what time you

13   discontinued your surveillance on that day?

14   A.    It was on that log you just took.  I don't recall.

15   Q.    I show you again what's been marked as 3500-GV-1 for

16   identification.

17             (Document handed.)

18   A.    Surveillance was terminated at 8:05 p.m.

19   Q.    Do you know why surveillance was terminated at 8:05

20   on May 26, 1999?

21   A.    Without guessing, no.

22             It could have been that no one showed up, people

23   showed up and left, no one was there, we didn't think he

24   was going to show up, so we terminated.

25             I don't know specifically.

3502

1   Q.   When you say no one showed up, you were conducting

2   surveillance first at Bruno's, right?

3            MR. BURETTA:  Objection.

4            THE COURT:  Sustained.

5   BY MS. KEDIA:

6   Q.   On May 26, 1999, your surveillance initiated at

7   Bruno's; is that right?

8   A.   That's correct.

9   Q.   And then did it move to another location?

10  A.   Our surveillance, no.

11  Q.   Your surveillance remained at Bruno's the entire

12  time?

13  A.   As far as I can recall.

14  Q.   And so that evening you personally didn't go to the

15  Bocce Club?

16  A.   I did not go to the club that I recall.

17  Q.   Were you able to -- did you see people go in and out

18  of Bruno's on May 26, 1999?

19  A.   I did not, no.

20  Q.   You did not?

21  A.   No.

22            I kept the log that day.  It's a very tight

23  area.  You can't have a lot of vehicles out there because

24  they'll know you're out there watching if your vehicle

25  doesn't fit in the neighborhood.

3503

1          So I was a distance from the actual location out

2     of sight but in radio contact.

3          The other agents would call out their

4     observations, I would make notes, and I'm the author of

5     this surveillance log that you handed me.

6     Q.   You're the author of this surveillance log for May

7     26, 1999?

8     A.   That is correct.

9     Q.   And was Frank Campanella seen at Bruno's that day?

10              MR. BURETTA:  Objection.

11              He doesn't see it.

12              THE COURT:  Sustained.

13    BY MS. KEDIA:

14    Q.   Well, the observations were all reported to you as

15    they were being made; is that right?

16    A.   Yes.

17    Q.   Was one of the observations that was made that Frank

18    Campanella was seen at Bruno's?

19    A.   Yes.

20    Q.   And another individual by the name of Benji

21    Castellazzo?

22    A.   Yes.

23    Q.   Now, you identified Ronald Califano as someone you

24    had seen two weeks earlier on May 12, 1999, right?

25    A.   Correct.

3504

1    Q.    Was he one of the individuals that was seen on May

2    26, 1999?

3    A.    I don't see his name listed on the surveillance log,

4    but there were a lot of unknown males that were called

5    out.

6    Q.    Well, Ronald Califano was certainly someone known to

7    you at that point.  You had made the observation of him

8    two weeks earlier, right?

9            MR. BURETTA:  Objection.

10            THE COURT:  Overruled.

11    A.    Yes.

12    Q.    And the people reporting their observations to you

13    and that you noted on a surveillance log that day were

14    Agent Pontecorvo and Agent Vila; is that right?

15    A.    That's correct.

16            MR. BURETTA:  Your Honor, can we approach?

17            THE COURT:  Come on up.

18            (Continued on next page.)

19

20

21

22

23

24

25

3505

1           (The following takes place at sidebar.)

2           MR. BURETTA:  Judge, the witness didn't see any

3    of these things, so what she's having him do is read from

4    a report.

5           THE COURT:  I know.  I thought it might save

6    some time rather than having him recalled.

7           MR. BURETTA:  Now, we're off on Califano.

8           THE COURT:  I assume that the reason is you want

9    to place Ronald Califano as one of the would be abductors,

10   or whatever enemies.  I don't know at this point.

11          How much more do you have with this witness?

12          MS. KEDIA:  On May 26 I don't have much more at

13   all.

14          I'll move on to the one that Mr. Buretta spoke

15   about, July 27, it was 1999.

16          And then, of course, the search of the apartment

17   where the documents were found.

18          THE COURT:  It's reasonable to believe that

19   you're going to be done with this witness around 12:00?

20          MS. KEDIA:  I think so, Judge.

21          THE COURT:  Okay.  Good.

22          MR. LARUSSO:  Of course, I have five or six

23   questions.

24          THE COURT:  Really.

25          MR. LARUSSO:  Yes, I believe.  You want to wait

3506

1    to see, right?

2              THE COURT:  Always.

3              (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3507

1        (The following takes place in open court.)

2    BY MS. KEDIA:

3    Q.   Now, Agent, I'm going to hand you back the report

4    that I just took from you.

5        Was William Cutolo junior one of the people that

6    was observed on this day, May 26, 1999?

7    A.   I don't see his name listed, no.

8    Q.   And when you say you don't see his name listed,

9    you're talking about just the surveillance that you were

10   conducting between 4:50 and I believe you said 8:00 on

11   this date?

12   A.   The surveillance I was a part of between those times.

13   Q.   You, Agent Pontecorvo and Agent Vila?

14   A.   That's correct.

15   Q.   Now, do you recall -- let me ask you this.

16       You testified about a surveillance that you

17   conducted on July 27, I believe it was, 1999; is that

18   right?

19   A.   Yes.

20   Q.   And that was a surveillance that you had initiated at

21   1435 Broadway?

22   A.   Correct.

23   Q.   And what is the reason that you went to 1435 Broadway

24   on that date?

25   A.   To see who would show up.

3508

1    Q.    When you say to see who would show up, had you been

2    to 1435 Broadway prior to this date?

3    A.    I don't recall. I could have been, but I don't

4    recall.  It does not stand out in my mind.

5    Q.    Do you recall, when you reviewed your surveillance

6    reports last night, do you recall having seen one in which

7    you actually started your observations at 1435 Broadway?

8    A.    That was the only one that was on July 27 that I saw

9    last night.

10   Q.    And the ones that you reviewed last night, where did

11   you get those from?

12   A.    From the New York office of the FBI.

13   Q.    Were you retrieving all of your prior surveillance

14   reports, or were you just directed to look at a couple of

15   them?

16   A.    I was given quite a few of them.  I don't know if --

17   they're obviously not all my surveillance reports, I don't

18   believe, that I've done since I have been in the bureau.

19   Q.    Well, let's confine it related to William Cutolo

20   Senior and your investigation of him and then into his

21   disappearance.

22         Did you review all of those surveillance

23   reports?

24   A.    I don't know if I reviewed all of them.

25   Q.    And how was it determined which ones you would

3509

1    review?

2    A.    Again, I was given those reports.

3    Q.    You were given those reports?

4    A.    That's correct.

5    Q.    By whom?

6    A.    By the New York office of the FBI.  Agent Pontecorvo

7    sent those to me.

8    Q.    So you reviewed the specific ones that

9    Agent Pontecorvo sent to you?

10   A.    That's correct.  That's the only ones I had.

11   Q.    Those were the only ones you had to review?

12   A.    That's the only one I had available for me to review,

13   correct.

14   Q.    When you say available, there were others in a file

15   somewhere; is that right?

16   A.    Again, over my career in the FBI, I've done quite a

17   few surveillances.  So, yeah, there are other

18   surveillances that are in the files.

19   Q.    Well, Agent Bogle, I'm not talking about over your

20   career in the FBI.

21         I'm talking about surveillances that you

22   conducted in relation to your investigation of William

23   Cutolo Senior, and then your investigation into his

24   disappearance.

25   A.    Okay.

3510

1   Q.    Apart from the surveillances that were sent to you by

2   Agent Pontecorvo to review -- well, first of all, how many

3   would you say that was?

4   A.    Five or six.

5   Q.    Apart from those five or six, there are certainly a

6   number of other surveillances that you conducted either

7   when you were investigating William Cutolo Senior or when

8   you were investigating his disappearance, right?

9              MR. BURETTA:  Objection.

10             THE COURT:  Sustained.

11  BY MS. KEDIA:

12  Q.    Well, how often, if you have any idea, did you

13  surveil William Cutolo Senior?

14             MR. BURETTA:  Objection.

15             THE COURT:  I believe it's been answered but,

16  once again, tell us.

17  A.    I don't recall.

18  Q.    Do you have any idea if it's more than 100, more than

19  50, any approximation at all?

20             MR. BURETTA:  Objection.

21             THE COURT:  Sustained.

22  BY MS. KEDIA:

23  Q.    How often did you conduct surveillance of other

24  individuals in connection with your investigation into

25  Mr. Cutolo Senior's disappearance?

3511

1           MR. BURETTA:  Objection.

2           THE COURT:  Do you know?

3           THE WITNESS:  Excuse me?

4           THE COURT:  Do you know with respect to the

5    disappearance?

6           THE WITNESS:  I don't know.

7    BY MS. KEDIA:

8    Q.    When you went to 1435 Broadway on July 27, 1999, you

9    identified having seen two individuals, John Gannone and

10   Frank Persico, right?

11   A.    Correct.

12   Q.    Did you know, prior to your arrival at 1435 Broadway

13   that day, who John Gannone was?

14   A.    Yes, by sight, by photograph again.

15   Q.    When you say by sight, do you mean just by photograph

16   or do you mean you had seen him before?

17   A.    I had not seen him personally before.  I had seen

18   photographs of him before.

19   Q.    So this was the first time you had seen John Gannone?

20   A.    In person.

21   Q.    In person.

22           What about Frank Persico?

23   A.    I don't recall if that's the first time.  It may have

24   been the first time also for him in person.

25   Q.    Nothing in the reports you reviewed last night would

3512

1    refresh your recollection that you had seen him prior to

2    that certainly, right?

3    A.    Not that I recall.

4    Q.    When you conducted surveillance on that day, July 27,

5    1999, you started at 9:46 in the morning; is that right?

6    A.    That sounds about correct.

7    Q.    And how was that decided?

8    A.    That, I don't recall.

9    Q.    After you saw Mr. Gannone and Mr. Frank Persico, you

10   said you saw them walking on 41st Street, right, and

11   entering a garage?

12   A.    I believe so.

13   Q.    And then you saw a vehicle depart from the garage?

14   A.    Right, and observed Mr. Frank Persico driving with

15   Gannone as a passenger.

16   Q.    You didn't see Mr. Gannone anymore; is that right,

17   after that?

18   A.    I don't recall seeing him that day nor thereafter.  I

19   don't believe. I don't recall.

20   Q.    Nor thereafter, meaning even after this?

21   A.    A subsequent date or another time.

22   Q.    You don't recall ever having seen him again?

23   A.    I don't recall, no.

24   Q.    And you, on that date, after Mr. Persico, Frank

25   Persico and John Gannone left this location, or you saw

3513

1    Frank Persico leave this location, you said you went to a

2    place in Staten Island that you knew to be his residence,

3    right?

4    A.    I believe so.

5    Q.    And how did you know that place to be his residence?

6    A.    I don't know where I received that information,

7    whether I was reading the file or something.  Somewhere

8    down the line I knew that was his address.

9    Q.    Had you been to that location conducting surveillance

10    before?

11    A.    I don't recall.

12    Q.    Now, when you -- I believe that you said that when

13    you were looking at those pictures that Frank Persico was

14    carrying a briefcase, right?

15    A.    Correct.

16    Q.    That's something in fact you noted in your

17    surveillance report, right?

18    A.    That's correct.

19    Q.    And those types of observations you typically note in

20    your reports; is that right?

21    A.    Yes.

22    Q.    Whether somebody is on a cell phone, whether somebody

23    is carrying some object, those type of observations; is

24    that right?

25    A.    Types of observations, yes.  I don't know if I would

3514

1  have noted if someone was talking on a cell phone unless

2  there was some circumstance surrounding it.

3  Q.   So you might not note that, make that observation; is

4  that right?

5  A.   I can't say that I wouldn't, but I don't know if I

6  would always list that information.

7  Q.   And if it's an individual that you were specifically

8  there to observe, would you make that observation?

9         MR. BURETTA:  Objection.

10        THE COURT:  Sustained.

11 BY MS. KEDIA:

12 Q.   On -- after this particular date, July 27, 1999, you

13 said you didn't see John Gannone after.  You don't recall

14 seeing John Gannone after that date.

15        Do you recall seeing Frank Persico after that

16 date?

17 A.   I don't recall.

18 Q.   Did you review any reports that would have refreshed

19 your recollection in that regard in any way?

20 A.   I've not seen a report dated after that date where I

21 would have observed Frank Persico.

22 Q.   Now, you testified that you were present at a search,

23 Agent Bogle, at I believe you thought the address was 242

24 5th Avenue; is that right?

25 A.   I believe so.

3515

1    Q.    And this was on October 8 of 1999, some four months

2    after Mr. Cutolo's disappearance, right?

3    A.    It was on October 8, 1999.

4    Q.    And you testified about having received certain

5    documents -- seized certain documents in connection with

6    that search, right?

7    A.    Correct.

8    Q.    Now, what was the purpose of your search that day?

9              MR. BURETTA:  Objection.

10             Can we approach, your Honor?

11             THE COURT:  Yes.  Come up.

12             (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

3516

1           (The following takes place at sidebar.)

2           MR. BURETTA:  First of all, it's not relevant.

3           But, second, to give you some background, the

4    defendant sought on several occasions to suppress the

5    materials from the search.  All such motions were denied.

6           And so basically every time it's been alleged

7    Bogle testifies, the defense tries to get into all these

8    irrelevant details again.

9           They're not relevant.  He sees what he sees.  If

10   they want to ask him where he found it, fine.  The purpose

11   of it is totally irrelevant.

12          THE COURT:  Just out of curiosity, what was the

13   purpose of it?

14          MR. BURETTA:  They had obtained a search warrant

15   for a cell phone that the defendant had used at the time

16   of William Cutolo Senior's disappearance.

17          And they were searching for and didn't locate

18   that telephone immediately.  But as they were searching

19   they found other things and so they obtained a second

20   search warrant to expand the scope of the search that same

21   day and continued searching and seized certain items,

22   including these items.

23          MS. KEDIA:  Your Honor, Agent Bogle didn't

24   actually testify at the last trial but several other

25   agents testified.

3517

1          THE COURT:  Did he testify at the suppression

2   hearing?

3          MS. KEDIA:  I believe he did testify at the

4   suppression hearing.  Several other agents at the last

5   trial testified in connection with this search.

6          My purpose is not to relitigate the suppression

7   hearing but what I was permitted to do and I would ask to

8   be permitted to do certainly because it is relevant, is to

9   ask the agent the purpose of the search, because it's to

10  locate this cell phone that is used to call Mr. Cutolo

11  Senior on May 25th, 1999, to page him.

12         And it was, in fact, one of the first things

13  that the agent saw in plain view sitting on the kitchen

14  counter in Mr. Persico's apartment.

15         Now, the agent says they didn't realize this was

16  the cell phone so that's the reason that they obtained a

17  second search warrant and, in fact, found these other

18  documents and what not.

19         The purpose is not to say they should have known

20  that it was the cell phone that they were looking for, the

21  purpose is to show that Mr. Persico wasn't hiding that

22  cell phone which, obviously, our argument would be if, in

23  fact, it was used to page Mr. Cutolo on May 25th, 1999,

24  and then he actually killed him on May 26, 1999, he

25  wouldn't have kept that piece of evidence on the kitchen

3518

1    table.

2           That's the argument that I did make at the last

3    trial.  That's the argument that I would be making here.

4    It's not to suggest that the remainder of the search was

5    improper, Judge.

6           MR. BURETTA:  Judge, this agent didn't seize any

7    cell phones.

8           If there's an appropriate witness they want to

9    ask that it's relevant to the trial, that's fine.

10          MS. KEDIA:  Well, I will certainly ask, this

11   agent did testify that he saw the cell phones.

12          THE COURT:  Who testified at the last trial?

13          MS. KEDIA:  Agent Pontecorvo testified at the

14   last trial about this.

15          THE COURT:  You're calling him?

16          MS. KEDIA:  I'm going to call Agent Pontecorvo,

17   I believe, Judge.  Wait.

18          Obviously, we haven't made those determinations

19   exactly as to who we're calling and not calling.

20          If I didn't feel the need, after crossing the

21   government's witnesses, to call any witnesses, then I will

22   make that decision.

23          Certainly, with respect to their case agent,

24   that's a decision to be made whether we're going to put

25   him on the stand.

3519

1        This agent did see the cell phone in the

2   apartment.  He's testified to that at the suppression

3   hearing.  Even if he didn't specifically write down on the

4   log that he seized the cell phone, he actually sees them

5   in the apartment, Judge.

6        THE COURT:  You're certain that during the last

7   trial you were permitted to inquire about the seizure of

8   the cell phone?

9        MS. KEDIA:  Absolutely, Judge.

10        MS. MAYER:  If I can speak to that.

11        MR. BURETTA:  Before we do that, my objection as

12   to this witness is there's no foundation for asking him

13   those questions.

14        THE COURT:  She can get into the foundation.

15   Let's not go through six senseless questions and then you

16   make an objection as to relevancy or the scope of the

17   questions.

18        Now, right now, you're saying provided this

19   witness can testify that he was present when the seizure

20   was made and Ms. Kedia will be allowed to go into the fact

21   that they were seeking a cell phone which it was alleged

22   to have been used on May 25 to page Cutolo Senior.

23        MR. BURETTA:  Again, if he knows that.

24        THE COURT:  Okay.

25        MR. BURETTA:  I don't know that he knows any of

3520

1    that.

2            THE COURT:  All right.  He was certainly a

3    witness at the suppression hearing?

4            MR. BURETTA:  I agree, Judge.  I don't know if

5    he knows.  That's my point.  He made certain seizures and

6    that's what he testified about.

7            THE COURT:  Let's ask him about that.

8            (Continued on next page.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3521

1          (The following takes place in open court.)

2     BY MS. KEDIA:

3     Q.   Agent Bogle, on October 8, 1999, what was the purpose

4     of the search, if you know?

5     A.   It was to locate a cell phone.

6     Q.   And was it a particular cell phone that you were

7     trying to locate?

8     A.   Yes.

9     Q.   And what was the purpose of locating the cell phone?

10    A.   I don't know exactly.  Can you rephrase it?  I mean,

11    obviously we had a search warrant to obtain --

12    Q.   Do you know why you were looking for a cell phone?

13    A.   I believe that the reason for the search of the cell

14    phone was that that cell phone had contacted a particular

15    pager that was either owned or utilized by Bill Cutolo

16    Senior.

17    Q.   And this cell phone that you were looking for was, in

18    fact, seized that day; is that right?

19    A.   I believe it was.  But I think that at the time that

20    we did the search it wasn't known, but I believe a little

21    bit later I was told by an agent that it was.  In fact, it

22    turned out to be the phone.

23    Q.   Meaning you didn't know at the time that you seized

24    the phone that it was the phone that you were looking for,

25    you learned that at a subsequent time?

3522

1    A.    I believe so.

2    Q.    And the phone that was seized that turned out to be

3    the phone that you were looking for, where was that

4    located in the search?

5    A.    I don't know.

6    Q.    Did you see the cell phone that day?

7    A.    I saw a cell phone.

8    Q.    You saw a cell phone?

9    A.    Correct.  I don't know if the one that I saw was

10   actually the one later identified as being the one that

11   was listed on the search warrant.

12   Q.    What cell phone did you see?

13   A.    I couldn't describe it to you.  I just know it was a

14   cell phone.

15   Q.    Well, do you recall it being one with a flip?

16   A.    I think it was a flip phone.

17   Q.    Meaning it flips open; is that right?

18   A.    Correct.

19   Q.    When you saw it, it was in the kitchen area of the

20   residence, right?

21   A.    Actually, when I first saw it, it was in the hand of

22   the agent.

23   Q.    It was in the hands of which agent?

24   A.    Kevin Lyons.

25   Q.    Who is Kevin Lyons?

3523

1    A.    He was an agent that was on the Colombo Crime Squad

2    Family.

3    Q.    And, in fact, when you saw it, Agent Lyons and

4    Agent Pontecorvo and Agent  Carmichael, there was an agent

5    by the name of Carmichael there as well?

6    A.    That is correct.

7    Q.    Who is Agent Carmichael?

8    A.    She was also on the squad.

9    Q.    Her first name is Margaret?

10    A.    Yes.

11    Q.    And those three agents were kind of huddled together

12    in the kitchen looking at this cell phone; is that right?

13    A.    They were looking at a cell phone, yes.

14    Q.    They were looking at the cell phone that you saw, the

15    one with the flip?

16    A.    Correct.

17    Q.    Now, on this particular date, Agent Bogle, you

18    testified to having found a few documents, right?

19    A.    Yes.

20    Q.    And, in fact, you also, on that particular date,

21    located a pager in that apartment, right?

22    A.    I don't know.  I don't recall myself seizing that.

23    It may have been seized subsequent to the search warrant,

24    but I don't recall that.

25    Q.    Now, when you seized certain items like those pieces

3524

1   of paper that you identified, you actually document that

2   you're the person who seized those items, right?

3   A.   I would have, yes.

4   Q.   And that's then noted on an inventory, right?

5   A.   Of the items that were seized, taken, yes.

6   Q.   And the person who actually found the items in fact

7   is noted as well, right?

8   A.   Sometimes.  I really don't know.

9   Q.   Let me show you what I'm marking as Defendant

10  Persico's BA for identification, Agent Bogle.

11          If you could take a look at this and I would

12  direct your attention to page 2 and halfway down the

13  middle of the page.

14          (Exhibit handed.)

15  A.   Yes.

16  Q.   Agent Bogle, having looked at that document, does

17  that refresh your recollection that in fact you personally

18  found a pager in the apartment at 242 5th Avenue on

19  October 8, 1999?

20  A.   According to this document it does list a pager and a

21  number and it has my name next to it.  But I still don't

22  as I sit here recall.  It could have been me.  Obviously

23  from the document it was listed.

24  Q.   As you?

25  A.   As me, correct.

3525

1    Q.    Having found this document?

2    A.    That's correct.

3    Q.    When you testified to having found those other

4    documents, how is it that you recall having found these

5    particular documents?

6    A.    Because we were looking for a cell phone.  And when I

7    saw those documents secreted into a shoe box in a walk-in

8    closet, that obviously raised a flag to me as why are

9    these documents in here.  This doesn't look right type of

10   thing.  That's something that stood out to me.

11   Q.    And a pager didn't stand out to you; is that right?

12   A.    At that time I think a lot of people carried pagers.

13   So, no, I don't know that it did stand out to me at that

14   time.

15   Q.    And when you say that the pieces of papers stood out

16   to you, certainly there were many, many, many, many pieces

17   of papers seized from the apartment that day, right?

18   A.    I don't know how many.  I have been on searches were

19   there were a lot of papers seized.  I don't recall that

20   there were a lot taken from this apartment.  There may

21   have been.

22   Q.    Well, when you say there may have been, did you

23   examine what was taken from the apartment?

24   A.    No.

25   Q.    You only documented what you specifically took?

3526

1    A.    No.

2          What I found I would have documented or had

3    documented that I was the individual that located those

4    items and where I would have located those items at.

5          Those exhibits that were entered earlier I found

6    in the shoe box, I did initial and date which would be a

7    normal thing for me to do, initial and date that I found

8    them.

9    Q.    The pager that you found on October 8, 1999, what was

10    the number on the pager?

11    A.    I don't know, but I can read you the number that's on

12    the receipt.

13    Q.    Well, that refreshes your recollection as to what the

14    number is on the pager?

15          When you conduct a search, Agent Bogle, one of

16    the things that you are required to do is list what was

17    seized, right?

18          MR. BURETTA:  Objection.

19          THE COURT:  I'm sorry, I didn't hear the last

20    part.

21    BY MS. KEDIA:

22    Q.    List what was seized from the apartment, that's one

23    of the things you're required to do, right?

24          THE COURT:  Sustained.

25

3527

1   BY MS. KEDIA:

2   Q.   When you found various items in the apartment,

3   Agent Bogle, did you make a notation or make a report of

4   having found that item?

5   A.   I have in the past.

6         On this particular search I think I did a 302

7   regarding -- which is our document -- regarding the

8   finding of those paper documents.

9         I don't think it was listed as -- the pager was

10  listed in there.  Again, that didn't stand out to me.

11  Q.   When you say that you prepared a 302 identifying that

12  you found certain documents, certainly you didn't identify

13  what specific documents you found, right?

14  A.   I believe in the 302 --

15        MR. BURETTA:  Objection.

16        THE COURT:  Sustained.

17  BY MS. KEDIA:

18  Q.   Agent Bogle, when you conduct a search, it is the

19  duty of the FBI to prepare an inventory of the items

20  seized; is that right?

21        MR. BURETTA:  Objection.

22        The Court sustained an objection to this

23  already.

24        MS. KEDIA:  Your Honor, may we approach?

25        THE COURT:  Yes.

3528

1           (The following takes place at sidebar.)

2           MR. BURETTA:  Judge, I don't have an objection

3    to the question she started to ask about six questions

4    ago, which is does this document refresh your recollection

5    of the pager number.  That's fine.  She stopped asking

6    that and went to all of these irrelevant things.

7           MS. KEDIA:  He said it doesn't refresh his

8    recollection.  Obviously he made a note of it.

9           MR. BURETTA:  You didn't finish the question.

10          MS. KEDIA:  That is what he said.  He noted it.

11   That's fine.  If he wants to identify the pager number

12   from looking at the document, fine.

13          THE COURT:  Most of the stuff you can stipulate

14   to rather than asking these questions.

15          MS. KEDIA:  I will just ask him if looking at

16   the document he knows what the pager number was of the

17   pager he seized.  That's fine.  I thought that question

18   would be objected to, so that's why I did it in this

19   fashion, Judge.

20          MR. BURETTA:  I'm trying to get it done, that's

21   all.

22          THE COURT:  Okay.

23          (Continued on next page.)

24

25

3529

1      (The following takes place in open court.)

2  BY MS. KEDIA:

3  Q.   Agent Bogle, the pager that you found at this

4  apartment at 242 5th Avenue on October 8, 1999, bore the

5  number (888) 997-0967; is that right?

6  A.   That is the number that's listed on the inventory,

7  correct.

8  Q.   When you say on the inventory, you mean the inventory

9  prepared in relation to the items that were seized from

10  that apartment?

11  A.   On this document you just handed me, that is the

12  number that's listed next to a pager with my name next to

13  it.

14  Q.   With your name next to it as the pager that you found

15  in the apartment that day?

16  A.   Correct.

17      I don't have an independent recollection of the

18  exact number on the pager.

19  Q.   I'm going to show you what I'm marking as Defendant's

20  Persico BB.

21      (Document handed.)

22      Agent Bogle, looking at Defendant's Persico BB,

23  do you recognize that document?

24  A.   No, I don't.

25  Q.   Did you do any kind of a comparison on the pager that

3530

1    you retrieved from the search on October 8, 1999?

2           Did you do anything to determine what numbers

3    had dialed that pager?

4    A.    No.

5    Q.    What did you do with the pager once you retrieved it?

6    A.    Once I located the pager, I turned it over to the

7    seizing agent who was Kevin Lyons.

8    Q.    And what was done with it subsequently?

9           MR. BURETTA:  Objection.

10          THE COURT:  Sustained.

11   BY MS. KEDIA:

12   Q.    Well, do you have any idea what happened to it after

13   that?

14   A.    No.

15   Q.    Now, these documents that you testified to having

16   found on October 8, 1999, you testified that there was

17   a -- let me ask you this first.

18          Agent Bogle, this is one of the documents that

19   you personally found; is that right?

20   A.    Yes.

21   Q.    And was this the condition it was in when you found

22   it?

23   A.    What do you mean by condition?

24   Q.    Well, it has discolorations.

25   A.    It may have been processed for prints.  I don't know

3531

1    exactly what was done to the document after I located it.

2    Q.    Do you know whether it was processed for prints?

3    A.    I do not know that.

4    Q.    Do you know, when you located it, if it had these

5    fingerprints and discolorations on it?

6    A.    I don't recall.

7    Q.    You testified that -- there are two sides to this

8    document and one side has on top of it Dom and 27 in the

9    corner, right?

10   A.    Correct.

11   Q.    Then the other side has Spats on the top with a

12   question mark and then below it has Joe C; is that right?

13   A.    Correct.

14   Q.    Then the number 350 is written there, right?

15   A.    Yes.

16   Q.    Do you have any idea what that is, what that means?

17   A.    It could be a lot of things.  Are you asking me to

18   guess what I think it is?

19   Q.    I'm asking you if you know what it is?

20                MR. BURETTA:  Objection.

21                THE COURT:  Sustained.

22   BY MS. KEDIA:

23   Q.    Well, when you seized this document on October 8,

24   1999, the number 350 was there and it wasn't crossed out

25   or anything, right?

3532

1   A.   I believe that's the document that I found.

2   Q.   So when you found this document, this is also

3   something that you gave to the seizing agent, right?

4   A.   Correct.

5   Q.   And beside this Joe C, 350, there's some initials

6   here with a number.

7        Do you know what that is?

8   A.   No, I do not.

9   Q.   Was that on the document when you found it?

10  A.   I don't recall.

11  Q.   When you find various documents, Agent Bogle, do you

12  initial having found them?

13  A.   I do, and my initials and the date is on the bottom

14  section.

15  Q.   That was on the other side.

16       On this side with Joe C you have somebody's

17  initials and the number, right?

18  A.   I don't know what that is.

19  Q.   Some scribble, okay, right, that you don't know what

20  it is, right?

21  A.   Correct.

22  Q.   On the other side you have your initials here, right?

23  A.   That is correct.

24  Q.   And then there's another set of initials, maybe two

25  other sets of initials on top of yours; is that right?

3533

1    A.    There is other handwriting on top of mine, correct.

2    Q.    Well, underneath yours there's GB 10/5/99 or 10/8/99,

3    right?

4    A.    Yes.

5    Q.    And then there's 12/4/01 MC, right?

6    A.    I can't really make it out here on the screen.

7    Q.    Let me show it to you if I could.

8          MS. KEDIA:  Your Honor, if I may question from

9    here so we can both look at the document together?

10         THE COURT:  Yes.

11         (Document handed.)

12   BY MS. KEDIA:

13   Q.    At the bottom corner underneath your initials there

14   appears the date 12/4/01 with the initials MC, right?

15   A.    That's right.

16         THE COURT:  N as in Nancy?

17         MS. KEDIA:  M as in Mary.

18   BY MS. KEDIA:

19   Q.    And the agent that was present at the search with you

20   on October 8, 1999, with the initials MC, would be

21   Margaret Carmichael, right?

22   A.    That's correct.

23   Q.    And up above your initials are some other initials;

24   is that right?

25   A.    Yes.

3534

1   Q.   Whose are those?

2   A.   I don't know.

3   Q.   You don't know?

4   A.   No.

5   Q.   And the date appears to be October of 1999, October

6   something of 1999, can you make that out?

7   A.   No, I can't.

8   Q.   And the initials appear to be K, can you make it out?

9   A.   Right here?

10  Q.   Yes.

11  A.   I can't make that out either.

12  Q.   Do you have any idea whether all of these initials

13  were present on the document when you found it?

14  A.   Well, no.

15  Q.   These were not.  These were all written on the

16  document subsequent to your finding it; is that right?

17  A.   Correct.

18  Q.   And F2C, what about that?

19  A.   I don't know the initials or is that a date?  I can't

20  tell what that is.

21  Q.   When you say what that is, you're referring to what

22  seems to be in some other kind of pen, a different colored

23  pen than your initials, right?

24  A.   Correct.

25  Q.   That was something that was put on the document --

3535

1    and you can't make that out either -- after it was seized

2    by you?

3    A.    I believe so.

4            It's not consistent with the other ink it looks

5    like on the page.

6    Q.    And you have no idea when or where any of these

7    things, apart from what you wrote on the document, were

8    placed on the document; is that right?

9    A.    That's correct.

10   Q.    Agent Bogle, were you actually asked to analyze these

11   documents in any way?

12   A.    No.

13   Q.    Now, Agent Bogle, at the time that you were -- you

14   testified that this cell phone that you were looking for

15   had paged a pager that was either owned or utilized by

16   William Cutolo Senior, right?

17   A.    That's my understanding.

18   Q.    And that was a pager on which you, in fact, had an

19   interception, right?

20           MR. BURETTA:  Objection.

21           THE COURT:  Sustained.

22   BY MS. KEDIA:

23   Q.    Well, did you have interceptions on Mr. Cutolo

24   Senior's pagers and cell phones at the time of his

25   disappearance?

Mary Ann Steiger, CSR
Official Court Reporter

3536

1    A.    What do you mean by interceptions?

2    Q.    Were you intercepting any of the information, whether

3    it was the phone number that was dialing the pager or the

4    cell phones, or whether it was more than the phone

5    numbers?

6    A.    I believe we were.

7    Q.    And, in fact, you participated as a reviewer in

8    reviewing what information was obtained with respect to

9    Mr. Cutolo's pager and his cell phones, right?

10   A.    Cell phones, I believe, yes.  I don't know if the

11   pager.  I don't recall.

12   Q.    Well, with respect to the cell phones, how many

13   phones are we talking about?

14   A.    I don't recall.

15   Q.    Do you recall any of the phone numbers associated

16   with any of the cell phones?

17   A.    No.

18   Q.    And do you recall any of the phone numbers associated

19   with the pager that had been dialed?

20   A.    No.

21   Q.    Let me show you -- I'm going to show you what I'm

22   marking as Defendant's CC-1, CC-2 and CC-3.

23         (Exhibits handed.)

24         Agent Bogle, if you could take a look at those

25   documents.

3537

1    A.    Yes.

2          (Pause in proceedings.)

3    Q.    Agent Bogle, have you had an opportunity to look at

4    those?

5    A.    Yes.

6    Q.    Do you recognize them?

7    A.    It's a long time ago.

8    Q.    Well, all of the events that you are testifying about

9    here today are a long time ago, right?

10   A.    I understand that.  They look familiar.

11   Q.    What do you recognize them to be?

12   A.    I think we call them pertinent summaries.

13   Q.    What does that mean, a pertinent summary?

14   A.    During a Title III operation which is an overhear on

15   a cell phone, mainline phone, any type of communication.

16   Q.    Let's break that down.

17          A Title III, you said, is an overhear, meaning

18   that you are intercepting phone conversations that someone

19   is having on a phone, right?

20   A.    Correct.

21   Q.    And you have been authorized by a court to obtain

22   such information, right, to overhear the conversations?

23   A.    Correct.

24   Q.    Go ahead.

25   A.    Any call that is logged down it would list the date,

3538

1    the time, who actually monitored the conversation in

2    realtime, and then a synopsis or summary of the

3    conversation.

4    Q.    And that is something that you prepared, right?

5    A.    I reviewed it.  It would have been prepared by

6    whoever monitored the telephone call.

7    Q.    When you say you reviewed it, what does that mean?

8    A.    I was the administrative agent so I would review,

9    make daily reviews of the calls and the tapes that we

10   intercepted telephone calls.  So, I would review those.

11   Q.    Let me show you one additional document.  This is

12   also the same type of document, one of the interceptions

13   on a cell phone which you reviewed, right?

14         (Document handed.)

15   A.    Yes.

16         MS. KEDIA:  I offer Defendant's Persico CC-1

17   through CC-4.

18         MR. BURETTA:  Objection.

19         THE COURT:  Sustained.

20   BY MS. KEDIA:

21   Q.    Agent Bogle, these are documents that -- is that your

22   handwriting on the documents?

23   A.    No.

24   Q.    Do you know whose it is?

25   A.    No.

3539

1    Q.    When you actually reviewed the calls, you said you

2    had information, you had pen registers up on Mr. Cutolo's

3    cell phones or phones you believed to be used by Cutolo

4    Senior right; is that right?

5    A.    I know the pager.  I don't know if we had anything on

6    the cells.  I don't recall the cells.  I do recall having

7    information on the pager.

8    Q.    Do you recall -- you don't recall having

9    information -- pen registers up on William Cutolo Senior's

10   cell phones?

11            MR. BURETTA:  Asked and answered.

12            THE COURT:  Sustained.

13   BY MS. KEDIA:

14   Q.    Well, Agent Bogle, I asked you earlier about the

15   pager and I believe you stated that you don't recall the

16   pager but you recall cell phones.

17            Did I misunderstand?

18            MR. BURETTA:  Objection.

19            THE COURT:  For clarification purposes I'll

20   allow you to answer the question.

21            Do you understand the question?

22   A.    I know of a clone pager.  I'm not sure whether we had

23   actually pens running up on cell phones for Mr. Cutolo.

24   Q.    When you say a clone pager, what does that mean?

25   A.    Interceptions, the information as we spoke earlier

3540

1    about information that was coming across to the pager.

2    Q.    So meaning if someone has a pager, you are receiving

3    on a clone pager the information that the person is

4    receiving on his pager simultaneously; is that right?

5    A.    I believe so.

6    Q.    You're saying that you're aware that you had that?

7    A.    Yes.

8    Q.    On the pager believed to be used by William Cutolo

9    Senior, right?

10   A.    Correct.

11   Q.    That is a pager with a number (917) 433-3052; is that

12   right?

13   A.    That, I don't know.

14   Q.    If you could look at the documents that you have in

15   front of you and see if they help you refresh your

16   recollection.

17   A.    These are actual overhears.  This would have come

18   from a verbal interception, verbal communication

19   interception.

20   Q.    Right.

21         Having looked at those documents, do they help

22   you refresh your recollection about the pager to William

23   Cutolo Senior bearing the number (917) 433-3052?

24   A.    That's not my handwriting and, again, I don't recall.

25   Q.    When you were conducting these overhears or your

3541

1    review of the overhears, did you make any comparison

2    between the information that you were receiving in

3    connection with William Cutolo Senior's pager and the

4    overhears?

5    A.   I did not.

6    Q.   Did you direct anyone to make such a comparison?

7    A.   No.

8    Q.   Did you participate in any way in making such an

9    analysis?

10   A.   Not that I remember.

11   Q.   Were you, Agent Bogle, also at the time -- when you

12   say that these are overhears, what are they overhears of?

13             MR. BURETTA:  Objection.

14             THE COURT:  Sustained.

15   BY MS. KEDIA:

16   Q.   You said you were reviewing overhears, right, during

17   this period of time in 1999, right?

18   A.   These are '98 and '97.

19   Q.   '98 and '97 and you continued to conduct these

20   overhears between William Cutolo Senior and others

21   throughout up until the disappearance in 1999; is that

22   right?

23             MR. BURETTA:  Objection.

24             THE COURT:  Sustained.

25

3542

BY MS. KEDIA:

Q.   Well, Agent Bogle, when you were conducting overhears during this period of time what -- who was it that you overheard?

A.   A lot of people.

Q.   Was William Cutolo Senior one of the people that you overheard?

A.   Yes, according to this overhear you placed in front of me he was listed as one.

Q.   And when you say this overhear I placed in front of you, you're talking about overhears that you reviewed, right?

A.   Correct.

Q.   And there are several overhears on which he was overheard that you participated in reviewing; is that right?

A.   Could have been.  I don't know.

Q.   Well, there are at least what, four in front of you, right?

A.   At least four, yes, with his name mentioned.

Q.   And you don't recall how many others there would have been, right?

A.   No.

Q.   Now, when you received the information about the overhears, you received information about the number that

3543

1    was -- the number that was called and the number that was

2    being called; is that right?

3    A.    I believe so.

4    Q.    In fact, that's something that you're able to

5    determine from the documents that you were reviewing; is

6    that right?

7    A.    Sometimes the equipment will pick up if it's an

8    incoming call to the target telephone.

9           I don't know if it always picked up that -- the

10   number at that time that came in.  For instance, I'll show

11   you this one that you provided up here.

12   Q.    Could you read me the number?

13   A.    Activation 65.  It's your CC-4.

14   Q.    Okay.

15   A.    There was obviously an incoming call.

16   Q.    To what number?

17   A.    It would have been the target telephone, and I don't

18   recall what that is right off the top of my head.

19   Q.    Incoming call from what number?

20   A.    It does not list it on here.

21          Again, that's what I'm saying.  Sometimes it may

22   have picked up the number, sometimes it may not have.

23   Q.    If you could look at the other three, were those

24   incoming or outgoing calls on which Mr. Cutolo Senior was

25   overheard?

3544

1   A.    I believe CC-1 is an outgoing.  I think the other

2   one, CC-2 and CC-3 appear to be incoming.

3   Q.    And CC-1, can you read me the number at the bottom,

4   SJ11 --

5   A.    046.

6   Q.    And the person being called is William Cutolo; is

7   that right, William Cutolo Senior, right?

8   A.    He's listed as being overheard.  I don't know if

9   that's his number or a number associated with him.

10   Q.    Well, if I could just direct your attention to a

11   third of the way down the page, if that helps you identify

12   that the person being called is William Cutolo, Sr.; is

13   that right?

14   A.    As listed, yes, the caller called, that's correct.

15   Q.    And the caller is a person by the name of Dominick

16   Dionisio, right?

17   A.    Correct.

18   Q.    And the number being called is (917) 941-0918, right?

19   A.    That is the number listed on this, correct.

20   Q.    And the subscriber information for that phone number

21   is a person by the name of Gerald DiNardo, right?

22   A.    That is what's listed, that's correct.

23   Q.    And this phone number, (917) 941-0918, did you know

24   that number to be associated with William Cutolo, Sr.?

25   A.    I don't know.

3545

1   Q.   The next one, CC-2 and CC-3, on CC-2, William Cutolo

2   Senior is in fact the caller, right?

3   A.   Correct.

4   Q.   And are you able to determine, from looking at this

5   document, what the number was that was used to call -- the

6   person being called was Dominick Dionisio, right?

7   A.   The person being called was Dominick Dionisio.

8   Q.   Are you able to determine, by looking at this

9   document, what phone number was -- what phone was used to

10  call Dominick Dionisio by way of Cutolo Senior?

11  A.   No, I don't see anything listed on the summary.

12  Q.   At the time that you reviewed this information,

13  certainly that information was available to you, right?

14  A.   I don't know.  I don't recall.

15       If it were available I would have made sure that

16  it was on here because that would have been part of my

17  reviewing.

18       I don't recall whether a number was actually

19  captured on that call or not.

20  Q.   So meaning that if it had been, it would have been

21  something you would have noted, is that what you mean?

22  A.   Correct.

23  Q.   And, similarly, with CC-3; is that true?

24  A.   Is what true?

25  Q.   That you were unable to determine what phone was

3546

1    being used by William Cutolo Senior to place the call to

2    Dominick Dionisio?

3    A.    At the time of the review, at the time that this was

4    typed by the monitor, there is no telephone number that

5    was listed, that's correct.

6    Q.    And do you know if you were ever able to determine

7    what phone William Cutolo Senior was using to make these

8    calls that you were intercepting?

9    A.    I do not.  I don't know whether or not another agent

10   did it or not.

11   Q.    Even sitting here today, you don't know that?

12   A.    I don't know.

13            MS. KEDIA:  Thank you, Agent Bogle.

14            I have nothing further.

15            THE COURT: Mr. LaRusso.

16            MR. LARUSSO:  Thank you, your Honor.

17

18   CROSS-EXAMINATION

19   BY MR. LARUSSO:

20   Q.    Good afternoon.

21   A.    Good afternoon.

22   Q.    I'm going to show you Government's Exhibit 56, which

23   you have seen a couple of times already, and direct your

24   attention to the number 6-14, do you see that?

25   A.    Yes.

3547

1    Q.   Can you make out the writing just before the number

2    6-14?

3    A.   No, I cannot.

4    Q.   Is it possible that it may be as of 6-14?

5    A.   Again, I can't make it out.

6    Q.   Aside from the initials and dates that you reviewed

7    with Ms. Kedia, the rest of the writing, do you know whose

8    handwriting this is, the names that you referred to, Dom

9    and Joe C, and some numbers, do you know whose handwriting

10   that is?

11   A.   I do not.

12   Q.   Did you come to learn that it was the handwriting of

13   Jack DeRoss?

14   A.   I don't think I knew that.

15   Q.   As you're sitting here today, you don't know he was

16   the author of those names and numbers?

17   A.   I don't believe so.

18   Q.   Do you have any independent recollection of

19   participating in the surveillance on November 16, 1999?

20   A.   Without seeing a document, no.

21          MR. LARUSSO:  If I may approach, your Honor?

22          THE COURT:  Yes.

23          (Document handed.)

24   BY MR. LARUSSO:

25   Q.   Showing you what's marked DeRoss ZA, would you take a

3548

1    look at that.

2    A.    Yes.

3    Q.    Have you had a chance to look at that?

4    A.    I did.  My initials are on here, so I was a party to

5    this surveillance on that date.

6    Q.    Do you remember on this date -- and you can look at

7    any part of the document to refresh your recollection --

8    that part of the surveillance entailed an individual named

9    Jack DeRoss; is that correct?

10   A.    That's correct.

11   Q.    And you knew Mr. DeRoss at this point in time; is

12   that right?

13   A.    I did.

14   Q.    I'm not going to go through the whole report, but

15   directing your attention to some time around 9:55 in the

16   morning, did you or any of the other agents pick up any

17   surveillance of Mr. DeRoss?

18         And then if the answer is yes, tell us what you

19   personally observed at or about that time and thereafter.

20   A.    There is a notation for observation at that time.  My

21   name, my initials, aren't next to it, so I did not observe

22   any of that.

23   Q.    Could you tell us, you were in communication with the

24   other agents; is that right?

25   A.    Correct.

3549

1   Q.   Would it be fair to say that the entries on this log

2   would have been what those other agents were observing at

3   or about this time?

4   A.   Yes.

5   Q.   And would it likewise be fair to say that you would

6   be privy to that information around the time you were

7   making those observations?

8   A.   I would have heard them say that over the radio.

9   Q.   Tell us what happened at or about this time, 9:55,

10  and take us to the observation you personally made.

11  A.   I can read this.  Is that what you're asking me to

12  do?

13  Q.   Please.

14  A.   At 9:55 a.m., observations were Jackie DeRoss exits

15  club and enters New York registration A31-OUR, proceeds to

16  SI expressway to 440 south, exits last exit before toll,

17  observed on Page Avenue heading south towards Hylan

18  Boulevard, makes left on Hylan Blvd., takes Hylan to

19  Butler Blvd., and makes a right.  That was all listed for

20  9:55 a.m.

21  Q.   Now, thereafter, did you make any personal

22  observations?

23  A.   Yes.

24  Q.   Can you tell us what they were, please, and what

25  time?

3550

1    A.    10:30 observed that New York registration A31-OUR

2    heading on boulevard or heading on Hylan towards bridge.

3    That was -- actually I think that's 11:30 a.m.

4    Q.    Was there an earlier surveillance that you were

5    involved in at 10:30?

6    A.    Same surveillance.  If you're talking about the time,

7    I think we set it up in the vicinity of Hylan and Butler.

8    Q.    It would be fair to say that you and other agents at

9    or about 10:30 that morning observed the same car

10   Mr. DeRoss was seen driving earlier around 9:55?

11   A.    Yes.

12   Q.    I understand you didn't have a chance to review this

13   log.  This is the first time in a long time that you're

14   looking at it.

15          But your initials are there for this particular

16   surveillance at 10:30 in the morning; is that right; is

17   that correct?

18   A.    I believe these are my initials.

19   Q.    So at 10:30 the car that Mr. DeRoss was seen in is

20   now in the vicinity of Hylan Boulevard and Butler

21   Boulevard, Hylan Avenue and Butler Boulevard?

22   A.    The surveillance team sets up in that vicinity.

23          I don't know if the vehicle was later observed

24   an hour later heading on Hylan towards the bridge.

25          I don't know if that vehicle was actually there

3551

1    at that time.

2         The observation says that the surveillance team

3    sets up in the vicinity whereas no observation at 10:30

4    noting that the vehicle was observed.

5    Q.   Do you know any home in the vicinity of Hylan Avenue

6    and Butler Boulevard -- do you know Mr. Cutolo's residence

7    to be at 515 Butler Boulevard, Cutolo Senior?

8    A.   That address sounds familiar, but I don't recall.

9    Q.   And this location where the surveillance was setup on

10   Hylan and Butler Boulevard, do you know how far that was

11   from Mr. Cutolo's residence?

12   A.   I do not.

13   Q.   And approximately 11:30 what observation did you make

14   again, please?

15   A.   Observed a vehicle that had a New York registration

16   A31-OUR heading on Hylan toward the bridge.

17   Q.   That was the car that Mr. DeRoss was seen in earlier,

18   9:55 a.m.?

19   A.   According to the log, that's correct.

20   Q.   And could you tell us, please, were you involved in

21   any other surveillances that day?

22   A.   I couldn't tell you.

23   Q.   Take a look at 12:00 and tell us what it says.

24   A.   Surveillance was terminated at that time at 12.

25   Q.   At what location?

3552

1   A.   168 Hope on Staten Island.

2   Q.   Do you know that to be the residence of Mr. DeRoss?

3   A.   I believe so.

4   Q.   And the car was observed, the same car that you

5   identified earlier, at that location now at 12:00,

6   correct?

7   A.   At what location?

8   Q.   168 Hope?

9   A.   Okay.

10  Q.   Okay.  One other question.

11       When agents initial items that are found, is

12  that for the purpose of establishing chain of custody so

13  at some future time you can identify it, if you had to?

14       MR. BURETTA:  Objection.

15       THE COURT:  Overruled.

16       Is that one of the purposes?

17       MR. LARUSSO:  Thank you, your Honor.

18  A.   That is one of the purposes.

19       MR. LARUSSO:  I have no further questions, your

20  Honor.

21       MR. BURETTA:  Nothing further.

22       THE COURT:  You can step down, sir.  You're

23  done.

24       Perfect timing for our lunch recess.  We will

25  resume at 1:30.

3553

1          Please do not talk about the case.  Have a good

2    lunch.

3          (The witness steps down.)

4          THE COURT:  I think it's time for a run either

5    for bagels or Stanley's.  Let me know what you would like.

6          (The jury is excused.)

7          THE COURT:  I would like to discuss the

8    situation with Mr. Levin.

9          At the last trial Mr. Levin, in response to the

10   government's questions, indicated that he had a scheduled

11   meeting with Mr. Persico for May 26, or was it he was

12   contacted by Mr. Persico on May 25th and Mr. Persico and

13   he setup a meeting.  What is the testimony?

14         MS. KEDIA:  Your Honor, the testimony is that on

15   May 25th, 1999, Mr. Levin was contacted by Mr. Persico at

16   a meeting and a meeting was scheduled for 3:30 in the

17   afternoon approximately on May 26, 1999.

18         At that time, Mr. Levin represented Mr. Persico

19   on the case that was then pending in Florida.

20         THE COURT:  Correct.

21         MS. KEDIA:  At the last trial, in fact, I was

22   concerned about Mr. Levin's testimony in terms of getting

23   into any actual privileged discussions between himself and

24   Mr. Persico.

25         The Court, in fact, directed Mr. Levin to answer

3554

1   all of the questions that were posed to him in connection

2   with when the meeting was setup, why it was setup.

3         He did answer those questions.  They were not

4   determined in any way to be privileged because he wasn't

5   relating certainly the communication that he had during

6   the course of his meetings with Mr. Persico.

7         He is simply testifying to the fact that a

8   meeting was setup, that it was for the purpose of

9   preparing this hearing that was I believe at the time

10  scheduled on June 11, 1999, in Florida, that Mr. Persico

11  was to arrive and did arrive that afternoon with or, you

12  know, I don't know if they arrived together.

13        At some later time a person by the name of Frank

14  Berry, also an attorney, he specialized in coast guard law

15  because the case in Florida had to do with a gun that was

16  found on a boat and he was charged with constructive

17  possession charge.

18        Mr. Berry and Mr. Persico did in fact meet with

19  Mr. Levin at 3:30.

20        I think what the government is trying to do is

21  to say that Mr. Persico -- that Mr. Levin should not be

22  entitled to tell the jury the reason for the meeting, so

23  as to suggest to the jury that this whole purpose of the

24  meeting was a charade and to set up an alibi for himself.

25        During this period of time Mr. Levin will

1   testify and did testify at the last trial that he was

2   routinely meeting with Mr. Persico; that, in fact, he was

3   already scheduled to meet with Mr. Persico sometime that

4   week.  The specific time and date was made on May 25th,

5   1999, because he had actually been away in Florida for a

6   few days prior to May 25th.

7          He returned home that evening, found out that

8   Mr. Persico in fact had called his office on May 24th and

9   then had tried to reach him at home on May 25th, 1999, and

10  the meeting was set up for the following date, your Honor.

11         Certainly none of that was determined by

12  Judge Johnson to be privileged communications between

13  Mr. Persico and Mr. Levin.

14         MR. BURETTA:  Judge, we don't object to

15  Mr. Levin testifying that he represented this defendant in

16  the proceeding in Florida at the time.

17         Our problem is when he answers a question and

18  volunteers the subject of the subject meeting.

19         What he's doing is he's saying to the jury what

20  we talked about at that meeting was his case.  That's what

21  the whole conversation is about.

22         And so he's using the privilege as a sword to

23  say that this is what it was about, but as a shield saying

24  but you can't ask what we talked about.

25         We don't have a problem if they want to argue

3556

1   Mr. Levin represented him at the time and they had a

2   meeting and they had had meetings before.  That's fine.

3   They can make their arguments about what they want to say

4   that meeting was about and what the details of it were.

5        What they can't do is specifically elicit the

6   purpose of the meeting, because that's privileged.  That's

7   a communication.  That's revealing a communication

8   Mr. Persico had with Levin about what the meeting was

9   about.  That is privileged.

10        THE COURT:  I'm not too sure I follow your line

11   of thinking on this, Mr. Buretta, but it would appear that

12   at the very least the meeting should have some purpose.

13   Otherwise, what was your comment during summation

14   regarding this meeting that it was --

15        MR. BURETTA:  I didn't make a comment and I

16   don't know, Judge.

17        THE COURT:  When I say you, I'm referring to the

18   government's attorneys.  What did you argue?

19        MS. MAYER:  The argument was, as counsel is

20   aware, this meeting was conveniently set up at the same

21   time that William Cutolo disappeared.

22        There was never any suggestion to my

23   recollection and, obviously, I didn't review the

24   summation, I did not sum up in the case or rebut, but I

25   don't believe there was any suggestion or argument about

3557

1    anything specifically being discussed.  It was simply the

2    fact of there being immunity, that it was set up at the

3    same time as the disappearance, and it was set up at the

4    very last minute.

5            THE COURT:  Are you saying that if an attorney

6    disclosed I set up a meeting to get the papers ready for a

7    closing, that that's a violation of the attorney/client

8    privilege?

9            MR. BURETTA:  I would have to think about that,

10   Judge.  I'm not sure if that's even privilege

11   communication given its subject.

12           THE COURT:  I set up a meeting to go over a

13   will, set up a meeting to form a corporation.

14           MR. BURETTA:  It really depends on the subject,

15   I think.  I'm not sure.

16           THE COURT:  Well, you're saying that those type

17   of statements can only be made in the context of a civil

18   non-criminal situation.

19           MR. BURETTA:  No, Judge.

20           Being confronted with them and haven't had time

21   to think about it --

22           THE COURT:  Think about them.

23           And is Mr. Levin your next witness?

24           MR. BURETTA:  I'm not sure.  We had Tytell

25   scheduled.

3558

1          He was going to testify about the document we

2   were just looking at that's handwritten that Mr. DeRoss'

3   attorney said in his questioning his client wrote.

4          You'll recall Mr. LaRusso also opened in his

5   opening statement and said it was his client's

6   handwriting.  I'm not sure I need to call him.

7          THE COURT:  You might not.

8          MR. BURETTA:  If he's conceding that, I don't

9   need to call this witness.  I have no purpose in calling

10  him.

11         THE COURT:  Are you conceding that, Mr. LaRusso?

12  It just seems like it when you asked that last question.

13         MS. KEDIA:  Your Honor, I would like to be

14  permitted to ask Mr. Tytell some questions and I don't

15  need -- I'm perfectly happy with designating him as a

16  handwriting expert but I am not stipulating to this being

17  Mr. DeRoss' handwriting and certainly both parties have to

18  do so.

19         THE COURT:  I don't think that evidence is

20  admissible against your client necessarily.

21         MR. BURETTA:  It is found in her client's

22  apartment.

23         MS. KEDIA:  It certainly is something that the

24  government is going to argue is to be used against my

25  client, your Honor, because it's obviously found during

3559

1    the search of Mr. Persico's place.

2            MR. LARUSSO:  Obviously, Judge, from my point of

3    view, I'm not going to try and slip and slide on this

4    much.

5            The answer is we're not going to contest the

6    handwriting on that document as being somebody else's.

7            I have discussed this and felt that it wasn't

8    our position to come out and readily admit it during the

9    course of the trial, but let the government prove it.  In

10   other words, that's part of their obligation.  It's a

11   strategy situation.

12           THE COURT:  You put it out there at the opening

13   and said to the government now you prove it, and then

14   you'll say in the closing we conceded it all along.  Okay.

15   I get it.

16           MR. LARUSSO:  I opened on it.  I asked a

17   question of this witness, if he knew it was Mr. DeRoss'

18   handwriting.  I'll close on the same issue.

19           THE COURT:  The question is, are you conceding

20   that it's your client's handwriting?

21           MR. LARUSSO:  Yes, I am.  Like I said, I'm not

22   going to play games on that, Judge.

23           MR. BURETTA:  What shouldn't happen is they

24   argue in closing by calling this witness, this is window

25   dressing, I think is the term Mr. LaRusso used in his

3560

1  opening, as though we're calling witnesses gratuitously to

2  prove things that the defense agrees are true.

3          MR. LARUSSO:  Absolutely not.

4          MR. BURETTA:  That's not true?

5          MR. LARUSSO:  I will never do that, Judge.  I

6  have no intentions of doing that.

7          THE COURT:  All right.

8          And your position as to why Mr. Tytell has to be

9  called is what, Ms. Kedia?

10         MR. LARUSSO:  Putting the government to their

11  burden is the way it's put.

12         THE COURT:  She can talk for herself.

13         MS. KEDIA:  Obviously that is the first issue.

14         The second issue is that Mr. Tytell was given

15  not just this document but any number of documents that

16  are found during the search of Mr. Persico's apartment.

17         There are a number of documents that Mr. Persico

18  is also required to give a handwriting exemplar after

19  these documents are found.  Mr. DeRoss is required to do

20  so as are some other defendants in that related case.

21         One of the documents that is obviously going to

22  be critical and that I certainly intend to ask Mr. Tytell

23  about is the piece of paper that the government --

24         THE COURT:  The one that says 250 Allie Persico?

25         MS. KEDIA:  No, your Honor.  That I believe

3561

1    Mrs. Cutolo said she gave to the government directly.

2           What was found in the apartment, however, was

3    this piece of paper that said Al and had the pager number

4    for William Cutolo Senior, and I do intend to ask him

5    about any analysis he did of that handwriting.

6           MR. BURETTA:  He didn't do any analysis of that

7    handwriting.

8           If she wants to call him to say he didn't, let

9    her.

10          I don't understand why I'm being put to the

11   burden of wasting the time to call this witness when what

12   he's testifying about --

13          THE COURT:  Is that your only question in terms

14   of documents that aren't covered?

15          MS. KEDIA:  No, Judge.

16          There are a number of questions.

17          Certainly, it is the Government's burden.  For

18   Mr. Buretta to say I don't understand why I'm being put to

19   the burden, it is absolutely the government's burden to

20   prove --

21          THE COURT:  Ms. Kedia, please.  Don't make an

22   argument.  Tell me what documents you believe you're

23   entitled to call this witness on and I'll make a

24   determination whether or not it has to be done before the

25   government rests or after the government rests.

3562

1        MS. KEDIA:  Very good, Judge.

2        THE COURT:  If you're going to be allowed to do

3    it at all.

4        MS. KEDIA:  There are a number of documents that

5    I have.  Defendant's Persico G we put into evidence in

6    this case.

7        THE COURT:  What is G?

8        MS. KEDIA:  This is a document that was shown I

9    believe initially to Barbara Jean Cardinale.

10        Your Honor, I'll hand up the copy that we put in

11    evidence to the Court.

12        THE COURT:  Is this the document that Mr. Tytell

13    examined?

14        MR. BURETTA:  No.

15        Obviously they can say the government didn't

16    call him, a handwriting expert.  I don't know what the

17    document is.  I don't have it in front of me.  I'm

18    assuming it's --

19        THE COURT:  One of the Bill Cutolo Senior

20    documents.

21        THE COURT:  A loansharking document.

22        MR. BURETTA:  Mr. Tytell did his analysis in

23    '01.  Mr. Cutolo certainly wasn't around to give

24    exemplars.  He didn't analyze the document.

25        THE COURT:  That's fine.  He didn't examine it.

3563

1    That one you're not going to be talking to him about.

2            What else do you have?

3            MS. KEDIA:  There are a number of other

4    documents that are in evidence.

5            I believe Defendant's DeRoss C, H, Z and P.

6            And, your Honor, these documents -- yes, that is

7    actually another point that I intend to elicit from

8    Mr. Tytell is the fact that Mr. Cutolo Senior wasn't

9    around to give handwriting exemplars doesn't prevent him

10   from conducting handwriting analysis.

11           In fact, one of the ways that the witness will

12   testify that he conducts handwriting analyses is not only

13   from exemplars but also from ordinary other documents that

14   are known to be in a certain person's handwriting meaning,

15   and in Mr. Persico's case, particularly there were known

16   examples and then the exemplar and a comparison was made

17   with both the known exemplars.

18           THE COURT:  I have had many handwriting experts.

19   It's thrilling testimony.

20           What is the purpose, to show that the government

21   didn't do a comparison of Mr. Cutolo's known handwriting

22   samples with any of the documents here?

23           MS. KEDIA:  The purpose, for example,

24   Defendant's G, this is a document that was handed to

25   Agent Pontecorvo in the year 2000, almost a year after

3564

1    Cutolo Senior disappeared, by Cutolo Junior.

2         There is certainly some testimony by

3    Mrs. Cutolo, Marguerite Cutolo, that in fact a lot of the

4    numbers on these various documents don't appear to be her

5    husband's handwriting.

6         MR. BURETTA:  Just to be clear, Mr. Tytell

7    didn't assess that document.

8         THE COURT:  I know he didn't.  You told me that

9    at the beginning.  Okay.

10        MS. KEDIA:  There are a number of documents that

11   the government had that were known samples that certainly

12   could have been given to Mr. Tytell to do such analysis.

13        THE COURT:  You got a concession from the

14   government they didn't do it.

15        MS. KEDIA:  If the government wants to stipulate

16   to that instead of calling Mr. Tytell, that's fine.

17        THE COURT:  That you didn't make --

18        MS. KEDIA:  They had the ability to do it and it

19   wasn't done, Judge.

20        MR. BURETTA:  They can make that argument that

21   they didn't call a handwriting expert.  I don't understand

22   this.  It's an argument you make.  There's a lack of

23   evidence.  The government didn't do X.

24        MS. KEDIA:  Your Honor, we can't make that

25   argument without the handwriting person.

3565

1          The fact that the government employed this

2    handwriting expert is certainly relevant because they had

3    him analyze a number of documents.  We're not talking

4    about one or two.

5          THE COURT:  You can cross-examine him on all

6    those documents that he examined.

7          MS. KEDIA:  And these were the only set of

8    documents that he examined, certainly, and the fact that

9    certain of the documents what he was asked to do is

10   compare them with known exemplars, known specimens, as

11   opposed to simply the exemplars that were given.  That's

12   what I intend to cross him about, Judge.

13         THE COURT:  The government isn't putting in all

14   these documents that you have chosen to put in; is that

15   correct?

16         And is it also correct, Mr. Buretta, that none

17   of these documents were examined by the handwriting

18   expert?

19         MR. BURETTA:  Correct.

20         MS. KEDIA:  When we say these documents, there

21   are a number of documents.

22         THE COURT:  Persico's G, DeRoss' C, H, Z and P.

23         MS. KEDIA:  These are documents the government

24   had in its possession at the time Mr. Tytell conducted a

25   handwriting analysis of the documents that he was given.

3566

1          He was given a certain amount of documents and

2     what he was given is something that certainly the jury

3     should know and be aware of.

4          I don't intend to cross-examine him on each and

5     every document that he was given.  I only intend to cross

6     him on the relevant documents.

7          The fact of what he was given to analyze is

8     something that I intend to argue to the jury and the

9     manner in which he's able to do an analysis is something

10    that I intend to examine Mr. Tytell about.

11         THE COURT:  That depends if the government is

12    going to call him at this point in time.  That's a

13    decision you'll make.

14         MR. BURETTA:  Do we have -- I want to be clear

15    about Mr. DeRoss' position.

16         Is he agreeing that the handwriting is his on

17    that document?

18         MR. LARUSSO:  Judge, I cannot stipulate.  I'm

19    putting the government to their test.

20         THE COURT:  That's the end of the discussion.

21         MR. LARUSSO: I told the Court and the

22    Mr. Buretta I'm not going to argue it's somebody else's

23    handwriting.  It's my client's handwriting.  I don't

24    intend to draw any other emphasis that he's concerned

25    about.

3567

1          THE COURT:  I'll see you after lunch.

2          (A lunch recess is taken.)

3          (Continued on next page.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3568

1       AFTERNOON SESSION

2

3           THE COURT:  All right.

4           MR. BURETTA:  Judge, as to this witness, I'm

5   only going to elicit his analysis as to Mr. DeRoss and I

6   would object to anything beyond the scope of that.

7           If they want to call him in their case, great.

8           THE COURT:  Okay.

9           MR. BURETTA:  Secondly, Walter Obando testified

10  on Monday, and on cross-examination by Ms. Kedia was

11  asking questions about a person by the name of Tommy Cappa

12  and when his incarceration started.

13          He erroneously stated it began in '93 when it

14  began in '96.  I have shown the records he printed out

15  regarding Mr. Cappa, and I understand that both defense

16  counsel are stipulating that his incarceration, in fact,

17  began June 14, 1996.

18          We would ask that the portion of the record

19  indicating '93 be stricken.

20          MS. KEDIA:  Well, your Honor, I actually believe

21  that Mr. Cappa was incarcerated in '93, was released, and

22  then incarcerated again in '96.

23          Certainly, the correct dates of his

24  incarceration we will stipulate to.

25          MR. BURETTA:  Okay.

3569

1              MS. KEDIA:  But --

2              MR. BURETTA:  Sorry.

3              MS. KEDIA:  It's before 1996 as well, including

4    a period in 1993.

5              But we'll work that out.  We don't need to call

6    Mr. Obando for that purpose.

7              THE COURT:  I hope so.

8              MR. BURETTA:  We'll excuse him, then.

9              THE COURT:  Okay.

10             Is there any further discussion on that

11   evidentiary issue with regard to Mr. Levin's testimony?

12             MR. BURETTA:  I have thought about it, Judge.

13             I think it's a close call.  I defer to the

14   court.

15             THE COURT:  Okay.

16             MR. BURETTA:  My concern is, they are making it

17   seem like the whole conversation is about that.

18             THE COURT:  No.

19             MR. BURETTA:  And I'm not allowed to ask because

20   it's privileged.

21             THE COURT:  I will call Mr. Levin in prior to

22   the jury coming in and advise him of the parameters of the

23   discussion.

24             MR. BURETTA:  Thank you.

25             THE COURT:  Not that he doesn't know about the

3570

1    attorney-client privilege, but we'll make it clear.

2              MS. MAYER:  Judge, there are a few other matters

3    I'd like to take up at the end of the day.

4              They certainly don't need to be dealt with now.

5              THE COURT:  Okay.

6              MS. KEDIA:  Your Honor, to clarify for the

7    record, the exhibit I mentioned to the court earlier,

8    Defendant Persico G, that is something that this witness

9    did analyze.

10             THE COURT:  Okay.

11             (Jury enters the courtroom.)

12

13             THE COURT:  Please be seated.

14             The government's next witness is.

15             MR. BURETTA:  The government calls Peter Tytell.

16             THE CLERK:  Sir, if you would just stand a

17   moment to be sworn in.

18   PETER TYTELL,

19             having been duly sworn, was examined

20             and testified as follows:

21             THE CLERK:  Thank you.

22             You can have a seat.  Please state and spell

23   your name for the record.

24             THE WITNESS:  Peter Tytell, T-Y-T-E-L-L.

25             THE CLERK:  Thank you.

3571

1    MR. BURETTA:  Your Honor, at this time I'd

2    request that Mr. Tytell be designated a handwriting expert

3    pursuant to Rule 702.

4         THE COURT:  No objection by defendants?

5         MS. KEDIA:  No objection.

6         MR. LARUSSO:  No, your Honor.

7         THE COURT:  He will be so designated.

8    DIRECT EXAMINATION

9    BY MR. BURETTA:

10   Q.   Mr. Tytell, good afternoon.

11   A.   Good afternoon.

12   Q.   Are you in the occupation of something called a

13   document examiner?

14   A.   Yes, sir.

15   Q.   How long have you been doing that?

16   A.   Many decades.

17   Q.   And, just briefly, can you describe for the jury some

18   of the training you have had in document examination?

19   A.   My initial training was with Pearl and Martin Tytell,

20   my parents who were, at the time, licensed by the

21   University of the State of New York to teach the subject

22   of questioned document examination and identification.

23        And during that initial training, I studied the

24   textbooks in the field, read the current literature,

25   articles and professional journals, as well as conducting

3572

1  research promotion and experimentation relative to

2  document examination.

3        I also studied at various other professional

4  level courses, including courses given at Georgetown

5  University under the auspices of the University's

6  Institute of Advanced Analytical Chemistry and the

7  University's Institute of Criminal Law and Procedure,

8  courses at Rensselaer Polytechnic Institute, the Institute

9  of Paper Chemistry, which then was in Appleton, Wisconsin,

10 Rochester Institute of Technology.

11       I have also continued, since then, with

12 professional education, continuing professional education,

13 taking seminars and workshops in various venues, as well

14 as attending meetings of professional organizations, both

15 in the United States and overseas, and visiting document

16 examiners in public and private practice around the

17 country and overseas as well, to see how other people do

18 the same kind of tasks that I do in my work, and to learn

19 from them how they do things.

20 Q.   Have you also taught document examination?

21 A.   Yes, I have.

22       I have lectured to investigators, attorneys,

23 public defenders.  I have taught document examination,

24 various specialized courses, to law enforcement agencies

25 here and overseas, as well as to lecturing to professional

3573

1  organizations at various meetings and workshops.

2  Q.    Have you consulted in the past, both with the defense

3  bar, and also with prosecuting agencies?

4  A.    Yes, sir.

5  Q.    And have you testified on behalf of both defendants

6  and on behalf of the government in various proceedings?

7  A.    Yes.

8  Q.    Approximately how many times have you testified as an

9  expert?

10  A.    110, or 120 times, all told.

11  Q.    In 2001, sir, were you asked to examine a document

12  which I'll show you --

13          MR. BURETTA:  May I approach the witness, your

14  Honor?

15          THE COURT:  Yes.

16  BY MR. BURETTA:

17  Q.    Which was identified as Government Exhibit 56.

18  A.    Yes.

19          I may have actually seen this as early as late

20  2000.  But, yes, around that time.

21  Q.    And can you describe for the jury what some of the

22  procedures are you employed when you examine documents

23  like Government Exhibit 56?

24  A.    Well, first thing to do when any document is

25  submitted for examination, a questioned document in this

3574

1    case because there is a question about who wrote it, the

2    first thing is to see if it's an original document, or if

3    it's a photocopy.

4           If it's a photocopy, the first thing to do with

5    the copy would be to assess the quality of the copy, to

6    see if detail is reproduced because what I'm going to look

7    at will be the fine details in the handwriting that make

8    one person's handwriting different from another's, the

9    detail recorded on the paper that shows what their habit

10   pattern of writing is.

11          In this case, it's not a photocopy.  It's an

12   original document, but by the time I saw it, the document

13   had been apparently processed for fingerprints, and the

14   chemicals used in that processing had caused the ink to

15   run, to some extent.

16          So some of the detail was lost in that

17   processing.  Even -- I'm sorry.

18          MR. BURETTA:  May I approach the witness, your

19   Honor?

20          THE COURT:  Yes.

21   BY MR. BURETTA:

22   Q.   I show you Government Exhibit 56 A.

23          Do you recognize that?

24   A.   Yes.

25   Q.   What is that?

3575

1  A.    This is a copy of that same piece of paper before it

2  was processed with chemicals and before the ink had run.

3        So that you can see the lines much more sharply

4  in the photocopy's Exhibit 56 A, than in the original,

5  although there are still some details that can be seen on

6  the original under magnification.

7                MR. BURETTA:  I offer 56 A.

8                MS. KEDIA:  No objection.

9                MR. LARUSSO:  No objection, your Honor.

10               THE COURT:  Received in evidence.

11               MR. BURETTA:  May I publish 56 A to the jury,

12  along with 56, your Honor?

13               THE COURT:  Yes.

14               MR. BURETTA:  Thank you.

15               (Whereupon, Government Exhibit 56 A was received

16  in evidence, as of this date.)

17

18               (Whereupon, the above-mentioned exhibit was

19  published to the jury.)

20  BY MR. BURETTA:

21  Q.    Mr. Tytell, how did you go about assessing who wrote

22  that document, Exhibit 56?

23  A.    The first part of the process is examining the

24  handwriting in question, as seen on Exhibit 56, and

25  Exhibit 56 A, taking those two together, and looking for

3576

1    the various individualities, the individualizing features

2    of the handwriting.

3            The alignment of the writing, the presence of

4    any abbreviation where letters may be consistently slurred

5    or omitted, where letter formations are written only

6    partially rather than fully, looking at the connections

7    between letters.

8            In hand printing, usually you don't connect

9    writing.  Sometimes people will connect it.  The use of

10   capital versus small letters.

11           If you want to write in block capitals, they

12   should all be capitals.  If you want to write in printed

13   style, cap and small letters, the capital may be the first

14   word of a sentence or a name, the rest in small letters.

15           But some people have a habit of mixing capital

16   and small letter formations within a word.  Also look at,

17   again, the connections between letters, at the way that

18   the letters are formed, the order of the pen strokes as

19   they move through the word, which can be seen under

20   magnification, and sometimes you can see connecting

21   strokes between letters that can give you an idea of the

22   order in which the strokes were made.

23           Also, you look at the proportions of the

24   letters, not just the proportion of the height of one

25   letter next to another, but the proportions of one part of

3577

1    a letter to other parts of that same letter.  Features

2    such as these and the overall variation of the

3    handwriting.

4    Q.   What does variation refer to?

5    A.   Well, we are only human.  We are not printing

6    presses, or computer printers.

7         When we write, there will be some slight

8    difference between writing a simple word, or your own

9    signature once, and then writing it a second time.

10        Even with your signature, which is the thing

11   which most of us write most often in our lives, if you

12   take two signatures written one after the other, they

13   won't superimpose exactly.  There will be some little

14   difference.  There will be some variation and that's

15   normal.  That's expected.

16        With some people that variation can be very,

17   very small, very limited.  With others, they can write all

18   over the place.  You can have a wide range of variation

19   with those individuals.  Most people, someplace in the

20   middle.

21        But with everyone, there is some variation.  And

22   that variation can include using, perhaps, two different

23   forms for the same letter.  This is one variant, that's

24   another variant.

25        But both can be used by the same person as part

3578

1    of their habitual style of handwriting.

2    Q.    In addition to looking at the actual handwriting,

3    itself, and analyzing it, what's on Government Exhibit 56,

4    what else did you do to analyze that document?

5    A.    Well, then, having familiarized myself with the

6    details of the handwriting with the individualizing

7    features of the handwriting on that little scrap of paper

8    in the copy, I then compared it to other handwriting that

9    I had similarly looked at for its individualizing features

10   and compared if there were similarities, and were there

11   differences.

12        Were the differences explainable as being

13   variations?  I just mentioned, I wouldn't expect

14   handwriting written one day to exactly overlay handwriting

15   by the same person written another day, or even another

16   minute.

17        But within the range of variation of a

18   particular individual, are there significant similarities,

19   features that are individual to that person that appear in

20   both the questioned writing, in this case Exhibit 56, and

21   also in somebody's known writing.

22        If there are significant differences, then you

23   would eliminate that person as having written it.  If --

24   or just say that they can't be determined to be the writer

25   of this material based upon what we know about their

3579

1    handwriting from the known request and nonrequest

2    exemplars.

3            And if there are significant similarities, and

4    there are significant sufficient similarities, then you

5    can decide that, indeed, two things were written by the

6    same person based on those significant similarities.

7    Q.   Are you familiar with something known as a

8    handwriting exemplar?

9    A.   Yes.

10   Q.   Is there any other term for that?

11   A.   Well, there are sort of two kinds of exemplars for

12   known writings, request and nonrequest writings.

13   Q.   In assessing Government Exhibit 56, were there any

14   exemplars taken?

15   A.   Yes, there were.

16   Q.   And what kinds were those?

17   A.   With respect to Government Exhibit 56, there were

18   request exemplars taken.

19           By request exemplars, I mean somebody is asked

20   to please sit down, and I will request that you write

21   things, and these can be simple things, name, address,

22   numbers 1 to 100.

23           Please write the days of the week, the months of

24   the year, various paragraphs that would include all the

25   different letters, capital and small and numerals.

3580

1      And also, at that time, the person could be

2  asked to write specific words or specific letter

3  combinations in words, and this is all done at request.

4  And that's a very specific situation.

5      Nonrequest writings are basically everything

6  else that you write in the course of your normal writing

7  life.

8  Q.   And in analyzing Government Exhibit 56, were request

9  exemplars taken of a John DeRoss?

10  A.   Yes.

11  Q.   And did you take those?

12  A.   Yes, on December 22, 2000.

13      MR. BURETTA:  May I approach the witness, your

14  Honor?

15      THE COURT:  Yes.

16  BY MR. BURETTA:

17  Q.   I show you Government Exhibit 172 A.

18      Are these the exemplars you took from

19  John DeRoss?

20  A.   Yes.

21      The first sheet is my cover sheet recording the

22  times when we began, and when the writing ended and the

23  times for each of the pages that are involved, the 26

24  different pages.

25  Q.   And approximately how long did you take these

3581

1   exemplars for?

2   A.   Well, the writing began at 1:26 p.m. and ended at

3   2:51 p.m.

4           So --

5   Q.   When was that?

6   A.   On the afternoon of December 22nd.

7   Q.   Of what year?

8   A.   2000.

9           So from about 1:30 until ten to 3.

10          MR. BURETTA:  I offer --

11  A.   And there were some breaks in between.

12          MR. BURETTA:  I offer 172 A.

13          MR. LARUSSO:  No objection, your Honor.

14          MS. KEDIA:  No objection.

15          THE COURT:  Received in evidence.

16          (Whereupon, Government Exhibit 172 A was

17  received in evidence, as of this date.)

18  BY MR. BURETTA:

19  Q.   After you took the exemplars, did you conduct further

20  analysis of Government Exhibit 56?

21  A.   Yes.

22  Q.   Have you prepared some comparison charts that aid in

23  depicting the analysis you conducted and the conclusions

24  you reached?

25  A.   I have.

3582

1        MR. BURETTA:  May I approach the witness, your

2   Honor?

3        THE COURT:  Yes.

4   BY MR. BURETTA:

5   Q.   I show you Government Exhibit 175 A -- I'm sorry --

6   175 A, B, and C.

7        (Whereupon, there was a pause in the

8   proceedings.)

9   A.   Yes, sir.

10  Q.   Did you prepare those charts?

11  A.   I did.

12       MR. BURETTA:  I offer 175 A, B, and C.

13       MS. KEDIA:  May we just see them for a moment?

14       THE COURT:  Sure.

15       (Whereupon, there was a pause in the

16  proceedings.)

17       MR. BURETTA:  These were previously provided.

18       MS. KEDIA:  No objection.

19       MR. LARUSSO:  No objection, your Honor.

20       THE COURT:  Received in evidence.

21       (Whereupon, Government Exhibits 175 A-C were

22  received in evidence, as of this date.)

23       MR. BURETTA:  Your Honor, may I circulate copies

24  to the jury?

25       THE COURT:  Sure.

3583

1           MR. BURETTA:  Thank you.

2           Here's a copy for the court as well.

3           (Whereupon, the above-mentioned exhibits were

4    published to the jury.)

5

6           MR. BURETTA:  Your Honor, with your permission,

7    can I have the witness step down and use the ELMO?

8           THE COURT:  Sure.

9           MR. BURETTA:  Thank you.

10          (Witness steps down.)

11   BY MR. BURETTA:

12   Q.   Mr. Tytell, if you could take the jury through 175 A,

13   B, and C and describe your analysis.

14          But before you do that, could you tell the jury

15   what conclusion you reached in comparing

16   Government Exhibit 56 to known handwriting of John DeRoss.

17   A.   Given the limitation imposed by the nature of

18   Exhibit 56 when I saw it, that it had been processed and

19   the ink had been slightly blurred, and that the best

20   available image was the photocopy, Exhibit 56 A, bearing

21   that in mind, the conclusion that I reached was that it

22   was highly probable that the John DeRoss of the knowns,

23   Exhibit 172, was the person who had written the various

24   entries on that small piece of paper, Exhibit 56, as

25   depicted also in the photocopy, 56 A.

3584

1   Q.   And --

2   A.   And highly probable is one very small step down from

3   a definite determination of authorship.

4        And here the limitation being the nature of the

5   available questioned document.

6   Q.   In other words, given that the original was treated

7   with a chemical, did that alter your analysis from

8   definite to highly probable?

9   A.   Because -- well, because the chemical had blurred the

10  writing, to some extent, it did limit my examination.

11       Although there were details -- whereas 56 --

12  Q.   The jury has it.

13  A.   If I could borrow that back.

14       There is one thing that can illustrate that

15  there is detail that can be seen here.  Let's zoom in.

16       This is the last letter in the H in Ralph that

17  you can see on the screen, and even though the ink has

18  blurred somewhat, under magnification it's possible to see

19  that there is a V-like notch in the bottom of that H.

20       And I'm going to show it over here -- it doesn't

21  work there -- just here, comes down and up in a V-like

22  formation and then out.  And that's in the H at the end of

23  what appears to be the name Ralph.

24       And it can be seen here in the original, but not

25  so much in the photocopy, and we'll get to that on the

3585

1    second page.  That's just to give an example of the kind

2    of detail that can be seen from the original, even if

3    somewhat faintly.

4              Now, the exhibits that you have, ladies and

5    gentlemen, before you, Exhibit 175 A through C, are in two

6    columns.  The column on the left are images taken from the

7    questioned document, and in this case these were scanned

8    into the computer with a scanner from Exhibit 56 A from a

9    photocopy.

10             On the right-hand side, under the heading known,

11   are words taken from various pages in Government Exhibit

12   172 A, which are the request exemplars of Mr. DeRoss from

13   December 22, 2000.

14             As you noticed as it was passed out to you,

15   Exhibit 56 is a fairly small piece of paper, and the

16   handwriting on it is also fairly small.  The handwriting

17   on Government Exhibit 172, the request exemplar's on

18   regular 8-and-a-half-by-11 lined paper where there's more

19   room to write.  That writing is somewhat larger.

20             So to even things up, the handwriting on the

21   left, in the questioned column, is twice the size of the

22   handwriting on the right, in the enlargement, so that you

23   can see them at equal size, and you can concentrate on the

24   formations and the writing habits that are depicted in the

25   questioned document compared to those in the knowns.

3586

1            In the first line on the first page, 175 A, on

2    the left you see an entry from the questioned exhibit,

3    Exhibit 56, and on the right, the samples of Mr. DeRoss,

4    when he was requested to write green eyes, green eyes.

5            Now, you will notice that in looking at the

6    right-hand column, the known column where it says green

7    eyes, it's really hard in some of those to see the N at

8    the end of the word green.  That's an abbreviation.

9            And in the questioned writing on the left, it

10    looks like it's gree eyes, the N is missing.  It's been

11    abbreviated out.

12            Other features that would be noticeable in this

13    handwriting would include -- I'll just put the exhibit up

14    on the screen --

15    Q.    Just to address that point for a moment.

16            In other words, Mr. Tytell, are you saying in

17    Exhibit 56, the N is dropped or abbreviated and that's

18    consistent with what you see in the exemplars, in

19    particular the third example, of Mr. DeRoss writing the

20    word green?

21    A.    Yes, sir, exactly so.

22            Also, another significant similarity between the

23    exemplar and the questioned writing would be found in the

24    letter Y, as seen here in eyes.

25            Not just the curved, sort of closed parentheses

3587

1    style curve of the downstroke of the Y, and not just the

2    proportion of the heights of the two parts, the first peak

3    and the second peak of the Y, but also the distance

4    between the top of the Y and the point where the loop of

5    the Y crosses over the stem again.

6         And this distance that you see consistently in

7    these questioned -- excuse me -- in the known writings,

8    one from page 24, and the other two from page 26 of the

9    exemplars, Exhibit 172, you can see that same kind of

10   proportion, and that same kind of curve and that same kind

11   of distance here in the questioned writing from

12   Exhibit 56.

13        Moving down to the Gs in Gigi, G-I-G-I, again,

14   capital Gs, just as in green eyes, the proportion of the

15   Gs, short, relatively square here and here, and here, the

16   G open at the bottom in one variation, closed at the

17   bottom in another.

18        In the question, open at the bottom in one

19   variation, closed at the bottom in another.  In the known

20   side, these two exemplars are written one after the other

21   on page 26 of Exhibit 172.  So, again, there is variation

22   here in the writing of Gigi twice in a matter of a moment,

23   and that's a normal and expected variation.  But both

24   variants present in the known writing are present also in

25   the questioned writing.

3588

1              Now moving down that page to the next word.  The

2    first name there is Frank.  Although here again the last

3    letter of Frank is somewhat abbreviated in its formation.

4    It could be read as a B, for instance, in the question,

5    and also in the knowns.

6              Many people will abbreviate and simplify

7    letters.  And that's fine.  It helps you write faster.

8    The problem becomes when your abbreviation turns into fear

9    of legibility of the character, when it's hard to

10   recognize that as a K instead of a B, or perhaps some

11   other letter.

12             So here the letter K has been abbreviated and

13   changed around.  Also, in speaking of proportions, the

14   large proportion of the R relative to the capital F in

15   Frank.

16             Another letter that's almost missing is the N in

17   Frank.  Here in the question, as you see before you, it's

18   just a little blip, a little point, and perhaps we can

19   zoom in on that.  So here you can see the N in Frank, just

20   a blip on the horizon.

21             Similarly here in the known, the N, well, if you

22   recognize it as anything, you might think of it as an R.

23   Similarly, the A is open at the top, could be confused

24   with a U.  That's a habit that we see consistently on both

25   page 24 of Mr. DeRoss's exemplar and now these three down

3589

1    below from page 26, the A being open at the top, and here

2    in the questioned writing, again, the A open at the top,

3    the N abbreviated almost out of being, the K modified.

4            The F begins in the questioned writing with a

5    loop, a very big pronounced loop crossing the stem, both

6    in that particular version of Frank, and in the questioned

7    Exhibit 56 there is a second place where that F appears.

8    And, similarly, in the known writing, we see that same

9    kind of a movement, that same kind of an introductory

10   loop.

11   Q.   Could you explain to the jury, it looks like a lot of

12   the loops are bigger in the exemplar than they are in the

13   questioned writing.

14           What does that appear to mean?

15   A.   Well, they are both bigger and smaller.  That could,

16   again, be variation.

17           The second one from page 26 illustrated here is

18   much larger than the third one from page 26, written

19   immediately after it, and the one on page 24, much

20   smaller.

21           However, the movement is the same, the same loop

22   around movement to begin that letter.

23           Moving to the next page, Exhibit 175 B, and here

24   is the image from the questioned document of the name

25   Ralph that I had illustrated previously from the original

3590

1    Exhibit 56, here illustrated from 56 A from the photocopy.

2         As I had mentioned that there was a sort of down

3    and up V-like form at the end of that name, and you can

4    see that here on the name Ralph written on page 20, that

5    would be on the first line on the right-hand side, and

6    there is the V-like formation, probably easier to see from

7    the paper in your hand, than from the image on the screen.

8         Again, this formation of the H abbreviated,

9    abbreviated to the point that you might think that it was

10   the K from Frank, or it could be a B.  So you have a habit

11   in the writing of Mr. DeRoss, as seen in the request

12   exemplars, of abbreviating H and K in a similar manner.

13        And that same habit shows up in the questioned

14   writing in the left-hand column in Frank and in Ralph.

15   You will also notice in Ralph that the P, the bowl of the

16   P here is very, very small, indeed, and that same kind of

17   a habit shows up in the third Ralph from the known request

18   writings of Mr. DeRoss.

19        Moving further down this page, another series of

20   examples involving the letter K, among others, in the word

21   week, illustrated on the left-hand side from Exhibit 56,

22   four different places, and again variations in the way

23   that the K is abbreviated, and on the right, also.

24        Now, the K is not always completely abbreviated

25   like a B.  Sometimes, as in the last of the illustrations

3591

1    in the left-hand column from Exhibit 56, sometimes it

2    looks like an H.  Well, if you go right across to the

3    third per week in the right-hand column, from page 25,

4    there is per week written with the K abbreviated.  So it

5    looks like an H.

6            Other features that you might notice would be

7    the large introductory stroke at the beginning of the P,

8    seen in per week, in the knowns as in the questioned

9    writing.  The very large, sort of balloon-like structure

10   of the P in per week, in the body of the letter, both in

11   the questioned and the known.

12           And that structure for the P carries on down to

13   the words per month, at the bottom of Exhibit 175 B, and

14   here again, the H at the end of month, in this particular

15   writing, is -- well, it could be misread as a double T or

16   as a TL.  As you can also see in the questioned writing,

17   the two instances on the left, from Exhibit 56.

18           Finally, moving to the last page, the word and

19   numeral comparison, Exhibit 175 C, the word monthly

20   appears here at the top, both twice in the questioned and

21   three times from page 25 of the request exemplars,

22   Exhibit 172.

23           Similar features in this particular word, the N,

24   which had been abbreviated where it was in a different set

25   of letters framing it, where that N had almost

1  disappeared, here the N is more or less recognizable,

2  coming out of the O in monthly, and the questioned N,

3  similarly.  Here the N is, more or less, recognizable in

4  the knowns.  A variation.

5      Two different variations in the N that appear

6  both in the questioned writing, as well as in the known

7  writing of Mr. DeRoss.  The Y here, the LY combination,

8  the Y coming back over to the left underneath the

9  previously written material.

10      In the next name down, Chucky, the Y has,

11  itself, been abbreviated, the bowl of the Y is pretty much

12  gone in the knowns, and -- oh, also in the questioned.  So

13  that it might be misread as a Z rather than a Y.

14      The formation of the D in Don in the material

15  that follows, come up a bit here, the lower left corner, a

16  very prominent both formation, way out to the left, and a

17  circular formation for the body of the D.  In the

18  handprinted word phones, immediately beneath that, again,

19  a mixture of small and capital formations.  Small P, small

20  H, O, capital style N, capital style E mixed in.

21      The P is done in two strokes, a straight line

22  and then a curve.  The H, very tall and very narrow, in

23  comparison to the widths of the other letters, both in the

24  questioned and in the known.

25      The letter E, as can be seen from the known, a

3593

1    capital style generally, but the method of production, the

2    way the E is made is a semicircle, or a C formation and

3    then a separate bar in the middle, rather than a straight

4    line and three horizontal lines, two movements, the C and

5    the horizontal line, consistent in the style of writing,

6    both here in the questioned, and in the knowns.

7         The slant of the top of the S going downwards,

8    another consistent feature in this handprinted word

9    phones.  The H -- well, not just with being narrow, but

10   also the relative -- the proportions.  Where is the bottom

11   of the staff of that H on the left side, relative to the

12   bottom of the arc of the H on the right side?

13        The one on the right noticeably lower than the

14   one on the left in the known, as it is in the questioned.

15   These are all small individualities that are a product of

16   the habits of the writer, Mr. DeRoss, in the known

17   writing, I saw him write them, and on the left, the

18   writing, which is very probably Mr. DeRoss's in the

19   photocopy.

20        Finally, to some numerals, the numbers 2500 --

21   excuse me -- 25,000, and 30,000, written on the right from

22   the knowns and on the left from Exhibit 56.  The large

23   loop at the bottom of the 2, and the small loop at the

24   top, these are consistent features, but they are not

25   nearly as significant in terms of being individual as the

3594

1    very long and straight comma separating the 25 from the

2    three zeros that follow it.

3           Or the way that these multiple zeros are

4    written.  From context, we know that they are zeros.  But

5    if you took any one of them by themselves, you might think

6    it was a letter U, maybe a letter U, maybe a backwards

7    letter C, maybe a comma.  They are just very small

8    markings, highly abbreviated almost open at the top, and

9    we see that same pattern here with the large commas in the

10   known writing, and these highly abbreviated habits for

11   writing the zeros in the numbers found in the questioned

12   writing.

13          MR. BURETTA:  Thank you.

14          You can retake the stand.

15          (Witness resumes the stand.)

16

17          MR. BURETTA:  I have no further questions.

18   CROSS-EXAMINATION

19   BY MS. KEDIA:

20   Q.   Mr. Tytell, good afternoon.

21   A.   Good afternoon.

22   Q.   You said that you have worked for both the defense

23   bar as well as the government.

24          Right?

25   A.   Yes, ma'am.

3595

1    Q.    And you are certainly not an employee of the

2    government.

3            Right?

4    A.    No.

5    Q.    You have your own private practice.

6            Is that right?

7    A.    Yes, ma'am.

8    Q.    You and I have never met before.

9            Right?

10   A.    Not to my knowledge.

11           I think I would remember.

12   Q.    And when you are retained, you are retained to

13   analyze documents, whether it be by the government or

14   whether it be by the defense.

15           Right?

16   A.    Correct.

17   Q.    And in this particular case, you were retained back

18   in 2000, you believe it was, by the government to analyze

19   certain documents.

20           Right?

21   A.    Yes, ma'am.

22   Q.    And how is it that you are compensated?

23   A.    I bill on an hourly basis.

24   Q.    And how much time if you know, if you remember, did

25   it take to analyze the set of documents that was given to

3596

1    you by the government in this case?

2    A.    Well, including taking exemplars from -- taking the

3    request exemplars from various individuals, scanning the

4    documents, analyzing the documents, preparing

5    illustrations, such as the ones you have just sat through,

6    I believe I billed for 140 and three quarter hours.

7    Q.    And includes your testimony here today, or --

8    A.    No.

9          That was -- you had asked about back before

10   9/11.

11   Q.    Okay.

12   A.    Back in 2000-2001.

13   Q.    And since that time, have you spent additional hours?

14   A.    Some, yes.

15   Q.    And do you have an approximation as to how many that

16   was?

17   A.    No.

18   Q.    You haven't --

19   A.    I haven't added it up yet.

20   Q.    Okay.

21   A.    Certainly nowhere near that number.

22   Q.    And certainly you will bill for those hours as well,

23   as well as your testimony here today.

24          Right?

25   A.    I bill for the time I spent -- well, I was here

3597

1   previous to today also.

2   Q.   Meaning waiting to testify.

3   A.   Enjoying the view from the windows outside.

4           THE COURT:  That's very nice of you.

5           THE WITNESS:  It's a gorgeous view.

6           THE COURT:  It's a bad time of year.  We don't

7   have the trees in bloom or any snow yet.

8           But it's a remarkable view.

9           THE WITNESS:  Monday's sunset was really

10  beautiful.

11  BY MS. KEDIA:

12  Q.   And, Mr. Tytell, may I inquire how much is it that

13  you bill by the hour?

14  A.   At that time, in 2000-2001, it was $200 an hour.

15          Now it is $300 an hour.  That's the government

16  rate.

17  Q.   So there is a specific rate that, every time the

18  government retains you, this is what you charge?

19  A.   Yes.

20          It's lower than my civil rate.

21  Q.   Meaning if the defense bar hires you, you charge

22  more?

23  A.   No.

24          When I work for the public defenders, I very

25  rarely send in a bill at all.

3598

1    Q.   For the public defenders.

2    A.   Yes, ma'am.

3    Q.   And then in certain cases, you are retained

4    privately?

5    A.   Yes.

6    Q.   And you said in civil cases also you are retained?

7    A.   Yes.

8    Q.   Now, when you were asked to analyze documents in this

9    particular case, you were given a number of documents to

10   analyze.

11        Right?

12   A.   Yes, ma'am.

13   Q.   And if I may show you what's been marked as

14   Defendant Persico DD for identification, Mr. Tytell.

15        If you could take a look at these documents.

16        THE COURT:  Please approach with the documents.

17   Come on up.

18        (Continued on next page.)

19

20

21

22

23

24

25

3599

1          (Sidebar.)

2          THE COURT:  I know that you indicated that

3  Persico G had been examined by this witness.

4          MS. KEDIA:  Yes.

5          THE COURT:  What other documents have you given

6  the witness that you believe have been examined by him?

7          MS. KEDIA:  These are all the documents, it's my

8  understanding, that have been examined by the witness.

9  They are labeled Q 1.

10          I think he has labeled them Q 1 through Q 51,

11  and the one he just testified to is Q 50.

12          MR. BURETTA:  Can I just see that?

13          MS. KEDIA:  Certainly.

14          These are obviously all the documents that were

15  produced by the government.

16          THE COURT:  Okay.

17          MR. BURETTA:  Okay.

18          I still object.  It's beyond the scope.  If she

19  wants to call him to talk about something else other than

20  what we have, she's welcome to do it.

21          THE COURT:  I just note the first page is typed.

22          So I don't think that's getting us anywhere.

23          MS. KEDIA:  I'll not going to ask him about the

24  first page.

25          THE COURT:  Okay.

3600

1        MS. KEDIA:  These are simply all the documents

2   he was asked to analyze.

3        I don't know why they gave him a typed page to

4   analyze.

5        THE COURT:  What's the purpose of your cross?

6        MS. KEDIA:  First I want to introduce all the

7   documents he was asked to analyze.

8        THE COURT:  Right.

9        MS. KEDIA:  Then I'm going to specifically ask

10  him about this one that's already in evidence as G.

11       THE COURT:  G.

12       MS. KEDIA:  Right.

13       THE COURT:  And none of the other pages.

14       MS. KEDIA:  I intend to ask him, simply, if

15  there are a number of pages that he was asked to analyze

16  that have this similar notation on the side.

17       There are a number of documents that have that

18  same notation on them, but I don't intend to go into

19  specific detail about any of them.

20       THE COURT:  It's just G you are focusing on.

21       MR. BURETTA:  That should take three or four

22  questions?

23       MS. KEDIA:  It shouldn't --

24       MR. BURETTA:  I'm asking.

25       THE COURT:  If you are going far afield.

3601

1          MS. KEDIA:  I'm not going far --

2          THE COURT:  I'll cut you down.

3          MS. KEDIA:  I understand, Judge.

4          THE COURT:  Okay.

5          (Sidebar concluded.)

6          (Continued on next page.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3602

1                    (In open court.)

2    BY MS. KEDIA:

3    Q.   Mr. Tytell, have you had an opportunity to look at

4    those documents?

5    A.   I'm assuming that this is a copy of a printout of the

6    various material in question that was submitted to me back

7    at that time.

8                    That's what it looks like to me, and I assume

9    that's what it is, rather than studying and comparing each

10   one, because that will take us a while.

11                   MS. KEDIA:  I offer Defendant Persico DD.

12                   MR. BURETTA:  I object.

13                   THE COURT:  Sustained.

14   BY MS. KEDIA:

15   Q.   Well, Mr. Tytell, can you take a few minutes?

16                   In fact, if I can give you --

17                   THE COURT:  Mr. Tytell -- defense counsel,

18   please approach before you get into any more detail.

19                   THE WITNESS:  Yes, ma'am.

20                   (Continued on next page.)

21

22

23

24

25

3603

1          (Sidebar.)

2          THE COURT:  Does the government accept the

3    representation that this stack of documents are the

4    documents you turned over?

5          MR. BURETTA:  It is, Judge.

6          THE COURT:  Okay.

7          MR. BURETTA:  That's not my objection.

8          THE COURT:  Ask him that question.

9          MS. KEDIA:  That's what I did ask him.

10          MR. BURETTA:  If I could clarify my objection.

11          THE COURT:  Yes.

12          MR. BURETTA:  He's not prepared to address any

13    of this.

14          If they would like -- this is the government

15    case.  I have offered his analysis of a piece of paper.

16          If they want to make a case and they want to

17    call him for something else, they can do it.

18          THE COURT:  Okay.

19          MR. BURETTA:  But it's just bogging us down.

20          They are welcome to.  They will prepare him in a

21    proper fashion instead of showing him stuff when he shows

22    up here.

23          THE COURT:  Okay.

24          MR. BURETTA:  We never said to him we were going

25    to have him testify about 61 pages.

3604

1          THE COURT:  You identified the documents.

2     Okay.

3          MS. KEDIA:  Again, I don't intend to ask him

4     about 61 pages.

5          He prepared a report of his analysis of each of

6     these documents which he identifies by the bottom number

7     on the page.  I intend to ask him simply if these are the

8     set of documents that were given to him, and this

9     Government Exhibit 56 is one of the documents that was

10    included in that.

11         THE COURT:  Do it as part of your direct case.

12         If you are telling me that G represents

13    something that you can have the witness look at quickly

14    and make a determination on, I'll let you do it with G.

15         But the government is right in this situation.

16    You want to call him as your witness, bring him on back on

17    your case.

18         MS. KEDIA:  He's not our expert witness, your

19    Honor.  He's the government's expert witness.

20         In fact, we wouldn't be allowed to obtain the

21    same expert witness.

22         THE COURT:  Then ask him the questions on the

23    documents he's testified about.

24         MS. KEDIA:  Your Honor, he's examined and

25    testified to having examined a number of documents.

Mary Ann Steiger, CSR
Official Court Reporter

3605

1          He's testified to having taken exemplars from

2     Mr. DeRoss in order to make a comparison, not just the one

3     document, to make a comparison, obviously, to a number of

4     documents.

5          THE COURT:  But at this point in time, it's the

6     representation of the government that he has not reviewed

7     all of his prior notes and comparisons.

8          And I'm not going to let you get into it.  If

9     you want to cross him on all the documents --

10          MS. KEDIA:  I don't.

11          I told the court what I want to ask him about

12     specifically.

13          THE COURT:  Every time you go back, I get a

14     different impression.

15          MS. KEDIA:  Judge, I want --

16          THE COURT:  And my impression is that these are

17     the documents that were given to him.

18          MS. KEDIA:  By the government.

19          THE COURT:  The government can stipulate to

20     that.

21          You are not contesting that.

22          MR. BURETTA:  Right.

23          But they shouldn't be admitted into evidence.

24          THE COURT:  They are not going to be admitted

25     into evidence.

3606

1          What's the purpose of admitting them into

2    evidence?

3          MS. KEDIA:  I don't need to admit them all into

4    evidence, Judge.

5          I will admit the ones that are admitted into

6    evidence.

7          THE COURT:  That's the only one.

8          And you are limiting your examination to G?

9          MS. KEDIA:  On this issue, yes, on these

10   documents meaning --

11         THE COURT:  Okay.

12         So --

13         MS. KEDIA:  I have some other questions to ask

14   him generally.

15         But on the documents, yes.

16         THE COURT:  Ask him your general questions and

17   we are done with him.

18         You can bring him back on your own time.

19         MS. KEDIA:  To ask him the rest.

20         Meaning, I'll ask him about the general

21   questions and about --

22         THE COURT:  What are the general questions?

23         MS. KEDIA:  About the comparison to the

24   exemplars, as well as to known business records.

25         For example, one of the things he says in his

3607

1    report, your Honor, is that the purpose of the exemplar,

2    he's taking a handwriting exemplar.

3        THE COURT:  Of Mr. Persico.

4        MS. KEDIA:  Right, includes requested exemplars

5    written for the purpose of comparison, as well as

6    nonrequest or normal course of business dealings.

7        That's just one of the methods he can use to

8    make a comparison, the normal course of business.

9        THE COURT:  You can bring him in on your own

10   time, on your case, and get that information out.

11       He's not prepared today to testify as to all the

12   other items.  The government specifically limited him, and

13   I'll allow you to do that.

14       MS. KEDIA:  Your Honor --

15       THE COURT:  And I'll make sure that he shows up.

16       Okay.

17       MR. LARUSSO:  Your Honor, one question.

18       If the witness says that he used all of these

19   exemplars, compared Mr. DeRoss's known writing to all of

20   these, then they become relevant, Judge, because he then

21   has an opinion --

22       THE COURT:  I don't think he said anything of

23   that sort.

24       MR. LARUSSO:  I know, but that's where I believe

25   part of this is leading to, what he used to make that

3608

1    opinion.

2            If he says I looked at Mr. DeRoss's known

3    handwriting and compared it to all of these known and

4    found his to have written one, then it all becomes

5    relevant to his examination.

6            THE COURT:  That isn't what he testified to.

7            MR. LARUSSO:  I know what he's doing right now.

8            THE COURT:  Right now, the objection is

9    sustained.

10           MR. LARUSSO:  Okay.

11           (Sidebar concluded.)

12           (Continued on next page.)

13

14

15

16

17

18

19

20

21

22

23

24

25

3609

1          (In open court.)

2     BY MS. KEDIA:

3     Q.    Mr. Tytell, one of the ways in which you determine

4     whether a document is in a certain person's handwriting is

5     to have them give an exemplar.

6          Right?

7     A.    Yes.

8     Q.    And are there other methods which you use to

9     determine whether this is a person's handwriting?

10    A.    If I may interpret your question meaning, are there

11    other kinds of known material used for comparison besides

12    request exemplars?

13    Q.    Yes.

14    A.    Is that what --

15    Q.    Yes.

16    A.    That's the sense that I had of it.

17          Yes.  There are basically everything else that

18    you write in your life, letters, Christmas cards are

19    coming up, shopping lists, various things that you may

20    write, filling out forms, getting a driver's license,

21    things like that, where you can, from the context of the

22    document, make sure that somebody wrote it.

23          And then intercomparing knowns that are

24    collected out in the world, normal business writings,

25    intercomparing them with each other, and then also

3610

1    comparing them back to the request exemplars where you

2    have a witness or you, yourself, have seen it written by a

3    particular person.

4    Q.    And that's --

5    A.    So then you can be sure of that body of writing.

6    Q.    And that's something that you ordinarily do as a

7    handwriting expert?

8    A.    Yes.

9    Q.    And any other methods that you use?

10    A.    Watching somebody write.

11    Q.    One is actually physically watching them write?

12    A.    Yes, although that's not the way I usually determine

13    questioned documents.

14    Q.    And when you say watching somebody write, you will

15    often watch somebody write when they are giving the

16    exemplars.

17          Right?

18    A.    Yes.

19    Q.    If you are present.

20    A.    If I'm present, I will certainly watch them.

21    Q.    And this document you were shown, Government Exhibit

22    56 and Government Exhibit 56 A, if I could show you both

23    of these.

24    A.    Yes.

25    Q.    Those were two of a number of documents that you were

3611

1    given to analyze.

2            Right?

3    A.   Yes, ma'am.

4    Q.   And whose handwriting --

5            MS. KEDIA:  Withdrawn.

6    BY MS. KEDIA:

7    Q.   Were you only given one person's handwriting to make

8    a comparison of those documents to?

9    A.   No.

10           MR. BURETTA:  Your Honor --

11   BY MS. KEDIA:

12   Q.   Whose handwriting were you asked to compare the

13   documents to?

14           MR. BURETTA:  Objection.

15           THE COURT:  Sustained.

16   BY MS. KEDIA:

17   Q.   When you look at those documents, Mr. Tytell, are you

18   able to determine when the item was actually written on,

19   the date?

20   A.   Well, before I saw it.

21           But other than that, no.

22   Q.   Well, it was given to you, meaning it was already

23   written on when you saw it.

24   A.   Well, it's -- it wasn't -- since I saw them in 2000

25   or 2001, I don't think they were written in 2004.

3612

1    Q.    Right.

2    A.    But when, prior to the first time I saw them, I

3    couldn't tell you.

4    Q.    Meaning you can't tell if they were written in 1990

5    or 1999 or 2000, just right before you got them?

6    A.    Pretty much.

7          Yes.

8    Q.    And even if they were written within a week or a

9    month before you got them, that's not a determination that

10   you made?

11   A.    Correct.

12   Q.    Now, when you --

13         MS. KEDIA:  Withdrawn.

14   BY MS. KEDIA:

15   Q.    And do you have the ability to make that

16   determination?

17   A.    Sometimes you can.

18   Q.    You weren't asked to do so in this particular case?

19   A.    Correct.

20   Q.    With any of the documents that you were given?

21   A.    Any is a big word, and it was a while ago.

22         But not that I recall.

23   Q.    Okay.

24         If I can show you what I'll mark as -- I think I

25   messed up the exhibit numbering system -- BE.  I'll show

3613

1   you what we'll mark as Defense Exhibit BE.

2           I'll ask you to take a look at this and ask if

3   it refreshes your recollection.

4           (Whereupon, there was a pause in the

5   proceedings.)

6

7   A.   The only thing, either in the report or in Exhibit 56

8   and 56 A, which would give me any clue as to the dating of

9   Exhibit 56 is a notation that appears on the bottom corner

10  of 56 A, and on 56 itself, a set of initials and a date in

11  October of 1999.

12          And if that date is accurate as to when those

13  initials were placed there, then it would seem that this

14  was written sometime prior to that date.

15          But other than that, I couldn't say.

16  Q.   And when you are referring to the -- if I may --

17  referring to the initials at the bottom, you are referring

18  to that initialing in the bottom right-hand corner, right,

19  GB 10/8/99.

20          Right?

21  A.   Yes, ma'am.

22  Q.   And that doesn't tell you anything about when Dom was

23  written.

24          Right?

25  A.   Correct.

3614

1    Q.    Now, my question to you is, were you -- did you have,

2    other than, obviously, seeing this date at the bottom,

3    just simply by looking at the document, itself, or at the

4    photocopies of the documents, are you able to determine

5    when these documents were written?

6    A.    No.

7    Q.    Now, you testified that there was -- I believe that

8    you said that on the questioned document that green was

9    abbreviated.

10          Is that what you said?

11   A.    Yes.

12   Q.    When you say abbreviated, do you mean that, like, the

13   handwriting was just lazy at the end?

14          Is that what you mean when you say abbreviated?

15   A.    I wouldn't like to say lazy, but that's pretty much

16   the drift of it.

17   Q.    Meaning when the person wrote it the person kind of

18   just faded out?

19   A.    Faded out.

20          The fancy word is elision.

21   Q.    That's the handwriting expert.

22   A.    It's actually linguistics, the way that we say

23   don't-know, dunno.

24          It's that you run letters together.  You drop

25   letters in your normal speech, and you do it also in your

3615

1   handwriting.

2           And although it's a word from linguistics, it

3   can be applied to the way you drop letters in writing

4   also.

5   Q.   Now, when you actually analyzed these documents, you

6   went through each word on the documents.

7           Right?

8   A.   Yes, ma'am.

9   Q.   And each set of numbers on the document.

10          Right?

11  A.   Yes, ma'am.

12  Q.   Were you able to determine if all of these words and

13  numbers or names and numbers were written at the same

14  time?

15  A.   No.

16  Q.   So they could have been days apart or months apart

17  that these were taken down?

18  A.   Correct.

19  Q.   Thank you.

20          MS. KEDIA:  I have nothing further for the

21  witness.

22          MR. LARUSSO:  No questions, your Honor.

23          THE COURT:  Any redirect?

24          MR. BURETTA:  No, your Honor.

25          THE COURT:  Thank you, sir.  You can step down.

3616

1           The government's next witness.

2           MS. MAYER:  Judge, the government calls Anthony

3    Farneti.

4           THE CLERK:  Sir, remain standing to be sworn in,

5    please.

6    ANTHONY FARNETI,

7           having been duly sworn, was examined

8           and testified as follows:

9           THE CLERK:  Thank you.

10          Kindly have a seat.  Pick up the microphone.

11   State and spell your name for the record.

12          THE WITNESS:  Anthony Farneti, F-A-R-N-E-T-I.

13          MS. MAYER:  Judge, may I inquire?

14          THE COURT:  Yes.

15   DIRECT EXAMINATION

16   BY MS. MAYER:

17   Q.   Good afternoon, Mr. Farneti.

18        Where do you work?

19   A.   Currently?

20   Q.   Yes.

21   A.   I'm --

22   Q.   Can you actually pick up the mike so the jurors can

23   hear you.

24   A.   Currently I'm the security and compliance manager for

25   Waste Management of New York, a public company.

3617

1    Q.    And between 1982 and 2002, who did you work for?

2    A.    The New York City Police Department.

3    Q.    Did you retire in 2002?

4    A.    Yes, I did.

5    Q.    What was your position when you retired?

6    A.    I was a detective.

7    Q.    Directing your attention to the beginning of 2000,

8    were you involved in an investigation which included fixed

9    video surveillance?

10    A.    Yes, I was.

11    Q.    Can you just tell the jury, what is fixed video

12    surveillance.

13    A.    Most plainly put, it was a camera attached to a

14    telephone pole disguised to look like something else on

15    the outside.

16             And that -- well, and that's it.  At times, it's

17    controlled from another location.

18    Q.    Where was your fixed video surveillance?

19             What was it looking on in this investigation in

20    2000?

21    A.    It was looking on Bay Street in Staten Island, corner

22    of Bay Street and Nautilus.

23    Q.    How long, approximately, was this fixed camera in

24    place?

25    A.    Approximately a year and a half.

3618

1    Q.    And do you recall when it started, and approximately

2    when it ended?

3    A.    I believe it started in February of 2000, and it ran

4    a year and a half after that.

5    Q.    As part of your duties in the NYPD, did you monitor

6    that fixed video camera?

7    A.    Yes, I did.

8    Q.    During that period of time, how often would you

9    monitor it?

10   A.    Depending on when I was in the plant.

11          It would be sometimes three days a week,

12   sometimes one, sometimes five days a week.

13   Q.    And when you say plant, can you just tell the jury

14   what you mean.

15   A.    It's a location that we work out of, myself and a

16   team of detectives.

17   Q.    And you said that your camera was looking at the

18   corner of Bay and Nautilus.

19          What borough is that in?

20   A.    Staten Island.

21   Q.    Could you maneuver the camera from the plant where

22   you were working?

23   A.    Yes.

24          We controlled pan, tilt and zoom.  We could move

25   the camera side to side, up and down, and zoom in and out.

3619

1          We did so with a touch-tone phone.  We would

2     dial into a number and be able to control the camera from

3     that point.

4     Q.    Prior to your appearance in court today, have you

5     reviewed excerpts from that video surveillance between

6     February of 2000 and about 18 months later, sometime in

7     2001?

8     A.    Yes.

9          MS. MAYER:  Judge, may I approach the witness?

10          THE COURT:  Yes.

11     BY MS. MAYER:

12     Q.    I'm showing you what's been marked Government Exhibit

13     37 for identification.

14          Do you recognize it?

15     A.    Yes, I do.

16     Q.    How do you recognize it?

17          Have you initialed it?

18     A.    Yes, I have.

19     Q.    And this is the disk that you reviewed prior to your

20     appearance in court today?

21     A.    Yes.

22     Q.    Does it contain excerpts of your fixed video

23     surveillance at Bay and Nautilus?

24     A.    Yes, it does.

25     Q.    Are the excerpts fair and accurate depictions of your

3620

1    observations or the camera's observations?

2    A.    Yes.

3              MS. MAYER:  Judge, I offer Government Exhibit

4    37.

5              MS. KEDIA:  No objection.

6              MR. LARUSSO:  May I, your Honor?

7              THE COURT:  Yes.

8    VOIR DIRE EXAMINATION

9    BY MR. LARUSSO:

10   Q.    Do you know how many excerpts are contained on this

11   disk?

12   A.    No, I don't.

13   Q.    When we say excerpts, do you know that to mean

14   different days or portions of the surveillance on the same

15   day?

16   A.    I don't know what that means from your end.

17              It --

18   Q.    Did you prepare this?

19   A.    No, I did not.

20   Q.    Do you know what this was prepared from?

21              When I say this, I'm referring to the

22   Government Exhibit 37.

23   A.    I don't know what they used to copy that from.

24              No.

25   Q.    I would assume that when you were monitoring the

3621

1    surveillance camera, the images were being processed on

2    some kind of a disk or tape.

3              Is that correct?

4    A.    Yes.

5              It was being recorded on a -- back then, a VCR

6    tape.

7              (Continued on next page.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Farneti  -  Direct/Mayer

3622

1    BY MR. LARUSSO:

2    Q.    But you don't know if the excerpts came from one of

3    the original VCR tapes that you were using during the

4    course of the surveillance; is that correct?

5    A.    It would had to have come from one of our tapes.  It

6    is from our camera and I know that from looking at it

7    yesterday.

8    Q.    What is it that you know when you looked at it that

9    leads you to conclude that it had to have come from one of

10   your VHS tapes?

11   A.    The location from which the point of view is, and the

12   way that the camera moved up and down and exactly what it

13   was focused on.

14   Q.    But there's no date on the videos that you were

15   recording, were there?

16   A.    Yes, there were.  It was time and date stamped.

17   Q.    Are they on these as well to help you determine when

18   they were?

19   A.    The first time I looked at them afterwards was

20   yesterday and I don't recall if it's on there or not.

21          MR. LARUSSO:  I have no further questions,

22   Judge.

23          THE COURT:  Any objection?

24          MR. LARUSSO:  No.

25          THE COURT:  Received in evidence 37.

Farneti  -  Direct/Mayer

3623

1          (Government's Exhibit 37 in evidence.)

2     BY MS. MAYER:

3     Q.    The time and date stamps, when you were monitoring,

4     there were time and date stamps on it?

5     A.    Yes, there were.

6     Q.    The time and date stamps, did you check those to make

7     sure they were accurate?

8     A.    Yes, every morning when the tape was placed into the

9     machine.

10    Q.    And as you sit here now you can't recall whether,

11    when you reviewed exhibit 37, if it also included the time

12    and date, is that what you're saying?

13    A.    That's correct.

14    Q.    If you looked at it again, would it refresh your

15    recollection?

16    A.    Yes.

17          MS. MAYER:  Judge, if I could have a moment to

18    set up the computer.

19          THE COURT:  Yes.

20          (Pause in proceedings.)

21          MS. MAYER:  Judge, I'm not going to bother.

22          No additional questions.

23          THE COURT:  Any cross-examination?

24          I guess not from the silence.

25          MR. LARUSSO:  I'm sorry?

Farneti - Direct/Mayer

3624

1          THE COURT:  There's no further questions.

2    Cross-examination.

3          MR. LARUSSO:  I thought they were playing the

4    video, Judge.

5          THE COURT:  No, they're not.  She sat down.

6    They're not playing the video.

7          MS. KEDIA:  Judge, may we approach for a second?

8          THE COURT:  Sure.  Come on up.

9          (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Farneti  -  Direct/Mayer

3625

1          (The following takes place at sidebar.)

2          MS. KEDIA:  The 3500 material for this witness

3    was one of the documents that was in my package apparently

4    last night.  I'm looking at it for the first time.

5    Mr. LaRusso is looking at it for the first time because he

6    received it this morning.  We haven't had an

7    opportunity --

8          MS. MAYER:  This was provided in discovery

9    actually over two years ago I believe.

10          And when the defendants recently made a renewed

11    request for all video surveillance, we reminded them that

12    all of the full videos that underlie those excerpts -- and

13    you heard from the witness there are 18 months of them --

14    we reminded them they were available for purchase at

15    Carroll Audio, which is what they were told a year and a

16    half, two years ago.  We reminded them in a letter in

17    October and we attached that log.

18          THE COURT:  October of 2007?

19          MS. MAYER:  It was originally provided.  We

20    reminded them by letter in October of 2000 and that log

21    was specifically attached to the letter with all of the

22    details, should they want to find particular days or

23    anything.

24          It was just marked as a 3500 exhibit, but they

25    have had it and had access to all of the underlying tapes

Farneti  -  Direct/Mayer

3626

1   for years.

2        MR. LARUSSO:  I'm not going to dispute that.  I

3   remember seeing this about a year and a half ago.

4        I found out for the first time this morning that

5   this witness is being called.  I had no idea this witness

6   was coming on the stand.  I ignored this, considering what

7   we have been hearing from the government.

8        Judge, this is a very substantial body of

9   evidence.  The witness's name was not provided to me until

10  this morning.  I understand there was an e-mail sent out

11  yesterday --

12        THE COURT:  Did this witness testify?

13        MR. LARUSSO:  No.

14        MS. MAYER:  We didn't have to have an

15  authentication witness for trial.  We put it in through a

16  witness who recognized everybody, which we could do the

17  same thing.

18        Since they indicated they're going to object to

19  the foundation and everything, this witness is simply

20  being called as a foundational witness.

21        It came in through a cooperating witness in the

22  last trial, Judge.  They didn't even get into how the

23  recording was made.

24        MS. KEDIA:  The recording can't come in, your

25  Honor.

Farneti  -  Direct/Mayer

3627

1          MR. LARUSSO:  I thought it was going to be

2     played so I know how many excerpts are being played.

3          MS. MAYER:  You have an exhibit from the last

4     trial.

5          THE COURT:  You do.

6          If there's no further questions, I'll let the

7     witness go.

8          MS. KEDIA:  We do have questions on this line.

9          THE COURT:  Get up and ask them.

10          MR. LARUSSO:  I have to be very candid, Judge.

11          If I knew the witness was going to be called, I

12     would have gone back over the notes on this.  This is the

13     first time this witness --

14          THE COURT:  Why didn't you have him on the list,

15     because you just found out they weren't going to stipulate

16     to the authenticity?

17          MS. MAYER:  What happened is we proposed several

18     stipulations on other matters and we have consistently not

19     gotten any answers on any issues of foundation or

20     anything.

21          We have several e-mails on Sprint reports, on

22     phone records with certifications.  Walter Obando's

23     testimony --

24          MS. KEDIA:  Which we just stipulated --

25          MR. BURETTA:  Which required him to come here

3628

1    today because there was no time, no response when I

2    contacted them about it.

3         MS. MAYER:  What we did in the last case, we

4    have been trying to cut the trial down.  We cut out

5    several cooperating witnesses.

6         Because of that late cut, which was at the end

7    of last week, we had to go run and find foundation

8    witnesses not taking the chance that they would agree to

9    its admission.

10        MR. LARUSSO:  Judge --

11        THE COURT:  That's it.  Enough discussion on it.

12        You can take the time to go over it in the next

13   15 minutes.  We will take the mid-afternoon break and then

14   after you're done with your cross-examination, which I

15   can't imagine is going to be terribly long with this

16   witness because you're not contesting authenticity of

17   what's in here.  You have seen it in the last trial.  It

18   came in through the cooperating witness in terms of any

19   heightened concerned as to it's relevance or reliability.

20        But, moreover, at this point in time, I can't

21   imagine your cross-examination combined running more than

22   a half hour, and then I would like to have Mr. Levin on

23   the stand so we can get him out of here.

24        MR. LARUSSO:  I'm going to ask the tape be

25   prepped to be played.  I don't know --

Farneti  -  Direct/Mayer

3629

1          THE COURT:  How long is the tape?

2          MR. LARUSSO:  I don't remember, to be honest

3      with you.

4          MS. MAYER:  I believe there are 15 excerpts.

5      They're all less than a minute.

6          With all due respect, Judge, this is our case.

7      If, on cross-examination, they want to play the tape, they

8      can do it.  This is our case.  I don't plan on asking

9      about the excerpts.  He's simply a foundational witness.

10     That's it.

11         THE COURT:  Who are you going to use the tape

12     with?

13         MS. MAYER:  It's in evidence.  We will just play

14     it.

15         MR. LARUSSO:  How can I cross-examine a

16     witness --

17         MS. MAYER:  If you wanted to know whether or not

18     it was his excerpts, you should have objected to the

19     witness.

20         THE COURT:  Set up the tape for him to play.

21     This witness is half an hour.

22         (Continued on next page)

23

24

25

Farneti - Direct/Mayer

3630

1           (The following takes place in open court.)

2           THE COURT:  We will take our mid-afternoon

3    break.  See you in 15.

4           (The jury is excused.)

5           (Recess taken.)

6           (After recess.)

7           THE COURT:  All right.

8           MR. LARUSSO:  What I indicated to the government

9    is what I intend to do is ask a few preliminary questions

10   about the video surveillance.

11          And then what I hope to do is play the video

12   without any interruptions and ask the witness to identify

13   who he can and have some additional questions.  Hopefully,

14   that won't be too long.

15          THE COURT:  We will do the best we can.  Bring

16   the witness back in, please.

17          Is it set to have it played?

18          MS. MAYER:  It is, Judge.

19          This is the way it was compiled by Carroll

20   Audio.  I didn't have anything to do with its preparation.

21   It is individual excerpts from various dates, so what I

22   would do to assist Mr. LaRusso is operate the computer

23   since it is my computer.

24          THE COURT:  Good.

25          (The witness resumes the stand.)

3631

1          THE COURT:  At the conclusions of today's

2   session I would like to discuss with you requests to

3   charge and that procedure.

4          After Mr. Levin testifies, who else do you have?

5          MR. BURETTA:  Ms. Joseph.

6          THE COURT:  Is that a surveillance witness?

7          MR. BURETTA:  No, Judge, a substantive witness.

8          THE COURT:  Then you have Sullivan for tomorrow?

9          MR. BURETTA:  Sullivan is for tomorrow morning.

10         (The jury is present.)

11         THE COURT:  Please be seated, if you would.

12         Cross-examination.

13         Mr. LaRusso.

14         MR. LARUSSO:  Thank you.

15

16   CROSS-EXAMINATION

17   BY MR. LARUSSO:

18   Q.   Mr. Farneti, good afternoon.  How are you?

19   A.   Good afternoon.

20   Q.   You mentioned a log.

21         Do you have a copy of that log with you here

22   today?

23   A.   Yes, I do.

24   Q.   If, in answer to any of the questions, you need to

25   refer to the log, please feel free to do so.

Farneti  -  Cross/LaRusso

3632

1          MR. LARUSSO:  It's been marked 3500-AF-1 for the

2     record, your Honor.

3          THE COURT:  All right.

4     BY MR. LARUSSO:

5     Q.    This log, is it a handwritten log?

6     A.    Yes.

7     Q.    What is contained on the log in terms of what kind of

8     information was put down?

9     A.    Do you mind if I look at it?

10    Q.    Absolutely.

11    A.    It's got a heading on it telling what type of camera

12    it is, either a pole or still camera.

13          It's got a tape number assigned to the

14    particular tape that was in the machine that day.

15          It's got the date and the time that the tape was

16    placed into the machine, what time the tape was taken out

17    of the machine, and remarks which were generally a brief

18    synopsis of what was seen on the tape.

19    Q.    Who would be filling out the log and when would that

20    log be filled out?

21    A.    It would depend who was on that day -- well, not that

22    day but any given period of time during a day or a week.

23    It could have been one of many investigators at the time.

24          Under the remarks, brief synopsis, would be as

25    you see it.  You would make a comment in the log book.

Farneti  -  Cross/LaRusso

3633

1   Q.    Did you make any entries in the log when you were

2   working at the plant?

3   A.    Yes, I did.

4   Q.    Again, I think you told us that it lasted

5   approximately a year to a year and a half.

6          Looking at the log, can you give us a more

7   definitive time period that the video surveillance

8   occurred at that location?

9   A.    Sure.

10         February 4th, 2000, to July 5, 2001.

11  Q.    You testified, I believe, that the plant was

12  monitored by you between three to five days you were on

13  duty per week, is that a fair statement?

14  A.    Yes.

15  Q.    And I guess over the entire period of this video

16  surveillance you came to learn how long you would be at

17  that plant videoing activities at that location; is that

18  correct?

19  A.    Yes.

20  Q.    Were you videoing 24/7?

21  A.    We did video 24/7.  We did not monitor 24/7.

22  Q.    When you did monitor, what time period did you

23  monitor?

24  A.    As a general rule the plant was shut down

25  approximately seven p.m., if I remember correctly.

**Farneti  -  Cross/LaRusso**

3634

1    Q.    So that somebody throughout this whole period of time

2    would be in the plant at least from sometime in the early

3    morning until late in the evening when the plant gets shut

4    down; is that correct?

5    A.    Until evening.

6          In the wintertime it would probably conclude a

7    little earlier because of the daylight conditions as

8    opposed to in the spring and summertime.

9    Q.    Now, did you, or any of the other agents who were

10   monitoring the plant, have the ability to overhear any

11   conversations of the people you were video surveilling?

12   A.    No.  Not from that location, no.

13   Q.    Did you have any kind of electronic surveillance

14   inside the premises that was the subject of your video

15   surveillance?

16   A.    No.

17   Q.    You understand what I mean by electronic

18   surveillance?

19   A.    Yes, I do.  No.

20   Q.    Meaning being able to, with Court approval, overhear

21   conversations that were occurring inside?

22   A.    I understand, and the answer is no.

23   Q.    You didn't have any such kind of surveillance outside

24   where the people would be viewed by the video surveillance

25   camera?

3635

1    A.    No.

2    Q.    Over the course -- I think what we will do, if it's

3    all right with the Court and the government, I would like

4    to run the video and what I would ask you to do for us is

5    as the video is playing -- hopefully I won't have to stop

6    it -- just identify the people who you're able to identify

7    and hopefully it won't take too long.

8          (Video playing.)

9          That's the date that you were referring to that

10   is able to tell you that it's a video that was from your

11   surveillance during that time frame; is that correct?

12   A.    Yes.  That would have been April 6, 2000.

13   Q.    That's the first time we're viewing.

14         Can you tell the jury what they're viewing?

15   A.    They're looking at the corner of Nautilus Street and

16   Bay, the southeast direction.

17   Q.    If you could identify any people in the videos,

18   please do so for us.

19   A.    Yes.

20         The individual on the left is a James LaForte.

21   The individual on the right I don't know.

22   Q.    Again, as new people are introduced on the video,

23   would you just, if you could, identify them for us, okay?

24   A.    Yes.

25   Q.    I noticed the time is 9:05.  That would be in the

3636

1    morning; is that correct?

2    A.    Yes.

3    Q.    Now, we're switching dates.  I believe we're now

4    looking at December -- April 7 of 2000?

5    A.    That's correct.  That's Dominick Dionisio.

6    Q.    On the right?

7    A.    Yes.

8          And Jack DeRoss with the cigar.  I don't know

9    who the other individual was.

10   Q.    Which one was Jack DeRoss?

11   A.    The gentleman with the cigar.  He stepped out last.

12   Q.    He was wearing the darker jacket?

13   A.    Yes.  That's Sal Salome.

14   Q.    Does he have a nickname?

15   A.    We use to call him salami.

16   Q.    Did you ever here him referred to as Sally Botts?

17   A.    Yes.

18   Q.    Would he be a frequent visitor to this location

19   during the time of your surveillance?

20   A.    Yes, he was.

21   Q.    This is April 7 and there are people walking in.

22   A.    That's Mr. DeRoss.

23   Q.    That would be the gentleman closest to the door?

24   A.    Yes.

25   Q.    The guy in the white shirt?

Farneti  -  Cross/LaRusso

3637

1   A.   And LaForte in the baseball cap.  Salome stepped out

2   and Dominick Dionisio.

3   Q.   That's the bigger gentleman?

4   A.   Stepping in last.

5   Q.   Do you know a person by the name of John Floridia?

6   A.   No, I don't.

7   Q.   We're still on April 7th.

8        Can you tell who that is?

9   A.   No.

10  Q.   That gentleman that came out and disappeared, were

11  you able to make out who that was?

12  A.   From the deli?  No.

13       Jack DeRoss just stepped out.

14  Q.   The gentleman going into what you called the deli.

15  A.   We had no idea who he was, but he was there everyday,

16  several times a day.  He lived across the street.

17       That's Salome.  LaForte stepped out and Salome

18  is walking behind him.

19  Q.   That would be Mr. LaForte's arm around Mr. Salome?

20  A.   Yes.

21  Q.   And they're going into the?

22  A.   Deli.

23  Q.   When you say deli, it's a deli in fact; is that

24  correct?  You buy coffee?

25  A.   Yes.

3638

1   Q.   The two gentlemen coming out?

2   A.   Mr. Dionisio is in the middle.  I don't know who the

3   other gentlemen are.

4   Q.   Do you recall the address that we see these gentlemen

5   coming in and out of for the last several minutes?

6   A.   It's seven years ago.  I don't recall exactly.

7   Q.   But it's on Bay Street?

8   A.   It is on Bay Street.

9        That's LaForte and Salome just came out of the

10  deli.  They're now going into the storefront.

11  Q.   Were you ever inside the premises?

12  A.   The deli, yes.  The storefront, no.

13  Q.   We're now on April 12; is that correct?

14  A.   Yes.

15  Q.   Again in the morning hours?

16  A.   Yes.

17       That would be Jack DeRoss with Salome walking

18  behind him.

19  Q.   Mr. DeRoss to the left and Mr. Salome to the right?

20  A.   That's correct.

21  Q.   Who is the third gentleman, and now there's a fourth?

22  A.   I think Mr. DeRoss is talking to his son John.

23  Q.   Where is that, over here on the left?

24  A.   Yes, on Nautilus.

25  Q.   Were you able to tell who the other two gentlemen

**Farneti  -  Cross/LaRusso**

3639

1   were?

2   A.   No.

3   Q.   Does that close-up help at all?

4   A.   No.

5   Q.   On May 3rd, would you tell us who that is?

6   A.   Mr. Salome on the left, and I don't know who the

7   other gentlemen are.

8   Q.   Do you know what kind of place this location is that

9   they're coming and going?

10  A.   No.

11        Mr. Salome is standing in the doorway.  The

12  gentleman with the sunglasses is Mr. LaForte.

13  Q.   That's the same Jimmy LaForte you identified earlier?

14  A.   Yes.  That's Jack and Jim LaForte on the side on the

15  street.

16  Q.   Mr. DeRoss, you called him Jack, is on the left-hand

17  side?

18  A.   Yes.

19  Q.   And Mr. LaForte is on the right-hand side obviously?

20  A.   That's correct.

21  Q.   This is now May 9th.

22        I assume if you don't identify somebody, you

23  don't know who the people are in the picture.

24  A.   Mr. LaForte just walked by the front.

25  Q.   Are you able to identify the other individuals?

**Farneti  -  Cross/LaRusso**

3640

1    A.    I believe the gentleman all the way to the right with

2    the shorts, I believe it's Lenny Dello Junior.

3    Q.    This is at about 8:19 in the morning, right?

4    A.    Right now it's now 8:22.

5    Q.    I've noticed that the videos are almost all in the

6    morning, eight or 9:00.

7          Is that common?

8    A.    Yes, it is.

9          It's when it was most active over there in the

10   early morning hours.

11   Q.    Do you recognize either of those two?

12   A.    No.

13   Q.    That was at 8:23 on May 9 of 2000, correct?

14   A.    Yes.

15   Q.    I noticed you looking at your notes.

16         Is that in an effort to try and identify who

17   they may be?

18   A.    Yes.

19   Q.    If the notes help you, please use them.

20   A.    I believe that the gentleman in the striped shirt is

21   an individual named Spataro, you have James LaForte to the

22   right, and Salome with the white shirt on.

23   Q.    We're at 9:21 in the morning.  Same day, correct?

24   A.    That's correct.

25         That's Salome, Spataro and Thomas Musso.  Musso

**Farneti  -  Cross/LaRusso**

3641

1    is the man with the glasses on, the heavy-set gentleman

2    leaning on the building.  That's Mr. Spataro, Mr. Musso

3    and Mr. LaForte.

4    Q.    Same day, but it's 9:29 in the morning?

5    A.    That's correct.

6    Q.    Is that Mr. Salome going into the deli again?

7    A.    Yes.

8          And there's a gentleman to Mr. Musso's left,

9    Mr. Capichano.

10   Q.    You say Mr. Musso's left or his right?

11   A.    Mr. Musso's left, our right.

12   Q.    We're now on September 25th, 2000, at 9:15 in the

13   morning?

14   A.    That's correct.

15   Q.    That's Mr. Dionisio, Mr. Musso, and I believe

16   Mr. Capichano and Mr. DeRoss, and you say Mr. Capichano is

17   the big gentleman?

18   A.    No, the gentleman to the left.  Mr. Dionisio is the

19   big gentleman.

20   Q.    Was he known as Black Dom?

21   A.    Yes.

22   Q.    When the camera zooms in, that's being done by one of

23   the officers at the plant; is that correct?

24   A.    That's correct.

25   Q.    I just have one other question.

**Farneti  -  Cross/LaRusso**

3642

1          MR. LARUSSO:  Your Honor, may I approach?

2          THE COURT:  Yes.

3     BY MR. LARUSSO:

4     Q.   You said you did not know a person by the name of

5     John Floridia.

6          How about Giovanni Floridia?

7     A.   No, I don't recall.

8     Q.   Government's Exhibit 2-CC, do you recognize that

9     person?

10    A.   No, I don't.

11         MR. LARUSSO:  I have no further questions, your

12    Honor.

13         THE COURT:  Any questions?

14         MS. KEDIA:  No, I have no questions, your Honor.

15         MS. MAYER:  No redirect.

16         THE COURT:  Thank you, sir.

17         You can step down.

18         (The witness steps down.)

19         THE COURT:  I'll ask you folks to step out for

20    five minutes and then come back in.  Sorry for the

21    additional exercise.

22         (The jury is excused.)

23         THE COURT:  With regard to the motion that the

24    government made in terms of Mr. Levin's testimony, I took

25    a quick look at the cases.

3643

1            I don't think they support your position,

2      Mr. Buretta, and I'm going to at this time allow the

3      defendants and/or the government to elicit from Mr. Levin

4      that -- I believe the testimony was something to the

5      effect he was contacted on May 25, 1999, by Mr. Persico,

6      or Mr. Levin contacted Mr. Persico, an appointment was set

7      up for 3:30 the following day, and that the purpose of

8      this meeting was to deal with or to prepare for a

9      suppression hearing in the Florida case that Mr. Persico

10     was facing.

11           That shouldn't touch, in my estimation, on

12     anything having to do with the attorney/client privilege.

13           No need for me to mention to Mr. Levin, I would

14     hope, that he's not to use the word prior trial?

15           MR. BURETTA:  I've never spoken to him, Judge.

16           THE COURT:  Bring him on in and let's make sure

17     we understand.

18           I don't think there's any need for you to treat

19     him as a hostile witness at this point.

20           MR. BURETTA:  We will see how it goes.

21           THE COURT:  I will mention to him what the

22     parameters are of his testimony.

23           MR. BURETTA:  Thank you.

24           THE COURT:  Come on up, Mr. Levin.

25           MR. LEVIN:  Good afternoon, Judge.

3644

1      THE COURT:  Good afternoon.

2      Get comfortable on the witness stand.  We will

3   have you sworn in when the jury comes in.

4      Have a seat, everyone.

5      You have been called by the government.  With

6   regard to your subpoena by the government, you're here to

7   testify as you did in the prior proceeding.  Please don't

8   use the word trial.  I'm sure you're aware not to use the

9   word trial.

10      MR. LEVIN:  Okay.

11      THE COURT:  All right, at least associating it

12   with the defendants on trial here.

13      What I want you to do is you're permitted to

14   testify with regard to having represented Mr. Persico in a

15   proceeding that was down in Florida, having contact or had

16   been contacted by Mr. Persico I understand on May 25th,

17   and the purpose of the meeting on the 26th at 3:30, I

18   believe, was to prepare for a suppression hearing arising

19   out of the case in Florida.

20      MR. LEVIN:  That's correct.

21      THE COURT:  Please do not get into any areas

22   that might violate any attorney/client privilege.

23      MR. LEVIN:  Understood, your Honor.

24      THE COURT:  Okay.

25      MR. BURETTA:  Judge, we will be using

3645

1    Government's Exhibit 69 with the witness, which has a

2    business record certification.

3         I would ask that it be admitted into evidence at

4    this time.

5              MS. KEDIA:  No objection.

6              MR. LARUSSO:  No objection.

7              THE COURT:  69 comes in, and we will bring the

8    jury out in a moment.

9              (Government's Exhibit 69 in evidence.)

10             THE COURT:  Any further discussion pertaining to

11   this witness?

12             MR. BURETTA:  We might as well put 82 in, as

13   well.

14             MS. KEDIA:  We don't have any objection.

15             MR. LARUSSO:  No objection.

16             THE COURT:  Okay.

17             (Government's Exhibit 82 in evidence.)

18             (The jury is present.)

19             THE COURT:  Please be seated, if you would.

20             The government's next witness.

21             MR. BURETTA:  The government calls Barry Levin.

22             THE CLERK:  Sir, would you raise your right hand

23   to be sworn in.

24

25

Levin  -  Direct/Buretta

3646

1    BARRY LEVIN,

2                    called as a witness, having been first

3                    duly sworn, was examined and testified

4                    as follows:

5

6                    THE CLERK:  Have a seat.

7                    Speak into the microphone, and please state and

8    spell your name for the record.

9                    THE WITNESS:  Barry Levin, L-E-V-I-N.

10                   MR. BURETTA:  May I inquire, your Honor?

11                   THE COURT:  Yes.

12

13   DIRECT EXAMINATION

14   BY MR. BURETTA:

15   Q.   Good afternoon, Mr. Levin.

16   A.   How are you, Mr. Buretta?

17   Q.   I'm fine, thank you.  How are you?

18   A.   I would have been better.  It's late in the day.  Go

19   ahead.

20   Q.   Mr. Levin, you're an attorney, correct?

21   A.   Yes, I am.

22   Q.   When did you first meet Alphonse Persico?

23   A.   End of 1993, early 1994.

24   Q.   And as an attorney, part of the kind of

25   representation you do is to represent criminal defendants,

**Levin  -  Direct/Buretta**

3647

1   correct?

2   A.   Among other types of cases.

3   Q.   That's one type, correct?

4   A.   That is correct.

5   Q.   You represent other types too, civil litigants,

6   correct?

7   A.   Yes, I do.

8   Q.   You're here pursuant to a subpoena, correct?

9   A.   That is correct.

10  Q.   You're testifying pursuant to an order of immunity,

11  do you understand?

12  A.   Yes.

13  Q.   Have you ever met Carmine Persico?

14  A.   Yes, once.

15  Q.   I show you Government's Exhibit 2-A in evidence.

16       Do you know who that is?

17  A.   I believe that's an old picture of Carmine Persico.

18  Q.   You never represented Carmine Persico; is that

19  correct?

20  A.   That's correct.

21  Q.   But you visited him in prison?

22  A.   Once.

23  Q.   Were you with anyone else?

24  A.   I was with his other son, Michael.

25  Q.   Michael Persico; is that correct?  That's Alphonse

Levin  -  Direct/Buretta

3648

1    Persico's brother?

2    A.    Correct.

3    Q.    You might want to pick up the microphone so the jury

4    can hear you.

5           At the time you visited Carmine Persico in

6    prison, you were not his lawyer, correct?

7                MS. KEDIA:  Objection, your Honor, relevance.

8                THE COURT:  Please approach.

9                (Continued on next page.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Levin  -  Direct/Buretta

3649

1      (The following takes place at sidebar.)

2      THE COURT:  Your objection?

3      MS. KEDIA:  Is to relevance.

4      What is the relevance of the fact that Mr. Levin

5  visited Mr. Persico, Carmine Persico?

6      MR. BURETTA:  The defense's position repeatedly

7  at trial has been that once people go to jail, including

8  Carmine Persico, they're incapacitated, they cannot

9  communicate with the outside world.  And, yet, Mr. Levin,

10  who is not Mr. Persico's attorney, visited him in jail.

11      If they want to elicit what that communication

12  was about, they're welcome to.  It directly rebuts the

13  defense.

14      MS. KEDIA:  I'm sorry, is the government

15  suggesting that a message was passed through Mr. Levin?

16      Because, otherwise, there is absolutely no

17  relevance to the fact that Mr. Levin, who is an attorney,

18  may have visited Carmine Persico in connection with who

19  knows what.  I don't know.

20      MR. BURETTA:  It's a good question.

21      MS. KEDIA:  Judge, I visit numerous defendants

22  that I may or may not end up representing.  That happens

23  repeatedly, as your Honor I'm sure well knows, and it

24  happens with every lawyer in the world.

25      Unless the government is actually alleging that

Levin  -  Direct/Buretta

3650

1    a message was passed, it has absolutely no relevance.

2            MR. LARUSSO:  Judge --

3            THE COURT:  When both of you talk, nothing gets

4    done.

5            MR. BURETTA:  The defense is they're

6    incapacitated and they have no contact with the outside

7    world.  Yet, attorneys are visiting people and not

8    representing them.  That's material.  It directly rebuts a

9    defense.  It provides a very low threshold for relevance.

10           THE COURT:  It's relevant, but it becomes more

11   relevant if the defense's position, and it seems to have

12   been, was that either Carmine or Alli Boy could have been

13   leaders in the Colombo Crime Family but because they were

14   incarcerated, then that belies that fact.

15           I'm going to allow one question on it.

16           MR. BURETTA:  I'm done with it.

17           THE COURT:  And move on.

18           MR. BURETTA:  Thank you, Judge.

19           MR. LARUSSO:  My position is there has to be a

20   good faith basis for even asking this question which

21   implies that he's acting as a messenger for Carmine

22   Persico.

23           There is no good faith basis for it.  There is

24   no evidence that the government has in their possession

25   that this man, who is an attorney, was there for any

**Levin  -  Direct/Buretta**

3651

1    reason other than to pass messages on the outside.

2              I'm asking for a good faith basis for this

3    question.  I think it's improper, Judge.  It shouldn't be

4    done.

5              MR. BURETTA:  This witness testified in the

6    grand jury he visited Carmine Persico, that he had gone

7    with Michael Persico.  He was asked if he passed messages.

8    He said yes, I did.

9              Then he was asked what were they about.  His

10   position was I send my love, I send my regards to people

11   I'm not representing.

12             They want to elicit that?  Let them.  It's

13   relevant.

14             THE COURT:  It's good enough.

15             (Continued on next page.)

16

17

18

19

20

21

22

23

24

25

Levin  -  Direct/Buretta

3652

1          (The following takes place in open court.)

2          THE COURT:  The objection is overruled.

3     BY MR. BURETTA:

4     Q.   Mr. Levin, where we left off, the question was at the

5     time you visited Carmine Persico in jail with his son

6     Michael, you were not Carmine Persico's lawyer, correct?

7     A.   Correct.

8     Q.   And Carmine Persico, the person on the screen, has

9     called you from jail, correct?

10    A.   Once a year, maybe.  Not recently.

11    Q.   And, sir, you're friendly with the defendant Alphonse

12    Persico, correct?

13    A.   Define friendly.  He's a former client.

14    Q.   Sir, have you used the word friendly previously in

15    describing your relationship with Alphonse Persico?

16    A.   I might have.

17    Q.   Is that accurate?

18    A.   Is what accurate?

19         MR. BURETTA:  Your Honor, I direct the attention

20    of the Court to 3500-BL-3.

21         THE COURT:  All right.

22         MR. BURETTA:  Page 24, lines 9 through 14.

23         MS. KEDIA:  Your Honor, may we approach?

24         THE COURT:  Come on up.

25         (Continued on next page.)

Levin  -  Direct/Buretta

3653

1          (The following takes place at sidebar.)

2          THE COURT:  Yes?

3          MS. KEDIA:  There was certainly a time period

4    when Mr. Levin actually represented Mr. Persico, and I

5    expect they were friendly at that time three years later.

6          THE COURT:  Mr. Persico who?

7          MS. KEDIA:  This Mr. Persico, Alphonse Persico.

8    I don't know that Mr. Levin and Mr. Persico have spoken

9    since this time that Mr. Levin quit representing him.

10          So if Mr. Buretta wants to ask was there a time

11    when you represented Mr. Persico, when you were friendly

12    with him, he certainly has the ability to do that.

13          If he wants to ask are you friendly with

14    Mr. Persico now, that's fine, and the witness can answer.

15          THE COURT:  I don't think he's bound by those

16    time periods.  He can bring that out.  It's a fair basis.

17          MS. KEDIA:  What the witness said is define

18    friendly.  He asked now if he's friendly --

19          THE COURT:  The witness is busy being a lawyer.

20          The objection is overruled.

21          (Continued on next page.)

22

23

24

25

Levin  -  Direct/Buretta

3654

1           (The following takes place in open court.)

2           THE COURT:  The objection is overruled.

3    BY MR. BURETTA:

4    Q.    In 1999, you were friendly with Alphonse Persico,

5    correct?

6    A.    You can say that.

7    Q.    Would you say that?

8    A.    Well, he was a former client.  We socialized once in

9    a while.  I guess, yes, we were friendly.

10   Q.    He was always calling you then, right?

11   A.    He wasn't always calling me.  When he came into the

12   office, he called me.  We would get together once in a

13   while.  He also had a case, a prior proceeding, I was

14   representing him on in 1999.

15   Q.    Do you recall testifying under oath in a proceeding

16   in 2004?

17   A.    I testified, yes.

18   Q.    In 2004, had you testified in a proceeding?

19   A.    I believe I did, yes.

20   Q.    You were asked the following question:

21         "QUESTION:  Do you recall if you had a phone

22   call with Alphonse Persico on the night before May 26,

23   1999?

24         "ANSWER:  He was always calling me.  We got to

25   know each other.  We were friendly.  We spoke all the

3655

1    time."

2              Do you recall giving that answer?

3              MS. KEDIA:  If we could finish the answer.

4              THE COURT:  Yes.

5    BY MR. BURETTA:

6              "ANSWER:  I can't tell you I have an independent

7    recollection of that call, but it appears he did call me."

8    Q.   Did you give that answer?

9    A.   Yeah.

10              That was to a particular phone call on September

11    25th.

12    Q.   I'm sorry, sir, I asked you if you were friendly with

13    Alphonse Persico?

14    A.   I told you --

15    Q.   I'm sorry, sir --

16              THE COURT:  One at a time.

17              MR. BURETTA:  Can I finish the question, please?

18              THE COURT:  Yes.

19    BY MR. BURETTA:

20    Q.   Let me finish the question.

21              I asked you if, in 1999, you were friendly with

22    Alphonse Persico, yes or no?

23    A.   Yes.

24    Q.   I asked you if he was always calling you.

25              Was he always calling you in 1999, yes or no?

Levin  -  Direct/Buretta

3656

1    A.    The answer would be no.

2    Q.    You testified under oath, quote, he was always

3    calling me, correct?

4             MS. KEDIA:  Objection, your Honor.

5             This has been asked and answered.

6             THE COURT:  Overruled.

7    BY MR. BURETTA:

8    Q.    You testified under oath, in 2004, quote, he was

9    always calling me, unquote, correct?

10   A.    You're taking it out of context.

11   Q.    Sir, answer my question.

12            Did you say that under oath?

13   A.    Yes, I said that.

14   Q.    Thank you.

15            You've gone boating with Alphonse Persico,

16   correct?

17   A.    Twice.

18   Q.    In 1999, though, Alphonse Persico did not have a boat

19   in New York, correct?

20   A.    Not to my knowledge.

21   Q.    Absolutely not, correct?

22   A.    Not to my knowledge.

23            MR. BURETTA:  Directing the Court's attention to

24   3500-BL-3, page 27, line 24 through page 28, line 3.

25            MS. KEDIA:  Your Honor, I object.

Levin  -  Direct/Buretta

3657

1           THE COURT:  Your objection is overruled.

2           I'll allow the question and I'll allow the

3    witness an opportunity to explain.

4           MR. BURETTA:  Thank you, Judge.

5           "QUESTION:  Do you know if he kept a boat in the

6    New York area?

7           "ANSWER:  What time period are you talking

8    about?

9           "QUESTION:  This time period, 1999.

10          "ANSWER:  Absolutely not."

11   Q.   Was that correct?

12   A.   So was not to my knowledge.  It means the same thing

13   in my mind.

14   Q.   I'm sorry, sir?

15          THE COURT:  Speak up, if you will, and into the

16   mike.

17   A.   I said not to my knowledge.  In that prior proceeding

18   I said absolutely not.  To my knowledge, he did not own a

19   boat.  I don't see the discrepancy.

20   Q.   Now, on the night of May 25th, 1999, Alphonse Persico

21   called you at your house, correct?

22   A.   Correct.

23   Q.   And that was at 9:22 p.m., correct?

24   A.   I wouldn't remember what the exact time was.  It was

25   several years ago.  If you have something you want to show

Levin  -  Direct/Buretta

3658

1    me to refresh my recollection, I'll be happy to look at

2    it.

3    Q.    I show you Government's Exhibit 69 in evidence.

4          Directing your attention to page 10, the first

5    page indicates mobile telephone records for (917)

6    613-6734, do you see that?

7    A.    Yes.

8    Q.    I direct your attention to May 25th, 1999, at 9:22

9    p.m.

10   A.    I see my phone number there.

11   Q.    The phone number (516) 889-4859, dialed by this

12   phone, is your home phone number; is that correct?

13   A.    That's correct.

14   Q.    How long did you talk to Mr. Persico that evening?

15   A.    I don't recall.

16          I mean, the records reflect how long the call

17   was.

18   Q.    Was it about 10 minutes?

19   A.    Could be.

20   Q.    Now, during that call, Mr. Persico indicated to you

21   that he wants to set up a meeting with you for the

22   following day, correct?

23   A.    Correct.

24   Q.    And the meeting was scheduled on that call, correct?

25   A.    That's correct.

Levin  -  Direct/Buretta

3659

1    Q.    Did you have anything scheduled that morning at the

2    time?

3    A.    Did I have anything scheduled that morning?

4    Q.    May 26, the next morning?

5    A.    There was a prior deposition that I believe was

6    cancelled a week and a half before because the case

7    settled.

8    Q.    So, did you have anything scheduled that morning?

9    A.    No.  The answer would be no.

10   Q.    You did have plans to go to the Yankee game that

11   afternoon, correct, May 26, 1999?

12   A.    I probably did, yes.

13         I think there's an entry there.

14   Q.    It was a Yankee/Red Sox game, do you recall that?

15   A.    No, because I didn't go to the game.

16   Q.    You ended up not going to the game?

17   A.    Correct.

18   Q.    You had planned to go to the game, correct?

19   A.    I probably had tickets to many Yankee games that

20   year, yeah, okay.

21   Q.    Showing you what's in evidence as Government's

22   Exhibit 82, that's a page from your calendar, correct, for

23   1999?

24   A.    Yes, I recognize it.

25   Q.    And if we look at May 26, 1999, on the left there's a

Levin  -  Direct/Buretta

3660

1    notation EB something?

2    A.    EBT.

3    Q.    That was the civil matter that had settled some weeks

4    before?

5    A.    Correct.

6    Q.    And there's a notation down below here also referring

7    to that same civil matter, correct, prepare EBT?

8    A.    Probably.  Yeah, I would say that's accurate.

9    Q.    So those two notations, those were cleared from your

10   calendar as of the night of May 25th, 1999, correct?  They

11   had settled?

12   A.    Yes.

13   Q.    And you have a notation here of a Yankee game,

14   correct?

15   A.    Yes.

16   Q.    It was an afternoon game that day, right?

17   A.    I have no idea.  I don't remember.

18             MR. BURETTA:  May I approach the witness, your

19   Honor?

20             THE COURT:  Yes.

21             (Document handed.)

22   BY MR. BURETTA:

23   Q.    If you could take a look at the first and second

24   pages of that document and I'll ask you whether that

25   refreshes your recollection that the Yankee game on May

3661

1   26, 1999, was an afternoon game?

2   A.   It says it was an afternoon game, but I have no

3   recollection whether it was or was not because I didn't go

4   to the game.

5   Q.   Who decided that the meeting on May 26, 1999, between

6   you and the defendant Persico would occur in the

7   afternoon?

8   A.   I did.

9   Q.   What were your previous commitments in the morning?

10  A.   Go jogging, check my messages.

11          I never book meetings in the morning absolutely

12  they're absolutely necessary.

13  Q.   Well, on May 24th, there's a notation at nine a.m.

14  for a Bonanno meeting; is that correct?

15  A.   No, you're wrong.

16          That's part nine, Nassau County.  I was

17  representing someone named Bonanno, and part nine is an

18  all part in Nassau County and I was appearing there for a

19  calendar call in the morning.

20  Q.   In the morning?

21  A.   Yes.

22  Q.   There's a notation next to the Yankee game, 3:30

23  p.m., correct?

24  A.   Correct.

25  Q.   It's in the same pen as the Yankee game, right?

Levin  -  Direct/Buretta

3662

1    A.    I'm not sure.

2    Q.    You're not sure?

3    A.    No, because there's a couple of pens on my desk.

4    It's a thicker ink than on the other notations.  I don't

5    know if it's the same pen.

6    Q.    Let me magnify it more.

7          The pen used to write the Yankee game and the

8    pen used to write 3:30 p.m., are those the same pen?

9    A.    It could be.  I don't know.

10   Q.    You're not certain?

11   A.    No, I'm not.  It's on my desk.  There are always

12   three, four, five pens.  Some are felt tip, some are hard

13   tip.

14         It appears that the thickness of the ink is

15   about the same.  I'm not arguing with you.

16   Q.    There's a notation written in a different pen,

17   correct, above that 3:30 p.m.?

18   A.    That's true.

19   Q.    You would agree that's a different pen than was used

20   to write Yankee game, right?

21   A.    That was written in on the night of the 25th.

22   Q.    Sir, that wasn't my question, was it?

23   A.    Yes.

24   Q.    Let's try my question.

25   A.    Go ahead.

Levin  -  Direct/Buretta

3663

1   Q.   Where it's written Frank/Allie, that's in a different

2   pen than the pen used to write Yankee game, yes or no?

3   A.   Yes.

4   Q.   And where it says Frank/Allie, that's in a different

5   pen than the notation 3:30 p.m., yes or no?

6   A.   Yes, I think so.

7   Q.   Are you uncertain about that?

8   A.   Of course I'm uncertain.  I don't have the pens in

9   front of me.

10   Q.   Just so the record is clear, you're not sure whether

11   Frank/Allie is written in a different pen than 3:30 p.m.,

12   is that your testimony?

13   A.   That's not what I said.

14          MS. KEDIA:  Objection, asked and answer.

15   Q.   Sir --

16          THE COURT:  Sustained.

17          Don't make me raise my voice again when there's

18   an objection.

19          You stop speaking when there's an objection, you

20   stop talking Mr. Buretta and, Ms. Kedia, the same rule for

21   you.

22          MR. BURETTA:  Yes, your Honor.

23   BY MR. BURETTA:

24   Q.   Did you meet with Alphonse Persico that afternoon,

25   May 26?

Levin  -  Direct/Buretta

3664

1    A.    Yes.

2    Q.    What time did he get there?

3    A.    Three, 3:30.

4    Q.    Did he come alone?

5    A.    As I sit here today, the answer was yes, he did.

6    Q.    Do you have the original of your day planner?

7    A.    No.  We -- no.

8    Q.    How long did the meeting last that afternoon, May 26,

9    1999?

10    A.    A couple of hours.  An hour, two hours.

11    Q.    What did you do after the meeting?

12    A.    I think I went to dinner with Alphonse Persico.

13    Q.    What time did you go to dinner?

14    A.    I'm going to say, I don't know, 5:30, six.

15    Q.    Who set up the dinner?

16    A.    It really wasn't setup.  We just finished up and -- I

17    have to explain my answer because I know where you're

18    going.

19          THE COURT:  Rather than give us a colloquy,

20    listen for the next question.

21    A.    There was no dinner so to speak set up.

22          We worked for a couple of hours and we decided

23    to get a bite to eat together.

24    Q.    How long did you eat dinner?

25    A.    I would say a couple of hours.

Levin  -  Direct/Buretta

3665

1    Q.    What time did dinner end?

2    A.    I don't know.

3          As I sit here today, I don't remember

4    specifically when dinner ended but I was probably home by

5    about eight, 8:30.

6    Q.    Where did you eat?

7    A.    At a restaurant in Rockville Centre.

8    Q.    Which one?

9    A.    I don't remember the name of it, but it was a

10   restaurant on Park Avenue in Rockville Centre.

11         I live on the south shore.  I go to those

12   restaurants quite frequently.

13   Q.    What kind of food was it?

14   A.    Italian.  It was Italian.  Definitely was Italian.

15   Q.    Did Mr. Persico place any phone calls while you were

16   with him for those roughly, what was it, four hours

17   together?

18   A.    I don't remember.

19         The only thing I can tell you is he didn't place

20   any phone calls while we were in my office in the meeting

21   with the other lawyer.

22   Q.    Did Mr. Persico tell you where he was going after you

23   left dinner with him?

24   A.    Home.

25   Q.    I would like to direct your attention to the year

Levin  -  Direct/Buretta

3666

1    2000.

2            Did you retain an investigator named Margaret

3    Clemons?

4    A.    Yes.

5    Q.    And in the year 2000, did you know who John or Jackie

6    DeRoss was?

7    A.    In 2000?  No, I did not.

8    Q.    Do you see him here today?

9    A.    Yes.

10   Q.    Can you point him out, please?

11   A.    The gentleman sitting in the corner.

12   Q.    What's he wearing?

13   A.    He's wearing a button down gray shirt with a blue

14   collar.

15           MR. BURETTA:  Let the record reflect he's

16   identified the defendant John DeRoss.

17           THE COURT:  Yes.

18           MR. BURETTA:  Thank you.

19   BY MR. BURETTA:

20   Q.    You had Ms. Clemons go to visit the Cutolo family in

21   late March of 2000, correct?

22   A.    Yes.  It was discussed, yes.

23   Q.    And Ms. Clemons contacted them directly, correct?

24   A.    To my knowledge.

25   Q.    You had no knowledge that Mr. DeRoss had been at the

Levin  -  Direct/Buretta

3667

1   Cutolo residence two days before Margaret Clemons met with

2   them, right?

3   A.   That's correct.

4   Q.   And had you known he had been there, you probably

5   wouldn't have sent her, right?

6        MS. KEDIA:  Objection, your Honor.

7        THE COURT:  Sustained.

8   BY MR. BURETTA:

9   Q.   You listened to the tape of Mr. DeRoss' statements to

10   the Cutolo family; is that right?

11   A.   Years ago.

12        MR. BURETTA:  I have no further questions.

13

14   CROSS-EXAMINATION

15   BY MS. KEDIA:

16   Q.   Mr. Levin, good afternoon.

17   A.   Good afternoon.

18   Q.   You represented Mr. Persico, I believe you said you

19   began representing him in 1993 or so?

20   A.   End of '93, early '94.

21   Q.   And at the time that you began representing

22   Mr. Persico, he was incarcerated; is that right?

23   A.   Correct.

24   Q.   And there was a period where he was released from

25   jail in August of 1994; is that right?

Levin  -  Cross/Kedia

3668

1    A.    That's correct.

2    Q.    And from that time in August of 1994 until October 8

3    of 1999, Mr. Persico was in fact released from jail,

4    right?

5    A.    Yes.

6    Q.    And October 8, 1999, that's the day that agents came

7    to search an apartment that Mr. Persico was staying in

8    with his daughter at 242 5th Avenue; is that right?

9              MR. BURETTA:  Objection.

10   A.    Correct.

11             THE COURT:  Overruled.

12   BY MS. KEDIA:

13   Q.    Now, soon after, in 1999, at this time October 8,

14   1999, Mr. Persico had a case pending in Florida; is that

15   right?

16   A.    Yes, that's correct.

17   Q.    And he was actually charged in that case sometime in

18   February of 1999?

19   A.    I think so.

20   Q.    And in connection with that case, there actually had

21   been a state charge sometime in 1998 which was dismissed?

22   A.    Yes.

23   Q.    And then he was charged federally in 1999; is that

24   right?

25   A.    Yes, that's correct.

**Levin  -  Cross/Kedia**

3669

1    Q.    And on October 8, 1999, the date of the search of the

2    apartment where Mr. Persico was staying with his daughter

3    in Brooklyn, he was actually scheduled to begin trial

4    shortly thereafter on the Florida case; is that right?

5    A.    Within a week or two, yes.

6    Q.    And in the end he actually decided to take a plea and

7    was sentenced to a period of 18 months incarceration on

8    that case; is that right?

9    A.    Yes.

10    Q.    Now, and that case had nothing whatsoever to do with

11    the charge here in this case now, right?

12    A.    Correct.

13    Q.    Now, he remained incarcerated in fact until after

14    July 16 of 2001, right?

15    A.    Yes.

16    Q.    And for the period for the whole year of the entire

17    year of 2000, Mr. Persico was in fact incarcerated in a

18    facility in Miami, Florida; is that right?

19    A.    Yes.

20    Q.    Now, you were asked about visiting a Mr. Carmine

21    Persico and you were shown the picture of Carmine Persico,

22    right?

23    A.    That's correct.

24    Q.    And that is the father of Alphonse Persico, right?

25    A.    That's correct.

**Levin  -  Cross/Kedia**

3670

1    Q.    In fact, you had subpoenaed him to be a witness in

2    the case you were representing Mr. Persico on back in the

3    early 1990s; is that right?

4    A.    That is correct.  That's correct.

5    Q.    In fact, Mr. Carmine Persico Junior was represented

6    by another attorney in that matter, a woman by the name of

7    Margaret Alverson?

8    A.    I think so.

9    Q.    And that's the time period in which you met with

10   Carmine Persico Junior; is that right?

11   A.    That's correct.

12   Q.    Now, you were asked about a call that you received

13   and this was a call at your home on May 25th, 1999; is

14   that right?

15   A.    That's correct.

16   Q.    And you had just returned from a vacation?

17   A.    Yes, I was in Disney World.

18   Q.    Disney World?

19   A.    With my kids, yeah.

20              (Continued on next page.)

21

22

23

24

25

Levin - Cross/Kedia

3671

1    BY MS. KEDIA (Cont'd):

2    Q.    And you returned, in fact, on that day, on May 25,

3    1999?

4    A.    No.

5    Q.    When did you return?

6    A.    You know, maybe I did.

7          I either came in Sunday night or Monday morning.

8    I really don't recall, as I sit here now.

9    Q.    And you received a call at your home and you set up a

10   meeting with Mr. Persico.

11         Right?

12   A.    And another lawyer, yes.

13   Q.    And this lawyer by the name of Frank Berry.

14         Right?

15   A.    Correct.

16   Q.    And Frank Berry was a attorney who had a special

17   expertise in the area on which that case in Florida was

18   about.

19         Right?

20   A.    Correct.

21   Q.    And during that time period in April, May, even March

22   of 1999, you were speaking to Mr. Persico about his case,

23   certainly on a regular basis.

24         Right?

25   A.    During that time period, yes.

Levin - Cross/Kedia

3672

1    Q.    And, in fact, you continued to do so into June and

2    July and until he decided to take a plea on that case.

3          Right?

4    A.    Until the case concluded.

5    Q.    Until the case concluded.

6          And during that time, whenever Mr. Persico came

7    to New York he tried to set up a meeting with you to go

8    over that case.

9          Right?

10   A.    That is correct.

11   Q.    And, in fact, during this specific period of time

12   there was a suppression hearing that was coming up.

13         Right?

14   A.    Yeah, about -- that was about a week or two weeks

15   later, we -- yes.

16   Q.    June 11th?

17   A.    That sounds about right.

18   Q.    Now, you testified about this woman by the name of

19   Margaret Clemons.

20         When did you first meet Margaret Clemons?

21   A.    I met Margaret, I think, working for Alli on that

22   prior proceeding in 1994.

23   Q.    In 1994.

24   A.    Yeah.

25   Q.    I --

Levin - Cross/Kedia

3673

1    Q.   And so you had known her for a number of years at the

2    time that you talked to her or retained her in 2000?

3    A.   2000.

4         I used Margaret many times.

5    Q.   Many times in connection with many cases?

6    A.   Many cases, many clients.

7    Q.   And when you were representing Mr. Persico in 2000,

8    you were representing him in conjunction with another

9    lawyer?

10   A.   Yes.

11   Q.   A woman by the name of Linda Sheffield?

12   A.   That's correct.

13   Q.   And the two of you, whether it be you or whether it

14   be Ms. Sheffield, retained Ms. Clemons to conduct not only

15   an interview of the Cutolo family, but an interview of 30

16   or 50 people.

17        Right?

18   A.   I don't remember the number.

19        But there were numerous interviews we set up in

20   that time period.

21   Q.   And there were interviews that you asked her to

22   conduct with people that may have any information on the

23   disappearance of William Cutolo Senior.

24        Is that right?

25        MR. BURETTA:  Objection.

Levin - Cross/Kedia

3674

1          THE COURT:  Sustained.

2    BY MS. KEDIA:

3    Q.   Well, why did you ask Ms. Clemons to set up the

4    interviews?

5          What was the purpose?

6    A.   Because --

7          MR. BURETTA:  Objection.

8          THE COURT:  This is the Cutolo interview?

9          MS. KEDIA:  Yes, your Honor.

10          THE COURT:  Please approach.

11          (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Levin - Cross/Kedia

3675

1           (Sidebar.)

2           THE COURT:  Do you have an objection?

3           MR. BURETTA:  Yes, Judge.

4           That's work product.  I didn't elicit what the

5      purpose or the case was about.  I don't think there was a

6      case.

7           But simply he was asked about where it was, and

8      about the DeRoss meeting.

9           MS. KEDIA:  Your Honor, this witness testified

10     at the last trial, and obviously the point is that it's

11     not only the Cutolos that are being interviewed at that

12     time and certainly that's not the impression the jury

13     should be left with.

14          A number of people --

15          THE COURT:  You brought that out.

16          There were 30 people interviewed.

17          MS. KEDIA:  He testified at the last trial that

18     he specifically, he together with Linda Sheffield, decided

19     who would be interviewed.

20          And they gave Margaret Clemons the assignment to

21     interview those people.  It's not an assignment that

22     came --

23          THE COURT:  Including the Cutolo.

24          MS. KEDIA:  Right.

25          It's not an assignment that came from

Levin - Cross/Kedia

1    Mr. Persico.

2              THE COURT:  You are saying this is a work

3    product?

4              MR. BURETTA:  I don't object to eliciting the

5    interviews were conducted.

6              THE COURT:  Okay.

7              MR. BURETTA:  But what they are thinking about

8    what they are conducting is not appropriate.

9              MS. KEDIA:  The purpose about conducting the

10   interview is the only thing I'm trying to elicit.

11             I'm not trying to elicit every single person

12   that was interviewed.  But the purpose of conducting the

13   interviews is something, certainly, I seek to elicit and

14   something that this witness has testified to before.

15             THE COURT:  And what did he testify it was to

16   elicit what happened --

17             MS. KEDIA:  Information on the Cutolo

18   disappearance because the government made it known in

19   October of 1999 -- I mean, I'm just giving your Honor

20   background, and I'll tell you what Judge Johnson

21   permitted.

22             THE COURT:  The because is the part.

23             MS. KEDIA:  Right.  I'm giving your Honor

24   background.

25             THE COURT:  Okay.

Levin - Cross/Kedia

1        MS. KEDIA:  The government had made it clear

2    they were looking at Mr. Persico as a target at that point

3    in time.

4            Therefore, Mr. Levin and Ms. Sheffield decided

5    to conduct the interviews into the disappearance, although

6    Mr. Persico hadn't formally been charged at that point in

7    time.  In fact, he wasn't formally charged with this crime

8    until October of 2004.

9            They started their investigation much earlier

10   than that because the government had made it known at his

11   October 1999 arraignment the reason for the search and the

12   cell phone and the fact that which they were investigating

13   him for Mr. Cutolo Senior's disappearance.

14           So the reason that this witness -- this witness

15   directs an investigator to conduct interviews into that

16   disappearance is relevant.  It's highly relevant.

17           Obviously this is not, as the government is

18   going to allege that it is, our argument is that it's not

19   for the purpose of intimidating the Cutolo family.

20           MR. BURETTA:  We are not alleging the Margaret

21   Clemons interview was that at all.

22           It's the DeRoss interview.

23           MS. KEDIA:  Right.

24           But this witness will testify that he never

25   before this met Jackie DeRoss.

### Levin - Cross/Kedia

3678

1          THE COURT:  He just said that.

2          MS. KEDIA:  Right.

3          THE COURT:  So where are you going with the

4    additional questions?

5          MS. KEDIA:  The purpose -- I'm not going with

6    the additional information, the fact of additional

7    interviews there were one of a number of people --

8          THE COURT:  It's already in there.

9          MS. KEDIA:  And the fact and the purpose of the

10   interview was to gather information on the disappearance

11   of William Cutolo.

12          Obviously that's the purpose of the interview,

13   the reason for asking that these people be interviewed is

14   absolutely relevant and, in fact, necessary for the

15   defense to explain as to why Ms. Clemons would go there.

16          As opposed to all the jury has right now before

17   it, which is that Jackie DeRoss intimidates them.

18          THE COURT:  Who gave Mr. DeRoss a heads up this

19   was going to happen?

20          MS. KEDIA:  To this day, your Honor, we don't

21   know.

22          Margaret Clemons interviewed from February to

23   March, for a two-month period, any number of people and

24   asked anyone if you know, all of her interviews, she will

25   testify, that all of her interviews or she has testified,

1    I should say, I don't know if the government's calling her

2    at this time, the government called her in the last trial,

3    and she testified specifically that during the course of

4    this process in which she was interviewing people, she

5    would always ask if she didn't know the person she was

6    going to interview to have any number of people to set up

7    the interview or contact the people if they know that.

8             She continued to do so, and she did the same

9    thing with the Cutolos.  She even interviewed the woman,

10   or someone from the office interviewed --

11            THE COURT:  Did they reach out to Mr. DeRoss?

12            MS. KEDIA:  Margaret Clemons did not reach out

13   to Mr. DeRoss specifically.

14            She will say she reached out to a number of

15   people, one of whom probably reached out to Mr. DeRoss, is

16   the best we can gather of how this was set up.

17            No one knows exactly how Mr. DeRoss got the

18   information.

19            THE COURT:  What's your objection?

20            MR. BURETTA:  We don't object to eliciting his

21   knowledge or statements the government made in 1999 about

22   his client being involved in the murder.

23            THE COURT:  All right.

24            MR. BURETTA:  But when you get into the reason

25   we said is because we were investigating the

Levin - Cross/Kedia

1    disappearance, that is work product and that is the sort

2    of information and what that says to the jury is my

3    client's innocent.

4          We have talked about this.  We are going to go

5    figure out who really did it.

6          That's not fair to us.

7          THE COURT:  When you talk about fairness, your

8    prosecution, in some ways, is based on the fact that not

9    enough was done to find out who Billy was.

10         Right?

11         MR. BURETTA:  At the time, correct.

12         THE COURT:  At the time.

13         MR. BURETTA:  This is seven years later.

14         MS. KEDIA:  This is naturally --

15         MR. BURETTA:  Several months later.

16         Sorry.

17         THE COURT:  I --

18         MR. BURETTA:  What I am allowed to ask him --

19         THE COURT:  Then you can't get up there and say

20    didn't you discuss this --

21         MR. BURETTA:  Right.

22         That's the problem.

23         THE COURT:  That is the problem.

24         MS. KEDIA:  What does that mean, didn't you

25    discuss this with Mr. Persico the fact that the

1    investigation was going to occur?

2                THE COURT:  That he was a target?

3                MS. KEDIA:  That's not a problem.

4                We don't have any objection to that, judge.

5    Certainly Mr. --

6                MR. BURETTA:  But I can't --

7                THE COURT:  He is not violating the privilege

8    and he is using it, more importantly, as a sword.

9                MS. KEDIA:  Well, first of all, it's

10   Mr. Persico's privilege, so to the extent he wants to

11   allow his attorney to get into the subject matter --

12               THE COURT:  There are other issues.

13               In any event --

14               MS. KEDIA:  But the government wants to elicit

15   the fact that Mr. Persico certainly knew that he was a

16   target, and that he certainly can, this doesn't even have

17   to go into a discussion --

18               THE COURT:  They can't get into that.

19               MR. BURETTA:  I can't.

20               He didn't testify.

21               MS. KEDIA:  That's not --

22               MR. BURETTA:  Judge, we have no problem with

23   you, Mr. Levin -- that the government had made the

24   statements about his client being involved in the murder,

25   and we have no problem with what was elicited already,

**Levin - Cross/Kedia**

3682

1    that they did interviews.

2         But to go beyond -- they have all they need

3    there to make all their arguments, and it doesn't unfairly

4    prejudice me in trying to redirect him.

5         But to go beyond that does because then I can't

6    do anything.  I can't ask a single question.

7         MS. KEDIA:  This has nothing to do with

8    attorney-client privilege.

9         This is a decision made by Mr. Levin and

10   Ms. Sheffield once they are informed --

11        THE COURT:  Now you are using the

12   attorney-client privilege as the shield.

13        You are saying that we can put our attorney out

14   there and say we did these things because we were unfairly

15   you accused by the government.  We had to protect

16   ourselves, and when push comes to shove, the government

17   can't go back and say, well, if that was so, why doesn't

18   Mr. Persico tell us about it.

19        Because now, that would be commenting on the

20   defendant's failure to testify.

21        MS. KEDIA:  I'm not commenting on anything that

22   Mr. Persico did.

23        THE COURT:  You are putting the government in a

24   position of not being able to raise it.

25        I'm going to allow you to bring out the fact

Levin - Cross/Kedia

3683

1      that Mr. Persico is considered a target and that, as a

2      result, there was an investigation done and Ms. Clemons

3      was retained.

4                  I think you have that already.

5                  MS. KEDIA:  That's fine, Judge.

6                  THE COURT:  Don't go over privilege.

7                  MS. KEDIA:  That's fine, Judge.

8                  THE COURT:  Then I'm going to strike it.

9                  MS. KEDIA:  That's fine, Judge.

10                 (Sidebar concluded.)

11                 (Continued on next page.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Levin - Cross/Kedia

3684

1                    (In open court.)

2     BY MS. KEDIA:

3     Q.    Mr. Levin, when you retained Ms. Clemons in early

4     2000, you were already aware, the government had already

5     made it clear that Mr. Persico was a target in the

6     investigation into Mr. Cutolo's disappearance.

7                    Right?

8     A.    Yes.

9                    As early as October of '99 they made that clear.

10    Q.    And, therefore, you and Ms. Sheffield retained

11    Ms. Clemons in connection with that?

12    A.    Yes.

13    Q.    Now, prior to this interview that you were asked

14    about with the Cutolo family --

15                   MS. KEDIA:  Withdrawn.

16    BY MS. KEDIA:

17    Q.    Did you know that the interview that Ms. Clemons was

18    going to do with the Cutolo family would be on any

19    particular date, even?

20    A.    No.

21    Q.    Was she conducting interviews throughout the time

22    period in February and March of 2000?

23    A.    Yes.

24    Q.    And even subsequent to that.

25                   Is that right?

Levin - Cross/Kedia

3685

1    A.    Correct.

2    Q.    At this time period, Mr. Persico had not been

3    formally charged with the murder of William Cutolo.

4          Right?

5    A.    Correct.

6    Q.    An he had not been formally charged in any way with

7    any disappearance of Mr. Cutolo.

8          Right?

9    A.    Correct.

10   Q.    And those charges were brought in October of 2004.

11         Right?

12   A.    I'm not sure.

13         But it sounds about right.  I was not involved

14   at that point.

15   Q.    You weren't even representing Mr. Persico anymore at

16   that point in time.

17   A.    That is correct.

18   Q.    And, in fact, your representation of Mr. Persico

19   ended some five years ago or so?

20   A.    Easily.

21         Yes.

22   Q.    Now, when you scheduled this meeting with Mr. Persico

23   on May 26, 1999, you actually had already planned on

24   getting together during some point that week.

25         Is that right?

3686

1    A.    Yeah, that's correct.

2          I knew he was coming up.

3    Q.    And the date and the time was specifically determined

4    on May 25?

5    A.    Correct.

6    Q.    1999?

7    A.    Correct.

8    Q.    And, in fact, during the time period prior to that,

9    there were numerous phone calls, Mr. Levin, to both your

10   home phone and your office in connection with this matter

11   that was pending in Florida.

12         Right?

13   A.    Yes.

14   Q.    Do you have what's in evidence as Government Exhibit

15   69?

16   A.    No.   I have nothing.

17         I have a Yankee schedule.

18   Q.    Now, these phone records, Mr. Levin, the setup date

19   for this phone record is 4/14, 1999.

20         Right?

21   A.    Yes.

22   Q.    The original setup date, can you read all of that

23   together?

24   A.    Yes.

25   Q.    Okay.

Levin - Cross/Kedia

3687

1          So beginning 4/14/99, which these phone records

2    cover, there is a call on 4/16, 1999, there are two calls,

3    1633 and 1635, to your home number, from this phone.

4          Right?

5    A.    That's my number.

6          That's correct.

7    Q.    And that's 4:33 and 4:35 in the afternoon.

8          Right?

9    A.    Yes.

10    Q.    And then, similarly, on April 20th, there is a call

11    at 1546 --

12          MS. KEDIA:  Withdrawn.

13    BY MS. KEDIA:

14    Q.    Do you recognize this number, this 404-501-0125, in

15    Atlanta, Georgia?

16    A.    I think that's Linda Sheffield's number, the other

17    attorney.

18    Q.    The other attorney that was representing Mr. Persico?

19    A.    Yeah, I think so.

20    Q.    And there's a call to that number on 4 -- on April

21    20th, at 3:47 in the afternoon.

22          Right?

23    A.    Correct.

24    Q.    And there is a call again to that number on April

25    21st at 10:56 in the morning.

Levin - Cross/Kedia

3688

1           Right, that same number?  Do you see this?

2    A.    It's moving around on me.

3    Q.    All right.  I'm sorry.

4           There we go.

5    A.    Now I see it.

6           Yes, I do see that call.

7    Q.    And then again on the following day, there is another

8    call to that number at 11:14 in the morning.

9    A.    Correct.

10   Q.    And this is the number for Linda Sheffield down in

11   Atlanta, Georgia.

12           Right?

13   A.    I believe so.

14   Q.    And that was where her practice was located, in

15   Atlanta, Georgia?

16   A.    Correct.

17   Q.    And the following day --

18           MS. KEDIA:  Withdrawn.

19   BY MS. KEDIA:

20   Q.    Let me ask you this.

21           This number 516-222-4502, is that an office

22   number?

23   A.    That's my office in Garden City.

24   Q.    In Garden City, and that's the location in

25   Garden City where you had your meeting with Mr. Persico.

Levin - Cross/Kedia

1          Right?

2    A.    That's correct.

3    Q.    And that call was placed on April 23, 1999, at 5:08?

4    A.    That's correct.

5    Q.    In the afternoon.

6          And then a call was placed shortly thereafter,

7    15 minutes later, to your home phone on the same day.

8          Right?

9    A.    Yes.

10   Q.    And then again three hours later to your home phone

11   on April 23, 1999.

12         Right?

13   A.    Correct.

14   Q.    And this was at 8:17 in the evening?

15   A.    Yeah, I think -- yes, 2017.

16         Yes.

17   Q.    And, Mr. Levin, you frequently worked out of your

18   home.

19         Right?

20   A.    I have an office in my home, and I also have an

21   office where my staff works in Garden City.

22   Q.    And Mr. Persico would often, as many other clients of

23   yours, try to reach you at both locations.

24   A.    Correct.

25   Q.    Now, on April 26th, a call was again placed to your

Levin - Cross/Kedia

1   office number at 1609, 4:09 in the afternoon.

2          Right?

3   A.   4500 is the general exchange.

4          Yes, that's --

5   Q.   4500 is your general exchange and 4502 --

6   A.   Is my direct extension.

7   Q.   And then there are several calls on 4/28, and then on

8   May 4th there are calls again to this number in Atlanta,

9   Georgia, 404-501-0125.

10          Right?

11  A.   Yes.

12  Q.   And then again on May 4th at 10 o'clock in the

13  morning.

14          Right?  You see this?

15  A.   Yeah.

16          Okay.

17  Q.   I'm sorry, May 4, 10 o'clock in the morning?

18  A.   Yes.

19  Q.   And then May 4th at 12:16 in the afternoon.

20          Right?

21  A.   Correct.

22  Q.   And then a couple of more calls to a 404 number in

23  Atlanta, one is the same one that's been dialed, 9:16 --

24  7:16 in the afternoon, the evening of May 4, 1999.

25          Correct?

Levin - Cross/Kedia

3691

1   A.   Correct.

2   Q.   And, similarly, another 404 number at the same time

3   on May 4 of 1999 in Atlanta, Georgia.

4        Right?

5   A.   Correct.

6   Q.   Do you recognize that that is Ms. Sheffield's home

7   number?

8   A.   It may be.

9        It's vaguely familiar.  I just can't say for

10  certain.

11  Q.   And, Mr. Levin, you also received calls fairly

12  frequently during this time period from Mr. Persico.

13       Right?

14  A.   Yes, during the time period the case was going on,

15  yes.

16  Q.   And these phone records actually, if you can look at

17  them, they went, when there is an incoming call, if you

18  made a call it's just shown as an incoming call as opposed

19  to showing who the incoming call is from.

20       Right?

21  A.   That's correct.

22       I think that's right.

23  Q.   Now, on May 11, 1999, a call is made from this phone

24  number at 11:38 in the morning, go to the next page, at

25  11:38 in the morning.

Levin - Cross/Kedia

3692

1          If I can direct your attention to this line,

2     again, it's your home phone number?

3     A.   That's correct.

4     Q.   And again 11:39 to your office line.

5          Correct?

6     A.   That's correct.

7     Q.   And, in fact, that evening, at 10:20 in the evening,

8     Mr. Persico, from this phone, tried to reach you.

9          Is that right?

10    A.   Yes.

11    Q.   At your home?

12    A.   That is -- yes.

13    Q.   Okay.

14         Similarly, on May 12, 1999, there are several

15    calls to your home phone, go to the next page, at 5:17 in

16    the afternoon.

17         Right?

18    A.   Correct.

19    Q.   And then again at 5: -- I'm sorry, 7:39 in the

20    evening.

21         Right?

22    A.   1754, yes.

23    Q.   1754 and then again at 1939.

24         Right, 7:39?

25    A.   That's me.

Levin - Cross/Kedia

3693

1          Yes?

2    Q.   Then there's the call that we have seen on May 25th.

3    Right?

4          But on May 24th, there is also a call in the

5    morning to your office number at 12:07, from this same

6    phone number.

7          Right?

8    A.   That's the office number.

9          That's my direct extension.

10   Q.   That's your direct extension on May 24, 1999.

11   A.   Correct.

12   Q.   And do you recall whether at that point in time you

13   were back from Florida yet?

14   A.   What date was that?

15   Q.   May 24, 1999?

16   A.   I don't recall -- I don't think I was.

17   Q.   And then on May 25, 1999, there's a call at 2:17 in

18   the afternoon to 516-420-1070.

19   A.   I see that.

20   Q.   You had an associate by the name of Kelly Duffy,

21   right?

22   A.   Kelly Guthy.

23   Q.   Kelly Guthrie?

24   A.   G-U-T-H-Y, that is correct.

25   Q.   And she actually worked with you in your office and

Levin - Cross/Kedia

3694

1    she worked out of her home at some point as well.

2            Right?

3    A.    She had a baby, and she was doing research at home.

4    Q.    And she was doing research on Mr. Persico's case as

5    well.

6            Is that right?

7    A.    I --

8            MR. BURETTA:  Objection.

9            THE COURT:  Sustained.

10   BY MS. KEDIA:

11   Q.    And a call is made to her home number at 2:17 in the

12   afternoon on the day of the 25th of May, 1999.

13           Right?

14   A.    Correct.

15   Q.    And calls continued to be made to your home on June

16   3, 1999 at 1755, that's 5:55.

17           You can see this, Mr. Levin, at 1755 in the

18   afternoon, right?

19   A.    That's correct.

20   Q.    June 3rd?

21   A.    Yes.

22   Q.    And then again on June 7th there are calls from this

23   phone to your office number, and your home number at 1454.

24           Right?  First your office direct line, and then

25   your home number.  Is that right?

Levin - Cross/Kedia

3695

1    A.    I -- yes, that is correct.

2          I see them.

3    Q.    And then on June 8th, again, calls to your office

4    number, and then your home line at 11:17, right?

5          First your home line?

6    A.    Yes.

7    Q.    And then your office?

8    A.    Yes.

9    Q.    And then your office direct extension.

10          Right?

11   A.    Correct.

12   Q.    And then, again, at 11:31 there's a call to that

13   Atlanta, Georgia number, Linda Sheffield.

14          Right?

15   A.    Yes.

16   Q.    You see that?

17   A.    Yes, I do.

18   Q.    And at 12:10, the same number for the Atlanta,

19   Georgia lawyer.

20          Right?

21   A.    Correct.

22   Q.    And at 12:10, the same number for the Atlanta,

23   Georgia lawyer.

24          Right?

25   A.    Correct.

Levin - Cross/Kedia

3696

1   Q.   And then, again, that same day at 1551, a call to the

2   Atlanta, Georgia lawyer.

3            Right?

4   A.   Yes.

5   Q.   And then just later that day, at 1554, three minutes

6   after the call to the Atlanta, Georgia, lawyer, a call

7   again to your direct line in New York.

8            Right?

9   A.   That is correct.

10  Q.   And then again that day, the call to the Atlanta,

11  Georgia lawyer.

12           Right?

13  A.   Yes.

14  Q.   At 1649.

15  A.   Yes.

16  Q.   And then at 11:56, there's a call to the Atlanta,

17  Georgia lawyer again.

18           Right?

19  A.   Yes.

20  Q.   Now, if I can just show you the records that are in

21  evidence, the records in evidence actually only continue

22  showing calls through June 18th of 1999.

23           Right?

24  A.   That is correct.

25  Q.   So they don't show what calls were made to you from

Levin - Cross/Kedia

3697

1    this phone in July or thereafter of 1999.

2            Right?

3    A.   That is correct.

4    Q.   And Mr. Persico, apart from calling you from this

5    cell phone, also called you from his home line.

6            Is that correct?

7    A.   That is correct.

8    Q.   And when I say his home line, that means the line in

9    Florida.

10           Right?

11   A.   Yes.

12           He was living in Florida at the time.

13   Q.   Are you aware, Mr. Levin, that the government

14   obtained cell site information in 1999 for a telephone --

15           MR. BURETTA:  Objection.

16   BY MS. KEDIA:

17   Q.   -- for this telephone during the time period placing

18   Mr. Persico in the vicinity of your office?

19           MR. BURETTA:  Objection.

20           THE COURT:  Sustained.

21           MR. BURETTA:  Move to strike.

22           THE COURT:  The jury's instructed to disregard

23   it.

24   BY MS. KEDIA:

25   Q.   Well, when is it that Mr. Persico's whereabouts on

Levin - Cross/Kedia

3698

1    May 26, 1999, first became a subject of discussion with

2    the government, in your recollection?

3              MR. BURETTA:  Objection.

4              THE COURT:  Sustained.

5    BY MS. KEDIA:

6    Q.   When did you first disclose to the government that

7    Mr. Persico was, in fact, in your office?

8              MR. BURETTA:  Objection.

9    BY MS. KEDIA:

10   Q.   -- on the afternoon of --

11             MR. BURETTA:  Move to strike.

12   BY MS. KEDIA:

13   Q.   -- May 26, 1999.

14             THE COURT:  Sustained.

15             MS. KEDIA:  Your Honor, may I approach?

16             THE COURT:  Sure.

17             Come on up.

18             (Continued on next page.)

19

20

21

22

23

24

25

**Levin - Cross/Kedia**

3699

1        (Sidebar.)

2        THE COURT:  Your objection is.

3        MR. BURETTA:  It's irrelevant, and it's a

4    hearsay statement.

5        THE COURT:  Okay.

6        MS. KEDIA:  When he first disclosed to the

7    government is absolutely relevant because this information

8    that he's given -- this is not information he's creating

9    now for the jury to testify to in 2007.

10        This is information the government has had for a

11    long period of time.  That diary entry is something that

12    he turned over some years ago.  He has testified in prior

13    proceedings that, in fact, his original diary entry after

14    giving this page to the government, he -- his normal files

15    went to storage, and then were destroyed from 2000 back.

16        All of these things are absolutely relevant.

17    The government is trying to destroy the credibility of

18    this person as if he's making up this meeting.  They talk

19    about his writing it in different pen.

20        Your Honor, there is no question that not only

21    did he disclose this --

22        THE COURT:  Enter into a stipulation.

23        When did he turn over the file diary?

24        MR. BURETTA:  2005, I think.

25        MS. KEDIA:  He turned over the diary when he was

Levin - Cross/Kedia

3700

1    called into the grand jury, your Honor.

2           MR. BURETTA:  That is not quite right, as you

3    know.

4           MS. MAYER:  He's also giving inconsistent

5    testimony as to whether or not the original was

6    maintained, and your Honor has that testimony from the

7    last trial where his testimony was inconsistent.

8           He was confronted with his prior statements.

9    I'll let Mr. Buretta speak to the rest.

10          THE COURT:  Why don't we get to the point here.

11          Where are you going?

12          MS. KEDIA:  That this individual -- the

13   government has had information for eight years that

14   Mr. Persico was in Mr. Levin's office on May 26, 1999.

15          They have cell site records, placing him in that

16   vicinity.

17          THE COURT:  So what?

18          MS. KEDIA:  And Mr. Levin specifically told the

19   government about that information.

20          So to now suggest that something else was

21   happening besides this meeting, because that is what the

22   government is implying by the different pens, what is the

23   point of the different pens, if it's not to suggest that

24   this meeting is concocted or fabricated, or that this

25   meeting didn't occur?

Levin - Cross/Kedia

3701

1        MR. BURETTA:  Judge, we started with questions

2    about cell site records.

3            He didn't turn cell site records over.

4            MS. KEDIA:  It was the opposite question.

5            MR. BURETTA:  In 2004.

6            MS. KEDIA:  It's the opposite question.

7            Whether he was aware because he asked --

8            THE COURT:  He was told that the government had

9    cell phone records placing the defendant at his office.

10           MR. BURETTA:  Right.

11           MS. KEDIA:  Mr. Levin specifically requested the

12   cell -- because Mr. Persico had a pen register of his

13   phone starting July of 1999, when the government first

14   made it public that they were investigating Mr. Persico in

15   connection with Mr. Cutolo's disappearance.

16           Sometime during the course of Mr. Levin's

17   representation he asked the government, specifically,

18   whether they had cell site records which could verify what

19   it was he was saying that Mr. Persico was in his office.

20   They actually said no, would not provide them.  They did

21   not provide them.

22           They didn't even provide them prior to the last

23   trial, Judge.  They provided them prior to this trial,

24   which Mr. Persico was, in fact, in this office.

25           THE COURT:  I think this is spinning out of

Levin - Cross/Kedia

1    control here.

2              MR. BURETTA:  If the questions are when did you

3    first tell the government that he was in your office, and

4    he wants to answer that, that's fine.

5              THE COURT:  Yes.

6              MR. BURETTA:  I thought we were off on cell

7    sites and what we knew.

8              THE COURT:  Okay.

9              MS. KEDIA:  I'll limit it to that, Judge.

10             THE COURT:  We understand what that question is,

11   right?

12             MS. KEDIA:  When he first disclosed to the

13   government Mr. Persico was with him in his office.

14             Right?

15             THE COURT:  Correct.

16             MS. KEDIA:  Okay.

17             (Sidebar concluded.)

18             (Continued on next page.)

19

20

21

22

23

24

25

 1           (In open court.)

 2   BY MS. KEDIA:

 3   Q.    Mr. Levin, when did you disclose to the government

 4   that Mr. Persico was in your office with you on the

 5   afternoon of May 26, 1999?

 6   A.    Formally?  Back in '01, 2001.

 7   Q.    And when you say formally, was there a time when you

 8   informally disclosed that to the government?

 9   A.    I remember discussions with the assistant who handled

10   the search warrant in 1999.

11   Q.    Meaning back in October of 1999?

12   A.    Um-hmm.

13   Q.    Discussions that --

14   A.    Well, it might have been after October.

15           But there were ongoing discussions.  Yes.

16   Q.    In which you disclosed that you, in fact, had been

17   with Mr. Persico on the afternoon of May 26, 1999?

18   A.    That is correct.

19   Q.    And then there came a point in time where the

20   government asked you for your diary reflecting your

21   meeting with Mr. Persico.

22           Right?

23   A.    I believe that wasn't until the end of '04.

24   Q.    That wasn't requested from you until the end of 2004?

25   A.    That's correct.

Levin - Cross/Kedia

3704

1    Q.    And at that point, at the end of 2004, what have you

2    done with your files from 1999?

3    A.    Well, what my office manager had done in 2000 was, we

4    have all our dead files, closed files off-site.

5          So we have a practice, every several years, of

6    purging old files, so we don't have to pay the storage

7    facility and we don't have to keep them.

8          So in 2000, before the government ever asked for

9    my diary, my original business files, other than tax

10   returns, and my client files that the originals went back

11   to the clients, were purged.

12   Q.    And, as far as you knew, the files were sent to

13   storage, and then you subsequently learned that those

14   files in storage had actually been destroyed.

15         Is that right?

16   A.    We asked -- in 2000, yes.

17         They were destroyed, correct.

18   Q.    Thank you.

19         MS. KEDIA:  I have nothing further.

20         THE COURT:  Any questions?

21         MR. LARUSSO:  No questions, your Honor.

22         MR. BURETTA:  Nothing further, your Honor.

23         THE COURT:  Thank you.

24         You are done.

25         THE WITNESS:  Thank you, Judge.

Joseph - Direct/Buretta

3705

1          THE COURT:  If you have another witness, call

2    your witness.

3          MR. BURETTA:  We call Ms. Joseph to the stand.

4          (Whereupon, there was a pause in the

5    proceedings.)

6

7          THE CLERK:  This way, please.

8          Please remain standing a moment to be sworn in,

9    please.

10          THE COURT:  Your right hand.

11    **KATHERINE JOSEPH**,

12          having been duly sworn, was examined

13          and testified as follows:

14          THE CLERK:  Thank you.

15          You can have a seat.  Pick up the microphone in

16    front of you.  Please state and spell your name for the

17    record.

18          THE WITNESS:  Katherine with a K,

19    A-T-H-E-R-I-N-E, last name Joseph, J-O-S-E-P-H.

20          THE COURT:  Thank you.

21          MR. BURETTA:  May I inquire, your Honor?

22          THE COURT:  Yes.

23    DIRECT EXAMINATION

24    BY MR. BURETTA:

25    Q.   Good afternoon, Ms. Joseph.  Sorry it's so late in

PAUL J. LOMBARDI, RMR, FCRR
Official Court Reporter

Joseph - Direct/Buretta

3706

1    the day.

2            Where do you currently work?

3    A.    Production Workers Pension Fund.

4    Q.    Is that related at all to the Local 400?

5    A.    In a way, yes.

6    Q.    When did you first begin working for the Production

7    Workers Pension Fund?

8    A.    In 1968.

9    Q.    And at that time, who was in charge of the fund?

10   A.    The pension fund?

11   Q.    Yes.

12   A.    Well, the pension fund actually is, if you want to

13   say run, is by board of trustees and an directive that

14   makes up the fund.

15   Q.    Why does the pension fund exist?

16   A.    To have -- give the union members when they retire,

17   they get that benefit.

18   Q.    And are those the union members of the Local 400?

19   A.    Yes.

20   Q.    Does the local, itself, Local 400, the union, does

21   that have positions like president, vice president?

22   A.    Yes.

23           The union is made up of a president, vice

24   president.  They have bylaws and rules that they have to

25   adhere to.

1    Q.   When you first started working for the pension fund,

2    who was the president of the union?

3    A.   When I first started there, there was the person's

4    name was Alan Roberts.

5    Q.   And who was the next president?

6    A.   Louis Camerato.

7    Q.   And approximately when did Louis Camerato start?

8    A.   I don't know.

9         He was there long before I got there.

10   Q.   At some point did someone named William Cutolo Senior

11   begin working at the union?

12   A.   Yes.

13   Q.   Approximately when did William Cutolo Senior start

14   working at the union?

15   A.   I would say sometime in the '80s, maybe 198 --

16   sometime in the '80s.

17            MR. BURETTA:  May I approach the witness, your

18   Honor?

19            THE COURT:  Yes.

20   BY MR. BURETTA:

21   Q.   I show you, Ms. Joseph, Government Exhibit 29.

22            Do you recognize that document?

23   A.   Yes.

24   Q.   Do you recognize that?

25   A.   Yes.

Joseph - Direct/Buretta

3708

1   Q.   What is that?

2   A.   That is the pension --

3            THE COURT:  Okay.

4            If you could just hold the mike up.

5   A.   That is the pension credit card for William Cutolo.

6   Q.   Does that relate to his pension fund account?

7   A.   Yes.

8            MR. BURETTA:  I offer 29.

9            MS. KEDIA:  May I just see it for a second.

10           (Whereupon, there was a pause in the

11   proceedings.)

12

13           MS. KEDIA:  No objection.

14           MR. LARUSSO:  No objection, your Honor.

15           THE COURT:  Received in evidence.

16           (Whereupon, Government Exhibit 29 was received

17   in evidence, as of this date.)

18   BY MR. BURETTA:

19   Q.   I'm putting Government Exhibit 29 up on the screen.

20           This is the pension fund credit card for

21   William Cutolo Senior.

22           Is that right?

23   A.   Yes.

24   Q.   Does that identify when he became affiliated with the

25   union?

Joseph - Direct/Buretta

3709

1   A.   Yes.

2   Q.   When was that?

3   A.   July 1, 1982.

4   Q.   And when was the last time you saw

5   William Cutolo Senior?

6   A.   May -- I think the 26th, of 1999.

7   Q.   And is that also noted here on Government Exhibit 29?

8   A.   Yes.

9   Q.   Missing since May 26, 1999?

10  A.   Yes.

11  Q.   Did you see him at all that day?

12  A.   Yes.

13  Q.   About what time did he get there?

14  A.   He came in, as I recall, sometime in -- had to be

15  around 11, I think.

16  Q.   Was that the normal time that he came in?

17  A.   No.

18       He -- the normal time he got into the office was

19  usually around 10, 10:30, and he would call before coming

20  in.

21  Q.   Why did he usually call before coming in?

22  A.   Because he always wanted a fresh pot of coffee made.

23  Q.   And did he call that morning for a fresh pot of

24  coffee?

25  A.   No, not to my knowledge.

Joseph - Direct/Buretta

3710

1              No.

2    Q.    What happened next when he got there?

3    A.    When he came in, I made a pot of coffee.

4              He didn't ask for it, but I made a pot of

5    coffee, which he didn't partake.

6    Q.    Was that unusual?

7    A.    It was unusual.

8              Yes.

9    Q.    What happened next?

10   A.    Then he left, you know, might have been a half an

11   hour.

12             I'm not sure about the timing.

13   Q.    Was that unusual?

14   A.    That was -- I thought he was going to church because

15   he usually would go to church when he came in to the

16   office.

17   Q.    What time did he usually go to church?

18   A.    He went to the 12 o'clock mass.

19   Q.    Would he usually come back?

20   A.    Yes.

21   Q.    Did he come back that day?

22   A.    No.

23   Q.    Do you know if he went to church that day?

24   A.    Well, I don't think he did because when he was

25   leaving.  I asked him if he was going to church, and he

Joseph - Direct/Buretta

3711

1    said no.

2         I said are you coming back?  And he said no.

3    Q.   Did he say anything else?

4    A.   No.

5         All he told me, he'll call me before I left the

6    office.

7    Q.   Did he call you?

8    A.   No.

9    Q.   Did you stay late?

10   A.   No.

11   Q.   Did you ever see him again?

12   A.   No.

13   Q.   What was his mood that day?

14   A.   He seemed sort of upset.

15        He wasn't his usual self.  He did not seem

16   happy.  There's something wrong.

17        He didn't appear to be the way he used to be,

18   usually was.

19   Q.   Did you ever hear from him again?

20   A.   No.

21   Q.   What happened the next day?

22   A.   The next day, when I came into the office, there was

23   a message to call his house, which I did.

24   Q.   Who did you speak to?

25   A.   His son.

Joseph - Direct/Buretta

3712

1    Q.    Is that William Cutolo Junior?

2    A.    Yes.

3    Q.    Describe to the jury what William Cutolo Junior's

4    mood was like, his demeanor that next day, May 27, 1999.

5    A.    On the phone he was upset.

6          He wanted to know what time his father left, and

7    I gave him an approximation of what I thought the time

8    was.

9          And I said to him then he probably went

10   somewhere because he was so upset.  But he was so sure

11   that something had happened to his father.

12         And I said to him, well, I have his cell phone

13   number.  I'll call the number.  He said, go ahead and

14   call.

15         I called, and there was no response.

16   Q.    Did William Cutolo Senior also have a pager at that

17   time?

18   A.    Yes, he did.

19   Q.    Did you beep or page him?

20   A.    I did call him on the pager.

21         That's what I called him on.  Everyone in the

22   office had it to get in touch with him.

23   Q.    Did he call you back?

24   A.    No.

25   Q.    That next day, May 27, 1999, did you speak to anyone

Joseph - Direct/Buretta

3713

1    else in the Cutolo family?

2    A.    On the 27th, I think I spoke to his wife.

3    Q.    What was she like on the phone?

4    A.    She was upset, of course.

5    Q.    After that day, May 27th, did you ever get any calls

6    from William Cutolo Senior?

7    A.    No.

8    Q.    A few days after that, did somebody new come to the

9    office?

10   A.    Yes.

11   Q.    Who?

12   A.    That was the following week because -- let's see, we

13   had Memorial Day weekend was that weekend, and Wednesday

14   of the following week after Memorial Day, the president,

15   John Gannone, brought up a gentleman to the office.

16   Q.    Who was that gentleman?

17   A.    Frank Persico.

18            MR. BURETTA:  May I approach the witness, your

19   Honor?

20            THE COURT:  Yes.

21   BY MR. BURETTA:

22   Q.    I show you Government Exhibits 2 II and 2 QQ.

23            Do you know who those people are?

24   A.    This looks like John Gannone, and --

25   Q.    That's Government Exhibit 2 QQ.

Joseph - Direct/Buretta

3714

1    A.    And this is Frank Persico.

2    Q.    Frank Persico, that's Government Exhibit 2 II.

3          MR. BURETTA:  I offer 2 II and 2 QQ.

4          MS. KEDIA:  No objection.

5          MR. LARUSSO:  No objection, your Honor.

6          THE COURT:  Received in evidence.

7          (Whereupon, Government Exhibits 2 II and 2 QQ

8    were received in evidence, as of this date.)

9    BY MR. BURETTA:

10   Q.    You said that John Gannone brought Frank Persico to

11   the union.

12         Who was John Gannone at the time?

13   A.    He was president of the union.

14   Q.    Could he read?

15   A.    No.

16   Q.    Was Frank Persico employed by the union the few days

17   after William Cutolo Senior disappeared?

18   A.    Excuse me?

19   Q.    Was he employed, Frank Persico, by the union at the

20   time he showed up?

21   A.    No.

22   Q.    What happened?

23   A.    On that day, when John Gannone brought up

24   Frank Persico, he went into William Cutolo's office.

25         They both went into the office.

Joseph - Direct/Buretta

3715

1    Q.    Who went into William Cutolo's office?

2    A.    Frank Persico and John Gannone went into Mr. Cutolo's

3    office.

4    Q.    What was your reaction?

5    A.    I had no reaction until John Gannone came out and

6    told me that he wanted to see me.

7    Q.    What happened?

8    A.    When I went into the office, Frank Persico said to

9    me --

10              MS. KEDIA:  Objection to what he said to her.

11              THE COURT:  Please approach.

12              Come on up.

13              (Continued on next page.)

14

15

16

17

18

19

20

21

22

23

24

25

Joseph - Direct/Buretta

3716

1          (Sidebar.)

2          MR. BURETTA:  These were coconspirator

3    statements.  I'm happy to write a letter tonight, if

4    necessary.

5          I think this was elicited at the last trial, but

6    we can file a letter, and, in that sense, Frank Persico

7    tries to ransack $50 million from the pension fund as soon

8    as William Cutolo disappears.

9          MS. KEDIA:  I would ask the government write

10   their letter because how are they coconspirator

11   statements?

12         There is absolutely no allegation that either of

13   these defendants was involved in ransacking the union in

14   any way, shape, or form, or had anything to do with the

15   union.

16         THE COURT:  Did I hear the witness correct, John

17   Gannone didn't read?

18         MR. BURETTA:  Yes, that's right.

19         MS. KEDIA:  That's right, Judge, John Gannone

20   didn't read.

21         MR. BURETTA:  It's about breaking time anyway.

22         We are happy to lay it out fully for your Honor.

23         THE COURT:  You are certain this was brought out

24   in the last trial?

25         MR. BURETTA:  I'll check, your Honor.

**Joseph - Direct/Buretta**

3717

1              THE COURT:  Do you remember anything like that,

2      Mr. LaRusso?

3              MR. LARUSSO:  I do, but I don't remember if

4      whether it was colloquy or testimony, your Honor.

5              MR. BURETTA:  We'll figure it out.

6              THE COURT:  I'll dismiss the jury and we have to

7      bring her back anyway.

8              MR. LARUSSO:  The one thing I probably do

9      remember is, I probably hollered loud last time if it came

10     out.

11             MR. BURETTA:  We'll check.

12             THE COURT:  Okay.

13             (Sidebar concluded.)

14             (Continued on next page.)

15

16

17

18

19

20

21

22

23

24

25

3718

1          (In open court.)

2          THE COURT:  Ladies and gentlemen, we are going

3    to conclude for the day.

4          Tomorrow we will be greeted by bagels, which I

5    will supply.  Have a nice evening, but remember the rules

6    here and they really do apply.

7          Do not let anyone speak to you, nor should you

8    speak about this case.  If anyone attempts to influence

9    you in any way, you immediately report that to me without

10   discussing it with the other jurors.  Of course, you would

11   give Mr. Baran a note pertaining that information.

12         Do not read, view, or listen to anything that

13   might be reported in the media concerning the facts of

14   this case, and, of course, do not read or attempt to

15   investigate the facts in this case in any way, shape, or

16   form.

17         Continue to keep an open mind.  We will resume

18   tomorrow at 9:30.  Have a nice evening.

19         (Jury leaves the courtroom.)

20

21         THE COURT:  Ms. Joseph, we'll see you tomorrow

22   morning.

23         You can step down.  Thank you.

24         (Witness is excused.)

25         THE COURT:  Be seated for a moment.

3719

1          MR. LARUSSO:  Your Honor, I think we were

2     supposed to report back to the court about my son's

3     operation on Wednesday, the 12th.

4          THE COURT:  Yes.

5          MR. LARUSSO:  I have been told, and my wife

6     reminded me, I had forgotten, on the operations, they

7     don't tell you until the day before because they schedule

8     surgeries on a daily basis.

9          I do know that it will probably take several

10    hours for the operation and recuperative period.  I'm not

11    sure I'll be available, Judge, of course, if the court

12    grants me my request, until very late.

13         It is the Hospital For Special Surgery in New

14    York City.

15         THE COURT:  I realize that.

16         Let's discuss scheduling for a moment.  We can

17    see what, if anything, can be done if you are going to

18    have off at least part of the day.

19         MR. LARUSSO:  I would appreciate it, your Honor.

20         THE COURT:  I would do the best I can, but you

21    understand that this case is coming very close to the

22    Christmas holidays, and I'm sure neither the defendants,

23    nor the government, want to jeopardize losing this jury.

24         And I'm not suggesting that anyone unnecessarily

25    has delayed anything here.  I just want to be realistic in

3720

1      terms of setting a schedule.

2              Now, the government should rest tomorrow, I

3      believe early in the day?

4              MR. BURETTA:  I wish, Judge.

5              I hope we finish tomorrow, Judge.  It is

6      conceivable it's going to spill into the early part of

7      Monday, and we are trying to cut it as much as we can.

8              THE COURT:  Have you made any overtures to the

9      defendants for stipulations?

10             MR. BURETTA:  We have done that, Judge.

11             We don't even get a, we are not interested.  We

12     get nothing.  So I believe we put it on the record

13     earlier.

14             THE COURT:  I'm going to evaluate that if you

15     don't have time to respond to what can be deemed

16     reasonable stipulations, I'll be less inclined to give you

17     expanded time when you claim this is the first notice you

18     have gotten of a witness's coming in.

19             Who do you have tomorrow, Mr. Buretta, and who

20     if any of those witnesses can be eliminated with a

21     stipulation?

22             MR. BURETTA:  Judge, we have Ms. Joseph,

23     obviously.

24             We have Laura Fahmy from pretrial services.

25             THE COURT:  And what is she testifying to?

3721

1              MR. BURETTA:  She testifies that she met with

2     Alphonse Persico sometime on May 26, 1999.

3              She doesn't recall when in the day it was.  It

4     must have been, I think, early in the day, but I don't

5     know that.  I would think we could stipulate to -- the

6     reason we are calling her is to elicit he was there at

7     some point that day for a brief period.

8              THE COURT:  This was in Brooklyn pretrial?

9              MR. BURETTA:  Yes, Judge.

10             And that there were certain other times later in

11    the year that Mr. Persico indicated he was in New York.

12    That's it.

13             So I don't know what the defense position is.

14             MS. KEDIA:  Your Honor, I probably need to look

15    at it again.

16             I would not object to offering her testimony

17    from the last trial in evidence.  She did testify the last

18    time.

19             THE COURT:  How long was her testimony in the

20    last trial?

21             MS. KEDIA:  It's not very long, Judge.

22             MR. BURETTA:  I'll look at it again, Judge.

23             THE COURT:  That eliminates one witness, which

24    is guaranteed 15 minutes.

25             MR. BURETTA:  I agree.

3722

1                    THE COURT:  To a half hour.

2                    MR. BURETTA:  I agree.

3                    THE COURT:  Do you have any position on it,

4       Mr. LaRusso?

5                    MR. LARUSSO:  I don't even anticipate crossing

6       her, Judge.

7                    THE COURT:  Okay.

8                    Hopefully that takes care of Laura.

9                    MS. KEDIA:  Again, Judge, I need to evaluate

10      whether there is anything else in the pretrial services

11      documents that I would want to elicit from her.

12                   Because she was actually called as a defense

13      witness in the last trial, your Honor, not a government

14      witness, and there may be additional facts that I want to

15      elicit from her beyond the testimony that she gave last

16      time.

17                   THE COURT:  Do you have the testimony,

18      Mr. Buretta?

19                   MR. BURETTA:  It is marked as 3500, I believe,

20      your Honor.  I have to double-check.

21                   I don't have it right here, Judge.  I'm sorry.

22                   THE COURT:  I thought perhaps you could give it

23      to Ms. Kedia.

24                   MR. BURETTA:  I'm happy to, Judge.

25                   THE COURT:  Right now, and let her take a look

1    at it.

2              MR. BURETTA:  Sure.

3              THE COURT:  And then you can make that

4    evaluation and let me know in the next half hour.

5              MS. KEDIA:  Certainly, Judge.

6              THE COURT:  Who's your next witness?

7              MR. BURETTA:  After that we have a cell site

8    employee from Verizon Wireless who would testify to the

9    cell site locations of Alphonse Persico's phone on May 25,

10   1999.

11             THE COURT:  And what is that going to be?

12             Connected with something on Route 106 or 107?

13   What's the purpose of that?

14             MR. BURETTA:  The purpose of it is that the

15   defendant at certain locations placed calls to

16   William Cutolo Senior.

17             It's not a peripheral matter at all.

18             THE COURT:  It's an essential matter?

19             MR. BURETTA:  Yes, Judge.

20             THE COURT:  Even though it's an essential

21   matter, is there any possibility of a stipulation?

22             MS. KEDIA:  Your Honor, with respect to this

23   information, the cell site records were turned over, as

24   your Honor knows, for the first time just shortly we began

25   this trial.  They were not turned over, even, to the

3724

1    defense prior to the last trial.

2            So my first request is that the government be

3    prohibited from introducing them into evidence as a Rule

4    16 violation, and a sanction for its Rule 16 violation.

5            The second matter is that the cell site records

6    that the government did provide prior to this trial,

7    actually have no corresponding documents which would show

8    that this cell site -- these set of numbers on this

9    document corresponds to some location.

10           Those are things that we don't know.  I think

11   that we have reviewed, and I don't think has been provided

12   by the government.

13           MR. BURETTA:  That's why the witness is

14   testifying.

15           MS. KEDIA:  The witness has to look at documents

16   to determine whether there are numbers that correspond to

17   a certain location, your Honor, and certainly those

18   documents have to be provided to the defense, and we have

19   to have the ability to analyze them ourselves.

20           THE COURT:  As to the first point, when did you

21   get these cell phone site records?

22           MR. BURETTA:  It was before the trial, Judge.

23           The exact date, I don't know, and this is

24   something that was already litigated in the beginning of

25   this trial.  Ms. Kedia filed a motion on that.

3725

1          It was already disposed of that.

2          THE COURT:  I want to make sure it's the same

3     set of facts.

4          MR. BURETTA:  Yes.

5          MS. KEDIA:  When the government first received

6     them in 1999, the only issue that was litigated already

7     was whether your Honor was going to dismiss the charges

8     based on double jeopardy grounds based on the Rule 16

9     violation.

10         Not what I'm suggesting here today, which is

11    that the government should be precluded from even

12    introducing that.

13         MR. BURETTA:  Actually -- sorry.

14         Point two, it was very brief at the time.

15         MS. KEDIA:  With respect to the corresponding

16    documents, those have not been provided, unless they were

17    provided in the material that we received at midnight last

18    night.

19         THE COURT:  Where are those documents?

20         MR. GOLDBERG:  Your Honor, just to be clear,

21    there's two sets of cell sites records.

22         There's the batch that show the cell site codes

23    for the calls that were made on May 25th, 1999.  Those

24    records -- as Mr. Buretta indicated, they were produced

25    prior to the trial.

3726

1           There's another set of records which I have

2     referred to as an index which show cell site numbers and

3     corresponding locations in the New York area.  Those were

4     provided, I believe -- and they relate to 2001, it's a

5     2001 listing.

6           But a lot of those cell sites were the same in

7     1999.  Those were provided, I believe, yesterday.  But --

8           THE COURT:  So you have a directory which

9     basically says cell site No. 24 is in East Norwich,

10    cell --

11          MR. GOLDBERG:  That's exactly right, Judge.

12          THE COURT:  Then you have the cell records that

13    correspond to those particular cell sites?

14          MR. GOLDBERG:  There are records that show calls

15    and the cell site locations.

16          THE COURT:  Right.

17          MR. GOLDBERG:  And there is a separate document

18    which is a listing, a database of what location

19    corresponds to that cell site number.

20          THE COURT:  Correct.

21          MR. GOLDBERG:  What should be clear here is that

22    the witness, and I'll put this on the record because it

23    was originally going to be Ranaida Lewis.  It's now a

24    woman Leslie Labrioela, she will testify that as to what

25    the codes were in 1999.

 1          Whether she's referring to documents, I'll

 2   figure that out.  But she is extremely competent, legally

 3   competent to testify about what those codes were in 1999,

 4   and this is, I think, something that is very ripe for a

 5   stipulation because that's all she's going to be doing,

 6   authenticating the documents and saying what the codes

 7   correspond to.

 8          MS. KEDIA:  We don't even know what we would be

 9   stipulating to because I have never seen any codes to

10   correspond to anything, and I think that Mr. Goldberg just

11   said that he hasn't turned over anything that shows what

12   the codes are for the period 1999.

13          What he just said is that what was provided

14   yesterday were codes for the period 2001.

15          THE COURT:  Right.

16          MS. KEDIA:  And this woman is supposed to be

17   doing this by memory?

18          Is that what Mr. Goldberg is suggesting what

19   various codes are, she's going to get up on the witness

20   stand and testify what they were in May of 1999?

21          MR. GOLDBERG:  We haven't disclosed any

22   documents because we don't have any documents referring to

23   1999.

24          If she comes with documents, obviously we'll

25   turn them over and I'm happy to draft a stipulation which

3728

1    would proffer her testimony.

2         THE COURT:  I think you are a little bit ahead

3    here.  Let's get this witness in.

4         She's scheduled to come after we have Laura

5    Fahmy?  If we don't have her, she would be the first

6    witness to testify?

7         MR. BURETTA:  Yes.

8         THE COURT:  Leslie.

9         MR. GOLDBERG:  Labrioela.

10        THE COURT:  When is she due in?

11        MR. GOLDBERG:  I'm going to be calling her when

12   we are done with court here today.

13        THE COURT:  You will get her here about 8

14   o'clock.

15        MR. GOLDBERG:  If she can make it.

16        THE COURT:  And 9 o'clock you can turn over to

17   Ms. Kedia any records she provides you.

18        MR. GOLDBERG:  Absolutely.

19        THE COURT:  Hopefully we will have Ms. Fahmy

20   from pretrial services.

21        Who's the next witness?

22        MR. BURETTA:  David Busse, B-U-S-S-E.

23        He testified in the previous trial he works for

24   Verizon, not Verizon wireless, but Verizon.  The defense

25   should have his testimony as well.

1          This is simple foundation stuff, as I recall.

2    He's not long.  I say we may go over to Monday, Judge.  I

3    don't want to say it tomorrow at the end of the day and it

4    not be that and have been bound by that.  We may finish

5    tomorrow, I don't know.

6          The next witness after him is Frank Cultrera,

7    who is a surveillance agent.  He puts in several

8    surveillances.  I have to assume the defense will want to

9    cross-examine him.

10          We have John Sullivan, who has limited

11    testimony.  He recovers a piece of paper from the Persico

12    search in October 8, 1999.  I have to assume the defense

13    also wants to cross-examine him.

14          Am I wrong?

15          MS. KEDIA:  No.

16          MR. BURETTA:  Okay.

17          THE COURT:  And that's it?

18          MR. BURETTA:  James -- only two more, Judge.

19          James DeStefano, who will testify about a

20    variety of sort of clean-up matters, and Betty Ann Fox.

21          I just want to check, Judge, but I think that's

22    it.

23          (Whereupon, there was a pause in the

24    proceedings.)

25          MR. LARUSSO:  I believe there was one other

3730

1    witness, Thomas Krall.

2          MR. BURETTA:  I'm sorry.  You are right.  Thank

3    you.

4          He just authenticates two tape recordings.

5          THE COURT:  The tape recordings are from what

6    day?

7          MR. BURETTA:  I'll let Ms. Mayer address that,

8    your Honor.

9          MS. MAYER:  One is from June 4, 1999 and the

10   other is from October 5, 1999.

11         Both were admitted in the last trial, and the

12   defense is aware of its content and has copy of the

13   transcripts, as does the court have the transcripts.

14         THE COURT:  Was there any objection to these

15   recordings at the last trial?

16         MS. MAYER:  There was an objection to part of it

17   because originally we intended to play a longer excerpt of

18   the June 4th one, there was an objection.

19         Judge Johnson limited the excerpt and cut it

20   down.  So we are --

21         THE COURT:  These are the June 4th recordings.

22   Who is on that recording?

23         MS. MAYER:  Frank Campanella, Sammy Aparo and

24   Michael D'Urso, a cooperator.

25         THE COURT:  Okay.

 1           MS. MAYER:  And on the October 5th one, it's

 2   Jackie DeRoss, Frank Campanella, Michael D'Urso, Sammy

 3   Aparo.

 4           MR. LARUSSO:  Your Honor, my recollection is, as

 5   just stated, that there was a discussion about how much of

 6   these conversations would actually be played before the

 7   jury.

 8           Judge Johnson precluded certain portions of it.

 9   I just got the transcript this morning, but I understand

10   it was given to us before today.

11           MS. MAYER:  No.

12           Because we are not putting it in through Michael

13   D'Urso.  In the last trial we put it in through Michael

14   D'Urso.  Now we are having the agent put them in.

15           So it's the same content.  I believe he might

16   have caught a typo or two, but he had to initial them

17   himself, anyway.  Because we can't put in any transcripts

18   that he personally has not reviewed.

19           We are not going beyond -- we are obviously

20   sticking by Judge Johnson's ruling and we are putting in

21   the exact same excerpts that were put in the last trial.

22           MR. LARUSSO:  I don't doubt the representation.

23   I would like an opportunity to take a look at what went on

24   in the last trial, and make sure this is as represented.

25   I don't have any question that it's probably adequate.  I

3732

1    still have to look at it tonight, your Honor.

2         There was a major issue, and the reason why

3    Judge Johnson precluded a portion of it was that he felt

4    it wasn't within the coconspirator exceptions.  There was

5    more talk between people outside of the charges here.  I'm

6    really truncating the issue.

7         But there may not be one after I had an

8    opportunity to look at this.

9         MS. MAYER:  Judge, it was only as to the June

10   4th tape.

11        We are sticking by Judge Johnson's ruling as to

12   that.  These defendants by name are mentioned by Frank

13   Campanella.  There has been extensive testimony he's an

14   associate in the Colombo family.

15        These defendants are mentioned by name on the

16   tape, and we are sticking by Judge Johnson's ruling on

17   this issue.

18        MR. LARUSSO:  Judge, I should also state this

19   relates to, I believe, a number of businesses that were

20   owned by some individuals.

21        One was, I believe, Jan Susman, and

22   Mr. De DiBenedetto, one family that Mr. D'Urso was

23   associated with claimed one business, and Mr. Cutolo, for

24   the Colombo family, was claiming the other business.

25        What these relate to are the continued

3733

1    relationships between the two families, and how to resolve
2    the dispute that had arisen between the two companies.
3            I don't even feel that this, at this point,
4    should be made part of the record.  It's cumulative.  I
5    don't think it has anything to do with either the
6    disappearance of Mr. Cutolo, or the shooting of
7    Mr. Campanella.
8            But, again, Judge, let me take a look at these
9    transcripts, with your permission, and I'll give you an
10   answer regarding it tomorrow morning.
11           MR. BURETTA:  There's one final witness who is
12   also very short, and her name is Christy Russell.
13           You may recall Mr. Floridia testified about the
14   time period he was in New Hampshire, which was hotly
15   contested during his cross.
16           She was with the one that went with him to
17   New Hampshire and will talk about the full time period he
18   was there.
19           That should take about five minutes on direct.
20           MS. KEDIA:  Is there any 3500 material in
21   connection with that witness?
22           MR. BURETTA:  There is none.
23           MS. KEDIA:  With respect to the witness from
24   Verizon that the government stated its intention to call,
25   your Honor, I am not going to be in a position to be

1    prepared, if the court even permitted her to testify, and

2    I don't know what her testimony would be, to cross her

3    because I now am going -- if the court permits this to

4    happen, I will now have to take the cell site information

5    that the government gave me at midnight last night, and

6    have a cell site person who is competent to examine it,

7    examine it, and let me know what they say.

8              I'm certainly not competent to do so.

9              MR. BURETTA:  Judge, she's had over a month,

10   with all due respect, to inquire about the cell sites, if

11   she wanted to.

12             MS. KEDIA:  Yes.

13             And you know what?  When I got those records, I

14   did inquire from the phone company, and they said they

15   don't have any records that they could produce that would

16   allow me to know what was happening back in 1999.  They

17   don't know what the codes are anymore for 1999.  So I did

18   what I could do.

19             Now the government has turned over a new

20   document at midnight last night, which I don't even

21   understand, that it relates to a time period in 1999, but,

22   to the extent that this is what the government is relying

23   upon, it relates to a time period in 1999, I certainly

24   need to have it analyzed.  I need to have a cell site

25   person explain what these particular sites mean, and I

1    will not be prepared to cross-examine this witness until

2    that happens.

3              And I don't know, exactly, when that will be.

4    I'll have to obviously leave court today and try to find a

5    person with the ability to do that.

6              THE COURT:  Before you do that, check on the

7    testimony of Ms. Fahmy, and see if it's something that you

8    can stipulate to.

9              I also want a schedule in terms of what the

10   defendant's case is.  I want witnesses and some time

11   frame.  Because it's my intention that you will have your

12   summations starting the week of December 17th, at the

13   latest.

14             MS. KEDIA:  Well, Judge, we would like that to

15   happen as well.  I have no idea whether it will happen or

16   not.

17             We intend, as I believe that the court received

18   a list of witnesses that we submitted yesterday to the

19   government and copied to the court, and the government has

20   informed me that Ryan Cop is in Iraq and is not able to

21   testify.  I would ask that Eugene Shannon, another FBI

22   agent, be produced in his stead.

23             In addition, in light of some new surveillances

24   that we received, I would ask that, I believe his first

25   name is William, Hutton be produced.  He is part of the

3736

1    surveillance team and made observations on the dates that

2    have been testified about here in court.

3              Beyond that, I also intend to recall Peter

4    Tytell to ask him the questions that I was not able to ask

5    him during the government's case today.

6              THE COURT:  Can you make arrangements to get a

7    hold of Mr. Tytell?

8              MS. KEDIA:  I will.

9              THE COURT:  Set him up, and you can make him

10   your first witness on Monday.

11             In terms of any other witnesses, I don't have

12   your list before me.  How many witnesses are you planning

13   on calling?

14             MS. KEDIA:  I believe that our list included

15   Vito Salerno, Kimberly McCaffrey, Nora Conley, Lindley

16   Delvecchio, Stephanie Dudzinski.

17             Some of these are very short, and some of them

18   are longer witnesses.  I expect Vito Salerno will be a

19   little while.  Eugene Shannon I just requested in lieu of

20   Ryan Cop.  Michael Volpicella, although I believe that is

21   a witness about whom we can work out a stipulation, Gary

22   Pontecorvo, who I also assume will be a fairly long

23   witness, and, of course, William Cutolo Junior and Joseph

24   Massino, your Honor.

25             THE COURT:  Have you heard anything on

1    Mr. Cutolo Junior?

2            MS. MAYER:  Judge, that was one of the matters I

3    actually wanted to raise.

4            I have spoken with people in Washington, D.C.

5    My understanding is that both Mr. Massino and

6    Mr. Cutolo Junior will be produced here on Monday.  It is

7    going to be a little bit closer call with Mr. Massino

8    because the request was made later.  But they will notify

9    me if there is a problem.

10           We also did discuss that the defendant, because

11   he has retained counsel, has to bear the cost of the

12   transportation for both of these witnesses, not just

13   Mr. Massino, and so I asked Washington, give me an

14   estimate so I that I could put it on record with the

15   court.

16           They estimate that for both witnesses together,

17   obviously they are not traveling together, but for both

18   witnesses combined the total expense, and it's a very

19   rough estimate, would be somewhere between $50 and

20   $70,000, the bulk of that coming from the transportation

21   of Mr. Massino.  But I did want to notify the defendant

22   and the court so that it's on record.

23           Obviously, if they can give me a more -- when

24   they have more specific details on the finances, they will

25   let us know, and we'll provide it to the court.  But they

3738

1    will both be here.

2              I have also spoken with the attorney who has

3    been appointed and he indicated he will need time to meet

4    with his client on Monday morning so that the defense

5    should have other witnesses ready to go.

6              THE COURT:  This is the attorney that's been

7    appointed for Mr. Cutolo Junior.

8              MS. MAYER:  That's correct, Judge, that the

9    court appointed.

10             I did facilitate his contact information going

11   to Washington, so that they can facilitate contact with

12   Mr. Cutolo Junior, and his court-appointed attorney.

13             THE COURT:  In terms of Mr. Massino, does the

14   marshal service request an up-front payment to cover

15   expenses initially?

16             MS. MAYER:  No.

17             That's not my understanding.

18             THE COURT:  All right.

19             MS. MAYER:  They want to make it clear because

20   they don't want to be told afterwards that's too expensive

21   because they have to actually go to that expense in order

22   to transport him.

23             THE COURT:  Mr. Massino is serving a jail

24   sentence?

25             MR. BURETTA:  He's in the witness security

3739

1    program, Judge.

2              THE COURT:  All right.

3              MS. KEDIA:  Your Honor, in light of the absurd

4    amount of money it costs to transport Mr. Massino, I would

5    request that we be permitted to question him through video

6    conferencing.

7              MR. BURETTA:  I think we'd consider that, but I

8    think there is case law that says you are not supposed to

9    do that.

10             THE COURT:  Give me the case law.

11             This is the first time I have ever heard of it.

12             MR. BURETTA:  Yes.

13             THE COURT:  I'd be happy to look into it.

14             MS. KEDIA:  With respect to

15   William Cutolo Junior, may we know who the witness's

16   counsel is?

17             THE COURT:  Yes.

18             Who is the attorney?

19             THE CLERK:  Michael Gold, the prior attorney.

20             THE COURT:  I figured that would save us a

21   little bit of time.

22             MR. LARUSSO:  Judge, just for the record, I sent

23   an e-mail, I believe, the other day indicating the

24   witnesses that Mr. DeRoss would be calling.

25             The only other witnesses that we are

3740

1    anticipating would have to wait until after we hear the

2    testimony of Agent DeStefano.  We may not call them based

3    upon his testimony.

4              And, if they are, they are relatively short.

5    They are not long witnesses, Judge, maybe 15, 20 minutes.

6              THE COURT:  Mr. DeStefano's going to be

7    testifying tomorrow, hopefully?

8              MR. BURETTA:  Yes, Judge.

9              THE COURT:  Okay.

10             MR. BURETTA:  I'm sorry, Judge.

11             We had received a short list of witnesses from

12   Mr. LaRusso yesterday.  I don't know if -- he's talking

13   about people other than those people?

14             MR. LARUSSO:  Yes.

15             There will be two other witnesses, if possible,

16   but I don't even know if they are going to be called at

17   all.

18             MR. BURETTA:  We would like to know the

19   potential list, so we can prepare.

20             MR. LARUSSO:  Judge, one may not be available,

21   and I may have to go to a substitute, and one other

22   witness we are trying to contact we understand is not

23   there.

24             It may not even come to pass.  Tomorrow, if I

25   have some further information, I'll provide that to the

1    government, so they'll have plenty of time.

2         THE COURT:  Just turn over the testimony of the

3    pretrial services officer, and I'll wait to hear whether

4    or not you are going to be stipulating to it.

5         MR. LARUSSO:  Thank you.

6         I can get the pretrial services officer, Daisy

7    Tuscano, but I believe she will not be the witness --

8         MS. KEDIA:  That's not what we are talking

9    about.

10        MR. LARUSSO:  The other.

11        I'm sorry.

12        MS. MAYER:  Judge, I'm sorry.  I had one other

13   matter.

14        THE COURT:  Yes.

15        MS. MAYER:  As to Government Exhibit 67 A and

16   68 A, as you recall, those were the recordings that were

17   admitted through our second witness, Barbara Jean Cutolo

18   Cardinale.

19        At the time Defendant Persico had asked for a

20   limiting instruction because there had been no testimony

21   yet as to the Colombo family, his participation in it.  So

22   the court gave a limiting instruction.

23        There's been evidence, obviously in the record,

24   as to Mr. Persico's involvement and participation into the

25   enterprise and conspiracy and, therefore, we would ask for

3742

1    a proper instruction to the jurors that they may now

2    consider both of those exhibits against both defendants,

3    if they find that a conspiracy existed.

4              THE COURT:  Okay.

5              MR. LARUSSO:  Your Honor, one last matter.  I

6    should have brought it up before.

7              The government said that they are going to call

8    John Sullivan, and I believe Mr. Buretta said --

9              MR. BURETTA:  No.

10             MR. LARUSSO:  He's going to be --

11             MR. BURETTA:  I'm sorry.

12             Yes.

13             MR. LARUSSO:  In looking at his material last

14    night, he's involved in a number of surveillances.

15             I assume, from the comment Mr. Buretta made,

16    that he's not intending on direct to bring out any of

17    that.

18             MR. BURETTA:  Correct.

19             Short and sweet.

20             THE COURT:  Short and sweet, maybe you can

21    stipulate to him.

22             MS. MAYER:  I'm sorry.

23             I think Mr. LaRusso jumped in.  There is one

24    other exhibit, Government Exhibit 92, which, Mr. LaRusso,

25    that was the listing of the phone numbers that had been

3743

1    pulled out.

2         THE COURT:  Right.

3         MS. MAYER:  Mr. LaRusso had initially objected.

4    The court allowed it in subject to connection and

5    Mr. LaRusso's objection was that we don't even know where

6    these phone numbers came from.

7         Mr. LaRusso, himself, through his

8    cross-examination of Giovanni Floridia, actually

9    extensively used Government Exhibit 92 to establish that,

10   in fact, those numbers came from that witness's cell

11   phone.

12        As you recall, he used in he said that number

13   there, that No. 1, it says home, that's you.  And then he

14   used Rob No. 24, and went through all of that as a basis

15   to then admit the phone records that he wanted admitted as

16   to this individual Rob.

17        So, given that record that Mr. LaRusso has now

18   made, we ask that it's not subject to connection anymore.

19   The connection's been made.

20        MR. LARUSSO:  The only problem there, Judge, is

21   he identified the numbers.

22        He didn't identify that this particular printout

23   came from his phone.  We have had witnesses say I remember

24   a number and here's the number.

25        So to say that because he identifies a number as

PAUL J. LOMBARDI, RMR, FCRR
Official Court Reporter

3744

1    attributable to an individual, that doesn't provide any

2    kind of connection between the phone that was received and

3    the record the government's seeking to introduce.

4              MS. MAYER:  Except the first one which says

5    home.

6              So that the Rob numbers I agree with, but the

7    one where it says home, that's the connection, Judge.

8              MR. LARUSSO:  He's got a system.

9              MS. MAYER:  There's going to be more testimony

10   about this.

11             I think if the court looks at the record, there

12   is ample testimony not subject to connection, but there

13   will be more phone records that are introduced as well.

14             But Mr. Floridia did, in fact, identify that he

15   entered the chick telephone number in his electronic

16   memory, and there was that chick phone number, which we

17   will be having the underlying records of, as well as all

18   of the identification of the phone records, through

19   Mr. LaRusso's requesting.

20             MR. LARUSSO:  Judge, there was one other matter.

21             I don't know if Mr. Buretta had an opportunity

22   to address it.  I asked him to see if he had the grand

23   jury testimony for a man we have been calling Jimmy Island

24   Wide.

25             MR. BURETTA:  I have found that.

3745

1        I will give that to you.

2        MR. LARUSSO:  That solves that problem.

3        THE COURT:  I'll wait to hear whether you can

4    enter into that stipulation.

5        Give Ms. Kedia the testimony.

6        MR. BURETTA:  We are retrieving it now.

7        Thank you.

8        (Whereupon, the trial was adjourned until

9    Thursday, December 6th, at 9:30 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2

3    Witnesses                                              Page

4

5

6    CROSS-EXAMINATION

7    BY MR. LARUSSO                                         3631

8

9    BARRY LEVIN                                            3645

10   DIRECT EXAMINATION

11   BY MR. BURETTA                                         3646

12

13   CROSS-EXAMINATION

14   BY MS. KEDIA                                           3667

15

16   **KATHERINE JOSEPH**                                      3705

17   DIRECT EXAMINATION

18   BY MR. BURETTA                                         3705

19

20                    E X H I B I T S

21                                                          Page

22

23

24   Government's Exhibit 37 in evidence                    3623

25   Government's Exhibit 69 in evidence                    3645

```
1   Government's Exhibit 82 in evidence              3645

2   Government Exhibit 29 was received in evidence   3708

3   Government Exhibits 2 II and 2 QQ were received in   3714

4   evidence

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**$**

**$200** [1] - 3597:14
**$300** [1] - 3597:15
**$50** [2] - 3716:7;
3737:19
**$70,000** [1] - 3737:20

**'**

**'01** [1] - 3703:6
**'04** [1] - 3703:23
**'80s** [2] - 3707:15
**'93** [4] - 3568:13, 19,
21; 3667:22
**'94** [1] - 3667:20
**'96** [3] - 3471:22;
3568:14, 22
**'97** [2] - 3541:18
**'98** [2] - 3541:18
**'99** [7] - 3418:8;
3438:22; 3440:24;
3475:17; 3476:9, 16;
3684:9
**'01** [1] - 3562:23

**0**

**046** [1] - 3544:5

**1**

**1** [9] - 3419:19;
3456:17; 3497:19;
3499:25; 3579:22;
3599:9; 3709:3; 3743:13
**10** [9] - 3456:9;
3457:17; 3459:15;
3483:8; 3658:4, 18;
3690:12, 17; 3709:19
**10/5/99** [1] - 3533:2
**10/8/99** [3] - 3465:15;
3533:2; 3613:19
**100** [3] - 3414:23;
3510:18; 3579:22
**10010** [1] - 3414:18
**106** [1] - 3723:12
**107** [1] - 3723:12
**10:20** [1] - 3692:7
**10:30** [7] - 3550:1, 5,
9, 16, 19; 3551:3;
3709:19
**10:56** [1] - 3687:25
**11** [3] - 3554:10;
3691:23; 3709:15
**110** [1] - 3573:10
**11201** [1] - 3414:15

**11501** [1] - 3414:21
**11722** [1] - 3414:23
**1180** [1] - 3414:23
**11:14** [1] - 3688:8
**11:17** [1] - 3695:4
**11:30** [2] - 3550:3;
3551:13
**11:31** [1] - 3695:12
**11:38** [2] - 3691:24
**11:39** [1] - 3692:4
**11:56** [1] - 3696:16
**11th** [1] - 3672:16
**12** [25] - 3446:15;
3470:6; 3471:16;
3472:8; 3473:16;
3475:19; 3476:3;
3477:1, 17; 3479:2;
3481:13; 3486:24;
3487:23; 3488:18;
3489:13; 3490:3;
3491:6; 3494:9;
3499:11; 3503:24;
3551:24; 3638:13;
3692:14; 3710:18
**12/4/01** [2] - 3533:5,
14
**120** [1] - 3573:10
**123** [9] - 3460:9, 21;
3461:4, 25; 3463:6
**12668** [1] - 3456:9
**12669** [1] - 3456:9
**129** [1] - 3459:18
**12:00** [3] - 3505:19;
3551:23; 3552:5
**12:07** [1] - 3693:5
**12:10** [2] - 3695:18, 22
**12:16** [1] - 3690:19
**12:51** [1] - 3549:19
**12th** [8] - 3446:16;
3474:19, 23; 3475:17;
3480:21; 3481:18;
3490:11; 3719:3
**13** [3] - 3481:5, 10;
3492:6
**14** [2] - 3568:17;
3652:22
**140** [1] - 3596:6
**1400** [2] - 3452:24;
3462:2
**1435** [10] - 3457:6;
3458:9, 12, 19;
3507:21, 23; 3508:2, 7;
3511:8, 12

**1454** [1] - 3694:23
**15** [6] - 3628:13;
3629:4; 3630:3; 3689:7;
3721:24; 3740:5
**1546** [1] - 3687:11
**1551** [1] - 3696:1
**1554** [1] - 3696:5
**16** [12] - 3417:3, 6;
3418:23-25; 3419:1;
3438:18; 3547:19;
3669:14; 3724:4; 3725:8
**1609** [1] - 3690:1
**1633** [1] - 3687:3
**1635** [1] - 3687:3
**1649** [1] - 3696:14
**168** [2] - 3552:1, 8
**17,000** [2] - 3422:7;
3423:16
**172** [9] - 3580:17;
3581:12, 16; 3583:23;
3585:12, 17; 3587:9,
21; 3591:22
**175** [7] - 3582:5, 12,
21; 3583:12; 3585:5;
3586:1; 3589:23;
3591:13, 19
**1754** [2] - 3692:22
**1755** [2] - 3694:16
**17th** [1] - 3735:12
**18** [3] - 3619:6;
3625:13; 3669:7
**188** [11] - 3447:9, 21;
3448:2, 6; 3449:3, 5,
8, 17; 3450:8, 25;
3452:12
**18th** [1] - 3696:22
**1939** [1] - 3692:23
**1968** [1] - 3706:8
**198** [1] - 3707:15
**1982** [2] - 3617:1;
3709:3
**1990** [1] - 3612:4
**1990s** [1] - 3670:3
**1993** [3] - 3569:4;
3646:23; 3667:19
**1994** [5] - 3646:23;
3667:25; 3668:2;
3672:22
**1996** [2] - 3568:17;
3569:3
**1998** [1] - 3668:21
**1999** [166] - 3417:14;
3418:7; 3419:19, 24;

3421:14; 3423:7;
3424:24; 3426:5;
3428:22; 3439:10, 21;
3440:2, 8; 3441:2;
3446:17; 3452:11, 20;
3454:5; 3457:5;
3460:16; 3463:15, 18;
3466:12; 3469:11;
3470:6; 3471:16;
3472:4, 8; 3473:16;
3475:19; 3476:4;
3477:1, 17; 3479:2;
3481:14; 3486:24;
3487:23; 3488:18;
3489:13; 3490:3;
3491:6; 3494:9;
3496:13; 3499:11, 21;
3500:6; 3501:8, 12, 20;
3502:6, 18; 3503:7, 24;
3504:2; 3505:15;
3507:6, 17; 3511:8;
3512:5; 3514:12;
3515:1, 3; 3517:11,
23-24; 3521:3; 3524:19;
3526:9; 3529:4; 3530:1,
16; 3531:24; 3533:20;
3534:5; 3541:17, 21;
3547:19; 3553:15, 17;
3554:10; 3555:5, 9;
3612:5; 3613:11;
3643:5; 3654:4, 14, 23;
3655:21, 25; 3656:18;
3657:9, 20; 3658:8;
3659:11, 23, 25;
3660:10; 3661:1, 5;
3664:9; 3668:3, 6,
13-14, 18, 23; 3669:1;
3670:13; 3671:3, 22;
3676:19; 3677:11;
3679:21; 3685:23;
3686:6, 19; 3687:2;
3689:3, 11; 3690:24;
3691:3, 23; 3692:14;
3693:10, 15, 17;
3694:12, 16; 3696:22;
3697:1, 14; 3698:1, 13;
3700:14; 3701:13;
3703:5, 10-11, 17;
3704:2; 3709:6, 9;
3712:4, 25; 3721:2;
3723:10; 3725:6, 23;
3726:7, 25; 3727:3, 12,
20, 23; 3729:12;
3730:9; 3734:16, 21, 23
**1:26** [1] - 3581:2
**1:30** [2] - 3552:25;

3581:9

## 2

**2** [15] - 3423:25; 3463:23; 3483:7; 3524:12; 3593:23; 3713:22, 25; 3714:2, 7; 3747:3
**2,000** [1] - 3468:25
**2-A** [1] - 3647:15
**2-CC** [1] - 3642:8
**20** [3] - 3417:9; 3590:4; 3740:5
**2000** [32] - 3563:25; 3573:20; 3580:12; 3581:8; 3585:13; 3595:18; 3611:24; 3612:5; 3617:7, 20; 3618:3; 3619:6; 3625:20; 3633:10; 3635:12; 3636:4; 3640:13; 3641:12; 3666:1, 5, 7, 21; 3669:17; 3673:2, 7; 3684:4, 22; 3699:15; 3704:3, 8, 16
**2000-2001** [2] - 3596:12; 3597:14
**2001** [11] - 3417:19; 3573:11; 3611:25; 3619:7; 3633:10; 3669:14; 3703:6; 3726:4; 3727:14
**2002** [2] - 3617:1, 3
**2004** [9] - 3611:25; 3654:16, 18; 3656:8; 3677:8; 3685:10; 3701:5; 3703:24; 3704:1
**2005** [1] - 3699:24
**2007** [3] - 3414:7; 3625:18; 3699:9
**2017** [1] - 3689:15
**20th** [2] - 3687:10, 21
**21st** [4] - 3446:21; 3448:11; 3494:11; 3687:25
**22** [2] - 3580:12; 3585:13
**22nd** [2] - 3414:17; 3581:6
**23** [3] - 3451:25; 3689:3, 11
**24** [9] - 3587:8; 3588:25; 3589:19;

3652:22; 3656:24; 3693:10, 15; 3726:9; 3743:14
**24/7** [3] - 3633:20
**242** [5] - 3463:25; 3514:23; 3524:18; 3529:4; 3668:8
**24th** [3] - 3555:8; 3661:13; 3693:4
**25** [9] - 3519:22; 3591:3, 21; 3594:1; 3643:5; 3671:2; 3686:4; 3693:17; 3723:9
**25,000** [1] - 3593:21
**250** [1] - 3560:24
**2500** [1] - 3593:20
**25th** [18] - 3517:11, 23; 3553:12, 15; 3555:4, 6, 9; 3641:12; 3644:16; 3655:11; 3657:20; 3658:8; 3660:10; 3662:21; 3670:13; 3693:2; 3694:12; 3725:23
**26** [37] - 3496:13; 3499:21; 3500:6; 3501:8, 12, 20; 3502:6, 18; 3503:7; 3504:2; 3505:12; 3507:6; 3517:24; 3553:11, 17; 3580:23; 3587:8, 21; 3589:1, 17-18; 3654:22; 3659:4, 11, 25; 3661:1, 5; 3663:25; 3664:8; 3685:23; 3698:1, 13; 3700:14; 3703:5, 17; 3709:9; 3721:2
**26th** [8] - 3417:19; 3421:15, 17; 3428:22; 3476:16; 3644:17; 3689:25; 3709:6
**27** [15] - 3452:20; 3457:5; 3460:16; 3466:19; 3468:12; 3505:15; 3507:17; 3508:8; 3511:8; 3512:4; 3514:12; 3531:8; 3656:24; 3712:4, 25
**27,000** [3] - 3468:8, 11
**27th** [6] - 3452:11; 3454:5; 3469:15; 3476:9; 3713:2, 5
**28** [2] - 3499:11; 3656:24
**29** [6] - 3707:21;

3708:8, 16, 19; 3709:7; 3747:2
**2:17** [2] - 3693:17; 3694:11
**2:20** [1] - 3459:16
**2:51** [1] - 3581:3

## 3

**3** [3] - 3581:9; 3656:24; 3694:16
**30** [2] - 3673:15; 3675:16
**30,000** [1] - 3593:21
**300** [1] - 3414:20
**302** [3] - 3527:6, 11, 14
**30th** [1] - 3417:19
**32** [1] - 3444:16
**33** [2] - 3432:22
**341** [1] - 3414:20
**35** [1] - 3443:17
**350** [3] - 3531:14, 24; 3532:5
**3500** [13] - 3454:13, 16; 3456:9; 3459:15; 3470:11; 3481:5; 3497:18; 3499:25; 3625:2, 24; 3722:19; 3733:20
**3500-AF-1** [1] - 3632:1
**3500-BL-3** [2] - 3652:20; 3656:24
**3500-GV-1** [1] - 3501:15
**3623** [1] - 3746:24
**3631** [1] - 3746:7
**3645** [3] - 3746:9, 25; 3747:1
**3646** [1] - 3746:11
**3667** [1] - 3746:14
**37** [7] - 3619:13; 3620:4, 22; 3622:25; 3623:1, 11; 3746:24
**3705** [2] - 3746:16, 18
**3708** [1] - 3747:2
**3714** [1] - 3747:3
**38** [2] - 3492:17, 19
**3:30** [10] - 3553:16; 3554:19; 3643:7; 3644:17; 3661:22; 3662:8, 17; 3663:5, 11; 3664:3
**3:47** [1] - 3687:21

**3rd** [2] - 3639:5; 3694:20
**3RXB** [1] - 3490:16

## 4

**4** [5] - 3687:20; 3690:17, 24; 3691:3; 3730:9
**4/14** [1] - 3686:19
**4/14/99** [1] - 3687:1
**4/16** [1] - 3687:2
**4/28** [1] - 3690:7
**400** [5] - 3457:12; 3458:9; 3706:4, 18, 20
**404** [2] - 3690:22; 3691:2
**404-501-0125** [2] - 3687:14; 3690:9
**41st** [1] - 3512:10
**433-3052** [2] - 3540:11, 23
**440** [1] - 3549:16
**4500** [2] - 3690:3, 5
**4502** [1] - 3690:5
**45H** [1] - 3489:8
**4:09** [1] - 3690:1
**4:33** [1] - 3687:7
**4:35** [1] - 3687:7
**4:50** [3] - 3483:1; 3497:23; 3507:10
**4:54** [2] - 3485:18; 3488:19
**4SH** [2] - 3488:20, 23
**4th** [7] - 3633:10; 3690:8, 12, 19; 3730:18, 21; 3732:10

## 5

**5** [4] - 3414:7; 3633:10; 3692:19; 3730:10
**50** [3] - 3510:19; 3599:11; 3673:16
**50,000** [1] - 3469:14
**51** [1] - 3599:10
**515** [1] - 3551:7
**516** [1] - 3658:11
**516-222-4502** [1] - 3688:21
**516-420-1070** [1] - 3693:18
**518-398-1303** [1] - 3444:7

**52** [1] - 3428:8
**53** [8] - 3427:13; 3431:1; 3432:22; 3434:10; 3435:9; 3437:4; 3442:5; 3443:6
**56** [51] - 3465:2, 16; 3466:1, 11; 3468:1, 11, 21; 3546:22; 3573:17, 23; 3574:22; 3575:4, 7, 11-12, 15, 22, 24-25; 3578:3, 20; 3579:13, 17; 3580:8; 3581:20; 3583:16, 18, 20, 24-25; 3584:11; 3585:8, 15; 3586:3, 17; 3587:12; 3589:7; 3590:1, 21; 3591:1, 17; 3593:22; 3604:9; 3610:22; 3613:7
**58** [4] - 3465:2, 16; 3466:1; 3469:18
**584** [1] - 3490:16
**59** [5] - 3465:2, 16; 3466:1; 3469:6, 13
**5:08** [1] - 3689:3
**5:17** [1] - 3692:15
**5:30** [1] - 3664:14
**5:55** [1] - 3694:16
**5th** [7] - 3419:15; 3421:14; 3514:24; 3524:18; 3529:4; 3668:8; 3731:1

---

### 6

**6** [1] - 3635:12
**6-14** [3] - 3546:24; 3547:2, 4
**6/27/99** [1] - 3469:5
**60** [7] - 3465:3, 16; 3466:2; 3468:4, 18, 24; 3469:3
**61** [2] - 3603:25; 3604:4
**613-6734** [1] - 3658:6
**631** [2] - 3414:23
**65** [1] - 3543:13
**67** [1] - 3741:15
**68** [1] - 3741:16
**69** [6] - 3645:1, 7, 9; 3658:3; 3686:15; 3746:25
**6th** [1] - 3745:9

---

### 7

**7** [4] - 3421:1;

3470:12; 3636:4, 21
**702** [1] - 3571:3
**712-6106** [1] - 3414:23
**712-6122** [1] - 3414:23
**72E** [3] - 3495:2, 15, 21
**7:02** [1] - 3491:6
**7:16** [1] - 3690:24
**7:28** [1] - 3452:2
**7:35** [5] - 3452:7; 3483:2; 3491:22; 3492:14; 3493:21
**7:39** [2] - 3692:19, 24
**7B** [1] - 3414:17
**7th** [2] - 3637:7; 3694:22

---

### 8

**8** [18] - 3419:24; 3466:12; 3515:1, 3; 3521:3; 3524:19; 3526:9; 3529:4; 3530:1, 16; 3531:23; 3533:20; 3668:2, 6, 13; 3669:1; 3728:13; 3729:12
**8-and-a-half-by-11** [1] - 3585:18
**82** [4] - 3645:12, 17; 3659:22; 3747:1
**86th** [1] - 3448:16
**888** [1] - 3529:5
**888-943-1762** [2] - 3442:5, 21
**889-4859** [1] - 3658:11
**8:00** [1] - 3507:10
**8:05** [2] - 3501:18
**8:17** [1] - 3689:14
**8:19** [1] - 3640:3
**8:22** [1] - 3640:4
**8:23** [1] - 3640:13
**8:30** [1] - 3665:5
**8th** [2] - 3463:18; 3695:3

---

### 9

**9** [4] - 3456:18; 3640:13; 3652:22; 3728:16
**9/11** [1] - 3596:10
**914-476-9000** [1] - 3444:6
**914-584-9432** [1] - 3444:6

**917** [5] - 3540:11, 23; 3544:18, 23; 3658:5
**917-629-0874** [1] - 3444:17
**92** [2] - 3742:24; 3743:9
**941-0918** [2] - 3544:18, 23
**997-0967** [1] - 3529:5
**9:00** [1] - 3640:6
**9:05** [1] - 3635:25
**9:15** [1] - 3641:12
**9:16** [1] - 3690:23
**9:20** [1] - 3414:7
**9:21** [1] - 3640:23
**9:22** [2] - 3657:23; 3658:8
**9:29** [1] - 3641:4
**9:30** [3] - 3416:6; 3718:18; 3745:9
**9:46** [1] - 3512:5
**9:55** [6] - 3548:15; 3549:9, 14, 20; 3550:10; 3551:18
**9th** [1] - 3639:21

---

### A

**a.m** [8] - 3414:7; 3421:1; 3549:14, 20; 3550:3; 3551:18; 3661:13; 3745:9
**A31-0UR** [3] - 3549:15; 3550:1; 3551:16
**abbreviate** [1] - 3588:6
**abbreviated** [17] - 3586:11, 17; 3588:3, 12; 3589:3; 3590:8, 23-24; 3591:4, 24; 3592:11; 3594:8, 10; 3614:9, 12, 14
**abbreviating** [1] - 3590:12
**abbreviation** [3] - 3576:4; 3586:8; 3588:8
**abductors** [1] - 3505:9
**ability** [6] - 3564:18; 3612:15; 3634:10; 3653:12; 3724:19; 3735:5
**able** [37] - 3426:3, 10-11; 3428:14; 3429:17; 3430:3;

**3433:14, 18, 23;** 3435:21; 3442:19; 3444:11; 3445:1; 3478:2; 3487:4; 3489:21; 3502:17; 3543:4; 3545:4, 8; 3546:6; 3566:9; 3611:18; 3614:4; 3615:12; 3619:2; 3634:20; 3635:6, 10; 3637:11; 3638:25; 3639:25; 3682:24; 3735:20; 3736:4
**above-mentioned** [6] - 3452:16; 3461:15; 3463:12; 3466:6; 3575:18; 3583:3
**Absolutely** [6] - 3519:9; 3560:3; 3632:10; 3656:21; 3657:10; 3728:18
**absolutely** [11] - 3416:21; 3561:19; 3649:16; 3650:1; 3657:18; 3661:11; 3678:14; 3699:7, 16; 3716:12
**absurd** [1] - 3739:3
**AC** [1] - 3582:21
**accept** [1] - 3603:2
**access** [3] - 3426:10; 3442:20; 3625:25
**According** [6] - 3483:10; 3490:12, 16; 3491:21; 3524:20; 3551:19
**according** [1] - 3542:8
**account** [1] - 3708:6
**accurate** [7] - 3422:1; 3613:12; 3619:25; 3623:7; 3652:17; 3660:8
**accurately** [2] - 3447:18; 3460:18
**accused** [1] - 3682:15
**acting** [1] - 3650:21
**Activation** [1] - 3543:13
**active** [1] - 3640:9
**activities** [1] - 3633:17
**actual** [6] - 3434:9; 3484:13; 3503:1; 3540:17; 3553:23; 3578:2

**AD** [1] - 3461:4
**add** [4] - 3416:15; 3424:20; 3432:13; 3438:10
**added** [5] - 3428:24; 3439:9; 3440:23; 3441:11; 3596:19
**adding** [1] - 3439:8
**addition** [4] - 3417:21; 3435:1; 3578:2; 3735:23
**additional** [17] - 3417:3, 6; 3418:16, 18; 3419:8; 3421:7, 10; 3482:7; 3538:11; 3596:13; 3623:22; 3630:13; 3642:21; 3678:4, 6; 3722:14
**address** [14] - 3427:5; 3434:16, 23; 3459:21; 3463:25; 3513:8; 3514:23; 3551:8; 3579:21; 3586:15; 3603:12; 3638:4; 3730:7; 3744:22
**adequate** [1] - 3731:25
**adhere** [1] - 3706:25
**adjourned** [1] - 3745:8
**administrative** [1] - 3538:8
**admissible** [1] - 3558:20
**admission** [1] - 3628:9
**admit** [4] - 3559:2; 3606:3, 5; 3743:15
**admitted** [8] - 3420:16; 3605:23; 3606:5; 3645:3; 3730:11; 3741:17; 3743:15
**admitting** [1] - 3606:1
**ado** [1] - 3441:14
**Advanced** [1] - 3572:6
**advise** [1] - 3569:22
**advised** [1] - 3421:2
**affiliated** [1] - 3708:24
**afield** [1] - 3600:25
**afternoon** [41] - 3488:19; 3546:20; 3553:17; 3554:11; 3571:10; 3581:6; 3594:20; 3616:17; 3628:13; 3630:2;

3631:18; 3643:25; 3644:1; 3646:15; 3659:11; 3660:16; 3661:1, 7; 3663:24; 3664:8; 3667:16; 3687:7, 21; 3689:5; 3690:1, 19, 24; 3692:16; 3693:18; 3694:12, 18; 3698:10; 3703:5, 17; 3705:25
**AFTERNOON** [1] - 3568:1
**afterwards** [2] - 3622:19; 3738:20
**agencies** [2] - 3572:24; 3573:3
**agent** [27] - 3470:17; 3471:24; 3473:1, 4; 3486:21; 3487:21; 3488:17; 3517:9, 13, 15; 3518:6, 11, 23; 3519:1; 3521:21; 3522:22; 3523:1, 4; 3530:7; 3532:3; 3533:19; 3538:8; 3546:9; 3729:7; 3731:14; 3735:22
**Agent** [111] - 3417:24; 3418:5; 3419:13; 3420:9, 25; 3423:4; 3424:24; 3426:5; 3430:12, 21; 3440:1; 3445:18; 3452:20; 3457:5; 3461:24; 3466:10; 3468:1; 3470:3, 15-16, 18-19; 3471:8, 23; 3473:1, 4, 11; 3476:2; 3477:17; 3478:11; 3480:11; 3481:1, 11; 3482:3, 17; 3483:6, 20, 24; 3484:4, 8, 20; 3485:6, 13; 3486:12; 3487:2, 11; 3489:6; 3491:4, 15; 3492:6, 13, 20, 22; 3494:2; 3496:6; 3497:25; 3498:4; 3499:7, 9, 22; 3501:6; 3504:14; 3507:3, 13; 3509:6, 9, 19; 3510:2; 3514:23; 3516:23; 3518:13, 16; 3521:3; 3523:3, 7, 17; 3524:10, 16; 3526:15; 3527:3, 18; 3529:3, 22; 3530:18; 3532:11; 3535:10, 13; 3536:24;

3537:3; 3538:21; 3539:14; 3541:11; 3542:2; 3546:13; 3563:25; 3740:2
**agents** [27] - 3419:18; 3470:17; 3471:7; 3478:17, 23; 3482:6; 3483:23; 3486:13; 3488:7; 3492:15, 17, 19; 3493:2; 3501:2, 7; 3503:3; 3516:25; 3517:4; 3523:11; 3548:16, 24; 3549:2; 3550:8; 3552:11; 3634:9; 3668:6
**ago** [17] - 3417:9, 20; 3440:10; 3475:8, 13; 3528:4; 3537:7, 9; 3612:21; 3625:9, 16; 3626:3; 3638:6; 3657:25; 3667:11; 3685:19; 3699:12
**agree** [8] - 3423:9, 11; 3520:4; 3628:8; 3662:19; 3721:25; 3722:2; 3744:6
**agreeing** [1] - 3566:16
**agrees** [1] - 3560:2
**ahead** [6] - 3450:6; 3537:24; 3646:19; 3662:25; 3712:13; 3728:2
**aid** [1] - 3581:22
**A1** [4] - 3431:3; 3442:5, 20; 3561:3
**Alan** [1] - 3707:4
**alibi** [1] - 3554:24
**alignment** [1] - 3576:3
**allegation** [1] - 3716:12
**allege** [1] - 3677:18
**alleged** [2] - 3516:6; 3519:21
**alleging** [2] - 3649:25; 3677:20
**Alli** [2] - 3650:12; 3672:21
**Allie** [1] - 3560:24
**allow** [11] - 3415:7; 3423:17; 3539:20; 3607:13; 3643:2; 3650:15; 3657:2; 3681:11; 3682:25; 3734:16

**allowed** [6] - 3519:20; 3562:2; 3569:19; 3604:20; 3680:18; 3743:4
**allows** [1] - 3442:15
**almost** [8] - 3420:5, 9; 3563:25; 3588:16; 3589:3; 3591:25; 3594:8; 3640:5
**alone** [1] - 3664:4
**alphabetical** [5] - 3432:6, 24; 3433:4, 8
**Alphonse** [20] - 3464:10, 16; 3466:12; 3646:22; 3647:25; 3652:11, 15; 3653:7; 3654:4, 22; 3655:13, 22; 3656:15, 18; 3657:20; 3663:24; 3664:12; 3669:24; 3721:2; 3723:9
**ALPHONSE** [1] - 3414:6
**alter** [1] - 3584:7
**altered** [3] - 3428:17; 3429:8, 19
**Alverson** [1] - 3670:7
**AMERICA** [1] - 3414:3
**amount** [2] - 3566:1; 3739:4
**ample** [1] - 3744:12
**analyses** [1] - 3563:12
**analysis** [16] - 3430:8; 3541:9; 3561:5; 3562:22; 3563:10; 3564:12; 3565:25; 3566:9; 3568:5; 3581:20, 23; 3583:13; 3584:7; 3603:15; 3604:5
**Analytical** [1] - 3572:6
**analyze** [20] - 3435:5, 16; 3445:8; 3535:10; 3562:24; 3565:3; 3566:7; 3570:9; 3578:4; 3595:13, 18, 25; 3598:8, 10; 3600:2, 4, 7, 15; 3611:1; 3724:19
**analyzed** [2] - 3615:5; 3734:24
**analyzing** [3] - 3578:3; 3580:8; 3596:4
**Ann** [3] - 3432:25; 3443:20; 3729:20
**another's** [1] - 3574:8

**Answer** [1] - 3480:8
**answer** [19] - 3539:20;
3548:18; 3553:25;
3554:3; 3559:5;
3631:24; 3634:22;
3653:14; 3655:2, 8;
3656:1, 11; 3659:9;
3663:14; 3664:5, 17;
3702:4; 3733:10
**ANSWER** [4] - 3654:24;
3655:6; 3657:7, 10
**answered** [6] -
3482:20; 3485:9;
3493:23; 3510:15;
3539:11; 3656:5
**answers** [2] - 3555:17;
3627:19
**Anthony** [2] - 3616:2,
12
**ANTHONY** [1] - 3616:6
**anticipate** [1] -
3722:5
**anticipating** [1] -
3740:1
**anyway** [3] - 3716:21;
3717:7; 3731:17
**Aparo** [2] - 3730:23;
3731:3
**Apart** [3] - 3434:9;
3510:1, 5
**apart** [4] - 3535:7;
3615:16; 3697:4
**apartment** [22] -
3463:21; 3464:3;
3468:3; 3505:16;
3517:14; 3519:2, 5;
3523:21; 3524:18;
3525:17, 20, 23;
3526:22; 3527:2;
3529:4, 10, 15;
3558:22; 3560:16;
3561:2; 3668:7; 3669:2
**Apartment** [1] -
3463:23
**appear** [11] - 3431:19;
3468:12, 19; 3534:8;
3544:2; 3556:11;
3564:4; 3578:19;
3589:14; 3592:5;
3711:17
**appearance** [2] -
3619:4, 20
**APPEARANCES** [1] -
3414:11

**appeared** [1] - 3431:22
**appearing** [1] -
3661:18
**Appleton** [1] - 3572:9
**application** [2] -
3416:25; 3418:20
**applied** [1] - 3615:3
**apply** [1] - 3718:6
**appointed** [4] -
3738:3, 7, 9, 12
**appointment** [1] -
3643:6
**appreciate** [1] -
3719:19
**approach** [29] -
3436:20; 3437:7;
3447:5; 3451:19;
3453:1; 3459:12;
3460:5; 3464:23;
3504:16; 3515:10;
3527:24; 3547:21;
3573:13; 3574:18;
3580:13; 3582:1;
3598:16; 3602:18;
3619:9; 3624:7; 3642:1;
3648:8; 3652:23;
3660:18; 3674:10;
3698:15; 3707:17;
3713:18; 3715:11
**appropriate** [4] -
3423:5; 3425:2; 3518:8;
3676:8
**approval** [1] - 3634:20
**approximation** [3] -
3510:19; 3596:15;
3712:7
**April** [13] - 3499:11;
3635:12; 3636:4, 21;
3637:7; 3638:13;
3671:21; 3687:10, 20,
24; 3689:3, 11, 25
**arc** [1] - 3593:12
**archived** [1] - 3421:4
**area** [6] - 3451:13;
3502:23; 3522:19;
3657:6; 3671:17; 3726:3
**areas** [1] - 3644:21
**argue** [6] - 3555:25;
3556:18; 3558:24;
3559:24; 3566:8, 22
**arguing** [1] - 3662:15
**argument** [10] -
3517:22; 3518:2;
3556:19, 25; 3561:22;

3564:20, 22, 25;
3677:18
**arguments** [3] -
3415:9; 3556:3; 3682:3
**argyle** [1] - 3464:14
**arisen** [1] - 3733:2
**arising** [1] - 3644:18
**arm** [1] - 3637:19
**arraignment** [1] -
3677:11
**arrangements** [3] -
3415:10; 3424:6; 3736:6
**arrival** [1] - 3511:12
**arrive** [2] - 3554:11
**arrived** [1] - 3554:12
**articles** [1] - 3571:25
**Aside** [1] - 3547:6
**assess** [2] - 3564:7;
3574:5
**assessing** [2] -
3575:21; 3579:13
**assigned** [5] - 3471:4;
3472:20; 3473:5;
3490:24; 3632:13
**assignment** [4] -
3472:1; 3675:20, 25
**assist** [1] - 3630:22
**assistant** [1] - 3703:9
**associate** [3] -
3488:5; 3693:20;
3732:14
**associated** [6] -
3426:16; 3536:15, 18;
3544:9, 24; 3732:23
**associating** [1] -
3644:11
**assume** [8] - 3505:8;
3602:8; 3620:25;
3639:22; 3729:8, 12;
3736:22; 3742:15
**assuming** [2] -
3562:18; 3602:5
**ATHERINE** [1] - 3705:19
**Atlanta** [13] - 3687:15;
3688:11, 15; 3690:8,
23; 3691:3; 3695:13,
18, 22; 3696:2, 6, 10,
16
**attached** [4] -
3439:20; 3617:13;
3625:17, 21
**attempt** [1] - 3718:14
**attempts** [1] - 3718:8

**attending** [1] -
3572:14
**attention** [15] -
3442:4; 3446:16;
3452:10; 3463:15;
3524:12; 3544:10;
3546:24; 3548:15;
3617:7; 3652:19;
3656:23; 3658:4, 8;
3665:25; 3692:1
**attorney** [22] -
3554:14; 3557:5;
3558:3; 3570:1;
3646:20, 24; 3649:10,
17; 3650:25; 3670:6;
3671:16; 3681:11;
3682:8, 12-13; 3687:17;
3738:2, 6, 12; 3739:18
**ATTORNEY** [1] - 3414:12
**attorney-client** [3] -
3570:1; 3682:8, 12
**attorney/client** [3] -
3557:7; 3643:12;
3644:22
**attorneys** [3] -
3556:18; 3572:22;
3650:7
**attributable** [1] -
3744:1
**attribute** [1] - 3461:9
**Audio** [2] - 3625:15;
3630:20
**August** [4] - 3417:19;
3469:11; 3667:25;
3668:2
**AUSA** [3] - 3414:13
**auspices** [1] - 3572:5
**authenticates** [1] -
3730:4
**authenticating** [1] -
3727:6
**authentication** [1] -
3626:15
**authenticity** [2] -
3627:16; 3628:16
**author** [3] - 3503:4, 6;
3547:16
**authorized** [1] -
3537:21
**authorship** [1] -
3584:3
**available** [9] -
3509:12, 14; 3545:13,
15; 3583:20; 3584:5;

3625:14; 3719:11; 3740:20

**Avenue** [13] - 3446:21; 3448:11; 3463:21; 3494:11; 3514:24; 3524:18; 3529:4; 3549:17; 3550:27; 3551:5; 3665:10; 3668:8

**avenue** [1] - 3448:23

**aware** [19] - 3420:21; 3479:25; 3480:1, 12; 3483:11, 14, 16; 3488:5; 3489:7; 3494:2; 3499:10; 3540:6; 3556:20; 3566:3; 3644:8; 3684:4; 3697:13; 3701:7; 3730:12

## B

**B-O-G-L-E** [1] - 3446:4
**B-U-S-S-E** [1] - 3728:22
**BA** [1] - 3524:10
**baby** [1] - 3694:3
**background** [3] - 3516:3; 3676:20, 24
**backwards** [1] - 3594:6
**bad** [1] - 3597:6
**bagels** [2] - 3553:5; 3718:4
**balloon** [1] - 3591:9
**balloon-like** [1] - 3591:9
**bar** [4] - 3573:3; 3593:3; 3594:23; 3597:21
**Baran** [1] - 3718:11
**Barbara** [2] - 3562:9; 3741:17
**BARRY** [2] - 3646:1; 3746:9
**Barry** [5] - 3415:7; 3416:1, 9; 3645:21; 3646:9
**base** [1] - 3498:17
**baseball** [1] - 3637:1
**based** [7] - 3417:1; 3578:25; 3579:6; 3680:8; 3725:8; 3740:2
**Based** [1] - 3417:3
**basis** [9] - 3421:21; 3595:23; 3650:20, 23; 3651:2; 3653:16;

3671:23; 3719:8; 3743:14

**batch** [1] - 3725:22
**Bates** [3] - 3422:4; 3423:19; 3456:8
**Bay** [7] - 3617:21; 3618:18; 3619:23; 3635:16; 3638:7
**BB** [2] - 3529:20, 22
**BE** [2] - 3612:25; 3613:1
**bear** [1] - 3737:11
**bearing** [3] - 3495:21; 3540:23; 3583:20
**beautiful** [1] - 3597:10
**became** [2] - 3698:1; 3708:24
**become** [1] - 3607:20
**becomes** [3] - 3588:8; 3608:4; 3650:10
**beep** [1] - 3712:19
**BEFORE** [1] - 3414:9
**began** [10] - 3457:19, 25; 3568:13, 17; 3580:22; 3581:2; 3667:19, 21; 3723:24
**begin** [5] - 3479:3; 3589:22; 3669:3; 3706:6; 3707:11
**beginning** [7] - 3419:21; 3432:6; 3564:9; 3591:7; 3617:7; 3687:1; 3724:24
**begins** [1] - 3589:4
**behalf** [2] - 3573:5
**behind** [4] - 3450:21; 3451:3; 3637:18; 3638:18
**belief** [1] - 3498:17
**belies** [1] - 3650:14
**believes** [1] - 3422:5
**belonged** [1] - 3493:9
**below** [3] - 3531:12; 3589:1; 3660:6
**beneath** [1] - 3592:18
**beneficial** [1] - 3488:16
**benefit** [1] - 3706:17
**Benji** [1] - 3503:20
**Benz** [1] - 3490:13
**Berry** [4] - 3554:14, 18; 3671:13, 16

**beside** [1] - 3532:5
**best** [4] - 3583:19; 3630:15; 3679:16; 3719:20
**better** [1] - 3646:18
**Betty** [3] - 3432:25; 3443:20; 3729:20
**between** [27] - 3426:23; 3427:17; 3428:9, 22; 3496:8; 3507:10, 12; 3541:2, 20; 3553:23; 3555:12; 3576:7, 17, 21; 3577:8; 3581:11; 3586:22; 3587:4; 3617:1; 3619:5; 3633:12; 3661:5; 3732:5; 3733:1; 3737:19; 3744:2
**beyond** [6] - 3568:6; 3599:18; 3682:2, 5; 3722:15; 3731:19
**Beyond** [1] - 3736:3
**BF** [1] - 3448:2
**big** [4] - 3589:5; 3612:21; 3641:17, 19
**bigger** [3] - 3589:12, 15; 3637:3
**Bill** [3] - 3472:15; 3521:15; 3562:19
**bill** [5] - 3595:23; 3596:22, 25; 3597:13, 25
**billed** [1] - 3596:6
**Billy** [4] - 3449:11, 24; 3680:9
**binder** [1] - 3456:16
**bit** [5] - 3521:21; 3592:15; 3728:2; 3737:7; 3739:21
**bite** [1] - 3664:23
**black** [2] - 3464:14; 3490:12
**Black** [1] - 3641:20
**blip** [2] - 3588:18, 20
**block** [7] - 3427:2; 3448:25; 3452:24; 3462:2, 6, 19; 3576:11
**bloom** [1] - 3597:7
**blue** [1] - 3666:13
**blurred** [4] - 3449:22; 3583:19; 3584:9, 18
**blurry** [1] - 3451:8
**Blvd** [2] - 3549:18

**board** [2] - 3460:9; 3706:13
**boat** [4] - 3554:16; 3656:18; 3657:5, 19
**boating** [1] - 3656:15
**Bob** [1] - 3443:24
**Bocce** [5] - 3491:19; 3493:7; 3494:3; 3502:15
**body** [4] - 3591:10; 3592:17; 3610:5; 3626:8
**bogging** [1] - 3603:19
**BOGLE** [1] - 3445:23
**Bogle** [42] - 3415:17; 3416:9; 3445:19; 3446:4; 3461:24; 3466:10; 3470:3; 3476:2; 3477:17; 3481:11; 3482:17; 3489:6; 3492:6, 13; 3494:2; 3496:6; 3499:9; 3501:6; 3509:19; 3514:23; 3516:7, 23; 3521:3; 3523:17; 3524:10, 16; 3526:15; 3527:3, 18; 3529:3, 22; 3530:18; 3532:11; 3535:10, 13; 3536:24; 3537:3; 3538:21; 3539:14; 3541:11; 3542:2; 3546:13
**Bonanno** [2] - 3661:14, 17
**book** [2] - 3632:25; 3661:11
**bore** [2] - 3494:25; 3529:4
**borough** [1] - 3618:19
**borrow** [1] - 3584:13
**Borum** [8] - 3470:16, 18; 3471:6; 3481:1; 3482:3; 3483:20; 3484:8; 3492:22
**bother** [1] - 3623:21
**bottom** [20] - 3467:5, 24; 3468:23; 3532:13; 3533:13; 3544:3; 3584:19; 3587:16-19; 3591:13; 3593:10, 12, 23; 3604:6; 3613:9, 17-18; 3614:2
**Botts** [1] - 3636:16
**Boulevard** [7] - 3549:18; 3550:20; 3551:6, 10

boulevard [1] - 3550:2

bound [2] - 3653:15; 3729:4

bowl [2] - 3590:15; 3592:11

box [3] - 3430:19; 3525:7; 3526:6

Boy [1] - 3650:12

Brady [1] - 3419:25

break [5] - 3455:16; 3456:3; 3537:16; 3628:13; 3630:3

breaking [1] - 3716:21

breaks [1] - 3581:11

bridge [3] - 3550:2, 24; 3551:16

brief [4] - 3632:17, 24; 3721:7; 3725:14

briefcase [2] - 3462:12; 3513:14

briefly [1] - 3571:17

bring [13] - 3423:22; 3424:10; 3439:19; 3456:21; 3461:19; 3604:16; 3606:18; 3607:9; 3645:7; 3653:16; 3682:25; 3717:7; 3742:16

Bring [2] - 3630:15; 3643:16

Broadway [11] - 3452:24; 3457:6; 3458:12, 19; 3462:2; 3507:21, 23; 3508:2, 7; 3511:8, 12

Brooklyn [5] - 3414:15; 3446:22; 3463:22; 3669:3; 3721:8

brother [1] - 3648:1

brought [10] - 3423:25; 3439:10; 3487:20; 3675:15; 3685:10; 3713:15; 3714:10, 23; 3716:23; 3742:6

Bruce [1] - 3416:8

BRUCE [1] - 3425:20

Bruno's [11] - 3446:24; 3448:19; 3472:9, 13; 3497:5; 3502:2, 7, 11, 18; 3503:9, 18

building [1] - 3641:2

bulk [1] - 3737:20

burden [5] - 3560:11; 3561:11, 17, 19

bureau [1] - 3508:18

BURETTA [354] - 3414:13; 3415:18, 20, 22, 24; 3416:1, 3, 6, 11; 3420:5, 25; 3421:12, 16, 19; 3422:12; 3423:24; 3425:2, 7, 11; 3430:22; 3435:13; 3436:16, 18, 20, 23; 3437:4; 3438:5, 10, 21, 24; 3439:3, 6, 9, 14, 17, 24; 3440:6, 14, 17, 20; 3441:16, 18; 3442:3, 25; 3445:14, 18; 3446:6, 9; 3447:5, 8, 13, 21; 3448:5; 3451:19, 22; 3452:12, 15, 19; 3454:8, 11, 14, 16, 19, 24; 3455:5, 9, 12, 17; 3456:7, 14; 3457:3; 3458:3; 3459:12, 14; 3460:5, 8, 14, 21; 3461:6, 12, 17, 23; 3463:3, 6, 9, 14; 3464:15, 18-19, 23; 3465:1, 6, 16; 3466:3, 9; 3468:16; 3469:25; 3473:7, 13; 3475:10, 22; 3476:5; 3478:18, 24; 3479:19; 3480:6, 15; 3482:14, 20; 3485:9; 3488:10; 3492:10; 3493:22; 3494:5; 3495:17; 3496:1, 9; 3499:12, 17; 3501:3, 9; 3502:3; 3503:10; 3504:9, 16; 3505:2, 7; 3510:9, 14, 20; 3511:1; 3514:9; 3515:9; 3516:2, 14; 3518:6; 3519:11, 23, 25; 3520:4; 3526:18; 3527:15, 21; 3528:2, 9, 20; 3530:9; 3531:20; 3535:20; 3538:18; 3539:11, 18; 3541:13, 23; 3552:14, 21; 3555:14; 3556:15; 3557:9, 14, 19, 24; 3558:8, 21; 3559:23; 3560:4; 3561:6; 3562:14, 22; 3564:6, 20; 3565:19; 3566:14; 3568:4, 9, 25; 3569:2, 8, 12, 16, 19, 24;

3570:15; 3571:1, 9; 3573:13, 16; 3574:18, 21; 3575:7, 11, 14, 20; 3580:13, 16; 3581:10, 12, 18; 3582:1, 4, 12, 17, 23; 3583:1, 6, 9, 11; 3594:13, 17; 3599:12, 17; 3600:21, 24; 3602:12; 3603:5, 7, 10, 12, 19, 24; 3605:22; 3611:10, 14; 3615:24; 3627:25; 3631:5, 7, 9; 3643:15, 20, 23; 3644:25; 3645:12, 21; 3646:10, 14; 3649:6, 20; 3650:5, 16, 18; 3651:5; 3652:3, 19, 22; 3654:3; 3655:5, 17, 19; 3656:7, 23; 3657:4; 3660:18, 22; 3663:22; 3666:15, 18-19; 3667:8, 12; 3668:9; 3673:25; 3674:7; 3675:3; 3676:4, 7; 3677:20; 3679:20, 24; 3680:11, 13, 15, 18, 21; 3681:6, 19, 22; 3694:8; 3697:15, 19, 21; 3698:3, 8, 11; 3699:3, 24; 3700:2; 3701:1, 5, 10; 3702:2, 6; 3704:22; 3705:3, 21, 24; 3707:17, 20; 3708:8, 18; 3713:18, 21; 3714:3, 9; 3716:2, 18, 21, 25; 3717:5, 11; 3720:4, 10, 22; 3721:1, 9, 22, 25; 3722:2, 19, 24; 3723:2, 7, 14, 19; 3724:13, 22; 3725:4, 13; 3728:7, 22; 3729:16, 18; 3730:2, 7; 3733:11, 22; 3734:9; 3738:25; 3739:7, 12; 3740:8, 10, 18; 3742:9, 11, 18; 3744:25; 3745:6; 3746:11, 18

Buretta [21] - 3419:9, 16; 3422:3; 3440:4, 11; 3505:14; 3556:11; 3561:18; 3565:16; 3566:22; 3643:2; 3646:16; 3653:10; 3663:20; 3700:9; 3720:19; 3722:18; 3725:24; 3742:8, 15; 3744:21

business [8] - 3606:24; 3607:6, 8; 3609:24; 3645:2; 3704:9; 3732:23

businesses [1] - 3732:19

Busse [1] - 3728:22

busy [1] - 3653:19

Butler [7] - 3549:19; 3550:7, 20-21; 3551:6, 10

button [3] - 3428:1, 5; 3666:13

buy [1] - 3637:24

BY [136] - 3414:13; 3425:24; 3427:24; 3430:24; 3435:15; 3436:18, 23; 3442:3; 3443:5; 3446:9; 3447:8, 13; 3448:5; 3452:19; 3457:4; 3458:4; 3459:14; 3460:8, 14; 3461:6, 23; 3463:14; 3464:19; 3465:1, 6; 3466:9; 3468:17; 3470:2; 3473:9, 15; 3475:12; 3476:1; 3478:20; 3479:1, 21; 3481:9; 3482:16; 3485:12, 20; 3488:12; 3492:12; 3493:6; 3494:1, 7; 3495:19; 3496:2, 5, 11; 3499:14, 19; 3500:3; 3501:1, 5, 11; 3502:5; 3503:13; 3507:2; 3510:11, 22; 3511:7; 3514:11; 3521:2; 3526:21; 3527:1, 17; 3529:2; 3530:11; 3531:22; 3533:12, 18; 3535:22; 3538:20; 3539:13; 3541:15; 3542:1; 3546:19; 3547:24; 3571:9; 3573:16; 3574:21; 3575:20; 3580:16; 3581:18; 3582:4; 3583:11; 3594:19; 3597:11; 3602:2, 14; 3609:2; 3611:6, 11, 16; 3612:14; 3616:16; 3619:11; 3620:9; 3622:1; 3623:2; 3631:17; 3632:4; 3642:3; 3646:14;

3652:3; 3654:3; 3655:5, 19; 3656:7; 3660:22; 3663:23; 3666:19; 3667:8, 15; 3668:12; 3671:1; 3674:2; 3684:2, 16; 3687:13; 3688:19; 3694:10; 3697:16, 24; 3698:5, 9, 12; 3703:2; 3705:24; 3707:20; 3708:18; 3713:21; 3714:9; 3746:7, 11, 14, 18

**bylaws** [1] - 3706:24

---

**C**

**calendar** [3] - 3659:22; 3660:10; 3661:19

**Califano** [11] - 3449:24; 3450:21; 3477:18, 21; 3478:1, 13; 3490:11; 3503:23; 3504:6; 3505:7, 9

**California** [2] - 3490:14, 16

**caller** [3] - 3544:14; 3545:2

**camera** [15] - 3450:13; 3617:13, 23; 3618:6, 17, 21, 25; 3619:2; 3621:1; 3622:6, 12; 3632:11; 3634:25; 3641:22

**camera's** [1] - 3620:1

**Camerato** [2] - 3707:6

**Camp** [1] - 3466:25

**Campanella** [21] - 3448:8; 3449:4; 3450:16; 3451:5; 3473:17, 20; 3474:17; 3475:20; 3487:23; 3489:7, 12; 3490:6; 3491:6; 3503:9, 18; 3730:23; 3731:2; 3732:13; 3733:7

**cancelled** [1] - 3659:6

**candid** [1] - 3627:10

**cannot** [9] - 3427:19; 3440:11; 3448:14; 3467:8; 3487:13, 21; 3547:3; 3566:18; 3649:8

**cap** [2] - 3576:13; 3637:1

**Cap** [1] - 3469:1

**Capichano** [3] -

3641:9, 16

**capital** [10] - 3576:10, 13, 15; 3579:25; 3587:14; 3588:14; 3592:19; 3593:1

**capitals** [2] - 3576:11

**Cappa** [3] - 3568:11, 15, 21

**captured** [1] - 3545:19

**car** [6] - 3443:20; 3550:9, 19; 3551:17; 3552:4

**card** [2] - 3708:5, 20

**Cardinale** [2] - 3562:9; 3741:18

**cards** [1] - 3609:18

**care** [1] - 3722:8

**career** [2] - 3509:16, 20

**Carmichael** [4] - 3523:4, 7; 3533:21

**Carmine** [17] - 3647:13, 17-18; 3648:5; 3649:5, 8, 18; 3650:12, 21; 3651:6; 3652:5, 8; 3669:20; 3670:5, 10

**Carrie** [6] - 3419:13; 3483:23; 3499:1, 8, 22; 3500:10

**carried** [1] - 3525:12

**carries** [1] - 3591:12

**Carroll** [2] - 3625:15; 3630:19

**carrying** [2] - 3513:14, 23

**case** [65] - 3416:25; 3418:21; 3419:3, 21; 3420:16; 3424:9; 3440:12; 3473:4; 3491:4; 3518:22; 3553:1, 19; 3554:15; 3555:20; 3556:24; 3560:20; 3562:6; 3563:15; 3568:7; 3574:1, 11; 3578:20; 3585:7; 3595:17; 3596:1; 3598:9; 3603:15; 3604:11, 17; 3607:10; 3612:18; 3628:3; 3629:6, 8; 3643:9; 3644:19; 3654:13; 3659:6; 3668:14, 17, 20; 3669:4, 8, 10-11;

3670:2; 3671:17, 22; 3672:2, 4-5, 8; 3675:5; 3691:14; 3694:4; 3718:8, 14-15; 3719:21; 3735:10; 3736:5; 3739:8, 10

**cases** [6] - 3598:3, 6; 3642:25; 3647:2; 3673:5

**Castellazzo** [1] - 3503:21

**CAT** [1] - 3414:25

**caught** [1] - 3731:16

**caused** [1] - 3574:14

**CC-1** [4] - 3536:22; 3538:16; 3544:1, 3

**CC-2** [4] - 3536:22; 3544:2; 3545:1

**CC-3** [4] - 3536:22; 3544:2; 3545:1, 23

**CC-4** [2] - 3538:17; 3543:13

**cell** [75] - 3417:18; 3444:6; 3513:22; 3514:1; 3516:15; 3517:10, 16, 20, 22; 3518:7, 11; 3519:1, 4, 8, 21; 3521:5, 9, 12-14, 17; 3522:6-8, 12, 14; 3523:12-14; 3525:6; 3535:14, 24; 3536:4, 9, 12, 16; 3537:15; 3538:13; 3539:3, 10, 16, 23; 3677:12; 3697:5, 14; 3700:15; 3701:2, 9, 12, 18; 3702:6; 3712:12; 3723:7, 9, 23; 3724:5, 8, 21; 3725:21; 3726:2, 6, 9-10, 12-13, 15, 19; 3734:4, 6, 10, 24; 3743:10

**Cell** [1] - 3536:10

**cells** [2] - 3539:6

**Central** [2] - 3414:5, 23

**Centre** [2] - 3665:7, 10

**certain** [25] - 3420:12; 3426:19; 3442:17; 3472:20; 3479:6; 3515:4; 3516:21; 3519:6; 3520:5; 3523:25; 3527:12; 3563:14; 3565:9; 3566:1; 3595:19; 3598:3; 3609:4;

3662:10; 3691:10; 3716:23; 3721:10; 3723:15; 3724:17; 3731:8

**Certainly** [8] - 3518:23; 3555:11; 3561:17; 3568:23; 3596:21; 3599:13; 3681:5; 3723:5

**certainly** [42] - 3416:19; 3417:12; 3423:8; 3438:17; 3440:7; 3489:17; 3492:7; 3494:18; 3495:9; 3504:6; 3510:5; 3512:2; 3517:8; 3518:10; 3520:2; 3525:16; 3527:12; 3545:13; 3554:5; 3558:17, 23; 3560:22; 3562:23; 3564:2, 11; 3565:2, 8; 3566:2; 3570:4; 3595:1; 3596:22; 3610:20; 3653:3, 12; 3671:23; 3675:12; 3676:13; 3681:15; 3724:17; 3734:8, 23

**certification** [1] - 3645:2

**certifications** [1] - 3627:22

**cetera** [1] - 3421:22

**chain** [1] - 3552:12

**chance** [5] - 3417:11; 3418:2; 3548:3; 3550:12; 3628:8

**change** [1] - 3438:10

**changed** [2] - 3429:19; 3588:13

**changing** [1] - 3438:8

**character** [1] - 3588:9

**charade** [1] - 3554:24

**charge** [8] - 3422:16; 3554:17; 3597:18, 21; 3631:3; 3668:21; 3669:11; 3706:9

**charged** [7] - 3554:16; 3668:17, 23; 3677:6; 3685:3, 6

**charges** [3] - 3685:10; 3725:7; 3732:5

**charts** [2] - 3581:22; 3582:10

**check** [11] - 3415:15;

3454:16; 3495:24; 3623:6; 3661:10; 3716:25; 3717:11; 3722:20; 3729:21; 3735:6

**chemical** [2] - 3584:7, 9

**chemicals** [2] - 3574:14; 3575:2

**Chemistry** [2] - 3572:6, 9

**chick** [2] - 3744:15

**CHKY** [1] - 3469:15

**chosen** [1] - 3565:14

**Christmas** [2] - 3609:18; 3719:22

**Christy** [1] - 3733:12

**Chuckie** [1] - 3467:21

**Chucky** [1] - 3592:10

**church** [5] - 3710:14, 17, 23, 25

**cigar** [5] - 3491:7, 10, 12; 3636:8, 11

**circular** [1] - 3592:17

**circulate** [1] - 3582:23

**circumstance** [1] - 3514:2

**cited** [1] - 3418:25

**cites** [1] - 3440:19

**City** [6] - 3617:2; 3688:23-25; 3689:21; 3719:14

**civil** [6] - 3557:17; 3597:20; 3598:6; 3647:5; 3660:3, 7

**claim** [1] - 3720:17

**claimed** [1] - 3732:23

**claiming** [1] - 3732:24

**clarification** [1] - 3539:19

**clarify** [2] - 3570:6; 3603:10

**clean** [2] - 3437:6; 3729:20

**clean-up** [1] - 3729:20

**clear** [12] - 3419:3; 3458:13; 3564:6; 3566:14; 3570:1; 3663:10; 3677:1; 3684:5, 9; 3725:20; 3726:21; 3738:19

**cleared** [1] - 3660:9

**clearly** [2] - 3418:23; 3419:25

**Clemons** [17] - 3666:3, 20, 23; 3667:1; 3672:19; 3673:14; 3674:3; 3675:20; 3677:21; 3678:15, 22; 3679:12; 3683:2; 3684:3, 11, 17

**CLERK** [13] - 3445:20; 3446:1, 5; 3570:16, 21, 25; 3616:4, 9; 3645:22; 3646:6; 3705:7, 14; 3739:19

**client** [12] - 3558:3, 20, 25; 3570:1; 3652:13; 3654:8; 3679:22; 3681:24; 3682:8, 12; 3704:10; 3738:4

**client's** [5] - 3558:5, 21; 3559:20; 3566:23; 3680:3

**clients** [3] - 3673:6; 3689:22; 3704:11

**clone** [3] - 3539:22, 24; 3540:3

**close** [4] - 3559:18; 3569:13; 3639:3; 3719:21

**close-up** [1] - 3639:3

**closed** [4] - 3586:25; 3587:16, 19; 3704:4

**closer** [2] - 3461:19; 3737:7

**closest** [1] - 3636:23

**closet** [2] - 3468:3; 3525:8

**closing** [3] - 3557:7; 3559:14, 24

**Club** [5] - 3491:19; 3493:7; 3494:3; 3502:15

**club** [4] - 3493:9, 12; 3502:16; 3549:15

**clue** [1] - 3613:8

**coast** [1] - 3554:14

**coconspirator** [3] - 3716:2, 10; 3732:4

**codes** [9] - 3725:22; 3726:25; 3727:3, 6, 9, 12, 14, 19; 3734:17

**coffee** [5] - 3637:24; 3709:22, 24; 3710:3, 5

**collar** [1] - 3666:14

**collected** [1] - 3609:24

**colloquy** [2] - 3664:19; 3717:4

**Colombo** [9] - 3471:9, 17, 20; 3488:16; 3523:1; 3650:13; 3732:14, 24; 3741:21

**colored** [2] - 3449:14; 3534:22

**column** [7] - 3585:6, 21; 3586:6; 3590:14; 3591:1, 3

**columns** [1] - 3585:6

**combination** [1] - 3592:7

**combinations** [1] - 3580:3

**combine** [1] - 3486:14

**combined** [2] - 3628:21; 3737:18

**combining** [1] - 3487:16

**comfortable** [1] - 3644:2

**coming** [21] - 3415:20; 3472:5; 3474:22; 3476:2; 3540:1; 3569:22; 3592:2, 8; 3609:19; 3626:6; 3638:1, 5; 3639:9; 3672:12; 3686:2; 3709:19, 21; 3711:2; 3719:21; 3720:18; 3737:20

**comma** [2] - 3594:1, 7

**commas** [1] - 3594:9

**comment** [4] - 3556:13, 15; 3632:25; 3742:15

**commenting** [2] - 3682:19, 21

**commitments** [1] - 3661:9

**common** [1] - 3640:7

**communicate** [2] - 3485:3; 3649:9

**communicated** [1] - 3493:1

**communication** [10] - 3492:14; 3501:6; 3537:15; 3540:18; 3548:23; 3554:5; 3556:7; 3557:11; 3649:11

**communications** [1] - 3555:12

**companies** [1] - 3733:2

**company** [2] - 3616:25; 3734:14

**compare** [4] - 3468:10; 3495:25; 3565:10; 3611:12

**compared** [5] - 3578:8, 10; 3585:25; 3607:19; 3608:3

**comparing** [3] - 3583:15; 3602:9; 3610:1

**comparison** [16] - 3496:8; 3529:25; 3541:1, 6; 3563:16, 21; 3581:22; 3591:19; 3592:23; 3605:2; 3606:23; 3607:5, 8; 3609:11; 3611:8

**comparisons** [1] - 3605:7

**compensated** [1] - 3595:22

**competent** [4] - 3727:2; 3734:6, 8

**compiled** [1] - 3630:19

**completed** [1] - 3451:18

**completely** [2] - 3418:19; 3590:24

**completion** [1] - 3430:12

**compliance** [1] - 3616:24

**computer** [6] - 3486:8; 3577:6; 3585:8; 3623:18; 3630:22

**conceded** [1] - 3559:14

**conceding** [3] - 3558:8, 11; 3559:19

**conceivable** [1] - 3720:6

**concentrate** [1] - 3585:23

**concern** [2] - 3416:22; 3569:16

**concerned** [3] - 3553:22; 3566:24; 3628:19

**concerning** [1] - 3718:13

**concession** [1] - 3564:13

**conclude** [3] - 3622:9; 3634:6; 3718:3

**concluded** [9] - 3441:21; 3455:18; 3601:5; 3608:11; 3672:4; 3683:10; 3702:17; 3717:13

**conclusion** [2] - 3583:15, 21

**conclusions** [2] - 3581:23; 3631:1

**concocted** [1] - 3700:24

**condition** [2] - 3530:21, 23

**conditions** [1] - 3634:7

**conduct** [17] - 3446:18; 3452:20; 3464:1; 3484:15; 3490:2; 3491:19; 3493:17; 3496:24; 3510:23; 3526:15; 3527:18; 3541:19; 3581:19; 3673:14, 22; 3677:5, 15

**conducted** [12] - 3419:14; 3470:5; 3493:12; 3496:12, 17; 3507:17; 3509:22; 3510:6; 3512:4; 3565:24; 3581:23; 3676:5

**conducting** [22] - 3452:23; 3464:20; 3483:1, 7; 3488:8; 3492:8, 13, 16; 3499:20; 3500:5; 3501:7; 3502:1; 3507:10; 3513:9; 3540:25; 3542:2; 3563:10; 3571:25; 3676:8, 12; 3684:21

**conducts** [1] - 3563:12

**conferencing** [1] - 3739:6

**confine** [1] - 3508:19

**confronted** [2] - 3557:20; 3700:8

**confused** [1] - 3588:23

**conjunction** [1] - 3673:8

**Conley** [1] - 3736:15

**connect** [2] - 3576:8

**Connected** [1] -

3723:12

**connecting** [1] - 3576:20

**connection** [18] - 3477:11; 3510:24; 3515:5; 3517:5; 3541:3; 3554:1; 3649:18; 3668:20; 3673:5; 3684:11; 3686:10; 3701:15; 3733:21; 3743:4, 18; 3744:2, 7, 12

**connection's** [1] - 3743:19

**connections** [2] - 3576:6, 17

**consequence** [1] - 3423:14

**consider** [2] - 3739:7; 3742:2

**considered** [1] - 3683:1

**considering** [1] - 3626:6

**consistent** [5] - 3535:4; 3586:18; 3593:5, 8, 24

**consistently** [4] - 3576:4; 3587:6; 3588:24; 3627:18

**conspiracy** [2] - 3741:25; 3742:3

**constitute** [1] - 3427:14

**constructive** [1] - 3554:16

**consulted** [1] - 3573:2

**Cont'd** [1] - 3671:1

**contact** [13] - 3484:5, 16; 3485:5, 13, 16; 3487:21; 3503:2; 3644:15; 3650:6; 3679:7; 3738:10; 3740:22

**contacted** [9] - 3424:3; 3521:14; 3553:12, 15; 3628:2; 3643:5; 3644:16; 3666:23

**contain** [1] - 3619:22

**contained** [4] - 3440:22; 3461:7; 3620:10; 3632:7

**contains** [2] - 3467:2;

3469:9

**content** [2] - 3730:12; 3731:15

**contest** [1] - 3559:5

**contested** [1] - 3733:15

**contesting** [2] - 3605:21; 3628:16

**context** [4] - 3557:17; 3594:4; 3609:21; 3656:10

**Continue** [1] - 3718:17

**continue** [3] - 3459:5; 3468:19; 3696:21

**Continued** [29] - 3437:10; 3441:22; 3453:4; 3455:19; 3500:11; 3504:18; 3506:3; 3515:12; 3520:8; 3528:23; 3567:3; 3598:18; 3601:6; 3602:20; 3608:12; 3621:7; 3624:9; 3629:22; 3648:9; 3651:15; 3652:25; 3653:21; 3670:20; 3674:11; 3683:11; 3698:18; 3702:18; 3715:13; 3717:14

**continued** [13] - 3419:18, 22; 3491:25; 3492:8, 23; 3493:7; 3516:21; 3541:19; 3572:11; 3672:1; 3679:8; 3694:15; 3732:25

**continuing** [1] - 3572:12

**control** [2] - 3619:2; 3702:1

**controlled** [2] - 3617:17; 3618:24

**conveniently** [1] - 3556:20

**conversation** [5] - 3484:14; 3538:1, 3; 3555:21; 3569:17

**conversations** [5] - 3537:18, 22; 3634:11, 21; 3731:6

**convert** [1] - 3496:7

**converted** [1] - 3489:2

**convertible** [1] -

3490:13

**convey** [1] - 3487:10

**conveyed** [2] - 3480:10

**Conway** [1] - 3414:20

**cooperating** [3] - 3626:21; 3628:5, 18

**cooperator** [1] - 3730:24

**coordinate** [1] - 3424:14

**Cop** [2] - 3735:20; 3736:20

**copied** [1] - 3735:19

**copies** [1] - 3582:23

**copy** [14] - 3436:24; 3437:6; 3438:5; 3454:24; 3562:10; 3574:5; 3575:1; 3578:8; 3583:2; 3602:5; 3620:23; 3631:21; 3730:12

**corner** [9] - 3531:9; 3533:13; 3592:15; 3613:9, 18; 3617:21; 3618:18; 3635:15; 3666:11

**corporation** [1] - 3557:13

**Correct** [85] - 3415:24; 3422:24; 3431:12; 3439:3, 6, 13, 17; 3440:17, 20; 3449:1; 3466:24; 3470:20; 3471:19; 3473:22; 3479:24; 3486:1; 3489:23; 3493:11; 3497:3; 3503:25; 3507:22; 3511:11; 3513:15; 3515:7; 3522:9, 18; 3523:16; 3529:16; 3531:10, 13; 3532:4, 21; 3534:17, 24; 3537:20, 23; 3540:10; 3542:13; 3544:17; 3545:3, 22; 3548:25; 3553:20; 3565:19; 3595:16; 3612:11, 19; 3613:25; 3615:18; 3648:2; 3652:7; 3657:22; 3658:23; 3659:17; 3660:5; 3661:24; 3667:23; 3668:10; 3669:12; 3671:15, 20; 3685:1, 5, 9; 3686:5,

7; 3687:23; 3688:9, 16; 3689:13, 24; 3690:21, 25; 3691:1, 5; 3692:5, 18; 3693:11; 3694:14; 3695:11, 21, 25; 3702:15; 3726:20; 3742:18

**correct** [179] - 3426:7, 14, 21; 3429:2, 6, 11; 3430:4, 14; 3431:9, 13; 3432:3, 20; 3434:4; 3435:18; 3443:23; 3444:1, 13, 15; 3450:18; 3457:9; 3458:15; 3459:24; 3463:19; 3470:21, 25; 3471:15; 3472:11, 14, 23; 3473:19; 3476:12, 14; 3477:16, 20; 3480:4; 3481:3; 3482:1; 3483:5, 10, 22; 3486:6, 10; 3487:7; 3489:20; 3490:10; 3491:5, 9, 18; 3492:21, 25; 3495:5, 8, 13; 3496:3; 3497:7, 11; 3498:13; 3502:8; 3503:8; 3504:15; 3507:14; 3509:4, 10, 13; 3512:6; 3513:18; 3523:6; 3524:25; 3525:2; 3529:7; 3532:23; 3533:1, 22; 3535:9; 3544:14, 19, 22; 3546:5; 3548:9; 3550:17; 3551:19; 3552:6; 3565:15; 3568:23; 3621:3; 3622:4; 3623:13; 3633:18; 3634:4; 3635:11; 3636:1, 5; 3637:24; 3638:13, 20; 3639:20; 3640:13, 23-24; 3641:5, 14, 23-24; 3644:20; 3646:20; 3647:1, 3-4, 6, 8-9, 19-20, 25; 3648:6; 3652:6, 9, 12; 3654:5; 3656:3, 9, 16, 19, 21; 3657:11, 21, 23; 3658:12, 22, 24-25; 3659:11, 18, 22; 3660:7, 10, 14; 3661:14, 23; 3662:17; 3666:21, 23; 3667:3; 3668:1, 16, 25; 3669:23, 25; 3670:4, 11, 15; 3672:10;

3673:12; 3680:11; 3685:17; 3686:1; 3687:6; 3689:2, 4; 3691:21; 3692:3, 6; 3693:24; 3694:19; 3695:1; 3696:9, 24; 3697:3, 6-7; 3703:18, 25; 3704:17; 3716:16; 3738:8

**correctly** [2] - 3461:9; 3633:25

**correspond** [6] - 3468:12, 20; 3724:16; 3726:13; 3727:7, 10

**corresponding** [3] - 3724:7; 3725:15; 3726:3

**corresponds** [2] - 3724:9; 3726:19

**Corrin** [2] - 3473:2

**cost** [1] - 3737:11

**costs** [1] - 3739:4

**counsel** [10] - 3415:8, 11; 3422:12; 3424:1, 7; 3556:19; 3568:16; 3602:17; 3737:11; 3739:16

**counter** [1] - 3517:14

**country** [1] - 3572:17

**Country** [1] - 3414:20

**County** [2] - 3661:16, 18

**couple** [11] - 3420:22; 3458:11, 17; 3459:8; 3508:14; 3546:23; 3662:3; 3664:10, 22, 25; 3690:22

**course** [19] - 3419:1; 3420:17; 3505:16, 22; 3554:6; 3559:9; 3580:6; 3607:6, 8; 3622:4; 3635:2; 3663:8; 3679:3; 3701:16; 3713:4; 3718:10, 14; 3719:11; 3736:23

**courses** [4] - 3572:4, 8, 24

**Court** [10] - 3414:22; 3459:18; 3527:22; 3553:25; 3562:11; 3566:21; 3634:20; 3635:3; 3652:20

**COURT** [461] - 3414:1, 3; 3415:4, 19, 21, 23, 25; 3416:2, 4, 10, 14, 21; 3417:2; 3418:8;

3420:24; 3421:10, 15, 18; 3422:11, 17, 24; 3423:8, 13; 3424:8, 13; 3425:14; 3430:23; 3435:14; 3436:13, 15, 22; 3437:8; 3438:2, 7, 13, 20, 23; 3439:1, 4, 7, 13, 16, 23; 3440:13, 15, 18, 25; 3441:4, 14, 17, 20; 3442:2; 3443:1, 3; 3445:13, 16; 3446:7; 3447:7, 23; 3448:1; 3451:21; 3452:14; 3453:2; 3454:7, 13, 15, 18, 25; 3455:4, 11, 14; 3456:2, 13, 19; 3457:1; 3459:13; 3460:7, 23; 3461:3, 14, 19; 3463:8; 3464:17, 25; 3465:19, 23; 3466:5; 3473:8, 14; 3475:11, 23; 3476:6; 3478:19, 25; 3479:20; 3480:7, 17; 3482:15, 21; 3485:11; 3488:11; 3492:11; 3493:24; 3494:6; 3495:18; 3496:4, 10; 3498:1; 3499:13, 18; 3501:4, 10; 3502:4; 3503:12; 3504:10, 17; 3505:5, 8, 18, 21, 24; 3506:2; 3510:10, 15, 21; 3511:2, 4; 3514:10; 3515:11; 3516:12; 3517:1; 3518:12, 15; 3519:6, 14, 24; 3520:2, 7; 3526:19, 24; 3527:16, 25; 3528:13, 22; 3530:10; 3531:21; 3533:10, 16; 3535:21; 3538:19; 3539:12, 19; 3541:14, 24; 3546:15; 3547:22; 3552:15, 22; 3553:4, 7, 20; 3556:10, 17; 3557:5, 12, 16, 22; 3558:7, 11, 19; 3559:12, 19; 3560:7, 12, 24; 3561:13, 21; 3562:2, 7, 12, 19, 21, 25; 3563:18; 3564:8, 13, 17; 3565:5, 13, 22; 3566:11, 20; 3567:1; 3568:3, 8; 3569:7, 9, 15, 18, 21, 25; 3570:5, 10, 13; 3571:4, 7; 3573:15; 3574:20; 3575:10, 13; 3580:15;

3581:15; 3582:3, 14, 20, 25; 3583:8; 3597:4, 6; 3598:16; 3599:2, 5, 16, 21, 25; 3600:5, 8, 11, 13, 20, 25; 3601:2, 4; 3602:13, 17; 3603:2, 6, 8, 11, 18, 23; 3604:1, 11, 22; 3605:5, 13, 16, 19, 24; 3606:7, 11, 16, 22; 3607:3, 9, 15, 22; 3608:6, 8; 3611:15; 3615:23, 25; 3616:14; 3619:10; 3620:7; 3622:23, 25; 3623:19, 23; 3624:1, 5, 8; 3625:18; 3626:12; 3627:5, 9, 14; 3628:11; 3629:1, 11, 20; 3630:2, 7, 15, 24; 3631:1, 6, 8, 11; 3632:3; 3642:2, 13, 16, 19, 23; 3643:16, 21, 24; 3644:1, 11, 21, 24; 3645:7, 10, 16, 19; 3646:11; 3648:8; 3649:2; 3650:3, 10, 17; 3651:14; 3652:2, 21, 24; 3653:2, 6, 15, 19; 3654:2; 3655:4, 16, 18; 3656:6; 3657:1, 15; 3660:20; 3663:16; 3664:19; 3666:17; 3667:7; 3668:11; 3674:1, 8, 10; 3675:2, 15, 23; 3676:2, 6, 15, 22, 25; 3678:1, 3, 8, 18; 3679:11, 19, 23; 3680:7, 12, 17, 19, 23; 3681:2, 7, 12, 18; 3682:11, 23; 3683:6, 8; 3694:9; 3697:20, 22; 3698:4, 14, 16; 3699:2, 5, 22; 3700:10, 17; 3701:8, 25; 3702:5, 8, 10, 15; 3704:20, 23; 3705:1, 10, 20, 22; 3707:19; 3708:3, 15; 3713:20; 3714:6; 3715:11; 3716:16, 23; 3717:1, 6, 12; 3718:2, 21, 25; 3719:4, 15, 20; 3720:8, 14, 25; 3721:8, 19, 23; 3722:1, 3, 7, 17, 22, 25; 3723:3, 6, 11, 18, 20; 3724:20; 3725:2, 19; 3726:8, 12, 16, 20; 3727:15;

3728:2, 8, 10, 13, 16, 19; 3729:17; 3730:5, 14, 21, 25; 3735:6; 3736:6, 9, 25; 3738:6, 13, 18, 23; 3739:2, 10, 13, 17, 20; 3740:6, 9; 3741:2, 14; 3742:4, 20; 3743:2; 3745:3

**court** [48] - 3415:3; 3416:18; 3417:8; 3418:20; 3419:10, 14; 3421:25; 3422:2, 9, 23; 3442:1; 3456:1; 3507:1; 3521:1; 3529:1; 3537:21; 3569:14; 3570:7; 3583:2; 3602:1; 3605:11; 3609:1; 3619:4, 20; 3630:1; 3652:1; 3654:1; 3684:1; 3703:1; 3718:1; 3719:2, 11; 3728:12; 3730:13; 3734:1, 3; 3735:4, 17, 19; 3736:2; 3737:15, 22, 25; 3738:9, 12; 3741:22; 3743:4; 3744:11

**Court's** [1] - 3656:23
**court-appointed** [1] - 3738:12
**courthouse** [1] - 3424:4
**Courthouse** [1] - 3414:5
**courtroom** [7] - 3419:1; 3423:25; 3425:12; 3456:4, 25; 3570:11; 3718:19
**cover** [3] - 3580:21; 3687:2; 3738:14
**covered** [1] - 3561:14
**CR-04-911** [1] - 3414:4
**created** [2] - 3438:20, 22
**creating** [1] - 3699:8
**credibility** [1] - 3699:17
**credit** [2] - 3708:5, 20
**crime** [4] - 3471:9; 3488:2, 16; 3677:7
**Crime** [2] - 3523:1; 3650:13
**Criminal** [1] - 3572:7
**criminal** [2] - 3557:18; 3646:25

**critical** [1] - 3560:22
**Cross** [2] - 3624:2; 3631:12
**cross** [21] - 3419:13; 3424:25; 3438:17; 3565:5, 12; 3566:4; 3568:10; 3600:5; 3605:9; 3623:23; 3628:14, 21; 3629:7, 15; 3729:9, 13; 3733:15; 3734:2; 3735:1; 3743:8
**CROSS** [8] - 3425:23; 3470:1; 3546:18; 3594:18; 3631:16; 3667:14; 3746:6, 13
**Cross-examination** [2] - 3624:2; 3631:12
**CROSS-EXAMINATION** [8] - 3425:23; 3470:1; 3546:18; 3594:18; 3631:16; 3667:14; 3746:6, 13
**cross-examination** [8] - 3424:25; 3438:17; 3568:10; 3623:23; 3628:14, 21; 3629:7; 3743:8
**cross-examine** [6] - 3565:5; 3566:4; 3629:15; 3729:9, 13; 3735:1
**cross-examining** [1] - 3419:13
**crossed** [1] - 3531:24
**crosses** [1] - 3587:5
**crossing** [3] - 3518:20; 3589:5; 3722:5
**CRR** [1] - 3414:22
**Cultrera** [15] - 3420:25; 3470:16, 18; 3471:6; 3481:1; 3482:2; 3483:6, 20; 3484:4, 20; 3485:6, 13; 3492:7, 22; 3729:6
**cumulative** [1] - 3733:4
**curb** [1] - 3451:3
**curiosity** [1] - 3516:12
**current** [1] - 3571:24
**cursory** [1] - 3417:12
**curve** [3] - 3587:1, 10; 3592:22

**curved** [1] - 3586:25
**custody** [1] - 3552:12
**cut** [6] - 3601:2; 3628:4, 6; 3720:7; 3730:19
**Cutolo** [118] - 3415:11; 3417:23, 25; 3418:1, 9; 3419:11, 20; 3449:11, 24; 3450:3, 6-7, 12, 20; 3451:2, 9-10; 3472:15; 3473:5, 12; 3474:6, 10, 18; 3479:5; 3480:14, 19; 3481:13; 3493:9; 3494:3, 8; 3495:20; 3496:18, 25; 3497:9; 3498:19; 3499:3, 10; 3507:5; 3508:19; 3509:23; 3510:7, 13, 25; 3516:16; 3517:10, 23; 3519:22; 3521:15; 3535:16, 23; 3539:3, 9, 23; 3540:8, 23; 3541:3, 20; 3542:6; 3543:24; 3544:6, 12, 24; 3545:1, 10; 3546:1, 7; 3551:7; 3556:21; 3561:1, 4; 3562:19, 23; 3563:8; 3564:1, 3; 3666:20; 3667:1, 10; 3673:15, 23; 3674:8; 3675:23; 3676:17; 3677:13, 19; 3678:11; 3684:14, 18; 3685:3, 7; 3707:10, 13; 3708:5, 21; 3709:5; 3712:1, 3, 16; 3713:1, 6; 3714:17; 3716:8; 3723:16; 3732:23; 3733:6; 3736:23; 3737:1, 6; 3738:7, 12; 3739:15; 3741:17
**Cutolo's** [13] - 3419:19; 3481:20; 3515:2; 3536:9; 3539:2; 3551:6, 11; 3563:21; 3684:6; 3701:15; 3714:24; 3715:1
**Cutolos** [2] - 3675:11; 3679:9

**D**

**D'Urso** [5] - 3730:24; 3731:2, 13-14; 3732:22
**D-O-M** [1] - 3466:17
**D.C** [1] - 3737:4

**daily** [2] - 3538:9; 3719:8
**Daisy** [1] - 3741:6
**darker** [1] - 3636:12
**data** [12] - 3427:16, 18, 20; 3428:5, 8; 3429:14; 3433:13; 3434:25; 3435:5; 3442:15, 24; 3445:9
**database** [1] - 3726:18
**date** [64] - 3428:21; 3448:3; 3452:11; 3461:5; 3465:15; 3466:2; 3475:5, 7; 3477:17; 3480:12; 3484:16; 3496:17; 3497:24; 3498:7, 15; 3499:21; 3507:11, 24; 3508:2; 3512:21, 24; 3514:12, 14, 16, 20; 3523:17, 20; 3526:6; 3532:13; 3533:14; 3534:5, 19; 3537:25; 3548:5; 3555:4, 10; 3575:16; 3581:17; 3582:22; 3611:19; 3613:10, 12, 14; 3614:2; 3622:14, 16; 3623:3, 6, 12; 3632:15; 3635:9; 3669:1; 3684:19; 3686:3, 18, 22; 3693:14; 3708:17; 3714:8; 3724:23
**dated** [1] - 3514:20
**dates** [7] - 3421:10; 3476:19; 3547:6; 3568:23; 3630:21; 3636:3; 3736:1
**dating** [2] - 3418:6; 3613:8
**daughter** [2] - 3668:8; 3669:2
**David** [1] - 3728:22
**daylight** [1] - 3634:7
**days** [13] - 3418:17; 3423:4; 3555:6; 3579:23; 3615:16; 3618:11; 3620:14; 3625:22; 3633:12; 3667:1; 3713:8; 3714:16
**DD** [2] - 3598:14; 3602:11
**De** [1] - 3732:22
**dead** [1] - 3704:4
**deal** [1] - 3643:8

**dealings** [1] - 3607:6

**dealt** [1] - 3570:4

**DEBORAH** [1] - 3414:13

**decades** [1] - 3571:16

**December** [7] - 3414:7; 3580:12; 3581:6; 3585:13; 3636:4; 3735:12; 3745:9

**decide** [1] - 3579:5

**decided** [7] - 3512:7; 3661:5; 3664:22; 3669:6; 3672:2; 3675:18; 3677:4

**decision** [5] - 3493:4; 3518:22, 24; 3566:13; 3682:9

**deemed** [1] - 3720:15

**Defendant** [5] - 3524:9; 3570:8; 3598:14; 3602:11; 3741:19

**defendant** [11] - 3464:16; 3516:4, 15; 3555:15; 3652:11; 3661:6; 3666:16; 3701:9; 3723:15; 3737:10, 21

**defendant's** [2] - 3682:20; 3735:10

**Defendant's** [7] - 3529:19, 22; 3536:22; 3538:16; 3562:5; 3563:5, 24

**defendants** [15] - 3423:21; 3560:20; 3571:4; 3573:5; 3625:10; 3643:3; 3644:12; 3646:25; 3649:21; 3716:13; 3719:22; 3720:9; 3732:12, 15; 3742:2

**Defendants** [2] - 3414:7, 16

**defendants'** [1] - 3415:12

**defenders** [3] - 3572:23; 3597:24; 3598:1

**defense** [28] - 3415:9; 3419:2, 6; 3420:14, 16; 3423:6; 3424:1; 3516:7; 3560:2; 3568:15; 3573:2; 3594:22; 3595:14; 3597:21;

3602:17; 3649:13; 3650:5, 9; 3678:15; 3721:13; 3722:12; 3724:1, 18; 3728:24; 3729:8, 12; 3730:12; 3738:4

**Defense** [1] - 3613:1

**defense's** [2] - 3649:6; 3650:11

**defer** [1] - 3569:13

**Define** [1] - 3652:13

**define** [1] - 3653:17

**definite** [2] - 3584:3, 8

**Definitely** [1] - 3665:14

**definitely** [1] - 3474:5

**definitive** [1] - 3633:7

**Deft** [2] - 3414:18, 21

**delayed** [1] - 3719:25

**deleted** [2] - 3429:4, 22

**deli** [8] - 3458:11; 3637:12, 14, 23; 3638:10, 12; 3641:6

**Deli** [1] - 3637:22

**deliver** [1] - 3424:7

**Dello** [1] - 3640:2

**Delvecchio** [1] - 3736:16

**demeanor** [1] - 3712:4

**denied** [1] - 3516:5

**depart** [1] - 3512:13

**Department** [1] - 3617:2

**depict** [1] - 3447:18

**depicted** [2] - 3583:25; 3585:24

**depicting** [1] - 3581:23

**depictions** [1] - 3619:25

**deposition** [1] - 3659:5

**DEROSS** [1] - 3414:6

**DeRoss** [49] - 3414:21; 3547:13, 25; 3548:9, 11, 17; 3549:14; 3550:10, 19; 3551:17; 3552:2; 3560:19; 3563:5; 3568:5; 3580:9,

19; 3583:16, 22; 3585:12; 3586:3, 19; 3590:11, 18; 3592:7; 3593:16; 3605:2; 3636:8, 10, 22; 3637:13; 3638:17, 19, 22; 3639:16; 3641:16; 3666:6, 16, 25; 3675:8; 3677:22, 25; 3678:17; 3679:11, 13, 15, 17; 3731:2; 3739:24

**DeRoss'** [6] - 3558:2, 17; 3559:17; 3565:22; 3566:15; 3667:9

**DeRoss's** [4] - 3588:25; 3593:18; 3607:19; 3608:2

**Describe** [1] - 3712:3

**describe** [8] - 3448:7; 3461:25; 3462:4; 3464:13; 3522:13; 3571:17; 3573:21; 3583:13

**describing** [1] - 3652:15

**designated** [2] - 3571:2, 7

**designating** [1] - 3558:15

**desk** [2] - 3662:3, 11

**DeStefano** [4] - 3420:9; 3423:4; 3729:19; 3740:2

**DeStefano's** [1] - 3740:6

**destroy** [1] - 3699:17

**destroyed** [3] - 3699:15; 3704:14, 17

**detail** [8] - 3415:9; 3574:6, 9, 16; 3584:15; 3585:2; 3600:19; 3602:18

**details** [8] - 3516:8; 3556:4; 3574:7; 3575:5; 3578:6; 3584:11; 3625:22; 3737:24

**detective** [1] - 3617:6

**detectives** [1] - 3618:16

**determination** [9] - 3430:3, 5; 3433:20, 23; 3561:24; 3584:3; 3604:14; 3612:9, 16

**determinations** [1] -

3518:18

**determine** [19] - 3433:15, 18; 3436:5; 3445:2; 3487:5; 3530:2; 3543:5; 3545:4, 8, 25; 3546:6; 3609:3, 9; 3610:12; 3611:18; 3614:4; 3615:12; 3622:17; 3724:16

**determined** [7] - 3433:25; 3479:3; 3508:25; 3554:4; 3555:11; 3578:24; 3686:3

**device** [3] - 3428:8; 3442:16; 3445:9

**dial** [1] - 3619:2

**dialed** [4] - 3530:3; 3536:19; 3658:11; 3690:23

**dialing** [1] - 3536:3

**diary** [6] - 3699:11, 13, 23, 25; 3703:20; 3704:9

**DiBenedetto** [1] - 3732:22

**difference** [5] - 3426:23; 3438:8; 3440:15; 3577:8, 14

**differences** [3] - 3578:11, 22

**different** [22] - 3427:4, 17; 3432:23; 3452:10; 3534:22; 3574:8; 3577:22; 3579:25; 3580:24; 3590:22; 3591:24; 3592:5; 3605:14; 3620:14; 3662:16, 19; 3663:1, 4, 11; 3699:19; 3700:22

**differentiate** [2] - 3427:17; 3428:9

**differentiated** [1] - 3428:5

**DiNardo** [1] - 3544:21

**dinner** [8] - 3664:12, 15, 21, 24; 3665:1, 4, 23

**Dionisio** [11] - 3449:10; 3544:16; 3545:6, 10; 3546:2; 3636:5; 3637:2; 3638:2; 3641:15, 18

**DIRE** [1] - 3620:8

**DIRECT** [7] - 3446:8; 3571:8; 3616:15; 3646:13; 3705:23; 3746:10, 17

**direct** [21] - 3446:16; 3452:10; 3463:15; 3476:10; 3524:12; 3541:6; 3544:10; 3546:23; 3604:11; 3652:19; 3658:8; 3665:25; 3690:6; 3692:1; 3693:9; 3694:24; 3695:9; 3696:7; 3733:19; 3742:16

**directed** [2] - 3508:14; 3553:25

**Directing** [3] - 3617:7; 3656:23; 3658:4

**directing** [2] - 3442:4; 3548:15

**direction** [2] - 3448:21; 3635:16

**Directionally** [1] - 3448:20

**directive** [1] - 3706:13

**directly** [6] - 3430:11, 13; 3561:1; 3649:12; 3650:8; 3666:23

**directory** [2] - 3428:2; 3726:8

**directs** [1] - 3677:15

**DiSalvio** [1] - 3443:24

**disappearance** [22] - 3418:2; 3508:21; 3509:24; 3510:8, 25; 3511:5; 3515:2; 3516:16; 3535:25; 3541:21; 3557:3; 3673:23; 3676:18; 3677:5, 13, 16; 3678:10; 3680:1; 3684:6; 3685:7; 3701:15; 3733:6

**disappeared** [6] - 3418:9; 3556:21; 3564:1; 3592:1; 3637:10; 3714:17

**disappears** [1] - 3716:8

**disclose** [4] - 3438:16; 3698:6; 3699:21; 3703:3

**disclosed** [6] - 3557:6; 3699:6; 3702:12; 3703:8, 16; 3727:21

**discolorations** [2] - 3530:24; 3531:5

**discontinued** [2] - 3483:2; 3501:13

**discovery** [7] - 3417:7; 3420:6, 11; 3454:14, 21; 3456:8; 3625:8

**discrepancy** [1] - 3657:19

**discuss** [7] - 3484:17; 3553:7; 3631:2; 3680:20, 25; 3719:16; 3737:10

**discussed** [3] - 3557:1; 3559:7; 3666:22

**discussing** [1] - 3718:10

**discussion** [8] - 3566:20; 3569:10, 23; 3628:11; 3645:10; 3681:17; 3698:1; 3731:5

**discussions** [3] - 3553:23; 3703:9, 15

**Discussions** [1] - 3703:13

**disguised** [1] - 3617:14

**disk** [3] - 3619:19; 3620:11; 3621:2

**dismiss** [3] - 3416:25; 3717:6; 3725:7

**dismissal** [2] - 3418:21; 3421:21

**dismissed** [1] - 3668:21

**Disney** [2] - 3670:17

**disposed** [1] - 3725:1

**dispute** [2] - 3626:2; 3733:2

**disregard** [1] - 3697:22

**distance** [4] - 3503:1; 3587:3, 6, 11

**DISTRICT** [3] - 3414:1, 10

**Document** [6] - 3501:17; 3529:21; 3533:11; 3538:14; 3547:23; 3660:21

**document** [90] - 3424:23; 3427:13; 3428:8; 3436:25; 3438:15, 18, 20; 3439:1, 5; 3444:20; 3459:9; 3467:9, 11; 3468:5, 10; 3469:7, 18; 3481:10; 3524:1, 16, 20, 23; 3525:1; 3527:7; 3528:4, 12, 16; 3529:11, 23; 3531:1, 8, 23; 3532:1, 9; 3533:9; 3534:13, 16, 25; 3535:7; 3538:11; 3545:5, 9; 3547:20; 3548:7; 3558:1; 3559:6; 3560:15; 3562:8, 12, 17, 21, 24; 3563:24; 3564:7; 3566:5, 17; 3571:13, 18, 22; 3572:2, 15, 20, 23; 3573:11, 24-25; 3574:2, 12; 3575:22; 3578:4; 3584:5; 3585:7, 25; 3589:24; 3605:3; 3609:4, 22; 3610:21; 3614:3, 8; 3615:9; 3660:24; 3707:22; 3724:9; 3726:17; 3734:20

**documented** [3] - 3525:25; 3526:2

**documents** [120] - 3417:17; 3418:3, 6, 13-14, 16, 18, 23; 3419:5, 7; 3420:2; 3422:4, 7-8; 3423:6, 25; 3439:12; 3465:7, 9, 11; 3505:17; 3515:5; 3517:18; 3523:18; 3525:4, 7, 9; 3527:8, 12-13; 3530:15, 18; 3532:11; 3535:11; 3536:25; 3538:21; 3540:14, 21; 3543:5; 3560:15, 17, 19, 21; 3561:14, 22; 3562:4, 20; 3563:4, 6, 13, 22; 3564:4, 10; 3565:3, 6, 8-9, 14, 17, 20-21, 23, 25; 3566:1, 6; 3573:22; 3595:13, 19, 25; 3596:4; 3598:8, 15-16; 3599:5, 7, 14; 3600:1, 7, 17; 3602:4; 3603:3; 3604:1, 6, 8-9, 23, 25;

3605:4, 9, 17; 3606:10, 15; 3610:13, 25; 3611:8, 13, 17; 3612:20; 3614:4; 3615:5; 3625:3; 3722:11; 3724:7, 15, 18; 3725:16, 19; 3727:1, 6, 22, 24

**Dom** [9] - 3466:17; 3467:23; 3468:8, 11-12; 3531:8; 3547:8; 3613:22; 3641:20

**Dominick** [8] - 3449:10; 3544:15; 3545:6, 10; 3546:2; 3636:5; 3637:2

**Don** [2] - 3467:23; 3592:14

**don't-know** [1] - 3614:23

**done** [31] - 3430:9; 3434:7; 3472:18; 3474:3; 3490:22; 3492:5; 3505:19; 3508:18; 3509:16; 3528:20; 3530:8; 3531:1; 3552:23; 3561:24; 3564:19; 3580:3; 3592:21; 3606:17; 3628:14; 3641:22; 3650:4, 16; 3651:4; 3680:9; 3683:2; 3704:2, 24; 3719:17; 3720:10; 3728:12

**door** [1] - 3636:23

**doorway** [1] - 3639:11

**double** [4] - 3417:1; 3591:15; 3722:20; 3725:8

**double-check** [1] - 3722:20

**doubt** [1] - 3731:22

**down** [46] - 3422:13, 20; 3445:16; 3461:18, 21; 3487:15; 3490:17; 3513:8; 3519:3; 3524:12; 3537:16, 25; 3544:11; 3552:22; 3553:3; 3579:20; 3583:7, 10; 3584:2, 21; 3587:13; 3588:1, 25; 3590:2, 19; 3591:12; 3592:10; 3601:2; 3603:19; 3615:17, 25; 3618:25; 3622:12;

3624:5; 3628:4; 3632:8; 3633:24; 3634:4; 3642:17; 3644:15; 3660:6; 3666:13; 3688:10; 3718:23; 3730:20

**download** [3] - 3433:13; 3435:6, 21

**downloaded** [10] - 3427:16, 20; 3428:7, 21; 3433:6, 9; 3435:1, 22; 3436:4; 3442:8

**downstroke** [1] - 3587:1

**downwards** [1] - 3593:7

**draft** [1] - 3727:25

**draw** [1] - 3566:24

**dressing** [1] - 3559:25

**drift** [1] - 3614:16

**driven** [1] - 3458:22

**driver's** [1] - 3609:20

**driving** [5] - 3458:25; 3489:7; 3490:11; 3512:14; 3550:10

**drop** [2] - 3614:24; 3615:3

**dropped** [1] - 3586:17

**drove** [2] - 3490:7

**Dudzinski** [1] - 3736:16

**due** [3] - 3629:6; 3728:10; 3734:10

**Duffy** [1] - 3693:20

**duly** [5] - 3445:24; 3570:19; 3616:7; 3646:3; 3705:12

**dunno** [1] - 3614:23

**During** [4] - 3537:14; 3554:25; 3618:8; 3671:25

**during** [33] - 3419:1; 3420:17; 3424:25; 3428:24; 3429:4, 8; 3438:16; 3519:6; 3541:16; 3542:3; 3554:5; 3556:13; 3558:25; 3559:8; 3560:16; 3571:23; 3622:3; 3632:22; 3635:11; 3636:19; 3658:20; 3671:21; 3672:6, 11; 3679:3; 3685:24; 3686:8; 3691:12, 14; 3697:17;

3701:16; 3733:15; 3736:5

**duties** [1] - 3618:5

**duty** [2] - 3527:19; 3633:13

---

## E

**e-mail** [2] - 3626:10; 3739:23

**e-mails** [1] - 3627:21

**early** [14] - 3424:4; 3455:15; 3456:2; 3573:19; 3634:2; 3640:10; 3646:23; 3667:20; 3670:3; 3684:3, 9; 3720:3, 6; 3721:4

**easier** [1] - 3590:6

**Easily** [1] - 3685:20

**East** [2] - 3414:17; 3726:9

**EASTERN** [1] - 3414:1

**eat** [3] - 3664:23; 3665:6

**EB** [1] - 3660:1

**EBT** [2] - 3660:2, 7

**education** [2] - 3572:12

**effect** [1] - 3643:5

**effort** [1] - 3640:16

**eight** [5] - 3475:8, 13; 3640:6; 3665:5; 3700:13

**either** [17] - 3417:19; 3435:2; 3454:6; 3467:23; 3510:6; 3521:15; 3534:11; 3535:1, 15; 3553:4; 3613:7; 3632:12; 3640:11; 3660:12; 3671:7; 3716:12; 3733:5

**electronic** [13] - 3426:4, 20; 3429:14, 18, 23, 25; 3430:8; 3432:12; 3442:14, 22; 3634:13, 17; 3744:15

**elicit** [15] - 3556:5; 3563:7; 3568:5; 3643:3; 3649:11; 3651:12; 3675:4; 3676:10, 13, 16; 3681:14; 3721:6; 3722:11, 15

**elicited** [2] - 3681:25; 3716:5

**eliciting** [2] -

3676:4; 3679:20

**eliminate** [1] - 3578:23

**eliminated** [1] - 3720:20

**eliminates** [1] - 3721:23

**elision** [1] - 3614:20

**ELMO** [1] - 3583:7

**elsewhere** [1] - 3434:23

**Embassy** [1] - 3419:22

**emphasis** [1] - 3566:24

**employed** [4] - 3565:1; 3573:22; 3714:16, 19

**employee** [2] - 3595:1; 3723:8

**enclosure** [3] - 3439:2; 3440:16, 19

**encoded** [1] - 3426:9

**End** [2] - 3646:23; 3667:20

**end** [16] - 3566:20; 3570:3; 3584:22; 3586:8; 3590:3; 3591:14; 3614:13; 3620:16; 3628:6; 3649:22; 3665:1; 3669:6; 3703:23; 3704:1; 3729:3

**ended** [6] - 3580:22; 3581:2; 3618:2; 3659:16; 3665:4; 3685:19

**enemies** [1] - 3505:10

**enforcement** [1] - 3572:24

**Enjoying** [1] - 3597:3

**enlargement** [1] - 3585:22

**entailed** [1] - 3548:8

**enter** [3] - 3442:15; 3494:17; 3745:4

**Enter** [1] - 3699:22

**entered** [4] - 3442:23; 3458:11; 3526:5; 3744:15

**entering** [4] - 3427:4; 3444:12; 3494:12; 3512:11

**enterprise** [1] - 3741:25

**enters** [5] - 3425:12;

3442:18; 3456:25; 3549:15; 3570:11

**entire** [3] - 3502:11; 3633:15; 3669:16

**entitled** [2] - 3554:22; 3561:23

**entries** [24] - 3426:8, 15, 19; 3427:14; 3428:16; 3429:7, 21; 3432:1, 4; 3433:3, 5-7; 3434:9, 12; 3435:10, 17; 3443:6, 14, 17; 3445:6; 3549:1; 3583:24; 3633:1

**entry** [21] - 3427:3; 3428:12; 3429:21; 3431:3; 3433:15; 3442:5, 10, 12, 21; 3443:19, 24; 3444:2, 16; 3445:5; 3466:15; 3468:7; 3586:2; 3659:13; 3699:11, 13

**equal** [1] - 3585:23

**equipment** [1] - 3543:7

**erroneously** [1] - 3568:13

**ESQ** [4] - 3414:12, 16-17, 19

**essential** [2] - 3723:18, 20

**establish** [1] - 3743:9

**establishing** [1] - 3552:12

**estimate** [3] - 3737:14, 16, 19

**estimation** [1] - 3643:11

**et** [1] - 3421:22

**Ethaloe** [1] - 3431:16

**Eugene** [2] - 3735:21; 3736:19

**evaluate** [2] - 3720:14; 3722:9

**evaluation** [1] - 3723:4

**evening** [20] - 3424:4; 3476:24; 3477:15; 3483:7; 3493:2, 16; 3502:14; 3555:7; 3634:3, 5; 3658:14; 3689:14; 3690:24; 3692:7, 20; 3718:5, 18

**event** [2] - 3475:14; 3681:13

**events** [1] - 3537:8
**everyday** [1] - 3637:15
**evidence** [54] -
3420:10, 17; 3427:12;
3430:11; 3437:6;
3448:1, 3; 3461:5;
3465:23; 3466:2;
3517:25; 3558:19;
3562:5, 11; 3563:4;
3564:23; 3575:10, 16;
3581:15, 17; 3582:20,
22; 3600:10; 3605:23,
25; 3606:2, 4, 6;
3622:25; 3623:1;
3626:9; 3629:13;
3645:3, 9, 17; 3647:15;
3650:24; 3658:3;
3659:21; 3686:14;
3696:21; 3708:15, 17;
3714:6, 8; 3721:17;
3724:3; 3741:23;
3746:24; 3747:1, 4
**evidentiary** [1] -
3569:11
**exact** [4] - 3529:18;
3657:24; 3724:23;
3731:21
**exactly** [12] - 3448:21;
3518:19; 3521:10;
3531:1; 3577:13;
3578:14; 3586:21;
3622:12; 3638:6;
3679:17; 3726:11;
3735:3
**EXAMINATION** [18] -
3425:23; 3436:17;
3443:4; 3446:8; 3470:1;
3546:18; 3571:8;
3594:18; 3616:15;
3620:8; 3631:16;
3646:13; 3667:14;
3705:23; 3746:6, 10,
13, 17
**examination** [21] -
3424:25; 3430:12;
3438:17; 3476:11;
3568:10; 3571:18, 22;
3572:2, 20, 23;
3573:25; 3584:10;
3606:8; 3608:5;
3623:23; 3624:2;
3628:14, 21; 3629:7;
3631:12; 3743:8
**examine** [13] - 3525:23;
3562:25; 3565:5;
3566:4, 10; 3573:11,

22; 3629:15; 3729:9,
13; 3734:6; 3735:1
**examined** [15] -
3445:24; 3455:2;
3562:13; 3565:6, 8, 17;
3570:19; 3599:3, 6, 8;
3604:24; 3616:7;
3646:3; 3705:12
**examiner** [1] - 3571:13
**examiners** [1] -
3572:16
**examining** [2] -
3419:13; 3575:23
**example** [5] - 3431:2;
3563:23; 3585:1;
3586:19; 3606:25
**examples** [2] -
3563:16; 3590:20
**Except** [1] - 3744:4
**exception** [1] -
3443:14
**exceptions** [1] -
3732:4
**excerpt** [2] - 3730:17,
19
**excerpts** [13] -
3619:5, 22, 25;
3620:10, 13; 3622:2;
3625:12; 3627:2;
3629:4, 9, 18; 3630:21;
3731:21
**exchange** [2] - 3690:3,
5
**excuse** [3] - 3569:8;
3587:7; 3593:21
**Excuse** [4] - 3437:9;
3453:3; 3511:3; 3714:18
**excused** [4] - 3553:6;
3630:4; 3642:22;
3718:24
**exemplar** [9] -
3560:18; 3563:16;
3579:8; 3586:23;
3588:25; 3589:12;
3607:1; 3609:5
**exemplar's** [1] -
3585:17
**exemplars** [30] -
3562:24; 3563:9, 13,
17; 3565:10; 3579:2,
11, 14, 18-19; 3580:9,
18; 3581:1, 19;
3585:12; 3586:18;
3587:9, 20; 3590:12;

3591:21; 3596:2;
3605:1; 3606:24;
3607:4, 19; 3609:12;
3610:1, 16
**exercise** [1] - 3642:21
**exhibit** [15] - 3420:8,
13, 19; 3423:14;
3452:16; 3570:7;
3575:18; 3586:2, 13;
3612:25; 3623:11;
3625:24; 3627:3;
3742:24
**Exhibit** [99] - 3427:13;
3428:8; 3431:1;
3432:22; 3434:10;
3435:9; 3442:5; 3443:6;
3448:6; 3459:15;
3460:9; 3461:25;
3465:2; 3466:10;
3468:1, 4, 11, 18, 21,
24; 3469:3, 6, 13, 18;
3524:14; 3546:22;
3573:17, 23; 3574:22;
3575:4, 15, 22, 24-25;
3578:3, 20; 3579:13,
17; 3580:8, 17;
3581:16, 20; 3582:5;
3583:16, 18, 20, 23-24;
3585:5, 8, 11, 15, 17;
3586:3, 17; 3587:9, 12,
21; 3589:7, 23; 3590:1,
21; 3591:1, 13, 17, 19,
22; 3593:22; 3604:9;
3610:21; 3613:1, 7, 9;
3619:12; 3620:3, 22;
3623:1; 3642:8; 3645:1,
9, 17; 3647:15; 3658:3;
3659:22; 3686:14;
3707:21; 3708:16, 19;
3709:7; 3713:25;
3714:2; 3741:15;
3742:24; 3743:9;
3746:24; 3747:1
**Exhibits** [9] - 3448:2;
3460:10; 3461:4;
3466:1; 3536:23;
3582:21; 3713:22;
3714:7; 3747:3
**exhibits** [11] -
3420:13; 3438:8;
3461:7, 15; 3463:12;
3466:6; 3526:5; 3583:3;
3585:4; 3742:2
**exist** [1] - 3706:15
**existed** [3] - 3419:18;
3429:8; 3742:3

**exit** [1] - 3549:16
**exited** [1] - 3458:12
**exits** [2] - 3549:14, 16
**expand** [1] - 3516:20
**expanded** [1] - 3720:17
**expect** [3] - 3578:13;
3653:5; 3736:18
**expected** [2] -
3577:15; 3587:23
**expense** [2] - 3737:18;
3738:21
**expenses** [1] - 3738:15
**expensive** [1] -
3738:20
**experimentation** [1] -
3572:1
**expert** [13] - 3415:23;
3558:16; 3562:16;
3564:21; 3565:2, 18;
3571:2; 3573:9;
3604:18, 21; 3610:7;
3614:21
**expertise** [2] -
3429:13; 3671:17
**experts** [1] - 3563:18
**explain** [8] - 3420:22;
3426:23; 3427:14;
3589:11; 3657:3;
3664:17; 3678:15;
3734:25
**Explain** [1] - 3442:12
**explainable** [1] -
3578:12
**expressway** [1] -
3549:16
**extension** [4] -
3690:6; 3693:9; 3695:9
**extensive** [1] -
3732:13
**extensively** [1] -
3743:9
**extent** [4] - 3574:15;
3584:10; 3681:10;
3734:22
**extremely** [1] - 3727:2
**eyes** [7] - 3466:23;
3586:4, 7, 10, 24;
3587:14

---

**F**

---

**F-A-R-N-E-T-I** [1] -
3616:12
**F2C** [1] - 3534:18

**fabricated** [1] - 3700:24

**facilitate** [2] - 3738:10

**facility** [2] - 3669:18; 3704:7

**facing** [2] - 3450:12; 3643:10

**fact** [76] - 3419:21; 3423:13, 15; 3426:8, 10; 3434:10; 3435:11; 3473:4; 3478:4; 3481:12, 23; 3482:2, 11; 3489:6; 3495:15; 3513:16; 3517:12, 17, 23; 3519:20; 3521:18, 21; 3523:3, 20; 3524:6, 17; 3535:18; 3536:7; 3543:4; 3545:2; 3553:21, 25; 3554:7, 18; 3555:2, 8; 3557:2; 3563:8, 11; 3564:3; 3565:1, 8; 3566:7; 3568:16; 3602:16; 3604:20; 3637:23; 3649:4, 17; 3650:14; 3668:3; 3669:13, 17; 3670:1, 5; 3671:2; 3672:1, 11; 3677:7, 12; 3678:6, 9, 14; 3680:8, 25; 3681:15; 3682:25; 3685:18; 3686:8; 3692:7; 3698:7; 3699:13; 3701:24; 3703:16; 3743:10; 3744:14

**Factory** [1] - 3432:25

**facts** [4] - 3718:13, 15; 3722:14; 3725:3

**faded** [1] - 3614:18

**Faded** [1] - 3614:19

**Fahmy** [4] - 3720:24; 3728:5, 19; 3735:7

**failed** [1] - 3422:25

**failure** [1] - 3682:20

**faintly** [1] - 3585:3

**fair** [7] - 3549:1, 5; 3550:8; 3619:25; 3633:13; 3653:16; 3680:6

**fairly** [6] - 3447:18; 3460:18; 3585:15; 3691:11; 3736:22

**fairness** [1] - 3680:7

**faith** [3] - 3650:20,
23; 3651:2

**familiar** [4] - 3537:10; 3551:8; 3579:7; 3691:9

**familiarized** [1] - 3578:5

**families** [1] - 3733:1

**family** [15] - 3471:9; 3488:3, 16-17; 3666:20; 3667:10; 3673:15; 3677:19; 3684:14, 18; 3713:1; 3732:14, 22, 24; 3741:21

**Family** [2] - 3523:2; 3650:13

**fancy** [1] - 3614:20

**far** [8] - 3429:19; 3450:22; 3451:4; 3502:13; 3551:10; 3600:25; 3601:1; 3704:12

**farm** [1] - 3444:7

**Farneti** [4] - 3616:3, 12, 17; 3631:18

**FARNETI** [1] - 3616:6

**fashion** [6] - 3423:1; 3431:20; 3432:5; 3441:8; 3528:19; 3603:21

**faster** [1] - 3588:7

**father** [3] - 3669:24; 3712:6, 11

**fax** [2] - 3418:4; 3439:14

**Fax** [1] - 3414:23

**FBI** [16] - 3419:18; 3421:3; 3429:12; 3439:15, 21; 3446:13; 3464:4; 3477:25; 3478:21; 3508:12; 3509:6, 16, 20; 3527:19; 3735:21

**FC** [3] - 3481:5, 10; 3492:6

**fear** [1] - 3588:8

**feature** [2] - 3442:15; 3593:8

**Features** [1] - 3577:1

**features** [8] - 3576:1; 3578:7, 9, 19; 3586:12; 3591:6, 23; 3593:24

**February** [6] - 3618:3; 3619:6; 3633:10; 3668:18; 3678:22;
3684:22

**Federal** [1] - 3414:23

**federally** [1] - 3668:23

**FedEx** [1] - 3430:19

**felt** [3] - 3559:7; 3662:12; 3732:3

**few** [12] - 3416:13; 3452:9; 3455:1; 3508:16; 3509:17; 3523:18; 3555:6; 3570:2; 3602:15; 3630:9; 3713:8; 3714:16

**few-minute** [1] - 3455:1

**field** [7] - 3427:1, 5-6, 21; 3571:24

**fields** [4] - 3426:25; 3427:4, 18; 3428:9

**Fifth** [2] - 3463:21

**figure** [5] - 3422:14; 3468:25; 3680:5; 3717:5; 3727:2

**figured** [1] - 3739:20

**file** [5] - 3465:18; 3509:14; 3513:7; 3699:23; 3716:6

**filed** [1] - 3724:25

**files** [10] - 3509:18; 3699:14; 3704:2, 4, 6, 9-10, 12, 14

**filled** [1] - 3632:20

**filling** [2] - 3609:20; 3632:19

**final** [1] - 3733:11

**Finally** [3] - 3450:25; 3591:18; 3593:20

**finally** [2] - 3462:22; 3469:18

**finances** [1] - 3737:24

**fine** [18] - 3441:16; 3516:10; 3518:9; 3528:5, 11-12, 17; 3556:2; 3562:25; 3564:16; 3574:7; 3588:7; 3646:17; 3653:14; 3683:5, 7, 9; 3702:4

**finger** [1] - 3450:7

**fingerprint** [1] - 3430:8

**fingerprints** [2] - 3531:5; 3574:13

**finish** [7] - 3416:8;
**3528**:9; 3655:3, 17, 20; 3720:5; 3729:4

**finished** [1] - 3664:16

**fired** [1] - 3419:23

**first** [78] - 3417:15, 22; 3418:5, 17; 3423:6, 8; 3424:22; 3425:1; 3431:2; 3433:6, 15; 3434:10; 3439:14; 3440:4, 11; 3442:4; 3443:10; 3457:24; 3466:15, 17; 3468:7; 3478:5; 3502:2; 3510:2; 3511:19, 23-24; 3517:12; 3522:21; 3523:9; 3530:17; 3550:13; 3560:13; 3573:24; 3574:2, 4; 3575:23; 3576:13; 3580:21; 3586:1; 3587:2; 3588:2; 3590:5; 3599:21, 24; 3612:2; 3622:19; 3625:4; 3626:4; 3627:13; 3635:13; 3646:2, 22; 3658:4; 3660:23; 3672:20; 3681:9; 3698:1, 6; 3699:6; 3701:13; 3702:3, 12; 3706:6; 3707:1, 3; 3720:17; 3723:24; 3724:2, 20; 3725:5; 3728:5; 3735:24; 3736:10; 3739:11; 3744:4

**First** [4] - 3516:2; 3600:6; 3694:24; 3695:5

**fit** [1] - 3502:25

**Five** [2] - 3414:17; 3510:4

**five** [13] - 3421:13; 3458:18; 3470:17; 3480:24; 3484:15; 3505:22; 3510:5; 3618:12; 3633:12; 3642:20; 3662:12; 3685:19; 3733:19

**fixed** [6] - 3617:8, 11, 18, 23; 3618:6; 3619:22

**flag** [1] - 3525:8

**flip** [3] - 3522:15; 3523:15

**flips** [1] - 3522:17

**Florida** [17] - 3495:2; 3553:19; 3554:10, 15;

3555:5, 16; 3643:9; 3644:15, 19; 3668:14; 3669:4, 18; 3671:17; 3686:11; 3693:13; 3697:9, 12

**Floridia** [6] - 3637:5; 3642:5; 3733:13; 3743:8; 3744:14

**focused** [1] - 3622:13

**focusing** [1] - 3600:20

**folder** [1] - 3455:12

**folks** [3] - 3415:4; 3425:14; 3642:19

**Folks** [1] - 3456:2

**follow** [3] - 3466:20; 3556:10; 3594:2

**following** [21] - 3431:7; 3505:1; 3507:1; 3516:1; 3521:1; 3528:1; 3529:1; 3555:10; 3625:1; 3630:1; 3643:7; 3649:1; 3652:1; 3653:1; 3654:1, 20; 3658:22; 3688:7, 17; 3713:12, 14

**follows** [7] - 3425:22; 3445:25; 3570:20; 3592:15; 3616:8; 3646:4; 3705:13

**food** [1] - 3665:13

**forgotten** [1] - 3719:6

**form** [4] - 3557:13; 3590:3; 3716:14; 3718:16

**formal** [1] - 3439:20

**Formally** [1] - 3703:6

**formally** [5] - 3677:6; 3685:3, 6; 3703:7

**formation** [8] - 3584:22; 3588:3; 3590:6, 8; 3592:14, 16-17; 3593:2

**formations** [4] - 3576:5, 16; 3585:24; 3592:19

**formed** [1] - 3576:18

**former** [3] - 3415:8; 3652:13; 3654:8

**forms** [2] - 3577:23; 3609:20

**forth** [3] - 3427:6; 3432:18; 3488:6

**forward** [1] - 3456:20

**foundation** [7] - 3480:16; 3519:12, 14;

3626:19; 3627:19; 3628:7; 3729:1

**foundational** [2] - 3626:20; 3629:9

**four** [11] - 3421:13; 3443:14, 17, 19; 3515:1; 3542:18, 20; 3590:22; 3600:21; 3662:12; 3665:16

**fourth** [1] - 3638:21

**Fox** [3] - 3432:25; 3443:20; 3729:20

**frame** [5] - 3451:12, 25; 3482:1; 3635:11; 3735:11

**framing** [1] - 3591:25

**Frank** [62] - 3448:8; 3449:4; 3450:16; 3451:5; 3457:23; 3458:14, 24; 3459:23, 25; 3462:8, 12, 21; 3463:1; 3466:25; 3470:16; 3471:6; 3473:17, 20; 3474:17; 3475:20; 3476:13; 3482:2; 3487:23; 3491:6; 3503:9, 17; 3511:10, 22; 3512:9, 14, 24; 3513:1, 13; 3514:15, 21; 3554:13; 3588:2, 15, 17, 19; 3589:6; 3590:10, 14; 3671:13, 16; 3713:17; 3714:1, 10, 16, 19, 24; 3715:2, 8; 3716:6; 3729:6; 3730:23; 3731:2; 3732:12

**Frank/Allie** [3] - 3663:1, 4, 11

**free** [1] - 3631:25

**frequency** [1] - 3484:23

**frequent** [1] - 3636:18

**frequently** [3] - 3665:12; 3689:17; 3691:12

**fresh** [2] - 3709:22

**friendly** [13] - 3652:11, 13-14; 3653:5, 11, 13, 18; 3654:4, 9, 25; 3655:12, 21

**front** [14] - 3424:21; 3425:3, 5, 8, 10; 3540:15; 3542:8, 10, 18; 3562:17; 3639:24;

3663:9; 3705:16; 3738:14

**full** [4] - 3420:18; 3438:12; 3625:12; 3733:17

**fully** [2] - 3576:6; 3716:22

**Fund** [2] - 3706:3, 7

**fund** [9] - 3706:9, 12, 14-15; 3707:1; 3708:6, 20; 3716:7

**future** [1] - 3552:13

---

**G**

**game** [16] - 3659:10, 14-16, 18; 3660:13, 16, 25; 3661:1, 4, 22, 25; 3662:7, 20; 3663:2

**games** [2] - 3559:22; 3659:19

**Gannone** [28] - 3457:23; 3458:9, 17; 3459:1; 3462:3, 7, 9, 20, 25; 3476:13; 3511:9, 13, 19; 3512:9, 15-16, 25; 3514:13; 3713:15, 24; 3714:10, 12, 23; 3715:2, 5; 3716:17, 19

**garage** [4] - 3458:22; 3512:11, 13

**Garden** [4] - 3688:23-25; 3689:21

**GARY** [2] - 3445:23; 3446:4

**Gary** [7] - 3415:17; 3416:9; 3445:19; 3446:4; 3470:15; 3498:4; 3736:21

**gather** [2] - 3678:10; 3679:16

**GB** [8] - 3456:9, 17; 3459:15; 3465:15; 3470:12; 3533:2; 3613:19

**general** [7] - 3472:4; 3606:16, 20, 22; 3633:24; 3690:3, 5

**generally** [3] - 3593:1; 3606:14; 3632:17

**generate** [1] - 3486:19

**gentleman** [17] - 3636:11, 23; 3637:3, 10, 14; 3638:21;

3639:12; 3640:1, 20; 3641:1, 8, 17-19; 3666:11; 3713:15

**gentlemen** [7] - 3585:5; 3638:1, 3-4, 25; 3639:7; 3718:2

**Georgetown** [1] - 3572:4

**Georgia** [12] - 3687:15; 3688:11, 15; 3690:9; 3691:3; 3695:13, 19, 23; 3696:2, 6, 11, 17

**Gerald** [1] - 3544:21

**Gigi** [2] - 3587:13, 22

**GIGI** [1] - 3587:13

**Gina** [1] - 3497:25

**Giovanni** [2] - 3642:6; 3743:8

**Given** [2] - 3441:1; 3583:17

**given** [29] - 3430:20; 3484:16; 3508:16; 3509:2; 3557:11; 3560:14; 3564:12; 3565:11, 25; 3566:1, 5, 7; 3572:4; 3584:6; 3595:25; 3598:9; 3599:5; 3604:8; 3605:17; 3611:1, 7, 22; 3612:20; 3632:22; 3699:8; 3731:10; 3743:17

**glance** [1] - 3417:12

**glasses** [1] - 3641:1

**goal** [1] - 3496:24

**Gold** [1] - 3739:19

**Goldberg** [4] - 3422:13, 21; 3727:10, 18

**GOLDBERG** [11] - 3414:14; 3725:20; 3726:11, 14, 17, 21; 3727:21; 3728:9, 11, 15, 18

**Goldberg's** [1] - 3422:16

**gorgeous** [1] - 3597:5

**Government** [60] - 3414:12; 3427:13; 3431:1; 3432:22; 3434:10; 3435:9; 3443:6; 3448:2, 6; 3459:15; 3460:9; 3461:4; 3465:2; 3466:1,

10; 3468:4, 11, 18, 21, 24; 3469:3, 6, 13; 3573:17, 23; 3574:22; 3575:15; 3578:3; 3579:13, 17; 3580:8, 17; 3581:16, 20; 3582:5, 21; 3583:16; 3585:11, 17; 3604:9; 3610:21; 3619:12; 3620:3, 22; 3686:14; 3707:21; 3708:16, 19; 3709:7; 3713:22, 25; 3714:2, 7; 3741:15; 3742:24; 3743:9; 3747:2

**government** [119] - 3415:6; 3417:5, 13, 19, 21; 3418:15, 22, 24; 3419:4, 11; 3422:25; 3423:2, 4, 18; 3424:22; 3438:16; 3440:9, 11; 3441:1, 3, 13; 3445:18; 3554:20; 3558:24; 3559:9, 13; 3560:10, 23; 3561:1, 25; 3562:15; 3563:20; 3564:11, 14-15, 23; 3565:1, 13, 23; 3566:11, 19; 3570:15; 3573:6; 3594:23; 3595:2, 13, 18; 3596:1; 3597:15, 18; 3599:15; 3603:2, 14; 3604:15; 3605:6, 18-19; 3607:12; 3616:2; 3626:7; 3630:8; 3635:3; 3642:24; 3643:3; 3644:5; 3645:21; 3649:14, 25; 3650:24; 3676:18; 3677:1, 10, 17; 3679:2, 21; 3681:14, 23; 3682:15, 23; 3684:4; 3697:13; 3698:2, 6; 3699:7, 10, 14, 17; 3700:13, 19, 22; 3701:8, 13, 17; 3702:3, 13; 3703:3, 8, 20; 3704:8; 3716:9; 3719:23; 3720:2; 3722:13; 3724:2, 6, 12; 3725:5, 11; 3733:24; 3734:5, 19, 22; 3735:19; 3741:1; 3742:7

**Government's** [13] - 3546:22; 3561:17; 3623:1; 3642:8; 3645:1, 9, 17; 3647:15; 3658:3;

3659:21; 3746:24; 3747:1

**government's** [13] - 3440:7; 3445:17; 3518:21; 3553:10; 3556:18; 3561:19; 3570:14; 3604:19; 3616:1; 3645:20; 3679:1; 3736:5; 3744:3

**grand** [3] - 3651:6; 3700:1; 3744:22

**grant** [1] - 3418:20

**grants** [1] - 3719:12

**gratuitously** [1] - 3560:1

**gray** [2] - 3464:14; 3666:13

**great** [1] - 3568:7

**gree** [1] - 3586:10

**green** [8] - 3466:23; 3586:4, 6, 8, 20; 3587:14; 3614:8

**greeted** [1] - 3718:4

**Grosso** [2] - 3444:2, 5

**grounds** [2] - 3417:1; 3725:8

**group** [3] - 3471:5; 3491:23; 3492:4

**groups** [2] - 3472:20; 3482:23

**Gs** [3] - 3587:13

**guaranteed** [1] - 3721:24

**guard** [1] - 3554:14

**guess** [7] - 3423:3; 3432:6; 3471:12; 3531:18; 3623:24; 3633:15; 3654:9

**guessing** [2] - 3477:7; 3501:21

**gun** [1] - 3554:15

**Guthrie** [1] - 3693:23

**Guthy** [1] - 3693:22

**GUTHY** [1] - 3693:24

**guy** [1] - 3636:25

**guys** [2] - 3480:22

**GV** [1] - 3497:18

---

### H

**habit** [6] - 3574:9; 3576:15; 3588:24; 3590:10, 13, 17

**habits** [3] - 3585:24;

3593:16; 3594:10

**habitual** [1] - 3578:1

**Hair** [2] - 3446:24; 3448:19

**half** [12] - 3475:8; 3617:25; 3618:4; 3625:16; 3626:3; 3628:22; 3629:21; 3633:5; 3659:6; 3710:10; 3722:1; 3723:4

**halfway** [1] - 3524:12

**hall** [3] - 3457:12; 3458:10, 19

**Hampshire** [2] - 3733:14, 17

**hand** [26] - 3423:6; 3450:1; 3461:25; 3462:4, 17, 22; 3467:10; 3469:13; 3486:8; 3507:3; 3522:21; 3562:10; 3576:8; 3585:10; 3586:6; 3590:5, 7, 14, 21; 3591:1, 3; 3613:18; 3639:16, 19; 3645:22; 3705:10

**handed** [13] - 3438:5; 3449:23; 3501:17; 3503:5; 3524:14; 3529:11, 21; 3533:11; 3536:23; 3538:14; 3547:23; 3563:24; 3660:21

**handheld** [1] - 3446:2

**handled** [1] - 3703:9

**handprinted** [2] - 3592:18; 3593:8

**hands** [1] - 3522:23

**handwriting** [65] - 3415:23; 3489:2; 3533:1; 3538:22; 3540:24; 3547:8, 12; 3558:6, 16-17; 3559:6, 18, 20; 3560:18; 3561:5, 7; 3562:16; 3563:9, 12, 14, 18, 21; 3564:5, 21, 25; 3565:2, 17, 25; 3566:16, 23; 3571:2; 3574:7; 3575:24; 3576:2; 3577:3; 3578:1, 6-8, 14; 3579:1, 8; 3583:16; 3585:16, 20, 22; 3586:13; 3607:2; 3608:3; 3609:4, 9;

3610:7; 3611:4, 7, 12; 3614:13, 21; 3615:1

**handwritten** [9] - 3466:11; 3468:10, 12, 20; 3469:2; 3495:25; 3496:6; 3558:2; 3632:5

**happy** [8] - 3558:15; 3658:1; 3711:16; 3716:3, 22; 3722:24; 3727:25; 3739:13

**hard** [3] - 3586:7; 3588:9; 3662:12

**head** [1] - 3543:18

**header** [5] - 3427:1, 7-8, 15; 3441:11

**heading** [7] - 3549:17; 3550:2, 24; 3551:16; 3585:10; 3632:11

**headquarters** [2] - 3477:25; 3478:22

**heads** [1] - 3678:18

**hear** [8] - 3526:19; 3616:23; 3648:4; 3711:19; 3716:16; 3740:1; 3741:3; 3745:3

**heard** [4] - 3549:8; 3625:13; 3736:25; 3739:11

**hearing** [12] - 3484:25; 3485:2; 3517:2, 4, 7; 3519:3; 3520:3; 3554:9; 3626:7; 3643:9; 3644:18; 3672:12

**hearsay** [1] - 3699:4

**heavy** [1] - 3641:1

**heavy-set** [1] - 3641:1

**height** [1] - 3576:24

**heightened** [1] - 3628:19

**heights** [1] - 3587:2

**help** [5] - 3540:15, 21; 3622:17; 3639:3; 3640:19

**helps** [2] - 3544:11; 3588:7

**Hera** [1] - 3473:2

**herself** [1] - 3560:12

**hiding** [1] - 3517:21

**highly** [6] - 3583:22; 3584:2, 8; 3594:8, 10; 3677:16

**himself** [4] - 3553:23; 3554:24; 3731:17; 3743:7

**hires** [1] - 3597:21
**history** [1] - 3488:2
**hmm** [2] - 3431:15; 3703:12
**hold** [2] - 3708:4; 3736:7
**holding** [1] - 3438:2
**holidays** [1] - 3719:22
**hollered** [1] - 3717:9
**Home** [1] - 3665:24
**home** [32] - 3419:19; 3431:14; 3551:5; 3555:7, 9; 3658:12; 3665:4; 3670:13; 3671:9; 3686:10; 3687:3; 3689:7, 10, 18, 20; 3691:6; 3692:2, 11, 15; 3694:1, 3, 11, 15, 23, 25; 3695:4; 3697:5, 8; 3743:13; 3744:5, 7
**honest** [1] - 3629:2
**Honor** [124] - 3417:7, 9; 3418:3; 3421:23; 3422:20; 3424:20; 3425:19; 3436:14, 21; 3437:5, 7; 3439:25; 3443:2; 3445:14; 3446:6; 3447:6, 25; 3451:20; 3452:12; 3453:1; 3456:14, 17; 3457:3; 3460:6; 3461:2, 13; 3463:7; 3464:24; 3465:17, 22; 3466:4; 3485:10; 3504:16; 3515:10; 3516:23; 3527:24; 3533:8; 3546:16; 3547:21; 3552:17, 20; 3553:14; 3555:10; 3558:13, 25; 3560:25; 3562:10; 3563:6; 3564:24; 3568:20; 3570:6; 3571:1, 6; 3573:14; 3574:19; 3575:9, 12; 3580:14; 3581:13; 3582:2, 19, 23; 3583:6; 3604:19, 24; 3607:1, 14, 17; 3611:10; 3615:22, 24; 3620:6; 3626:25; 3632:2; 3642:1, 12, 14; 3644:23; 3646:10; 3648:7; 3649:23; 3652:19, 23; 3656:4, 25; 3660:19; 3663:22;
3667:6; 3674:9; 3675:9; 3676:19, 23; 3678:20; 3698:15; 3699:20; 3700:1, 6; 3704:21; 3705:21; 3707:18; 3708:14; 3713:19; 3714:5; 3716:22, 25; 3717:4; 3719:1, 19; 3721:14; 3722:13, 20; 3723:22, 24; 3724:17; 3725:7, 20; 3730:8; 3731:4; 3732:1; 3733:25; 3736:24; 3739:3; 3742:5
**HONORABLE** [1] - 3414:9
**hooked** [1] - 3499:7
**hope** [4] - 3569:7; 3630:11; 3643:14; 3720:5
**Hope** [2] - 3552:1, 8
**Hopefully** [1] - 3630:13; 3722:8; 3728:19
**hopefully** [3] - 3635:5, 7; 3740:7
**horizon** [1] - 3588:20
**horizontal** [2] - 3593:4
**Hospital** [1] - 3719:13
**hostile** [2] - 3415:8; 3643:19
**hotly** [1] - 3733:14
**hour** [14] - 3422:14; 3457:25; 3458:20; 3487:16; 3550:24; 3597:13-15; 3628:22; 3629:21; 3664:10; 3710:11; 3722:1; 3723:4
**hourly** [1] - 3595:23
**hours** [14] - 3416:13; 3459:8; 3596:6, 13, 22; 3638:15; 3640:10; 3664:10, 22, 25; 3665:16; 3689:10; 3719:10
**house** [2] - 3657:21; 3711:23
**huddled** [1] - 3523:11
**human** [1] - 3577:5
**husband's** [1] - 3564:5
**Hutton** [1] - 3735:25
**Hylan** [11] - 3549:17; 3550:2, 7, 20-21, 24; 3551:5, 10, 16

**I**

**idea** [14] - 3428:20; 3445:4; 3474:14; 3510:12, 18; 3530:12; 3531:16; 3534:12; 3535:6; 3576:21; 3626:5; 3637:15; 3660:17; 3735:15
**identification** [9] - 3470:12; 3481:5; 3499:25; 3501:16; 3524:10; 3571:22; 3598:14; 3619:13; 3744:18
**identified** [15] - 3464:16; 3474:6; 3478:4; 3488:5; 3490:7; 3503:23; 3511:9; 3522:10; 3524:1; 3552:5; 3573:17; 3604:1; 3639:13; 3666:16; 3743:21
**identifies** [2] - 3604:6; 3743:25
**identify** [17] - 3449:20; 3478:2; 3527:12; 3528:11; 3544:11; 3552:13; 3630:12; 3635:6, 17, 23; 3639:22, 25; 3640:16; 3708:24; 3743:22; 3744:14
**identifying** [3] - 3434:15, 22; 3527:11
**ignored** [1] - 3626:6
**II** [6] - 3470:16; 3713:22; 3714:2, 7; 3747:3
**III** [2] - 3537:14, 17
**illustrate** [1] - 3584:14
**illustrated** [4] - 3589:17, 25; 3590:1, 21
**illustrations** [2] - 3590:25; 3596:5
**image** [3] - 3583:20; 3589:24; 3590:7
**images** [2] - 3585:6; 3621:1
**imagine** [2] - 3628:15, 21
**Imes** [4] - 3470:15, 19; 3471:8; 3492:20
**immediate** [3] -
3416:24; 3418:20; 3420:3
**Immediate** [1] - 3417:2
**immediately** [7] - 3473:21; 3477:22; 3478:13; 3516:18; 3589:19; 3592:18; 3718:9
**immunity** [2] - 3557:2; 3647:10
**implies** [1] - 3650:21
**implying** [1] - 3700:22
**importantly** [1] - 3681:8
**imposed** [1] - 3583:17
**impression** [3] - 3605:14, 16; 3675:12
**improper** [3] - 3418:19; 3518:5; 3651:3
**incapacitated** [2] - 3649:8; 3650:6
**incarcerated** [6] - 3568:21; 3650:14; 3667:22; 3669:13, 17
**incarceration** [4] - 3568:12, 16, 24; 3669:7
**inclined** [1] - 3720:16
**include** [3] - 3577:22; 3579:24; 3586:13
**included** [4] - 3604:10; 3617:8; 3623:11; 3736:14
**includes** [2] - 3596:7; 3607:4
**including** [9] - 3417:16; 3419:12; 3421:14; 3483:6; 3516:22; 3569:3; 3572:4; 3596:2; 3649:7
**Including** [2] - 3469:11; 3675:23
**incoming** [7] - 3543:8, 15, 24; 3544:2; 3691:17
**Incoming** [1] - 3543:19
**inconsistent** [2] - 3700:4, 7
**incorrect** [1] - 3422:6
**indeed** [2] - 3579:5; 3590:16
**independent** [3] - 3529:17; 3547:18; 3655:6
**index** [1] - 3726:2

**indicate** [3] - 3464:15; 3465:11, 14

**indicated** [10] - 3423:15; 3489:18; 3553:10; 3599:2; 3626:18; 3630:8; 3658:20; 3721:11; 3725:24; 3738:3

**indicates** [2] - 3469:21; 3658:5

**indicating** [2] - 3568:19; 3739:23

**indication** [2] - 3423:19; 3428:16

**individual** [29] - 3448:8; 3449:10; 3450:4, 14, 22; 3462:3, 7; 3473:17; 3486:16; 3498:24; 3500:9; 3503:20; 3514:7; 3526:3; 3548:8; 3578:18; 3593:25; 3630:21; 3635:20; 3636:9; 3640:21; 3700:12; 3743:16; 3744:1

**individualities** [2] - 3576:1; 3593:15

**individualizing** [3] - 3576:1; 3578:6, 9

**individually** [1] - 3478:22

**individuals** [19] - 3447:1; 3449:8, 20; 3450:9, 11; 3451:1; 3457:19; 3462:25; 3471:4; 3482:3, 23; 3483:18; 3504:1; 3510:24; 3511:9; 3577:19; 3596:3; 3639:25; 3732:20

**influence** [1] - 3718:8

**informally** [1] - 3703:8

**information** [76] - 3417:16; 3426:3; 3427:4; 3428:11, 14, 24; 3429:3, 13, 17; 3430:20, 25; 3433:10; 3434:22, 25; 3435:2, 17, 20-22; 3436:3, 5; 3440:21, 23; 3441:10; 3444:12; 3445:1; 3479:5, 9-10, 14, 18, 22; 3480:1, 5; 3487:10;

3491:3; 3493:20; 3513:6; 3514:6; 3536:2, 8; 3537:22; 3539:2, 7, 9, 25; 3540:1, 3; 3541:2; 3542:24; 3544:20; 3545:12; 3549:6; 3607:10; 3632:8; 3673:22; 3678:6, 10; 3679:18; 3680:2; 3697:14; 3699:7, 10; 3700:13, 19; 3718:11; 3723:23; 3734:4; 3738:10; 3740:25

**Information** [1] - 3676:17

**informed** [2] - 3682:10; 3735:20

**initial** [8] - 3486:20; 3526:6; 3532:12; 3552:11; 3571:19, 23; 3731:16

**initialed** [1] - 3619:17

**initialing** [1] - 3613:18

**initials** [24] - 3465:15; 3532:5, 13, 17, 22, 24-25; 3533:13, 20, 23; 3534:8, 12, 19, 23; 3547:6; 3548:4, 21; 3550:15, 18; 3613:10, 13, 17

**initiated** [3] - 3497:20; 3502:6; 3507:20

**ink** [7] - 3535:4; 3574:14; 3575:2; 3583:19; 3584:17; 3662:4, 14

**innocent** [1] - 3680:3

**inquire** [9] - 3425:18; 3446:6; 3519:7; 3597:12; 3616:13; 3646:10; 3705:21; 3734:10, 14

**inside** [3] - 3634:14, 21; 3638:11

**instance** [2] - 3543:10; 3588:4

**instances** [1] - 3591:17

**instead** [3] - 3564:16; 3588:10; 3603:21

**Institute** [5] -

3572:6-8, 10

**instructed** [1] - 3697:22

**instruction** [3] - 3741:20, 22; 3742:1

**intend** [16] - 3560:22; 3561:4; 3563:7; 3565:12; 3566:4, 8, 10, 24; 3600:14, 18; 3604:3, 7; 3630:9; 3735:17; 3736:3

**intended** [1] - 3730:17

**intending** [1] - 3742:16

**intends** [3] - 3419:5; 3423:3, 5

**intention** [2] - 3733:24; 3735:11

**intentions** [1] - 3560:6

**intercepted** [1] - 3538:10

**intercepting** [3] - 3536:2; 3537:18; 3546:8

**interception** [3] - 3535:19; 3540:18

**interceptions** [3] - 3535:23; 3536:1; 3538:12

**Interceptions** [1] - 3539:25

**intercomparing** [2] - 3609:23, 25

**interested** [1] - 3720:11

**internal** [1] - 3435:5

**interpret** [1] - 3609:10

**interruptions** [1] - 3630:12

**interview** [13] - 3673:15; 3674:8; 3675:21; 3676:10; 3677:21; 3678:10, 12; 3679:6; 3684:13, 17

**interviewed** [8] - 3675:11, 16, 19; 3676:12; 3678:13, 22; 3679:9

**interviewing** [1] - 3679:4

**interviews** [12] - 3673:19, 21; 3674:4; 3676:5, 13; 3677:5, 15;

3678:7, 24-25; 3682:1; 3684:21

**intimidates** [1] - 3678:17

**intimidating** [1] - 3677:19

**introduce** [6] - 3419:5; 3438:18; 3440:9, 12; 3600:6; 3744:3

**introduced** [2] - 3635:22; 3744:13

**introducing** [3] - 3418:22; 3724:3; 3725:12

**introductory** [2] - 3589:9; 3591:7

**inventory** [5] - 3524:4; 3527:19; 3529:6, 8

**investigate** [1] - 3718:15

**investigating** [5] - 3510:7; 3677:12; 3679:25; 3701:14

**investigation** [10] - 3508:20; 3509:22; 3510:24; 3617:8, 19; 3677:9; 3681:1; 3683:2; 3684:6

**investigator** [2] - 3666:2; 3677:15

**investigators** [2] - 3572:22; 3632:23

**involved** [9] - 3550:5; 3551:20; 3580:23; 3617:8; 3679:22; 3681:24; 3685:13; 3716:13; 3742:14

**involvement** [1] - 3741:24

**involving** [1] - 3590:20

**Iraq** [1] - 3735:20

**irrelevant** [4] - 3516:8, 11; 3528:6; 3699:3

**Island** [7] - 3459:7, 17; 3513:2; 3552:1; 3617:21; 3618:20; 3744:23

**Islip** [2] - 3414:5, 23

**issue** [9] - 3559:18; 3560:13; 3569:11;

3606:9; 3725:6; 3732:2, 6, 17

**issues** [2] - 3627:19; 3681:12

**Italian** [3] - 3665:14

**item** [2] - 3527:4; 3611:18

**items** [18] - 3420:12; 3423:18-20; 3464:21; 3516:21; 3523:25; 3524:2, 5-6; 3526:4; 3527:2, 19; 3529:9; 3552:11; 3607:12

**itself** [10] - 3431:24; 3432:12; 3435:3; 3442:14; 3498:24; 3578:3; 3592:11; 3613:10; 3614:3; 3706:20

### J

**J-O-S-E-P-H** [1] - 3705:19

**Jack** [8] - 3547:13; 3548:9; 3636:8, 10; 3637:13; 3638:17; 3639:14, 16

**jacket** [1] - 3636:12

**Jackie** [5] - 3549:14; 3666:5; 3677:25; 3678:17; 3731:2

**jail** [7] - 3649:7, 10; 3652:5, 9; 3667:25; 3668:3; 3738:23

**James** [4] - 3635:20; 3640:21; 3729:18

**Jan** [1] - 3732:21

**Jean** [2] - 3562:9; 3741:17

**Jeff** [2] - 3499:1; 3500:9

**Jeffrey** [1] - 3483:23

**JEFFREY** [1] - 3414:14

**jeopardize** [1] - 3719:23

**jeopardy** [2] - 3417:1; 3725:8

**Jim** [1] - 3639:14

**Jimmy** [2] - 3639:13; 3744:23

**JOANNA** [1] - 3414:9

**Joe** [11] - 3444:16; 3445:3, 5; 3467:16; 3487:24; 3489:7, 12;

3531:12; 3532:5, 16; 3547:9

**jogging** [1] - 3661:10

**John** [37] - 3415:19; 3457:23; 3458:2, 17; 3459:1; 3462:3, 7, 9, 20, 25; 3476:13; 3511:9, 13, 19; 3512:25; 3514:13; 3580:9, 19; 3583:16, 22; 3637:5; 3638:22; 3642:5; 3666:5, 16; 3713:15, 24; 3714:10, 12, 23; 3715:2, 5; 3716:16, 19; 3729:10; 3742:8

**JOHN** [2] - 3414:6, 13

**Johnson** [5] - 3555:12; 3676:20; 3730:19; 3731:8; 3732:3

**Johnson's** [3] - 3731:20; 3732:11, 16

**JONES** [1] - 3414:17

**Joseph** [8] - 3631:5; 3705:3, 19, 25; 3707:21; 3718:21; 3720:22; 3736:23

**JOSEPH** [2] - 3705:11; 3746:16

**journals** [1] - 3571:25

**JS** [1] - 3414:4

**judge** [1] - 3681:4

**JUDGE** [1] - 3414:10

**Judge** [131] - 3415:18, 20; 3416:7, 17, 24; 3419:25; 3420:5; 3421:16; 3423:7, 24; 3424:11; 3425:2; 3436:16; 3440:14; 3441:16; 3447:24; 3454:19; 3455:2, 9, 17; 3456:7; 3482:14; 3505:2, 20; 3518:5, 17; 3519:5, 9; 3520:4; 3528:2, 19; 3555:12, 14; 3556:16; 3557:10, 19; 3559:2, 22; 3560:5; 3561:15; 3562:1; 3564:19; 3565:12; 3566:18; 3568:4; 3569:12; 3570:2; 3601:3; 3603:5; 3605:15; 3606:4; 3607:20; 3616:2, 13; 3619:9; 3620:3;

3622:22; 3623:17, 21; 3624:4, 7; 3626:8, 22; 3627:10; 3628:10; 3629:6; 3630:18; 3631:7; 3643:15, 25; 3644:25; 3649:21; 3650:2, 18; 3651:3; 3657:4; 3675:3; 3676:20; 3681:22; 3683:5, 7, 9; 3701:1, 23; 3702:9; 3704:25; 3716:19; 3719:11; 3720:4, 10, 22; 3721:9, 21-22; 3722:6, 9, 21, 24; 3723:5, 19; 3724:22; 3726:11; 3729:2, 18, 21; 3730:19; 3731:8, 20; 3732:3, 9, 11, 16, 18; 3733:8; 3734:9; 3735:14; 3737:2; 3738:8; 3739:1, 22; 3740:5, 8, 10, 20; 3741:12; 3743:20; 3744:7, 20

**JULIE** [1] - 3414:17

**July** [19] - 3417:19; 3452:11, 20; 3454:5; 3457:5; 3460:15; 3476:9; 3505:15; 3507:17; 3508:8; 3511:8; 3512:4; 3514:12; 3633:10; 3669:14; 3672:2; 3697:1; 3701:13; 3709:3

**jumped** [1] - 3742:23

**June** [16] - 3419:19, 24; 3469:15; 3554:10; 3568:17; 3672:1, 16; 3694:15, 20, 22; 3695:3; 3696:22; 3730:9, 18, 21; 3732:9

**junior** [2] - 3474:7; 3507:5

**Junior** [17] - 3449:11; 3450:7, 12; 3451:3, 10; 3564:1; 3640:2; 3670:5, 10; 3712:1; 3736:23; 3737:1, 6; 3738:7, 12; 3739:15

**Junior's** [2] - 3415:11; 3712:3

**jurors** [3] - 3616:22; 3718:10; 3742:1

**Jury** [5] - 3425:12; 3456:4, 25; 3570:11;

3718:19

**jury** [62] - 3414:10; 3415:3; 3423:22; 3424:10; 3425:3, 6, 8; 3427:14; 3442:12; 3448:7; 3449:20; 3452:13, 17; 3456:21; 3461:12, 16, 20; 3462:1, 5, 23; 3463:7, 13; 3466:3, 7; 3553:6; 3554:22; 3555:19; 3566:2, 8; 3569:22; 3571:17; 3573:21; 3575:11, 19; 3582:24; 3583:4, 12, 14; 3584:12; 3589:11; 3617:11; 3618:13; 3630:4; 3631:10; 3635:14; 3642:22; 3644:3; 3645:8, 18; 3648:3; 3651:6; 3675:12; 3678:16; 3680:2; 3699:9; 3700:1; 3712:3; 3717:6; 3719:23; 3731:7; 3744:23

**jury's** [1] - 3697:22

### K

**KATHERINE** [2] - 3705:11; 3746:16

**Katherine** [1] - 3705:18

**KEDIA** [280] - 3414:16; 3416:17, 24; 3417:3, 10; 3418:10; 3421:23; 3422:19, 25; 3423:12; 3424:20; 3425:5, 9, 19, 24; 3427:23; 3430:24; 3435:15; 3436:12; 3437:7; 3438:4, 14; 3439:25; 3440:4, 7, 21; 3441:1, 6; 3443:2, 5; 3445:12; 3447:22, 24; 3453:1; 3454:2, 22; 3455:1; 3456:17; 3460:22; 3461:1; 3465:17, 22; 3470:2; 3473:9, 15; 3475:12; 3476:1; 3478:20; 3479:1, 21; 3481:9; 3482:16; 3485:12, 19-20; 3488:12; 3492:12; 3493:5; 3494:1, 7; 3495:19; 3496:2, 5, 11; 3499:14,

19; 3500:3; 3501:1, 5, 11; 3502:5; 3503:13; 3505:12, 20; 3507:2; 3510:11, 22; 3511:7; 3514:11; 3516:23; 3517:3; 3518:10, 13, 16; 3519:9; 3521:2; 3526:21; 3527:1, 17, 24; 3528:7, 10, 15; 3529:2; 3530:11; 3531:22; 3533:8, 12, 17-18; 3535:22; 3538:16, 20; 3539:13; 3541:15; 3542:1; 3546:13; 3553:14, 21; 3558:13, 23; 3560:13, 25; 3561:15; 3562:1, 4, 8; 3563:3, 23; 3564:10, 15, 18, 24; 3565:7, 20, 23; 3568:20; 3569:1, 3; 3570:6; 3571:5; 3575:8; 3581:14; 3582:13, 18; 3594:19; 3597:11; 3599:4, 7, 13, 23; 3600:1, 6, 9, 12, 14, 23; 3601:1, 3; 3602:2, 11, 14; 3603:9; 3604:3, 18, 24; 3605:10, 15, 18; 3606:3, 9, 13, 19, 23; 3607:4, 14; 3609:2; 3611:5, 11, 16; 3612:13; 3615:20; 3620:5; 3624:7; 3625:2; 3626:24; 3627:8, 24; 3642:14; 3645:1, 24; 3648:7; 3649:3, 14, 21; 3652:23; 3653:3, 7, 17; 3655:3; 3656:4, 25; 3663:14; 3667:6, 15; 3668:12; 3671:1; 3674:2, 9; 3675:9, 17, 24; 3676:9, 17, 23; 3677:1, 23; 3678:2, 5, 9, 20; 3679:12; 3680:14, 24; 3681:3, 9, 14, 21; 3682:7, 21; 3683:5, 7, 9; 3684:2, 15-16; 3687:12; 3688:18; 3694:10; 3697:16, 24; 3698:5, 9, 12, 15; 3699:6, 25; 3700:12, 18; 3701:4, 6, 11; 3702:9, 12, 16; 3703:2; 3704:19; 3708:9, 13; 3714:4; 3715:10; 3716:9, 19; 3721:14, 21; 3722:9;

3723:5, 22; 3724:15; 3725:5, 15; 3727:8, 16; 3729:15; 3733:20, 23; 3734:12; 3735:14; 3736:8, 14; 3739:3, 14; 3741:8; 3746:14

**Kedia** [14] - 3414:15; 3422:13; 3425:18; 3438:5; 3519:20; 3547:7; 3560:9; 3561:21; 3568:10; 3663:20; 3722:23; 3724:25; 3728:17; 3745:5

**keep** [2] - 3704:7; 3718:17

**Kelly** [3] - 3693:20, 22

**kept** [4] - 3421:4; 3502:22; 3517:25; 3657:5

**Kevin** [3] - 3522:24; 3530:7

**kids** [1] - 3670:19

**killed** [1] - 3517:24

**Kimberly** [1] - 3736:15

**kind** [23] - 3427:1; 3438:7; 3455:15; 3523:11; 3529:25; 3534:22; 3572:18; 3585:1; 3587:9; 3589:9; 3590:16; 3614:17; 3621:2; 3632:7; 3634:13, 23; 3639:8; 3646:24; 3665:13; 3744:2

**Kindeley** [12] - 3416:8; 3423:23; 3424:22, 24-25; 3425:10, 16, 25; 3426:2; 3428:10; 3442:4; 3443:8

**KINDELEY** [1] - 3425:20

**Kindly** [1] - 3616:10

**kinds** [4] - 3438:3; 3579:11, 16; 3609:11

**kitchen** [4] - 3517:13, 25; 3522:19; 3523:12

**knowing** [4] - 3428:24; 3429:3, 7; 3436:8

**knowledge** [13] - 3429:12; 3430:10; 3485:16; 3595:10; 3656:20, 22; 3657:12, 17-18; 3666:24; 3679:21; 3709:25

**known** [42] - 3448:8; 3499:5; 3504:6; 3517:19; 3521:20; 3563:14, 17, 21; 3564:11; 3565:10; 3578:21; 3579:1, 7, 12; 3583:16; 3585:10; 3586:6; 3587:7, 19, 24; 3588:21; 3589:8; 3590:17; 3591:11; 3592:6, 24-25; 3593:14, 16; 3594:10; 3606:24; 3607:19; 3608:2; 3609:11; 3641:20; 3667:4; 3673:1; 3676:18; 3677:10

**knowns** [9] - 3583:22; 3585:25; 3588:5; 3591:8; 3592:4, 12; 3593:6, 22; 3609:23

**knows** [9] - 3440:12; 3519:23, 25; 3520:5; 3528:16; 3649:19, 23; 3679:17; 3723:24

**Krall** [2] - 3416:3; 3730:1

---

**L**

**L-E-V-I-N** [1] - 3646:9

**labeled** [2] - 3599:9

**labels** [1] - 3461:7

**Labrioela** [2] - 3726:24; 3728:9

**lack** [1] - 3564:22

**Lack** [1] - 3480:16

**ladies** [1] - 3585:4

**Ladies** [1] - 3718:2

**LaForte** [11] - 3635:20; 3637:1, 17; 3638:9; 3639:12-14, 19, 24; 3640:21; 3641:3

**LaForte's** [1] - 3637:19

**large** [5] - 3588:14; 3591:7, 9; 3593:22; 3594:9

**larger** [2] - 3585:19; 3589:18

**LARUSSO** [89] - 3414:19; 3417:9; 3424:11; 3436:14; 3440:3; 3447:25; 3454:6, 10, 12; 3461:2; 3465:25; 3505:22, 25; 3546:16, 19; 3547:21, 24;

3552:17, 19; 3559:2, 16, 21; 3560:3, 5, 10; 3566:18, 21; 3571:6; 3575:9; 3581:13; 3582:19; 3607:17, 24; 3608:7, 10; 3615:22; 3620:6, 9; 3622:1, 21, 24; 3623:25; 3624:3; 3626:2, 13; 3627:1, 10; 3628:10, 24; 3629:2, 15; 3630:8; 3631:14, 17; 3632:1, 4; 3642:1, 3, 11; 3645:6, 15; 3650:2, 19; 3704:21; 3708:14; 3714:5; 3717:3, 8; 3719:1, 5, 19; 3722:5; 3729:25; 3731:4, 22; 3732:18; 3739:22; 3740:14, 20; 3741:5, 10; 3742:5, 10, 13; 3743:20; 3744:8, 20; 3745:2; 3746:7

**LaRusso** [19] - 3414:20; 3417:7; 3436:13; 3465:24; 3546:15; 3558:4, 11; 3559:25; 3625:5; 3630:22; 3631:13; 3717:2; 3722:4; 3740:12; 3742:23; 3743:3, 7, 17

**LaRusso's** [2] - 3743:5; 3744:19

**last** [73] - 3416:10; 3417:5, 12, 25; 3418:15; 3420:6; 3424:6; 3428:12; 3429:21; 3451:14; 3476:24; 3477:15; 3494:8, 10; 3498:2; 3508:6, 9-10; 3511:25; 3516:24; 3517:4; 3518:2, 12, 14; 3519:6; 3526:19; 3549:16; 3553:9, 21; 3555:1; 3557:4; 3558:12; 3584:16; 3588:2; 3590:25; 3591:18; 3625:4; 3626:22; 3627:3; 3628:3, 7, 17; 3636:11; 3637:4; 3638:5; 3664:8; 3675:10, 17; 3679:2; 3700:7; 3701:22; 3705:19; 3709:4; 3716:5, 24; 3717:9; 3721:17, 20; 3722:13,

15; 3724:1; 3725:17; 3730:11, 15; 3731:13, 21, 24; 3734:5, 20; 3742:5, 13

**lasted** [1] - 3633:4

**Late** [1] - 3424:6

**late** [10] - 3476:24; 3477:15; 3573:19; 3628:6; 3634:3; 3646:18; 3666:21; 3705:25; 3711:9; 3719:12

**latest** [1] - 3735:13

**Laura** [3] - 3720:24; 3722:8; 3728:4

**law** [5] - 3419:3; 3554:14; 3572:24; 3739:8, 10

**Law** [1] - 3572:7

**lawyer** [14] - 3648:6; 3649:24; 3652:6; 3653:19; 3665:21; 3671:12; 3673:9; 3695:19, 23; 3696:2, 6, 11, 17

**lay** [1] - 3716:22

**lazy** [2] - 3614:13, 15

**leaders** [1] - 3650:13

**leading** [1] - 3607:25

**leads** [1] - 3622:9

**leaning** [1] - 3641:2

**learn** [3] - 3547:12; 3572:18; 3633:16

**learned** [2] - 3521:25; 3704:13

**learning** [1] - 3425:1

**Leasing** [1] - 3431:16

**least** [7] - 3479:15; 3542:18, 20; 3556:12; 3634:2; 3644:11; 3719:18

**leave** [3] - 3460:2; 3513:1; 3735:4

**leaves** [2] - 3456:4; 3718:19

**leaving** [1] - 3710:25

**lectured** [1] - 3572:22

**lecturing** [1] - 3572:25

**left** [49] - 3426:2; 3431:11; 3449:10; 3450:4; 3451:12; 3456:14; 3457:5; 3458:20; 3461:25;

3462:7, 17, 20, 25; 3467:10; 3469:21; 3501:23; 3512:25; 3549:18; 3585:6, 21; 3586:2, 9; 3590:14, 21; 3591:1, 17; 3592:8, 15-16; 3593:11, 14, 17, 22; 3635:20; 3638:19, 23; 3639:6, 16; 3641:8, 10-11, 18; 3652:4; 3659:25; 3665:23; 3675:13; 3710:10; 3711:5; 3712:6

**left-hand** [7] - 3461:25; 3462:17; 3467:10; 3590:14, 21; 3591:1; 3639:16

**legally** [1] - 3727:2

**legibility** [1] - 3588:9

**Lenny** [1] - 3640:2

**Leslie** [2] - 3726:24; 3728:8

**less** [4] - 3592:1, 3; 3629:5; 3720:16

**letter** [29] - 3415:6; 3432:12; 3434:11; 3576:5, 16, 25; 3577:1, 23; 3580:2; 3584:16; 3586:24; 3588:3, 11-12, 16; 3589:22; 3590:20; 3591:10; 3592:25; 3594:6; 3625:16, 20-21; 3716:3, 6, 10

**letters** [18] - 3431:6; 3576:4, 7, 10, 13-14, 17-18, 21, 24; 3579:25; 3588:7; 3591:25; 3592:23; 3609:18; 3614:24; 3615:3

**level** [1] - 3572:4

**LEVIN** [6] - 3643:25; 3644:10, 20, 23; 3646:1; 3746:9

**Levin** [52] - 3415:7; 3416:1, 5, 9, 19, 23; 3553:8, 15, 18, 25; 3554:19, 21, 25; 3555:13, 15; 3556:1, 8; 3557:23; 3569:21; 3628:22; 3631:4; 3643:3, 6, 13, 24; 3645:21; 3646:9, 15, 20; 3649:4, 9, 15, 17; 3652:4; 3653:4, 8-9;

3667:16; 3677:4; 3681:23; 3682:9; 3684:3; 3686:9, 18; 3689:17; 3691:11; 3694:17; 3697:13; 3700:18; 3701:11; 3703:3

**Levin's** [5] - 3553:22; 3569:11; 3642:24; 3700:14; 3701:16

**Lewis** [1] - 3726:23

**Lexus** [2] - 3488:19; 3490:8

**license** [6] - 3489:8; 3495:2, 9, 14, 21; 3609:20

**licensed** [1] - 3571:20

**lieu** [1] - 3736:19

**life** [2] - 3580:7; 3609:18

**light** [2] - 3735:23; 3739:3

**lighter** [1] - 3449:14

**likewise** [1] - 3549:5

**limit** [2] - 3584:10; 3702:9

**limitation** [2] - 3583:17; 3584:4

**limited** [5] - 3420:2; 3577:17; 3607:12; 3729:10; 3730:19

**limiting** [3] - 3606:8; 3741:20, 22

**Linda** [5] - 3673:11; 3675:18; 3687:16; 3688:10; 3695:13

**Lindley** [1] - 3736:15

**line** [19] - 3513:8; 3556:10; 3586:1; 3590:5; 3592:21; 3593:4; 3627:8; 3656:24; 3692:1, 4; 3694:24; 3695:4; 3696:7; 3697:5, 8

**lined** [1] - 3585:18

**lines** [4] - 3427:20; 3575:3; 3593:4; 3652:22

**linguistics** [2] - 3614:22; 3615:2

**List** [1] - 3526:22

**list** [20] - 3415:15; 3467:2, 17; 3468:13, 15, 18, 20, 23; 3514:6; 3524:20; 3526:16;

3537:25; 3543:20; 3627:14; 3735:18; 3736:12, 14; 3740:11, 19

**listed** [35] - 3432:5, 17; 3466:18; 3481:20; 3482:2, 9, 11-12; 3484:2, 4, 8-10; 3492:1, 18; 3500:8; 3504:3; 3507:7; 3522:11; 3524:23; 3527:9; 3529:6, 12; 3542:9; 3544:8, 14, 19, 22; 3545:11; 3546:5; 3549:19

**listen** [3] - 3415:9; 3664:20; 3718:12

**listened** [1] - 3667:9

**listening** [1] - 3484:24

**listing** [3] - 3726:5, 18; 3742:25

**lists** [1] - 3609:19

**literature** [1] - 3571:24

**litigants** [1] - 3647:5

**litigated** [2] - 3724:24; 3725:6

**live** [1] - 3665:11

**lived** [1] - 3637:16

**lives** [1] - 3577:11

**living** [1] - 3697:12

**loansharking** [1] - 3562:21

**Local** [4] - 3457:12; 3706:4, 18, 20

**local** [2] - 3458:9; 3706:20

**locate** [6] - 3423:19; 3426:11; 3516:17; 3517:10; 3521:5, 7

**located** [12] - 3456:7; 3463:21; 3466:13; 3468:2; 3522:4; 3523:21; 3526:3; 3530:6; 3531:1, 4; 3688:14

**locating** [1] - 3521:9

**location** [48] - 3421:3; 3446:20, 23; 3448:15; 3449:4, 17; 3457:10; 3458:18, 21; 3459:7, 18; 3462:1, 5; 3463:16, 20; 3464:1;

3472:5; 3479:6, 16; 3493:17; 3496:20; 3497:2, 4, 9; 3502:9; 3503:1; 3512:25; 3513:1, 9; 3551:9, 25; 3552:5, 7; 3617:17; 3618:15; 3622:11; 3633:8, 17; 3634:12; 3636:18; 3639:8; 3688:24; 3724:9, 17; 3726:18

**locations** [6] - 3417:18; 3689:23; 3723:9, 15; 3726:3, 15

**log** [44] - 3470:10; 3481:22; 3482:4, 7; 3484:4, 8-10; 3486:20, 22; 3489:25; 3490:4, 9, 12, 16; 3491:2, 21; 3492:1-3; 3497:15; 3501:14; 3502:22; 3503:5; 3504:3, 13; 3519:4; 3549:1; 3550:13; 3551:19; 3625:17, 20; 3631:20, 25; 3632:5, 7, 19-20, 25; 3633:1, 6

**logged** [1] - 3537:25

**logs** [1] - 3484:3

**Lombardi** [1] - 3414:22

**look** [47] - 3427:13; 3431:19; 3435:9, 20; 3436:3, 7-8; 3444:18; 3462:17; 3492:6; 3508:14; 3524:11; 3525:9; 3533:9; 3536:24; 3537:3, 10; 3540:14; 3543:23; 3548:1, 3, 6; 3551:23; 3574:6; 3576:16, 23; 3598:15; 3602:3; 3604:13; 3611:17; 3613:2; 3617:14; 3632:9; 3642:25; 3658:1; 3659:25; 3660:23; 3691:16; 3721:14, 22; 3722:25; 3724:15; 3731:23; 3732:1, 8; 3733:8; 3739:13

**looked** [13] - 3421:7; 3427:22; 3428:10; 3449:23; 3476:24; 3500:4; 3524:16; 3540:21; 3578:9; 3608:2; 3622:8, 19;

3623:14

**looking** [48] - 3430:25; 3433:14; 3436:5; 3445:2; 3448:7; 3472:12, 22, 24; 3475:5; 3485:24; 3487:5; 3491:21; 3497:8; 3500:7; 3513:13; 3517:20; 3521:12, 17, 24; 3522:3; 3523:12-14; 3525:6; 3528:12, 15; 3529:22; 3535:14; 3545:4, 8; 3550:14; 3558:2; 3575:25; 3576:6; 3578:2; 3586:5; 3614:3; 3617:19, 21; 3618:17; 3622:6; 3625:4; 3635:15; 3636:4; 3640:15; 3677:2; 3742:13

**Looking** [8] - 3431:2; 3443:6; 3449:17; 3450:1, 8; 3469:6; 3498:18; 3633:6

**Looks** [1] - 3467:23

**looks** [10] - 3450:16; 3456:15; 3535:4; 3586:10; 3589:11; 3591:2, 5; 3602:8; 3713:24; 3744:11

**loop** [7] - 3587:4; 3589:5, 10, 21; 3593:23

**loops** [1] - 3589:12

**losing** [1] - 3719:23

**lost** [2] - 3459:6; 3574:16

**loud** [1] - 3717:9

**Louis** [2] - 3707:6

**love** [1] - 3651:10

**low** [1] - 3650:9

**lower** [5] - 3462:17, 22; 3592:15; 3593:13; 3597:20

**lunch** [5] - 3422:14; 3552:24; 3553:2; 3567:1

**luncheon** [1] - 3416:16

**LY** [1] - 3592:7

**Lyons** [4] - 3522:24; 3523:3; 3530:7

## M

**ma'am** [10] - 3594:25; 3595:7, 21; 3598:2, 12;

3602:19; 3611:3; 3613:21; 3615:8, 11

**machine** [4] - 3623:9; 3632:14, 16

**magnification** [3] - 3575:6; 3576:20; 3584:18

**magnify** [1] - 3662:6

**mail** [2] - 3626:10; 3739:23

**mails** [1] - 3627:21

**mainline** [1] - 3537:15

**maintained** [1] - 3700:6

**major** [1] - 3732:2

**males** [1] - 3504:4

**man** [3] - 3641:1; 3650:25; 3744:23

**Management** [1] - 3616:25

**manager** [2] - 3616:24; 3704:3

**maneuver** [1] - 3618:21

**Manhattan** [3] - 3452:25; 3457:7; 3462:2

**manner** [4] - 3433:9, 12; 3566:9; 3590:12

**manufactured** [1] - 3434:1

**March** [6] - 3418:6, 8; 3666:21; 3671:21; 3678:23; 3684:22

**Margaret** [13] - 3523:9; 3533:21; 3666:2; 3667:1; 3670:7; 3672:19-21; 3673:4; 3675:20; 3677:20; 3678:22; 3679:12

**Marguerite** [1] - 3564:3

**Mark** [1] - 3470:15

**mark** [5] - 3423:13; 3467:13; 3531:12; 3612:24; 3613:1

**marked** [20] - 3420:8, 12-13, 18; 3437:4; 3447:9; 3456:9; 3470:11; 3481:4, 10; 3497:18; 3499:24; 3501:15; 3547:25; 3598:13; 3619:12; 3625:24; 3632:1; 3722:19

**marking** [3] - 3524:9;

3529:19; 3536:22

**markings** [1] - 3594:8

**marks** [1] - 3434:15

**marshal** [1] - 3738:14

**Martin** [1] - 3571:19

**Mary** [1] - 3533:17

**mass** [1] - 3710:18

**Massino** [8] - 3736:24; 3737:5, 7, 13, 21; 3738:13, 23; 3739:4

**material** [19] - 3417:10, 13; 3419:6, 25; 3420:5, 15; 3454:13; 3456:10; 3578:25; 3592:9, 14; 3602:6; 3609:11; 3625:2; 3650:8; 3725:17; 3733:20; 3742:13

**materials** [1] - 3516:5

**matter** [15] - 3422:22; 3474:23; 3587:22; 3660:3, 7; 3670:6; 3681:11; 3686:10; 3723:17, 21; 3724:5; 3741:13; 3742:5; 3744:20

**matters** [6] - 3416:17, 21; 3570:2; 3627:18; 3729:20; 3737:2

**MAUSKOPF** [1] - 3414:12

**Mayer** [1] - 3730:7

**MAYER** [41] - 3414:13; 3519:10; 3556:19; 3570:2; 3616:2, 13, 16; 3619:9, 11; 3620:3; 3623:2, 17, 21; 3625:8, 19; 3626:14; 3627:3, 17; 3628:3; 3629:4, 13, 17; 3630:18; 3642:15; 3700:4; 3730:9, 16, 23; 3731:1, 11; 3732:9; 3737:2; 3738:8, 16, 19; 3741:12, 15; 3742:22; 3743:3; 3744:4, 9

**MC** [3] - 3533:5, 14, 20

**McCaffrey** [1] - 3736:15

**mean** [26] - 3427:7; 3442:12; 3464:9; 3472:24; 3491:22; 3511:15; 3521:10; 3529:8; 3530:23; 3536:1; 3537:13; 3538:7; 3539:24;

3545:21; 3579:19; 3589:14; 3614:12, 14; 3618:14; 3620:13; 3634:17; 3658:16; 3676:19; 3680:24; 3734:25

**meaning** [10] - 3472:1; 3486:22; 3512:20; 3537:17; 3540:2; 3545:20; 3563:14; 3606:10; 3609:10; 3611:22

**Meaning** [10] - 3492:2; 3521:23; 3522:17; 3597:2, 21; 3606:20; 3612:4; 3614:17; 3634:20; 3703:11

**means** [4] - 3531:16; 3620:16; 3657:12; 3697:8

**mechanical** [1] - 3414:24

**media** [1] - 3718:13

**meet** [7] - 3479:17; 3554:18; 3555:3; 3646:22; 3663:24; 3672:20; 3738:3

**meeting** [42] - 3479:15; 3553:11, 13, 16; 3554:2, 8, 22, 24; 3555:2, 10, 18, 20; 3556:2, 4, 6, 8, 12, 14, 20; 3557:6, 12-13; 3643:8; 3644:17; 3658:21, 24; 3661:5, 14; 3664:8, 11; 3665:20; 3671:10; 3672:7; 3675:8; 3685:22; 3688:25; 3699:18; 3700:21, 24-25; 3703:21

**meetings** [5] - 3554:6; 3556:2; 3572:14; 3573:1; 3661:11

**members** [4] - 3488:5; 3491:15; 3706:16, 18

**memo** [10] - 3426:20, 22-23, 25; 3427:15; 3428:1, 6; 3433:5, 7

**Memorial** [2] - 3713:13

**memory** [7] - 3451:16; 3475:1, 4, 18; 3495:6; 3727:17; 3744:16

**mention** [2] - 3643:13, 21

**mentioned** [15] - 3445:8; 3452:16; 3461:15; 3463:12; 3466:6; 3471:7; 3542:20; 3570:7; 3575:18; 3578:13; 3583:3; 3590:2; 3631:20; 3732:12, 15

**Mercedes** [2] - 3489:15; 3490:13

**message** [3] - 3649:15; 3650:1; 3711:23

**messages** [3] - 3651:1, 7; 3661:10

**messed** [1] - 3612:25

**messenger** [1] - 3650:21

**met** [10] - 3498:20, 22; 3499:3; 3595:8; 3647:13; 3667:1; 3670:9; 3672:21; 3677:25; 3721:1

**method** [1] - 3593:1

**methods** [3] - 3607:7; 3609:8; 3610:9

**Miami** [1] - 3669:18

**Michael** [10] - 3647:24; 3651:7; 3652:6; 3730:24; 3731:2, 12-13; 3736:20; 3739:19

**microphone** [5] - 3446:2; 3616:10; 3646:7; 3648:3; 3705:15

**mid** [4] - 3455:15; 3456:3; 3628:13; 3630:2

**mid-afternoon** [2] - 3628:13; 3630:2

**mid-morning** [2] - 3455:15; 3456:3

**middle** [6] - 3467:19; 3469:14; 3524:13; 3577:20; 3593:3; 3638:2

**midnight** [5] - 3417:5; 3423:1; 3725:17; 3734:5, 20

**might** [19] - 3423:10; 3456:15; 3495:15; 3505:5; 3514:3; 3558:7; 3588:22; 3590:9; 3591:6; 3592:13; 3594:5; 3644:22; 3645:12; 3648:3; 3652:16; 3703:14; 3710:10; 3718:13;

3731:15

**mike** [3] - 3616:22; 3657:16; 3708:4

**million** [1] - 3716:7

**mind** [9] - 3424:21; 3425:8; 3450:7; 3508:4; 3583:21; 3632:9; 3657:13; 3718:17

**mine** [1] - 3533:1

**Mineola** [1] - 3414:21

**minimal** [1] - 3423:14

**minimum** [2] - 3418:19, 22

**minus** [1] - 3469:14

**minute** [5] - 3455:1, 10; 3557:4; 3578:16; 3629:5

**minutes** [15] - 3417:9; 3452:9; 3458:12, 17-18; 3602:15; 3628:13; 3638:5; 3642:20; 3658:18; 3689:7; 3696:5; 3721:24; 3733:19; 3740:5

**misread** [2] - 3591:15; 3592:13

**Missing** [1] - 3709:9

**missing** [2] - 3586:10; 3588:16

**mistake** [1] - 3495:16

**mistrial** [4] - 3416:25; 3417:2; 3418:21; 3420:4

**misunderstand** [1] - 3539:17

**mixed** [1] - 3592:20

**mixing** [1] - 3576:15

**mixture** [1] - 3592:19

**mobile** [1] - 3658:5

**modified** [1] - 3589:3

**moment** [12] - 3445:21; 3460:22; 3465:17; 3570:17; 3582:13; 3586:15; 3587:22; 3623:17; 3645:8; 3705:8; 3718:25; 3719:16

**Monday** [17] - 3419:12; 3426:2; 3438:6, 25; 3439:2, 11, 18, 20, 24; 3456:10; 3568:10; 3671:7; 3720:7; 3729:2; 3736:10; 3737:6; 3738:4

**Monday's** [1] - 3597:9

**money** [1] - 3739:4

**monitor** [6] - 3546:4; 3618:5, 9; 3633:21

**monitored** [3] - 3538:1, 6; 3633:12

**monitoring** [3] - 3620:25; 3623:3; 3634:10

**month** [6] - 3434:5; 3591:13; 3612:9; 3678:23; 3734:9

**monthly** [2] - 3591:19; 3592:2

**months** [7] - 3515:1; 3579:23; 3615:16; 3619:6; 3625:13; 3669:7; 3680:15

**mood** [2] - 3711:13; 3712:4

**moreover** [1] - 3628:20

**morning** [55] - 3415:4; 3417:8; 3421:1, 7; 3425:14, 25; 3426:1; 3445:20; 3446:10; 3455:15; 3456:3, 10; 3457:18; 3470:3; 3512:5; 3548:16; 3550:9, 16; 3623:8; 3625:6; 3626:4, 10; 3631:9; 3634:3; 3636:1; 3638:15; 3640:3, 6, 10, 23; 3641:4, 13; 3659:1, 3-4, 8; 3661:9, 11, 19-20; 3671:7; 3687:25; 3688:8; 3690:13, 17; 3691:24; 3693:5; 3709:23; 3718:22; 3731:9; 3733:10; 3738:4

**most** [3] - 3577:11; 3640:9

**Most** [3] - 3528:13; 3577:19; 3617:13

**motion** [2] - 3642:23; 3724:25

**motions** [1] - 3516:5

**move** [7] - 3420:3; 3450:6; 3502:9; 3505:14; 3576:19; 3618:24; 3650:17

**Move** [2] - 3697:21; 3698:11

**moved** [1] - 3622:12

**movement** [3] - 3589:9, 21

**movements** [1] - 3593:4
**moving** [4] - 3416:24; 3588:1; 3591:18; 3688:2
**Moving** [3] - 3587:13; 3589:23; 3590:19
**MR** [455] - 3415:18, 20, 22, 24; 3416:1, 3, 6, 11; 3417:9; 3420:5, 25; 3421:12, 16, 19; 3422:12; 3423:24; 3424:11; 3425:2, 7, 11; 3430:22; 3435:13; 3436:14, 16, 18, 20, 23; 3437:4; 3438:5, 10, 21, 24; 3439:3, 6, 9, 14, 17, 24; 3440:3, 6, 14, 17, 20; 3441:16, 18; 3442:3, 25; 3445:14, 18; 3446:6, 9; 3447:5, 8, 13, 21, 25; 3448:5; 3451:19, 22; 3452:12, 15, 19; 3454:6, 8, 10-12, 14, 16, 19, 24; 3455:5, 9, 12, 17; 3456:7, 14; 3457:3; 3458:3; 3459:12, 14; 3460:5, 8, 14, 21; 3461:2, 6, 12, 17, 23; 3463:3, 6, 9, 14; 3464:15, 18-19, 23; 3465:1, 6, 16, 25; 3466:3, 9; 3468:16; 3469:25; 3473:7, 13; 3475:10, 22; 3476:5; 3478:18, 24; 3479:19; 3480:6, 15; 3482:14, 20; 3485:9; 3488:10; 3492:10; 3493:22; 3494:5; 3495:17; 3496:1, 9; 3499:12, 17; 3501:3, 9; 3502:3; 3503:10; 3504:9, 16; 3505:2, 7, 22, 25; 3510:9, 14, 20; 3511:1; 3514:9; 3515:9; 3516:2, 14; 3518:6; 3519:11, 23, 25; 3520:4; 3526:18; 3527:15, 21; 3528:2, 9, 20; 3530:9; 3531:20; 3535:20; 3538:18; 3539:11, 18; 3541:13, 23; 3546:16, 19; 3547:21, 24; 3552:14, 17, 19, 21; 3555:14; 3556:15; 3557:9, 14, 19, 24;

3558:8, 21; 3559:2, 16, 21, 23; 3560:3-5, 10; 3561:6; 3562:14, 22; 3564:6, 20; 3565:19; 3566:14, 18, 21; 3568:4, 9, 25; 3569:2, 8, 12, 16, 19, 24; 3570:15; 3571:1, 6, 9; 3573:13, 16; 3574:18, 21; 3575:7, 9, 11, 14, 20; 3580:13, 16; 3581:10, 12-13, 18; 3582:1, 4, 12, 17, 19, 23; 3583:1, 6, 9, 11; 3594:13, 17; 3599:12, 17; 3600:21, 24; 3602:12; 3603:5, 7, 10, 12, 19, 24; 3605:22; 3607:17, 24; 3608:7, 10; 3611:10, 14; 3615:22, 24; 3620:6, 9; 3622:1, 21, 24; 3623:25; 3624:3; 3626:2, 13; 3627:1, 10, 25; 3628:10, 24; 3629:2, 15; 3630:8; 3631:5, 7, 9, 14, 17; 3632:1, 4; 3642:1, 3, 11; 3643:15, 20, 23, 25; 3644:10, 20, 23, 25; 3645:6, 12, 15, 21; 3646:10, 14; 3649:6, 20; 3650:2, 5, 16, 18-19; 3651:5; 3652:3, 19, 22; 3654:3; 3655:5, 17, 19; 3656:7, 23; 3657:4; 3660:18, 22; 3663:22; 3666:15, 18-19; 3667:8, 12; 3668:9; 3673:25; 3674:7; 3675:3; 3676:4, 7; 3677:20; 3679:20, 24; 3680:11, 13, 15, 18, 21; 3681:6, 19, 22; 3694:8; 3697:15, 19, 21; 3698:3, 8, 11; 3699:3, 24; 3700:2; 3701:1, 5, 10; 3702:2, 6; 3704:21; 3705:3, 21, 24; 3707:17, 20; 3708:8, 14, 18; 3713:18, 21; 3714:3, 5, 9; 3716:2, 18, 21, 25; 3717:3, 5, 8, 11; 3719:1, 5, 19; 3720:4, 10, 22; 3721:1, 9, 22, 25; 3722:2, 5, 19, 24;

3723:2, 7, 14, 19; 3724:13, 22; 3725:4, 13, 20; 3726:11, 14, 17, 21; 3727:21; 3728:7, 9, 11, 15, 18, 22; 3729:16, 18, 25; 3730:2, 7; 3731:4, 22; 3732:18; 3733:11, 22; 3734:9; 3738:25; 3739:7, 12, 22; 3740:8, 10, 14, 18, 20; 3741:5, 10; 3742:5, 9-11, 13, 18; 3743:20; 3744:8, 20, 25; 3745:2, 6; 3746:7, 11, 18
**MS** [319] - 3416:17, 24; 3417:3, 10; 3418:10; 3421:23; 3422:19, 25; 3423:12; 3424:20; 3425:5, 9, 19, 24; 3427:23; 3430:24; 3435:15; 3436:12; 3437:7; 3438:4, 14; 3439:25; 3440:4, 7, 21; 3441:1, 6; 3443:2, 5; 3445:12; 3447:22, 24; 3453:1; 3454:2, 22; 3455:1; 3456:17; 3460:22; 3461:1; 3465:17, 22; 3470:2; 3473:9, 15; 3475:12; 3476:1; 3478:20; 3479:1, 21; 3481:9; 3482:16; 3485:12, 19-20; 3488:12; 3492:12; 3493:5; 3494:1, 7; 3495:19; 3496:2, 5, 11; 3499:14, 19; 3500:3; 3501:1, 5, 11; 3502:5; 3503:13; 3505:12, 20; 3507:2; 3510:11, 22; 3511:7; 3514:11; 3516:23; 3517:3; 3518:10, 13, 16; 3519:9; 3521:2; 3526:21; 3527:1, 17, 24; 3528:7, 10, 15; 3529:2; 3530:11; 3531:22; 3533:8, 12, 17-18; 3535:22; 3538:16, 20; 3539:13; 3541:15; 3542:1; 3546:13; 3553:14, 21; 3556:19; 3558:13, 23; 3560:13, 25; 3561:15; 3562:1, 4, 8; 3563:3, 23; 3564:10, 15, 18,

24; 3565:7, 20, 23; 3568:20; 3569:1, 3; 3570:2, 6; 3571:5; 3575:8; 3581:14; 3582:13, 18; 3594:19; 3597:11; 3599:4, 7, 13, 23; 3600:1, 6, 9, 12, 14, 23; 3601:1, 3; 3602:2, 11, 14; 3603:9; 3604:3, 18, 24; 3605:10, 15, 18; 3606:3, 9, 13, 19, 23; 3607:4, 14; 3609:2; 3611:5, 11, 16; 3612:13; 3615:20; 3616:2, 13, 16; 3619:9, 11; 3620:3, 5; 3623:2, 17, 21; 3624:7; 3625:2, 8, 19; 3626:14, 24; 3627:3, 8, 17, 24; 3628:3; 3629:4, 13, 17; 3630:18; 3642:14; 3645:5, 14; 3648:7; 3649:3, 14, 21; 3652:23; 3653:3, 7, 17; 3655:3; 3656:4, 25; 3663:14; 3667:6, 15; 3668:12; 3671:1; 3674:2, 9; 3675:9, 17, 24; 3676:9, 17, 23; 3677:1, 23; 3678:2, 5, 9, 20; 3679:12; 3680:14, 24; 3681:3, 9, 14, 21; 3682:7, 21; 3683:5, 7, 9; 3684:2, 15-16; 3687:12; 3688:18; 3694:10; 3697:16, 24; 3698:5, 9, 12, 15; 3699:6, 25; 3700:4, 12, 18; 3701:4, 6, 11; 3702:9, 12, 16; 3703:2; 3704:19; 3708:9, 13; 3714:4; 3715:10; 3716:9, 19; 3721:14, 21; 3722:9; 3723:5, 22; 3724:15; 3725:5, 15; 3727:8, 16; 3729:15; 3730:9, 16, 23; 3731:1, 11; 3732:9; 3733:20, 23; 3734:12; 3735:14; 3736:8, 14; 3737:2; 3738:8, 16, 19; 3739:3, 14; 3741:8, 12, 15; 3742:22; 3743:3; 3744:4, 9; 3746:14
**multiple** [1] - 3594:3

**Multiple** [1] - 3498:9
**murder** [3] - 3679:22; 3681:24; 3685:3
**Musso** [4] - 3640:25; 3641:2, 15
**Musso's** [3] - 3641:8, 10
**must** [1] - 3721:4

---

**N**

**name** [61] - 3427:5, 9-10; 3431:16; 3434:16, 22; 3435:7; 3436:1, 6, 8; 3446:3; 3466:16; 3467:19, 22, 24; 3473:17; 3477:18; 3481:20; 3498:2; 3503:20; 3504:3; 3507:7; 3523:5, 9; 3524:21; 3529:12, 14; 3542:20; 3544:15, 21; 3548:21; 3554:13; 3568:11; 3570:23; 3576:14; 3579:21; 3584:23; 3588:2; 3589:24; 3590:3; 3592:10; 3616:11; 3626:9; 3637:5; 3642:4; 3646:8; 3665:9; 3670:6; 3671:13; 3672:18; 3673:11; 3693:20; 3705:16, 19; 3707:4; 3732:12, 15; 3733:12; 3735:25
**named** [7] - 3470:17; 3480:25; 3548:8; 3640:21; 3661:17; 3666:2; 3707:10
**names** [9] - 3461:8; 3466:20; 3467:17; 3468:19, 24; 3482:9; 3547:8, 16; 3615:13
**Nancy** [1] - 3533:16
**narrow** [2] - 3592:22; 3593:9
**Nassau** [2] - 3661:16, 18
**Natalie** [1] - 3431:16
**naturally** [1] - 3680:14
**nature** [2] - 3583:17; 3584:4
**Nautilus** [5] - 3617:22; 3618:18; 3619:23; 3635:15;

3638:24
**near** [1] - 3596:21
**nearly** [1] - 3593:25
**necessarily** [1] - 3558:20
**necessary** [3] - 3661:12; 3678:14; 3716:4
**need** [20] - 3444:19; 3454:22; 3455:1; 3465:17; 3518:20; 3558:6, 9, 15; 3569:5; 3570:4; 3606:3; 3631:24; 3643:13, 18; 3682:2; 3721:14; 3722:9; 3734:24; 3738:3
**neighborhood** [1] - 3502:25
**never** [10] - 3441:3; 3556:22; 3560:5; 3595:8; 3603:24; 3643:15; 3647:18; 3661:11; 3677:24; 3727:9
**NEW** [1] - 3414:1
**new** [7] - 3420:21; 3421:20, 24; 3635:22; 3713:8; 3734:19; 3735:23
**New** [27] - 3414:5, 15, 18, 21, 23; 3439:15, 22; 3448:20; 3488:20; 3508:12; 3509:6; 3549:15; 3550:1; 3551:15; 3571:21; 3616:25; 3617:2; 3656:19; 3657:6; 3672:7; 3696:7; 3719:13; 3721:11; 3726:3; 3733:14, 17
**newer** [1] - 3429:24
**next** [68] - 3416:22; 3419:23; 3437:10; 3441:22; 3445:17; 3453:4; 3455:19; 3458:16; 3467:15, 22; 3468:4, 25; 3500:11; 3504:18; 3506:3; 3515:12; 3520:8; 3524:21; 3528:23; 3529:12, 14; 3545:1; 3548:21; 3557:23; 3567:3; 3570:14; 3576:25; 3588:1; 3589:23; 3592:10;

3598:18; 3601:6; 3602:20; 3608:12; 3616:1; 3621:7; 3624:9; 3628:12; 3629:22; 3645:20; 3648:9; 3651:15; 3652:25; 3653:21; 3659:4; 3661:22; 3664:20; 3670:20; 3674:11; 3683:11; 3691:24; 3692:15; 3698:18; 3702:18; 3707:5; 3710:2, 9; 3711:21; 3712:4, 25; 3715:13; 3717:14; 3723:4, 6; 3728:21; 3729:6
**nice** [4] - 3438:3; 3597:4; 3718:5, 18
**Nice** [1] - 3415:4
**nickname** [1] - 3636:14
**night** [22] - 3417:6, 12; 3420:6; 3424:6; 3493:8; 3494:4, 24-25; 3508:6, 9-10; 3511:25; 3625:4; 3654:22; 3657:20; 3660:10; 3662:21; 3671:7; 3725:18; 3734:5, 20; 3742:14
**nine** [3] - 3661:13, 16
**non** [1] - 3557:18
**non-criminal** [1] - 3557:18
**none** [4] - 3555:11; 3565:16; 3600:13; 3733:22
**None** [1] - 3421:15
**nonrequest** [3] - 3579:1, 12; 3607:6
**Nonrequest** [1] - 3580:5
**Nora** [1] - 3736:15
**normal** [11] - 3526:7; 3577:15; 3580:6; 3587:23; 3607:6, 8; 3609:24; 3614:25; 3699:14; 3709:16, 18
**Normally** [3] - 3487:12; 3490:19; 3491:2
**normally** [2] - 3487:18; 3492:4
**north** [1] - 3448:22
**Norwich** [1] - 3726:9

**notation** [17] - 3465:11; 3467:10, 15; 3469:2, 14; 3527:3; 3548:20; 3600:16, 18; 3613:9; 3660:1, 6, 13; 3661:13, 22; 3662:16; 3663:5
**notations** [6] - 3467:3; 3469:9, 11; 3496:7; 3660:9; 3662:4
**notch** [1] - 3584:19
**note** [7] - 3457:19; 3486:25; 3513:19; 3514:3; 3528:8; 3599:21; 3718:11
**noted** [10] - 3486:21; 3487:20; 3504:13; 3513:16; 3514:1; 3524:4, 7; 3528:10; 3545:21; 3709:7
**notes** [12] - 3486:17, 19; 3487:2, 8, 15, 22; 3495:25; 3503:4; 3605:7; 3627:12; 3640:15, 19
**Nothing** [3] - 3511:25; 3552:21; 3704:22
**nothing** [12] - 3421:20; 3436:12; 3441:14; 3445:12; 3546:14; 3615:20; 3650:3; 3669:10; 3682:7; 3686:16; 3704:19; 3720:12
**notice** [4] - 3586:5; 3590:15; 3591:6; 3720:17
**noticeable** [1] - 3586:12
**noticeably** [1] - 3593:13
**noticed** [4] - 3585:14; 3635:25; 3640:5, 15
**notify** [2] - 3737:8, 21
**noting** [2] - 3487:16; 3551:4
**November** [1] - 3547:19
**nowhere** [1] - 3596:21
**number** [131] - 3418:14; 3420:13, 19; 3422:4; 3427:4; 3431:10, 14; 3440:19; 3444:6, 17; 3456:13; 3466:18; 3488:23; 3489:8; 3490:18; 3495:1, 15,

21; 3510:6; 3524:21;
3526:10, 14; 3528:5,
11, 16; 3529:5, 12, 18;
3531:14, 24; 3532:6,
17; 3536:3; 3540:11,
23; 3542:25; 3543:1,
10, 12, 16, 19, 22;
3544:3, 9, 18-20,
23-24; 3545:5, 9, 18;
3546:4, 24; 3547:1;
3560:15, 17; 3561:3,
16; 3562:4; 3563:3;
3564:10; 3565:3, 21;
3596:21; 3598:9;
3600:15, 17; 3604:6,
25; 3605:3; 3610:25;
3619:2; 3632:13;
3658:10-12; 3673:1, 18;
3675:14; 3678:7, 23;
3679:6, 14; 3687:3, 5,
14, 16, 20, 24; 3688:1,
8, 10, 21-22; 3690:1,
8, 22; 3691:2, 7, 24;
3692:2; 3693:5, 8;
3694:11, 23, 25;
3695:4, 13, 18, 22;
3712:13; 3726:19;
3732:19; 3742:14;
3743:12, 24-25; 3744:15

**numbering** [1] -
3612:25

**numbers** [25] - 3431:6;
3444:5; 3456:8;
3469:21; 3530:2;
3536:5, 15, 18; 3547:9,
16; 3564:4; 3579:22;
3593:20; 3594:11;
3615:9, 13; 3724:8, 16;
3726:2; 3742:25;
3743:6, 10, 21; 3744:6

**numeral** [1] - 3591:19

**numerals** [2] -
3579:25; 3593:20

**numeric** [2] - 3467:2;
3469:9

**numerous** [4] -
3418:25; 3649:21;
3673:19; 3686:9

**NYPD** [1] - 3618:5

---

**O**

**o'clock** [7] - 3483:7;
3690:12, 17; 3710:18;
3728:14, 16

**oath** [5] - 3425:16;
3654:15; 3656:2, 8, 12

**Obando** [2] - 3568:9;
3569:6

**Obando's** [1] - 3627:22

**object** [12] - 3425:4;
3482:14; 3513:23;
3555:14; 3568:6;
3599:18; 3602:12;
3626:18; 3656:25;
3676:4; 3679:20;
3721:16

**objected** [3] -
3528:18; 3629:18;
3743:3

**objection** [52] -
3438:13, 15; 3441:4;
3442:2; 3447:22, 25;
3461:1; 3465:22, 24-25;
3519:11, 16; 3527:22;
3528:2; 3571:4; 3575:8;
3581:13; 3582:18;
3603:7, 10; 3608:8;
3620:5; 3622:23;
3645:5, 14-15; 3649:2;
3652:2; 3653:20;
3654:2; 3657:1;
3663:18; 3675:2;
3679:19; 3681:4;
3699:2; 3708:13;
3714:4; 3730:14, 16,
18; 3743:5

**Objection** [57] -
3430:22; 3435:13;
3473:7, 13; 3475:10,
22; 3476:5; 3478:18,
24; 3479:19; 3480:6,
15; 3488:10; 3492:10;
3493:22; 3494:5;
3495:17; 3496:1, 9;
3499:12, 17; 3501:3, 9;
3502:3; 3503:10;
3504:9; 3510:9, 14, 20;
3511:1; 3514:9; 3515:9;
3526:18; 3527:15, 21;
3530:9; 3531:20;
3535:20; 3538:18;
3539:18; 3541:13, 23;
3552:14; 3611:14;
3648:7; 3656:4;
3663:14; 3667:6;
3668:9; 3673:25;
3674:7; 3694:8;
3697:15, 19; 3698:3, 8;
3715:10

**obligation** [4] -
3419:2, 4; 3490:3;
3559:10

**observation** [12] -
3438:12; 3487:14;
3488:19; 3489:17;
3504:7; 3514:3, 8;
3548:20; 3549:10;
3551:2, 13

**observations** [22] -
3482:9, 11-12; 3484:17;
3486:3, 11, 21;
3487:20; 3503:4, 14,
17; 3504:12; 3508:7;
3513:19, 23, 25;
3549:7, 14, 22; 3620:1;
3736:1

**observe** [3] - 3491:12;
3514:8; 3548:21

**observed** [17] -
3473:16, 20; 3477:18,
21; 3489:15; 3490:8;
3491:7; 3507:6;
3512:14; 3514:21;
3548:19; 3549:17;
3550:1, 9, 23; 3551:4;
3552:4

**Observed** [1] - 3551:15

**observing** [1] - 3549:2

**obtain** [10] - 3428:14;
3429:17; 3444:11;
3479:9; 3489:22;
3521:11; 3537:21;
3604:20

**obtained** [9] -
3430:21; 3479:5, 12,
18; 3516:14, 19;
3517:16; 3536:8;
3697:14

**obviously** [23] -
3417:20; 3421:21;
3439:18; 3441:8;
3508:17; 3517:22;
3521:11; 3525:8;
3543:15; 3556:23;
3558:25; 3560:21;
3599:14; 3605:3;
3614:2; 3639:19;
3675:10; 3720:23;
3727:24; 3731:19;
3735:4; 3737:17;
3741:23

**Obviously** [9] -
3518:18; 3524:22;
3528:8; 3559:2;
3560:13; 3562:15;
3677:17; 3678:12;
3737:23

**occasion** [4] -
3490:21; 3491:14;
3494:19; 3499:9

**occasions** [2] -
3418:25; 3516:4

**occupation** [1] -
3571:12

**occur** [3] - 3661:6;
3681:1; 3700:25

**occurred** [6] -
3475:14, 17-18;
3487:18; 3633:8

**occurrence** [1] -
3499:16

**occurring** [1] -
3634:21

**occurs** [1] - 3487:12

**October** [35] - 3426:5;
3428:23; 3463:15, 18;
3466:12; 3515:1, 3;
3521:3; 3524:19;
3526:9; 3529:4; 3530:1,
16; 3531:23; 3533:20;
3534:5; 3613:11;
3625:17, 20; 3668:2, 6,
13; 3669:1; 3676:19;
3677:8, 11; 3684:9;
3685:10; 3703:11, 14;
3729:12; 3730:10;
3731:1

**OF** [3] - 3414:1, 3, 9

**off-site** [2] - 3421:2;
3704:4

**offer** [14] - 3424:5;
3437:6; 3447:21;
3460:21; 3465:16;
3538:16; 3575:7;
3581:10, 12; 3582:12;
3602:11; 3620:3;
3708:8; 3714:3

**offered** [2] - 3424:3;
3603:15

**offering** [1] - 3721:16

**office** [43] - 3508:12;
3509:6; 3555:8;
3654:12; 3665:20;
3679:10; 3686:10;
3688:21, 23; 3689:20;
3690:1; 3692:4; 3693:5,
8, 25; 3694:23; 3695:3,
7, 9; 3697:18; 3698:7;
3700:14; 3701:9, 19,
24; 3702:3, 13; 3703:4;
3704:3; 3709:18;
3710:16; 3711:6, 22;

3712:22; 3713:9, 15; 3714:24; 3715:1, 3, 8

**officer** [2] - 3741:3, 6

**officers** [1] - 3641:23

**Official** [1] - 3414:22

**often** [8] - 3473:11; 3474:14; 3510:12, 23; 3577:11; 3610:15; 3618:8; 3689:22

**old** [4] - 3415:15; 3433:18; 3647:17; 3704:6

**Old** [1] - 3414:20

**omitted** [1] - 3576:5

**once** [8] - 3510:16; 3530:5; 3577:9; 3647:14; 3649:7; 3654:8, 12; 3682:10

**Once** [3] - 3530:6; 3647:22; 3652:10

**one** [134] - 3426:25; 3438:11; 3439:2; 3440:16, 19; 3441:7, 15, 18; 3443:7, 11; 3449:23; 3451:14; 3454:8; 3457:25; 3462:8; 3465:17; 3466:17; 3470:22; 3471:2; 3476:10; 3482:10; 3485:6; 3486:16; 3488:4; 3489:24; 3492:7; 3498:8, 24-25; 3501:22; 3502:1; 3503:17; 3504:1; 3505:9, 14; 3507:5; 3508:6, 8; 3509:12; 3517:12; 3522:9, 15; 3523:15; 3526:15, 22; 3530:18; 3531:8; 3538:11; 3542:6, 9; 3543:11; 3544:2; 3545:1; 3552:16, 18; 3560:24; 3563:1, 11; 3565:4; 3574:8; 3576:24; 3577:12, 23; 3578:14; 3584:2, 14; 3587:8, 16, 18, 20; 3589:17-19; 3593:13; 3594:5; 3599:11; 3600:10; 3602:10; 3604:9; 3605:2; 3606:7, 25; 3607:7, 17; 3608:4; 3609:3; 3611:7; 3618:12; 3622:2, 5, 9;

3625:3; 3632:23; 3636:10; 3641:22, 25; 3647:3; 3650:15; 3665:8; 3678:7; 3679:15, 17; 3690:23; 3717:8; 3721:23; 3729:25; 3730:18; 3731:1; 3732:7, 22-23; 3733:11, 16; 3737:2; 3740:20; 3741:12; 3742:5, 23; 3744:4, 7, 20

**One** [11] - 3414:14; 3427:1; 3486:19, 23; 3552:10; 3560:21; 3562:19; 3610:11; 3655:16; 3730:9; 3732:21

**ones** [12] - 3424:15; 3429:24; 3443:10; 3476:20; 3492:17; 3508:10, 25; 3509:8, 10-11; 3596:5; 3606:5

**ongoing** [1] - 3703:15

**open** [22] - 3415:3; 3442:1; 3456:1; 3507:1; 3521:1; 3522:17; 3529:1; 3587:16, 18; 3588:23; 3589:1; 3594:8; 3602:1; 3609:1; 3630:1; 3652:1; 3654:1; 3684:1; 3703:1; 3718:1, 17

**opened** [2] - 3558:4; 3559:16

**opening** [3] - 3558:5; 3559:12; 3560:1

**operate** [1] - 3630:22

**operating** [1] - 3490:12

**operation** [3] - 3537:14; 3719:3, 10

**operational** [1] - 3471:5

**operations** [3] - 3472:20; 3480:22; 3719:6

**opinion** [2] - 3607:21; 3608:1

**opportunity** [10] - 3420:2; 3423:15; 3456:18; 3537:3; 3602:3; 3625:7; 3657:3; 3731:23; 3732:8; 3744:21

**opposed** [5] - 3492:3; 3565:11; 3634:8; 3678:16; 3691:18

**opposite** [2] - 3701:4, 6

**option** [1] - 3427:3

**order** [8] - 3432:7, 24; 3433:4; 3576:18, 22; 3605:2; 3647:10; 3738:21

**ordinarily** [1] - 3610:6

**ordinary** [1] - 3563:13

**organizations** [2] - 3572:14; 3573:1

**organized** [3] - 3471:9; 3488:2, 15

**organizer** [46] - 3426:4, 20, 22; 3427:20, 25; 3428:10-12, 18, 23; 3429:14, 18, 23, 25; 3430:8, 21; 3431:19, 23; 3432:2, 4, 12; 3433:14, 16, 18, 25; 3434:15, 17, 19, 21; 3435:3, 6, 11-12; 3436:4; 3440:22; 3441:10, 12; 3442:8, 14, 22; 3444:14; 3445:3, 6

**original** [16] - 3439:4, 11; 3574:2, 12; 3575:4, 6; 3584:6, 24; 3585:2; 3589:25; 3622:3; 3664:6; 3686:22; 3699:13; 3700:5; 3704:9

**originally** [4] - 3482:10; 3625:19; 3726:23; 3730:17

**originals** [1] - 3704:10

**otherwise** [1] - 3649:16

**Otherwise** [1] - 3556:13

**ourselves** [2] - 3682:16; 3724:19

**outgoing** [2] - 3543:24; 3544:1

**output** [1] - 3433:13

**outside** [8] - 3435:4; 3597:3; 3617:15;

3634:23; 3649:9; 3650:6; 3651:1; 3732:5

**overall** [1] - 3577:2

**overhear** [7] - 3537:14, 17, 22; 3542:8, 10; 3634:10, 20

**overheard** [5] - 3542:4, 7, 15; 3543:25; 3544:8

**overhears** [12] - 3540:17, 25; 3541:1, 4, 12, 16, 20; 3542:2, 11, 14, 25

**overlapping** [2] - 3481:24; 3482:18

**overlay** [1] - 3578:14

**Overruled** [8] - 3476:6; 3480:7, 17; 3482:21; 3504:10; 3552:15; 3656:6; 3668:11

**overruled** [4] - 3652:2; 3653:20; 3654:2; 3657:1

**overseas** [3] - 3572:15, 17, 25

**overtime** [1] - 3424:9

**overtures** [1] - 3720:8

**own** [6] - 3484:23; 3577:8; 3595:5; 3606:18; 3607:9; 3657:18

**owned** [5] - 3435:6, 11; 3521:15; 3535:15; 3732:20

**owner** [2] - 3435:23; 3442:22

**owner's** [5] - 3434:16, 22; 3435:17; 3436:6, 8

**P**

**p.m** [16] - 3423:25; 3452:2; 3459:16, 19; 3497:23; 3501:18; 3581:2; 3633:25; 3657:23; 3658:9; 3661:23; 3662:8, 17; 3663:5, 11

**package** [1] - 3625:3

**packaged** [1] - 3430:18

**Page** [4] - 3549:17; 3652:22; 3746:3, 21

**page** [82] - 3420:16; 3431:2; 3432:21-23;

3434:10; 3437:10; 3441:22; 3442:5; 3443:10, 16-17, 19; 3444:16; 3453:4; 3455:19; 3466:21; 3467:19; 3500:11; 3504:18; 3506:3; 3515:12; 3517:11, 23; 3519:22; 3520:8; 3524:12; 3528:23; 3535:5; 3544:11; 3567:3; 3585:1; 3586:1; 3587:8, 21; 3588:1, 25; 3589:1, 17-19, 23; 3590:4, 19; 3591:3, 18, 21; 3598:18; 3599:21, 24; 3600:3; 3601:6; 3602:20; 3604:7; 3608:12; 3621:7; 3624:9; 3629:22; 3648:9; 3651:15; 3652:25; 3653:21; 3656:24; 3658:4; 3659:22; 3670:20; 3674:11; 3683:11; 3691:24; 3692:15; 3698:18; 3699:14; 3702:18; 3712:19; 3715:13; 3717:14

**paged** [1] - 3535:15
**pager** [46] - 3417:23; 3422:18; 3521:15; 3523:21; 3524:18, 20; 3525:11; 3526:9, 14; 3527:9; 3528:5, 11, 16-17; 3529:3, 12, 14, 18, 25; 3530:3, 5-6; 3535:15, 18; 3536:3, 9, 11, 19; 3539:5, 7, 15-16, 22, 24; 3540:1-4, 8, 11, 22; 3541:3; 3561:3; 3712:16, 20
**pagers** [2] - 3525:12; 3535:24
**pages** [11] - 3422:7; 3423:16; 3440:18; 3580:23; 3585:11; 3600:13, 15; 3603:25; 3604:4; 3660:24
**pan** [1] - 3618:24
**Paper** [1] - 3572:9
**paper** [15] - 3466:11; 3487:16; 3524:1; 3527:8; 3560:23; 3561:3; 3574:9; 3575:1;

3578:7; 3583:24; 3585:15, 18; 3590:7; 3603:15; 3729:11
**papers** [4] - 3525:15, 17, 19; 3557:6
**paragraphs** [1] - 3579:24
**parameters** [2] - 3569:22; 3643:22
**parentheses** [1] - 3586:25
**parents** [1] - 3571:20
**Park** [1] - 3665:10
**parking** [2] - 3458:21
**part** [31] - 3470:17, 22; 3471:2, 17, 20; 3483:19; 3488:17; 3490:3; 3507:12; 3526:20; 3545:16; 3548:7; 3559:10; 3575:23; 3576:25; 3577:25; 3604:11; 3607:25; 3618:5; 3646:24; 3661:16-18; 3676:22; 3719:18; 3720:6; 3730:16; 3733:4; 3735:25
**partake** [1] - 3710:5
**partially** [1] - 3576:6
**participate** [2] - 3463:16; 3541:8
**participated** [2] - 3536:7; 3542:15
**participating** [1] - 3547:19
**participation** [2] - 3741:21, 24
**particular** [51] - 3432:5; 3452:6; 3471:25; 3472:1, 3, 6-7, 12; 3475:3, 7; 3482:25; 3484:14; 3486:22; 3487:13, 19; 3490:20; 3491:14; 3493:16; 3494:19, 23, 25; 3497:12; 3498:7; 3499:9; 3514:12; 3521:6, 14; 3523:17, 20; 3525:5; 3527:6; 3550:15; 3578:18; 3586:19; 3589:6; 3591:14, 23; 3595:17; 3598:9; 3610:3; 3612:18; 3625:22; 3632:14; 3655:10;

3684:19; 3726:13; 3734:25; 3743:22
**particularly** [1] - 3563:15
**parties** [1] - 3558:17
**parts** [2] - 3577:1; 3587:2
**party** [1] - 3548:4
**pass** [2] - 3651:1; 3740:24
**passed** [4] - 3585:14; 3649:15; 3650:1; 3651:7
**passenger** [1] - 3512:15
**password** [21] - 3426:9, 11-12, 16; 3435:1; 3439:2; 3440:16, 19; 3442:10, 13, 18, 23; 3443:12, 15, 17, 20; 3444:7, 14, 23
**past** [3] - 3474:4; 3527:5; 3573:2
**Pat** [2] - 3444:2, 5
**pattern** [2] - 3574:10; 3594:9
**Paul** [1] - 3414:22
**pause** [17] - 3424:17; 3447:10; 3451:23; 3455:6; 3456:22; 3460:11, 24; 3465:4, 20; 3481:6; 3500:1; 3582:7, 15; 3613:4; 3705:4; 3708:10; 3729:23
**Pause** [2] - 3537:2; 3623:20
**pay** [1] - 3704:6
**payment** [1] - 3738:14
**peak** [2] - 3587:2
**Pearl** [1] - 3571:19
**pen** [19] - 3418:11; 3534:22; 3539:2, 9; 3576:18; 3661:25; 3662:5, 7-8, 16, 19; 3663:2, 5, 11; 3699:19; 3701:12
**pending** [3] - 3553:19; 3668:14; 3686:11
**pens** [6] - 3539:23; 3662:3, 12; 3663:8; 3700:22
**Pension** [2] - 3706:3, 7
**pension** [9] - 3706:10,

12, 15; 3707:1; 3708:2; 5-6, 20; 3716:7
**people** [46] - 3442:17; 3464:4; 3472:1; 3480:24; 3485:6; 3492:7; 3501:22; 3502:17; 3504:12; 3507:5; 3525:12; 3542:5; 3572:17; 3576:9, 15; 3577:16, 19; 3588:6; 3634:11, 24; 3635:6, 17, 22; 3636:21; 3639:23; 3649:7; 3650:7; 3651:10; 3673:16, 22; 3675:14, 16, 21; 3678:7, 13, 23; 3679:4, 6-7, 15; 3713:23; 3732:5; 3737:4; 3740:13
**per** [6] - 3591:3, 8, 10, 13; 3633:13
**Perfect** [1] - 3552:24
**perfectly** [1] - 3558:15
**perhaps** [4] - 3577:22; 3588:10, 18; 3722:22
**period** [43] - 3428:25; 3429:4, 8; 3472:4, 17; 3475:7; 3541:17; 3542:3; 3554:25; 3569:4; 3618:8; 3632:22; 3633:7, 15, 22; 3634:1; 3653:3; 3657:7, 9; 3667:24; 3669:7, 16; 3670:9; 3671:21, 25; 3672:11; 3673:20; 3678:23; 3684:22; 3685:2; 3686:8; 3691:12, 14; 3697:17; 3699:11; 3719:10; 3721:7; 3727:12, 14; 3733:14, 17; 3734:21, 23
**periods** [1] - 3653:16
**peripheral** [1] - 3723:17
**permission** [2] - 3583:6; 3733:9
**permits** [1] - 3734:3
**permitted** [8] - 3517:7; 3519:7; 3558:14; 3644:13; 3676:21; 3734:1; 3739:5
**PERSICO** [1] - 3414:6
**Persico** [162] -

3414:18; 3457:23; 3458:11, 13-14, 23-24; 3459:22, 25; 3462:8, 12, 21; 3463:1; 3464:8-10, 16; 3466:12; 3476:13; 3511:10, 22; 3512:9, 14, 24-25; 3513:1, 13; 3514:15, 21; 3517:21; 3529:20, 22; 3538:16; 3553:11, 15, 18, 24; 3554:6, 10, 18, 21; 3555:2, 8, 13; 3556:8; 3560:17, 24; 3562:5; 3570:8; 3598:14; 3599:3; 3602:11; 3607:3; 3643:5, 9; 3644:14, 16; 3646:22; 3647:13, 17-18, 25; 3648:5; 3649:5, 8, 18; 3650:22; 3651:6; 3652:5, 8, 12, 15; 3653:4, 6-8, 11, 14; 3654:4, 22; 3655:13, 22; 3656:15, 18; 3657:20; 3658:14, 20; 3661:6; 3663:24; 3664:12; 3665:15, 22; 3667:18, 22; 3668:3, 7, 14; 3669:2, 17, 21, 24; 3670:2, 5, 10; 3671:10, 22; 3672:6; 3673:7; 3676:1; 3677:2, 6; 3680:25; 3681:15; 3682:18, 22; 3683:1; 3684:5; 3685:22, 15, 18, 22; 3687:18; 3688:25; 3689:22; 3691:12; 3692:8; 3697:4, 18; 3698:7; 3700:14; 3701:12, 14, 19, 24; 3702:13; 3703:4, 17, 21; 3713:17; 3714:1, 10, 16, 19, 24; 3715:2, 8; 3716:6; 3721:2, 11; 3729:11; 3741:19

**Persico's** [15] - 3417:16; 3517:14; 3524:10; 3559:1; 3560:16; 3563:15; 3565:22; 3648:1; 3649:10; 3652:6; 3681:10; 3694:4; 3697:25; 3723:9; 3741:24

**person** [44] - 3444:2; 3449:12; 3450:2;

3472:12; 3474:2; 3477:18; 3486:19; 3487:14; 3497:8; 3511:20, 24; 3524:2, 6; 3540:3; 3544:6, 12, 15, 21; 3545:6; 3554:13; 3564:25; 3568:11; 3577:25; 3578:15, 19, 23; 3579:6; 3580:1; 3583:23; 3610:3; 3614:17; 3637:5; 3642:4, 9; 3652:8; 3676:11; 3679:5; 3699:18; 3734:6, 25; 3735:5

**person's** [7] - 3435:7; 3563:14; 3574:8; 3609:4, 9; 3611:7; 3707:3

**personal** [1] - 3549:21

**personally** [10] - 3422:6; 3423:16; 3471:17; 3502:14; 3511:17; 3524:17; 3530:19; 3548:19; 3549:10; 3731:18

**pertaining** [2] - 3645:10; 3718:11

**pertinent** [2] - 3537:12

**Peter** [5] - 3415:21; 3416:9; 3570:15, 24; 3736:3

**PETER** [1] - 3570:18

**Ph** [1] - 3414:23

**phone** [108] - 3418:12; 3420:9, 15; 3422:16-19; 3426:24; 3431:10, 14; 3444:5, 17; 3513:22; 3514:1; 3516:15; 3517:10, 16, 20, 22; 3519:1, 4, 8, 21; 3521:5, 9, 12, 14, 17, 22, 24; 3522:2, 6-8, 12, 14, 16; 3523:12-14; 3525:6; 3535:14; 3536:3, 15, 18; 3537:15, 18-19; 3538:13; 3544:20, 23; 3545:9, 25; 3546:7; 3619:1; 3627:22; 3654:21; 3655:10; 3658:10-12; 3665:15, 20; 3677:12; 3686:9, 18-19; 3687:1, 3; 3689:7, 10; 3691:16,

23; 3692:2, 8, 15; 3693:6; 3694:23; 3697:1, 5; 3701:9, 13; 3712:5, 12; 3713:3; 3723:9; 3724:21; 3734:14; 3742:25; 3743:6, 11, 15, 23; 3744:2, 13, 16, 18

**phones** [19] - 3417:23; 3418:11; 3518:7, 11; 3535:24; 3536:4, 9-10, 12-13, 16; 3539:3, 10, 16, 23; 3592:18; 3593:9

**photo** [2] - 3461:10, 25

**photocopies** [1] - 3614:4

**photocopy** [9] - 3574:3, 11; 3583:20, 25; 3584:25; 3585:9; 3590:1; 3593:19

**photocopy's** [1] - 3575:4

**photograph** [15] - 3449:21, 25; 3450:2, 13; 3451:25; 3452:3; 3462:4, 17, 22, 24; 3477:23; 3511:14

**photographed** [2] - 3449:4; 3462:1

**photographing** [2] - 3447:19; 3449:18

**photographs** [12] - 3447:3, 16; 3451:14; 3454:20; 3460:3, 15; 3462:16; 3474:1; 3477:25; 3478:1, 21; 3511:18

**photos** [1] - 3460:19

**physically** [1] - 3610:11

**pick** [5] - 3446:2; 3543:7; 3548:16; 3616:22; 3648:3

**Pick** [2] - 3616:10; 3705:15

**picked** [2] - 3543:9, 22

**picture** [3] - 3639:23; 3647:17; 3669:21

**pictures** [1] - 3513:13

**piece** [9] - 3487:15; 3517:25; 3560:23; 3561:3; 3575:1; 3583:24; 3585:15; 3603:15; 3729:11

**pieces** [3] - 3523:25; 3525:15

**Pierrepont** [1] - 3414:14

**pink** [2] - 3449:12, 16

**pizz** [1] - 3431:10

**pizza** [1] - 3431:3

**Pizza** [1] - 3431:10

**place** [25] - 3427:10; 3472:9; 3505:1, 9; 3507:1; 3513:2, 5; 3516:1; 3521:1; 3528:1; 3529:1; 3546:1; 3559:1; 3577:18; 3589:7; 3617:24; 3625:1; 3630:1; 3639:8; 3649:1; 3652:1; 3653:1; 3654:1; 3665:15, 19

**placed** [10] - 3535:8; 3542:8, 10; 3613:13; 3623:8; 3632:16; 3689:3, 6, 25; 3723:15

**places** [1] - 3590:22

**placing** [3] - 3697:17; 3700:15; 3701:9

**plain** [1] - 3517:13

**plainly** [1] - 3617:13

**plan** [2] - 3416:4; 3629:8

**planned** [2] - 3659:18; 3685:23

**planner** [1] - 3664:6

**planning** [3] - 3418:17; 3423:2; 3736:12

**plans** [1] - 3659:10

**plant** [11] - 3618:10, 13, 21; 3633:2, 11, 17, 24; 3634:2, 10; 3641:23

**plate** [7] - 3488:23; 3489:8; 3495:1, 9, 15, 21

**plates** [2] - 3488:20; 3490:14

**play** [6] - 3559:22; 3629:7, 13, 20; 3630:11; 3730:17

**played** [5] - 3627:2; 3628:25; 3630:17; 3731:6

**playing** [4] - 3624:3, 6; 3635:5, 8

**Plaza** [2] - 3414:14, 23

**plea** [2] - 3669:6;

3672:2

**plenty** [1] - 3741:1
**Point** [2] - 3441:7;
3725:14
**point** [40] - 3421:24;
3432:21; 3441:4, 9;
3471:21; 3489:6;
3493:1; 3504:7;
3505:10; 3520:5;
3548:11; 3559:2;
3563:7; 3566:12;
3586:15; 3587:4;
3588:18; 3590:9;
3605:5; 3619:3;
3622:11; 3628:20;
3643:19; 3666:10;
3675:10; 3677:2, 6;
3685:14, 16, 24;
3693:12; 3694:1;
3700:10, 23; 3703:19;
3704:1; 3707:10;
3721:7; 3724:20; 3733:3
**pointing** [4] - 3450:1,
5; 3467:20; 3468:25
**points** [1] - 3441:6
**pole** [2] - 3617:14;
3632:12
**Police** [1] - 3617:2
**Polytechnic** [1] -
3572:8
**Pontecorvo** [37] -
3417:24; 3418:5, 10;
3424:24; 3426:5;
3430:12, 15, 21;
3440:1; 3470:15, 18;
3471:8, 23; 3473:1, 4,
11; 3478:11; 3480:11;
3486:12; 3487:2, 11;
3491:4, 15; 3492:20;
3498:4; 3499:7;
3504:14; 3507:13;
3509:6, 9; 3510:2;
3518:13, 16; 3523:4;
3563:25; 3736:22
**portion** [7] - 3426:20,
22-25; 3568:18; 3732:3
**portions** [2] -
3620:14; 3731:8
**posed** [1] - 3554:1
**position** [13] -
3559:8; 3560:8;
3566:15; 3617:5;
3643:1; 3649:6;
3650:11, 19; 3651:10;
3682:24; 3721:13;

3722:3; 3733:25
**positions** [1] -
3706:21
**possessed** [1] -
3419:11
**possession** [6] -
3417:14; 3423:7;
3440:8; 3554:17;
3565:24; 3650:24
**possibility** [1] -
3723:21
**possible** [3] - 3547:4;
3584:18; 3740:15
**Post** [2] - 3438:3
**Post-Its** [2] - 3438:3
**pot** [4] - 3709:22;
3710:3
**potential** [1] -
3740:19
**practice** [4] -
3572:16; 3595:5;
3688:14; 3704:5
**precluded** [4] -
3418:22; 3725:11;
3731:8; 3732:3
**preclusion** [1] -
3421:21
**prejudice** [1] - 3682:4
**preliminarily** [1] -
3416:15
**preliminary** [1] -
3630:9
**premises** [2] -
3634:14; 3638:11
**prep** [1] - 3421:1
**preparation** [2] -
3496:13; 3630:20
**prepare** [11] - 3454:18;
3485:22; 3490:3;
3527:19; 3582:10;
3603:20; 3620:18;
3643:8; 3644:18;
3660:7; 3740:19
**prepared** [19] -
3420:10; 3439:10;
3454:3, 8; 3477:11;
3492:3; 3495:23;
3527:11; 3529:9;
3538:4; 3581:22;
3603:12; 3604:5;
3607:11; 3620:20;
3734:1; 3735:1
**preparing** [4] -
3419:6; 3486:2; 3554:9;

3596:4
**prepped** [1] - 3628:25
**presence** [1] - 3576:3
**present** [11] - 3415:3;
3514:22; 3519:19;
3533:19; 3534:13;
3587:24; 3610:19;
3631:10; 3645:18
**president** [8] -
3706:21, 23-24; 3707:2,
5; 3713:14; 3714:13
**presses** [1] - 3577:6
**pressing** [1] - 3416:21
**pretrial** [6] -
3720:24; 3721:8;
3722:10; 3728:20;
3741:3, 6
**Pretty** [1] - 3612:6
**pretty** [3] - 3451:8;
3592:11; 3614:15
**prevent** [1] - 3563:9
**previous** [5] -
3472:18; 3483:15;
3597:1; 3661:9; 3728:23
**previously** [17] -
3419:12; 3420:7;
3421:25; 3422:3, 5;
3423:10; 3425:21;
3445:8; 3470:11;
3473:1; 3481:4;
3497:18; 3499:24;
3582:17; 3589:25;
3592:9; 3652:14
**printed** [2] - 3568:14;
3576:12
**printers** [1] - 3577:6
**printing** [2] - 3576:8;
3577:5
**printout** [2] - 3602:5;
3743:22
**prints** [2] - 3530:25;
3531:2
**prison** [2] - 3647:21;
3648:6
**private** [2] - 3572:16;
3595:5
**privately** [1] - 3598:4
**privilege** [11] -
3555:22; 3557:8, 10;
3570:1; 3643:12;
3644:22; 3681:7, 10;
3682:8, 12; 3683:6
**privileged** [6] -
3553:23; 3554:4;

3555:12; 3556:6, 9;
3569:20
**privy** [1] - 3549:6
**probable** [3] -
3583:22; 3584:2, 8
**problem** [11] - 3555:17,
25; 3588:8; 3680:22;
3681:3, 22, 25; 3737:9;
3743:20; 3745:2
**Procedure** [1] - 3572:7
**procedure** [1] - 3631:3
**procedures** [1] -
3573:22
**proceeding** [8] -
3555:16; 3644:7, 15;
3654:13, 15, 18;
3657:17; 3672:22
**Proceedings** [1] -
3414:24
**proceedings** [21] -
3424:18; 3447:11;
3451:24; 3455:7;
3456:23; 3460:12, 25;
3465:5, 21; 3481:7;
3500:2; 3537:2; 3573:6;
3582:8, 16; 3613:5;
3623:20; 3699:13;
3705:5; 3708:11;
3729:24
**proceeds** [1] - 3549:15
**process** [2] - 3575:23;
3679:4
**processed** [6] -
3530:25; 3531:2;
3574:13; 3575:2;
3583:18; 3621:1
**processing** [2] -
3574:14, 17
**produce** [3] - 3419:2,
4; 3734:15
**produced** [13] -
3414:25; 3418:12;
3420:15; 3434:1;
3441:3, 5, 7; 3456:8;
3599:15; 3725:24;
3735:22, 25; 3737:6
**product** [4] - 3593:15;
3675:4; 3676:3; 3680:1
**Production** [2] -
3706:3, 6
**production** [1] -
3593:1
**professional** [6] -
3571:25; 3572:3, 12,

14, 25
**proffer** [1] - 3728:1
**program** [1] - 3739:1
**prohibited** [1] - 3724:3
**prominent** [1] - 3592:16
**promotion** [1] - 3572:1
**pronounced** [1] - 3589:5
**proper** [2] - 3603:21; 3742:1
**proportion** [5] - 3576:24; 3587:2, 10, 14; 3588:14
**proportions** [4] - 3576:23, 25; 3588:13; 3593:10
**proposed** [1] - 3627:17
**prosecuting** [1] - 3573:3
**prosecution** [1] - 3680:8
**protect** [3] - 3442:17, 23; 3682:15
**protected** [11] - 3439:2; 3440:16, 19; 3442:10, 13; 3443:12, 15, 18, 20; 3444:8, 23
**prove** [4] - 3559:9, 13; 3560:2; 3561:20
**provide** [10] - 3418:15; 3436:1; 3454:9; 3701:20-22; 3724:6; 3737:25; 3740:25; 3744:1
**provided** [28] - 3417:18; 3418:16; 3420:6, 14, 18; 3424:24; 3426:4; 3437:2; 3438:24; 3439:1, 19; 3440:1; 3454:20; 3456:9; 3519:18; 3543:11; 3582:17; 3625:8, 19; 3626:9; 3701:23; 3724:11, 18; 3725:16; 3726:4, 7; 3727:13
**provides** [2] - 3650:9; 3728:17
**providing** [1] - 3418:18
**PS** [1] - 3499:25
**public** [6] - 3572:16,

23; 3597:24; 3598:1; 3616:25; 3701:14
**publish** [5] - 3452:12; 3461:12; 3463:6; 3466:3; 3575:11
**published** [6] - 3452:17; 3461:16; 3463:13; 3466:7; 3575:19; 3583:4
**pulled** [1] - 3743:1
**pulling** [1] - 3465:18
**purchase** [1] - 3625:14
**purged** [1] - 3704:11
**purging** [1] - 3704:6
**purpose** [34] - 3515:8; 3516:10, 13; 3517:6, 9, 19, 21; 3521:3, 9; 3552:12; 3554:8, 23; 3556:6, 12; 3558:9; 3563:20, 23; 3569:6; 3600:5; 3606:1; 3607:1, 5; 3643:7; 3644:17; 3674:5; 3675:5; 3676:9, 12; 3677:19; 3678:5, 9, 12; 3723:13
**purposes** [3] - 3539:19; 3552:16, 18
**pursuant** [3] - 3571:3; 3647:8, 10
**purview** [1] - 3422:22
**push** [1] - 3682:16
**put** [24] - 3426:11, 19; 3518:24; 3534:25; 3559:12; 3560:11; 3561:10, 18; 3562:5, 10; 3565:14; 3586:13; 3617:13; 3626:15; 3632:8; 3645:12; 3682:13; 3720:12; 3726:22; 3731:13, 17, 21; 3737:14
**puts** [1] - 3729:7
**putting** [8] - 3416:4; 3420:10; 3565:13; 3566:19; 3682:23; 3708:19; 3731:12, 20
**Putting** [1] - 3560:10

## Q

**QQ** [5] - 3713:22, 25; 3714:3, 7; 3747:3
**quality** [1] - 3574:5
**quarter** [2] - 3457:17; 3596:6

**QUESTION** [3] - 3654:21; 3657:5, 9
**questioned** [32] - 3571:22; 3573:25; 3578:20; 3584:5; 3585:7, 21, 25; 3586:2, 9, 23; 3587:7, 11, 25; 3589:2, 4, 6, 13, 24; 3590:13; 3591:8, 11, 16, 20; 3592:2, 6, 12, 24; 3593:6, 14; 3594:11; 3610:13; 3614:8
**questioning** [1] - 3558:3
**questions** [43] - 3436:14; 3441:19; 3442:25; 3469:25; 3505:23; 3519:13, 15, 17; 3528:3, 14; 3552:19; 3553:10; 3554:1, 3; 3558:14; 3561:16; 3568:11; 3594:17; 3600:22; 3604:22; 3606:13, 16, 21-22; 3615:22; 3622:21; 3623:22; 3624:1; 3627:6, 8; 3630:9, 13; 3631:24; 3642:11, 13-14; 3667:12; 3678:4; 3701:1; 3702:2; 3704:20; 3736:4
**quick** [1] - 3642:25
**quickly** [1] - 3604:13
**quit** [1] - 3653:9
**quite** [5] - 3419:3; 3508:16; 3509:16; 3665:12; 3700:2
**quote** [2] - 3656:2, 8

## R

**radio** [3] - 3484:25; 3503:2; 3549:8
**raise** [5] - 3416:18; 3645:22; 3663:17; 3682:24; 3737:3
**raised** [1] - 3525:8
**Ralph** [7] - 3584:16, 23; 3589:25; 3590:4, 14-15, 17
**ran** [1] - 3618:3
**Ranaida** [1] - 3726:23
**range** [2] - 3577:18; 3578:17

**ransack** [1] - 3716:7
**ransacking** [1] - 3716:13
**rarely** [1] - 3597:25
**rate** [3] - 3597:16, 20
**rather** [6] - 3505:6; 3528:14; 3576:6; 3592:13; 3593:3; 3602:9
**Rather** [1] - 3664:19
**Ravioli** [1] - 3432:25
**reach** [5] - 3555:9; 3679:11; 3689:23; 3692:8
**reached** [5] - 3581:24; 3583:15, 21; 3679:14
**reaction** [2] - 3715:4
**read** [17] - 3418:24; 3466:16; 3468:24; 3469:4; 3505:3; 3526:11; 3543:12; 3544:3; 3549:11; 3571:24; 3588:4; 3686:22; 3714:14; 3716:17, 20; 3718:12, 14
**readily** [1] - 3559:8
**reading** [2] - 3495:10; 3513:7
**reads** [1] - 3468:7
**ready** [4] - 3456:19; 3457:2; 3557:6; 3738:5
**realistic** [1] - 3719:25
**realize** [2] - 3517:15; 3719:15
**really** [11] - 3423:14; 3524:8; 3533:6; 3557:14; 3586:7; 3597:9; 3664:16; 3671:8; 3680:5; 3718:6; 3732:6
**Really** [1] - 3505:24
**realtime** [1] - 3538:2
**reason** [13] - 3439:7; 3505:8; 3507:23; 3517:16; 3521:13; 3554:22; 3651:1; 3677:11, 14; 3678:13; 3679:24; 3721:6; 3732:2
**reasonable** [2] - 3505:18; 3720:16
**reasons** [1] - 3420:3
**rebut** [1] - 3556:24
**rebuts** [2] - 3649:12;

3650:8

**recalled** [1] - 3505:6

**recalling** [1] - 3459:4

**receipt** [1] - 3526:12

**receive** [1] - 3479:14

**Received** [8] - 3448:1; 3465:23; 3575:10; 3581:15; 3582:20; 3622:25; 3708:15; 3714:6

**received** [36] - 3415:6; 3417:6, 8; 3424:15; 3428:20, 23; 3430:13, 18-19; 3433:13; 3448:3; 3461:3, 5; 3466:2; 3480:2; 3513:6; 3515:4; 3542:24; 3575:15; 3581:17; 3582:22; 3625:6; 3670:12; 3671:9; 3691:11; 3708:16; 3714:8; 3725:5, 17; 3735:17, 24; 3740:11; 3744:2; 3747:2

**receiving** [6] - 3428:17; 3430:7; 3540:2, 4; 3541:2

**recent** [1] - 3428:17

**recently** [2] - 3625:10; 3652:10

**recess** [5] - 3416:16; 3455:2; 3552:24; 3567:2; 3630:6

**Recess** [2] - 3456:5; 3630:5

**recognizable** [2] - 3592:1, 3

**recognize** [19] - 3447:14; 3450:2, 8, 25; 3529:23; 3537:6, 11; 3574:23; 3588:10, 22; 3619:14, 16; 3640:11; 3642:8; 3659:24; 3687:14; 3691:6; 3707:22, 24

**recognized** [1] - 3626:16

**recollection** [29] - 3459:10; 3476:25; 3477:6; 3481:11, 15; 3484:19; 3485:5, 24; 3500:5; 3512:1; 3514:19; 3524:17; 3526:13; 3528:4, 8;

3529:17; 3540:16, 22; 3547:18; 3548:7; 3556:23; 3613:3; 3623:15; 3655:7; 3658:1; 3660:25; 3661:3; 3698:2; 3731:4

**record** [26] - 3423:24; 3424:21; 3442:19; 3446:3; 3464:15; 3568:18; 3570:7, 23; 3616:11; 3632:2; 3645:2; 3646:8; 3663:10; 3666:15; 3686:19; 3705:17; 3720:12; 3726:22; 3733:4; 3737:14, 22; 3739:22; 3741:23; 3743:17; 3744:3, 11

**recorded** [3] - 3414:24; 3574:9; 3621:5

**recording** [7] - 3486:3, 7; 3580:21; 3622:15; 3626:23; 3730:22

**recordings** [5] - 3730:4, 15, 21; 3741:16

**records** [40] - 3417:22; 3418:12; 3420:9, 18; 3422:16-19; 3442:15, 17; 3568:14; 3606:24; 3627:22; 3658:5, 16; 3686:18; 3687:1; 3691:16; 3696:20; 3700:15; 3701:2, 9, 18; 3723:23; 3724:5, 21; 3725:21, 24; 3726:1, 12, 14; 3728:17; 3734:13, 15; 3743:15; 3744:13, 17

**recovers** [1] - 3729:11

**RECROSS** [1] - 3443:4

**RECROSS-EXAMINATION** [1] - 3443:4

**recuperative** [1] - 3719:10

**redirect** [4] - 3436:15; 3615:23; 3642:15; 3682:4

**REDIRECT** [1] - 3436:17

**refer** [3] - 3444:19; 3577:4; 3631:25

**referred** [3] - 3547:8; 3636:16; 3726:2

**referring** [11] - 3492:19; 3534:21;

3556:17; 3613:16; 3620:21; 3635:9; 3660:6; 3727:1, 22

**reflect** [2] - 3658:16; 3666:15

**reflecting** [1] - 3703:20

**refresh** [15] - 3451:16; 3459:9; 3481:11, 15; 3485:24; 3500:4; 3512:1; 3524:17; 3528:4, 7; 3540:15, 22; 3548:7; 3623:14; 3658:1

**refreshed** [1] - 3514:18

**refreshes** [3] - 3526:13; 3613:3; 3660:25

**regard** [5] - 3514:19; 3569:11; 3642:23; 3644:6, 14

**regarding** [6] - 3415:12; 3527:7; 3556:14; 3568:15; 3733:10

**regards** [1] - 3651:10

**register** [2] - 3418:11; 3701:12

**registered** [1] - 3490:18

**registers** [2] - 3539:2, 9

**registration** [4] - 3490:25; 3549:15; 3550:1; 3551:15

**regular** [2] - 3585:18; 3671:23

**relate** [3] - 3708:6; 3726:4; 3732:25

**related** [4] - 3445:5; 3508:19; 3560:20; 3706:4

**relates** [3] - 3732:19; 3734:21, 23

**relating** [1] - 3554:5

**relation** [3] - 3473:11; 3509:22; 3529:9

**relationship** [2] - 3448:18; 3652:15

**relationships** [1] - 3733:1

**relative** [2] - 3572:1; 3588:14; 3593:10

**relatively** [2] - 3587:15; 3740:4

**released** [3] - 3568:21; 3667:24; 3668:3

**relevance** [7] - 3628:19; 3648:7; 3649:3, 17; 3650:1, 9

**relevancy** [1] - 3519:16

**relevant** [16] - 3516:2, 9; 3517:8; 3518:9; 3565:2; 3566:6; 3607:20; 3608:5; 3650:10; 3651:13; 3677:16; 3678:14; 3699:7, 16

**reliability** [1] - 3628:19

**relitigate** [1] - 3517:6

**relying** [1] - 3734:22

**remain** [2] - 3616:4; 3705:8

**Remain** [1] - 3445:21

**remainder** [1] - 3518:4

**remained** [2] - 3502:11; 3669:13

**remarkable** [1] - 3597:8

**remarks** [2] - 3632:17, 24

**remember** [21] - 3478:1; 3495:9; 3541:10; 3548:6; 3595:11, 24; 3626:3; 3629:2; 3633:25; 3657:24; 3660:17; 3665:3, 9, 18; 3673:18; 3703:9; 3717:1, 3, 9; 3718:5; 3743:23

**reminded** [5] - 3625:11, 14, 16, 20; 3719:6

**renew** [1] - 3416:25

**renewed** [1] - 3625:10

**Rensselaer** [1] - 3572:8

**repeatedly** [3] - 3419:8; 3649:6, 23

**rephrase** [1] - 3521:10

**report** [38] - 3439:21; 3451:16, 18; 3454:3, 5, 18, 22; 3455:4, 11;

3456:7; 3474:24; 3475:3, 5; 3481:17; 3482:12; 3485:22; 3486:14; 3487:5; 3488:24; 3489:18; 3495:3, 11; 3496:8, 13; 3500:7; 3505:4; 3507:3; 3513:17; 3514:20; 3527:3; 3548:14; 3604:5; 3607:1; 3613:7; 3718:9; 3719:2

**reported** [3] - 3439:21; 3503:14; 3718:13

**Reporter** [1] - 3414:22

**reporting** [1] - 3504:12

**reports** [16] - 3420:22; 3421:4; 3476:3, 8; 3477:11; 3495:23; 3508:6, 14, 17, 23; 3509:2; 3511:25; 3513:20; 3514:18; 3627:21

**represent** [3] - 3460:18; 3646:25; 3647:5

**representation** [8] - 3419:13; 3422:1; 3603:3; 3605:6; 3646:25; 3685:18; 3701:17; 3731:22

**represented** [11] - 3419:10; 3553:18; 3555:15; 3556:1; 3644:14; 3647:18; 3653:4, 11; 3667:18; 3670:5; 3731:24

**representing** [13] - 3649:22; 3650:8; 3651:11; 3653:9; 3654:14; 3661:17; 3667:19, 21; 3670:2; 3673:7; 3685:15; 3687:18

**represents** [1] - 3604:12

**reproduced** [1] - 3574:6

**request** [23] - 3418:21; 3571:2; 3579:1, 12, 18-20; 3580:3, 8; 3585:12, 17; 3590:11, 17; 3591:21; 3596:3; 3609:12; 3610:1;

3625:11; 3719:12; 3724:2; 3737:8; 3738:14; 3739:5

**requested** [6] - 3419:7; 3586:4; 3607:4; 3701:11; 3703:24; 3736:19

**requesting** [3] - 3415:7; 3418:13; 3744:19

**requests** [1] - 3631:2

**required** [5] - 3526:16, 23; 3560:18; 3627:25

**research** [3] - 3572:1; 3694:3

**residence** [9] - 3459:21; 3466:12; 3513:2, 5; 3522:20; 3551:6, 11; 3552:2; 3667:1

**resolve** [1] - 3733:1

**respect** [14] - 3417:22; 3432:1; 3478:16; 3511:4; 3518:23; 3536:8, 12; 3579:17; 3629:6; 3723:22; 3725:15; 3733:23; 3734:10; 3739:14

**respond** [2] - 3423:18; 3720:15

**response** [4] - 3416:19; 3553:9; 3628:1; 3712:15

**rest** [6] - 3423:5; 3547:7; 3576:14; 3606:19; 3700:9; 3720:2

**restaurant** [2] - 3665:7, 10

**restaurants** [1] - 3665:12

**resting** [2] - 3418:18; 3423:2

**rests** [2] - 3561:25

**result** [1] - 3683:2

**resume** [4] - 3423:23; 3457:2; 3552:25; 3718:17

**resumed** [1] - 3425:21

**resumes** [5] - 3415:1; 3463:4, 10; 3594:15; 3630:25

**retain** [1] - 3666:2

**retained** [11] -

3595:12, 17; 3598:3, 6; 3673:2, 14; 3683:3; 3684:3, 10; 3737:11

**retains** [1] - 3597:18

**retake** [2] - 3463:3; 3594:14

**retire** [2] - 3617:3; 3706:16

**retired** [1] - 3617:5

**retrieve** [3] - 3426:4; 3429:13; 3464:21

**retrieved** [3] - 3468:1; 3530:1, 5

**retrieving** [3] - 3491:7; 3508:13; 3745:6

**return** [1] - 3671:5

**returned** [5] - 3428:21; 3430:11; 3555:7; 3670:16; 3671:2

**returns** [1] - 3704:10

**revealing** [1] - 3556:7

**review** [18] - 3415:8; 3417:11; 3418:3; 3423:16; 3476:3, 15; 3508:22; 3509:1, 11-12; 3510:2; 3514:18; 3538:8, 10; 3541:1; 3546:3; 3550:12; 3556:23

**reviewed** [28] - 3422:6; 3474:23; 3475:2; 3476:18, 22; 3477:9; 3478:21; 3481:10; 3496:12; 3508:5, 10, 24; 3509:8; 3511:25; 3538:5, 7, 13; 3539:1; 3542:11; 3545:12; 3547:6; 3605:6; 3619:5, 19; 3623:11; 3724:11; 3731:18

**reviewer** [1] - 3536:7

**reviewing** [7] - 3476:9; 3478:1; 3536:8; 3541:16; 3542:15; 3543:5; 3545:17

**reviews** [1] - 3538:9

**revised** [1] - 3415:15

**Rich** [1] - 3469:1

**right-hand** [10] - 3450:1; 3462:4, 22; 3469:13; 3585:10; 3586:6; 3590:5; 3591:3; 3613:18; 3639:19

**ripe** [1] - 3727:4

**RMR** [1] - 3414:22

**Road** [1] - 3414:20

**Rob** [3] - 3743:14, 16; 3744:6

**ROBERT** [1] - 3414:19

**Roberts** [1] - 3707:4

**Rochester** [1] - 3572:10

**Rockville** [2] - 3665:7, 10

**Ronald** [8] - 3450:20; 3477:18, 21; 3478:12; 3490:11; 3503:23; 3504:6; 3505:9

**Ronnie** [1] - 3449:24

**room** [1] - 3585:19

**ROSLYNN** [1] - 3414:12

**rough** [1] - 3737:19

**roughly** [1] - 3665:16

**Route** [1] - 3723:12

**routinely** [1] - 3555:2

**rule** [2] - 3633:24; 3663:20

**Rule** [11] - 3417:3, 6; 3418:23-25; 3419:1; 3438:18; 3571:3; 3724:3; 3725:8

**rules** [2] - 3706:24; 3718:5

**ruling** [3] - 3731:20; 3732:11, 16

**run** [9] - 3490:18; 3491:2; 3553:4; 3574:15; 3575:2; 3614:24; 3628:7; 3635:4; 3706:13

**running** [2] - 3539:23; 3628:21

**Russell** [1] - 3733:12

**Ryan** [2] - 3735:20; 3736:20

**S**

**Sal** [1] - 3636:13

**Salamander** [2] - 3459:18

**salami** [1] - 3636:15

**Salerno** [2] - 3736:15, 18

**Sally** [1] - 3636:16

**Salome** [13] - 3636:13; 3637:1, 17, 19; 3638:9,

17, 19; 3639:6, 11; 3640:22, 25; 3641:6

**salon** [1] - 3446:24

**Sammy** [2] - 3730:23; 3731:2

**samples** [3] - 3563:22; 3564:11; 3586:3

**sanction** [1] - 3724:4

**SARITA** [1] - 3414:16

**sat** [2] - 3596:5; 3624:5

**save** [2] - 3505:5; 3739:20

**saw** [36] - 3434:11; 3440:5; 3447:19; 3458:21; 3460:1, 19; 3462:9; 3478:3; 3487:23; 3494:8, 10, 12; 3500:9; 3508:8; 3512:9, 13, 25; 3517:13; 3518:11; 3522:7-9, 19, 21; 3523:3, 14; 3525:7; 3574:12; 3583:18; 3593:17; 3611:20, 23-24; 3612:2; 3709:4

**scanned** [1] - 3585:7

**scanner** [1] - 3585:8

**scanning** [1] - 3596:3

**scene** [3] - 3478:6, 8, 13

**schedule** [4] - 3686:17; 3719:7; 3720:1; 3735:9

**scheduled** [12] - 3553:10, 16; 3554:10; 3555:3; 3557:25; 3658:24; 3659:1, 3, 8; 3669:3; 3685:22; 3728:4

**scheduling** [1] - 3719:16

**scope** [4] - 3516:20; 3519:16; 3568:6; 3599:18

**scrap** [1] - 3578:7

**screen** [7] - 3444:18; 3533:6; 3584:17; 3586:14; 3590:7; 3652:8; 3708:19

**scribble** [1] - 3532:19

**sealed** [1] - 3430:19

**search** [35] - 3435:8; 3463:16; 3464:1, 20; 3505:16; 3514:22;

3515:6, 8; 3516:5, 14, 20; 3517:5, 9, 17; 3518:4; 3521:4, 11, 13, 20; 3522:4, 11; 3523:23; 3526:15; 3527:6, 18; 3530:1; 3533:19; 3559:1; 3560:16; 3668:7; 3669:1; 3677:11; 3703:10; 3729:12

**searches** [1] - 3525:18

**searching** [3] - 3516:17, 21

**seat** [7] - 3425:17; 3446:1; 3570:22; 3616:10; 3644:4; 3646:6; 3705:15

**seated** [6] - 3425:15; 3457:1; 3570:13; 3631:11; 3645:19; 3718:25

**second** [16] - 3441:9; 3443:10; 3516:3, 19; 3517:17; 3560:14; 3577:9; 3585:1; 3587:3; 3589:7, 17; 3624:7; 3660:23; 3708:9; 3724:5; 3741:17

**Secondly** [1] - 3568:9

**secreted** [1] - 3525:7

**section** [6] - 3427:15; 3428:1; 3443:7, 18; 3532:14

**security** [3] - 3442:14; 3616:24; 3738:25

**See** [1] - 3630:3

**see** [105] - 3415:4; 3420:12; 3423:17; 3424:14; 3431:4, 17; 3432:24; 3433:1; 3434:9; 3442:6, 17; 3444:16, 18, 21; 3447:1; 3449:24; 3450:12; 3454:22; 3455:4; 3457:24; 3458:2, 8; 3459:25; 3460:2; 3462:15; 3465:7; 3469:16; 3470:10; 3472:5; 3478:7; 3479:7, 16; 3480:21; 3481:20; 3486:18; 3487:10; 3494:17; 3496:3; 3502:17; 3503:11;

3504:3; 3505:2; 3506:1; 3507:7, 25; 3508:1; 3512:16; 3514:13; 3519:1; 3522:6, 12; 3540:15; 3545:11; 3546:24; 3567:1; 3572:17; 3574:2, 6; 3575:3; 3576:20; 3582:13; 3584:17; 3585:23; 3586:2, 7, 18; 3587:6, 9; 3588:17, 19, 24; 3589:8; 3590:4, 6; 3591:16; 3594:9; 3599:12; 3632:25; 3638:4; 3643:20; 3657:19; 3658:6, 10; 3666:8; 3688:1, 5-6; 3690:14; 3693:19; 3694:17; 3695:2, 16; 3708:9; 3709:11; 3711:11; 3713:12; 3715:6; 3718:21; 3719:17; 3735:7; 3744:22

**seeing** [7] - 3483:25; 3512:18; 3514:14; 3547:20; 3614:2; 3626:3

**seek** [3] - 3438:18; 3440:12; 3676:13

**seeking** [2] - 3519:21; 3744:3

**seem** [4] - 3417:17; 3569:17; 3613:13; 3711:15

**sees** [3] - 3516:9; 3519:4

**seize** [1] - 3518:6

**seized** [23] - 3465:9; 3466:11; 3469:7, 19; 3515:5; 3516:21; 3519:4; 3521:18, 23; 3522:2; 3523:23, 25; 3524:2, 5; 3525:17, 19; 3526:17, 22; 3527:20; 3528:17; 3529:9; 3531:23; 3535:1

**seizing** [3] - 3523:22; 3530:7; 3532:3

**seizure** [2] - 3519:7, 19

**seizures** [1] - 3520:5

**self** [1] - 3711:15

**semicircle** [1] - 3593:2

**seminars** [1] - 3572:13

**send** [3] - 3597:25; 3651:10

**senior** [1] - 3474:7

**Senior** [58] - 3417:23; 3418:1; 3419:11; 3449:24; 3450:3, 20; 3451:2, 9; 3472:15; 3473:5, 12; 3474:10, 18; 3480:14; 3481:13; 3493:9; 3494:3, 8; 3496:18, 25; 3497:9; 3498:19; 3499:3, 10; 3508:20; 3509:23; 3510:7, 13; 3517:11; 3519:22; 3521:16; 3535:16; 3539:4; 3540:9, 23; 3541:20; 3542:6; 3543:24; 3544:7; 3545:2, 10; 3546:1, 7; 3551:7; 3561:4; 3562:19; 3563:8; 3564:1; 3673:23; 3707:10, 13; 3708:21; 3709:5; 3712:16; 3713:6; 3714:17; 3723:16

**Senior's** [6] - 3510:25; 3516:16; 3535:24; 3539:9; 3541:3; 3677:13

**sense** [3] - 3484:25; 3609:16; 3716:6

**senseless** [1] - 3519:15

**sent** [9] - 3417:6; 3439:14; 3509:7, 9; 3510:1; 3626:10; 3667:5; 3704:12; 3739:22

**sentence** [2] - 3576:14; 3738:24

**sentenced** [1] - 3669:7

**separate** [6] - 3421:2; 3428:1; 3492:3; 3498:12; 3593:3; 3726:17

**separating** [1] - 3594:1

**September** [3] - 3469:11; 3641:12; 3655:10

**series** [6] - 3431:6; 3466:20; 3468:19; 3469:9, 21; 3590:19

**service** [1] - 3738:14

**services** [5] - 3720:24; 3722:10; 3728:20; 3741:3, 6

**serving** [1] - 3738:23

**session** [1] - 3631:2

**SESSION** [1] - 3568:1

**set** [33] - 3479:7; 3532:24; 3550:7; 3554:24; 3555:10; 3556:20; 3557:2, 6, 12-13; 3565:7; 3591:24; 3595:25; 3604:8; 3613:10; 3615:9; 3623:18; 3630:17; 3641:1; 3643:6; 3658:21; 3664:15, 21; 3671:9; 3672:7; 3673:19; 3674:3; 3679:6, 16; 3724:8; 3725:3; 3726:1

**Set** [2] - 3629:20; 3736:9

**sets** [4] - 3532:25; 3550:22; 3551:3; 3725:21

**setting** [1] - 3720:1

**settled** [3] - 3659:7; 3660:3, 11

**setup** [8] - 3551:9; 3553:13; 3554:2, 8; 3664:16; 3686:18, 22

**seven** [3] - 3633:25; 3638:6; 3680:13

**several** [17] - 3416:22; 3417:24; 3472:21; 3516:4, 24; 3542:14; 3627:17, 21; 3628:5; 3637:16; 3638:5; 3657:25; 3690:7; 3692:14; 3704:5; 3719:9; 3729:7

**Several** [2] - 3517:4; 3680:15

**SEYBERT** [1] - 3414:9

**Shannon** [2] - 3735:21; 3736:19

**shape** [2] - 3716:14; 3718:15

**Sharp** [1] - 3427:16

**sharply** [1] - 3575:3

**sheet** [2] - 3580:21

**Sheffield** [8] - 3673:11, 14; 3675:18; 3677:4; 3682:10;

3684:10; 3688:10; 3695:13

**Sheffield's** [2] - 3687:16; 3691:6

**shield** [2] - 3555:23; 3682:12

**shirt** [6] - 3449:12, 14; 3636:25; 3640:20, 22; 3666:13

**shoe** [2] - 3525:7; 3526:6

**shoebox** [1] - 3468:2

**shooting** [1] - 3733:6

**Shop** [1] - 3448:19

**shopping** [1] - 3609:19

**shore** [1] - 3665:11

**short** [5] - 3587:15; 3733:12; 3736:17; 3740:4, 11

**Short** [2] - 3742:19

**shortly** [3] - 3669:4; 3689:6; 3723:24

**shorts** [1] - 3640:2

**shove** [1] - 3682:16

**show** [52] - 3417:17; 3418:7; 3419:20; 3422:2, 9; 3432:22; 3443:19; 3465:2; 3479:8, 16; 3481:4; 3494:3; 3497:8, 16; 3498:19; 3499:4, 15, 24; 3501:15, 24; 3507:25; 3508:1; 3517:21; 3524:9; 3529:19; 3533:7; 3536:21; 3538:11; 3543:10; 3546:22; 3563:20; 3573:12; 3574:22; 3580:17; 3582:5; 3584:20; 3598:13; 3610:22; 3612:24; 3647:15; 3657:25; 3658:3; 3696:20, 25; 3707:21; 3713:22; 3724:7; 3725:22; 3726:2, 14

**showed** [4] - 3501:22; 3502:1; 3714:20

**showing** [6] - 3427:12; 3436:25; 3603:21; 3619:12; 3691:19; 3696:22

**Showing** [7] - 3447:9; 3449:3; 3459:15;

3460:9; 3470:11; 3547:25; 3659:21

**shown** [6] - 3499:10; 3562:8; 3568:14; 3610:21; 3669:21; 3691:18

**shows** [9] - 3418:6; 3497:2, 4; 3574:9; 3590:13, 17; 3603:21; 3607:15; 3727:11

**shut** [2] - 3633:24; 3634:3

**SI** [1] - 3549:16

**side** [20] - 3450:2; 3469:13, 21; 3531:8, 11; 3532:15, 22; 3585:10; 3587:20; 3590:5, 21; 3593:11; 3600:16; 3618:25; 3639:14, 17, 19

**Sidebar** [14] - 3438:1; 3441:21; 3454:1; 3455:18; 3599:1; 3601:5; 3603:1; 3608:11; 3675:1; 3683:10; 3699:1; 3702:17; 3716:1; 3717:13

**sidebar** [6] - 3505:1; 3516:1; 3528:1; 3625:1; 3649:1; 3653:1

**sides** [1] - 3531:7

**sidewalk** [3] - 3448:9; 3458:7

**sight** [4] - 3459:6; 3503:2; 3511:14

**sign** [1] - 3448:12

**signature** [2] - 3577:9

**signatures** [1] - 3577:12

**significant** [7] - 3578:18, 22; 3579:3, 6; 3586:22; 3593:25

**silence** [1] - 3623:24

**similar** [2] - 3590:12; 3600:16

**Similar** [1] - 3591:23

**similarities** [5] - 3578:10, 18; 3579:3, 6

**similarity** [1] - 3586:22

**similarly** [6] - 3545:23; 3578:9; 3589:8; 3592:3;

3687:10; 3691:2

**Similarly** [3] - 3588:21, 23; 3692:14

**simple** [3] - 3577:8; 3579:21; 3729:1

**simplify** [1] - 3588:6

**simply** [10] - 3554:7; 3557:1; 3565:11; 3600:1, 14; 3604:7; 3614:3; 3626:19; 3629:9; 3675:7

**simultaneously** [3] - 3483:17; 3486:3; 3540:4

**single** [2] - 3676:11; 3682:6

**sit** [8] - 3422:13, 20; 3524:22; 3579:20; 3623:10; 3664:5; 3665:3; 3671:8

**site** [22] - 3417:18; 3421:2; 3697:14; 3700:15; 3701:2, 18; 3704:4; 3723:7, 9, 23; 3724:5, 8, 21; 3725:22; 3726:2, 9, 15, 19; 3734:4, 6, 24

**sites** [6] - 3702:7; 3725:21; 3726:6, 13; 3734:10, 25

**sitting** [6] - 3456:15; 3495:14; 3517:13; 3546:11; 3547:15; 3666:11

**situation** [5] - 3553:8; 3557:18; 3559:11; 3580:4; 3604:15

**six** [7] - 3417:20; 3505:22; 3510:4; 3519:15; 3528:3; 3664:14

**size** [2] - 3585:21, 23

**SJ11** [1] - 3544:4

**skimmed** [1] - 3424:12

**slant** [1] - 3593:7

**slide** [1] - 3559:3

**slight** [1] - 3577:7

**slightly** [1] - 3583:19

**slip** [2] - 3466:11; 3559:3

**slurred** [1] - 3576:4

**Small** [1] - 3592:19

**small** [16] - 3576:10, 13-14, 16; 3577:17;

3579:25; 3583:24; 3584:2; 3585:15; 3590:16; 3592:19; 3593:15, 23; 3594:7

**smaller** [2] - 3589:15, 20

**smoking** [1] - 3491:12

**snow** [1] - 3597:7

**SO** [2] - 3480:22

**So..** [1] - 3485:1

**socialized** [1] - 3654:8

**software** [2] - 3427:16; 3433:12

**solves** [1] - 3745:2

**Someone** [1] - 3490:24

**someone** [12] - 3472:16; 3474:6; 3478:8; 3480:18; 3503:23; 3504:6; 3514:1; 3537:18; 3540:2; 3661:17; 3679:10; 3707:10

**Someplace** [1] - 3489:20

**someplace** [2] - 3479:15; 3577:19

**Sometime** [1] - 3701:16

**sometime** [10] - 3555:3; 3613:14; 3619:6; 3634:2; 3668:17, 21; 3707:15; 3709:14; 3721:2

**sometimes** [6] - 3543:22; 3576:20; 3591:1; 3618:11

**Sometimes** [6] - 3524:8; 3543:7, 21; 3576:9; 3590:25; 3612:17

**somewhat** [4] - 3584:18; 3585:3, 19; 3588:3

**somewhere** [3] - 3509:15; 3712:10; 3737:19

**Somewhere** [1] - 3513:7

**son** [5] - 3451:3; 3638:22; 3647:24; 3652:5; 3711:25

**son's** [1] - 3719:2

**soon** [3] - 3421:9; 3668:13; 3716:7

**sorry** [26] - 3429:15;

3444:19; 3447:24; 3455:9, 17; 3482:5; 3498:1; 3526:19; 3574:17; 3582:5; 3623:25; 3649:14; 3655:12, 15; 3657:14; 3688:3; 3690:17; 3692:19; 3722:21; 3725:13; 3730:2; 3740:10; 3741:11; 3742:11, 22

**Sorry** [4] - 3569:2; 3642:20; 3680:16; 3705:25

**sort** [9] - 3427:11; 3579:11; 3586:25; 3590:2; 3591:9; 3607:23; 3680:1; 3711:14; 3729:20

**sought** [2] - 3440:9; 3516:4

**sounds** [4] - 3512:6; 3551:8; 3672:17; 3685:13

**south** [4] - 3448:22; 3549:16; 3665:11

**southeast** [1] - 3635:16

**Sox** [1] - 3659:14

**spacing** [1] - 3431:23

**Spataro** [3] - 3640:21, 25; 3641:2

**Spats** [1] - 3531:11

**Spatts** [1] - 3467:12

**speaking** [5] - 3462:10; 3588:13; 3663:19; 3671:22

**special** [3] - 3472:19; 3480:21; 3671:16

**Special** [13] - 3420:25; 3445:18; 3457:5; 3461:24; 3466:10; 3468:1; 3470:14-16; 3497:25; 3498:4; 3719:13

**specialized** [2] - 3554:14; 3572:24

**Specific** [1] - 3492:17

**specific** [12] - 3446:23; 3484:19; 3509:8; 3527:13; 3555:4; 3580:2, 4; 3597:17; 3600:19; 3672:11; 3737:24

**specifically** [26] - 3419:9; 3421:24; 3422:2, 9; 3427:19; 3480:25; 3483:19; 3487:8; 3501:25; 3514:7; 3519:3; 3525:25; 3556:5; 3557:1; 3600:9; 3605:12; 3607:12; 3625:21; 3665:4; 3675:18; 3679:3, 13; 3686:3; 3700:18; 3701:11, 17

**specimens** [1] - 3565:10

**speech** [1] - 3614:25

**spell** [5] - 3446:3; 3570:22; 3616:11; 3646:8; 3705:16

**spent** [2] - 3596:13, 25

**spill** [1] - 3720:6

**spinning** [1] - 3701:25

**spoken** [4] - 3643:15; 3653:8; 3737:4; 3738:2

**spring** [1] - 3634:8

**Sprint** [1] - 3627:21

**squad** [13] - 3421:4; 3471:9, 17, 20, 24; 3473:2; 3483:19; 3488:2, 16; 3498:21, 24; 3523:8

**Squad** [1] - 3523:1

**square** [1] - 3587:15

**Sr** [2] - 3544:12, 24

**stack** [2] - 3456:14; 3603:3

**staff** [2] - 3593:11; 3689:21

**stamp** [1] - 3422:4

**stamped** [2] - 3423:19; 3622:16

**stamps** [3] - 3623:3, 6

**stand** [20] - 3416:8; 3423:23; 3425:21; 3463:3, 10; 3508:4; 3518:25; 3525:11, 13; 3527:10; 3570:16; 3594:14; 3626:6; 3628:23; 3630:25; 3644:2; 3705:3; 3727:20

**standing** [5] - 3445:21; 3449:8; 3616:4; 3639:11; 3705:8

**Stanley's** [1] - 3553:5

**start** [5] - 3457:15; 3461:24; 3497:12; 3707:7, 13

**started** [12] - 3433:5; 3472:8; 3508:7; 3512:5; 3528:3; 3568:12; 3618:1, 3; 3677:9; 3701:1; 3707:1, 3

**starting** [4] - 3466:10, 15; 3701:13; 3735:12

**Starting** [1] - 3448:6

**starts** [4] - 3432:9, 23, 25; 3434:11

**state** [5] - 3570:22; 3646:7; 3668:21; 3705:16; 3732:18

**State** [3] - 3446:2; 3571:21; 3616:11

**statement** [3] - 3558:5; 3633:13; 3699:4

**statements** [7] - 3557:17; 3667:9; 3679:21; 3681:24; 3700:8; 3716:3, 11

**Staten** [6] - 3459:7, 17; 3513:2; 3552:1; 3617:21; 3618:20

**STATES** [4] - 3414:1, 3, 10, 12

**States** [2] - 3414:5; 3572:15

**stating** [2] - 3428:7; 3495:3

**stay** [2] - 3484:16; 3711:9

**staying** [2] - 3668:7; 3669:2

**stead** [1] - 3735:22

**stem** [2] - 3587:5; 3589:5

**stenography** [1] - 3414:24

**step** [10] - 3445:16, 21; 3461:17; 3552:22; 3583:7; 3584:2; 3615:25; 3642:17, 19; 3718:23

**Stephanie** [1] - 3736:16

**stepped** [4] - 3636:11; 3637:1, 13, 17

**Stepping** [1] - 3637:4

**steps** [4] - 3461:21;

3553:3; 3583:10; 3642:18

**stickers** [1] - 3420:8

**sticking** [3] - 3731:20; 3732:11, 16

**still** [7] - 3425:16; 3524:21; 3575:5; 3599:18; 3632:12; 3637:7; 3732:1

**stipulate** [9] - 3528:13; 3564:15; 3566:18; 3568:24; 3605:19; 3627:15; 3721:5; 3735:8; 3742:21

**stipulated** [1] - 3627:24

**stipulating** [4] - 3558:16; 3568:16; 3727:9; 3741:4

**stipulation** [7] - 3699:22; 3720:21; 3723:21; 3727:5, 25; 3736:21; 3745:4

**stipulations** [3] - 3627:18; 3720:9, 16

**stood** [2] - 3525:10, 15

**stop** [4] - 3492:16; 3635:5; 3663:19

**stopped** [2] - 3492:13; 3528:5

**storage** [4] - 3699:15; 3704:6, 13

**storefront** [2] - 3638:10, 12

**straight** [3] - 3592:21; 3593:3; 3594:1

**strategy** [1] - 3559:11

**street** [4] - 3448:12; 3451:11; 3637:16; 3639:15

**Street** [8] - 3414:17; 3448:16; 3512:10; 3617:21; 3635:15; 3638:7

**stricken** [1] - 3568:19

**strike** [3] - 3683:8; 3697:21; 3698:11

**striped** [1] - 3640:20

**stroke** [1] - 3591:7

**strokes** [4] - 3576:18, 21-22; 3592:21

**structure** [2] - 3591:9, 12

**studied** [2] - 3571:23;

3572:3

**studying** [1] - 3602:9

**stuff** [4] - 3439:19; 3528:13; 3603:21; 3729:1

**style** [7] - 3576:13; 3578:1; 3587:1; 3592:20; 3593:1, 5

**subject** [11] - 3555:18; 3557:11, 14; 3571:21; 3634:14; 3681:11; 3698:1; 3743:4, 18; 3744:12

**submitted** [3] - 3573:25; 3602:6; 3735:18

**subpoena** [3] - 3415:12; 3644:6; 3647:8

**subpoenaed** [1] - 3670:1

**subscriber** [1] - 3544:20

**subsequent** [7] - 3477:4; 3478:7; 3512:21; 3521:25; 3523:23; 3534:16; 3684:24

**subsequently** [4] - 3418:12; 3439:21; 3530:8; 3704:13

**substantial** [1] - 3626:8

**substantive** [1] - 3631:7

**substitute** [1] - 3740:21

**sufficient** [1] - 3579:4

**suggest** [6] - 3422:12; 3435:10; 3518:4; 3554:23; 3700:20, 23

**suggesting** [4] - 3649:15; 3719:24; 3725:10; 3727:18

**suggestion** [2] - 3556:22, 25

**Suite** [3] - 3414:17, 20, 23

**Sullivan** [5] - 3415:19; 3631:8; 3729:10; 3742:8

**sum** [1] - 3556:24

**summaries** [1] - 3537:12

**summarize** [1] - 3421:20

**summary** [3] - 3537:13; 3538:2; 3545:11

**summation** [2] - 3556:13, 24

**summations** [1] - 3735:12

**summertime** [1] - 3634:8

**Sunday** [1] - 3671:7

**sunglasses** [3] - 3449:13; 3450:14; 3639:12

**sunset** [1] - 3597:9

**Suozzi** [1] - 3483:24

**superimpose** [1] - 3577:13

**supply** [1] - 3718:5

**support** [1] - 3643:1

**supposed** [4] - 3416:6; 3719:2; 3727:16; 3739:8

**suppress** [1] - 3516:4

**suppression** [8] - 3517:1, 4, 6; 3519:2; 3520:3; 3643:9; 3644:18; 3672:12

**surgeries** [1] - 3719:8

**Surgery** [1] - 3719:13

**surrounding** [1] - 3514:2

**surveil** [3] - 3452:3; 3472:13; 3510:13

**Surveillance** [3] - 3459:16; 3501:18; 3551:24

**surveillance** [134] - 3419:14, 17, 19, 23; 3420:22; 3421:4; 3446:18; 3452:6, 21, 23; 3454:3, 5; 3457:15, 20; 3458:1; 3459:2; 3470:5, 9-10, 14, 22, 24; 3471:1-3, 5; 3472:8, 22; 3474:23; 3475:14; 3476:3, 8-9, 15; 3477:1; 3479:2, 4; 3480:13; 3481:12; 3482:4, 7; 3483:1, 3, 7; 3484:3, 6; 3487:7, 22-23; 3489:13, 18, 25; 3490:2, 4, 6; 3491:16, 19, 22-23; 3492:8, 14, 16; 3493:8, 13, 17, 21;

3495:23; 3496:12, 18, 24; 3497:13, 21; 3498:14, 20, 22; 3499:20; 3500:5; 3501:7, 13, 19; 3502:2, 6, 10-11; 3503:5; 3504:3, 13; 3507:9, 12, 16, 20; 3508:5, 13, 17, 22; 3510:23; 3512:4; 3513:9, 17; 3547:19; 3548:5, 8, 17; 3550:4, 6, 16, 22; 3551:2, 9; 3617:9, 12, 18; 3619:5, 23; 3620:14; 3621:1; 3622:4; 3625:11; 3630:10; 3631:6; 3633:7, 16; 3634:13, 15, 18, 23-24; 3635:11; 3636:19; 3729:7; 3736:1

**surveillances** [22] - 3419:8, 10, 20; 3421:8, 11, 13; 3472:18; 3473:10; 3474:3, 12; 3477:10, 12; 3488:8; 3509:17, 21; 3510:1, 6; 3551:21; 3729:8; 3735:23; 3742:14

**surveilling** [8] - 3446:20; 3457:10; 3472:2, 17; 3480:13; 3481:13; 3486:13; 3634:11

**Susman** [1] - 3732:21

**Sustained** [45] - 3430:23; 3435:14; 3473:8, 14; 3475:11, 23; 3478:19, 25; 3479:20; 3482:15; 3485:11; 3488:11; 3492:11; 3493:24; 3494:6; 3495:18; 3496:4, 10; 3499:13, 18; 3501:4, 10; 3502:4; 3503:12; 3510:10, 21; 3514:10; 3526:24; 3527:16; 3530:10; 3531:21; 3535:21; 3538:19; 3539:12; 3541:14, 24; 3602:13; 3611:15; 3663:16; 3667:7; 3674:1; 3694:9; 3697:20; 3698:4, 14

**sustained** [3] - 3442:2; 3527:22; 3608:9

**sweater** [1] - 3464:14

**sweet** [2] - 3742:19

**switching** [1] - 3636:3
**sword** [2] - 3555:22; 3681:8
**sworn** [12] - 3425:21; 3445:22, 24; 3570:17, 19; 3616:4, 7; 3644:3; 3645:23; 3646:3; 3705:8, 12
**synopsis** [3] - 3538:2; 3632:18, 24
**system** [2] - 3612:25; 3744:8

**T**

**T-Y-T-E-L-L** [1] - 3570:24
**table** [1] - 3518:1
**tag** [2] - 3490:16
**tall** [1] - 3592:22
**tape** [18] - 3621:2, 6; 3623:8; 3628:24; 3629:1, 7, 11, 20; 3632:13-16, 18; 3667:9; 3730:4; 3732:10, 16
**tapes** [5] - 3538:9; 3622:3, 5, 10; 3625:25
**target** [7] - 3543:8, 17; 3677:2; 3681:2, 16; 3683:1; 3684:5
**tasks** [1] - 3572:18
**taught** [2] - 3572:20, 23
**tax** [1] - 3704:9
**teach** [1] - 3571:21
**team** [22] - 3420:11; 3470:22; 3471:2, 12; 3480:13; 3481:12, 19; 3483:6, 12, 14-17; 3484:22; 3490:24; 3491:16; 3498:15; 3550:22; 3551:2; 3618:16; 3736:1
**teams** [3] - 3481:24; 3482:17, 22
**Technology** [1] - 3572:10
**telephone** [18] - 3427:3, 5; 3428:1, 6; 3433:6; 3443:18; 3516:18; 3538:6, 10; 3543:8, 17; 3546:4; 3617:14; 3658:5; 3697:14, 17; 3744:15
**ten** [1] - 3581:9

**term** [2] - 3559:25; 3579:10
**terminate** [1] - 3459:2
**terminated** [9] - 3452:7; 3459:16; 3491:22; 3492:18; 3493:20; 3501:18, 24; 3551:24
**terms** [11] - 3415:14; 3553:22; 3561:13; 3593:25; 3628:18; 3632:7; 3642:24; 3720:1; 3735:9; 3736:11; 3738:13
**Terrace** [1] - 3419:22
**terribly** [1] - 3628:15
**test** [1] - 3566:19
**testified** [53] - 3417:24; 3419:21; 3425:22; 3426:8; 3438:21; 3439:11; 3440:1; 3445:25; 3476:10; 3507:16; 3514:22; 3515:4; 3516:25; 3517:5; 3518:12; 3519:2; 3520:6; 3523:18; 3525:3; 3530:15; 3531:7; 3535:14; 3568:9; 3570:20; 3573:5, 8; 3599:11; 3604:23, 25; 3605:1; 3608:6; 3614:7; 3616:8; 3633:11; 3646:3; 3651:5; 3654:17; 3656:2, 8; 3672:18; 3675:9, 17; 3676:14; 3678:25; 3679:3; 3699:12; 3705:13; 3728:23; 3733:13; 3736:2
**testifies** [3] - 3516:7; 3631:4; 3721:1
**testify** [31] - 3474:22; 3516:24; 3517:1, 3; 3518:11; 3519:19; 3555:1; 3558:1; 3563:12; 3597:2; 3603:25; 3607:11; 3626:12; 3644:7, 14; 3676:15; 3677:24; 3678:25; 3681:20; 3682:20; 3699:9; 3721:17; 3723:8; 3726:24; 3727:3, 20;

3728:6; 3729:19; 3734:1; 3735:21
**testifying** [10] - 3477:2; 3537:8; 3554:7; 3555:15; 3561:12; 3647:10; 3654:15; 3720:25; 3724:14; 3740:7
**testimony** [36] - 3496:13; 3553:13, 22; 3563:19; 3564:2; 3569:11; 3596:7, 23; 3627:23; 3642:24; 3643:4, 22; 3663:12; 3700:5-7; 3717:4; 3721:16, 19; 3722:15, 17; 3728:1, 25; 3729:11; 3732:13; 3734:2; 3735:7; 3740:2; 3741:2, 20; 3744:9, 12, 23; 3745:5
**text** [1] - 3427:2
**textbooks** [1] - 3571:24
**That'll** [1] - 3472:15
**THE** [485] - 3414:9; 3415:4, 19, 21, 23, 25; 3416:2, 4, 10, 14, 21; 3417:2; 3418:8; 3420:24; 3421:10, 15, 18; 3422:11, 17, 24; 3423:8, 13; 3424:8, 13; 3425:14; 3430:23; 3435:14; 3436:13, 15, 22; 3437:8; 3438:2, 7, 13, 20, 23; 3439:1, 4, 7, 13, 16, 23; 3440:13, 15, 18, 25; 3441:4, 14, 17, 20; 3442:2; 3443:1, 3; 3445:13, 16, 20; 3446:1, 4-5, 7; 3447:7, 23; 3448:1; 3451:21; 3452:14; 3453:2; 3454:7, 13, 15, 18, 25; 3455:4, 11, 14; 3456:2, 13, 19; 3457:1; 3459:13; 3460:7, 23; 3461:3, 14, 19; 3463:8; 3464:17, 25; 3465:19, 23; 3466:5; 3473:8, 14; 3475:11, 23; 3476:6; 3478:19, 25; 3479:20; 3480:7, 17; 3482:15, 21; 3485:11; 3488:11; 3492:11; 3493:24; 3494:6; 3495:18;

3496:4, 10; 3498:1, 3; 3499:13, 18; 3501:4, 10; 3502:4; 3503:12; 3504:10, 17; 3505:5, 8, 18, 21, 24; 3506:2; 3510:10, 15, 21; 3511:2-4, 6; 3514:10; 3515:11; 3516:12; 3517:1; 3518:12, 15; 3519:6, 14, 24; 3520:2, 7; 3526:19, 24; 3527:16, 25; 3528:13, 22; 3530:10; 3531:21; 3533:10, 16; 3535:21; 3538:19; 3539:12, 19; 3541:14, 24; 3546:15; 3547:22; 3552:15, 22; 3553:4, 7, 20; 3556:10, 17; 3557:5, 12, 16, 22; 3558:7, 11, 19; 3559:12, 19; 3560:7, 12, 24; 3561:13, 21; 3562:2, 7, 12, 19, 21, 25; 3563:18; 3564:8, 13, 17; 3565:5, 13, 22; 3566:11, 20; 3567:1; 3568:3, 8; 3569:7, 9, 15, 18, 21, 25; 3570:5, 10, 13, 16, 21, 24-25; 3571:4, 7; 3573:15; 3574:20; 3575:10, 13; 3580:15; 3581:15; 3582:3, 14, 20, 25; 3583:8; 3597:4-6, 9; 3598:16; 3599:2, 5, 16, 21, 25; 3600:5, 8, 11, 13, 20, 25; 3601:2, 4; 3602:13, 17, 19; 3603:2, 6, 8, 11, 18, 23; 3604:1, 11, 22; 3605:5, 13, 16, 19, 24; 3606:7, 11, 16, 22; 3607:3, 9, 15, 22; 3608:6, 8; 3611:15; 3615:23, 25; 3616:4, 9, 12, 14; 3619:10; 3620:7; 3622:23, 25; 3623:19, 23; 3624:1, 5, 8; 3625:18; 3626:12; 3627:5, 9, 14; 3628:11; 3629:1, 11, 20; 3630:2, 7, 15, 24; 3631:1, 6, 8, 11; 3632:3; 3642:2, 13, 16, 19, 23; 3643:16, 21, 24; 3644:1, 11, 21, 24; 3645:7, 10, 16, 19, 22;

3646:6, 9, 11; 3648:8; 3649:2; 3650:3, 10, 17; 3651:14; 3652:2, 21, 24; 3653:2, 6, 15, 19; 3654:2; 3655:4, 16, 18; 3656:6; 3657:1, 15; 3660:20; 3663:16; 3664:19; 3666:17; 3667:7; 3668:11; 3674:1, 8, 10; 3675:2, 15, 23; 3676:2, 6, 15, 22, 25; 3678:1, 3, 8, 18; 3679:11, 19, 23; 3680:7, 12, 17, 19, 23; 3681:2, 7, 12, 18; 3682:11, 23; 3683:6, 8; 3694:9; 3697:20, 22; 3698:4, 14, 16; 3699:2, 5, 22; 3700:10, 17; 3701:8, 25; 3702:5, 8, 10, 15; 3704:20, 23, 25; 3705:1, 7, 10, 14, 18, 20, 22; 3707:19; 3708:3, 15; 3713:20; 3714:6; 3715:11; 3716:16, 23; 3717:1, 6, 12; 3718:2, 21, 25; 3719:4, 15, 20; 3720:8, 14, 25; 3721:8, 19, 23; 3722:1, 3, 7, 17, 22, 25; 3723:3, 6, 11, 18, 20; 3724:20; 3725:2, 19; 3726:8, 12, 16, 20; 3727:15; 3728:2, 8, 10, 13, 16, 19; 3729:17; 3730:5, 14, 21, 25; 3735:6; 3736:6, 9, 25; 3738:6, 13, 18, 23; 3739:2, 10, 13, 17, 19-20; 3740:6, 9; 3741:2, 14; 3742:4, 20; 3743:2; 3745:3

**theirs** [1] - 3486:13

**themselves** [2] - 3435:10; 3594:5

**thereafter** [7] - 3512:18, 20; 3548:19; 3549:21; 3669:4; 3689:6; 3697:1

**therefore** [3] - 3478:2; 3684:10; 3741:25

**Therefore** [1] - 3677:4

**thicker** [1] - 3662:4

**thickness** [1] - 3662:14

**thinking** [2] - 3556:11; 3676:7

**thinks** [1] - 3422:13

**third** [7] - 3443:11; 3544:11; 3586:19; 3589:18; 3590:17; 3591:3; 3638:21

**Thomas** [2] - 3640:25; 3730:1

**thoroughly** [2] - 3417:11; 3418:2

**Three** [1] - 3664:3

**three** [19] - 3471:7; 3476:20; 3498:5, 11; 3499:21; 3523:11; 3543:23; 3588:25; 3591:21; 3593:4; 3594:2; 3596:6; 3600:21; 3618:11; 3633:12; 3653:5; 3662:12; 3689:10; 3696:5

**threshold** [1] - 3650:9

**thrilling** [1] - 3563:19

**throughout** [3] - 3541:21; 3634:1; 3684:21

**Thursday** [1] - 3745:9

**tickets** [1] - 3659:19

**tight** [1] - 3502:22

**tilt** [1] - 3618:24

**timely** [2] - 3423:1; 3441:7

**timing** [2] - 3552:24; 3710:12

**tip** [2] - 3662:12

**Title** [2] - 3537:14, 17

**title** [1] - 3427:10

**TL** [1] - 3591:16

**today** [25] - 3415:14, 17; 3417:15; 3422:14; 3423:2; 3464:11; 3537:9; 3546:11; 3547:15; 3596:7, 23; 3597:1; 3607:11; 3619:4, 20; 3628:1; 3631:22; 3664:5; 3665:3; 3666:8; 3725:10; 3728:12; 3731:10; 3735:4; 3736:5

**today's** [1] - 3631:1

**together** [18] - 3422:14; 3458:5;

**thinking** [2] - 3471:11; 3474:18; 3498:5; 3523:11; 3533:9; 3554:12; 3575:25; 3614:24; 3654:12; 3664:23; 3665:17; 3675:18; 3685:24; 3686:23; 3737:16

**toll** [1] - 3549:16

**Tom** [2] - 3416:3; 3469:1

**Tommy** [1] - 3568:11

**Tomorrow** [2] - 3718:4; 3740:24

**tomorrow** [15] - 3415:20; 3420:10; 3423:2; 3631:8; 3718:18, 21; 3720:2, 5, 19; 3729:3, 5; 3733:10; 3740:7

**tone** [1] - 3619:1

**tonight** [2] - 3716:3; 3732:1

**took** [12] - 3447:16; 3450:13; 3454:19; 3460:15, 19; 3501:14; 3507:4; 3525:25; 3580:18; 3581:19; 3594:5; 3642:24

**top** [18] - 3427:9; 3432:11; 3448:13; 3466:15; 3468:7; 3531:8, 11; 3532:25; 3533:1; 3543:18; 3587:4; 3588:23; 3589:1; 3591:20; 3593:7, 24; 3594:8

**total** [2] - 3501:2; 3737:18

**totally** [1] - 3516:11

**totals** [1] - 3469:22

**touch** [4] - 3487:14; 3619:1; 3643:11; 3712:22

**touch-tone** [1] - 3619:1

**toward** [4] - 3450:12; 3451:2; 3458:21; 3551:16

**Towards** [1] - 3468:23

**towards** [7] - 3432:21; 3467:19, 24; 3469:14; 3549:17; 3550:2, 24

**trained** [1] - 3488:13

**training** [3] - 3571:18, 23

**transcript** [1] - 3731:9

**Transcript** [1] - 3414:25

**TRANSCRIPT** [1] - 3414:9

**transcripts** [4] - 3730:13; 3731:17; 3733:9

**transport** [2] - 3738:22; 3739:4

**transportation** [2] - 3737:12, 20

**traveling** [2] - 3498:7; 3737:17

**treat** [2] - 3415:7; 3643:18

**treated** [1] - 3584:6

**trees** [1] - 3597:7

**TRIAL** [1] - 3414:9

**trial** [52] - 3417:25; 3418:15; 3419:1, 3; 3420:17; 3516:24; 3517:5; 3518:3, 9, 12, 14; 3519:7; 3553:9, 21; 3555:1; 3559:9; 3626:15, 22; 3627:4; 3628:4, 17; 3643:14; 3644:8, 12; 3649:7; 3669:3; 3675:10, 17; 3679:2; 3700:7; 3701:23; 3716:5, 24; 3721:17, 20; 3722:13; 3723:25; 3724:1, 6, 22, 25; 3725:25; 3728:23; 3730:11, 15; 3731:13, 21, 24; 3745:8

**Trial** [1] - 3415:1

**tried** [3] - 3555:9; 3672:7; 3692:8

**tries** [2] - 3516:7; 3716:7

**true** [9] - 3422:13; 3432:1; 3478:16; 3488:7; 3545:23; 3560:2, 4; 3662:18

**truncating** [1] - 3732:6

**trustees** [1] - 3706:13

**try** [8] - 3485:13, 16; 3488:4; 3559:3; 3640:16; 3662:24;

3689:23; 3735:4
**trying** [11] - 3485:3; 3521:7; 3528:20; 3554:20; 3628:4; 3676:10; 3682:4; 3699:17; 3720:7; 3740:22
**turn** [5] - 3699:23; 3701:3; 3727:25; 3728:16; 3741:2
**turned** [22] - 3417:21; 3419:9, 12; 3420:6; 3421:9, 25; 3422:3, 5, 7; 3423:20; 3424:23; 3440:10; 3521:22; 3522:2; 3530:6; 3603:4; 3699:12, 25; 3723:23, 25; 3727:11; 3734:19
**Turning** [1] - 3467:9
**turning** [2] - 3417:15; 3468:4
**turns** [1] - 3588:8
**Tuscano** [1] - 3741:7
**twice** [3] - 3585:21; 3587:22; 3591:20
**Twice** [1] - 3656:17
**two** [57] - 3418:17; 3420:16, 3426:25; 3439:11; 3441:18; 3450:25; 3468:24; 3476:20; 3480:21, 24; 3481:24; 3482:3, 6, 17, 22-23; 3496:8; 3503:24; 3504:8; 3511:9; 3531:7; 3532:24; 3565:4; 3575:25; 3577:12, 22; 3579:5, 11; 3585:5; 3587:2, 8, 20; 3591:17; 3592:21; 3593:4; 3610:25; 3625:9, 16; 3638:1, 25; 3640:11; 3660:9; 3664:10; 3667:1; 3669:5; 3672:14; 3673:13; 3678:23; 3687:2; 3725:14, 21; 3729:18; 3730:4; 3731:16; 3733:1; 3740:15
**Two** [4] - 3423:4; 3441:6; 3471:4; 3592:5
**two-month** [1] - 3678:23
**type** [11] - 3429:13, 25; 3464:2; 3488:24; 3513:23; 3525:9;

3537:15; 3538:12; 3557:16; 3632:11; 3647:3
**type-written** [1] - 3488:24
**typed** [5] - 3468:12; 3469:18; 3546:4; 3599:21; 3600:3
**Types** [1] - 3513:25
**types** [4] - 3488:8; 3513:19; 3647:2, 5
**typewriter** [1] - 3486:8
**typewritten** [5] - 3468:5, 18, 23; 3485:23; 3496:7
**typically** [3] - 3426:25; 3471:14; 3513:19
**Typically** [2] - 3427:5; 3428:15
**typo** [1] - 3731:16
**TYTELL** [1] - 3570:18
**Tytell** [33] - 3415:21; 3416:9; 3557:24; 3558:14; 3560:8, 14, 22; 3562:12, 22; 3563:8; 3564:6, 12, 16; 3565:24; 3566:10; 3570:15, 24; 3571:2, 10, 19; 3575:21; 3583:12; 3586:16; 3594:20; 3597:12; 3598:14; 3602:3, 15, 17; 3609:3; 3611:17; 3736:4, 7

**U**

**Um-hmm** [2] - 3431:15; 3703:12
**unable** [1] - 3545:25
**uncertain** [2] - 3663:7
**under** [11] - 3425:16; 3443:7; 3572:5; 3575:6; 3576:19; 3584:18; 3585:10; 3654:15; 3656:2, 8, 12
**Under** [2] - 3419:1; 3632:24
**underlie** [1] - 3625:12
**underlying** [2] - 3625:25; 3744:17
**underneath** [3] - 3533:2, 13; 3592:8

**Understood** [1] - 3644:23
**understood** [1] - 3424:1
**unfairly** [2] - 3682:3, 14
**union** [15] - 3457:13; 3706:16, 18, 20, 23; 3707:2, 11, 14; 3708:25; 3714:11, 13, 16, 19; 3716:13, 15
**UNITED** [4] - 3414:1, 3, 10, 12
**United** [2] - 3414:5; 3572:15
**University** [2] - 3571:21; 3572:5
**University's** [2] - 3572:5, 7
**unknown** [1] - 3504:4
**unless** [2] - 3514:1; 3725:16
**Unless** [1] - 3649:25
**unnecessarily** [1] - 3719:24
**unquote** [1] - 3656:9
**unusual** [4] - 3499:16; 3710:6, 13
**up** [112] - 3424:5; 3439:14, 19; 3445:21; 3446:2; 3453:2; 3456:13, 15; 3458:7; 3479:7, 16; 3494:3; 3497:2, 4, 8; 3498:19; 3499:4, 7, 10, 15; 3501:22-24; 3502:1; 3504:17; 3507:25; 3508:1; 3515:11; 3533:23; 3539:2, 9, 23; 3541:21; 3543:7, 9, 11, 22; 3548:16; 3550:7, 22; 3551:3; 3554:24; 3555:10; 3556:20, 24; 3557:2, 6, 12-13; 3562:10; 3570:3; 3584:21; 3585:20; 3586:13; 3590:3, 13, 17; 3592:15; 3596:19; 3598:17; 3603:22; 3607:15; 3609:19; 3612:25; 3616:10, 22; 3618:25; 3622:12; 3623:18; 3624:8; 3627:9; 3629:20; 3639:3; 3643:7, 24;

3648:3; 3649:22; 3652:24; 3657:15; 3658:21; 3659:16; 3664:15, 21; 3671:9; 3672:7, 12; 3673:19; 3674:3; 3678:18; 3679:6, 16; 3680:19; 3686:2; 3698:17; 3699:18; 3705:15; 3706:14, 23; 3708:4, 19; 3713:15; 3714:20, 23; 3715:12; 3727:19; 3729:20; 3736:9; 3738:14; 3742:6
**up-front** [1] - 3738:14
**upper** [3] - 3461:25; 3462:4; 3467:10
**upset** [4] - 3711:14; 3712:5, 10; 3713:4
**user** [2] - 3427:3; 3442:16
**usual** [1] - 3711:15
**utilized** [2] - 3521:15; 3535:15

**V**

**V-I-L-A** [1] - 3498:3
**V-like** [4] - 3584:19, 21; 3590:3, 6
**V16** [2] - 3488:20, 23
**vacation** [1] - 3670:16
**vaguely** [1] - 3691:9
**variant** [2] - 3577:23
**variants** [1] - 3587:24
**variation** [14] - 3577:2, 4, 14, 16, 18, 21-22; 3578:17; 3587:16, 19, 21, 23; 3589:16; 3592:4
**variations** [3] - 3578:13; 3590:22; 3592:5
**variety** [1] - 3729:20
**various** [17] - 3527:2; 3532:11; 3564:4; 3572:3, 13, 24; 3573:1, 6; 3576:1; 3579:24; 3583:23; 3585:11; 3596:3; 3602:6; 3609:19; 3630:21; 3727:19
**VCR** [2] - 3621:5; 3622:3
**vehicle** [25] - 3458:22,

24; 3460:2; 3489:7; 3490:9, 17, 24; 3491:7; 3494:12, 15-18, 24-25; 3495:2, 21; 3498:8; 3502:24; 3512:13; 3550:23, 25; 3551:4, 15
**vehicles** [2] - 3498:9; 3502:23
**venues** [1] - 3572:13
**verbal** [2] - 3540:18
**verify** [1] - 3701:18
**Verizon** [5] - 3723:8; 3728:24; 3733:24
**version** [1] - 3589:6
**versus** [1] - 3576:10
**VHS** [1] - 3622:10
**vice** [2] - 3706:21, 23
**vicinity** [8] - 3457:6; 3550:7, 20, 22; 3551:3, 5; 3697:18; 3700:16
**Victor** [1] - 3497:19
**video** [22] - 3617:9, 11, 18; 3618:6; 3619:5, 22; 3624:4, 6; 3625:11; 3630:10; 3633:7, 15, 21; 3634:11, 14, 24; 3635:4, 10, 22; 3739:5
**Video** [1] - 3635:8
**videoing** [2] - 3633:17, 20
**videos** [4] - 3622:14; 3625:12; 3635:17; 3640:5
**view** [11] - 3423:14; 3442:19; 3451:5; 3499:16; 3517:13; 3559:3; 3597:3, 5, 8; 3622:11; 3718:12
**viewed** [3] - 3427:25; 3432:4; 3634:24
**viewing** [2] - 3635:13
**Vila** [4] - 3497:25; 3498:3; 3504:14; 3507:13
**violate** [1] - 3644:22
**violating** [1] - 3681:7
**violation** [6] - 3418:23; 3438:19; 3557:7; 3724:4; 3725:9
**violations** [1] - 3417:4
**virtually** [1] - 3421:20
**visit** [2] - 3649:21;

3666:20
**visited** [7] - 3647:21; 3648:5; 3649:5, 10, 18; 3651:6; 3652:5
**visiting** [3] - 3572:15; 3650:7; 3669:20
**visitor** [1] - 3636:18
**Vito** [3] - 3467:25; 3736:15, 18
**voice** [1] - 3663:17
**VOIR** [1] - 3620:8
**Volpicella** [1] - 3736:20
**volunteers** [1] - 3555:18

---

**W**

**Wait** [1] - 3518:17
**wait** [7] - 3416:7, 16, 20; 3505:25; 3740:1; 3741:3; 3745:3
**waiting** [1] - 3597:2
**walk** [2] - 3468:2; 3525:7
**walk-in** [2] - 3468:2; 3525:7
**walked** [1] - 3639:24
**walking** [10] - 3448:9; 3451:2, 10; 3458:7, 21; 3512:10; 3636:21; 3637:18; 3638:17
**Walter** [2] - 3568:9; 3627:22
**wants** [12] - 3422:3; 3528:11; 3561:8; 3564:15; 3599:19; 3653:10, 13; 3658:21; 3681:10, 14; 3702:4; 3729:13
**warrant** [7] - 3516:14, 20; 3517:17; 3521:11; 3522:11; 3523:23; 3703:10
**Washington** [3] - 3737:4, 13; 3738:11
**Waste** [1] - 3616:25
**wasting** [1] - 3561:11
**watch** [2] - 3610:15, 20
**watching** [3] - 3502:24; 3610:11, 14
**Watching** [1] - 3610:10
**ways** [3] - 3563:11; 3609:3; 3680:8

**wearing** [4] - 3464:13; 3636:12; 3666:12
**Wednesday** [3] - 3491:16; 3713:13; 3719:3
**week** [21] - 3456:10; 3555:4; 3579:23; 3590:21; 3591:3, 8, 10; 3612:8; 3618:11; 3628:7; 3632:22; 3633:13; 3659:6; 3669:5; 3672:14; 3685:24; 3713:12, 14; 3735:12
**weekend** [2] - 3713:13
**weeks** [5] - 3428:18; 3503:24; 3504:8; 3660:3; 3672:14
**welcome** [3] - 3599:20; 3603:20; 3649:12
**whatsoever** [1] - 3669:10
**whereabouts** [2] - 3417:17; 3697:25
**whereas** [2] - 3551:3; 3584:11
**white** [6] - 3488:19; 3489:7, 15; 3490:8; 3636:25; 3640:22
**whole** [6] - 3548:14; 3554:23; 3555:21; 3569:17; 3634:1; 3669:16
**wide** [1] - 3577:18
**Wide** [1] - 3744:24
**widths** [1] - 3592:23
**wife** [2] - 3713:2; 3719:5
**Wiley** [2] - 3470:16; 3471:6
**William** [60] - 3417:23, 25; 3418:1; 3419:11; 3451:9; 3473:5, 12; 3474:10, 18; 3481:13; 3493:9; 3494:3, 8; 3496:18, 25; 3497:9; 3499:3; 3507:5; 3508:19; 3509:22; 3510:7, 13; 3516:16; 3535:16; 3539:9; 3540:8, 22; 3541:3, 20; 3542:6; 3544:6, 12, 24; 3545:1; 3546:1, 7; 3556:21; 3561:4; 3673:23; 3678:11;

3685:3; 3707:10, 13; 3708:5, 21; 3709:5; 3712:1, 3, 16; 3713:6; 3714:17, 24; 3715:1; 3716:8; 3723:16; 3735:25; 3736:23; 3739:15
**window** [1] - 3559:24
**windows** [1] - 3597:3
**wintertime** [1] - 3634:6
**wireless** [1] - 3728:24
**Wireless** [1] - 3723:8
**Wisconsin** [1] - 3572:9
**wise** [1] - 3482:1
**wish** [1] - 3720:4
**Withdrawn** [10] - 3427:23; 3458:3; 3468:16; 3489:19; 3493:5; 3611:5; 3612:13; 3684:15; 3687:12; 3688:18
**witness** [124] - 3415:8; 3436:20; 3438:17; 3439:25; 3440:23; 3441:11; 3445:17; 3447:5; 3451:19; 3455:2; 3456:11; 3459:12; 3460:5; 3461:17; 3464:16, 23; 3505:2, 11, 19; 3518:8; 3519:12, 19; 3520:3; 3553:3; 3557:23; 3558:9; 3559:17, 24; 3561:11, 23; 3563:11; 3568:4; 3570:8, 14; 3573:13; 3574:18; 3580:13; 3582:1; 3583:7; 3599:3, 6, 8; 3604:13, 16, 18-19, 21; 3607:18; 3610:2; 3615:21; 3616:1; 3619:9; 3625:2, 13; 3626:5, 12, 15-16, 19-21; 3627:7, 11, 13; 3628:16, 18; 3629:9, 16, 19, 21; 3630:12, 16, 25; 3631:6; 3642:18; 3643:19; 3644:2; 3645:1, 11, 20; 3646:2; 3651:5; 3653:14, 17, 19; 3657:3; 3660:18; 3670:1; 3675:9; 3676:14; 3677:14, 24;

3705:1; 3707:17; 3713:18; 3716:16; 3721:23; 3722:13; 3723:6; 3724:13, 15; 3726:22; 3727:19; 3728:3, 6, 21; 3729:6; 3730:1; 3733:11, 21, 23; 3735:1; 3736:10, 21, 23; 3738:25; 3740:22; 3741:7, 17

**Witness** [6] - 3461:21; 3463:4, 10; 3583:10; 3594:15; 3718:24

**WITNESS** [12] - 3446:4; 3498:3; 3511:3, 6; 3570:24; 3597:5, 9; 3602:19; 3616:12; 3646:9; 3704:25; 3705:18

**witness's** [4] - 3626:9; 3720:18; 3739:15; 3743:10

**Witnesses** [1] - 3746:3

**witnesses** [23] - 3415:14; 3416:22; 3518:21; 3560:1; 3628:5, 8; 3720:20; 3735:10, 18; 3736:11, 18; 3737:12, 16, 18; 3738:5; 3739:24; 3740:5, 11, 15; 3743:23

**woman** [6] - 3670:6; 3672:18; 3673:11; 3679:9; 3726:24; 3727:16

**word** [21] - 3576:14, 16, 19; 3577:8; 3586:8, 20; 3588:1; 3590:20; 3591:18, 23; 3592:18; 3593:8; 3612:21; 3614:20; 3615:2, 6; 3643:14; 3644:8; 3652:14

**words** [8] - 3559:10; 3580:2; 3584:6; 3585:11; 3586:16; 3591:13; 3615:12

**Workers** [2] - 3706:3, 7

**works** [2] - 3689:21; 3728:23

**workshops** [2] - 3572:13; 3573:1

**world** [4] - 3609:24; 3649:9, 24; 3650:7

**World** [2] - 3670:17

**WPE** [2] - 3495:2, 15

**WPG** [1] - 3495:21

**write** [28] - 3487:15; 3490:17; 3519:3; 3576:11; 3577:7, 11, 17; 3579:20, 23; 3580:2, 6; 3585:19; 3586:4; 3588:7; 3593:17; 3609:18, 20; 3610:10, 14-15; 3662:7, 20; 3663:2; 3716:3, 9

**writer** [2] - 3578:24; 3593:16

**writing** [43] - 3547:1, 7; 3574:10; 3576:3, 9; 3577:8; 3578:20; 3580:6, 22; 3581:2; 3584:10; 3585:19, 24; 3586:9, 19, 23; 3587:11, 22, 24-25; 3589:2, 4, 8, 13; 3590:11, 14; 3591:9, 15-16; 3592:6; 3593:5, 17-18; 3594:10-12; 3607:19; 3610:5; 3615:3; 3699:19

**writings** [6] - 3579:12; 3580:5; 3587:7; 3590:18; 3609:24

**written** [33] - 3488:24; 3531:14; 3534:15; 3576:5; 3577:12; 3578:14, 23; 3579:5; 3583:23; 3587:20; 3589:18; 3590:4; 3591:4; 3592:9; 3593:21; 3594:4; 3607:5; 3608:4; 3610:2; 3611:18, 23, 25; 3612:4, 8; 3613:14, 23; 3614:5; 3615:13; 3662:16, 21; 3663:1, 11

**wrote** [6] - 3535:7; 3558:3; 3574:1; 3575:21; 3609:22; 3614:17

**Y**

**Y16** [1] - 3489:8

**Yankee** [10] - 3659:10, 19; 3660:13, 25; 3661:22, 25; 3662:7, 20; 3663:2; 3686:17

**Yankee/Red** [1] -

3659:14

**year** [19] - 3434:3; 3563:25; 3579:24; 3581:7; 3597:6; 3617:25; 3618:4; 3625:15; 3626:3; 3633:5; 3652:10; 3659:20; 3665:25; 3666:5; 3669:16; 3721:11

**years** [18] - 3417:20; 3418:14; 3440:10; 3446:15; 3475:8, 13; 3625:9, 16; 3626:1; 3638:6; 3653:5; 3657:25; 3673:1; 3680:13; 3685:19; 3699:12; 3700:13; 3704:5

**Years** [1] - 3667:11

**yesterday** [13] - 3420:11; 3421:1, 7; 3424:1, 4; 3437:2; 3622:7, 20; 3626:11; 3726:7; 3727:14; 3735:18; 3740:12

**YORK** [1] - 3414:1

**York** [25] - 3414:5, 15, 18, 21, 23; 3439:15, 22; 3448:20; 3488:20; 3508:12; 3509:6; 3549:15; 3550:1; 3551:15; 3571:21; 3616:25; 3617:2; 3656:19; 3657:6; 3672:7; 3696:7; 3719:14; 3721:11; 3726:3

**yourself** [3] - 3487:9; 3492:20; 3610:2

**Z**

**ZA** [1] - 3547:25

**zeros** [4] - 3594:2-4, 11

**zoom** [4] - 3584:15; 3588:19; 3618:24

**zooms** [1] - 3641:22