1

1                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF NEW YORK

2

3    -------------------------------X
    UNITED STATES OF AMERICA,

4                        :   CR-04-911
                             (JS)

5        -against-         :  United States Courthouse
                          Central Islip, New York

6    ALPHONSE PERSICO, JOHN DEROSS,
                        :  June 16, 2008

7                Defendants.   10:10 a.m.
    -------------------------------X

8                TRANSCRIPT OF ORAL ARGUMENT

9                BEFORE THE HONORABLE JOANNA SEYBERT
                UNITED STATES DISTRICT COURT JUDGE

10

11   APPEARANCES:

12   For the Government:      ROSLYNN MAUSKOPF, ESQ.
                       UNITED STATES ATTORNEY

13                    BY: JEFFREY GOLDBERG, AUSA
                    One Pierrepont Plaza

14                    Brooklyn, New York 11201

15

16   For the Defendants:      SARITA KEDIA, ESQ.
                       For Deft A. Persico

17                    (Not Present).

18                    ROBERT LA RUSSO, ESQ.
                       For Deft J. DeRoss

19

20

21
    Official Court Reporter:   Paul J. Lombardi, RMR, FCRR

22   Ph. (631) 712-6106       100 Federal Plaza - Suite 1180
    Fax (631) 712-6122       Central Islip, New York 11722

23

24            Proceedings recorded by mechanical stenography.

25              Transcript produced by CAT.

2

1           THE CLERK:  For oral argument or hearing, US v

2    Alphonse Persico and John DeRoss.

3           Please state your appearances.

4           MR. GOLDBERG:  Jeffrey Goldberg for the

5    government.

6           Good morning, your Honor.

7           THE COURT:  Good morning, Mr. Goldberg.

8           It might not be.  We'll see.

9           MS. KEDIA:  Good morning, your Honor.  Sarita

10    Kedia for Mr. Persico, and your Honor has waived

11    Mr. Persico's appearance.

12           THE COURT:  I have, and you have gotten

13    communication from your client saying he waived his

14    appearance here and he did it in writing?

15           MS. KEDIA:  He did not, but I certainly can

16    submit a letter.

17           THE COURT:  If you would so the record is

18    complete.

19           MS. KEDIA:  Absolutely.

20           MR. LA RUSSO:  And Robert LaRusso for

21    Mr. DeRoss.

22           Good morning, your Honor.

23           THE COURT:  Good morning, Mr. LaRusso, and

24    Mr. DeRoss.

25           Well, having been advised that there were

1   several witnesses who had been subpoenaed.  Mr. LaRusso,

2   you had presented those subpoenas and also Ms. Kedia, I

3   think you had also done that.

4            I was rather shocked when I came in this morning

5   to learn that the government has chosen not to produce

6   these people.  You had six days' notice, Mr. Goldberg, to

7   get them in.  You never raised any of these Toughy or the

8   federal rights requiring certain things be done when

9   Mr. LaRusso spoke to you.

10           MR. GOLDBERG:  I actually did, your Honor.

11           THE COURT:  When did you do that?

12           MR. GOLDBERG:  Mr. LaRusso is mistaken on that

13  point.

14           When he e-mailed me the next day I called him

15  and told him we had a question whether in fact this was an

16  evidentiary hearing.  We are past that.

17           I also told him that I was informed that at

18  least one of the witnesses, Ms. Mayer, would be out of the

19  D.C. area.  She's now in Washington, D.C. in main justice

20  and I said we also had the Toughy issue.  I don't know if

21  he remembers that, but I did say it.

22           It's not like I mentioned this for the first

23  time on Saturday.  I did mention it beforehand.

24           THE COURT:  Mr. LaRusso, you remember one way or

25  the other on this?

1          MR. LA RUSSO:  Again, I know Mr. Goldberg and I

2     know he wouldn't make a misrepresentation.

3          I don't remember it, Judge, to be very honest

4     with you.  There was a lot being discussed at that time.

5          The telephone conversation we had was primarily

6     concerning whether or not a hearing was going to be taking

7     place, and we discussed the necessity of witnesses.  I

8     also indicated, I believe there was a voice mail follow-up

9     that we also were going to press for any documentation

10    that may relate to any of the issues that would be very

11    relevant during the course of the hearing.

12         But I think it comes down to this, very simply,

13    Judge; this idea of Toughy is really a mask for what

14    really happens.  These witnesses, primarily Gary

15    Pontecorvo and Amy Walsh are really the two critical

16    witnesses on one of the issues.

17         We never had a problem in terms of producing

18    government witnesses before.

19         MS. KEDIA:  Your Honor, if I may just add

20    because I'm the one who subpoenaed Ms. Walsh.

21         Certainly no issue was raised with me regarding

22    Toughy regulations.  I never received a phone call from

23    Mr. Goldberg after I subpoenaed Ms. Walsh.  I served her

24    directly and she indicated she would accept service of the

25    subpoena.

1          That's the last I heard of her telling me she

2    was unavailable between 11 and 2.

3          MR. GOLDBERG:  Your Honor, so we are clear on

4    this, in Mr. LaRusso's defense, most of the conversation

5    that we had was about the question of whether this was a

6    hearing on the motions or an evidentiary hearing.  And

7    although I'm certain I mentioned the Toughy regulations,

8    it wasn't a primary focus of our conversation.

9          So the record is clear, I told Mr. LaRusso what

10   I think we should do to clarify the hearing issue is to

11   have a conference call with the court, with Ms. Kedia, and

12   simply ask the questions if it's the court's intention to

13   have an evidentiary hearing or a hearing on the motions.

14         Mr. LaRusso called me back an hour later and

15   said I have spoken with Ms. Kedia.  She doesn't want to

16   call the court.

17         MR. LA RUSSO:  It wasn't a matter of I don't

18   want to call the court.

19         It was a decision made by both counsel that it

20   was pretty clear when we look at your order that a hearing

21   was had on the issues relative to the Rule 33.

22         When I was doing in my voice mail, I was

23   advising Mr. Goldberg of our present status, that we

24   wanted to call the witnesses.  We understand they might

25   not be available.  So we are not going to yell and scream

6

1     that they are not going to be here.  If they are not
2     available, they are not available.
3           But we also wanted to discuss the question of
4     documentation on the issue of the $1.65 million.  Is there
5     any record, whatsoever, that was the purpose of calling
6     him back to let him know we are going forward with the
7     hearing and we would like to at least discuss with the
8     court the documentation.
9           Granted, we had no control over the witness's
10    schedule.  As a matter of fact, I even mentioned on the
11    call, I believe, that Ms. Mayer is not necessary, having
12    gone through the documentation a little closer, we have
13    narrowed it down to the two witnesses being Mr. Pontecorvo
14    and Amy Walsh.
15          I believe that was part of the voice mail as
16    well.
17          MR. GOLDBERG:  I think, your Honor, we are
18    prepared to get past the Toughy issue, and this is why.
19          When this issue was first raised by the defense
20    in a Rule 33 motion, the trial assistants who are still in
21    Brooklyn, Mr. Buretta and I, started looking into it.
22    Certainly neither of the two of us were aware of those
23    issues prior to the trial.
24          THE COURT:  What issues are we talking about?
25          MR. GOLDBERG:  The issues of whether the

1    government was aware about the forfeiture/tax issue and

2    failed to disclose that to the defense prior to trial.

3          We looked into it.  I spoke briefly with

4    Ms. Walsh only after she was contacted by Ms. Kedia, and I

5    raised the issue with Ms. Kedia just before this court

6    appearance and said, you know, we would probably be

7    willing to stipulate that the government was aware that

8    Peggy Cutolo was not required to pay tax on the money and

9    the defense was not informed of that fact before the trial

10   which, in my mind, based on the motion papers filed would

11   completely obviate the need for an evidentiary hearing.

12         In fact, Mr. LaRusso in his letter of yesterday,

13   the last sentence says, quote, in the event that the

14   government concedes that if the defense was not told about

15   the $1.65 million, it may be that the witnesses', plural,

16   the witnesses' testimony is not necessary.

17         We are not trying to make an issue of Toughy,

18   but Toughy exists for a purpose, and that is to make sure

19   that Department of Justice employees permitted to testify

20   or give an affidavit or documents relating to the

21   performance of their own duties.

22         So for the purposes of this argument, your

23   Honor, and perhaps to obviate the need entirely on an

24   evidentiary hearing, we are prepared to stipulate that the

25   defense was not told about the forfeiture/tax issue prior

1    to Peggy Cutolo's testimony.

2              THE DEFENDANT:  And the government knew about

3    the forfeiture/tax issue?

4              MR. GOLDBERG:  And when I say the government,

5    I'm cognizant of the fact that the trial assistants in

6    this case are charged with the knowledge of prior

7    assistants' knowledge.

8              So I don't mean to suggest that Mr. Buretta,

9    Ms. Mayer, or I had any knowledge of the forfeiture/tax

10   issue personally and somehow intentionally withheld it or

11   suppressed it.  But I am prepared to stipulate way back

12   when a decision was made by the US Attorney's Office to

13   not require Ms. Cutolo to forfeit or pay tax on that

14   money.

15             THE COURT:  And do you know when that was made?

16             Is there any documentation who made the

17   decision?

18             MR. GOLDBERG:  Well, Ms. Walsh was the primary

19   assistant on these matters, I believe, and she hasn't been

20   in the office for at least a year.  I was almost going to

21   say two years, but I know at least a year.

22             I think she would have been involved in that

23   decision.  But there are legal arguments we had within the

24   context of Rule 33 as to why all of this is a complete red

25   herring, mainly that the defense made effective use of the

1      information and overall it's immaterial.

2             I assume we'll get to those arguments, but I

3      wanted to alert the court.

4             MR. LA RUSSO:  Your Honor, I'm a little shocked,

5      and I almost feel like they are trying to sweep a very

6      critical issue under the rug here.

7             We have two witnesses who testified at a murder

8      trial that $1.65 million of illegal proceeds were taken by

9      Mrs. Cutolo, and used for her own family.  She said that

10     she told the government, she mentions an agent's name, and

11     she mentions an assistant's name.  $1.65 million.

12            We know from one of the agents who testified

13     that during the process before she left the New York area,

14     and including the period of time she was in the safe

15     house, no mention was ever made of that money, whatsoever.

16     So a critical issue was whether she had perjured herself

17     in regards to that before the jury.

18            Now, Mr. Pontecorvo, the case agent gets on the

19     stand, and he attempts to provide corroborative

20     information to this jury to lead them to believe that

21     Peggy Cutolo was telling the truth.  So he says, yes.  I

22     learned about the money.

23            He tiptoes.  He says I might have learned it

24     either before we left the New York area, or at the safe

25     house.  But, yes.  I talked to her about it and I saw the

1   money.  He had the nerve to say that $1.65 million in

2   illegal proceeds he never, ever wrote a 302 or made any

3   notes.  But what he did say, he said he spoke to somebody

4   in the US Attorney's Office.

5          Judge, not only did Peggy Cutolo lie, but

6   Agent Pontecorvo has stretched the truth.  What the

7   government is attempting to do here is to turn this into a

8   tax issue, into a matter of credibility, an impeachment

9   issue, as opposed to the heart of this whole hearing that

10  we are trying to get at.

11         Who in the government was told about this money,

12  and who in the government made a decision that

13  $1.65 million of illegal proceeds were going to be kept by

14  the Cutolo family?  It's outrageous to walk in here, and

15  to actually say to us, that it's a tax issue.  All we

16  asked for, and what we attempted to do is to find out who

17  in the government would have authorized her to keep

18  $1.65 million, and Mr. Goldberg comes in here and tells us

19  they don't know?

20         There's not a shred of evidence, documentary

21  proof regarding a decision that would be made by a

22  supervisor, more than likely the US Attorney himself or

23  maybe somebody from the IRS, and we have nothing?  I'm

24  sorry, Judge.  I'm passionate about this.  I apologize for

25  raising my voice, but I don't think we should be sweeping

1    this issue under the rug.

2            Because I think we know that this whole case

3    hinged on the credibility of these witnesses and if an

4    agent deliberately lied during the course of this trial to

5    back up a critical witness in this case, there's no doubt

6    about the result.  The government has an obligation, when

7    faced with these facts, to do justice, to interview the

8    witnesses, to determine whether or not perjury had

9    actually occurred.

10           I even think the court during the charge talked

11   about the government looked into the possibility of

12   bringing a complaint of perjury against Mr. Floridia and

13   Peggy Cutolo.  I'm sure it's the furthest thing from their

14   mind, and after having spent so much time in this

15   courtroom and have the government come and give this type

16   of an argument is very disconcerting and that's the

17   concern I have.

18           Judge, we should be putting this issue to rest.

19   We should be calling Amy Walsh.  We should be calling

20   Agent Pontecorvo.  We should be making a determination

21   whether in fact he lied because the evidence is leading

22   right to that point and unfortunately it's also leading to

23   the point, Judge, that somebody's attempting to cover it

24   up in the government and that's also a very disheartening

25   matter.

1           So I ask the court to seriously consider setting

2     this down for a hearing and calling the necessary

3     witnesses and that's the position I'm taking.

4           THE COURT:  Ms. Kedia, do you have something to

5     add?

6           MS. KEDIA:  Yes, your Honor.  Thank you.

7           With respect to Ms. Walsh, it's very telling

8     that Mr. Goldberg says she may have been the person who

9     was told.  He has spoken to Ms. Walsh this week on this

10    issue.  I explained to Ms. Walsh exactly what the issue

11    was.

12          And I can tell your Honor she seemed very

13    surprised to hear about $1.65 million that Peggy Cutolo

14    was permitted to keep.  She wouldn't directly respond to

15    my questions.  She said she would like to speak to

16    Mr. Goldberg, understandably so, and I expected that to be

17    her response having been a former assistant in the

18    US Attorney's Office.

19          However, it does not seem to me she knew about

20    this $1.65 million or that she made any decision to allow

21    Ms. Cutolo to keep it.  If she did so, then the question

22    becomes when, exactly, was the decision made.  Was there a

23    deal struck that Peggy Cutolo would come in and testify if

24    the government allowed her to keep this money?

25          We have one of two issues here.  We either have

1    the cover-up that Mr. LaRusso just spoke of, in which case

2    the government didn't know about the $1.65 million until

3    this trial, which I think seems to be the case based on

4    the nature of the witness's testimony.  Or we have,

5    unquestionably, a Brady violation and then the question

6    is, exactly what is the Brady violation?

7            Where are the documents that would support the

8    government's position that it was told about $1.65

9    million?  There is no way.  You can't be an assistant in

10   the US Attorney's Office and sneeze without going to your

11   supervisor.  So the idea that some assistant made the

12   decision to allow Peggy Cutolo to keep $1.65 million

13   without getting it approved through the ranks and there

14   being documents on this is absurd.

15           So in the first instance, where is the

16   documentation?  If there isn't any that exists, I think we

17   can assume that no one in the US Attorneys Office was

18   told, and in the event that Amy Walsh wants to come in and

19   says she was told, we need a hearing.

20           Mr. Goldberg also misreads the letter he cited

21   to the court.  The defense position is that if the

22   government wants to concede that it, meaning the

23   government, wasn't told about the $1.65 million, then

24   there may not be any need for a hearing.  If, in fact, it

25   wasn't told, it wasn't told.

1          We don't need Amy Walsh to come in here and say

2     it wasn't told.

3          THE COURT:  How could they possibly say that,

4     Ms. Kedia, when you have Agent Pontecorvo on the stand

5     saying they knew about it at sometime?

6          What does that get you?

7          MR. GOLDBERG:  And that he told the

8     US Attorney's Office.

9          THE COURT:  Yes.

10          MS. KEDIA:  So who is it --

11          THE COURT:  They can't possibly stipulate to

12     that unless they believe that Agent Pontecorvo committed

13     perjury.

14          MS. KEDIA:  I understand that, your Honor, and

15     that's exactly why we asked for the hearing and that's

16     exactly why we asked for the testimony of these witnesses.

17          Who was it that was told?  When were they told?

18     What, exactly, was the nature of the deal that was made

19     with the Cutolo family?  What is the story here?

20          That is an obligation that the government has to

21     reveal that to the defense, and based on that, the court

22     can make a determination whether the defense had

23     sufficient information at that time or not.

24          But without revealing exactly what the story

25     was, who was told, and under what circumstances precisely,

1    there can be no determination made, and a hearing is

2    necessary.

3              THE COURT:  Let me ask you this, Ms. Kedia.

4              How is this information, Mrs. Cutolo keeping

5    $1.65 million, how is that, one, exculpatory, and what is

6    the material difference that that made to the defense?

7              MS. KEDIA:  The fact she was permitted to keep

8    it?

9              THE COURT:  Yes.

10             I mean, you found out about it on

11   cross-examination, fair to say?

12             MS. KEDIA:  That's fair to say.

13             THE COURT:  And you made very effective use of

14   it during your cross-examination with Mrs. Cutolo.

15             MS. KEDIA:  Well, I have two things that I could

16   say off the top of my head with respect to that.

17             THE COURT:  All right.

18             MS. KEDIA:  One is we opened on the fact that

19   William Cutolo had $2.7 million in racketeering proceeds

20   that was missing.

21             So then to learn during the course of the trial

22   that the family actually had $1.65 million, that's too

23   little too late, Judge.  That's not something we should

24   have to stumble upon during cross-examination.

25             It certainly impacts the manner in which we

1    cross-examine witnesses and it certainly impacts our tact

2    that we take when we open to the jury and begin this case.

3    So there is no question that the government's failure to

4    reveal this information was material.

5           Secondly, if there was a deal made with

6    Mrs. Cutolo about whether she would come testify in the

7    event that she was allowed to keep this money, if, in

8    fact, she was not willing to testify, or speak to the

9    government, if she wasn't allowed to keep this money,

10   those are critical facts.  If she wouldn't have attended

11   that proffer session unless she had the agreement from the

12   government, I can keep this money, that is a critical fact

13   that the defense must be permitted to know.

14          THE COURT:  Mr. Goldberg.

15          MR. GOLDBERG:  Your Honor, first of all, on the

16   opening statement I think Ms. Kedia's opening statement

17   was about five hours long, and I'm sure that minor point,

18   even if there is some relevance to it was lost on the

19   jury.

20          Second of all, during her entire summation,

21   which was extremely long, she never once made mention of

22   Peggy Cutolo's ability to keep or not pay taxes on this

23   money.  I wrote this in my papers.  If it was so relevant,

24   she would have made much of it during her argument.

25          When the government confers a benefit on a

1    witness, it's not required to produce all the witnesses

2    who were part of the decision to confer that benefit.

3    When the government gives money to a cooperating witness

4    for relocation, for example, it's not required to call in

5    the US Marshal's Service to testify about what went into

6    making that decision.

7            A benefit was apparently conferred on

8    Peggy Cutolo.  That benefit was that she was not -- she

9    was allowed, rather, to keep the money and not pay taxes

10   on it.  Ms. Kedia had that information.  Mr. LaRusso had

11   that information during the entire trial.

12           You will recall, she was one of the first

13   witnesses to testify.  They were able to make effective

14   use of it, and in Rittweger, R-I-T-T-W-E-G-E-R, there is a

15   great example of this.

16           In **Rittweger**, the government made an untimely

17   disclosure of prior grand jury testimony and some

18   debriefing notes, and the Second Circuit held there was no

19   Brady violation whatsoever because, quote, first and

20   foremost, end quote, the defense had the information, and

21   was able to make use of it.  It went before the jury.

22           That's the exact same situation we have here.

23   What the defense is trying to do is, they are trying to

24   seize upon the government's, I don't want to say failure,

25   because there was no intentional withholding here, but the

1    fact the defense did not have that information, to have

2    some sort of blown up evidentiary hearing and call in all

3    the witnesses that were involved in conferring that

4    benefit, it's not necessary.

5           We are prepared to concede that the defense

6    should have been told about that information but they

7    weren't.  But the bottom line is under **Gill** and the cases

8    that follow there's no Brady violation here because they

9    made effective use and it's immaterial.

10          THE COURT:  Isn't there a Giglio violation?

11          MR. GOLDBERG:  That's what it is, at best.

12          It's not a Brady violation.  It's a Giglio

13   violation.  And Mr. LaRusso's argument confuses me,

14   because in the beginning of his long colloquy, he says

15   it's not about credibility, but in the end he says this is

16   all about credibility.  And the cases are very clear that

17   if the Giglio information merely provides an additional

18   basis for challenging the credibility of the witness, it

19   can't be material.

20          We put in our papers, and we explained that

21   Ms. Kedia and Mr. LaRusso spent a large part of their

22   summations attacking the credibility of Ms. Cutolo on

23   various bases.  What more would the forfeiture/tax issue

24   have given them and, more importantly, they had it.

25          They obviously didn't think it was so important.

1    They didn't use it.

2             MR. LA RUSSO:  Your Honor, just briefly.

3             Let me see if I can bring the government back to

4    the issue we are actually raising.

5             The $1.65 million first came out during

6    Barbara-Jean Cardinale's cross-examination by Ms. Kedia

7    and I believe Mr. Goldberg now admitted probably the first

8    time he or Ms. Mayer or Mr. Buretta ever heard about it

9    and certainly the defense ever heard about it.  And we

10   know Peggy Cutolo's testimony about the $1.65.  I won't

11   review it.  The court knows our position with regards to

12   it.

13            But what happens is now Gary Pontecorvo takes

14   the stand and here is a case agent in the stand who says,

15   in fact, he had a conversation with Peggy.  He actually

16   saw the money in a suitcase.

17            Let me tell you, it stretches one's imagination

18   to believe that a case agent, who is well aware of his

19   obligations, is not going to notify his own supervisors.

20   Clearly he's notifying the US Attorney's Office and you

21   are going to see some kind of report prepared.

22            And all we get, Judge, is some assistant must

23   have been told.  We have oral testimony which I suggest to

24   the court stretches the imagination, the believability.

25   What we have, Judge, are these general statements that

1    somebody must have been told.

2              It comes pretty close, Judge, to the fact that

3    nobody was told, that Mr. Pontecorvo first made that

4    testimony up here to back up Peggy Cutolo.  That's the

5    worst situation, and what we are trying to do, Judge, is

6    to make a determination, based upon the facts, whether, in

7    fact, perjury actually occurred during the course of this

8    trial, not whether it's a Brady or Giglio violation in the

9    sense that Mr. Goldberg is saying.  But in terms of a case

10   agent committing perjury during the course of the trial to

11   try to provide credibility for a critical witness in this

12   case.

13             And, Judge, you have been a judge in many

14   criminal cases and where issues like this arise, there's

15   documentation; there are reports; there are notes.

16   There's no question you would know who you discussed this

17   $1.65 million with that doesn't belong to the Cutolo

18   family.  That's illegal proceeds.  That's forfeitable

19   assets.  That's not a decision an agent or even an

20   assistant can make.

21             That's a decision that has to be made higher up,

22   and to come in here and say we don't know who was told in

23   the US Attorney's Office, and we still haven't heard,

24   Judge, whether there's any documentation, whatsoever,

25   existing to support the government's claim that this must

1    have been told to the United States Attorney.

2            I suggest to the court that there is a clear

3    indication that it didn't happen the way the government

4    says, and if a case agent lies during the course of this

5    trial, we are in a totally different situation.  That's

6    the point that we are making, or I am making on behalf of

7    Mr. DeRoss, your Honor.

8            MR. GOLDBERG:  And, your Honor --

9            MS. KEDIA:  Your Honor --

10           MR. GOLDBERG:  This is a very straightforward

11   issue.

12           Peggy Cutolo testified, I believe, that she told

13   the government about the money.  Gary Pontecorvo, who was

14   called by the defense, says, yes.  I was told by

15   Peggy Cutolo about the money and I told the US Attorney's

16   Office.  The defense wants to confirm that fact through an

17   evidentiary hearing.

18           We are prepared to stipulate to the fact that

19   someone in the US Attorney's Office, probably Ms. Walsh,

20   and the only reason I'm hedging on that is because,

21   despite what Ms. Kedia says, I haven't had extensive

22   conversations with Ms. Walsh about this --

23           THE COURT:  Mr. Goldberg, you are telling me you

24   never said to Ms. Walsh, do you remember this issue about

25   the money with Peggy Cutolo?

1            MR. GOLDBERG:  I did.

2            THE COURT:  Do you know who authorized it?  When

3    did you first learn it?

4            You never asked her questions like that?

5            MR. GOLDBERG:  I didn't go through a detailed

6    recitation of the time line.

7            I did, of course, say, do you recall ever, you

8    know, making decisions about that, and she generally said,

9    yeah.  A decision was made.  I have a recollection of

10   that.

11           I'm only couching what I'm saying because I

12   don't want to be later put in a brief as admitting to a

13   fact that I'm not certain about.  There's really nothing

14   here.  There's no evidence, whatsoever, that

15   Agent Pontecorvo testified untruthfully about that fact.

16           But, in any event, I don't want to lose sight of

17   the larger point here.  It's completely immaterial and

18   irrelevant under Rule 33, and I have made my argument

19   about that and will rely on the papers.

20           THE COURT:  Yes.

21           MS. KEDIA:  Your Honor, with respect to what

22   Mr. Goldberg just said, can we find out what was actually

23   said?

24           He says on behalf of the government, I don't

25   want to make any misrepresentations for them to be cited

1    in a brief.  Well, what is the true story?  Mrs. Cutolo

2    didn't just get up on the stand and testify she told

3    agents.

4            She said at a proffer session, she only had two,

5    one was in February of 2001, and the other wasn't until

6    after the trial in the first case of 2006, she said the

7    proffer session in February of 2001, she informed the

8    government of the $1.65 million.

9            We have notes from those proffer sessions.

10           THE COURT:  It's not mentioned.

11           MS. KEDIA:  Of course it's not mentioned.

12           The agent who took the notes at the proffer

13   session says she has absolutely no recollection of hearing

14   about $1.65 million.  Was Ms. Walsh told at the proffer

15   session or was she told before the proffer session or

16   after the proffer session and what exactly was done here?

17   What is it that the government agreed to do?

18           Simply to allow this woman if, in fact,

19   Ms. Walsh was told and, again, without having her here or

20   an affidavit from her saying, yes, I was told and I made

21   this decision and here's how I went about making it, what

22   was the decision that was made?

23           Was it, Mrs. Cutolo, if you come in and talk to

24   us, then we will consider allowing you to keep this $1.65

25   million that I have heard about now from Agent Pontecorvo?

1    Or was it something else?

2              MR. GOLDBERG:  Again, Judge, what's the point?

3    What's the end game here?

4              Let's assume, for the sake of argument, that

5    Agent Pontecorvo tells Ms. Walsh, Ms. Walsh has all kinds

6    of discussions, let's assume a supervisor's involved.

7    Let's assume she sneezes and gets a supervisor involved.

8    What's the point?  What's the end game?

9              It's completely irrelevant.  You asked

10   Ms. Kedia, what's the relevance here and she couldn't

11   answer you and the reason she couldn't answer you is

12   because there is no relevance to that added benefit that

13   was provided to Peggy Cutolo that came out during the

14   trial that she could have used in summation.

15             It was merely an additional basis and the case

16   law is clear, if there is an additional basis for

17   challenging the impeachment of a witness, it's not

18   relevant.  It's not material.

19             MS. KEDIA:  Your Honor, if I may respond briefly

20   to that.

21             **Rodriguez** makes this very clear.  The Second

22   Circuit in **Rodriguez**, the assistant did exactly what the

23   assistant is trying to do there.  He said that he elicited

24   from the witness and in that case it wasn't a situation

25   where the defense happened to stumble upon it during

1    cross-examination.  It was a situation where during the

2    direct examination of the witness, the government brought

3    out that the witness said, I think it was in that case the

4    witness lied about certain things during her first proffer

5    session with the government.

6              The Second Circuit said, we can't know whether

7    it was material or not, even though the defense

8    cross-examined the witness and certainly attacked the

9    credibility of the witness, we can't know whether the lies

10   and whether the substance of that failure to disclose by

11   the government was material unless we know exactly what

12   that information was, and the Second Circuit remanded the

13   case to the district court and said, we got to find out

14   what the information was.

15             But we are missing the first point here and

16   Mr. Goldberg keeps trying to just brush past it.  The

17   first point is if, in fact, the government wasn't told, if

18   Ms. Walsh wasn't told at that proffer session about the

19   $1.65 million, as Mrs. Cutolo claims she was, that is

20   perjury that the government failed to cure, and it had an

21   obligation to do so.

22             And the obligation doesn't just arise because

23   these three assistants sitting at the table knew or didn't

24   know about it.  They had an obligation to go back and

25   check whether, in fact, that witness was telling the

1    truth, and if she was not telling the truth about that,

2    that is the government's burden to prove.  And the

3    government is trying desperately not to address that

4    issue.

5            It keeps saying what does it matter if there is

6    a Brady violation here.

7            THE COURT:  No.

8            MS. KEDIA:  That's not --

9            THE COURT:  What they are saying is, what does

10   it matter if there is a Giglio violation.

11           MS. KEDIA:  I put those in the same category,

12   and that's fine.  We can call it either-or.

13           But we haven't established that that's the case.

14   We first need to establish who was told, if anyone, in the

15   United States Attorney's Office and when.

16           MR. LA RUSSO:  Your Honor, just briefly in

17   response to Mr. Goldberg.

18           He says assume the supervisor was apprised or

19   somebody in the US Attorney's Office was told.  That's the

20   way they want to phrase it.  Let's assume no supervisor or

21   anybody in the office was told.

22           Where does that leave the record?  That leaves

23   the record possibly with two witnesses that committed

24   material perjury during the course of the trial.

25           Ms. Kedia just brought up another point that we

1    hadn't discussed earlier, and that is on the direct

2    examination of Peggy Cutolo, after Barbara-Jean had let

3    the cat out of the bag, the government actually asks on

4    direct examination about the $1.65 million and says when

5    you first spoke with the government, did you tell the

6    government about the money, and she answers yes.  They

7    were eliciting information that they know is false or

8    should have known was false.

9              And they had, as Ms. Kedia says, an obligation

10   to correct the wrong.  That's subornation of perjury. That

11   is --

12             THE COURT:  I think that term is not applicable.

13             MR. LA RUSSO:  It's a harsh term, Judge, but in

14   the course of a trial you are not thinking clearly about

15   these issues.

16             I think in the course of a trial you hear about

17   the $1.65 and, gosh.  We never knew.  Mrs. Cutolo, did you

18   tell anybody?  Yes.  I told anybody and they accepted it.

19             I'm not saying they did it deliberately, but now

20   we are in a different situation.  Now we have a chance and

21   clearly the facts indicating it to show what happened.

22   It's Peggy Cutolo lied about it and Agent Pontecorvo did

23   not have the conversations he said he had with assistants

24   about the money, that there was a cover-up here and the

25   government has a clear obligation, I thought it would have

1    been done before today, to find out if, in fact, there was

2    somebody in the government who specifically told them

3    about this money.

4         Judge, you can't just come in and say an

5    assistant learned about $1.65 million and had a vague

6    recollection about that and they were permitting a witness

7    to keep it.  Judge, that stretch's the imagination beyond

8    any possible believability.

9         That's what we are having here, Judge.  We are

10   not putting the issue the way the government says.  It's

11   whether or not perjury had been committed and the

12   government has condoned it or allowed it to exist.

13        MR. GOLDBERG:  Your Honor, Mr. LaRusso just

14   conceded that the government raised the issue of the

15   $1.65 million on direct.

16        But, putting that aside, **Rodriguez** is completely

17   inapposite.  **Rodriguez** was a remand to determine if the

18   material withheld or not disclosed was material.  Here we

19   know precisely what it is that the defense wanted prior to

20   trial.  They wanted to be informed that Mrs. Cutolo was

21   able to keep the forfeiture, to keep the $1.65 million.

22        The case on point here is **Rittweger** where the

23   information did come out and it was not material and they

24   made effective use.  This is, again, an attempt by the

25   defense to take a potential Giglio violation and blow it

1    up into a full-blown hearing and accuse agents and

2    witnesses of committing perjury and to accuse prosecutors

3    of suborning perjury.

4              And I don't even know how to respond to that

5    accusation, but it's clearly irrelevant and a collateral

6    attack and immaterial --

7              MS. KEDIA:  Your Honor --

8              THE COURT:  Final argument, Ms. Kedia.

9              MS. KEDIA:  I will briefly address the last

10   argument that he made about **Rittweger**.

11             That has nothing to do with this case.  The

12   government a week before the trial in **Rittweger** produced

13   the information.  A week before the defense opened in the

14   case, the government produced the information that was at

15   issue.  In that case it was grand jury testimony of a

16   witness, and the question was, was that a little too late.

17             The question wasn't whether the government

18   failed to disclose information all together, whether the

19   government, even to this day, had failed to disclose

20   information.  That's what **Rodriguez** addressed.

21             What Mr. Goldberg just said about **Rodriguez** is

22   exactly right.  In that case the issue was what was it,

23   what was the substance of the disclosure that the

24   government failed to provide to the defense.

25             MR. GOLDBERG:  Your Honor, this is **Rittweger** at

1    Westlaw page eight, probably in the stacks by now, the

2    paragraph beginning under the circumstances of this case

3    we conclude there is no probability that the government's

4    late disclosure of the evidence resulted in a different

5    outcome in the defendant Branden's case.

6           And they go through and explain why.  Never once

7    does the Second Circuit say that the information was

8    disclosed prior to trial.  That's not a basis upon which

9    the Second Circuit held that they made effective use.

10          They said, first and foremost, the district

11   court admitted into evidence Allen's grand jury testimony

12   and Agent Lavit's debriefing notes.  They read that she

13   believed Branden did not know he was the sole signatory

14   for all CBL insured trustee accounts.  The jury was also

15   read excerpts of the notes taken by Agent Lavit during

16   proffer interviews of Allen including statements that

17   Branden was never told that he was not a signatory on

18   CBL's accounts.

19          Now, not once at this point has the Second

20   Circuit mentioned that the information was provided before

21   the trial started.

22          MS. KEDIA:  If I may borrow the case from

23   Mr. Goldberg, I can show him where the Second Circuit

24   mentioned the information was provided prior to trial.

25          MR. GOLDBERG:  It was, but this was not the

1   basis for the Second Circuit's holding.

2          The exculpatory information was therefore put

3   before the jury and Branden was able to assimilate the

4   materials into his case for its effective use at trial

5   citing Coppa, C-O-P-P-A, and that was the decision.

6          We have the exact same reasoning and situation.

7   Whether the information was provided to the defense before

8   trial or whether the defense, quote-unquote, stumbled upon

9   it during cross-examination, the information was put

10   before the jury, and the defense in this case, if they

11   wanted to, was able to make effective use of it.

12          They obviously didn't deem it material because

13   they didn't mention it during their summation.

14          MS. KEDIA:  Judge, we still don't know what the

15   information was.

16          That's the difference.

17          MR. GOLDBERG:  The information --

18          MS. KEDIA:  To this moment, we still don't know

19   the substance of the discussions that were had, if any,

20   about this $1.65 million.

21          When did they have it?  Did they have it at the

22   proffer session like Peggy Cutolo said they did.  If they

23   didn't, that's perjury by a witness that the government

24   had an obligation to cure.  We haven't answered that

25   question.  We haven't even gotten anywhere near where

1    **Rittweger** gets.

2         The information was fully disclosed, even the

3    portion Mr. Goldberg just read to the court, the

4    information was fully submitted to the jury.  They were

5    given every document that the government handed to the

6    defense a week before trial.  They were given the full

7    grand jury testimony of the witness, and they were given

8    the notes that the government handed the defense before

9    the trial.

10        And, more than likely, it doesn't really say so

11   in this case, but more than likely they were given this

12   material, which would ordinarily not be given to the jury.

13   You don't ordinarily hand to the jury grand jury testimony

14   of a witness, but it was probably done in an effort to

15   make the case fair because the defense got it at the last

16   minute in that particular case.

17        But the point is, in that case, it was fully

18   submitted.  It was fully disclosed during the trial.  They

19   knew exactly what they were dealing with.  We don't here.

20   That is the point that we are trying to make.

21        We don't know if, in fact, Peggy Cutolo was

22   telling the truth or not at this moment about whether she

23   disclosed the $1.65 million to the government at that

24   proffer session or not.

25        THE COURT:  What difference does it make if she

1    told the government at the proffer session or if she told

2    the government an hour before she hit the stand?

3              MS. KEDIA:  It's perjury.

4              THE COURT:  How is it perjury?

5              MS. KEDIA:  She claimed that she told the

6    government at the proffer session in 2001, specifically

7    named Assistant United States Attorney Amy Walsh that she

8    had told them at that time, and that she was permitted to

9    keep the money.

10             If that wasn't the case, your Honor, that's

11   perjury.

12             THE COURT:  So for the sake of your argument,

13   she commits perjury.

14             How does that affect the result in this trial,

15   the conviction?

16             MS. KEDIA:  It's virtually automatic according

17   to the Second Circuit.

18             If a witness commits perjury and the government

19   fails to cure the perjury and obviously the government has

20   an obligation to know everything that every assistant in

21   the case knew or didn't know before it, whether these

22   three prosecutors knew or not, that's failing to cure

23   perjury and reversal is automatic.

24             MR. GOLDBERG:  There's no evidence to support

25   the suggestion that she lied on that point.

1          I'm sure Ms. Kedia will point to the interview

2     notes that it's not in there.  It wouldn't be the first

3     time that a witness said something in a meeting and it

4     wasn't put down.  But Ms. Kedia talks about information.

5     I just quoted from **Rittweger** and I talked about making

6     effective use of the information.

7          Ms. Kedia says we don't have the information.

8     Her April 21st letter says, in spite of the witness's

9     claims that the government had been informed about the

10    cash, and that they were not required to forfeit the

11    money, nor were they required to pay taxes on it, the

12    government failed to provide the defense with this

13    information as it was most certainly required to do under

14    Brady, Giglio, if, in fact, such information was known to

15    it.

16         What Ms. Kedia is doing is, she's changing her

17    position of what information she wants.  Initially in her

18    papers she wants to know whether the government failed

19    under its obligations to inform the defense about simply

20    whether Ms. Cutolo was allowed to keep or pay taxes on

21    that money.

22         She has that information, faced with the legal

23    argument about immateriality and effective use, she's now

24    saying, well, I don't want that information.  I want more

25    information.  I want full-blown analysis of who made what

1    decision.  I want internal US Attorney's Office documents.

2    We really need to get to the bottom of this.

3              What's the point?  The point is that she had the

4    information she needed, a benefit apparently conferred on

5    a witness, and she could have used it.  I find myself now

6    rehashing my arguments, but they are so relevant.

7              THE COURT:  Is there anything else?

8              MS. KEDIA:  Your Honor, if there are any

9    internal US Attorney's Office documents that should have

10   been turned over to the defense prior to the trial, why

11   isn't the government producing them now?

12             Maybe we don't need to get to hearings with the

13   witnesses and everything if, in fact, there is such

14   documentation that exists?  It's because we expect it

15   doesn't exist, otherwise it would have been provided, at a

16   minimum, to the court, if not to the defense by this point

17   in time.

18             If no such documentation exists, then we need

19   the testimony of these witnesses to confirm or deny

20   whether they were actually told, and when and what was the

21   substance of the agreement, if any, made with

22   Peggy Cutolo.

23             MR. GOLDBERG:  Judge, **Rittweger** and **Diaz** speak

24   to that.

25             THE COURT:  It may be, Mr. Goldberg, but at this

1    point I want information from these witnesses.  An

2    affidavit should be sufficient, I would think.

3              I want you to do a search to see when, if there

4    has been any notation and approval of this process.

5              MR. GOLDBERG:  What we'll do, Judge, is a more

6    complete interview of Ms. Walsh, and if there are

7    documents readily available we'll try to find them.

8              THE COURT:  And that would include any

9    additional information that Agent Pontecorvo may have had.

10             MR. GOLDBERG:  Sure.

11             THE COURT:  I don't think we need Ms. Mayer.

12             MS. KEDIA:  I don't think we need her at this

13   point, certainly, your Honor.

14             MR. LA RUSSO:  No.

15             MR. GOLDBERG:  But I do want the court, of

16   course, even after that to keep in mind these cases --

17             THE COURT:  I'm aware of the cases, **Rittweger**

18   and also **Rodriguez**.

19             MR. GOLDBERG:  And **Diaz**.

20             THE COURT:  And **Diaz**.

21             I'm also aware that the US Attorney's Office has

22   a pretty hefty obligation to abide by Brady and Giglio and

23   it may turn out to be a big waste of time in the end.

24             But I'd rather have the hearing now than two

25   years from now have it remanded.

1           MR. GOLDBERG:  We'll try to find information,

2      Judge.

3           THE COURT:  Thank you.

4           What date are we looking at to continue this

5      hearing?

6           MR. GOLDBERG:  Your Honor --

7           MR. LA RUSSO:  I have no more vacation.

8           So I'm free, Judge.

9           MR. GOLDBERG:  Your Honor, we'd like some time

10     to look into this.

11          I know Mr. Buretta, he's been on vacation and

12     he's only recently back, he's available the second week in

13     July.  If we could do it then, that would be best for the

14     government.

15          But whatever is best for the court, of course.

16          THE COURT:  It may not require your actual

17     presence if we can get it done by affidavit.

18          MR. GOLDBERG:  Sure.

19          MS. KEDIA:  I would imagine that since we filed

20     the letter on April 21st, two months ago, that the

21     government has done some investigation into this.

22          MR. GOLDBERG:  Your Honor, if we could have two

23     weeks to make a submission.

24          We'll do a submission within two weeks.

25          THE COURT:  Let me just check.

1          (Whereupon, there was a pause in the

2     proceedings.)

3          THE COURT:  Two weeks you are going to do your

4     submission and what do you need?

5          MS. KEDIA:  Judge, if we could be back here in

6     two weeks that's perfectly fine, and we could see what it

7     is the government has to present.

8          Did your Honor want argument on the Rule 29

9     motions?  Obviously there are various other outstanding

10    posttrial motions.

11         THE COURT:  Yes.

12         MR. GOLDBERG:  Your Honor, I don't know if there

13    is a need right now -- your Honor just said there may not

14    be a need to come back.

15         If we make our submission, if your Honor wants

16    to hear us further, I think we can set a date at that

17    time.

18         THE COURT:  Why don't we see what the government

19    has in two weeks.

20         Then I'll give you a determination as to whether

21    or not we will have a hearing with live witnesses, not

22    have a hearing, and go on for oral argument on the Rule 29

23    and 33 motions.

24         MS. KEDIA:  Very well, your Honor.

25         THE COURT:  If that's even necessary.

1            MR. LA RUSSO:  Very well, your Honor.

2            THE COURT:  The papers are quite extensive.

3            MS. KEDIA:  Very well.

4            MR. GOLDBERG:  Is there a time, your Honor?

5            THE COURT:  Two weeks from today, what does that

6    put us at?

7            THE CLERK:  June 30th for the submission of

8    papers.

9            THE COURT:  The 30th for the submission of

10   papers and I will make a decision after that and give you

11   a new date.

12           Both sides don't have any planned vacations in

13   the next month and a half?  Ms. Kedia, you didn't get to

14   go on vacation, did you?

15           MS. KEDIA:  No, your Honor.

16           THE COURT:  All right.

17           I'll hear from you folks, and I'm sure I'll get

18   a reply after the government makes it submission from the

19   defense.

20           MR. GOLDBERG:  Thank you, your Honor.

21           MR. LA RUSSO:  Thank you, your Honor.

22           THE COURT:  I'll make a determination as quickly

23   as I can because this case is rapidly aging and, although

24   it's not statutory or constitutional, I think the public

25   is entitled to have sentences go forward, if there is

40

1   going to be a sentence in this case, absent a new trial.

2            Have a nice day.

3            MR. GOLDBERG:  Thank you, your Honor.

4            MS. KEDIA:  Thank you, your Honor.

5            (The matter concluded.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1.65** [29] - 6:4; 7:15; 9:8, 11; 10:1, 13, 18; 12:13, 20; 13:2, 8, 12, 23; 15:5, 22; 19:5, 10; 20:17; 23:8, 14, 24; 25:19; 27:4, 17; 28:5, 15, 21; 31:20; 32:23

**1**

**100** [1] - 1:22
**10:10** [1] - 1:7
**11** [1] - 5:2
**11201** [1] - 1:14
**11722** [1] - 1:22
**1180** [1] - 1:22
**16** [1] - 1:6

**2**

**2** [1] - 5:2
**2.7** [1] - 15:19
**2001** [3] - 23:5, 7; 33:6
**2006** [1] - 23:6
**2008** [1] - 1:6
**21st** [2] - 34:8; 37:20
**29** [2] - 38:8, 22

**3**

**302** [1] - 10:2
**30th** [2] - 39:7, 9
**33** [5] - 5:21; 6:20; 8:24; 22:18; 38:23

**6**

**631** [2] - 1:22

**7**

**712-6106** [1] - 1:22
**712-6122** [1] - 1:22

**A**

**a.m** [1] - 1:7
**abide** [1] - 36:22
**ability** [1] - 16:22
**able** [5] - 17:13, 21; 28:21; 31:3, 11
**absent** [1] - 40:1
**absolutely** [1] - 23:13
**Absolutely** [1] - 2:19
**absurd** [1] - 13:14
**accept** [1] - 4:24
**accepted** [1] - 27:18

**according** [1] - 33:16
**accounts** [2] - 30:14, 18
**accusation** [1] - 29:5
**accuse** [2] - 29:1
**actual** [1] - 37:16
**add** [2] - 4:19; 12:5
**added** [1] - 24:12
**additional** [4] - 18:17; 24:15; 36:9
**address** [2] - 26:3; 29:9
**addressed** [1] - 29:20
**admitted** [2] - 19:7; 30:11
**admitting** [1] - 22:12
**advised** [1] - 2:25
**advising** [1] - 5:23
**affect** [1] - 33:14
**affidavit** [4] - 7:20; 23:20; 36:2; 37:17
**agent** [8] - 9:18; 11:4; 19:14, 18; 20:10, 19; 21:4; 23:12
**Agent** [11] - 10:6; 11:20; 14:4, 12; 22:15; 23:25; 24:5; 27:22; 30:12, 15; 36:9
**agent's** [1] - 9:10
**agents** [3] - 9:12; 23:3; 29:1
**aging** [1] - 39:23
**ago** [1] - 37:20
**agreed** [1] - 23:17
**agreement** [2] - 16:11; 35:21
**alert** [1] - 9:3
**Allen** [1] - 30:16
**Allen's** [1] - 30:11
**allow** [3] - 12:20; 13:12; 23:18
**allowed** [6] - 12:24; 16:7, 9; 17:9; 28:12; 34:20
**allowing** [1] - 23:24
**almost** [2] - 8:20; 9:5
**ALPHONSE** [1] - 1:6
**Alphonse** [1] - 2:2
**AMERICA** [1] - 1:3
**Amy** [6] - 4:15; 6:14; 11:19; 13:18; 14:1; 33:7
**analysis** [1] - 34:25

**answer** [2] - 24:11
**answered** [1] - 31:24
**answers** [1] - 27:6
**apologize** [1] - 10:24
**appearance** [3] - 2:11, 14; 7:6
**APPEARANCES** [1] - 1:11
**appearances** [1] - 2:3
**applicable** [1] - 27:12
**apprised** [1] - 26:18
**approval** [1] - 36:4
**approved** [1] - 13:13
**April** [2] - 34:8; 37:20
**area** [3] - 3:19; 9:13, 24
**ARGUMENT** [1] - 1:8
**argument** [13] - 2:1; 7:22; 11:16; 16:24; 18:13; 22:18; 24:4; 29:8, 10; 33:12; 34:23; 38:8, 22
**arguments** [3] - 8:23; 9:2; 35:6
**arise** [2] - 20:14; 25:22
**aside** [1] - 28:16
**assets** [1] - 20:19
**assimilate** [1] - 31:3
**assistant** [10] - 8:19; 12:17; 13:9, 11; 19:22; 20:20; 24:22; 28:5; 33:20
**Assistant** [1] - 33:7
**assistant's** [1] - 9:11
**assistants** [4] - 6:20; 8:5; 25:23; 27:23
**assistants'** [1] - 8:7
**assume** [7] - 9:2; 13:17; 24:4, 6-7; 26:18, 20
**attack** [1] - 29:6
**attacked** [1] - 25:8
**attacking** [1] - 18:22
**attempt** [1] - 28:24
**attempted** [1] - 10:16
**attempting** [2] - 10:7; 11:23
**attempts** [1] - 9:19
**attended** [1] - 16:10
**Attorney** [3] - 10:22; 21:1; 33:7
**ATTORNEY** [1] - 1:12
**Attorney's** [14] -

**8:12; 10:4; 12:18; 13:10; 14:8; 19:20; 20:23; 21:15, 19; 26:15, 19; 35:1, 9; 36:21
**Attorneys** [1] - 13:17
**AUSA** [1] - 1:13
**authorized** [2] - 10:17; 22:2
**automatic** [2] - 33:16, 23
**available** [5] - 5:25; 6:2; 36:7; 37:12
**aware** [6] - 6:22; 7:1, 7; 19:18; 36:17, 21

**B**

**bag** [1] - 27:3
**Barbara** [2] - 19:6; 27:2
**Barbara-Jean** [2] - 19:6; 27:2
**based** [4] - 7:10; 13:3; 14:21; 20:6
**bases** [1] - 18:23
**basis** [5] - 18:18; 24:15; 30:8; 31:1
**becomes** [1] - 12:22
**BEFORE** [1] - 1:9
**beforehand** [1] - 3:23
**begin** [1] - 16:2
**beginning** [2] - 18:14; 30:2
**behalf** [2] - 21:6; 22:24
**believability** [2] - 19:24; 28:8
**belong** [1] - 20:17
**benefit** [7] - 16:25; 17:2, 7-8; 18:4; 24:12; 35:4
**best** [3] - 18:11; 37:13, 15
**between** [1] - 5:2
**beyond** [1] - 28:7
**big** [1] - 36:23
**blow** [1] - 28:25
**blown** [3] - 18:2; 29:1; 34:25
**borrow** [1] - 30:22
**bottom** [2] - 18:7; 35:2
**Brady** [9] - 13:5; 17:19; 18:8, 12; 20:8; 26:6; 34:14; 36:22

**Branden** [3] - 30:13, 17; 31:3
**Branden's** [1] - 30:5
**brief** [2] - 22:12; 23:1
**briefly** [5] - 7:3; 19:2; 24:19; 26:16; 29:9
**bring** [1] - 19:3
**bringing** [1] - 11:12
**Brooklyn** [2] - 1:14; 6:21
**brought** [2] - 25:2; 26:25
**brush** [1] - 25:16
**burden** [1] - 26:2
**Buretta** [4] - 6:21; 8:8; 19:8; 37:11
**BY** [1] - 1:13

**C**

**Cardinale's** [1] - 19:6
**case** [36] - 8:6; 9:18; 11:2, 5; 13:1, 3; 16:2; 19:14, 18; 20:9, 12; 21:4; 23:6; 24:15, 24; 25:3, 13; 26:13; 28:22; 29:11, 14-15, 22; 30:2, 5, 22; 31:4, 10; 32:11, 15-17; 33:10, 21; 39:23; 40:1
**cases** [5] - 18:7, 16; 20:14; 36:16
**cash** [1] - 34:10
**CAT** [1] - 1:25
**cat** [1] - 27:3
**category** [1] - 26:11
**CBL** [1] - 30:14
**CBL's** [1] - 30:18
**Central** [2] - 1:5, 22
**certain** [4] - 3:8; 5:7; 22:13; 25:4
**Certainly** [1] - 4:21; 6:22
**certainly** [7] - 2:15; 15:25; 16:1; 19:9; 25:8; 34:13; 36:13
**challenging** [2] - 18:18; 24:17
**chance** [1] - 27:20
**changing** [1] - 34:16
**charge** [1] - 11:10
**charged** [1] - 8:6
**check** [2] - 25:25; 37:25

**chosen** [1] - 3:5
**Circuit** [9] - 17:18; 24:22; 25:6, 12; 30:7, 9, 20, 23; 33:17
**Circuit's** [1] - 31:1
**circumstances** [2] - 14:25; 30:2
**cited** [2] - 13:20; 22:25
**citing** [1] - 31:5
**claim** [1] - 20:25
**claimed** [1] - 33:5
**claims** [2] - 25:19; 34:9
**clarify** [1] - 5:10
**clear** [8] - 5:3, 9, 20; 18:16; 21:2; 24:16, 21; 27:25
**clearly** [3] - 27:14, 21; 29:5
**Clearly** [1] - 19:20
**CLERK** [2] - 2:1; 39:7
**client** [1] - 2:13
**close** [1] - 20:2
**closer** [1] - 6:12
**cognizant** [1] - 8:5
**collateral** [1] - 29:5
**colloquy** [1] - 18:14
**commits** [2] - 33:13, 18
**committed** [3] - 14:12; 26:23; 28:11
**committing** [2] - 20:10; 29:2
**communication** [1] - 2:13
**complaint** [1] - 11:12
**complete** [3] - 2:18; 8:24; 36:6
**completely** [4] - 7:11; 22:17; 24:9; 28:16
**concede** [2] - 13:22; 18:5
**conceded** [1] - 28:14
**concedes** [1] - 7:14
**concern** [1] - 11:17
**concerning** [1] - 4:6
**conclude** [1] - 30:3
**concluded** [1] - 40:5
**condoned** [1] - 28:12
**confer** [1] - 17:2
**conference** [1] - 5:11
**conferred** [2] - 17:7; 35:4

**conferring** [1] - 18:3
**confers** [1] - 16:25
**confirm** [2] - 21:16; 35:19
**confuses** [1] - 18:13
**consider** [2] - 12:1; 23:24
**constitutional** [1] - 39:24
**contacted** [1] - 7:4
**context** [1] - 8:24
**continue** [1] - 37:4
**control** [1] - 6:9
**conversation** [4] - 4:5; 5:4, 8; 19:15
**conversations** [2] - 21:22; 27:23
**conviction** [1] - 33:16
**cooperating** [1] - 17:3
**Coppa** [1] - 31:5
**COPPA** [1] - 31:5
**correct** [1] - 27:10
**corroborative** [1] - 9:19
**couching** [1] - 22:11
**counsel** [1] - 5:19
**course** [13] - 4:11; 11:4; 15:21; 20:7, 10; 21:4; 22:7; 23:11; 26:24; 27:14, 16; 36:16; 37:15
**COURT** [49] - 1:1, 9; 2:7, 12, 17, 23; 3:11, 24; 6:24; 8:15; 12:4; 14:3, 9, 11; 15:3, 9, 13, 17; 16:14; 18:10; 21:23; 22:2, 20; 23:10; 26:7, 9; 27:12; 29:8; 32:25; 33:4, 12; 35:7, 25; 36:8, 11, 17, 20; 37:3, 16, 25; 38:3, 11, 18, 25; 39:2, 5, 9, 16, 22
**court** [19] - 5:11, 16, 18; 6:8; 7:5; 9:3; 11:10; 12:1; 13:21; 14:21; 19:11, 24; 21:2; 25:13; 30:11; 32:3; 35:16; 36:15; 37:15
**Court** [1] - 1:21
**court's** [1] - 5:12
**Courthouse** [1] - 1:5
**courtroom** [1] - 11:15
**cover** [3] - 11:23;

13:1; 27:24
**cover-up** [2] - 13:1; 27:24
**CR-04-911** [1] - 1:4
**credibility** [8] - 10:8; 11:3; 18:15, 18, 22; 20:11; 25:9
**criminal** [1] - 20:14
**critical** [7] - 4:15; 9:6, 16; 11:5; 16:10, 12; 20:11
**cross** [8] - 15:11, 14, 24; 16:1; 19:6; 25:1, 8; 31:9
**cross-examination** [6] - 15:11, 14, 24; 19:6; 25:1; 31:9
**cross-examine** [1] - 16:1
**cross-examined** [1] - 25:8
**cure** [4] - 25:20; 31:24; 33:19, 22
**Cutolo** [35] - 7:8; 8:13; 9:9, 21; 10:5, 14; 11:13; 12:13, 21, 23; 13:12; 14:19; 15:4, 14, 19; 16:6; 17:8; 18:22; 20:4, 17; 21:12, 15, 25; 23:1, 23; 24:13; 25:19; 27:2, 17, 22; 28:20; 31:22; 32:21; 34:20; 35:22
**Cutolo's** [3] - 8:1; 16:22; 19:10

**D**

**D.C** [2] - 3:19
**date** [3] - 37:4; 38:16; 39:11
**days'** [1] - 3:6
**deal** [3] - 12:23; 14:18; 16:5
**dealing** [1] - 32:19
**debriefing** [2] - 17:18; 30:12
**decision** [19] - 5:19; 8:12, 17, 23; 10:12, 21; 12:20, 22; 13:12; 17:2, 6; 20:19, 21; 22:9; 23:21; 31:5; 35:1; 39:10
**decisions** [1] - 22:8
**deem** [1] - 31:12
**DEFENDANT** [1] - 8:2

**defendant** [1] - 30:5
**Defendants** [2] - 1:7, 16
**defense** [36] - 5:4; 6:19; 7:2, 9, 14, 25; 8:25; 13:21; 14:21; 15:6; 16:13; 17:20, 23; 18:1, 5; 19:9; 21:14, 16; 24:25; 25:7; 28:19, 25; 29:13, 24; 31:7, 10; 32:6, 8, 15; 34:12, 19; 35:10, 16; 39:19
**Deft** [2] - 1:16, 18
**deliberately** [2] - 11:4; 27:19
**deny** [1] - 35:19
**Department** [1] - 7:19
**DEROSS** [1] - 1:6
**DeRoss** [5] - 1:18; 2:2, 21, 24; 21:7
**desperately** [1] - 26:3
**despite** [1] - 21:21
**detailed** [1] - 22:5
**determination** [6] - 11:20; 14:22; 15:1; 20:6; 38:20; 39:22
**determine** [2] - 11:8; 28:17
**Diaz** [3] - 35:23; 36:19
**difference** [3] - 15:6; 31:16; 32:25
**different** [3] - 21:5; 27:20; 30:4
**direct** [4] - 25:2; 27:1, 4; 28:15
**directly** [2] - 4:24; 12:14
**disclose** [4] - 7:2; 25:10; 29:18
**disclosed** [5] - 28:18; 30:8; 32:2, 18, 23
**disclosure** [3] - 17:17; 29:23; 30:4
**disconcerting** [1] - 11:16
**discuss** [2] - 6:3, 7
**discussed** [4] - 4:4, 7; 20:16; 27:1
**discussions** [2] - 24:6; 31:19
**disheartening** [1] - 11:24
**DISTRICT** [3] - 1:1, 9
**district** [2] - 25:13;

30:10
**document** [1] - 32:5
**documentary** [1] - 10:20
**documentation** [10] - 4:9; 6:4, 8, 12; 8:16; 13:16; 20:15, 24; 35:14, 18
**documents** [6] - 7:20; 13:7, 14; 35:1, 9; 36:7
**done** [7] - 3:3, 8; 23:16; 28:1; 32:14; 37:17, 21
**doubt** [1] - 11:5
**down** [4] - 4:12; 6:13; 12:2; 34:4
**during** [23] - 4:11; 9:13; 11:4, 10; 15:14, 21, 24; 16:20, 24; 17:11; 19:5; 20:7, 10; 21:4; 24:13, 25; 25:1, 4; 26:24; 30:15; 31:9, 13; 32:18
**duties** [1] - 7:21

---

**E**

**e-mailed** [1] - 3:14
**EASTERN** [1] - 1:1
**effective** [10] - 8:25; 15:13; 17:13; 18:9; 28:24; 30:9; 31:4, 11; 34:6, 23
**effort** [1] - 32:14
**eight** [1] - 30:1
**either** [3] - 9:24; 12:25; 26:12
**either-or** [1] - 26:12
**elicited** [1] - 24:23
**eliciting** [1] - 27:7
**employees** [1] - 7:19
**end** [5] - 17:20; 18:15; 24:3, 8; 36:23
**entire** [2] - 16:20; 17:11
**entirely** [1] - 7:23
**entitled** [1] - 39:25
**ESQ** [3] - 1:12, 16, 18
**establish** [1] - 26:14
**established** [1] - 26:13
**event** [4] - 7:13; 13:18; 16:7; 22:16
**evidence** [6] - 10:20; 11:21; 22:14; 30:4, 11;

33:24
**evidentiary** [7] - 3:16; 5:6, 13; 7:11, 24; 18:2; 21:17
**exact** [2] - 17:22; 31:6
**exactly** [12] - 12:10, 22; 13:6; 14:15, 18, 24; 23:16; 24:22; 25:11; 29:22; 32:19
**examination** [9] - 15:11, 14, 24; 19:6; 25:1; 27:2, 4; 31:9
**examine** [1] - 16:1
**examined** [1] - 25:8
**example** [2] - 17:4, 15
**excerpts** [1] - 30:15
**exculpatory** [2] - 15:5; 31:2
**exist** [2] - 28:12; 35:15
**existing** [1] - 20:25
**exists** [4] - 7:18; 13:16; 35:14, 18
**expect** [1] - 35:14
**expected** [1] - 12:16
**explain** [1] - 30:6
**explained** [2] - 12:10; 18:20
**extensive** [2] - 21:21; 39:2
**extremely** [1] - 16:21

---

**F**

**faced** [2] - 11:7; 34:22
**fact** [26] - 3:15; 6:10; 7:9, 12; 8:5; 11:21; 13:24; 15:7, 18; 16:8, 12; 18:1; 19:15; 20:2, 7; 21:16, 18; 22:13, 15; 23:18; 25:17, 25; 28:1; 32:21; 34:14; 35:13
**facts** [4] - 11:7; 16:10; 20:6; 27:21
**failed** [7] - 7:2; 25:20; 29:18, 24; 34:12, 18
**failing** [1] - 33:22
**fails** [1] - 33:19
**failure** [3] - 16:3; 17:24; 25:10
**fair** [3] - 15:11; 32:15
**false** [2] - 27:7
**family** [5] - 9:9;

10:14; 14:19; 15:22; 20:18
**Fax** [1] - 1:22
**FCRR** [1] - 1:21
**February** [2] - 23:5, 7
**federal** [1] - 3:8
**Federal** [1] - 1:22
**filed** [2] - 7:10; 37:19
**Final** [1] - 29:8
**fine** [2] - 26:12; 38:6
**first** [18] - 3:22; 6:19; 13:15; 16:15; 17:12, 19; 19:5, 7; 20:3; 22:3; 23:6; 25:4, 15, 17; 26:14; 27:5; 30:10; 34:2
**five** [1] - 16:17
**Floridia** [1] - 11:12
**focus** [1] - 5:8
**folks** [1] - 39:17
**follow** [2] - 4:8; 18:8
**follow-up** [1] - 4:8
**foremost** [1] - 17:20; 30:10
**forfeit** [2] - 8:13; 34:10
**forfeitable** [1] - 20:18
**forfeiture** [1] - 28:21
**forfeiture/tax** [5] - 7:1, 25; 8:3, 9; 18:23
**former** [1] - 12:17
**forward** [2] - 6:6; 39:25
**free** [1] - 37:8
**full** [3] - 29:1; 32:6; 34:25
**full-blown** [2] - 29:1; 34:25
**fully** [4] - 32:2, 4, 17
**furthest** [1] - 11:13

---

**G**

**game** [2] - 24:3, 8
**Gary** [3] - 4:14; 19:13; 21:13
**general** [1] - 19:25
**generally** [1] - 22:8
**Giglio** [8] - 18:10, 12, 17; 20:8; 26:10; 28:25; 34:14; 36:22
**Gill** [1] - 18:7
**given** [6] - 18:24; 32:5-7, 11

**GOLDBERG** [36] - 1:13; 2:4; 3:10, 12; 5:3; 6:17, 25; 8:4, 18; 14:7; 16:15; 18:11; 21:8, 10; 22:1, 5; 24:2; 28:13; 29:25; 30:25; 31:17; 33:24; 35:23; 36:5, 10, 15, 19; 37:1, 6, 9, 18, 22; 38:12; 39:4, 20; 40:3
**Goldberg** [21] - 2:4, 7; 3:6; 4:1, 23; 5:23; 10:18; 12:8, 16; 13:20; 16:14; 19:7; 20:9; 21:23; 22:22; 25:16; 26:17; 29:21; 30:23; 32:3; 35:25
**gosh** [1] - 27:17
**government** [70] - 2:5; 3:5; 4:18; 7:1, 7, 14; 8:2, 4; 9:10; 10:7, 11-12, 17; 11:6, 11, 15, 24; 12:24; 13:2, 22-23; 14:20; 16:9, 12, 25; 17:3, 16; 19:3; 21:3, 13; 22:24; 23:8, 17; 25:2, 5, 11, 17, 20; 26:3; 27:3, 5-6, 25; 28:2, 10, 12, 14; 29:12, 14, 17, 19, 24; 31:23; 32:5, 8, 23; 33:1, 6, 18-19; 34:9, 12, 18; 35:11; 37:14, 21; 38:7, 18; 39:18
**Government** [1] - 1:12
**government's** [6] - 13:8; 16:3; 17:24; 20:25; 26:2; 30:3
**grand** [5] - 17:17; 29:15; 30:11; 32:7, 13
**Granted** [1] - 6:9
**great** [1] - 17:15

**H**
**half** [1] - 39:13
**hand** [1] - 32:13
**handed** [2] - 32:5, 8
**harsh** [1] - 27:13
**head** [1] - 15:16
**hear** [4] - 12:13; 27:16; 38:16; 39:17
**heard** [5] - 5:1; 19:8; 20:23; 23:25
**hearing** [27] - 2:1; 3:16; 4:6, 11; 5:6, 10, 13, 20; 6:7; 7:11, 24;

10:9; 12:2; 13:19, 24; 14:15; 15:1; 18:2; 21:17; 23:13; 29:1; 36:24; 37:5; 38:21
**hearings** [1] - 35:12
**heart** [1] - 10:9
**hedging** [1] - 21:20
**hefty** [1] - 36:22
**held** [2] - 17:18; 30:9
**herring** [1] - 8:25
**herself** [1] - 9:16
**higher** [1] - 20:21
**himself** [1] - 10:22
**hinged** [1] - 11:3
**hit** [1] - 33:2
**holding** [1] - 31:1
**honest** [1] - 4:3
**Honor** [42] - 2:6, 9-10, 22; 3:10; 4:19; 5:3; 6:17; 7:23; 9:4; 12:6, 12; 14:14; 16:15; 19:2; 21:7-9; 22:21; 24:19; 26:16; 28:13; 29:7, 25; 33:10; 35:8; 36:13; 37:6, 9, 22; 38:8, 12-13, 15, 24; 39:1, 4, 15, 20-21; 40:3
**HONORABLE** [1] - 1:9
**hour** [2] - 5:14; 33:2
**hours** [1] - 16:17
**house** [2] - 9:15, 25

**I**
**idea** [2] - 4:13; 13:11
**illegal** [4] - 9:8; 10:2, 13; 20:18
**imagination** [3] - 19:17, 24; 28:7
**imagine** [1] - 37:19
**immaterial** [4] - 9:1; 18:9; 22:17; 29:6
**immateriality** [1] - 34:23
**impacts** [2] - 15:25; 16:1
**impeachment** [2] - 10:8; 24:17
**important** [1] - 18:25
**importantly** [1] - 18:24
**inapposite** [1] - 28:17
**include** [1] - 36:8
**including** [2] - 9:14; 30:16

**indicated** [2] - 4:8, 24
**indicating** [1] - 27:21
**indication** [1] - 21:3
**inform** [1] - 34:19
**information** [42] - 9:1, 20; 14:23; 15:4; 16:4; 17:10, 20; 18:1, 6, 17; 25:12, 14; 27:7; 28:23; 29:13, 18, 20; 30:7, 20, 24; 31:2, 7, 9, 15, 17; 32:2, 4; 34:4, 6-7, 13-14, 17, 22, 24-25; 35:4; 36:1, 9; 37:1
**informed** [5] - 3:17; 7:9; 23:7; 28:20; 34:9
**instance** [1] - 13:15
**insured** [1] - 30:14
**intention** [1] - 5:12
**intentional** [1] - 17:25
**intentionally** [1] - 8:10
**internal** [2] - 35:1, 9
**interview** [3] - 11:7; 34:1; 36:6
**interviews** [1] - 30:16
**investigation** [1] - 37:21
**involved** [4] - 8:22; 18:3; 24:6
**irrelevant** [3] - 22:18; 24:9; 29:5
**IRS** [1] - 10:23
**Islip** [2] - 1:5, 22
**issue** [30] - 3:20; 4:21; 5:10; 6:4, 18-19; 7:1, 5, 17, 25; 8:3, 10; 9:6, 16; 10:8, 15; 11:1, 18; 12:10; 18:23; 19:4; 21:11, 24; 26:4; 28:10, 14; 29:15, 22
**issues** [9] - 4:10, 16; 5:21; 6:23-25; 12:25; 20:14; 27:15

**J**
**Jean** [2] - 19:6; 27:2
**Jeffrey** [1] - 2:4
**JEFFREY** [1] - 1:13
**JOANNA** [1] - 1:9
**John** [1] - 2:2
**JOHN** [1] - 1:6

**JS** [1] - 1:4
**judge** [1] - 20:13
**JUDGE** [1] - 1:9
**Judge** [24] - 4:3, 13; 10:5, 24; 11:18, 23; 15:23; 19:22, 25; 20:2, 5, 13, 24; 24:2; 27:13; 28:4, 7, 9; 31:14; 35:23; 36:5; 37:2, 8; 38:5
**July** [1] - 37:13
**June** [2] - 1:6; 39:7
**jury** [16] - 9:17, 20; 16:2, 19; 17:17, 21; 29:15; 30:11, 14; 31:3, 10; 32:4, 7, 12
**justice** [2] - 3:19; 11:7
**Justice** [1] - 7:19

**K**
**Kedia** [22] - 2:10; 3:2; 5:11, 15; 7:4; 12:4; 14:4; 15:3; 17:10; 18:21; 19:6; 21:21; 24:10; 26:25; 27:9; 29:8; 34:1, 4, 7, 16; 39:13
**KEDIA** [34] - 1:16; 2:9, 15, 19; 4:19; 12:6; 14:10, 14; 15:7, 12, 15, 18; 21:9; 22:21; 23:11; 24:19; 26:8, 11; 29:7, 9; 30:22; 31:14, 18; 33:3, 5, 16; 35:8; 36:12; 37:19; 38:5, 24; 39:3, 15; 40:4
**Kedia's** [1] - 16:16
**keep** [18] - 10:17; 12:14, 21, 24; 13:12; 15:7; 16:7, 9, 12, 22; 17:9; 23:24; 28:7, 21; 33:9; 34:20; 36:16
**keeping** [1] - 15:4
**keeps** [2] - 25:16; 26:5
**kept** [1] - 10:13
**kind** [1] - 19:21
**kinds** [1] - 24:5
**knowledge** [3] - 8:6, 9
**known** [2] - 27:8; 34:14
**knows** [1] - 19:11

**L**
**LA** [12] - 1:18; 2:20; 4:1; 5:17; 9:4; 19:2;

26:16; 27:13; 36:14;
37:7; 39:1, 21

**large** [1] - 18:21

**larger** [1] - 22:17

**LaRusso** [13] - 2:20,
23; 3:1, 9, 12, 24;
5:9, 14; 7:12; 13:1;
17:10; 18:21; 28:13

**LaRusso's** [2] - 5:4;
18:13

**last** [4] - 5:1; 7:13;
29:9; 32:15

**late** [3] - 15:23;
29:16; 30:4

**Lavit** [1] - 30:15

**Lavit's** [1] - 30:12

**law** [1] - 24:16

**lead** [1] - 9:20

**leading** [2] - 11:21

**learn** [3] - 3:5; 15:21;
22:3

**learned** [3] - 9:22;
28:5

**least** [4] - 3:18; 6:7;
8:20

**leave** [1] - 26:22

**leaves** [1] - 26:22

**left** [2] - 9:13, 24

**legal** [2] - 8:23; 34:22

**letter** [5] - 2:16;
7:12; 13:20; 34:8;
37:20

**lie** [1] - 10:5

**lied** [5] - 11:4, 21;
25:4; 27:22; 33:25

**lies** [2] - 21:4; 25:9

**likely** [3] - 10:22;
32:10

**line** [2] - 18:7; 22:6

**live** [1] - 38:21

**Lombardi** [1] - 1:21

**look** [2] - 5:20; 37:10

**looked** [2] - 7:3; 11:11

**looking** [2] - 6:21;
37:4

**lose** [1] - 22:16

**lost** [1] - 16:18

---

## M

**mail** [3] - 4:8; 5:22;
6:15

**mailed** [1] - 3:14

**main** [1] - 3:19

**manner** [1] - 15:25

**Marshal's** [1] - 17:5

**mask** [1] - 4:13

**material** [12] - 15:6;
16:4; 18:19; 24:18;
25:7, 11; 26:24; 28:18,
23; 31:12; 32:12

**materials** [1] - 31:4

**matter** [7] - 5:17;
6:10; 10:8; 11:25;
26:5, 10; 40:5

**matters** [1] - 8:19

**MAUSKOPF** [1] - 1:12

**Mayer** [5] - 3:18; 6:11;
8:9; 19:8; 36:11

**mean** [2] - 8:8; 15:10

**meaning** [1] - 13:22

**mechanical** [1] - 1:24

**meeting** [1] - 34:3

**mention** [4] - 3:23;
9:15; 16:21; 31:13

**mentioned** [7] - 3:22;
5:7; 6:10; 23:10;
30:20, 24

**mentions** [2] - 9:10

**merely** [2] - 18:17;
24:15

**might** [3] - 2:8; 5:24;
9:23

**million** [28] - 6:4;
7:15; 9:8, 11; 10:1,
13, 18; 12:13, 20;
13:2, 9, 12, 23; 15:5,
19, 22; 19:5; 20:17;
23:8, 14, 25; 25:19;
27:4; 28:5, 15, 21;
31:20; 32:23

**mind** [3] - 7:10; 11:14;
36:16

**minimum** [1] - 35:16

**minor** [1] - 16:17

**minute** [1] - 32:16

**misreads** [1] - 13:20

**misrepresentation** [1]
- 4:2

**misrepresentations**
[1] - 22:25

**missing** [2] - 15:20;
25:15

**mistaken** [1] - 3:12

**moment** [2] - 31:18;
32:22

**money** [23] - 7:8; 8:14;
9:15, 22; 10:1, 11;
12:24; 16:7, 9, 12, 23;

17:3, 9; 19:16; 21:13,
15, 25; 27:6, 24; 28:3;
33:9; 34:11, 21

**month** [1] - 39:13

**months** [1] - 37:20

**morning** [6] - 2:6, 9,
22-23; 3:4

**most** [2] - 5:4; 34:13

**motion** [2] - 6:20; 7:10

**motions** [5] - 5:6, 13;
38:9, 23

**MR** [46] - 2:4, 20;
3:10, 12; 4:1; 5:3, 17;
6:17, 25; 8:4, 18; 9:4;
14:7; 16:15; 18:11;
19:2; 21:8, 10; 22:1,
5; 24:2; 26:16; 27:13;
28:13; 29:25; 30:25;
31:17; 33:24; 35:23;
36:5, 10, 14-15, 19;
37:1, 6-7, 9, 18, 22;
38:12; 39:1, 4, 20-21;
40:3

**MS** [33] - 2:9, 15, 19;
4:19; 12:6; 14:10, 14;
15:7, 12, 15, 18; 21:9;
22:21; 23:11; 24:19;
26:8, 11; 29:7, 9;
30:22; 31:14, 18; 33:3,
5, 16; 35:8; 36:12;
37:19; 38:5, 24; 39:3,
15; 40:4

**murder** [1] - 9:7

**must** [4] - 16:13;
19:22; 20:1, 25

---

## N

**name** [2] - 9:10

**named** [1] - 33:7

**narrowed** [1] - 6:13

**nature** [2] - 13:4;
14:18

**near** [1] - 31:25

**necessary** [6] - 6:11;
7:16; 12:2; 15:2; 18:4;
38:25

**necessity** [1] - 4:7

**need** [14] - 7:11, 23;
13:19, 24; 14:1; 26:14;
35:2, 12, 18; 36:11;
38:4, 13

**needed** [1] - 35:4

**nerve** [1] - 10:1

**Never** [1] - 30:6

**never** [9] - 3:7; 4:17,

22; 10:2; 16:21; 21:24;
22:4; 27:17; 30:17

**NEW** [1] - 1:1

**new** [2] - 39:11; 40:1

**New** [5] - 1:5, 14, 22;
9:13, 24

**next** [2] - 3:14; 39:13

**nice** [1] - 40:2

**nobody** [1] - 20:3

**notation** [1] - 36:4

**notes** [9] - 10:3;
17:18; 20:15; 23:9, 12;
30:12, 15; 32:8; 34:2

**nothing** [3] - 10:23;
22:13; 29:11

**notice** [1] - 3:6

**notify** [1] - 19:19

**notifying** [1] - 19:20

---

## O

**obligation** [10] -
11:6; 14:20; 25:21, 24;
27:9, 25; 31:24; 33:20;
36:22

**obligations** [2] -
19:19; 34:19

**obviate** [2] - 7:11, 23

**obviously** [3] - 18:25;
31:12; 33:19

**Obviously** [1] - 38:9

**occurred** [2] - 11:9;
20:7

**OF** [3] - 1:1, 3, 8

**Office** [15] - 8:12;
10:4; 12:18; 13:10, 17;
14:8; 19:20; 20:23;
21:16, 19; 26:15, 19;
35:1, 9; 36:21

**office** [2] - 8:20;
26:21

**Official** [1] - 1:21

**once** [3] - 16:21; 30:6,
19

**One** [2] - 1:13; 15:18

**one** [10] - 3:18, 24;
4:16, 20; 9:12; 12:25;
13:17; 15:5; 17:12;
23:5

**one's** [1] - 19:17

**open** [1] - 16:2

**opened** [2] - 15:18;
29:13

**opening** [2] - 16:16

**opposed** [1] - 10:9

**ORAL** [1] - 1:8
**oral** [3] - 2:1; 19:23; 38:22
**order** [1] - 5:20
**ordinarily** [2] - 32:12
**otherwise** [1] - 35:15
**outcome** [1] - 30:5
**outrageous** [1] - 10:14
**outstanding** [1] - 38:9
**overall** [1] - 9:1
**own** [3] - 7:21; 9:9; 19:19

**P**

**page** [1] - 30:1
**papers** [8] - 7:10; 16:23; 18:20; 22:19; 34:18; 39:2, 8, 10
**paragraph** [1] - 30:2
**part** [3] - 6:15; 17:2; 18:21
**particular** [1] - 32:16
**passionate** [1] - 10:24
**past** [3] - 3:16; 6:18; 25:16
**Paul** [1] - 1:21
**pause** [1] - 38:1
**pay** [6] - 7:8; 8:13; 16:22; 17:9; 34:11, 20
**Peggy** [22] - 7:8; 8:1; 9:21; 10:5; 11:13; 12:13, 23; 13:12; 16:22; 17:8; 19:10, 15; 20:4; 21:12, 15, 25; 24:13; 27:2, 22; 31:22; 32:21; 35:22
**people** [1] - 3:6
**perfectly** [1] - 38:6
**performance** [1] - 7:21
**perhaps** [1] - 7:23
**period** [1] - 9:14
**perjured** [1] - 9:16
**perjury** [19] - 11:8, 12; 14:13; 20:7, 10; 25:20; 26:24; 27:10; 28:11; 29:2; 31:23; 33:3, 11, 13, 18-19, 23
**permitted** [5] - 7:19; 12:14; 15:7; 16:13; 33:8
**permitting** [1] - 28:6
**PERSICO** [1] - 1:6
**Persico** [3] - 1:16; 2:2, 10

**Persico's** [1] - 2:11
**person** [1] - 12:8
**personally** [1] - 8:10
**Ph** [1] - 1:22
**phone** [1] - 4:22
**phrase** [1] - 26:20
**Pierrepont** [1] - 1:13
**place** [1] - 4:7
**planned** [1] - 39:12
**Plaza** [2] - 1:13, 22
**plural** [1] - 7:15
**point** [22] - 3:13; 11:22; 16:17; 21:6; 22:17; 24:2, 8; 25:15, 17; 26:25; 28:22; 30:19; 32:17, 20; 33:25; 34:1; 35:3, 16; 36:1, 13
**Pontecorvo** [15] - 4:15; 6:13; 9:18; 10:6; 11:20; 14:4, 12; 19:13; 20:3; 21:13; 22:15; 23:25; 24:5; 27:22; 36:9
**portion** [1] - 32:3
**position** [5] - 12:3; 13:8, 21; 19:11; 34:17
**possibility** [1] - 11:11
**possible** [1] - 28:8
**possibly** [3] - 14:3, 11; 26:23
**posttrial** [1] - 38:10
**potential** [1] - 28:25
**precisely** [2] - 14:25; 28:19
**prepared** [6] - 6:18; 7:24; 8:11; 18:5; 19:21; 21:18
**presence** [1] - 37:17
**present** [2] - 5:23; 38:7
**Present)** [1] - 1:17
**presented** [1] - 3:2
**press** [1] - 4:9
**pretty** [3] - 5:20; 20:2; 36:22
**primarily** [2] - 4:5, 14
**primary** [2] - 5:8; 8:18
**probability** [1] - 30:3
**problem** [1] - 4:17
**proceedings** [1] - 38:2
**Proceedings** [1] - 1:24

**proceeds** [5] - 9:8; 10:2, 13; 15:19; 20:18
**process** [2] - 9:13; 36:4
**produce** [2] - 3:5; 17:1
**produced** [3] - 1:25; 29:12, 14
**producing** [2] - 4:17; 35:11
**proffer** [15] - 16:11; 23:4, 7, 9, 12, 14-16; 25:4, 18; 30:16; 31:22; 32:24; 33:1, 6
**proof** [1] - 10:21
**prosecutors** [2] - 29:2; 33:22
**prove** [1] - 26:2
**provide** [4] - 9:19; 20:11; 29:24; 34:12
**provided** [5] - 24:13; 30:20, 24; 31:7; 35:15
**provides** [1] - 18:17
**public** [1] - 39:24
**purpose** [2] - 6:5; 7:18
**purposes** [1] - 7:22
**put** [7] - 18:20; 22:12; 26:11; 31:2, 9; 34:4; 39:6
**putting** [3] - 11:18; 28:10, 16

**Q**

**questions** [3] - 5:12; 12:15; 22:4
**quickly** [1] - 39:22
**quite** [1] - 39:2
**quote** [4] - 7:13; 17:19; 31:8
**quote-unquote** [1] - 31:8
**quoted** [1] - 34:5

**R**

**racketeering** [1] - 15:19
**raised** [3] - 3:7; 4:21; 6:19; 7:5; 28:14
**raising** [2] - 10:25; 19:4
**ranks** [1] - 13:13
**rapidly** [1] - 39:23
**rather** [3] - 3:4; 17:9; 36:24
**read** [3] - 30:12, 15;

32:3
**readily** [1] - 36:7
**really** [6] - 4:13-15; 22:13; 32:10; 35:2
**reason** [2] - 21:20; 24:11
**reasoning** [1] - 31:6
**received** [1] - 4:22
**recently** [1] - 37:12
**recitation** [1] - 22:6
**recollection** [3] - 22:9; 23:13; 28:6
**record** [5] - 2:17; 5:9; 6:5; 26:22
**recorded** [1] - 1:24
**red** [1] - 8:24
**regarding** [2] - 4:21; 10:21
**regards** [2] - 9:17; 19:11
**regulations** [2] - 4:22; 5:7
**rehashing** [1] - 35:6
**relate** [1] - 4:10
**relating** [1] - 7:20
**relative** [1] - 5:21
**relevance** [3] - 16:18; 24:10, 12
**relevant** [4] - 4:11; 16:23; 24:18; 35:6
**relocation** [1] - 17:4
**rely** [1] - 22:19
**remand** [1] - 28:17
**remanded** [2] - 25:12; 36:25
**remember** [3] - 3:24; 4:3; 21:24
**remembers** [1] - 3:21
**reply** [1] - 39:18
**report** [1] - 19:21
**Reporter** [1] - 1:21
**reports** [1] - 20:15
**require** [2] - 8:13; 37:16
**required** [6] - 7:8; 17:1, 4; 34:10, 13
**requiring** [1] - 3:8
**respect** [3] - 12:7; 15:16; 22:21
**respond** [3] - 12:14; 24:19; 29:4
**response** [2] - 12:17; 26:17

**rest** [1] - 11:18
**result** [2] - 11:6; 33:14
**resulted** [1] - 30:4
**reveal** [2] - 14:21; 16:4
**revealing** [1] - 14:24
**reversal** [1] - 33:23
**review** [1] - 19:11
**rights** [1] - 3:8
**Rittweger** [10] - 17:14, 16; 28:22; 29:10, 12, 25; 32:1; 34:5; 35:23; 36:17
**RITTWEGER** [1] - 17:14
**RMR** [1] - 1:21
**ROBERT** [1] - 1:18
**Robert** [1] - 2:20
**Rodriguez** [7] - 24:21; 28:16; 29:20; 36:18
**ROSLYNN** [1] - 1:12
**rug** [2] - 9:6; 11:1
**Rule** [6] - 5:21; 6:20; 8:24; 22:18; 38:8, 22
**RUSSO** [12] - 1:18; 2:20; 4:1; 5:17; 9:4; 19:2; 26:16; 27:13; 36:14; 37:7; 39:1, 21

## S

**safe** [2] - 9:14, 24
**sake** [2] - 24:4; 33:12
**Sarita** [1] - 2:9
**SARITA** [1] - 1:16
**Saturday** [1] - 3:23
**saw** [2] - 9:25; 19:16
**schedule** [1] - 6:10
**scream** [1] - 5:25
**search** [1] - 36:3
**Second** [11] - 16:20; 17:18; 24:21; 25:6, 12; 30:7, 9, 19, 23; 31:1; 33:17
**second** [1] - 37:12
**Secondly** [1] - 16:5
**see** [6] - 2:8; 19:3, 21; 36:3; 38:6, 18
**seem** [1] - 12:19
**seize** [1] - 17:24
**sense** [1] - 20:9
**sentence** [2] - 7:13; 40:1
**sentences** [1] - 39:25

**seriously** [1] - 12:1
**served** [1] - 4:23
**Service** [1] - 17:5
**service** [1] - 4:24
**session** [13] - 16:11; 23:4, 7, 13, 15-16; 25:5, 18; 31:22; 32:24; 33:1, 6
**sessions** [1] - 23:9
**set** [1] - 38:16
**setting** [1] - 12:1
**several** [1] - 3:1
**SEYBERT** [1] - 1:9
**shocked** [2] - 3:4; 9:4
**show** [2] - 27:21; 30:23
**shred** [1] - 10:20
**sides** [1] - 39:12
**sight** [1] - 22:16
**signatory** [2] - 30:13, 17
**simply** [3] - 4:12; 5:12; 34:19
**Simply** [1] - 23:18
**sitting** [1] - 25:23
**situation** [7] - 17:22; 20:5; 21:5; 24:24; 25:1; 27:20; 31:6
**six** [1] - 3:6
**sneeze** [1] - 13:10
**sneezes** [1] - 24:7
**sole** [1] - 30:13
**someone** [1] - 21:19
**sometime** [1] - 14:5
**sorry** [1] - 10:24
**sort** [1] - 18:2
**specifically** [2] - 28:2; 33:6
**spent** [2] - 11:14; 18:21
**spite** [1] - 34:8
**spoken** [2] - 5:15; 12:9
**stacks** [1] - 30:1
**stand** [6] - 9:19; 14:4; 19:14; 23:2; 33:2
**started** [2] - 6:21; 30:21
**state** [1] - 2:3
**statement** [2] - 16:16
**statements** [2] - 19:25; 30:16
**STATES** [4] - 1:1, 3, 9, 12
**States** [4] - 1:5; 21:1;

**status** [1] - 5:23
**statutory** [1] - 39:24
**stenography** [1] - 1:24
**still** [4] - 6:20; 20:23; 31:14, 18
**stipulate** [5] - 7:7, 24; 8:11; 14:11; 21:18
**story** [3] - 14:19, 24; 23:1
**straightforward** [1] - 21:10
**stretch's** [1] - 28:7
**stretched** [1] - 10:6
**stretches** [2] - 19:17, 24
**struck** [1] - 12:23
**stumble** [2] - 15:24; 24:25
**stumbled** [1] - 31:8
**submission** [7] - 37:23; 38:4, 15; 39:7, 9, 18
**submit** [1] - 2:16
**submitted** [2] - 32:4, 18
**subornation** [1] - 27:10
**suborning** [1] - 29:3
**subpoena** [1] - 4:25
**subpoenaed** [3] - 3:1; 4:20, 23
**subpoenas** [1] - 3:2
**substance** [4] - 25:10; 29:23; 31:19; 35:21
**sufficient** [2] - 14:23; 36:2
**suggest** [3] - 8:8; 19:23; 21:2
**suggestion** [1] - 33:25
**suitcase** [1] - 19:16
**Suite** [1] - 1:22
**summation** [3] - 16:20; 24:14; 31:13
**summations** [1] - 18:22
**supervisor** [5] - 10:22; 13:11; 24:7; 26:18, 20
**supervisor's** [1] - 24:6
**supervisors** [1] - 19:19
**support** [3] - 13:7; 20:25; 33:24

**suppressed** [1] - 8:11
**surprised** [1] - 12:13
**sweep** [1] - 9:5
**sweeping** [1] - 10:25

## T

**table** [1] - 25:23
**tact** [1] - 16:1
**talks** [1] - 34:4
**tax** [4] - 7:8; 8:13; 10:8, 15
**taxes** [4] - 16:22; 17:9; 34:11, 20
**telephone** [1] - 4:5
**term** [1] - 27:12
**terms** [2] - 4:17; 20:9
**testified** [4] - 9:7, 12; 21:12; 22:15
**testify** [7] - 7:19; 12:23; 16:6, 8; 17:5, 13; 23:2
**testimony** [13] - 7:16; 8:1; 13:4; 14:16; 17:17; 19:10, 23; 20:4; 29:15; 30:11; 32:7, 13; 35:19
**THE** [51] - 1:9; 2:1, 7, 12, 17, 23; 3:11, 24; 6:24; 8:2, 15; 12:4; 14:3, 9, 11; 15:3, 9, 13, 17; 16:14; 18:10; 21:23; 22:2, 20; 23:10; 26:7, 9; 27:12; 29:8; 32:25; 33:4, 12; 35:7, 25; 36:8, 11, 17, 20; 37:3, 16, 25; 38:3, 11, 18, 25; 39:2, 5, 7, 9, 16, 22
**therefore** [1] - 31:2
**thinking** [1] - 27:14
**three** [2] - 25:23; 33:22
**tiptoes** [1] - 9:23
**today** [2] - 28:1; 39:5
**together** [1] - 29:18
**took** [1] - 23:12
**top** [1] - 15:16
**totally** [1] - 21:5
**Toughy** [8] - 3:7, 20; 4:13, 22; 5:7; 6:18; 7:17
**Transcript** [1] - 1:25
**TRANSCRIPT** [1] - 1:8
**trial** [31] - 6:20; 23;

7:2, 9; 8:5; 9:8; 11:4; 13:3; 15:21; 17:11; 20:8, 10; 21:5; 23:6; 24:14; 26:24; 27:14, 16; 28:20; 29:12; 30:8, 21, 24; 31:4, 8; 32:6, 9, 18; 33:14; 35:10; 40:1

**true** [1] - 23:1

**trustee** [1] - 30:14

**truth** [5] - 9:21; 10:6; 26:1; 32:22

**try** [3] - 20:11; 36:7; 37:1

**trying** [10] - 7:17; 9:5; 10:10; 17:23; 20:5; 24:23; 25:16; 26:3; 32:20

**turn** [2] - 10:7; 36:23

**turned** [1] - 35:10

**two** [15] - 4:15; 6:13, 22; 8:21; 9:7; 12:25; 15:15; 23:4; 26:23; 36:24; 37:20, 22, 24; 38:6, 19

**Two** [2] - 38:3; 39:5

**type** [1] - 11:15

## U

**unavailable** [1] - 5:2

**under** [8] - 9:6; 11:1; 14:25; 18:7; 22:18; 30:2; 34:13, 19

**understandably** [1] - 12:16

**unfortunately** [1] - 11:22

**UNITED** [4] - 1:1, 3, 9, 12

**United** [4] - 1:5; 21:1; 26:15; 33:7

**unless** [3] - 14:12; 16:11; 25:11

**unquestionably** [1] - 13:5

**unquote** [1] - 31:8

**untimely** [1] - 17:16

**untruthfully** [1] - 22:15

**up** [12] - 4:8; 11:5, 24; 13:1; 18:2; 20:4, 21; 23:2; 26:25; 27:24; 29:1

**US** [17] - 2:1; 8:12; 10:4, 22; 12:18; 13:10,

17; 14:8; 17:5; 19:20; 20:23; 21:15, 19; 26:19; 35:1, 9; 36:21

## V

**vacation** [3] - 37:7, 11; 39:14

**vacations** [1] - 39:12

**vague** [1] - 28:5

**various** [2] - 18:23; 38:9

**violation** [11] - 13:5; 17:19; 18:8, 10, 12-13; 20:8; 26:6, 10; 28:25

**virtually** [1] - 33:16

**voice** [4] - 4:8; 5:22; 6:15; 10:25

## W

**waived** [2] - 2:10, 13

**walk** [1] - 10:14

**Walsh** [22] - 4:15, 20, 23; 6:14; 7:4; 8:18; 11:19; 12:7, 9-10; 13:18; 14:1; 21:19, 22, 24; 23:14, 19; 24:5; 25:18; 33:7; 36:6

**wants** [6] - 13:18, 22; 21:16; 34:17; 38:15

**Washington** [1] - 3:19

**waste** [1] - 36:23

**week** [5] - 12:9; 29:12; 32:6; 37:12

**weeks** [6] - 37:23; 38:3, 6, 19; 39:5

**Westlaw** [1] - 30:1

**whatsoever** [5] - 6:5; 9:15; 17:19; 20:24; 22:14

**whole** [2] - 10:9; 11:2

**William** [1] - 15:19

**willing** [2] - 7:7; 16:8

**withheld** [2] - 8:10; 28:18

**withholding** [1] - 17:25

**witness** [21] - 11:5; 17:1, 3; 18:18; 20:11; 24:17, 24; 25:2-4, 8-9, 25; 28:6; 29:16; 31:23; 32:7, 14; 33:18; 34:3; 35:5

**witness's** [3] - 6:9; 13:4; 34:8

**witnesses** [23] - 3:1,

18; 4:7, 14, 16, 18; 5:24; 6:13; 9:7; 11:3, 8; 12:3; 14:16; 16:1; 17:1, 13; 18:3; 26:23; 29:2; 35:13, 19; 36:1; 38:21

**witnesses'** [2] - 7:15

**woman** [1] - 23:18

**worst** [1] - 20:5

**writing** [1] - 2:14

**wrote** [2] - 10:2; 16:23

## Y

**year** [2] - 8:20

**years** [2] - 8:21; 36:25

**yell** [1] - 5:25

**yesterday** [1] - 7:12

**YORK** [1] - 1:1

**York** [5] - 1:5, 14, 22; 9:13, 24